1

```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
                      Alexandria Division




------------------------------:
                              :
UNITED STATES OF AMERICA       :
                              :
                              :
      -vs-                     :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,              :
                Defendant.     :
                              :
------------------------------:
```




                    HEARING ON MOTIONS


                    September 25, 2009


               Before:  Liam O'Grady, Judge




APPEARANCES:

Ronald L. Walutes, Jr. and Stephanie B. Hammerstrom,
Counsel for the United States

Frank Salvato, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

2

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| ROBERT HICKMAN | | |
| | DIRECT | 39 |
| | CROSS | 54 |
| BRIAN WISE | | |
| | DIRECT | 76 |
| | CROSS | 78 |
| | REDIRECT | 84 |

3

1          THE CLERK:  Case number 1:09-cr-179, the United

2   States of America versus Mirwais Mohamadi.  Counsel please

3   identify themselves.

4          MR. WALUTES:  Good afternoon.  Your Honor.  Ronald

5   Walutes and Stephanie Hammerstrom for the United States.

6          THE COURT:  All right, good afternoon.

7          MR. SALVATO:  Good afternoon, Your Honor.  Frank

8   Salvato for Mr. Mohamadi, who is present.

9          THE COURT:  All right.  Good afternoon to you.

10          Good afternoon, Mr. Mohamadi.

11          THE DEFENDANT:  Good afternoon, sir.

12          THE COURT:  All right.  This comes on for motions.

13   I have read the papers and the cases.  There has been a little

14   time that has transpired.  So, if anything has changed in

15   them, please let me know.

16          The Government and Mr. Salvato, have you talked

17   about how you want to proceed this afternoon?  There may be

18   some evidentiary testimony required.

19          MR. SALVATO:  There will be.  Your Honor, I would

20   suggest we take the nonevidentiary motions first.  I think we

21   can work our way through those efficiently and then turn to

22   the evidentiary motions.  I know the Government has witnesses

23   here concerning the identification, the issue of the

24   suppression of the identification.

25          So, I would suggest we take the nonevidentiary

4

1    motions first.  Start with the identification motion, and then

2    kind of see where we go from there.

3            I would ask for a rule on witnesses when the hearing

4    proceeds.

5            THE COURT:  All right, that's fine.  Is the

6    Government agreeable?

7            MR. WALUTES:  Yes, sir.

8            THE COURT:  Let's do the nonevidentiary ones first.

9    And then if there is argument about whether we need witnesses

10   in certain of these other motions, we can get--  Where do we

11   stand on the motion for the bill of particulars?  You have

12   received discovery now.

13           What areas do you think are deficient so that a bill

14   of particulars is required under the case law?

15           MR. SALVATO:  Thank you, Your Honor.  I had my

16   papers in different order.

17           THE COURT:  You had them in a different order.

18           MR. SALVATO:  That's what Judge Bryan used to always

19   do to me, skip to the fourth one on my list.

20           With regard to the motion for a bill of particulars,

21   Your Honor, we have continued to receive discovery.  There is

22   an enormous amount of phone calls in this case, and we are

23   working our way through that.

24           Mr. Mohamadi has been real, has worked his way

25   through the phone calls as well as myself, but we have got, I

5

1    think as earlier indicated, hours upon hours of phone calls.

2            So, with respect to the bill of particulars, I think

3    the three points I would make is that Count 5 of the

4    indictment has not alleged with any specificity the type of

5    firearm that was involved in that, with regard to that

6    particular Hobbs Act allegation.

7            But I think most importantly, we have Count 8, which

8    as indicated in the pleading does not describe with any

9    specificity the person referred to as another who Mr. Mohamadi

10   allegedly caused to use the mail and telephone in committing

11   the crime charged.

12           And as to Count 9, we have a situation where we have

13   a six-month gap.

14           In order of importance, obviously the Count 8 and

15   the Count 9 in my view carry more importance to the

16   preparation of our defense than perhaps the particulars with

17   regard to the firearm.

18           So, we would ask for the Government to particularize

19   the indictment with respect to those three items.

20           THE COURT:  Okay.

21           MR. SALVATO:  Your Honor, if I could, I know we are

22   still arguing the nonevidentiary parts, but if I could ask for

23   a rule on witnesses.  There are several detectives here, and

24   some of the motions may spill over onto each other.

25           THE COURT:  All right.  Anybody who believes they

6

1    may be a witness in the case this afternoon, you are excused

2    at this time and we will call you when ready.  Please don't

3    discuss with anyone who has been in the courtroom what's going

4    on in the courtroom.

5              Thank you.

6              NOTE:  The witnesses in the case are excluded from

7    the courtroom.

8              THE COURT:  All right.  Who wants to address the

9    bill of particulars?

10             MR. WALUTES:  Your Honor, I have that.  Your Honor,

11   I guess I am a little confused.  As I understand, the only

12   thing that Mr. Salvato seeks is the identity of the

13   Government's witnesses.  And he is not entitled to that under

14   any case law that I am aware of.

15             THE COURT:  Well, he is going to get it if there is

16   Jencks material, correct?

17             MR. WALUTES:  He will, Your Honor.  He also may be

18   able to discern it from the Government's exhibits which will

19   be due very shortly, a week before trial.

20             So, he obviously is going to have it by the Jencks

21   material in advance of trial or by the exhibits by at least a

22   week before trial.

23             But I am not aware of a bill of particulars being an

24   appropriate vehicle by which to identify the Government's

25   witnesses, particularly in a case like this where there are

7

1    obvious considerable concerns as to safety.

2            THE COURT:  When is the Jencks material going to be

3    turned over?  Is it five days or three days?  I don't know

4    whether there is any order that was ever signed.  I thought

5    there was.

6            MR. SALVATO:  There was a discovery order signed,

7    Your Honor.  I am not--  I believe it was five days.

8            MR. WALUTES:  Three business days, Your Honor.

9            THE COURT:  All right.  Well, let's turn over the

10   Jencks five days before trial.

11           MR. WALUTES:  Business days, Your Honor?

12           THE COURT:  I am sorry?

13           MR. WALUTES:  It says three business days in the

14   order.  You said five.  I assume you mean five business days?

15           THE COURT:  Yeah, five business days.  We are going

16   to start on a Tuesday, is that right?

17           MR. SALVATO:  The 13th, correct.

18           THE COURT:  Yes, the 13th.  Let's turn it over five

19   business days in advance, given the number of counts and the

20   amount of discovery.

21           And the type of firearm--

22           MR. WALUTES:  Your Honor, the Government does not

23   know nor does the Government need to know.  We will prove that

24   there was an operable firearm, but the specific model of it we

25   don't know.  We do know it is a semiautomatic, it is not a

8

1  revolver, but beyond that we are unable to detail it.

2          THE COURT:  Okay.  And the six-month gap, I am not

3  sure I understood that.  Maybe it got lost in my reading.

4  Count 9.

5          MR. SALVATO:  There was, in Count 9 of the

6  indictment with regard to the witness tampering, there was no

7  allegation of a specific date or a narrow range of time.

8  Instead, I think Count 9 sets forth a span of about six months

9  where it is alleged Mr. Mohamadi attempted to persuade another

10  individual.

11          THE COURT:  Well, it is from on or about May to

12  December.  Well, again, you are going to get Jencks material

13  on that or--

14          MR. WALUTES:  He will, Your Honor.  And I will tell

15  you that the obstruction is occurring during those six months.

16  It is not as if the Government is trying to cloak some item.

17  There is a constant effort on Mr. Mohamadi's part to obstruct

18  that state proceeding which federal agents were observing in

19  the Circuit Court in Alexandria in December of 2008.

20          And so, it would start in May and go through

21  December.  But obviously once he has the Jencks now as the

22  Court has ordered five business days in advance, he will be

23  able to discern that as well.

24          THE COURT:  All right.  Then I am going to deny the

25  bill of particulars, finding that discovery is close to

9

1    complete and Jencks will be turned over five days, five

2    business days before trial.

3          If there are any matters, Mr. Salvato, that you

4    discover are missing and you can't work it out with the

5    Government, then you file an emergency motion and I will be

6    glad to hear that.

7          MR. SALVATO:  I will, Your Honor.  And I do

8    appreciate the five days.  The public defender had the case

9    before me and had endorsed the order and we were certainly

10   prepared to live with the order, but I think five days will--

11   And this trial, Your Honor, will be really a plethora of

12   recorded phone calls and just that type of detailed analysis.

13         So, the faster, obviously, the defense can get the

14   exhibit list, for example, which I understand will also be

15   provided shortly, and if the Government has it sooner, I will

16   take it sooner, that will really at least give me a breath to

17   be able to deal with what specific phone calls they are going

18   to use.

19         You have got hundreds and hundreds of phone calls.

20   So, the more specificity that the Government can give Mr.

21   Mohamadi in order to narrow his focus on those particular

22   phone calls, that would be extremely helpful and I think would

23   be constitutionally required for Mr. Mohamadi's defense.

24         THE COURT:  Well, I think there shouldn't be a whole

25   lot of surprises in this case.  And the way the Government has

10

1   laid out its indictment I think is pretty specific.  And

2   certainly the facts and the recital of the facts that they

3   have provided in responding to the motions also provides a

4   great deal of notice as to trial strategy by them.  And

5   hopefully that will be the case.

6          MR. SALVATO:  I believe so, Your Honor.  And, Your

7   Honor, I also would request, and I will certainly work it out

8   with the Government, there will probably be a whole bunch of

9   phone calls we will play in cross-examination.

10         So, I will try to work it out with their computer

11   person, especially during cross-examination.  There will be a

12   fair amount of cross-examination on other phone calls that Mr.

13   Mohamadi has had with witnesses and that type of thing.

14         So, hopefully we won't be any stop-and-start

15   situation.

16         THE COURT:  All right.

17         MR. SALVATO:  But I appreciate the five days, Your

18   Honor.

19         THE COURT:  All right.  You can pick the next

20   motion.

21         MR. SALVATO:  Your Honor, if I could take up the

22   motion to dismiss regarding interstate commerce.  That is a

23   motion to dismiss Counts 1, 2, 3 and 4 of the indictment.

24         And essentially the allegation or the argument there

25   is that there is a lack of federal jurisdiction as to those

11

1  counts due to on its face an insufficient effect on interstate

2  commerce on Counts 1 and 2.

3          As the Court knows and will become intimately aware

4  as we proceed through this case, this is a ten-count

5  indictment.  Counts 1 and 2 each charge a separate violation

6  of, called a Hobbs Act armed robbery.  And Counts 3 and 4 each

7  allege a separate provision of 924(c) based upon the two

8  alleged robberies in Counts 1 and 2.

9          So, this motion, Your Honor, encompasses Counts 1,

10 2, 3 and 4 of the indictment.

11          Your Honor, I am not going to belabor the pleadings,

12 but I think it is important to look at the history of the

13 Hobbs Act in terms of how, what was the initial purpose of

14 that act and sort of how this case could apply or not apply to

15 the Hobbs Act.

16          Your Honor, the Hobbs Act was passed in 1945, and

17 for about 23 years there was no published opinion from the

18 Supreme Court or any Circuit Court dealing with how the Hobbs

19 Act would apply to the circumstance of an interference with

20 commerce by robbery.

21          So, you have had about 25 years, 20-some years after

22 the passage of the Act where you really had an utter silence

23 as to whether the Hobbs Act was applicable to the type of

24 robbery that is alleged to be present in this case.

25          There was another passage of time before the Hobbs

12

1    Act began to be attempted to be applied to, I would consider

2    them smaller robberies that are typically prosecuted in state

3    court.  And the text of the Hobbs Act states in pertinent

4    part:  Whoever in any way or degree obstructs, delays or

5    affects commerce or the movement of any article or commodity

6    in commerce by robbery or extortion, or attempts or conspires

7    to do so, or commits or threatens physical violence to any

8    person in furtherance of a plan, shall be imprisoned, et

9    cetera, for not more than 20 years or fined or both.

10          The legislative history demonstrates that the Hobbs

11   Act was passed to address a very particular and specific

12   problem.  And that is that members of labor unions were

13   hijacking produce trucks carrying produce into union states

14   and then requiring nonunion drivers to pay a tribute in the

15   form of a union wage or allow the delivery.

16          And quite simply put, Your Honor, I would

17   respectfully suggest that the legislative history simply does

18   not support the Government's proposition in this case that the

19   Hobbs Act extends to prohibit purely local robberies.

20          And you have seen some support in the Lopez decision

21   from the Supreme Court about the impact on interstate commerce

22   and what is required.  And certainly the most that could even

23   be plausibly argued in this case, which we do not even believe

24   is present, is a de minimis impact on interstate commerce.

25   And I think consistent with Lopez, even a de minimis, or a de

13

1    minimis impact on interstate commerce is not sufficient.

2              Now, as to the robbery alleged in Count 1 of the

3    indictment.  As the Court can see from the indictment, the

4    allegation is that Mr. Mohamadi met with a woman named

5    Kimberly Riley.  She has indicated to the police, and there is

6    a police report attached to the motion, that she was robbed at

7    gunpoint after she and Mr. Mohamadi had spent more than two

8    hours together at a club.  There is no allegation that she

9    was, at the time she made the report that she was involved in

10   any prostitution or escort activities or anything like that.

11   And then we have the 924(c) related to that.

12             Count 2 alleges that Mr. Mohamadi obstructed

13   commerce by robbery in that he took personal property

14   belonging to a taxicab driver, who is identified in the

15   indictment by his initials as GH.

16             Your Honor, quite simply put, the alleged acts of

17   Mr. Mohamadi related to the victims' personal assets and

18   really had nothing to do with any impact, de minimis,

19   substantial as we believe the test should be, or otherwise on

20   interstate commerce.  And, obviously, Lopez is a Supreme Court

21   case which talks about substantially affecting interstate

22   commerce, obviously in a different context.  Lopez is cited

23   within our paperwork.

