1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




------------------------------:
                              :
UNITED STATES OF AMERICA       :
                              :
                              :
     -vs-                      :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,              :
               Defendant.      :
                              :
------------------------------:
```

MOTIONS HEARING

December 11, 2009

Before:  Liam O'Grady, Judge

APPEARANCES

Ronald L. Walutes, Jr. and Stephanie B. Hammerstrom,
Counsel for the United States

Frank Salvato, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| RAYMOND F. PATTERSON | DIRECT | 4 |
| | CROSS | 19 |

3

```
1              THE CLERK:  Criminal case number 1:09-cr-179, the

2    United States of America versus Mirwais Mohamadi.

3              MR. WALUTES:  Good morning, Your Honor.  Ronald

4    Walutes and Stephanie Hammerstrom for the United States.

5              THE COURT:  All right, good morning.

6              MR. SALVATO:  Good morning, Your Honor.  Frank

7    Salvato for Mr. Mohamadi.

8              THE COURT:  Good morning.

9              Good morning, Mr. Mohamadi.

10             THE DEFENDANT:  How are you doing, sir?

11             THE COURT:  All right.  This comes on the docket for

12   hearing on Mr. Mohamadi's competency to assist in his defense

13   and competency at this time under Section 4241.  The motion

14   was made and granted that he be examined to determine his

15   competency and ability to assist in his defense.

16             He was examined by Dr. Patterson, who has filed a

17   written report with the Court that has been shared with

18   counsel on November 20 of 2009.  In that report he relates the

19   information that he reviewed in interviews with Mr. Mohamadi,

20   and finds to a reasonable degree of medical certainty that he

21   currently understands the nature and consequences of the

22   charges against him and is very capable of assisting his

23   attorney in his defense.