24             There is also other cases cited within the motion

25   that have indicated that it appears that the de minimis

14

1   approach of the past to interstate commerce jurisdictionally

2   is no longer good law.

3          Your Honor, there are some cases, and this is in

4   particular on pages 3 and 4 of our brief, which have

5   essentially found that there can be a situation where we have

6   an aggregate string of robberies that have a substantial or an

7   impact on interstate commerce.  For example, in Wang, which is

8   at 222 F.3d 234, Sixth Circuit 2000, that case is particularly

9   instructive because it goes through what types of

10  circumstances can have an impact and what types of

11  circumstances cannot.

12         But in Wang, as I indicated from the Sixth Circuit,

13  W-a-n-g, it was held that defendant's robbery of $4,200 from

14  individual victims, of which $1,200 belonged to the restaurant

15  owned by the victims, did not have sufficient impact on

16  commerce to support a Hobbs Act prosecution.

17         And you have seen, there are gigantic, humongous.

18  Enormous sentences that are possible with respect to two,

19  while serious, certainly de minimis state-related robberies,

20  along with 924(c) counts where there is no firearm, you have

21  the possibility of Mr. Mohamadi facing upwards of close to a

22  life situation just based upon those allegations.

23         The one robbery of the cab driver was prosecuted in

24  state court.  Mr. Mohamadi had a hung jury during that

25  proceeding.

15

1           But I would at this time, and I appreciate the

2    Court's patience as we work through some of those issues, ask

3    to dismiss for lack on its face of an impact on interstate

4    commerce, Counts 1 through 4.

5           THE COURT:  Thank you.  The Government want to be

6    heard?

7           MR. WALUTES:  Your Honor, I am not sure why we have

8    to go back 45 years.  The Fourth Circuit ruled in Williams in

9    2003 that the robbery of a drug dealer of $1,000 was

10   sufficient.

11          Here we have a prostitute who the defendant hires

12   and retains over the Internet and then confirms an appointment

13   using the cell phone and convinces her to come from Maryland

14   to Virginia and then takes her to D.C.  So, you have three

15   jurisdictions he has taken her.  She is then robbed of several

16   thousand dollars, which is multiples of what Williams said was

17   sufficient.

18          You then have him taking, very short distance, less

19   than a block, a taxicab, driving around the District of

20   Columbia and returning back to Virginia to his original

21   departure point, and in that case taking the entire proceeds

22   of a taxicab driver who was operating interstate.

23          Your Honor, these are not difficult, we would argue.

24   The Fourth Circuit is right on point.

25          And the statute itself, as Mr. Salvato correctly

16

1    points out, says in any way or degree.  It is at its heart two

2    very interstate, they are crossing the state lines, and he is

3    cleaning out sole proprietors.  And the fact that the first is

4    a prostitute, I think the fact that Williams has directly

5    addressed the issue of a drug dealer I think creates no issue.

6            As far as the deadlock in the state trial, the

7    Government is going to prove in this trial that that case was

8    obstructed with false testimony.  So, I wouldn't put much

9    weight on that.

10           It is a mandatory ten years, as I understand it, in

11   state court for armed robbery for each one.  So, I am not

12   quite sure after Booker how this Court--  Mr. Salvato can make

13   these arguments at a different time, but I don't think they

14   are appropriate in a nexus motion.

15           MR. SALVATO:  Your Honor, just a couple of comments

16   with regard to the Williams case.  Obviously, Congress has

17   indicated that drug dealing--  And I think in that case if I

18   recall correctly, it was actually a murder of a significant

19   narcotics dealer.  I think Congress has specifically indicated

20   that that would have or does have an impact on interstate

21   commerce.

22           Here you have a prostitute that is alleged to have

23   been hired over the Internet on Craigslist who initially, I

24   believe, indicated to the authorities the theft of

25   approximately $700, and now that has morphed into over $2,000.

1           So here, respectfully submitted, you have a

2    prostitute on Craigslist who has at least initially indicated

3    a $700 loss.  And I just don't see how that should subject Mr.

4    Mohamadi to the types of penalties that he would be subjected

5    to otherwise.

6           THE COURT:  All right.  Thank you.

7           Well, I think Judge Wilkinson in the United States

8    versus Williams case, which is a 2003 case, has analyzed the

9    Hobbs Act application and the interstate commerce nature and

10   requirements, and considered the Lopez case and also the

11   United States versus Morrison that talked about the minimal

12   effects standard, and identified that the Hobbs Act only

13   requires a minimal effect on commerce.  And that the economic

14   activity need not be substantial.

15          And under the facts of this case, clearly there is

16   the necessary minimal contacts and impact that are

17   sufficiently pled in the indictment itself.  And certainly

18   it's a jury issue ultimately as to whether there is interstate

19   commerce.  And that the jury will have the opportunity to

20   consider that element of the offense of the Hobbs Act, but I

21   think that has properly been pled as affecting interstate

22   commerce.

23          So, I will deny the motion to dismiss those counts

24   on that ground.

25          Let's talk about the joinder of the multiple events.

18

1   You know, I have looked at the cases pretty closely and I will

2   hear anything, but I don't want to prolong this.  I really

3   don't think that there is any legitimate argument to preclude

4   the Government from choosing to prosecute these cases

5   together.  Clearly there is a tremendous overlap of the facts

6   of the cases, the motive, theory, et cetera, timing of most of

7   them, but I will give you the opportunity to convince me I am

8   wrong, Mr. Salvato.

9           MR. SALVATO:  With that introduction.

10          THE COURT:  Yes.

11          MR. SALVATO:  And as I indicated to Mr. Mohamadi

12   with respect to that motion on the effect on interstate

13   commerce, there still remains, obviously, jury issues with

14   regard to that.  And we will submit jury instructions with

15   respect to our view of what the impact need be on interstate

16   commerce.

17          Your Honor, on the motion to sever counts.

18   Obviously, severance is controlled by Rules 8 and 14.  And I

19   will rest on the pleadings as far as argument on Rule 8.  But

20   turning the Court's attention to Rule 14, I think that is

21   particularly applicable with regard to this case.

22          Rule 14 states:  If the joinder of offenses in an

23   indictment appears to prejudice a defendant or even the

24   Government, the Court may order separate trials of counts or

25   provide any other just relief.

19

1          Obviously, that is a matter committed to your sound

2     discretion.  And, Your Honor--

3          THE COURT:  Has there been any kind of attempt to

4     negotiate that out?  Have that decided by the Court instead of

5     a jury?  Or have a stipulation as to the prior conviction?

6     Which would at least minimize the prejudice.  I mean, that has

7     been the remedy in virtually every case I have been involved

8     in where this comes up.

9          MR. SALVATO:  And if the Court denies the motion,

10    obviously, we will pursue that reasonable approach in terms of

11    trying to minimize any damage.

12         But the problem I think quite simply put, and I am

13    not going to belabor that given the Court's initial feeling

14    after review of the pleadings, but this is really the type of

15    case where jury instructions are just, in my humble view, not

16    going to be good enough to tell this jury, well, you have to

17    consider everything separately.

18         You have got a case where you are going to have one

19    victim of a robbery with an identification that's at least led

20    to a hung jury in state court.  And certainly that wasn't the

21    strongest case in the world, I would submit.  That case was

22    tried in the Alexandria Circuit Court.

23         And that witness' pointing out of Mr. Mohamadi in

24    the courtroom is going to be, in the Government's view, even

25    though the jury is going to be instructed to keep them all

20

1    separate, is going to be supported or corroborated by Ms.

2    Riley, who is then going to come in, again based upon a shaky

3    identification where she initially saw just one photo of Mr.

4    Mohamadi as it slipped out of the detective's file, that

5    causes great concern in terms of prejudice.

6              And then you have got a situation where the

7    Government had at least some hand in having an informant visit

8    the jail to talk to Mr. Mohamadi about alleged efforts about

9    these particular witnesses.

10             So, you really have the situation where it is an

11   impossibility in my view for the jury to keep all of that

12   separate and independent and give individual consideration to

13   each charge.

14             So, finally, Your Honor, as indicated in the

15   pleadings, I think there will be a situation where Mr.

16   Mohamadi would probably testify as to some counts, but not

17   other counts.  And, obviously, he is then left with the choice

18   of testifying as to some, not testifying as to others.  I

19   would expect that he would testify with regard to the

20   solicitation counts and at least one of the robbery counts,

21   but he may not be in a position to testify about the witness

22   tampering counts.

23             So, now we are in a situation where Mr. Mohamadi is

24   only testifying as to some and not others.  And I think that

25   certainly has been held under the case law to be a prejudicial

21

1    situation.

2           So, I would ask the Court pursuant to the pleadings

3    to separate these charges in the way that is set forth on the

4    first page and really the last page of the pleadings.  To

5    separate this into several trials.  Counts 1 and 3.  Counts 2

6    and 4.  Count 5, which is the possession of a firearm by a

7    convicted felony.  And then the various witness tampering at

8    the various situations with regard to the cab driver, at the

9    very minimum.  Or in the alternative, I think that the Counts

10   1 and 3 as they relate to Kimberly Riley should clearly be

11   severed out.

12          The solicitations and what not, and I know the

13   Government will argue consciousness of guilt and everything

14   like that, and we all familiar with that, but Counts 1 and 3

15   with regard to Ms. Riley, those really do sound and seem

16   completely separate and distinct.  And just the fact that they

17   may have happened or be alleged to have happened back to back

18   I don't think is good enough under the case law.

19          So, we would ask for it to be severed out the way it

20   is set forth in the pleading, but at the very least that

21   Counts 1 and 3, given the shaky identification situation, be

22   severed out and set for a separate trial.

23          THE COURT:  All right, thank you.

24          MR. WALUTES:  Your Honor, it's unfortunate with the

25   several months the Court afforded Mr. Salvato to make an

22

1    appearance in this case, he wouldn't seek to modify the motion

2    to articulate some conflict he perceived in having Mr.

3    Mohamadi testify in a partial fashion.

4            I am not aware of any condition under which the

5    Government could not cross-examine this defendant on every

6    count.

7            The point is that all the evidence is admissible

8    under 404(b) if they were severed under a common scheme, plan

9    or identity.  The first robbery occurs in sequence by time

10   chronologically of Ms. Riley.  There is a fingerprint on her

11   door of the passenger car where he is robbing her.  And that

12   gun is cocked in front of her so she sees the chamber bring a

13   round up into it.

14           You have her testimony as seeing a bullet in the

15   gun.  You have his fingerprint.  You have her identification

16   not only by face, but also by body because it is a unique

17   opportunity to see the whole body with the tattoos.

18           He then walks within a couple minutes, he is only

19   half a block away, flags a taxicab down.  And then you have

20   the second robbery begin.  But the same gun is being used in

21   both.  You have identity.

22           404(b) would allow all this in.  There is no way to

23   bifurcate it.  If you did, the evidence would be allowed in.

24   If he chose to testify in the first case and the second, we

25   would get the same evidence in and we would have the same

23

1    cross-examination.

2          I believe it to be a red herring.  And it's

3    unfortunate that Mr. Salvato believes there is some case law

4    that I am not familiar with, that he wouldn't have added it in

5    the extra few months that he has had since we tried to try

6    this case in the summer.

7          THE COURT:  That's the problem with a severance

8    motion is that the offenses are separate.  The conduct is a

9    continuous course of conduct as alleged in the indictments,

10   and that the same evidence would come into each of the severed

11   trials.  So, the prejudice wouldn't be reduced in any

12   significant way, if at all.

13         And then if you weigh it against, as you do in Rule

14   8 and 14, judicial economy and the Government's interest and

15   the interest in having the case handled expeditiously, then

16   clearly the severance for prejudice just carries very little

17   weight given that the same evidence would have to you put into

18   either one trial or three trials.

19         And I think that given that these offenses have a

20   logical relationship, they are intertwined, there is 404(b)

21   evidence if it is not direct evidence, and the course of

22   conduct, they should be tried together.

23         So, the motion to sever out any of the counts is

24   denied.  And I encourage you to work on some type of

25   stipulation as to the prior convictions so that impact can be

24

1    minimized.

2              But I also think that we are very fortunate and Mr.

3    Mohamadi is very fortunate in that we have a very bright jury

4    pool, and that they will be able to differentiate the

5    testimony and its relevance to the different counts.  And if

6    they are told to consider it only for one count, that they

7    will do so.

8              So, as I indicated, I will deny the motion.  With

9    all of these, the exception is noted.

10             All right.  What did you want to do next?

11             MR. SALVATO:  Thank you, Your Honor.  Your Honor,

12   just I would like to proceed to the motion to dismiss

13   regarding venue, if I could.  Which is some of the same themes

14   that the Court has heard.

15             And I would also note that Mr. Mohamadi and myself

16   have been working diligently with respect to digesting all of

17   these tapes.  He is in Northern Neck two-and-a-half hours

18   away, and we have been working diligently to prepare.  As

19   situations arise, we will obviously bring them to the

20   attention of the Court.  But Mr. Mohamadi has been diligent,

21   patient with counsel, and decent in terms of working with

22   counsel in order to prepare.

23             Obviously, final decisions on whether a person is

24   going to be testifying sometimes don't happen until the trial

25   itself.  So, we will obviously move as expeditiously as

25

1    possible.  And if beforehand we see a specific issue that he

2    may want to address with regard to one count that may cause a

3    severance, we will bring it up before the trial or as soon as

4    we can.  But we have been working very diligently concerning

5    the enormity of the discovery in this case.

6            Your Honor, on the motion to dismiss regarding

7    venue, that only deals with Counts 1 and 3 of the indictment.