24             He further finds, and evidently Mr. Mohamadi agrees,

25   that he does not have any serious mental illness and does not
```

R.F. Patterson - Direct

4

1    have any mental health issues that would prevent him from

2    assisting his attorney or understanding the processes at

3    trial.

4             We are here then for the return of the findings and

5    also for, pursuant to 4247(d), to hear any other evidence that

6    defendant would like to present at this time.

7             Mr. Salvato, do you have any other witnesses that

8    you wanted to call?

9             MR. SALVATO:  Your Honor, I know Dr. Patterson is

10   here, and I would like to call him on a few matters, if I

11   could.

12            THE COURT:  All right.  Dr. Patterson, good morning,

13   sir, please come forward and be sworn.

14            THE WITNESS:  Good morning, sir.

15            THE COURT:  Good morning, sir.

16            NOTE:  The witness is sworn.

17            RAYMOND F. PATTERSON, called by counsel for the

18   defendant, first being duly sworn, testifies and states:

19       DIRECT EXAMINATION

20   BY MR. SALVATO:

21   Q.   Good morning, Dr. Patterson.

22   A.   Good morning, Mr. Salvato.

23   Q.   Sir, I wanted to just ask a series of general questions

24   and then some specifically about your report to the judge, if

25   I could.

R.F. Patterson - Direct

5

1    A.   Certainly.

2    Q.   I will give you a second--  Do you have everything in

3    front of you?

4    A.   I am fine.

5    Q.   Just generally speaking, Dr. Patterson, can you tell the

6    Court what made you come to the conclusion that Mr. Mohamadi

7    is competent to understand the proceedings and to assist

8    counsel?

9    A.   Well, as I stated in my report, I reviewed a number of

10   documents that are listed.  I also met with Mr. Mohamadi in

11   the courthouse.  Good morning.

12        And also spoke with you in your office and spoke

13   with Mr. Walutes.

14        I had a brief conversation with the mental health

15   director at the Alexandria Detention Center, as well as Deputy

16   Burnham, who provided some documents to me.

17        Based on that information as I gathered--  And I

18   think I did not list the records from Fairfax County which I

19   got after filing my report, which did not change my opinions

20   in any way.

21   Q.   And that was one of the specific questions I wanted to

22   ask you.  I see that on pages 2 and 3 of the report you go

23   through the documents you used and what investigative methods

24   you used.

25   A.   That's correct.

R.F. Patterson - Direct

6

1    Q.   And you met with defense counsel in his office, and I

2    informed you of the Fairfax County case that Mr. Mohamadi had,

3    is that correct?

4    A.   That's correct.

5    Q.   And based upon that conversation, were you able to get

6    some records and some results from his Fairfax County case

7    that are not listed in your report?

8    A.   No.  The Fairfax County records I am mentioning had to do

9    with once he was incarcerated in Fairfax County prior to

10   coming to Alexandria.  During our discussion, as I think you

11   will recall, I did not believe that anyone would release

12   records to me without a release coming, that was signed by Mr.

13   Mohamadi, that I would have access to those records.

14          And the way we left it, as I understood it, is that

15   you would try to get those releases, that you would be seeing

16   Mr. Mohamadi the following day.  I did not get releases.

17   Q.   Okay.  So, there are two separate issues then.  The

18   Fairfax County jail records?

19   A.   That's right.

20   Q.   Okay.  And we spoke about that a little bit.  Can you

21   tell me what the results--  And those records are not

22   reflected in your report?

23   A.   That's right.  Those records essentially reflect that

24   Fairfax County, conducting their intake mental health

25   screening as is customary in most jails that I am familiar

R.F. Patterson - Direct

7

1    with, which revealed that Mr. Mohamadi did not have any mental

2    health issues that they felt were necessary to address.  But

3    they did involve him in I believe a substance abuse awareness

4    group process because he had reported that he had had some

5    difficulties with alcohol and some experience with other

6    drugs.

7    Q.   Okay.  And did you examine Mr. Mohamadi's court records

8    from his Fairfax County Circuit Court case?

9    A.   No.

10   Q.   Okay.  So, you are not aware whether or not a

11   psychiatrist or psychologist testified in that particular

12   case, is that fair to say?

13   A.   I am not.

14   Q.   Just a few more questions in general terms and then I

15   just have a couple questions about the report.

16   A.   Sure.

17   Q.   When you spoke to Mr. Mohamadi, did he display any

18   symptoms consistent with paranoia or mistrust when you

19   interviewed him and when you reviewed his records?

20   A.   Well, I wouldn't call them symptoms.  Mr. Mohamadi

21   certainly expressed his distrust for the system.  And he

22   expressed some distrust for officers at Alexandria Detention

23   Center as well as the Northern Neck Detention Center, and made

24   reference to one specific officer that he was concerned about

25   possibly tampering with his food.

R.F. Patterson - Direct

8

1    Q.   Okay.  And specifically I believe on page 7 of 9, that's

2    where this subject is addressed, is that right?

3    A.   Yes.

4    Q.   Okay.  And I see in the middle of the page it indicates