8    Again, as I said, this is, for lack of a better term, the

9    Riley allegation.

10           In her statements to the police, she alleges that

11   she was robbed at gunpoint in Washington, D.C.  And no crime

12   of violence or robbery or anything like that ever occurred

13   with regard to those allegations anywhere other than

14   Washington, D.C.

15           The Court is familiar with the <u>Bowens</u> case, which is

16   a Fourth Circuit case.  <u>Villarini</u>, which I believe is also,

17   yeah, a Fourth Circuit case from 2001.  And the emphasis of

18   those cases or the holding of those cases, I would submit, is

19   that venue on a count of an indictment is proper only in a

20   district in which an essential conduct element of the charged

21   offense took place.

22           So, it is an essential element test.  It is the

23   essential elements of that offense which are critical to the

24   analysis of this motion, not the circumstances element.  In

25   other words, the background circumstance or the underlying

26

1  circumstances.

2        As you can see in the report that is attached to

3  that motion, Your Honor, you have Ms. Riley, this is the

4  incident report prepared by the Alexandria Police, Ms. Riley

5  said, third paragraph down, that she and Omar, she called the

6  person that was with her at that time, traveled in her car to

7  a club in Washington, D.C.  And then at that point she

8  indicated that the person who was along with her produced a

9  small black handgun.  She said that Omar told, it should be

10  him, but told her the money, which she provided him,

11  approximately $700 at that time.  Apparently she did go to the

12  D.C. police.  She went to the Maryland police.  And then

13  eventually the case found its way to this federal prosecution.

14        So, Your Honor, there is simply--  I know the

15  Government is going to argue, well, this is some continuing

16  offense, but I think that that flies in the face of what the

17  Fourth Circuit ruled in Bowens and Villarini with respect to

18  the essential conduct elements.

19        And really, this is a D.C. only act case.  It is

20  alleged to have been a crime, is a D.C. act.  And you have got

21  a robbery in D.C.  That's where the robbery took place.  You

22  have got an allegation of a gun used in D.C.  And there is

23  simply nothing at all with regard to Counts 1 and 3 that

24  justifiably connect those counts to the Eastern District of

25  Virginia.

27

```
 1              THE COURT:  Okay.

 2              MR. WALUTES:  Your Honor, they traveled in Ms.

 3    Riley's car.  And so, the gun the defendant brought was

 4    brought from Virginia where they met and began their contact

 5    together.

 6              And so, the armed element, and in fact the tool used

 7    to commit the robbery begins in Virginia.

 8              The Government cited a Fourth Circuit case which

 9    said that a Hobbs Act in using explicitly, there is nothing in

10    the defense motion discussing Hobbs Act defenses, said a Hobbs

11    Act could be wherever the event is occurring.  And certainly

12    the gun is taken from Virginia.

13              The second point the Government would make, and I

14    will stop there, Your Honor, is that the relationship with Ms.

15    Riley was basically an hourly type relationship.  It would

16    have been much cheaper for the defendant to have negotiated a

17    series of hours.  He did it in an hourly sequential fashion

18    which becomes far more expensive.

19              Of course, he didn't care because he had the intent

20    from the inception to rob her and take all of his money back

21    at the end plus whatever she had made earlier in the day.  The

22    point the Government makes is that the plan to rob a

23    prostitute is in Mr. Mohamadi's head when he takes his gun and

24    when he is only using an hourly rate starting in Virginia.

25              THE COURT:  Well, I think it is sufficiently pled to
```

28

1   have the case tried here.  And again, this is an issue that

2   the jury will decide, and they will look independently at

3   venue and listen to the facts as they come into the case.

4           And certainly at the end of the case if the

5   Government has failed to prove venue, then the defendant will

6   have an opportunity to file a motion for judgment of acquittal

7   at that time after the Government has finished the rest of its

8   case.  But I will deny the venue motion at the present time.

9           The Speedy Trial.

10          MR. SALVATO:  Speedy Trial.  Your Honor,

11  essentially, the procedural nature of the Speedy Trial

12  violation is set forth in the pleadings, so I won't reiterate

13  that.

14          But the allegations here in fact made the 26th,

15  27th, I think I might be a day or so off in 2007, and the

16  factual history of the Speedy Trial violation is contained

17  within that.

18          You have got, what that motion really comes down to

19  is you have got two witnesses that were in the same apartment

20  complex where the alleged assailant of the cab driver fled to.

21  And those two witnesses indicate that at the very same time

22  that the alleged assailant was fleeing into the apartment

23  complex, that they encountered a gentleman who is really the

24  complete opposite of a physical description of Mr. Mohamadi,

25  banging on their door, making some escaping motions from the

29

1    ensuing--

2            THE COURT:  As I understand it, you have the

3    information that the husband and wife in the one apartment

4    couldn't identify--  They had seen the person that they

5    believed was in 117 prior and could describe that person, but

6    they couldn't describe the person who was banging on their

7    door because they couldn't see whether it was the same person

8    or someone else.  They were looking through the peep hole and

9    they could not identify that person.

10           So, we have got two different issues.  One is

11   whether they could describe Mr. Mohamadi as the person who

12   resided in 117 accurately or not, but the issue as to whether

13   they could identify the person who was knocking at the door is

14   a separate issue.  And I think the reports at least indicate

15   that they didn't get a look at that person.

16           MR. SALVATO:  If I could confer with Mr. Mohamadi,

17   he wanted to inquire about one issue.

18           THE COURT:  Certainly.

19           MR. SALVATO:  Your Honor, I think Mr. Mohamadi's

20   recollection was the same as mine.  I wanted to make sure we

21   were correct on this, the fact.  I think there is a total of

22   about eight police reports about the incident.

23           THE COURT:  Okay.

24           MR. SALVATO:  There is a police report indicating

25   that the husband came out during the canvass and said that

30

1    there was a black male that was just at his door.

2         So, I think that the husband was able to identify a

3    person that is obviously dramatically different than Mr.

4    Mohamadi's appearance.

5         I believe the wife, and this is where our

6    misapprehension may come about, I think the wife came out and

7    said, well, I wasn't able to see what he looked like.

8         And then there were some other police reports about

9    the person next door, as the Court has referenced.  But there

10   was a very direct indication according to the Alexandria

11   police that the husband came out and gave a description of a

12   black male that was the one who was outside his door trying to

13   gain entry.

14        THE COURT:  Okay, thank you.

15        MR. SALVATO:  So, I would just note, Your Honor, and

16   obviously with regard to the pleadings, whether it is a due

17   process or a Speedy Trial and all of that is, obviously I am

18   not going to go through all that, the Government I think, if

19   my recollection is correct, had offered to stipulate to that

20   report or stipulate to the police officer's testimony.  And

21   the Court can clearly preview what I am going to say is that

22   the stipulation, especially with a critical issue as to this,

23   is not going to be sufficient to really present that testimony

24   to the jury.

25        Considering our multiple counts, our multiple

1    robberies, our multiple victims who are going to come in and

2    point the finger at him, the issue about identification is

3    critical.

4         I understand that the Alexandria Commonwealth's

5    Attorney indicated to defense counsel at that time that these

6    individuals had moved and nobody can locate them.  And that

7    remains the circumstance now, is that nobody is able to locate

8    these individuals.

9         So, based upon that delay, and all the case law

10   comes down to prejudice, every motion I have ever had with

11   respect to any Speedy Trial violation, whether it is 3161 or

12   it is under due process or Barker versus Wingo situation, has

13   all come down to prejudice.  And there can really be no

14   clearer prejudice than an eyewitness from that location at

15   that time who has specifically described somebody who is

16   inconsistent with Mr. Mohamadi.

17        THE COURT:  All right, thank you.

18        MR. WALUTES:  Your Honor, there is no Speedy Trial

19   violation.  There are separate sovereigns.  I appreciate the

20   Court's trying to shortcut--

21        THE COURT:  I think the United States versus

22   MacDonald and the Fourth Circuit cases that follow are clear

23   from a Speedy Trial standpoint.  This is a federal offense,

24   that was a state action.  The due process prejudice based on

25   unavailability of witnesses is a slightly different issue.

32

1          MR. WALUTES:  The point I would make there, Your

2    Honor, is I am not sure Mr. Salvato has made any effort at all

3    to find them.  He obviously has their names.

4          I will tell you that we have started to make some

5    efforts because we believe the evidence will be inculpatory,

6    not exculpatory.  We actually attached the police report to

7    the Court to make that point more forcefully.

8          And we hope to be able to serve and bring those

9    witnesses to trial because we are not only not afraid of their

10   testimony, we are actually are seeking it affirmatively.

11         I am not sure that Mr. Salvato has made any effort

12   whatsoever to contact those witnesses.  I would be interested

13   to hear.

14         THE COURT:  If I recall the case law correctly, it

15   requires the defense to make the effort and not sit back and

16   not do anything.

17         So, I will deny the motion without prejudice.  Mr.

18   Salvato, you can bring it up in limine before trial if you

19   think you have the evidence to do so.

20         MR. SALVATO:  I will, Your Honor.  I can tell the

21   Court that there have been investigative efforts all the way

22   dating back to the state court case to locate these

23   individuals.

24         If Mr. Walutes is successful, obviously, he has a

25   few more resources available to him.  If he is available to

33

1    locate these witnesses, we will certainly address that issue

2    with the Court, if the Court needs further argument or

3    anything else submitted with regard to that.

4              THE COURT:  Okay.

5              MR. SALVATO:  And perhaps if we are still, if the

6    situation remains, obviously, I will renew the motion.  And

7    then we would have to take up at that point whether we could

8    call the Alexandria police officer or submit his report or

9    something along those lines.  That is a critical issue for Mr.

10   Mohamadi.

11             THE COURT:  All right, I understand.  And we will

12   review it pretrial if we can't get an agreement between the

13   parties.

14             How about the surplusage?

15             MR. SALVATO:  I will rest on the pleadings on that,

16   Your Honor.  That relates to what is found in the indictment.

17   I forget the Court's practice with regard to sending back the

18   indictment or not.

19             THE COURT:  I normally do.  And I redact it as

20   necessary to conform to the evidence in the trial.  But, you

21   know, certainly in this case the victim KR in Counts 1 and 3

22   referred to Mr. Mohamadi as Omar.  And then there is also

23   reference to O.  And, you know, the cards, et cetera, and the

24   text messages using O instead of any other term to identify

25   Mr. Mohamadi, at least the allegations are that it was towards

34

1    Mr. Mohamadi, would indicate that it is not just surplusage

2    for purposes of establishing prejudice.

3         If it turns out the evidence doesn't conform to

4    that, then certainly any indictment that went back to the

5    jury, that would be redacted.

6         MR. SALVATO:  Your Honor, and more particularly, and

7    we can address this issue at trial, and I don't want to

8    belabor it at this point, but the possession of a firearm as a

9    convicted felon in Count 5, the indictment lists the 1998

10   robbery, all of which were felonies.  And obviously that is

11   going to be something that we would have to address before

12   that indictment went back to the jury in the event Mr.

13   Mohamadi didn't testify.  Or even if he did testify, if we

14   made a motion in limine with respect to that.

15        So, other than the Omar or the O, we have a

16   significant issue with regard to the possession of a firearm

17   by a convicted felon, that portion of the indictment.

18        THE COURT:  Okay.  If you can't work it out, then we

19   will deal with it.  It looks like we will be getting together

20   the Monday before the Tuesday trial probably to resolve some

21   of this so that we don't delay a jury.

22        MR. SALVATO:  That may be a holiday, Your Honor.

23        THE COURT:  Oh, it is a holiday, you are right.  All

24   right, then we will be getting up a little early.

25        MR. SALVATO:  Or we could--

35

1           THE COURT:  Or the Friday before.

2           MR. SALVATO:  Or we could set something the Friday

3    before.  I have a matter before Judge Cacheris, so that may be

4    a good opportunity to see where we stand.

5           THE COURT:  Let's keep that date open.  Are you

6    available?

7           MR. WALUTES:  Your Honor, I would ask instead of

8    five business days, if the Court would allow the Government to

9    have the Jencks be consistent with the production of evidence

10   and the jury instructions so that everything is due for us a

11   week before trial.  I had forgotten when you said the five

12   days, that we had Monday as Columbus Day.

13          So, if we give the Jencks then, defense counsel

14   would have all the exhibits, would have all the Jencks and he

15   would have the Government's view of the jury instructions as

16   well all a week prior to trial.  If that's agreeable with the

17   Court.

18          Otherwise, five business days would put me at the

19   Monday before I actually would have to give Jencks before I

20   would have to file the exhibits.

21          THE COURT:  Yes, let's make it all available

22   Tuesday, that's fine.

23          MR. WALUTES:  Thank you, Your Honor.

24          MR. SALVATO:  Tuesday, the 6th?

25          THE COURT:  Tuesday the 6th.

36

1          MR. SALVATO:  Yes, that was my understanding of the

2     Court's ruling.

3          THE COURT:  Yes, I missed that day as well.

4          MR. SALVATO:  Your Honor, I think we are down to the

5     suppression of the identifications.  I think there are, the

6     Government has witnesses with respect to that.  I don't think

7     there are any nonevidentiary motions that are remaining.

8          THE COURT:  Okay.  Now, as I understand it, there

9     was a trial in the City of Alexandria.  The cab driver

10    testified, he was cross-examined.

11         Do you want to rehear the police officer testifying

12    about the identification at this stage?

13         I don't think any testimony is necessary as to the

14    cab driver.  You can try to convince me that I am wrong, but

15    the reason to put on an evidentiary witness is to explore the

16    nature of the identification, whether it is reliable, it's

17    unreliable, whether the photo array was in some way

18    prejudicial.  And all that has been explored in the state

19    court and you have a record of that.