5    Thought Content, and about middle of that particular paragraph

6    you indicate:  While Mr. Mohamadi reports this information, in

7    my opinion it is not based on his having a dilutional

8    disorder, but rather paranoid and antisocial personality

9    traits.

10          Is that correct?

11   A.   That's correct.

12   Q.   And then as a follow-up to the thought content on page 8

13   out of 9, you write about thought processes, is that correct?

14   A.   That's correct.

15   Q.   Okay.  And in that paragraph you indicate--  Or what did

16   you find with respect to his thought processes?

17   A.   Well, Mr. Mohamadi--  When I made mention to his

18   particular personality traits, personality traits are

19   essentially how we deal with other people and how we see

20   ourselves.

21          Mr. Mohamadi is, was I think very comfortable

22   talking with me and wanted to explain many things, but also

23   recognized that he should not get into any attorney/client

24   privilege issues, should not get into any of the details of

25   any trial strategy, et cetera.  This evaluation was based on

1    and focused on a competency evaluation.

2          But he is quite loquacious.  And some of the records

3    made reference to his at times being circumstantial.  In fact,

4    in talking with him about his relationship with you, he

5    reported to me that he understands you may become frustrated

6    with him at times because you at the time that we discussed it

7    were his primary contact socially and professionally as he has

8    been at the Northern Neck facility.  So that he talks about

9    many things in considerable detail.

10         I should add that that is fairly consistent with his

11   occupational functioning prior to this incarceration.  He was

12   a car salesman, and car salesmen tend to be people who talk

13   quite allot to get their points across and display their

14   products, he is quite good at that.

15         It has been described as circumstantial.  Which

16   means in a mental health context, more detail than most people

17   might provide on a particular subject.  And in my description

18   of thought processes, which is part of the mental status

19   examination, I said that he does have some evidence of

20   circumstantiality in that he goes into extensive tell about

21   particular issues of concern to him.

22         In this matter it had to do with his case, his

23   missing his family, his daughter and other issues of concern

24   to him, which I thought were quite appropriate given the

25   circumstances.

R.F. Patterson - Direct

10

1        I did not find that degree of circumstantiality to

2   be indicative of any mental illness, but rather his limited

3   social contacts with other people.  So, when he has a chance

4   to talk with someone who I think he believes is listening to

5   him and has interest in what he has to say, he provides a lot

6   of detail.

7   Q.   Okay.  So, in general terms then, the lot of detail can

8   be loosely described as a lack of focus on one particular

9   issue and too much detail about other issues, is that what you

10  are getting from him?

11  A.   No, that's not what I am getting from him.  It's not a

12  lack of detail or a lack of focus.  It is more detail and

13  being very focused on what he wants to talk about in response

14  to questions or that are of concern to him.

15        We all in our experiences probably know people who

16  are pretty circumstantial and at some point we say, okay, I

17  have got to go.  There are other folks who are not at all

18  circumstantial or providing extensive detail, and we sometimes

19  have to ask more and more questions.

20        With Mr. Mohamadi, I could ask a question and he

21  could talk about it for a few minutes.  And I would ask

22  another question, he would talk about that for a few minutes.

23  So, it wasn't a lack of focus at all.  He is very focused.

24  Q.   Okay.  And you're aware of the conditions and the limited

25  contact that he has with family members at the Northern Neck

R.F. Patterson - Direct

11

1    Jail?

2    A.    Yes.

3    Q.    What impact, if any, do those conditions have upon his

4    thought processes?

5    A.    They don't have an impact on his thought processes in any

6    significant manner.  I think his circumstantiality is just

7    part of who he is, he talks about things that are of interest

8    to him.  He has limited access to people.  And, therefore,

9    when he does have the access, I think he talks about them in

10   considerable detail because he has got that limited access.

11            Even with me, we talked in detail about many things.

12   At one point I think early on he started to talk about a

13   particular charge.  And I reminded him, cautioned that we're

14   not talking about the charges and whether he did or did not

15   commit these offenses.  We're talking about his understanding

16   of the processes, his understanding of the charges and his

17   ability to work with you as his attorney.  And he indicated he

18   understood that and pulled back from going into further

19   detail.

20            And at another point he said to me, things are not

21   as they seem, and I can't say more about that at this point.

22            So, I think he understands very well the limits of

23   what this examination was about, but he also I think is quite

24   capable of working directly with you as his attorney in

25   explaining what he thinks and what he, his opinions about what

R.F. Patterson - Direct

12

1    may be said in a courtroom setting.