20         Mr. Salvato, tell me why any witness and evidentiary

21    hearing is required as to the cab driver?  What do you not

22    have and what hasn't been explored that you think is going to

23    weigh on my decision?  I haven't reviewed that testimony, but

24    I am sure I am going to hear about it.

25         MR. SALVATO:  And I did not represent Mr. Mohamadi

37

1    during that.

2            THE COURT:  I understand.  Is there a record of that

3    testimony?

4            MR. SALVATO:  I believe there is a record of that

5    testimony.

6            THE COURT:  All right.  Do you have that?

7            MR. SALVATO:  I do have that, Your Honor.

8            THE COURT:  All right.  Then where is that deficient

9    in at least getting--  I mean, the issue is whether I would

10   preclude the identification before there is an opportunity of

11   the witness to come forward and be allowed to identify the

12   witness.  And then be subject to your cross-examination.

13           MR. SALVATO:  Well, if we are just dealing with the

14   cab driver, Your Honor--

15           THE COURT:  Cab driver only.

16           MR. SALVATO:  Certainly to some extent, and that

17   matter has been hashed out, certainly to some extent, and

18   since the Government has made the argument that this is a

19   separate sovereign, independent, I think this Court has to

20   make an independent evaluation about whether those procedures

21   were suggestive or were not.

22           And I am not sure whether that was brought up in a

23   pretrial motion or that was simply something that was dealt

24   with, that was dealt with by a pretrial motion in state court

25   as far as the identification procedures.

38

1          But, obviously, that this Court does have to make, I

2    would submit, an independent determination.  This Court may,

3    obviously, take a different view than a state court judge did.

4    There are several different identifications.

5          THE COURT:  Well, I guess I phrased my question to

6    you a little bit poorly.  I don't deny that I need to make an

7    independent judgment.  I am just asking why you think it's

8    necessary for me to make a pretrial judgment versus--  Well, I

9    guess what I am asking is if you have looked at that prior

10   pretrial hearing and the testimony and you think that there

11   are still issues, then we will put the witness on.

12         But just putting the witness on for discovery

13   purposes and see how the witness testifies against your

14   examination versus someone else's is not really an efficient

15   use of the Court's time, is I guess what I am really getting

16   at.

17         But if you want the witness to testify, I do need to

18   make an independent determination if you request that I do so.

19         All right, let's do the identifications of the

20   victims in Counts 1 and Count 2.

21         Mr. Walutes, do you want call a witness?

22         MR. WALUTES:  Your Honor, the Government would call

23   to the stand Detective Robert Hickman.

24         Your Honor, I would note just to supplement the

25   Court's thinking, the taxicab driver appeared both at the

R. Hickman - Direct

39

1    preliminary hearing and at trial and identified in court the

2    defendant because the state system requires the victim to

3    appear at the preliminary hearing personally.

4            THE COURT:  Is that right?

5            MR. WALUTES:  So, there have been two in-court

6    identifications by the taxicab driver.

7            THE COURT:  When did that law change?  I should

8    probably have been aware of that--

9            MR. WALUTES:  I never practiced in the state.

10           THE COURT:  I wasn't--

11           NOTE:  The witness is sworn.

12           MR. WALUTES:  May I proceed, Your Honor?

13           THE COURT:  Yes, sir.

14           ROBERT HICKMAN, called by counsel for the United

15   States, first being duly sworn, testifies and states:

16       DIRECT EXAMINATION

17   BY MR. WALUTES:

18   Q.   Good afternoon, sir.

19   A.   Good afternoon.

20   Q.   Would you please tell us your name.

21   A.   Robert Hickman.

22   Q.   And how are you currently employed?

23   A.   I am a detective with the Alexandria Police Department.

24   Q.   How long have you been with the Alexandra Police

25   Department, sir?

R. Hickman - Direct

40

1    A.    22 years.

2    Q.    Did you have occasion to assist in the investigation or

3    to lead the investigation of a robbery of a taxicab driver

4    that occurred on May 27 of 2007?

5    A.    I did.

6    Q.    2007?

7    A.    I did.

8    Q.    Thank you.  And in the course of that investigation, did

9    you also become aware of a robbery that had preceded that

10   robbery of a prostitute, someone by the name of Ms. Riley?

11   A.    Yes, I did.

12   Q.    And that would have actually begun on May 26, 2007, the

13   day before, the night before, would that be correct?

14   A.    That's correct.

15   Q.    Would that be the Memorial Day weekend of 2007?

16   A.    I believe it was, yes.

17   Q.    Did you have occasion to interview the taxicab driver?

18   A.    I did.

19   Q.    I wonder if you might briefly describe the opportunities

20   the taxicab driver had to observe, if any, the person that he

21   alleged had perpetrated a robbery on him?

22   A.    Well, he picked the fare up, the suspect up at DuPont

23   Circle and was asked to take him off of Duke Street in

24   Alexandria.

25             So, the taxicab driver started the fare towards Duke

R. Hickman - Direct

41

1    Street in Alexandria.   There was some communication between

2    the suspect and the driver along the trip.   At one point the

3    suspect asked the driver to take him into Georgetown.

4            So, the cab driver changed the route, took him into

5    Georgetown.   He said that the suspect got out of the car and

6    just approached a couple people for a short, you know, minute

7    or two and then came back to the cab and again asked him to

8    take him to Duke Street in Alexandria.

9            At that point the cab did go towards Alexandria and

10   ended up in the EOS 21 property, which is off of Duke Street

11   off Van Dorn Street.

12           During the trip the suspect asked to borrow, or

13   actually I believe physically took the victim's cell phone and

14   made a cell phone call on it.   And there was conversations

15   concerning the suspect's heritage that he had with the cab

16   driver.

17           So, there was throughout the ordeal leading up to

18   the robbery from the time the fare was actually picked up

19   until the actual robbery itself, there was some communication

20   back and forth between the cab driver and the suspect in the

21   back.

22   Q.   You said there was some discussion of ethnicity.   Did

23   this person, the fare actually say what his ethnicity was to

24   taxicab driver?

25   A.   He told the cab driver that his father was from

R. Hickman - Direct

42

1  Afghanistan.

2  Q.   At some point did you have an opportunity to create a

3  photo spread in this case?

4  A.   I did.

5  Q.   And if I could hand you, with the assistance of the Court

6  Security Officer, what has now been marked as Government's

7  Exhibit 1.

8  A.   Thank you.

9  Q.   I am sorry, Your Honor.  Do you recognize that, sir?

10  A.   Yes, this is the photo spread that I put together.  And

11  it's in the order that I had put it.  The corresponding number

12  for the photograph is on the back with the letter of the

13  series of photo spread, which is the A series.

14  Q.   Do you have a standardized procedure by which you show

15  those photo spreads to witnesses?

16  A.   We do.

17  Q.   I wonder if you might describe that to the Court so the

18  Court could become familiar with your practice.

19  A.   Well, for each suspect in a case, we would have a series

20  of photo spreads.  In other words, in this case there was one,

21  so it was the A series.  For example, in a case where there

22  were multiple suspects, it would go A series, B series, C

23  series.

24         That one photo spread is shown to all the victims

25  and witnesses that you intend on showing the photo spread to.

R. Hickman - Direct

43

1    And instead of having multiple photo spreads, you would have

2    multiple photo spread worksheets for each one of the occasions

3    that you show a photo spread.

4    Q.   If I could interrupt you there.  If the Court Security

5    Officer also could show you what is now marked as Government's

6    Exhibit 2 and 3.

7            And copies have been a provided to counsel, Your

8    Honor.

9            And I ask if those are the worksheets you are

10   talking about?

11   A.   Yes, they are.

12   Q.   And are those the worksheets that were actually used in

13   this case?

14   A.   Yes, they are.

15   Q.   And I take it No. 2 with the Commonwealth's Attorney

16   evidence sticker from the state trial would be the one for the

17   taxicab driver?

18   A.   Yes.

19   Q.   And what is now marked as Government's Exhibit No. 3,

20   that would be the one for Ms. Riley?

21   A.   That's right.

22   Q.   I am sorry, I interrupted you when you were talking about

23   use of the worksheet.

24   A.   That's quite all right.  So, the instructions are given

25   to the victim or witness of how the photo spread is going to

R. Hickman - Direct

44

1   be shown.  And that is each paragraph is shown individually,

2   one by one.  And after each photograph, they are to answer

3   yes, no, or they are not sure.

4            I then give instructions, don't pay attention to how

5   much facial hair the person has, what the hair on their head

6   looks like, how light or dark a person looks like.  Just

7   because we are showing you photographs, don't feel compelled

8   to identify anyone, the person may or may not be in there.

9   Things of that nature.

10           And at that point I show the photographs.  And after

11  their response, I mark down the response on the worksheet.

12  Q.   And then if they make or are able to make an

13  identification, do you actually have them sign the sheet, the

14  worksheet?

15  A.   I do.  There is a comments block that corresponds with

16  each photograph, and I have them sign in the block where they

17  identify.

18  Q.   Okay.  And what's now marked as Government's Exhibit No.

19  2, the one with the taxicab driver, the worksheet in

20  conjunction with the photo spread that is Government's 1, is

21  this the results of the photo spread to the cab driver on

22  June 1, what would that be, four or five days after the crime?

23  A.   Could you repeat the question.

24  Q.   Is this worksheet, Government 2, of the taxicab driver?

25  A.   Yes.

R. Hickman - Direct

45

1   Q.   And does he actually, is he able to make an

2   identification?

3   A.   He did.

4   Q.   I wonder if you might summarize the results of this

5   worksheet so that the Court would understand it since the

6   Court doesn't have it in front of him right now.

7           What happened when you showed these six photographs?

8   A.   I showed photograph 1.  And he responded, close,

9   somewhat.

10          I showed photograph 2.  And he responded, no.

11          I showed photograph 3.  And he responded, yes, yes.

12          I showed photograph 4.  And he said, no.  5, no.  6,

13  no.

14          At that point he asked to see 1 and 3 again.  And I

15  showed him 1 and 3.  And he tapped number 3 and said, yes,

16  that's him.

17          At that point he signed in the block that

18  corresponds for the A3, which is the third photograph.  Which

19  was Mr. Mohamadi in the photo spread.

20  Q.   And the checked boxes next to A1 through A6, have you

21  checked them or has the witness checked those?

22  A.   I checked those.

23  Q.   So, when you placed for the first photo, not sure, that's

24  because the witness had asked for a second opportunity to look

25  at the first photograph?

R. Hickman - Direct

46

1   A.   Well, because his verbiage used, close, somewhat, is a

2   not sure/maybe type answer.

3   Q.   I see.  And then he never said anything other than yes

4   for photo number 3?

5   A.   That's correct.

6   Q.   And then once he saw the two together, he selected 3?

7   A.   That's correct.

8   Q.   Okay.  That photo spread presentation on June 1 was not

9   videotaped, is that correct?

10  A.   It was not.

11  Q.   Okay.  If I could turn your attention to--  And just to

12  finish the line of sequence, I take it that you have testified

13  in a suppression hearing in the state, is that correct?

14  A.   I did.

15  Q.   And was the taxi driver allowed to make an in-court

16  identification in the state proceeding?  Did the taxicab

17  driver testify in the state?

18  A.   He did testify in the state.  You know, there was a rule

19  on witnesses and I don't remember if I learned if he made an

20  in-court identification or not.

21  Q.   Okay.  I just want to make--  The only other point I want

22  to make because I understand you couldn't be in because you

23  would be separate witnesses, but just to make it a matter of

24  record, in the state system the victim typically would also

25  testify in the preliminary hearing, is that correct, in

R. Hickman - Direct

47

1    Virginia?

2    A.    That's correct.

3    Q.    You might not have been in the courtroom because of the

4    rule on witnesses?

5    A.    Yes.  I can tell you there was a rule on witnesses, but

6    he was a witness called in the preliminary hearing.

7    Q.    Okay.  And then if I could turn your attention to the

8    second witness, Ms. Riley, and I think now marked as

9    Government's Exhibit--  Did you use the exact same photo

10   spread with Ms. Riley?

11   A.    The exact same photo spread.

12   Q.    Okay.  The worksheet, if I could turn your attention to

13   Government's 3, June 5 of 2007.  Did Ms. Riley have an

14   opportunity to look at the photo spread?

15   A.    She did.

16   Q.    Okay.  Before you get to the spread, I wonder if you

17   might go through the circumstances she had to observe the

18   alleged perpetrator in her case.

19   A.    Ms. Riley had a posting on Craigslist as a prostitute.

20   Mr. Mohamadi contacted her regarding that posting.  The two of

21   them agreed to meet at the apartment where he was staying in

22   the City of Alexandria, which was actually the apartment his

23   girlfriend at the time was leasing.  She was away at work at

24   the point when Ms. Riley came into Alexandria to that

25   apartment.  They met at that apartment.  Ms. Riley advised me

48

1   that they had sexual relations for money in that apartment.

2           At that point Mr. Mohamadi asked her if she would

3   accompany him and into the District of Columbia because he

4   wanted to show her off to friends, so to speak.  She again

5   told him that she would be happy to do that, however, there

6   would be a financial burden attached with that.  He agreed to

7   pay her for those services.

8           They went into the District of Columbia with her

9   driving.  They were in the same vehicle.  He was in the

10  passenger's seat.

11          Once they got into the District, into DuPont Circle,

12  he said he needed to go by a bank to get some more money and

13  asked her to pull into an alley where there was a bank.  And

14  when he did that, when she pulled into the alley, that is when

15  he produced a handgun, she described as a .380 auto, and

16  robbed her of her money and keys at gunpoint.

17  Q.   Okay.  And did she tell you whether he had any tattoos on

18  his body?