2    Q.   Do you think his circumstantiality could be reduced

3    through more contact with family members?

4    A.   Well, I think it might be spread out.  I don't know if it

5    would be reduced in the sense that he would be less

6    circumstantial.  I just think he would have more access to

7    more people where he would talk about things with more people.

8    Q.   Did you see any patterns or signs of any schizophrenia

9    with regard to Mr. Mohamadi?

10   A.   Absolutely not.  Mr. Mohamadi, in the two areas that we

11   are talking about right now, thought content and thought

12   processes, those are areas that are specifically designed to

13   look at individuals who may have psychotic disorders or

14   depressive disorders.

15        And schizophrenia being a psychotic disorder, one

16   would expect to find deficits in thought content, such as

17   dilutional thinking, unrealistic ideas.  As well as perhaps

18   thought processes, such as looseness of associations.  Meaning

19   that someone starts talking about one subject, goes to another

20   subject, goes to another subject without completing

21   information on any of them.  Or flight of ideas where they are

22   moving quickly from place to place to place within their mind.

23        He doesn't have those kinds of association defects

24   or thought content deficiencies.

25   Q.   Have there been suicide attempts while he has been

R.F. Patterson - Direct

13

1    incarcerated?

2    A.   There has been one that he reported to me.  I believe, if

3    memory serves me, in October of 2008 in Alexandria in which he

4    considered taking a laundry cord, putting it around his neck

5    and stepping off a ledge in his cell and hanging himself.

6            He reported that he did not do that because of

7    essentially the intervention of a deputy that he had a

8    reasonable relationship with and simply did not act on those

9    thoughts.

10           There was another reference, and I think that was

11   October of 2009 when he was at Northern Neck, in which the

12   information that I got through Mr. Walutes was an e-mail that

13   he had had a conversation with you, you had seen him, Mr.

14   Mohamadi, the day before and you were concerned about

15   suicidality.

16           Mr. Walutes contacted the Northern Neck staff.  And

17   a mental health counselor, from my understanding of the

18   e-mail, evaluated Mr. Mohamadi and did not find any evidence

19   that he was a danger to himself.

20   Q.   What is your opinion or feeling about the potential of

21   his suicidal thoughts with respect to his detention at this

22   point?

23   A.   I think that's a--  Well, suicide risk assessment is

24   based on a risk analysis.  It is not a prediction.  And people

25   in my line of work, mental health professionals,

14

1    psychiatrists, psychologists, are very cognizant that we

2    should not be predicting who may kill themselves, but more

3    whether or not the risk is high, moderate or low.

4            With Mr. Mohamadi, my impression is it's low.  He

5    wants to get through this trial, he wants to get his issues

6    before the Court and decided and return to his family,

7    particularly to his daughter who I believe he misses dearly.

8    So, I don't find that he has a potentially high or moderate

9    risk of suicide.

10           The records from Alexandria particularly make

11   reference to as a juvenile and as an adult his making suicidal

12   threats, but in the context of when he has been receiving

13   disciplinary infractions or having conflicts within the jail.

14   I have been to probably between 90 and 100 jails or prisons

15   over the last 20 years and evaluated detainees and inmates in

16   various conditions, including maximum security and solitary

17   confinement for years in SHUs.

18           So, it is not uncommon for people to sometimes feel

19   very frustrated by that.  The issue is having available mental

20   health staff to make the evaluation in a prompt manner and to

21   keep that individual safe until that evaluation is made.

22           So, if anyone who is incarcerated says, I'm thinking

23   about killing myself, hurting myself, then they should be

24   under constant watch until they are evaluated by a mental

25   health professional regardless of what their setting is.

R.F. Patterson - Direct

15

1           But specifically with regard to your question, one

2   of the diagnoses in my report is adjustment disorder with

3   depressed mood.  That is because of his conditions of

4   confinement and his absence, relative absence of contact with

5   his family.  I believe he misses them.  I believe that would

6   be helpful for anyone who is incarcerated to have contacts

7   with their family.

8           But that is, must be measured against whatever the

9   confinement issues may be.

10  Q.   What steps other than what you have already addressed,

11  what other steps could the Court or myself or the facility

12  take to ensure that the suicidal situation does not rise from

13  a low to a high situation?

14  A.   Well, there are a couple of things.  There are the usual

15  practice of correctional officers or deputies making their

16  rounds on various units to assure that someone is essentially

17  alive and breathing.  And if they have some complaints or

18  concerns, that they can then make referrals to mental health

19  staff for a prompt evaluation.

20          There is a self-referral process.  That if an inmate

21  believes that they are becoming dangerous, that they can refer