19  A.   She described him as having a tattoo on his upper back

20  and on his shoulder.

21  Q.   And did she tell you what, if any, name she used when she

22  interacted with him?

23  A.   I believe she called him Omar.

24  Q.   Omar?

25  A.   Omar.

R. Hickman - Direct

49

1   Q.   Were you able to associate that name with the individual

2   who you identified as your suspect?

3   A.   Yes.

4   Q.   And how did you make that association?

5   A.   Well, the phone number that she said was Mr. Mohamadi's,

6   because he called her on her cell phone from the Craigslist,

7   we entered into a computer data bank and it returned to

8   Mirwais Mohamadi.

9   Q.   And you keep pointing to him.  Could you identify him for

10  purposes of this proceeding.

11  A.   It is the gentleman here with the gray and white

12  checkered shirt on.

13          THE COURT:  I will notify the identification of Mr.

14  Mohamadi.

15          MR. WALUTES:  Thank you, Your Honor.

16  BY MR. WALUTES: (Continuing)

17  Q.   I am sorry, I interrupted you.

18  A.   So, at that point we interviewed who turned out to be his

19  girlfriend, a woman who leased the apartment in, 117, at 175

20  South Reynolds Street I believe the address is.  And she said

21  that her boyfriend did stay there with her on and off, his

22  name was Omar.  And she actually identified a photograph of

23  Mirwais Mohamadi as being Omar.

24  Q.   Did you also have an opportunity to have your evidence

25  technicians dust Ms. Riley's car that she used when she was

50

1   robbed?

2   A.   Yes.   Latent fingerprints were recovered from the car and

3   later compared to the known fingerprints of Mr. Mohamadi, and

4   were determined to be one in the same.

5   Q.   And you said earlier in your testimony describing the

6   circumstances prior to the robbery of the taxicab driver, that

7   his cell phone was used to make a call?

8   A.   It was.

9   Q.   And did you have an opportunity to investigate whether

10  that cell phone called a number familiar to anyone associated

11  with Mr. Mohamadi?

12  A.   It did.   It called several times.   It was used to call

13  his girlfriend, the witness that I interviewed who lives

14  inside the apartment.

15  Q.   The apartment in which he began the transaction with Ms.

16  Riley?

17  A.   That's correct.

18  Q.   I am sorry, I interrupted you to get there, but when you

19  showed the photo spread to Ms. Riley on June 5 of 2007, maybe

20  a little over a week after the robbery, was she able to make

21  an identification?

22  A.   She was.

23  Q.   Prior to her making an identification, was there an

24  errant step that displayed to her a photograph?

25  A.   There was.

R. Hickman - Direct

51

1   Q.   Okay.  And just to be clear, did you, unlike the taxicab

2   driver, did you have actually occasion to use a room that had

3   a videotape camera running during the photo spread

4   presentation to Ms. Riley?

5   A.   I did.

6   Q.   And so, was that videotaped?

7   A.   It was.

8   Q.   Both the error and the actual photo spread?

9   A.   From start to finish.

10           MR. WALUTES:  Your Honor, if defense counsel will

11   agree with me, I gave a copy to the Court as an attachment.  I

12   have also given it to defense counsel.  And I would move that

13   in as a piece of evidence available to the Court for purposes

14   of evaluating the circumstances of this identification

15   procedure if Mr. Salvato is agreeable, rather than trying to

16   play it today in the courtroom.

17           MR. SALVATO:  I don't have any problem with that,

18   Your Honor.  I would question the witness about the video

19   itself and do have a few questions with regard to that.

20           THE COURT:  All right.  The videotape will be

21   received.

22           MR. WALUTES:  Thank you, Your Honor.

23   BY MR. WALUTES: (Continuing)

24   Q.   The photograph that she was able to perceive for some

25   period of time, obviously memorialized on the videotape, was

R. Hickman - Direct

52

1    that the same photograph used in the spread that you have

2    already identified as Government's 1 for purposes of this

3    hearing?  Or was it a different photograph of Mr. Mohamadi?

4    A.    It was a different photograph.

5    Q.    Okay.  And what did she, if anything, did she say after

6    she observed it prior to seeing the spread?

7    A.    I believe her exact words were, yep, that's him.

8    Q.    What, if anything, did you do?

9    A.    I immediately closed up my file, excused myself, stepped

10   out and called our Commonwealth, Assistant Commonwealth's

11   Attorney who handles robberies to consult with her about how I

12   should proceed after that occurred.

13   Q.    Okay.  And then how did you proceed?

14   A.    On her advice, I went ahead and showed the photo spread

15   as I had originally planned.

16   Q.    Did you say anything to the witness--

17   A.    No.

18   Q.    So, when you came back in, if you might tell us the

19   procedures.  I know they are memorialized on the videotape,

20   but if you could summarize them for purposes of this hearing.

21        When you came back in on June 5, what, if anything,

22   did you say, what procedures do you follow with Ms. Riley and

23   worksheet number three?

24   A.    The same exact procedures that I did with Mr. Haile.  I

25   explained to her what I was going to be doing.  How the photo

R. Hickman - Direct

53

1    spread would progress with one at a time, please answer yes,

2    no, or you are not sure.

3            Again, I gave her the disclaimers about not worrying

4    too much about facial hair, hair on the head, how light or

5    dark a person looks.  And showed her the photographs one at a

6    time.

7    Q.   And was she able to make an identification?

8    A.   She was.

9    Q.   And did she also sign the form?

10   A.   She did.

11   Q.   Did she have any problem with any of the other

12   photographs, the other five photographs?

13   A.   A problem how so, sir?

14   Q.   I am using the taxicab, if I might, as an example where

15   on number 1 he wasn't sure.

16   A.   No, no.  She answered no to every photograph but Mr.

17   Mohamadi.  She answered yes to his photograph.

18   Q.   And, obviously, the photograph of Mr. Mohamadi that was

19   used in the spread didn't show the tattoos, is that correct?

20   A.   It did not.

21   Q.   If I might show you--  I think I have already asked this,

22   but I want to make sure.  Have you been able to determine what

23   country Mr. Mohamadi was born in?

24   A.   Afghanistan.

25   Q.   If I can hand to you what is now marked Government's

R. Hickman - Cross

54

1    Exhibit 4 and 5.

2              And they were attached to the Government's motion,

3    Your Honor.

4              And I ask you if recognize those items, Detective

5    Hickman.

6    A.   Those are tattoos on Mr. Mohamadi.

7    Q.   Okay.  Does one show a tattoo on his back and another

8    show tattoo on his shoulder?

9    A.   That's correct.

10   Q.   Is that consistent with the physical description that the

11   victim, Ms. Riley, gave to you?

12   A.   Yes.

13             MR. WALUTES:  Your Honor, those are all the

14   questions.  Thank you.

15             THE COURT:  All right.  Mr. Salvato,

16   cross-examination.

17       CROSS-EXAMINATION

18   BY MR. SALVATO:

19   Q.   Good afternoon, Detective Hickman.

20   A.   Good afternoon.

21   Q.   I am going take you back to the start, just working our

22   way through chronologically starting with the cab driver

23   situation, if I could.

24             The cab driver photo spread was provided to the cab

25   driver on what day?

55

1    A.    The day I showed it to him?  On June 1.

2    Q.    Had you had any conversations with him beforehand?

3    A.    I had.

4    Q.    What, if any, were the descriptions that he provided to

5    you about the identity of the assailant?

6    A.    He described his assailant as a Spanish or Middle Eastern

7    male.  He believed he was about 5-foot-9.  Had a muscular

8    build.  He described him as being bald with an unshaven face.

9    Q.    Anything else prior to the identification when you spoke

10   with the cab driver that he indicated about the description of

11   the assailant?

12   A.    I believe he said he had dark complexion.  He gave a

13   clothing description, but I am not sure that is relevant to

14   the photo spread.  That's all I can recall him describing.

15   Q.    Okay.  So, Spanish or Middle Eastern, is that correct?

16   He did use those terms?

17   A.    That's correct.

18   Q.    And dark complexion as well?

19   A.    That's correct.  And then the physical description.

20   Q.    And the physical description.  I am not trying to omit

21   anything, sir.

22   A.    Yes.

23   Q.    As far as you are aware, did the cab driver give any

24   other or any additional description to anybody else in the

25   Alexandria Police Department prior to the photo spread?

R. Hickman - Cross

56

1    A.    Well, he gave a description to the reporting officer the

2    night that, you know, he filed the police report immediately

3    following the robbery.  And I believe that he gave a

4    description to the dispatcher when he called 911.

5    Q.    Okay.  Can you tell the Court what the 911 description

6    was by the cab driver?

7    A.    You know, I don't recall.

8    Q.    And how about the description he gave to the, I think you

9    said it was the reporting officer?

10   A.    The reporting officer.  Again, I don't recall it, but

11   it's obviously documented in the police report.

12   Q.    All right.  Then taking you to the June 1 photo spread,

13   if I could.  That was done not at the Mill Road address, but

14   at Eisenhower Avenue?

15   A.    The criminal investigations offices are at 2034

16   Eisenhower Avenue.

17   Q.    And you indicated to the Court that that identification

18   procedure was not videotaped, is that correct?

19   A.    It was not.

20   Q.    Is it a normal course of action for Alexandria police to

21   videotape the identifications?

22   A.    It's not.

23   Q.    Okay.  So, that's up to your discretion?

24   A.    It is.  And I would say in my own personal experience

25   less than half of the photo spreads I show are even at my

R. Hickman - Cross

57

1    office.   They can be at the witness' workplace, for example,

2    or their home.   So--

3    Q.   Okay.   But as far as the identifications done at the

4    Eisenhower address--

5    A.   Yeah, there is certainly no rule saying it should be.

6    And it's up to each individual detective's discretion whether

7    to.   It is not my practice to.   So, I did not with Mr. Haile.

8    Q.   And can you tell the Court why you made that

9    discretionary decision not to videotape the identification

10   procedure?

11   A.   Because it's typically not my practice to.   I videotaped

12   Ms. Riley's because she was, she was somewhat hesitant in

13   speaking to the police based on the reason she had come into

14   the city of Alexandria.   Because we were going to go into a

15   small interview room and close the door, obviously, there is

16   no windows on the door or the walls of the interview, I felt

17   for my protection to record it from the moment we walked in

18   until the time we left.

19   Q.   Okay.   And Mr. Haile, the cab driver, did that

20   identification take place in the same room as Ms. Riley's?

21   A.   A similar room, but not the same room.   A larger room

22   intended for witnesses.   And that room was not available when

23   I showed it to Ms. Riley, or I would have shown her in the

24   same room.

25   Q.   Is the room when you did the identification with Mr.

R. Hickman - Cross

58

1    Haile, was that room equipped with video equipment?

2    A.    It is.

3    Q.    Okay.  So, you just made the call, I think you said it's

4    your practice not to?

5    A.    Again, and I understand what you are asking, but it was

6    not my decision not to show it--  If you can understand my

7    distinction.  It was not a decision to not show it to Mr.

8    Haile as much as it was a decision to videotape it with Ms.

9    Riley for the reasons I explained.

10   Q.    Okay.  And those were safety concerns?

11   A.    Well, not physical safety as much as because of her

12   concern about possible repercussions of criminal activity,

13   although I had assured her that was not anywhere near the

14   focus of this investigation, I did not want any, you know,

15   quite frankly, false accusations made against me.

16          I was a lone detective, male detective with a female

17   in a closed-in room.  What better way than a videotape to, you

18   know, be able to defend me if some false accusation was made

19   against me.

20   Q.    Let me turn you then to, Mr. Walutes asked you some

21   questions about Mr. Haile's opportunity to view the person who

22   was in his cab.  So, let me turn you to those conversations.

23          Did you interview Mr. Haile about his opportunity to

24   view his occupant or assailant?

25   A.    No.  Did I ask him directly?  I did not.

R. Hickman - Cross

59

1    Q.    On June 1.

2    A.    No.

3    Q.    Okay.  So, there is no conversation about that?

4    A.    On June 1?

5    Q.    On June 1.

6    A.    No.

7    Q.    Okay.  In your prior conversation with him, did you talk

8    about his opportunity to view his assailant?

9    A.    We certainly discussed the time that the two were in the

10   taxicab together and all the events that transpired from the

11   time that he picked Mr. Mohamadi up at DuPont Circle until the

12   time of the actual robbery.

13   Q.    And that is in that prior conversation where Mr. Haile

14   indicated a Spanish or Middle Eastern description?

15   A.    That's correct.

16   Q.    Okay.  Now, the Government asked you a few questions

17   about how long they had any face-to-face contact.  And I want

18   to explore that a little bit, if I could.

19            What did Mr. Haile tell you about how his passenger

20   was picked up?  A typical flag the cab driver down, or how did

21   that happen?

22   A.    I believe he flagged him down, that's correct.

23   Q.    And the occupant or the passenger got into the back seat,

24   I would assume?

25   A.    Yeah.

60

1   Q.   And what is the next--  And obviously Mr. Haile is

2   driving and the occupant is in the back seat.  What is the

3   next opportunity that the cab driver indicated to you that he

4   was able to see the person in the back seat?

5   A.   I believe the next opportunity he had to see him was when

6   he stopped in Georgetown and got out to the sidewalk for a

7   minute or two and then returned to the taxicab.

8   Q.   Okay.  And tell me about that, the occupant got out of

9   the back seat and was in the sidewalk?

10  A.   Yeah.  He said he approached a couple people standing on

11  the sidewalk.  I asked him if he heard what the conversation

12  was.  He said he did not.  I asked him did it look like he

13  robbed someone.  He said it didn't.

14          He said he just went up and talked to a couple

15  people on the sidewalk for a minute or two and then turned

16  around and walked back to the cab.