22  themselves into sick slip or sick call request to the

23  appropriate parties and be seen by mental health staff at that

24  point.

25          I don't know the full range of the issues that have

R.F. Patterson - Direct

16

1    to do with why Mr. Mohamadi is at Northern Neck or the

2    conditions that have been imposed, so I can't speak to the

3    correctional issues that may have to do with that.

4            But as I have said, I have been to many levels of

5    care and levels of confinement over the last many years, and

6    there are people who have been in solitary confinement in SHUs

7    and maximum security facilities, as I have said, for years.

8    And the issue of how they manage their own mental health and

9    how they access mental health services is the primary response

10   that one can have.

11   Q.  One or two final questions.  What, if any, medications

12   has Mr. Mohamadi been prescribed for any mental health or

13   adjustment issues in the past?

14           And secondly, is there any benefit to any type of

15   medication at this point moving forward in this case assuming

16   the Court finds him competent?

17   A.  Well, two things.  The records and my discussion with Mr.

18   Mohamadi, he reported that when he was an adolescent there was

19   a recommendation he take Depakote, which he didn't want to

20   take because he didn't want to be having any side effects to

21   medications.  Which, again, is not uncommon in my experience.

22           Since he has been incarcerated since 2007 in

23   Alexandria he was prescribed Depakote, and I believe

24   Risperdal.  Depakote is a mood stabilizing medication, it is

25   intended for people who may have lows or highs in their mood,

17

1    to try to stabilize that.

2            Risperdal is an antipsychotic medication, but the

3    dosage he was prescribed was 0.5 milligrams, according to the

4    records, which is a minimal dosage.  So, it was, in my review

5    of reviewing those records, based on his report of having some

6    rapid speech, rapid thoughts, and being very angry, very

7    frustrated with his conditions of confinement and his legal

8    situation.

9            He reported he never took the Depakote, and he took

10   the Risperdal, it was prescribed I believe twice a day, and he

11   would take it once a day when he felt, as he called it, wired.

12   And the wired had to do with his having a lot of thoughts and

13   just being real frustrated, really anxious.  So, he would do

14   that.

15           He also, however, reported taking Seroquel and

16   Prolixin, which was not prescribed for him, but that he got

17   from other inmates because they told him they were sleeping

18   pills.  And Seroquel currently is probably the most abused

19   psychotropic medication in corrections.  And they are called

20   sleepers or in some systems Suzie Qs.  Many people will

21   request Seroquel from the medical staff.

22           And there is a training circumstance inmate to

23   inmate of what to say to the doctors to be able to get the

24   medication.  Sometimes and many times, and that's not a

25   criticism of the doctors, it is in correctional practice,

R.F. Patterson - Direct

18

1  medications are prescribed usually based on the complaint or

2  concern that the inmate expresses, sometimes on observations

3  of the doctors or the correctional staff.  But because of the

4  conditions of confinement, being in a cell, you don't have the

5  social and occupational issues that you might have in an

6  outside world situation.

7       So, if someone reports that I am having trouble

8  sleeping, I am having rapid thoughts, I'm hearing voices, et

9  cetera, they may get a prescription for a medication.

10      The sleepers are frequently traded within

11  correctional institutions, many times by people who don't have

12  any mental illness at all but have convinced the medical staff

13  to give them a particular medicine, they trade it for

14  cigarettes or whatever else may be on the market.

15      And Mr. Mohamadi reported taking Seroquel and

16  Prolixin to help him sleep.

17  Q.  And moving forward?

18  A.  Moving forward, the adjustment disorder--  And I should

19  say, Alexandria diagnosed mood disorder NOS, that's why they

20  prescribed those medications, because they didn't find enough

21  evidence to diagnose other illnesses like bipolar disorder or

22  major depression.

23      Well, adjustment disorder essentially is a diagnosis

24  that is given and can be given basically to anyone if they are

25  going through a stressful situation.  So, you can have

R.F. Patterson - Cross

19

1    adjustment disorder because of a loss a job.  You can have

2    adjustment disorders because of being diagnosed with a chronic

3    or serious medical illness.  You can have adjustment because

4    you are incarcerated.

5          Antidepressants can be helpful with that, to help

6    someone who may have trouble sleeping or may have real

7    frustrations in being incarcerated.

8          When I asked Mr. Mohamadi on a scale of 1 to 10 how

9    he was feeling with 1 being suicidal, just the world is really

10   a bad place and 10 being on top of the world, everything is

11   great, he said he is about at a three and has been at a three

12   since he has been incarcerated.

13         So, technically, hypothetically an antidepressant

14   might help raise that up to a 4 or 5, help him deal with being

15   incarcerated without as much psychological distress.

16         MR. SALVATO:  That's all the questions I have.