17  Q.   Okay.  So, the cab driver is obviously still seated in

18  the driver's seat?

19  A.   Yes.

20  Q.   And the person in the back seat then, presumably to go to

21  the sidewalk, then turns his back towards the cab and then

22  engages in a conversation with people?

23  A.   I did not get into that kind of specifics, sir.

24  Q.   So, you are not sure whether during that conversation the

25  person who was in the cab had his back to the cab driver or

R. Hickman - Cross

61

1    not?

2    A.    I am not.

3    Q.    Was that conversation, that minute or two conversation,

4    was that something that the cab driver was paying particular

5    attention to?

6    A.    I didn't ask him in those words.  He described to me what

7    Mr. Mohamadi did when he approached.  I asked him if it looked

8    like a criminal offense occurred.  He said it did not, it

9    looked like he was just talking to them.

10            So, based on his responses to my direct questions, I

11   was left with the impression that he was paying attention, but

12   I did not specifically ask him, were you paying attention.

13            So, the best I can answer is just based on how he

14   described the events for those one or two minutes, I believed

15   he was paying attention.

16   Q.    All right.  Then at some point the individual gets back

17   in the cab.  And what is next interaction where the driver

18   would have any ability to observe the occupant?

19   A.    Well, the frequent conversation between Mr. Mohamadi and

20   the cab driver involving his father being from Afghanistan.

21   He asked the cab driver if he was interested in getting any

22   guns or drugs or prostitutes.  To which the cab driver told

23   him he was not.  Mr. Mohamadi took his cell phone--

24   Q.    When you say his cell phone?

25   A.    The cab driver 's cell phone.

R. Hickman - Cross

62

1    Q.   And did he--  I am sorry to interrupt.  If you could

2    finish, then I have got some--

3    A.   So, those are the instances where there was, you know,

4    contact being verbal, and I guess you could call it physical

5    contact because of the close proximity between Mr. Mohamadi

6    and the cab driver.

7    Q.   Okay.  So, there was a question about heritage, question

8    about if the cab driver was interested in anything illicit for

9    lack of a better term, and there was a conversation about the

10   cell phone?

11   A.   There was a statement about heritage.  Mr. Mohamadi said

12   that Mr. Mohamadi's father was from Afghanistan.  There was

13   questions or offers and questions about the interest in the

14   illicit behavior.  And I don't believe there was a

15   conversation about the cell phone.

16        As I recall, the victim said that Mr. Mohamadi just

17   reached over--  He described him as sitting between the seats,

18   kind of hunched forward talking to him, and he just reached

19   and grabbed the cell phone and made the phone call.

20   Q.   Okay.  And as all these conversations are taking place,

21   am I correct in the assumption that the cab driver is driving

22   the cab towards Alexandria?

23   A.   He was driving the vehicle.

24   Q.   Did you ask him or did he tell you that during these

25   conversations that he is turning around to look at the person

R. Hickman - Cross

63

1    in the back seat?

2           Or how is it that he has any opportunity to view the

3    person in the back seat?

4    A.   I did not ask him if he actually turned around and looked

5    at him in the back seat.

6    Q.   You just don't recall one way or another?

7    A.   I don't recall one way or another.

8    Q.   Okay.  What is the next opportunity to view the assailant

9    that the cab driver described to you?

10   A.   When Mr. Mohamadi robbed him.

11   Q.   Okay.  And can you tell me what he told you about that,

12   in particular about his opportunity to view the person in his

13   cab?

14   A.   He demanded his property.  He had stepped out of the

15   vehicle and told him, I am going to go rob a Spanish guy, just

16   stay here and I will be back.  And I believe he said he was

17   going to go to the 7-11 and rob a Spanish guy, just stay here,

18   and he said he would give him a whole bunch of money.  I think

19   he gave an amount, sir, and I don't recall the exact amount.

20          At that point he threw, Mr. Mohamadi threw the cab

21   keys in the same fashion he had thrown Ms. Riley's after

22   taking them from the vehicle and he fled.

23   Q.   Okay.  And how long did it take-- Did the cab driver

24   explain how long it took for that event to take place and what

25   opportunity, if any, did he have to look at the person who was

R. Hickman - Cross

64

1    doing this?

2    A.   He didn't describe how much time all those things took to

3    have happen in terms of the demanding of the money and the

4    stepping out of the vehicle, but he saw him outside of the

5    vehicle fleeing because he waited until after he fled and then

6    he went to go try to find his keys, but he couldn't find them

7    so he flagged down another cab driver.

8    Q.   All right.  Now, taking you specifically to what I

9    believe is Government's Exhibit No. 2 for purposes of this

10   hearing, Commonwealth's Exhibit 3-A in the state proceeding,

11   that's your lineup worksheet with regards to the cab driver.

12        Do you have that in front of you?  6/1/07.

13   A.   Yes, I have both.  The Government's Exhibit 2 is the

14   Commonwealth's Exhibit 3-A, is that the one you are referring

15   to?

16   Q.   I believe that's correct.

17   A.   It is Mr. Haile's worksheet.

18   Q.   Correct.  On Mr. Haile's worksheet, I see the time is

19   7:10 noted on the worksheet, is that correct?

20   A.   The ending time is 7:10.

21   Q.   When was the beginning time for when you began to speak

22   with Mr. Haile on that day?

23   A.   I started showing the actual photo spread at 7:07.  That

24   is up, if you have a copy of it, sir, where it says offense

25   date, right below that, 19:07 is the time of the presentation.

R. Hickman - Cross

65

1    Q.    So, from 19:07, 7:07 to 7:10, that's when this entire

2    identification procedure takes place, correct?

3    A.    Yes.

4    Q.    Okay.  Prior to 7:07, are you having any discussion at

5    all with Mr. Haile?

6    A.    I am explaining to him what is about to transpire.

7    Q.    Okay.  And in that explanation-- Or let me phrase it

8    differently.  What did you explain to him about what was going

9    to happen?

10   A.    I told him I would show six photographs to him, each one

11   individually, and for him to answer yes, no, or not sure after

12   each photograph.  I told him not to pay too much attention to

13   hair on the head, how much facial hair a person has, how light

14   or dark they look, and that the person who robbed him may or

15   may not be in the photo spread, so don't feel compelled to

16   identify anyone.

17   Q.    So, you never told Mr. Haile that the person that you

18   believed was involved in this offense is in the photo spread?

19   A.    No.

20   Q.    Okay.  Now, do you have the six individual pictures in

21   front of you?  I guess you can take them out.

22         But is there any identifying data on those six

23   pictures.

24   A.    No.  The only identifying data is on the back, A1.  And

25   then, obviously, next photograph so forth, A2 all the way to

R. Hickman - Cross

66

1    A6.  That is what is listed on the worksheet.

2          In my documentation I have who those individuals are

3    as well as the computer printout copies.  In other words, this

4    actually came off a sheet that lists their name, what we call

5    their AGIS number, which is the local computer program in

6    Alexandria.  And I make a copy of those sheets, I staple them

7    in the order that the photo spread is going to be in, and then

8    I cut these out so that they are that size right there.

9    Q.   Okay.  And you were-- Did you have your file with

10   respect to this case with you along with the photo spreads,

11   with the photographs?

12   A.   Oh, I don't remember.

13   Q.   Now, any other discussion with Mr. Haile either right

14   before or during the photo spread that you recall that we

15   haven't talked about?

16   A.   I don't remember.  I would have to check my notes.

17   Q.   Did you take notes, contemporaneous notes, or do you just

18   do a report later?

19   A.   I do a report later.

20   Q.   No notes?

21   A.   I do take notes, but then the notes are turned into a

22   report.  And once the report is filed, I typically just get

23   rid of my notes.

24   Q.   Okay.  And when shown A1, who is not Mr. Mohamadi, what

25   were the exact words that the witness used?

R. Hickman - Cross

67

1  A.   He either said close, somewhat or somewhat close.  I

2  believe it was close, pause, somewhat.

3  Q.   Okay.  And then when he saw A3, what were his exact

4  words?

5  A.   He said, yes, yes.

6  Q.   And then at some point did he ask to compare the two?

7  A.   He did.  He said, can I see 1 and 3 again.

8  Q.   And that was after he said, close, somewhat to A1 and yes

9  to A3?

10  A.   It was after all six.

11  Q.   Okay.  So, after all six, after he has had an opportunity

12  to see all six, then he asked for the side-by-side comparison?

13  A.   Yes.

14  Q.   And did you say anything or respond to either of his

15  statements, either close, somewhat or yes?

16  A.   Not verbally.  I simply checked off the appropriate box.

17  For close, somewhat, that is a not sure, so I checked not

18  sure.  For yes, yes, I checked yes.  So on down.

19       When he asked to see the pictures again, I just put

20  the two pictures out in front of him.  And he looked at them,

21  tapped number 3 like that and said, yeah, that's him.

22  Q.   Now, if I could turn your identification to the

23  identification you testified about from Ms. Riley.  That

24  identification was done on 6/5/07, is that correct?

25  A.   That's correct.

R. Hickman - Cross

68

1   Q.   Okay.  And did you have any conversation with Ms. Riley

2   prior to 6/5/07 about her opportunity to view the person that

3   was involved in her robbery, or escorting, the types of things

4   you have talked about?

5   A.   I did.  I spoke with her on the telephone because she was

6   out of town.  And then prior to showing her the photo spread,

7   I went through on the 5th of June immediately before the photo

8   spread, I went through the entire story with her again.

9   Q.   Okay.  What did she tell you in that first conversation

10  about the description of the person who was involved in her

11  robbery?

12  A.   I don't remember her description.

13  Q.   And what about prior to her identification on 6/5/07, you

14  had another conversation with her?

15  A.   I did.

16  Q.   How did she describe the person that was involved in her

17  robbery?

18  A.   Again, I don't remember.  I don't remember how she

19  described it.  It would be documented in my supplements.

20  Q.   Okay.  Was there anything--  So, you don't remember

21  anything about those descriptions?

22  A.   I don't.

23  Q.   Now, I want to talk to you a little bit about the

24  circumstances of her encounter with you.  You indicated, I

25  think, prior questioning, that she was concerned because of

tom

R. Hickman - Cross

69

1    her illicit activities?

2    A.   Yes.

3    Q.   And at some point I think your words were you assured her

4    that that was not an issue, for lack of a better term.  Was

5    that essentially the conversations between you two?

6    A.   Yes.  I told her that I was a robbery detective.  You

7    know, in so many words, I was a robbery detective, I wasn't a

8    vice detective.  So, I wasn't really interested in the

9    prostitution angle of this case.

10   Q.   And how did she express her concern and how did you

11   assure her--

12          MR. WALUTES:  Objection, irrelevant, for purposes of

13   identification.

14          THE COURT:  Sustained.  Unless it goes to some bias

15   issue.

16          MR. SALVATO:  It could be as to bias.

17          THE COURT:  Go ahead and answer the question.  I

18   will allow it.

19   A.   Could you repeat the question, sir.

20   BY MR. SALVATO: (Continuing)

21   Q.   What was the nature of the conversation between you and

22   Ms. Riley about her concern and your assurance that she was

23   not a target or not in trouble or not of interest to you?

24   A.   Right.  It was when I talked to her on the phone and I

25   asked her to, you know, if she was in Alexandria.  She said

R. Hickman - Cross

70

1    she was not.  I said, do you plan on coming back to Alexandria

2    because I need to sit down and with you and interview you

3    about this case.  And she said, well, you know, basically I am

4    kind of hesitant about coming back into Alexandria.

5            And that's when I was like, you don't need to worry

6    about that.

7    Q.   All right.  What specifically did she say about, I am not

8    going go through the whole contact that she claims that she

9    had with the person that was involved, but what did she say

10   about the tattoos?  I just missed what she had indicated about

11   the tattoos of this person.

12   A.   As I recall, she described the one on his back as some

13   word that was block letters.  And I believe she said it was a

14   spider web on the shoulder.

15   Q.   And in terms of the video, is the video that was provided

16   to the Court, is that the entire video from point A to point Z

17   as far as the identification?

18   A.   Yes, that was from the time we walked in the door until

19   we left.

20   Q.   And does that video encompass all the conversations you

21   had with Ms. Riley that day?

22   A.   Yes.

23           MR. WALUTES:  Your Honor, I should make clear, I

24   only put on the identification procedures.  He is giving you a

25   video of the entire thing.  I view that as Jencks.  The only

R. Hickman - Cross

71

1    thing that has been given to the Court and Mr. Salvato is what

2    I view as relevant to this proceeding, which is the

3    inadvertent showing of the photograph and then the spread

4    itself.

5            MR. SALVATO:  That's what I was getting at, Your

6    Honor.  I would ask that the entire--

7            THE COURT:  It's too narrow a view of Jencks versus

8    identification.  So, the introductory questions and answers

9    and subject matter I think are potentially relevant to

10   identification as well.  So, let's produce the entire

11   videotape to the Court and to Mr. Salvato.

12           MR. WALUTES:  I didn't bring them with me today,

13   Your Honor.

14           THE COURT:  I understand that.  I am going to have

15   to go view a video before I make a ruling on this anyway.  So,

16   if you just submit that in its totality.

17           MR. WALUTES:  I will, Your Honor.

18           THE COURT:  All right.  Go ahead and ask your

19   questions.

20           MR. SALVATO:  Thank you, Your Honor.

21   BY MR. SALVATO: (Continuing)

22   Q.   So, as Mr. Walutes indicated, there is a redacted video

23   with regard to the mistake or error that you made, and then

24   there is a video of the entire interview and identification,

25   correct?

R. Hickman - Cross

72

1    A.    The only video I made--

2    Q.    Is the entire one?

3    A.    Is the entire one from the time we went until the time we

4    left.