17   Thank you, Your Honor.

18         Thank you, Dr. Patterson.

19         THE COURT:  Thank you, Mr. Salvato.

20         Any questions from the Government, Mr. Walutes?

21         MR. WALUTES:  Your Honor, I would only move that we

22   admit formally the doctor's report into evidence as part of

23   this hearing.  And I guess I do have one.

24         CROSS EXAMINATION

25   BY MR. WALUTES:

20

1    Q.    Dr. Patterson, I have listened to some of the detail that

2    Mr. Salvato explored, but in the end is there any issue in

3    your mind that the defendant remains competent to proceed to

4    trial?

5    A.    None.

6    Q.    And the instances where you used malingering, I assume

7    that malingering would be that you don't see those signs

8    exhibited and don't have a basis to see those signs from when

9    he was examined?

10   A.    That's right.  Malingering is diagnosed when there is

11   either a manufacturing or exaggeration of symptoms.  In this

12   case it had to do with voices that were consistent with my

13   experience with people who actually hear voices.

14   Q.    The depression that you discussed at length, that would

15   not be inappropriate for any inmate in a correctional facility

16   or a jail, would that be true?

17   A.    It is certainly common, particularly for people when they

18   are first incarcerated or if they have been locked up for a

19   considerably long period of time and sometimes if they have

20   been in isolation or in medical units.  Inmates who, for

21   example, are in wheelchairs may have depression because they

22   can't get access to the yard and other kinds of things.

23           So, it depends upon their particular conditions.

24   Q.    I guess should ask, there is one other additional

25   question.  Mr. Salvato referred to some records from 2007, but

R.F. Patterson - Cross

21

1    am I correct that competency is an issue that is current?

2         The issue that you were asked by the Court to

3    examine was whether the defendant could be tried today, is

4    that correct.

5    A.   That's correct, competency is here and now.

6    Q.   Okay.  And so, historical information, although perhaps

7    helpful in educating you on what to be looking for, it doesn't

8    resolve the issue today?

9    A.   No.  It is helpful, as you have said, in the sense that

10   you have more collateral information about history, but that

11   may be more germane to other legal issues, not competency.

12   Competency has to do with how someone is functioning currently

13   and are there issues that impede their ability to understand

14   what's going on and the consequences, et cetera, and to assist

15   their attorney.

16        And my impression from Mr. Mohamadi is that he is

17   quite satisfied with Mr. Salvato.  And that Mr. Mohamadi is

18   quite sharp, he doesn't miss much from all that I can see.

19        MR. WALUTES:  Thank you, Your Honor.  That's all the

20   questions I have.

21        THE COURT:  All right.  Any objection to the report

22   being filed as Exhibit 1?

23        MR. SALVATO:  No, Your Honor.

24        THE COURT:  All right, it will be received.  You may

25   take your seat.  Thank you, sir.  Thank you very much for

22

1    assisting us and doing so expeditiously and professionally.

2         THE WITNESS:  Thank you, Your Honor.  My pleasure.

3         NOTE:  The witness stood down.

4         THE COURT:  Mr. Salvato, any other witnesses or

5    testimony?

6         MR. SALVATO:  No, Your Honor.

7         THE COURT:  All right.  Does the Government have any

8    witnesses or testimony it wants to offer?

9         MR. WALUTES:  No, Your Honor.

10         THE COURT:  Argument on competency?

11         MR. SALVATO:  No, Your Honor.  I would submit on the

12    evidence and the report as well.

13         THE COURT:  All right.  Well, I find that Dr.

14    Patterson's report has been properly admitted.  He has looked

15    at approximately 18 different exhibits going over the history

16    of Mr. Mohamadi's mental health.  He interviewed Mr. Mohamadi.

17    He has thoughtfully reviewed each of the issues that he was

18    requested to address, including whether Mr. Mohamadi had

19    auditory hallucinations, and his ability to assist counsel in

20    the trial.

21         I find that his conclusion that Mr. Mohamadi is to a

22    reasonable degree of medical certainty capable of assisting

23    his attorney in his defense and currently understands the

24    nature and consequences of his charges is fully supported by

25    his report.

23

1          And also the fact that he does not suffer from any

2     serious mental illness nor have any mental health issues that

3     would prevent him from assisting his attorney or understanding

4     the processes of trial.  He is not discovering from

5     schizophrenia or other medical health issue which would

6     preclude his assisting his counsel or being competent

7     presently.

8          So, I will file the report.  I will issue an order

9     finding Mr. Mohamadi competent under 4241 of Title 18, et sec.

10         Have you discussed a trial date?  We need to--  Are

11    you prepared to do that this morning?

12         MR. WALUTES:  Your Honor, we have not discussed it,

13    but the Government remains available to do it whenever.

14    Obviously, this case we have been trying to try it since June.

15    I saw a motion that was filed this morning.  Obviously, we

16    would ask the Court to summarily that.  The defendant secreted

17    a letter out of the jail.  In the motion we filed to oppose