5    Q.    So, let me draw your attention then, if I could, to Ms.

6    Riley seeing this photograph of Mr. Mohamadi before she made

7    her identification.  I presume that you did have your file

8    with you then for sure?

9    A.    I did.

10   Q.    Can you describe that file to the Court?

11   A.    It's a file folder that as you open it up, it has flaps

12   with the prongs.  And, you know, so sheets like this can be

13   put on the different levels of it.

14         And the way I had my set up was my report and

15   supplements on the first left, and then my notes on the right.

16   And then as you open it up, some other sheets.

17         Well, in the very back of it was Ms. Riley's--  We

18   took what in the city of Alexandria we call a police

19   information report.  Because the criminal offense that she

20   reported against Mr. Mohamadi, the robbery occurred in the

21   District of Columbia.

22         So, when she came to the city of Alexandria saying,

23   hey, I met a guy here and he robbed me in D.C., they obviously

24   couldn't write up a robbery report, it didn't happen within

25   the boundaries of the city of Alexandria.  So, they wrote up a

R. Hickman - Cross

73

1     police information report.

2              Well, that report has a different case number than

3     our robbery report with Mr. Haile.  So, I opened up my

4     notebook to get her case number which is documented here on

5     the worksheet, and the opposite flap I had Mr. Mohamadi's

6     personal information, including on the very top a photograph

7     of him.

8     Q.   Okay.  And then what did Ms. Riley see in regards to that

9     one photograph of Mr. Mohamadi?  What did she see?  You just

10    said she saw a single photograph of Mr. Mohamadi?

11    A.   That's it.

12    Q.   And some identifying data?

13    A.   Well, no.  In other words, it is stacked up like this.

14    So, the top sheet she saw was just a white piece of paper with

15    a centered photograph of probably about the size of this right

16    here of Mr. Mohamadi.

17    Q.   Okay.  And was that the same photograph that is depicted

18    in A3?

19    A.   No, it's not.

20    Q.   Okay.  And what were the circumstances of that

21    photograph?  Is that a jail photograph?  How is Mr. Mohamadi

22    attired in that photograph?

23    A.   I don't believe he is in a jumpsuit.  I think he was in a

24    different T-shirt.  But as I recall, it was an older

25    photograph from another jurisdiction.  So, I used a more

R. Hickman - Cross

74

1   recent one in the photo spread.

2   Q.   In the photo spread.  And was the photograph that Ms.

3   Riley viewed, the single photograph, was that from the waist

4   up, just a face shot?

5   A.   I don't remember.  I don't believe it was just a face

6   shot.  I think it's cropped somewhere around that area there

7   like from the upper chest up.

8   Q.   Okay.  And when she indicated an affirmative with regard

9   to that one photograph, that's obviously the very circumstance

10  you are trying to avoid, is her seeing a photograph of the

11  person that you think is the suspect, correct?

12  A.   Yes.

13  Q.   Did you respond to her when she said that's the person or

14  an affirmative with regard to the single photograph?

15  A.   No.  I think the most I said was, excuse me a minute, or

16  I will be right back, or something like that.  And I took my

17  stuff and went out to call the prosecutor.

18  Q.   And that was Ms. Sullivan?

19  A.   Yes.

20  Q.   And you spoke to Ms. Sullivan, and she gave you the

21  instruction to just go ahead and do the--

22  A.   She did.

23       MR. SALVATO:  The Court's indulgence for one second,

24  Your Honor.

25       THE COURT:  Yes, sir.

R. Hickman - Cross

75

1    BY MR. SALVATO: (Continuing)

2    Q.   Detective, if you could, from her seeing the photograph

3    until you excused yourself, is there a period of time that

4    elapses, for lack of a better term, while you were trying to

5    think of what the proper response would be?

6          Is there a pause between her seeing the one single

7    photograph, the erroneous viewing of that photograph, and when

8    you excused yourself?

9    A.   Oh, I see what you are saying.  In other words, how long

10   did it take for me to react to her saying, yep, that's him?  I

11   don't remember exactly.  But as I recall, it struck me

12   immediately what transpired.  I immediately closed up my book

13   and I immediately excused myself.

14         So, as I recall, and again, it's on video, just a

15   few seconds, a couple seconds, and then I was out the door.

16         THE COURT:  Did you take the book with you?  Did you

17   take your file with you?

18         THE WITNESS:  I did, Your Honor.

19         MR. SALVATO:  That's all the questions I have.

20         THE COURT:  All right.  Thank you.  Any redirect?

21         MR. WALUTES:  No, Your Honor.

22         THE COURT:  May the detective be excused?

23         MR. WALUTES:  He may, Your Honor.

24         THE COURT:  All right.

25         MR. WALUTES:  Your Honor, there is a second photo

76

1    spread shown in the District of Columbia to Ms. Riley.  I

2    would like to put that witness on as well.

3           Is he excused?

4           THE COURT:  He is excused.  I am sorry, I got

5    interrupted when I was trying to excuse you.

6           NOTE:  The witness stood down.

7           THE COURT:  How long is this going to take?

8           MR. WALUTES:  The only thing I intend to do with

9    this witness-- I don't think we need to have any facts.  I

10   think I am just going to put in the spread itself, Your Honor.

11          THE COURT:  Okay.  Are you doing all right there?

12   Do you all need a break?

13          NOTE:  The witness is sworn.

14          MR. WALUTES:  May I proceed?

15          THE COURT:  Yes.

16          BRIAN WISE, called by counsel for the United States,

17   first being duly sworn, testifies and states:

18       DIRECT EXAMINATION

19   BY MR. WALUTES:

20   Q.   Good afternoon, sir.

21   A.   Good afternoon.

22   Q.   Could you please tell us your name.

23   A.   Brian Wise, W-i-s-e.

24   Q.   How are you currently employed?

25   A.   I am employed by the Metropolitan Police Department.

B. Wise - Direct

77

1    Q.    What is your current assignment?

2    A.    I am a homicide detective.

3    Q.    Did you work last night?

4    A.    I did.

5    Q.    How long have you been with the Metropolitan Police

6    Department?

7    A.    Nine years.

8    Q.    Did you have occasion back on June 14 of 2007 to show a

9    photo spread to a witness by the name of Kim Riley?

10   A.    I did.

11   Q.    And if I might hand you what is marked as Government's

12   Exhibit 6 and 7, and ask if you could look at these two items

13   and tell us what they are.  If you recognize them.

14   A.    Okay.

15   Q.    And what are those, sir?

16   A.    It's the, Government's Exhibit No. 6 is the photo spread

17   that was shown to the complainant.  And Government's Exhibit

18   No. 7 is the photo viewing sheet that is read to the

19   complainant prior to being shown the photo spread.

20   Q.    And did you record on the, on the thing what, if any--

21   Was Ms. Riley able to make an identification from that photo

22   spread?

23   A.    Yes.

24   Q.    What, if any, words did she use?

25   A.    That's Omar, he is the one that robbed me.

B. Wise - Cross

78

1   Q.    And what photo number did she identify?

2   A.    Photograph number 8.

3   Q.    Was there any question involving any of the other

4   photographs?

5   A.    No.

6   Q.    Did you videotape this photo spread?

7   A.    Yes.

8   Q.    Your Honor, this is on the same videotape as the other.

9   And so, I would ask if Mr. Salvato is agreeable, that both,

10  that this one also be admitted in.

11          THE COURT:  Any objection?

12          MR. SALVATO:  No, Your Honor.

13          THE COURT:  All right, they will be received.

14          MR. WALUTES:  Your Honor, those are all the

15  questions I have for this witness.

16          THE COURT:  All right.

17          MR. SALVATO:  I have just a few questions, Your

18  Honor.

19      CROSS-EXAMINATION

20  BY MR. SALVATO:

21  Q.    Detective Wise, do you have the exhibits?  Can I retrieve

22  the exhibits?

23  A.    Yes, sir.

24  Q.    Can I get them from the Court Security Officer.

25          Did you have any conversations with Ms. Riley prior

79

1   to your interview?

2   A.   Conversations with her prior--  Prior to the videotaped

3   interview?

4   Q.   Correct.

5   A.   Yes.

6   Q.   And when was that?

7   A.   When she came in to report the offense.

8   Q.   And what did she say about the description of the person

9   that was involved in her robbery?

10  A.   I would have to review the videotape.  That part is

11  actually on the videotape when I asked her to give me a

12  description.

13  Q.   Did you have any conversations with her that are not

14  reflected in the videotape that has been provided to the

15  Court?

16  A.   Outside of her coming in and saying that she was robbed

17  and that she wanted to make a report, I asked her the

18  circumstances of what happened, meaning why the report wasn't

19  taken on the day that she stated that she was robbed.  She

20  provided me the circumstances behind that.

21          After I got that, then we went and did the

22  videotaped interview of the facts and circumstances

23  surrounding the robbery itself.

24  Q.   Okay.  And did Alexandria police contact you to do this

25  identification?  How did you become involved?

B. Wise - Cross

80

1    A.    I do not recall the circumstances of why she came into

2    the Third District to report.  I believe that she was referred

3    to the Metropolitan Police Department by someone, but I don't

4    recall who that someone is.

5    Q.    Okay.  And your identification took place on, and I will

6    give you these back, you can have them, I just needed to check

7    one thing, on June 14 of 2007, is that correct?

8    A.    Correct.

9    Q.    And did Ms. Riley indicate to you that she had been

10   subject to a prior photo spread involving this case?  Did you

11   have any conversation with her about that topic?

12   A.    I wouldn't have initiated that conversation.  I don't

13   recall her telling me that she viewed an array prior to this.

14   Q.    Did she ever tell you that she saw a single photograph of

15   my client not as part of any photo spread that was contained

16   in an Alexandria detective's police file?

17   A.    I don't recall her telling me that, no.

18   Q.    Did you ever ask her whether this was a second photo

19   spread for her, anything along those lines?

20   A.    I don't believe I did.

21   Q.    So, your testimony then, Detective, is that you believe

22   someone referred her to the Third District, but you are not

23   sure of any of the circumstances that took place before that

24   referral, and Ms. Riley didn't tell you about any of those

25   circumstances, correct?

B. Wise - Cross

81

1   A.   What I know is that she attempted to make the report on

2   the day.  That she was given the run-around.  And that she

3   finally found out from whatever source that she needed to come

4   to the Third District to report the offense.  Who told her to

5   come to the Third District, that I don't know.

6   Q.   And as far as you recall, you had no conversation with

7   Ms. Riley about any prior photographic identification of my

8   client or anybody else?

9   A.   No.  From what I recall, I didn't know about any

10  additional offenses outside the robbery that she was reporting

11  to me that had occurred.

12  Q.   Okay.  But my question is, you had no conversation with

13  her about any prior photo identifications about this robbery

14  that she was talking about?

15          MR. WALUTES:  Objection, Your Honor.  That's the

16  about the fourth time that question has been asked.

17          THE COURT:  I understand.  Answer it one last time

18  if you can, Detective.

19  A.   I do not believe I asked her about any other photo

20  arrays.  I don't believe I knew of any photo arrays or any

21  other crimes that were committed.  So, I don't believe I asked

22  her about it.

23  BY MR. SALVATO: (Continuing)

24  Q.   Okay.  And when she identified photograph number 8--  Do

25  you have photographic number 8 in front of you, or can you

B. Wise - Cross

82

1    pull that one?

2    A.   Yes.

3    Q.   Or if you recall the photograph, you don't have to take

4    it out, but do you recall photograph number 8 without looking

5    at it?  Or can you pull it out?

6    A.   Yeah, it's out.

7    Q.   That's a photograph of Mr. Mohamadi, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And where did that photograph come from?  Where

10   did you get that photo?

11   A.   From a database with the Metropolitan Police Department

12   that is photographs of arrestees in D.C.

13   Q.   So, that's a photograph of Mr. Mohamadi after he was

14   arrested or incarcerated on another charge?

15   A.   Yes, sir.

16   Q.   And in that photograph, is Mr. Mohamadi clothed in jail

17   clothing, garb?

18   A.   It appears to me he has a white T-shirt on with some type

19   of collared shirt.

20   Q.   Okay.  That's how that picture appears to you?

21   A.   That's what it appears to me, yes.

22   Q.   Okay.  And the other individuals in the other photographs

23   in that photo spread are all clothed in what we could term as

24   civilian clothes, is that correct?

25   A.   From what it appears to me, there is multiple individuals

B. Wise - Cross

83

1   in the spread that have collared shirts on.

2   Q.   Okay.  All civilian clothing, not jailhouse clothing,

3   correct, when you say collared shirts?

4   A.   Well, I can't recall the photos you are saying that is

5   not civilian clothing that Mr. Omar is wearing.

6   Q.   Is that jail clothing or civilian clothing?

7   A.   I don't recall the color photo, it was a couple years

8   ago.  From what it appears to me, he does have some type of

9   collared shirt on with a white T-shirt underneath.

10  Q.   All right.  But the photograph was obtained from a jail

11  or postarrest situation?

12  A.   A postarrest.  I can say it was a postarrest.

13  Q.   Okay.  Can you tell whether it was a postarrest situation

14  or a jail situation?  Can you tell which one it was?

15  A.   I don't recall if it was--  I don't recall what the

16  charge was that led to this photograph.  I don't recall the

17  color photo.

18  Q.   Did you get the photograph from a jail?

19  A.   No.  We get it from a database from our computer.

20  Q.   Okay.  Where does the database from your computer get the

21  photograph?

22  A.   It is a system called LiveScan that the different

23  districts, whatever district you are arrested in, you go to

24  the cellblock, they fingerprint you, they photograph you and

25  that photograph goes into the database.  So, that's where.

B. Wise - Redirect

84

1    And then we access the database to get photos.

2    Q.   Okay.  After Ms. Riley indicated individual number 8, did

3    you respond to her?