18    the insanity examination there was a letter where he used

19    another inmate's identifiers to get out of the jail.

20         If anything, the reason that he is under the

21    conditions he is now is because he stopped the trial in June

22    to fire the first set of attorneys.  He stopped the trial in

23    October because of the malingering attempt saying he was

24    hearing voices.  The best thing the Government would suggest

25    that we could do for this defendant is try him very rapidly,

24

1   and we are prepared to do it at the earliest date the Court

2   has available.

3          THE COURT:  All right.  I am not going to summarily

4   deny your request for conditions, but I will give you the

5   opportunity to flesh that out with more specifics.

6          We are dealing with, historically with someone who

7   when given freedoms while in custody has, at least there is

8   evidence that he has focused on defense versus consulting with

9   family, and as a result gotten himself in more trouble.

10          MR. SALVATO:  I understand, Your Honor, and

11   certainly understand everybody's concerns in that regard.

12          THE COURT:  Right.

13          MR. SALVATO:  And I would like to speak to Mr.

14   Mohamadi about specifically what we could reasonably request

15   from the Court.  You heard from Dr. Patterson about the family

16   contact and that type of thing.  I think that is going to help

17   us, not that that has to be the Court's objective or certainly

18   not Mr. Walutes', but it is going to help us moving forward so

19   that we don't have a more serious issue.

20          THE COURT:  I understand.  And I am sure it would

21   assist you in being able to most zealously represent your

22   client mentally if he is in a better position to do so.

23          MR. SALVATO:  Your Honor, the Government had

24   indicated this was going to be a two-week block of time still.

25   If that's still their estimate, I have some--

25

1          MR. WALUTES:  I do agree, Your Honor, that it is a

2    two-week trial.  We have a lot of tapes of the defendant

3    talking with great detail and video of him talking about how

4    he would like the witnesses killed, the witness killed.  And a

5    lot of our evidence is tapes, it will take sometime to go

6    through.  He is telling a witness what to say in the grand

7    jury and such.

8          So, I do think two weeks with Mr. Salvato, my

9    experience of Mr. Salvato's cross-examination, is not

10   unreasonable.  We might be able to do it in a little bit less

11   than that, but I do think that is a fair block.

12         MR. SALVATO:  I believe so, Your Honor.  And just

13   forward the record, Mr. Walutes' directs are not the most

14   direct either, but we will get to that at trial.

15         Your Honor, my January is packed.  I do have a

16   two-week space of time, my first two-week space of time would

17   be February 15, I would have two weeks available at that time.

18         Then my March, I have a murder trial in Stafford as

19   well as a jury trial in Loudoun, and then my April is open.

20         So, if those two weeks in February could be done.

21   If not, April is open.

22         THE COURT:  All right.  How about February--  The

23   15th is a holiday.  How about the 16th of February?

24         MR. WALUTES:  That's fine with the Government, Your

25   Honor.

26

1          THE COURT:  All right.  The alternative was

2     January 4, but I only have about six days on January 4 to do

3     it, and counsel has indicated he is unavailable.

4          So, we will set it with a jury on Tuesday,

5     February 16.

6          Mr. Salvato, after you have had an opportunity to

7     speak to Mr. Mohamadi about jail conditions--  I am not going

8     to be here next Friday, but I will be here the following

9     Monday, the 21st.  So, if you want to you it down for a

10    hearing on the 21st, we can hear it at that time.

11         MR. SALVATO:  Would the Court be available the

12    afternoon of the 21st?

13         THE COURT:  Yes.  Or the 22nd, whatever.  I am just

14    not going to be here that Friday, so I am doing my motions on

15    Monday.

16         MR. SALVATO:  Unless the Court--  Mr. Mohamadi

17    suggested we could do it today, if I could speak to him for a

18    few minutes, and then we could address it.

19         THE COURT:  That's fine.  Or I have got an 11:30

20    hearing and a 2 o'clock hearing.  So, whenever you want to try

21    and put it on, that's fine.

22         MR. SALVATO:  Does the Court have a civil docket?

23         THE COURT:  No, but I have got some matters back in

24    chambers.

25         So, let's leave Mr. Mohamadi up here and allow him

27

1    to speak with counsel and perhaps we can resolve it this

2    morning.

3              Is that all right?

4              MR. WALUTES:  It is, Your Honor.  I don't have

5    anything until the 2 o'clock docket.

6              THE COURT:  Okay.

7              MR. SALVATO:  I would appreciate that, Your Honor.

8              THE COURT:  Certainly.

9              THE DEFENDANT:  Thank you, Your Honor.

10             THE COURT:  All right.  Yes, sir.

11   ------------------------------------------------
                            HEARING CONCLUDED

12

13

14

15

16

17

18

19             I certify that the foregoing is a true and

20         accurate transcription of my stenographic notes.

21

22

23
                        /s/  Norman B. Linnell
24                      Norman B. Linnell, RPR, CM, VCE, FCRR

25