4    A.   I may have asked follow-up questions.

5    Q.   And do you recall what those were?

6    A.   I don't.

7    Q.   And this was a color photographic array, correct?

8    A.   No, I don't believe so.

9    Q.   So, it was the black and white ones that we have, that

10   you have in front of you?

11   A.   Correct.

12          MR. SALVATO:  That's all the questions I have, Your

13   Honor.

14          MR. WALUTES:  Just briefly, Your Honor.

15          THE COURT:  Yes, sir.

16      REDIRECT EXAMINATION

17   BY MR. WALUTES:

18   Q.   Detective Wise, to be clear, the photograph taken of Mr.

19   Mohamadi is taken in his civilian clothes when he is arrested

20   somewhere in D.C., would that be correct?

21   A.   It could have been.  I can't make representation of the

22   color of the shirt or the style of shirt.  It appears to me

23   that he has a collared shirt with a white T-shirt underneath

24   from what I can see from the photo.

25   Q.   The only point I am trying to make is that you didn't

B. Wise - Redirect

85

1   make an array, nine photograph array where everybody else is

2   wearing civilian clothes and Mr. Mohamadi is the only one

3   wearing prison clothes, do you understand?

4   A.   Correct.  No, I didn't.

5           THE COURT:  Am I going to have the spread?

6           MR. WALUTES:  Yes, sir.

7           THE COURT:  Make them exhibits so I can look

8   independently at them.

9           MR. WALUTES:  Understood.  Your Honor, I have no

10  other questions.

11          THE COURT:  May Detective Wise be excused?

12          MR. WALUTES:  Yes, sir.

13          THE COURT:  You are excused with our thanks,

14  Detective.

15          NOTE:  The witness stood down.

16          MR. WALUTES:  Your Honor, the last point, I will

17  obviously amend the record by giving both defense counsel and

18  the Court the complete interviews.  And I can't remember if I

19  did the same thing to the District of Columbia one, if I did,

20  I will obviously make it consistent and give you the entire

21  tape.

22          THE COURT:  Okay.

23          MR. WALUTES:  My only point is those are the

24  original photo spreads.  And so, I would just put in the

25  Government's exhibit book in a week that they are with the

86

1   Court.  Or if the Court rules earlier, I will come and pick

2   them up.

3          THE COURT:  No, give me some copies.  Take them back

4   now.  Don't give any originals to me.

5          MR. WALUTES:  Okay.  I will make copies then, Your

6   Honor.  And I will make a copy, I will make two copies of each

7   one and give one copy to Mr. Salvato so he can confirm to

8   himself that they are similar in appearance to the originals.

9          THE COURT:  Good, thank you.

10         All right.  Mr. Salvato, did you have any witnesses

11  you wanted to call on the identification issue?

12         MR. SALVATO:  No witness on the identification, Your

13  Honor.  We rest on the arguments.  The Court knows the

14  arguments based on that we have said and what we have said in

15  the pleadings.

16         The only thing I would say is factually that picture

17  number 8 does appear to be a jail uniform.  The Court can look

18  at that.

19         And other than that, the Court has our arguments set

20  forth in the pleadings.

21         THE COURT:  I will look at the videos and consider

22  the evidence that I have heard and get you a ruling as soon as

23  I can.

24         What else do we have?  We have the suppression of

25  the statement made to the inmate, is that inmate number 3?

87

1          MR. SALVATO:  Correct.  Well, there is apparently

2     three inmates involved in this case.  Inmate number 3, in

3     particular we know who that is.  That person was apparently

4     working with the Government.  That would require, in our view,

5     an evidentiary hearing with respect to those circumstances.

6          There is also the motion to suppress Mr. Mohamadi's

7     statements.  I realize the hour at this point, Your Honor.  I

8     am happy if the Court wants to set those two motions for next

9     week and take them up at that time.  I have pretty--

10         THE COURT:  Do you have a witness here or do you--

11    What's your position?

12         MR. WALUTES:  We don't share the view that it needs

13    a witness, frankly.  There has been a trial at the state.  Mr.

14    Salvato has the records, he has acknowledged explicitly before

15    the Court today.

16         That trial occurred after the period of cooperation

17    of inmate number 3.  And the witness was allowed, inmate

18    number 3 testified at the state trial.

19         If there was anything in there that Mr. Salvato

20    believes--  Or I understand he actually didn't file this

21    motion.  If the public defender, had they been here, if there

22    was anything specifically they believed that should not have

23    been, that was learned by inmate number 3 after he began his

24    period of cooperation with the Alcohol Tobacco & Firearms,

25    they should be able to point to the court record in the state

88

1     with specificity.  That hasn't occurred.

2            So, the Government doesn't believe there is

3     sufficient evidence to have that motion go forward without

4     some--  The Government has produced to the Court the explicit

5     instructions to the witness not to do that.  He has appeared

6     as a state witness in the robbery.  And state counsel for Mr.

7     Mohamadi at no point made any assertion that the testimony

8     that was being received was obtained in violation of the Sixth

9     Amendment.

10           On the second issue, the interview that occurs, Your

11    Honor, there is a videotape of that entire thing.  I can't

12    remember today, although maybe Mr. Salvato does, whether I

13    attached it, but there is an entire interview of it as well as

14    a written report of it saying that his rights were given.

15           So, we could submit on the record and just ensure

16    that the Court has a copy of that interview.  I don't think

17    the Court needs to hear that testimony.  The entire thing has

18    been videotaped.

19           THE COURT:  All right.  Well, on the first issue as

20    to whether there was some inappropriate request made of the

21    inmate number 3 who testified in the state case, do you have

22    that transcript, Mr. Salvato?

23           MR. SALVATO:  I do have a transcript of the trial

24    testimony.  It's my understanding, and obviously I didn't

25    represent Mr. Mohamadi, is that witness number 3 was

89

1    apparently presented to the defense about two days before the

2    jury trial was to be started.

3            Either the Commonwealth or witness number 3 himself

4    denied actually that he was a Government agent or working with

5    the Government or something along those lines.  Therefore,

6    there was I think a request to deal with that issue, but since

7    that witness or the Commonwealth denied, the witness denied

8    that he was working with the Government, there was no formal,

9    my understanding is no formal evidentiary hearing about the

10   suppression issue.

11           THE COURT:  Right.

12           MR. SALVATO:  So, that seems contradictory to what

13   now I think is the circumstances, that he was working with the

14   Government and did make that entrée, apparently videotaped and

15   audio taped to speak with Mr. Mohamadi at the jail.

16           Again, I think the Court needs to make that

17   independent evaluation.  I don't know whether inmates number 1

18   and 2 were also working with the Government under the terms of

19   their situation.  But certainly inmate number 3, I think there

20   is a pretty clear record that he was.  And I think we are

21   entitled to an evidentiary hearing with respect to not only

22   Mr. Mohamadi's statements because there are other allegation

23   there, but in particular to this witness, inmate number 3.

24           MR. WALUTES:  Your Honor, that we disagree with

25   because when he starts working with ATF, they do put him back

90

1    to jail, but they put a wire on him and so he is taped.  And

2    Mr. Salvato has the entire wire.  He doesn't have the ability

3    to turn it on and off.

4            THE COURT:  So, your argument is that regardless of

5    what ATF told him, it's what he said to Mr. Mohamadi while

6    they were together which is the evidence that I would have to

7    use to determine whether in fact he was attempting to elicit

8    the statement from Mr. Mohamadi?

9            MR. WALUTES:  The facts about the robbery, which

10   would obviously be in violation of the Sixth Amendment.  But

11   the point I make, Your Honor, is that he was wearing a wire.

12   And Mr. Salvato has had it since the inception, I gave it to

13   prior counsel.  Certainly for the entirety of Mr. Salvato's

14   representation of Mr. Mohamadi.

15           So, if there is something on that tape that he

16   believes is a violation of the Sixth Amendment, he should be

17   able to tell us, he should be able to show us with

18   specificity.  The Court shouldn't have to listen--  It is

19   literally, Your Honor, him going to the bathroom.  It is a

20   four-hour tape.  He cannot turn it off.  And they only have

21   access, without alerting other inmates at the jail that he is

22   wearing a wire, they only have access during particular

23   periods of time.

24           So, it is a four-hour tape.  Mr. Salvato should be

25   able to show the Court where there on that tape there is a

91

1    violation of the Sixth Amendment.  This shouldn't be that

2    difficult.

3              It is true that he had interactions with Mr.

4    Mohamadi before he meets with ATF, and that's the content of

5    his state testimony.  And that, obviously, would become

6    relevant in this case because these are discussions about the

7    robbery.

8              But once he becomes a Government agent, I understand

9    the Sixth Amendment.  The agents understood it, they

10   instructed him, and I believe the tape proves to a certainty

11   that it didn't happen.  There isn't a violation.

12             THE COURT:  Well, we all understand the Massiah

13   requirements.  Let's do this.  You have reviewed the tape with

14   the representations that that's the entire postinformant

15   conversations that this potential witness and Mr. Mohamadi

16   had.  Why don't you review it and identify--  Because I think

17   really my inquiry is what did he say during the time he was

18   with Mr. Mohamadi and was it suggestive and did it violate his

19   rights.

20             So, pretty much regardless of--  I mean, if there is

21   something where you think that the agent may have said, ask

22   this question this way so you elicit this response, if it is

23   close enough, we will hold a hearing.

24             MR. SALVATO:  Should I submit something--

25             THE COURT:  Well, you already have that information,

92

1   right?

2           MR. SALVATO:  But should I submit a supplemental

3   pleading indicating at this point, therefore, we need a

4   hearing?

5           THE COURT:  Yes.  Otherwise I don't think an

6   evidentiary hearing is necessary.  We can still reserve for

7   argument on the Friday before the Tuesday trial if you want,

8   that's fine, if you want to frame the argument.

9           Because right now I have a legal argument and I have

10  the representations that he was told what he should and

11  shouldn't do.  That he did that.  He has testified in the

12  state court, but evidently not concerning this matter.

13          So, that's not going to be very helpful.  But we do

14  have the tape of him conversing with Mr. Mohamadi, which is

15  the complete postinformant conversation.

16          So, let's look at that and frame the issue after you

17  have had an opportunity to focus on that.  Because that's what

18  I am going to be looking at.  And if there is something that

19  is suspicious and you want the ATF agent produced, we will

20  produce him on the Friday.

21          MR. SALVATO:  On that Friday, the 9th?

22          THE COURT:  On the 9th.

23          MR. SALVATO:  And with regard--

24          THE COURT:  To Mr. Mohamadi's statement--

25          MR. SALVATO:  I forget how long that--

93

1          MR. WALUTES:  It's about an hour and ten minutes,

2     Your Honor.  But I think given my experience in this hearing,

3     that the Court may want to hear the tape anyway in its

4     entirety.  So, perhaps the simplest thing is to simply submit

5     the tape, if I haven't already, to the Court, the hour and ten

6     minutes, and the Court could review it.

7          I believe on that the Court will hear the advisement

8     of rights.  I think the Court will hear Mr. Mohamadi saying

9     that he understands repeatedly his rights and he will only

10     answer the questions that he wants to answer.  I think that is

11     going to involve a legal issue that needs to be resolved.

12          MR. SALVATO:  It may or may not.  Obviously, Your

13     Honor, I can file something in addition to that.  We can deal

14     with that on the 9th as well.  There may have been prior

15     conversations.  Obviously, that is not a four-hour tape, that

16     is only an hour tape.  But at the same time, I will revisit

17     that issue and perhaps file something of a supplemental nature

18     on that.

19          THE COURT:  All right.

20          MR. SALVATO:  Obviously, the issue can go beyond

21     that hour or so because Mr. Mohamadi wrote to the agents.

22     What was their understanding about why they were going over

23     there?  There is a lot of topic areas that are outside of, I

24     would respectfully submit, that tape.

25          The same thing with the four-hour tape.  There have

94

1    to be other conversations with that informant about what he is

2    to say and what topics to touch on and what hot buttons to

3    push and those types of things, Your Honor.

4              THE COURT:  Okay.  Well, let's make sure the ATF

5    agent is available on the 9th because it seems more likely

6    than not that he or she will be called for that testimony.

7    And I will look at the hour or listen to the hour tape--  It's

8    a videotape or it's an audio tape of Mr. Mohamadi's interview?

9              MR. WALUTES:  Your Honor, I think it is both video

10   and audio.  The Court can watch whatever you choose, but the

11   video is what you need.

12             THE COURT:  That's all I need.  All right.  And we

13   will reserve that for the 9th as well.  And I will look at the

14   videotape submissions on the photo spreads as well.

15             Is there anything else I am forgetting?

16             MR. WALUTES:  I don't think so, Your Honor.

17             MR. SALVATO:  No, Your Honor.  Thank you for your

18   patience.

19             THE COURT:  No, I am happy to do it.  It is

20   appropriate to set this at 2, give us time to resolve the

21   multiple motions.  I appreciate the preparedness of counsel.

22             All right, this matter is continued in part until

23   the 9th.  And when we understand a little bit better what we

24   want to do on the 9th, if there is any postbriefing, let's try

25   and get your brief out, with 72 hours for the Government to

95

1    respond if they so choose.

2              MR. SALVATO:  Yes, Your Honor.

3              THE COURT:  All right.  Good.

4              All right, we are in recess until Monday morning.

5    ------------------------------------------------
                       HEARING CONCLUDED
6

7

8

9

10

11

12

13

14

15

16

17

18              I certify that the foregoing is a true and

19    accurate transcription of my stenographic notes.

20

21

22
                    /s/  Norman B. Linnell
23              Norman B. Linnell, RPR, CM, VCE, FCRR

24

25