1

United STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
               Defendant.     :
                              :
------------------------------:
```

MOTIONS HEARING

March 5, 2010

Before:  Liam O'Grady, Judge

<u>APPEARANCES:</u>

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

2

1            THE CLERK:  Criminal case number 1:09-cr-179, the

2    United States of America versus Mirwais Mohamadi.

3            MR. WALUTES:  Good morning, Your Honor.  Ronald

4    Walutes and Mike Ben'Ary for the United States.

5            THE COURT:  Good morning.

6            MR. NACHMANOFF:  Good morning, Your Honor.  Michael

7    Nachmanoff for Mr. Mohamadi, with Whitney Minter and Jeff

8    Corey.

9            THE COURT:  All right, good morning to you all.

10           Good morning, Mr. Mohamadi.

11           THE DEFENDANT:  Good morning, Your Honor.

12           THE COURT:  This comes on for a series of motions,

13   some of them recently filed, 404(b) motions, and also Mr.

14   Mohamadi's motions that he requested permission to file.  And

15   I granted that permission and they were filed the end of last

16   week for hearing today.  And the Government has responded to

17   those motions.

18           I don't know who is going to argue what motions, Mr.

19   Nachmanoff.

20           MR. NACHMANOFF:  Your Honor, if I can propose a way

21   of doing it.  Whatever is most convenient for the Court.

22           There is the motion in limine to exclude the

23   evidence surrounding the gun, that's the June 12 incident that

24   occurred in Washington, D.C.  And if we could address that

25   first, Ms. Minter was going to argue that.

1          If we could then turn to the transcripts and

2     recordings and how to address that under both 404(b) and 403.

3     Mr. Corey was going to address that.

4          And then if we could turn to the pro se matters at

5     the end, if the Court is willing to do that.  There are a

6     number of things that I know Mr. Mohamadi wants to address and

7     that he asked me to address on his behalf as well.

8          THE COURT:  I think that's a good way to proceed.

9          MS. MINTER:  Good morning, Your Honor.

10         We are asking the Court to exclude the evidence that

11    is described by the Government in their motion to admit

12    evidence pursuant to 404(b).  In short, the Government is

13    arguing that because Mr. Mohamadi is alleged to have possessed

14    a .380 handgun on the 12th of June 2007, that it means that he

15    possessed a handgun on May 26 and 27th of 2007.

16         And that is precisely the concept that other bad

17    acts evidence seeks to exclude.  One bad act on a particular

18    day, inviting the jury to assume that that person committed

19    that same or similar or any bad act on another day,

20    specifically the date of the offenses in the indictment.

21         This alleged possession of this .380 in Washington,

22    D.C. took place over two weeks after the date of the offense.

23    And as we acknowledged in our position, that does not

24    necessarily mean that something is excluded for purposes of

25    404(b), but it certainly cuts substantially against any

4

1    argument that can be made with regard to leaning toward

2    intent, knowledge, motive, all of the other things that 404(b)

3    lists.  Because, of course, other bad acts evidence is not

4    admissible if it only goes to show that somebody committed a

5    prior bad act earlier.  And that's exactly what this is, or in

6    this case later.

7           THE COURT:  Well, the argument I think we'll hear is

8    that Mr. Mohamadi allegedly used the gun on the 26th and 27th.

9    That the gun wasn't recovered.  The gun was described.  And

10    that two weeks later a gun meeting the same description, there

11    is another witness who says he saw a gun in Mr. Mohamadi's

12    possession two weeks later which meets the description.

13           And, therefore, it corroborates an element of

14    several of the charges, which is that he possessed a firearm.

15    Which is part of their burden to convince the jury beyond a

16    reasonable doubt that they, that he did possess the firearm,

17    and that it's really intrinsic to the crime.  And if not, then

18    it is certainly relevant to prove knowledge, intent.

19           I think the Government may refine that further, but

20    I think that's where they are headed.

21           So, tell me why it isn't relevant to an element of

22    the, proof of an element of the offense?

23           MS. MINTER:  Well, to begin, Your Honor, to the

24    extent that--  The Government has not put forth an argument

25    that it is intrinsic.  Their argument has been that it is

5

1     extrinsic and it is admissible under 404(b).

2           To the extent that it could be viewed as intrinsic

3     in that it is not there to prove one of the factors listed in

4     404(b), but rather to prove an element of the offense, it does

5     not provide any illumination toward the element of that

6     offense.  It does not show that Mr. Mohamadi possessed a

7     firearm on the 26th and 27th.

8           It shows, assuming the Government can prove what

9     they allege in their 404(b) notice, it shows that he possessed

10     a firearm on the 12th of June.  It shows nothing about what he

11     did on the 26th or 27th except to show that because he is a

12     bad guy who possessed it on the 12th, he is more like to have

13     possession it on the 26th and 27th.

14           Which is precisely what over bad acts rules and case

15     law attempt to avoid, the inference that because he did

16     something bad on one day, he has done something bad on the

17     date of the offense.

18           With respect to the issue that the Court raises with

19     the descriptions, under 404(b) the Fourth Circuit has said in

20     the Van Metre case that there are three things that the

21     Government needs to show before this evidence can be used

22     against Mr. Mohamadi.  The first is that it is relevant and

23     not character evidence.

24           And as we said, because these are wholly unrelated

25     incidents, this is not someone describing an individual

6

1   running from the scene of a robbery on the 26th and 27th

2   holding a firearm, this is something completely attenuated.

3        But the second element is that it is necessary.  And

4   the Van Metre case addresses the issue of necessity.  And

5   quite frankly, in this case it is the furthest thing from

6   necessary.

7        The Government, according to their discovery and

8   Jencks and Giglio material and their arguments in this case

9   thus far, have two witnesses, each of which will testify, as

10  we expect, that they saw Mr. Mohamadi holding a firearm.

11       That is the single best way to prove possession.

12  Anything else is simply bootstrapping.

13       And there are certainly plenty of cases that talk

14  about 404(b) evidence, but the bulk of those talk about things

15  such as motive or intent, obtuse concepts that require sort of

16  a piecemeal of evidence to show what the defendant might have

17  thought or intended on a particular day.

18       This is not the same thing.  The Government has put

19  forth that they are offering this evidence to show possession,

20  and they by their own explanation can prove possession through

21  the testimony of the witnesses.  We don't have to wonder down

22  the path of a two-week later incident involving other people,

23  involving a completely unrelated incident.  They by--

24       THE COURT:  I am sure if they weren't concerned

25  about the cross-examination of those two witnesses, and one of

7

1    whom, of course, has a lot of baggage and the other is a

2    foreign national, that they might be satisfied with the direct

3    evidence that they have, but aren't they allowed to also

4    support that and corroborate it through what still might be

5    necessary evidence?

6            MS. MINTER:  Well, Your Honor, the Van Metre case

7    looks at that exactly and whether evidence is necessary.  And

8    in that case they said that it was necessary because they

9    needed to piece together this other evidence.  They didn't

10   have the sort of direct evidence that we have in this case.

11           But with respect to the last issue that the Court

12   raised, and I apologize for my detour, but the reliability--

13   And this is sort of an interesting case because the

14   reliability at question here, I would submit, is not so much

15   the description of the firearm from the June 12 incident, but

16   rather it is the admissibility, or, excuse me, the reliability

17   of the previous description from Kimberly Riley.

18           The Government repeatedly describes it as a small

19   firearm.  Ms. Riley, although she says it is .380, she

20   describes it as a long weapon.  And she also describes in one

21   of the interviews with police, as she is describing it she has

22   difficulty describing the word "revolver" and describing

23   various guns.

24           I would submit that Ms. Riley's description is

25   certainly questionable.  And so, for us to say that just

8

1    because she said .380 and a .380 was at some point in time

2    recovered, is a difficult match to make because Ms. Riley's

3    description could be whole-heartedly wrong.  For example, if

4    Ms. Riley had said it was a knife, certainly the Government

5    would have no argument that a firearm from another incident

6    was relevant.

7         So, to say a .380 and a .380, that's one argument.

8    But when you look at the fact that Ms. Riley's description

9    doesn't hold up one end of the evidence that we're trying to

10   match up here, it becomes very difficult to say, well, this is

11   the same gun that we saw in both incidents.

12        But I would direct the Court to the D.C. Court of

13   Appeals opinion that we discussed which, again, goes into I

14   think a fairly good analysis of what we need to look at to

15   determine whether this is 404(b) evidence when we are talking

16   good a gun that shows up in a completely unrelated incident.

17        And again, it talks about knowledge and intent and

18   the difficulties that the Government faces in trying to say

19   that because someone had a firearm on another instance, it

20   reflects on what they thought or what they knew on a different

21   date.

22        The biggest problem that the Government has is they

23   are seeking to introduce this evidence to prove possession.

24   And possession on one day does not equal possession on another

25   day.  It doesn't reflect on someone's inner workings, if you

1  will, the way knowledge and intent and motive and some of

2  these other things do.

3          Your Honor, I will tell the Court, at this point we

4  are proceeding based on the Government's position paper that

5  the threats, alleged threats to the dancer from Camelot on

6  June 12 are not on the table at this point.  Certainly those

7  are relevant to nothing and highly prejudicial.  But we are

8  proceeding on the assumption that the Government is not

9  putting those forward at this time in their case in chief.

10         The Government as outlined in their notice describes

11  intent as a large basis for why they are seeking to introduce

12  this evidence, but possession on June 12 gives us nothing with

13  regard to intent on the 26th and 27th.

14         And with regard to the things that the Government

15  needs to prove regarding intent, that Mr. Mohamadi intended to

16  rob these individuals, that he intended to use a firearm in

17  the course of those robberies, none of that is illuminated by

18  what happened on June 12.  This is not a question of an

19  individual saying there was a firearm, but it was the person

20  next to me who possessed it.  These are the sort of issues

21  that are addressed in the case law.  That is not the case here

22  whatsoever.

23         And the Government gains nothing, other than

24  maligning Mr. Mohamadi's character, by introducing these other

25  bad acts.  It does not reflect on what was going on in the

10

1    inner workings of his mind on the 26th and 27th.

2              Finally, Your Honor, I would point out to the Court

3    that certainly many of the facts of this case have come to

4    light at the last minute given our late appointment to this

5    case.

6              The Government did indeed file this motion two weeks

7    before trial, but that is two weeks in a very, very long time

8    period that they have investigated this case.  And given the

9    difficulties that we have had investigating the case, we have

10   quite successfully looked into a number of matters, but that

11   is very much compounded when the notice that the Government

12   gives us has all of the identifying names and information

13   redacted out of the police reports.  We have no idea who these

14   witnesses are, no idea who these people may be.  We have no

15   opportunity to interview them.

16             If this is going to become a trial within a trial,

17   which we certainly submit it should not, but if it is, we are

18   wholly unprepared to defend against these accusations because

19   we don't know who those individuals are.  And we have asked

20   the Government to provide that identifying information, and it

21   has not been provided for us.

22             Finally, Your Honor, with respect to the specific

23   information provided in the 404(b) notice, we would submit

24   that, as we indicated, at most the Government argues that the

25   possession of the gun on June 12 has an illuminating reason

1  for the trial regarding the incidents on the 26th and 27th.

2  There is nothing that can be said to make the incidents

3  surrounding that possession on June 12 relevant.  The incident

4  involving the cab driver, the window to the cab, the other

5  comments that may have been made.  And we would certainly ask

6  the Court to find that those are inadmissible.

7          THE COURT:  All right, thank you.

8          Mr. Walutes.

9          MR. WALUTES:  Your Honor, it's hard to imagine the

10  prejudice to the defense when, had they tried this case in

11  June of 2009, the Government would not have possessed the gun.

12          As to the availability of the witnesses, the notice

13  itself, Your Honor, filed, as defense counsel just noted, back

14  in February, identifies the employment and role of the witness

15  the Government intends to call.

16          THE COURT:  Slow down and speak a little louder,

17  please.

18          MR. WALUTES:  I'm sorry.  The witness is identified

19  by employment in the Government's own notice, Your Honor,

20  filed back last month.  The person knows the defendant for two

21  years in his role as security for Ozio's Nightclub.

22          The defendant has been moved, I am not sure if the

23  Court is aware of this, but he has now been moved permanently

24  to Alexandria to allow rapid working with his counsel.

25          So, the defense counsel could ask their client.

12

1    They don't need to ask the Government.  When they asked me the

2    question, I gave that response.  To repeat it to the Court

3    today without explaining why the defendant is not the source,

4    I think makes that, frankly, a hollow argument.

5             The only thing I would say, Your Honor, I think the

6    Court--

7             THE COURT:  Then why not provide the name of the

8    witness?  It's now four days, five days before trial.

9             MR. WALUTES:  The witnesses, particularly the

10   stripper, is terrified of this defendant.  He threatened to

11   shoot her in the head.

12            Frankly, Your Honor, the Government's generous offer

13   for a number of reasons, not to put that into this case, is

14   because, frankly, she is very scared.

15            THE DEFENDANT:  Well, she is lying.

16            THE COURT:  Okay.

17            THE DEFENDANT:  I'm sorry.

18            THE COURT:  Okay.

19            MR. WALUTES:  Your Honor, I would say on the record

20   of this case there is--

21            THE COURT:  No, I am talking about the security

22   official.  Who would you--  I am not going to allow in the

23   extraneous stuff, the breaking the window on the taxicab and

24   the comments made.  I am focused on the possession of the

25   weapon and its admissibility.

13

1            So, if you get that preliminary ruling from me,

2    which I am not going to change my mind about, then how many

3    witnesses do you need to prove that part?

4            MR. WALUTES:  Two witnesses, Your Honor.  Police

5    Officer Holly Paige from the D.C. mobile crime, I think her

6    name is not redacted in any of the police officer reports.

7            THE COURT:  Who recovered the weapon.

8            MR. WALUTES:  Recovered and processed the weapon,

9    Your Honor.  And the second is the security guard from Ozio's

10   who has known the defendant for a couple years.

11           THE COURT:  All right.

12           MR. WALUTES:  Obviously, Your Honor, when I say a

13   couple years, I mean a couple years prior to 2007.  The

14   defendant has subsequently been locked up and the witness has

15   had no contact with him.

16           THE COURT:  Since that time?

17           MR. WALUTES:  Correct.

18           THE COURT:  All right.  And he knows who the

19   security guard is and has known him for a period of--

20           MR. WALUTES:  I believe that to be true, Your Honor.

21   He said that the two of them used to greet all the time.  He

22   would try to get free drinks.  He said before this day they

23   had a very amicable relationship.  That the defendant was

24   frequently at Ozio's, at least once a week, and that they all

25   greeted each other.

14

1          In fact, that day they had a very amicable

2     relationship.  And even when he was being ejected from the

3     establishment, the guard was trying to explain it in a very

4     amicable way to the defendant.

5          THE COURT:  And is there--

6          MR. WALUTES:  And, Your Honor, frankly, if Mr.

7     Nachmanoff calls me and he can't get the answer that way, I

8     will give it to him.  I understand the point the Court is

9     making.

10          THE COURT:  All right.  Speak to your counsel, Mr.

11     Mohamadi.

12          Is there Jencks material involving this witness or

13     not?

14          MR. WALUTES:  No.  The 911 call, Your Honor, that

15     was given to defense counsel a couple weeks ago.

16          THE COURT:  There was a 911-

17          MR. WALUTES:  The 911 call that he places.

18          The only other point I would make, Your Honor, is

19     the Court has actually seen the videotaped interviews of KR,

20     Kimberly Riley.  So, the Court knows that the .380 is being

21     used by her.  I think the Court has a very clear understanding

22     of that point.  We agree with the Court that it is

23     corroboration.

24          The last point I would make, Your Honor, is that it

25     is the weapon.  It is not a weapon, as Ms. Minter keeps

1   saying, this is the weapon.

2           When the defendant is talking about having had a

3   .380 to inmate number 3 on the recorded tapes, he doesn't say,

4   I had two .380s.  He says, I had a .380.  And this is it.

5           THE COURT:  So, your argument in response to the Van

6   Metre and Linares case is what?

7           MR. WALUTES:  Is that this is the weapon, Your

8   Honor.  It is relevant.  The fact that he has it, as I say,

9   two weeks, I frankly think that to be an amazingly close

10  period of time.  That he is possessing it on his person shows

11  that he had access to it and used it.

12          So, it goes to Counts 1 through 5, but it also

13  corroborates both victims, the taxicab driver and Kimberly

14  Riley.  Kimberly Riley is describing it as a .380, and it is a

15  .380.  And the taxicab driver characterizes it as a small,

16  black firearm.  And it is a small, black firearm.

17          Your Honor, I think it goes both--  And as the Court

18  noted, I don't believe that there is any expectation that they

19  will be waiving cross-examination of either of the victims in

20  this case.  Both will be appearing, they are both under

21  subpoena, and the Government is entitled to those two

22  corroborators.

23          I think the defendant's pro se motions serve wisely

24  to remind everyone that he is contesting all points.

25          THE COURT:  All right.  Thank you.

16

1          Ms. Minter.

2          MS. MINTER:  Just very briefly, Your Honor.  With

3    respect to, I already explained to the Court our concerns

4    about the lack of reliability with Ms. Riley's description of

5    the firearm.

6          And Mr. Haile, the cab driver, gave a description

7    perhaps of a small, black firearm, but he then upon further

8    inquiries from law enforcement officials isn't able to specify

9    if it's a revolver or a semiautomatic after being shown

10   pictures.

11         Again, we have a situation where essentially this

12   evidence will come in to say that gun looks like the gun that

13   I saw.  Not that gun is the gun.  And the Government asserts

14   this is the gun.  But we have no evidence, we have no reason

15   to believe that.

16         What we have is this gun on June 12 looks like this

17   gun from May 26 and 27th.  And again, that goes to the

18   reliability.  But assuming for the moment that the Government

19   could prove that it was the exact same description, they still

20   have the difficulty of proving that possession on the 12th of

21   June equates to possession on May 26 and 27th.  And they can't

22   do that.  It's an improper use of the evidence to say that

23   this gun looks like the gun that I saw.

24         If the Government wants to introduce the firearm as

25   a demonstrative, that's one thing.  To introduce it as this is

17

1    the firearm that was later recovered from Mr. Mohamadi's

2    possession, that's an entirely different thing.  We would

3    submit that is improper.  We would ask the Court to exclude

4    the evidence of the firearm as well.

5           THE COURT:  All right.  Well, I need to look a

6    little bit further on some cases regarding the recency, the

7    two-week period.

8           But I have reviewed the videotape of victim number

9    1, and I will do so again, but I think her description of the

10   weapon and her apparent sophistication with weapons is

11   apparent.

12          Now, it may turn out that the testimony at trial

13   comes in differently, and certainly the admissibility of

14   404(b) evidence is not made firmly before the trial because

15   the facts of the case may not come in the way the parties

16   predict.

17          So, I am going to look a little bit more at some

18   recent possession cases and as they involve the facts of this

19   case, and I will get you a decision this afternoon or first

20   thing Monday morning.

21          But the most that is coming in in this portion of

22   the case is possession of the weapon on the 12th.  None of the

23   extraneous acts, which I find are unnecessarily prejudicial

24   without being probative, sufficiently probative.

25          So, all right, let's move on to the transcripts.

18

1          MR. COREY:  Good morning, Your Honor.  This motion
2     relates to the recordings the Government intends to admit.
3          The Government intends to admit evidence, many hours
4     of recordings, as Your Honor is aware.  Now, these recordings
5     relate to Mr. Mohamadi's conversations with a Government
6     informant, Mr. Richard Bryan.  And also recordings of Mr.
7     Mohamadi's phone calls to an individual named Dominik Brown.
8     In our motion we have identified a very small portion of those
9     recordings that we believe should be excluded under Rules
10    404(b), 403 and 402.
11         Now, the Government's position seems to be that all
12    of these recordings are admissible as intrinsic evidence.  For
13    example, the Government claims that Mr. Mohamadi had
14    conversations, that his conversations with Mr. Bryan were part
15    of a carefully orchestrated scheme to convince him to commit
16    murder.  Now they are saying every single one of those
17    conversations was part of the scheme.
18         The reality, Your Honor, is that the transcripts
19    show that Mr. Mohamadi and Mr. Bryan had many, many different
20    conversations, sometimes at various different points in the
21    jail.  And these conversations are just simply not one giant
22    scheme.  It's just not credible to claim that they are
23    inextricably intertwined.
24         And I think the case law points this out.  For
25    example, United States versus Chin.  In that case the

19

1   defendant sold heroin and made statements in the middle of a

2   drug deal that he had killed people in the past.  And the

3   Fourth Circuit held that that statement, that in that context

4   killing was an integral part of the defendant's criminal

5   enterprise.

6           Here, Your Honor, though the Government is

7   overreaching, they are trying to get statements in of things

8   like conversations Mr. Mohamadi had about individuals having

9   sex change operations and statements Mr. Mohamadi made about

10  selling drugs in the past.  Drugs, of course, are not at issue

11  in this case.  We submit that's clearly Rule 404(b) evidence

12  and should be excluded on those grounds.

13          Similarly, comments about Mr. Mohamadi's efforts to

14  obtain counsel, it's just certainly not relevant.  It's not

15  intrinsic evidence of anything.  And the Government claims,

16  Your Honor, in its motion that Mr. Mohamadi discussed the need

17  to fire an attorney because his attorney would not participate

18  in obstructing justice for witness tampering.  That's just

19  simply false, that's not what the transcripts say.  As you

20  will see from the transcripts, Mr. Mohamadi complains in the

21  portions that we have cited about costs associated with his

22  lawyer and his lawyer not returning his calls.

23          Again, it's just overreaching to try to make the

24  case that this is intrinsic evidence of something that it's

25  not.

20

1          Again, we cite many examples of this in our motion,

2    the picking up women in bars, and probably most notably the

3    conversations relating to murder which we cite at length.

4          Now, under Rule 404(b), I think the Government is

5    trying to use this evidence as pure character evidence.  That

6    Mr. Mohamadi acted in conformity with these--  Basically

7    trying to say that he is a bad person and so, therefore, you

8    should convict him on the crimes in the indictment.  Which is

9    precisely what Rule 404(b) is designed to exclude.

10          Now, I guess the Government's theory is that Mr.

11   Mohamadi is trying to teach Mr. Bryan or talk him into a

12   scheme or win his trust over.  Again, the reality is proved by

13   the transcripts.

14          Those transcripts, first of all, they are hard to

15   understand at all what they're talking about.  And

16   specifically the murder conversation appears to be some kind

17   of long, rambling story about some other event that, again, it

18   just not simply tied at all to this case.  And it just is

19   clearly 404(b) evidence.  And if not, it would certainly be

20   inadmissible, we believe, under Rule 403.

21          In addition to those conversations, there is also

22   conversations regarding prostitution.  Again, we have

23   identified what we believe are very narrow portions of that

24   overall conversation which should not be admitted under Rule

25   403.

21

1              Now, we realize that the Rule 403 standard is a high

2     one, but, again, what we have identified are a very few

3     instances in which their conversations just go beyond the

4     bounds.  I mean, the derogatory comments about women and

5     racial minorities are precisely the type of things that we

6     think could enflame the jury and distract them from the issues

7     at hand.

8              So, with that being said, Your Honor, we

9     respectfully request that the portions of the transcripts that

10    we have identified in our motion be excluded.

11             THE COURT:  All right, thank you, Mr. Corey.

12             MR. WALUTES:  Your Honor, I apologize, I know some

13    of the grammar in my motion wasn't letter perfect.  I tried to

14    get something in writing to the Court before today.

15             THE COURT:  That's all right.

16             MR. WALUTES:  The bottom line is it is the crime,

17    Your Honor.  It isn't pretty, I concede that.  I know Judge

18    Brinkema in one of her cases said, you know, listen, the

19    Government wasn't in there, it was your client talking, it is

20    a tape of your client.

21             Is there foul language?  There is.  Are foul words

22    used like punctuation through the entire tape?  They are.

23    Your Honor, that is absolutely true.

24             It is also true that the tape is the crime.  I think

25    that to the extent there is any prejudice, it is certainly

22

1   outweighed by the probative value.  I don't believe that it is

2   404(b).  I think Chin speaks directly to this type of case.

3          We have a relationship which is predicated on, I am

4   hiring you to kill someone for me.  And then the level of

5   trust, the fact that there is a videotape, and one needed to

6   orient to themselves.  At one point the defendant in this case

7   tells inmate number 3, shhh, when he says the taxicab driver's

8   name.  The defendant is very afraid that they are too close to

9   other inmates.  The videotape shows all these things, Your

10  Honor.

11         The entire videotape shows the nature of the

12  relationship, the confidentiality of the information.  It

13  eliminates all the defenses that one might imagine could be

14  advanced in this type of case where the Government has such

15  evidence.

16         But, Your Honor, the videotape is the crime.  And to

17  try to parse it, it is incredibly unfair to the Government.

18  It is intrinsic evidence.  It is the story.

19         And given--  I cited, I know I blocked a lot of

20  quotage out of, what little few case there are on

21  solicitation, but the Government must show the surrounding

22  circumstances.  The jury is entitled to figure out for

23  themselves whether or not this defendant really meant to kill

24  someone.

25         These are very serious charges, as this Court is

23

1   well aware, and the tape proves it.  Your Honor, the parts

2   they object to, and obviously I was reading them very rapidly,

3   I am trying to clip it down because I think we can do this

4   with certain clips.  I don't think we have to play four hours

5   of tape.  But the tape is inmate number 3 and the defendant

6   talking on two days inside the Alexandria Detention Center

7   going over the plan to kill this taxicab driver.  And part of

8   that is the financial reward and the position in the

9   prostitution business.  Does the defense--

10          THE COURT:  Well, clearly the plan to kill the

11  taxicab driver is the crime.  And the reward is the position

12  in the prostitution business.  And in part the conversations

13  are relevant to show that Mr. Mohamadi was in the business,

14  that he had the money if that's what the informant wanted.

15  And those are pretty clear.

16          The conversation about the drugs and the attorney

17  being fired for not agreeing to violent the law, and also the

18  prior homicides, are pinpointed events which are, you know,

19  obviously prejudicial, it's just a question of whether its

20  probative value is outweighed by that prejudice.

21          So, tell me, focus in on that, why that can't be

22  redacted and you still get the full flavor of the crime.

23          MR. WALUTES:  If I could, Your Honor, I want to put

24  into two boxes, if I can, the inmates' conversations and then

25  the defendant's telephone conversations with Mr. Dominik

24

1    Brown.  They apply to different counts.  There are some shared

2    similarities.

3           In the box with the conversations with inmate number

4    3, the defendant there is talking about his experience in

5    murdering.  There, Your Honor, the Government believes that

6    that is this crime.  It is asking a person to commit a murder.

7    He is telling him, Your Honor, he is telling him how to dress

8    as either a UPS deliveryman, a police detective, a Pizza Hut

9    thing.  And he has to make the person believe that this advice

10   is coming from a source that is credible, somebody who knows

11   of what he speaks.

12          He tells him that it takes the police at least

13   30 minutes if not an hour to respond to shots.  That witnesses

14   never look.  That if he fires at bystanders, they will flee.

15   That people wiggle when they are hit with bullets.  And that

16   he should keep shooting into the body until the wiggling stops

17   and then shoot it in the head.

18          Your Honor, there is incredible detail in this

19   murder for hire.  The point there, Your Honor, is that the

20   fact that he is claiming, whether it is boasting or not, that

21   he has previous experience in doing crimes of violence, I

22   think, Your Honor, it is not any more prejudicial than the

23   crime being charged and it is probative of the fact that the

24   man is portraying himself as being an expert in this field,

25   someone whose advice is sound, and that this is a crime that

25

1    can be committed successfully.

2           And I believe, Your Honor, the Government is

3    entitled to that, for the jury to hear that to determine for

4    themselves whether or not they believe that's true.

5           The Government is not trying to say, and the defense

6    may argue, that he didn't commit any prior murders.  The point

7    here is he is trying to make the inmate believe that he did

8    commit prior acts of violence and that he knows of what he

9    speaks.  And that, Your Honor, goes to the crux of the charge.

10          The drug dealing, Your Honor, I think is being

11   discussed as something that could you set me up in that

12   instead of prostitution.  And the man says, I don't do that

13   anymore.

14          Given that Ms. Riley will say that he did drugs in

15   front of her, Your Honor, I don't think there is any prejudice

16   there that outweighs the probativeness of having the complete

17   videotape interaction with inmate number 3 before this jury.

18   They won't be able to later claim that this is some sort of

19   fanciful, imaginative, that all these are just bizarre claims.

20   If they have the whole tape, the jury can for themselves

21   decide whether this is a farce, if this is imaginative or if

22   this is real.

23          Your Honor, I believe that that is the strength of

24   the presentation.

25          If I could move to the second box, which is the

26

1    telephone conversations with Dominik Brown.  The first two

2    that they don't object to, Your Honor, I want to give it to

3    the Court in context, he is calling Dominik Brown, he is

4    having him in an emergency fashion--  Because his family has

5    just told that him that Ms. Riley is going to the grand jury,

6    flying from Miami to Alexandria.  He wakes her up at 2 in the

7    morning.  She hangs up on him.  He is telling Mr. Brown this

8    call has to go through.  He is telling her to write it down.

9    He has her read it back.  Those are the first two calls.

10         Then we have the coming back, he was checking up on

11   Mr. Brown whether he in fact went to the federal grand jury.

12   Mr. Brown is saying, I couldn't get down there, they won't let

13   people without grand jury subpoenas down into the grand jury

14   area in this federal courthouse.

15         And then he is asking him to get in contact with

16   her, find out what she said.  He tells her what text

17   messages--  And she will be testifying, Your Honor, as to the

18   text messages that she received that you can clearly hear.

19         And that then when he finds out that she sends back

20   a message saying, I've asserted the Fifth, he gets furious.

21   And you can hear it on the tape, Your Honor, the tone.  And

22   then he starts to say how he will not have as much

23   maneuverability in the defense he advances.  I admit they are

24   not complete sentences, but I think the Government is entitled

25   to the inference.

27

1          And, Your Honor, in the conversations he is talking

2     about how Mr. Jenkins would not intercede and stop her from

3     appearing before the grand jury.  And then after she has

4     appeared in the grand jury he is furious with Mr. Jenkins.

5          And Your Honor, I think we can--  I am willing to

6     stipulate to the name.  I am willing to put the name into it

7     so it is clear to the jury that none of the current counsel is

8     Mr. Jenkins.  But he is furious with Mr. Jenkins for not

9     interceding.

10          The Court needs to be cognizant of the fact that in

11     Count 9 this same witness, AI, the defendant's girlfriend,

12     went into the state proceedings when he was then represented

13     by Larry Brown and lied and perjured herself.

14          And so, Your Honor, he is contrasting Mr. Jenkins'

15     performance to Mr. Brown's.  And the witness, I will proffer,

16     will testify that her testimony and such, she went to Mr.

17     Brown and saw him after the defendant told her to go do that.

18     And so, she worked through with Mr. Brown.

19          So, there is a contrast to be drawn.  The fact that

20     Mr. Jenkins looks very good on these recordings, that he is

21     very ethical, I am not sure how there is prejudice to the

22     defendant, Your Honor.

23          The fact is, he doesn't want an ethical attorney.

24     He does not want Mr. Jenkins.  And so, I don't see the

25     perception that it is not relevant, Your Honor.  I think it is

1    relevant.  He is contrasting the two counts, 9 and 10, and the

2    different attorneys he was represented by.

3           There is no prejudice in this case because these

4    attorneys were never at any point representing him.

5           And so, we would suggest to the Court that the

6    discussions with the attorney is, frankly, not prejudicial,

7    but it is extremely probative of the fact that this defendant

8    is seeking to have a witness tamper with a witness, which is

9    the charge, Your Honor.

10          The fact that he says he then might as well plead

11   and he cuts the sentence short, he says that he can take the

12   time in federal prison as a soldier, Your Honor, that is an

13   admission by the defendant of guilt.  An innocent person

14   doesn't start to speculate about their ability to serve a long

15   sentence.

16          So, it is the jury hearing a tape of this defendant

17   after he has learned that a witness has gone into the grand

18   jury and potentially testified--  Because he is the one who

19   doesn't believe her claim to have asserted the Fifth, he says

20   that the feds don't get pissed, they immunize.  And, Your

21   Honor, I think it is extremely probative.

22          There was one other thought, Your Honor, and

23   apologize, it slipped out of my brain.

24          But the point is, Your Honor, he is trying to

25   manipulate the system.  And the jury, I believe, is entitled

29

1    to hear that so that they can discern his intent when he was

2    trying to get--  I should tell the Court, the first two calls,

3    he keeps saying, he knows he is on a recorded jail call, he

4    keeps saying, listen, everything I am telling you is the

5    truth, isn't it, Amanda.  Everything I am telling you the

6    truth.

7            So, if you listen to those calls, facially it would

8    look like the defendant is claiming what he is saying is the

9    truth.  When he hears that she may not have said what he told

10   her to say, he is furious.  Which would suggest to one that

11   perhaps what he was telling her to say wasn't the truth.

12           Obviously, that's what's going to be argued at this

13   trial.  That's why I believe I need both sides of the same

14   coin, Your Honor.  I don't believe that there is any prejudice

15   to outweigh that.

16           And, Your Honor, I am sorry, I know the Court has

17   already addressed the prostitution and foreshadowed its

18   thinking on that point, but in the topic about the

19   prostitution, he tells inmate number 3, listen, whenever you

20   are on a telephone call where the feds might be taping you,

21   you always say it's legit, it's just an escort service.  You

22   know and the women know that it's illegal, but you always say

23   it's legit.

24           The point I make there, Your Honor, is I am entitled

25   I think to take that part of the tape and contrast that to

30

1    what he is telling the witness before she travels to

2    Alexandria to testify before the federal grand jury.  This is

3    a defendant who thinks he is being very clever.  That whenever

4    he is on a taped thing, he will facially say--  Your Honor, I

5    know the Court has already heard this a year ago in a

6    different motion, but, I mean, for the telephone privileges

7    for six months he is reading Bible passages into the telephone

8    so that people will believe he is now Christian and so inmate

9    number 3, who is a Moslem, is just persecuting him.

10            I mean, manipulation is the essence of this case, it

11   will be a theme.

12            THE COURT:  All right, thank you.

13            Mr. Corey.

14            MR. COREY:  Yes, just very briefly, Your Honor.

15            I think the Government is giving Mr. Mohamadi far

16   too much credit here in their characterization of this as one

17   giant scheme to win over Mr. Bryan.  Again, the tapes show

18   multiple different conversations at different points in the

19   jail.

20            And it would be very easy I think, Your Honor, for

21   the Government to simply parse out the sections of the tapes

22   and the recordings that we've identified.  We are not asking

23   for a lot.  Frankly, we're not challenging a lot of the tapes

24   and the recordings.

25            On a couple of very specific points.  The efforts to

1    retain counsel.  You just heard the Government speak a lot

2    about what these mean or don't mean.  I think the tapes, the

3    actual transcripts show what they mean.  They show Mr.

4    Mohamadi complaining about costs and someone not returning his

5    calls.  And that's all they mean, and it's not something that

6    is proper or relevant for the jury to consider.

7           Likewise, the conversations about drugs and

8    homicide, they just simply are 404(b) evidence and are not

9    tied to the allegations in this case.  They are not intrinsic

10   to those allegations.

11          And I want to be perfectly clear here, the

12   Government just spoke a lot about portions of the tapes that

13   we're not objecting to.  I just heard the Government talk a

14   lot about people wiggling and testimony about how you should

15   dress, as a UPS agent.  That's not what this motion raises, so

16   I think it's important to keep in mind as well.

17          And that's true also with the comments the

18   Government made about the conversations with Mr. Brown and

19   taking the Fifth.  Again, we have identified a very small

20   portion of those conversations that are simply extraneous.

21          So, I think that's important to keep in mind, how

22   easy it would be to eliminate the objectionable material here.

23          THE COURT:  All right, thank you.

24          Well, I will take it under advisement.  I appreciate

25   the arguments.  I have not had the time to study the tapes,

32

1    the transcripts of the tapes sufficiently to make a decision.

2           I am concerned, frankly, only about the reference to

3    prior murder and prior drug dealing.  I think that the

4    conversations about the prostitution ring and the language

5    used all fair game.  They are all the words of Mr. Mohamadi,

6    and the Government has a right to play them.  Although the

7    jury may take some umbrage with the terms used, they are in

8    fact the words being used.  And that the prostitution ring

9    conversations are very much an integral part of the

10   solicitation to commit murder.

11          But I will look again at the drug dealing and the

12   prior reference to homicides.  Those are in my mind separate

13   incidents which are by their very nature prejudicial.  They

14   may nonetheless be sufficiently probative to be admissible

15   under 404(b) or, as counsel seeks, integral to the crime

16   itself.

17          All right.

18          MR. NACHMANOFF:  Your Honor, just to keep this

19   moving, there is another issue that we would like to raise,

20   which is that we have had the opportunity to discuss at some

21   length with Mr. Mohamadi taking Count 5, which is the felon in

22   possession count, which was the subject of a lot of

23   litigation, and we understand the Court's ruling with regard

24   to not severing it, but in light of the fact that it has not

25   been severed, Mr. Mohamadi has agreed and signed a jury trial

1    waiver so that that count could be addressed as a bench trial.

2         In my discussions with Mr. Walutes, he has agreed to

3    that.

4         And so, if the Court is willing, we would like to

5    take Count 5 and deal with it as a bench trial.  I presume

6    that the Court could take the evidence that is presented to

7    the jury, and then after the jury is deliberating the

8    Government could address those elements that have to be

9    addressed outside the presence of the jury.  That obviously

10   would take away the issue regarding his prior conviction,

11   setting aside whether or not he decides to testify.

12        So, at this time what I would ask to do is to hand

13   up the waiver and ask the Court to confirm that the Court is

14   willing to do so and can confirm, obviously, that the

15   Government is willing to do so as well.  That would leave us

16   to remove some of the jury instructions at a later time.

17        THE COURT:  All right, thank you.

18        MR. WALUTES:  Your Honor, that is an accurate

19   representation of the Government's position.  I think that the

20   case law is all very instructive that the Government should

21   join this motion so as to remove any possible taint to the

22   defendant.  And we would ask the Court to do it in the way Mr.

23   Nachmanoff has proposed, which is to allow the trial to

24   proceed.  Because, as we argued in severance, we believe all

25   that information will then give the Court everything it needs

34

1    to have except certified conviction.

2           THE COURT:  All right.  I am certainly willing to

3    approve the waiver of the trial by jury and decide the

4    possession of the firearm by a convicted felon in a bench

5    trial and do it the way you have proposed.  That's the way I

6    have proceeded in the past, and it worked well then.

7           Mr. Mohamadi, you understand you have a right to a

8    jury trial as to Count 5, the possession of the firearm by a

9    convicted felon offense?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And you have discussed your right to

12   waive the right to a jury to consider that and instead have me

13   make a determination about whether the evidence has

14   demonstrated your guilt beyond a reasonable doubt?

15          THE DEFENDANT:  Actually, sir, I would like to take

16   that back.  I just don't want to waste the Court's time and

17   change it later on.  I think I would just rather have them all

18   together then.

19          THE COURT:  All right.  Well, it's your decision

20   whether you want to waive your right to a jury trial on that

21   count or not.

22          THE DEFENDANT:  If it's possible, can I get 6, 7 and

23   5 as a bench trial?  I would be willing to do that if it's

24   possible.

25          THE COURT:  6 and 7 are--

35

1                    MR. WALUTES:  Your Honor, Mr. Nachmanoff and I have

2        already discussed that.  The defendant, there are certain

3        counts he would rather not have the jury try.  The Government

4        is not willing to do that.  The only one we are willing--

5        Because we think is, Old Chief, the Supreme Court, is very

6        instructive.  The only one we are willing to remove is the

7        felon in possession because of the inherent concerns the

8        courts have expressed, and they have advised the Government to

9        always enter into such a waiver.

10                    But we are not willing to waive on the others unless

11       he would like to waive the jury as to all counts.

12                    THE COURT:  All right.  That's where we stand then.

13                    So, we are just, the solicitation to commit murder

14       for hire, the Government is unwilling to waive the jury as we

15       have discussed in the past, that the offenses are intertwined

16       in such a manner that I have already made the determination

17       they should be --

18                    THE DEFENDANT:  What do you suggest, Your Honor?

19                    THE COURT:  -- tried together.  Go ahead.

20                    THE DEFENDANT:  What do you suggest, Your Honor?

21                    THE COURT:  It's not my job to act as your counsel.

22       You have excellent counsel.

23                    THE DEFENDANT:  I agree.

24                    THE COURT:  And you need to weigh the benefits.  And

25       it's a--

36

1          THE DEFENDANT:  How long do I have?

2          THE COURT:  You have a right--  Well, you are here

3     in Alexandria now.  Your counsel is available.  Think about

4     it.  It's all a balancing test, right.  You know, on the one

5     hand you have got me making the decision.  And on the other

6     hand, if a jury is making the decision, they are going to hear

7     that you are a convicted felon, it doesn't help you,

8     especially if you are otherwise not going to present a defense

9     to the charges.

10          Obviously, if you took the stand, the jury would

11     find out that you were a convicted felon.  If you don't take

12     the stand, then, unless there is some other vehicle, they

13     don't find out you are a convicted felon.  So, you preserve

14     the confidentiality of that information.

15          There would be a limiting instruction saying they

16     can only use the information of the prior conviction for

17     purposes of Count 5.  And I, of course, will strongly urge

18     that they do so.  I can't tell you what jurors are going to

19     think or not think.  Jurors are independent community persons

20     who have minds of their own.

21          So, you risk prejudice to your case and changing the

22     focus from the Government's burden of proof beyond a

23     reasonable doubt of each of the elements of each of the counts

24     you are charged with.  So, that's the risk as well.  I know

25     that counsel has told you all of this.

37

1          So, take some more time, think about it, let us know

2    ahead of time.

3          THE DEFENDANT:  Actually, I thought about it, I am

4    going to ago ahead and go with the exclusion.  I just think I

5    was thinking a little irrational because of Mr. Walutes' fairy

6    tales.  So, it kind of riled me up a little bit.  But now

7    after listening to you, I think Mr. Nachmanoff did make a good

8    suggestion, and I will go ahead and take that as a bench.

9          THE COURT:  Do you need any more time to talk with

10   counsel?

11         THE DEFENDANT:  No, sir, I am sure, I am pretty

12   sure.

13         THE COURT:  All right.  So, you want to waive your

14   right to a jury trial just on Count 5 and have me decide that

15   as the trial judge?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  All right.  I find that you have

18   knowingly and voluntarily waived the right to a jury as to

19   Count 5.  I will accept your waiver of the jury on Count 5 and

20   we will proceed in a bench trial.

21         We will hear the evidence that comes out during the

22   jury trial and any subsequent evidence after the evidence is

23   concluded for the jury portions of the case.

24         All right, have a seat, counsel.

25         Mr. Nachmanoff, we have the remaining motions that

38

1    Mr. Mohamadi has filed.  How do you want to proceed there?

2              MR. NACHMANOFF:  We do, Your Honor.  And let me say,

3    there are seven motions that were filed.  The Court has those.

4    The Government has filed a response.  I know Mr. Mohamadi

5    would like to have the opportunity to address the Court on

6    those seven motions.

7              I also want to advise the Court that Mr. Mohamadi

8    has another six motions that he would like the Court to

9    consider.  They have been written, they have not yet been

10   filed.  Two of them were sent to us earlier this week.

11             And I don't want to blame the Northern Neck Regional

12   Jail because they were actually very accommodating in trying

13   to send them, but the way they were sent to us, it made it

14   impossible for us to sort them out.  They were rather long

15   faxes, and by the time we had gotten them the pages were

16   misordered.

17             So, I wanted to make sure the Court was aware that

18   Mr. Mohamadi had done his best to provide those to us over the

19   weekend.  And now that he is here, I think we can sort out

20   those two motions that have been sent to us in incomplete

21   form.  We can then collect the rest of those motions and

22   hopefully file them over the weekend or at the latest on

23   Monday.  I know that Mr. Mohamadi would like the opportunity

24   for the Court to consider those before the trial starts.

25             THE COURT:  All right.  I will allow them to be

1    filed.  And you will supply the Government with those filings?

2    Are you going to handle--

3             MR. NACHMANOFF:  Yes, we will arrange the mechanics

4    of filing them.  Whether we do it electronically or through

5    the Clerk's Office, I think it will depend upon the total

6    volume.  But one way or another, we will make sure that they

7    are filed with a praecipe, copies provided to the Government

8    and that we provide a courtesy copy to the Court.

9             THE COURT:  All right.  I will review them and

10   determine how to best move forward after I look at them and

11   figure out what they are and what needs to be done.

12            MR. NACHMANOFF:  Thank you, Your Honor.

13            THE COURT:  So, Mr. Walutes, at this stage just wait

14   for further instructions as to how to proceed in responding or

15   not responding to them.

16            Okay.  All right, let's deal with the motions we

17   have today.  Mr. Mohamadi, are you going to--  The podium is

18   yours, sir.

19            THE DEFENDANT:  Which motion are we starting with?

20            THE COURT:  Why don't we go A through G.

21            THE DEFENDANT:  I don't have an order, sir, Your

22   Honor.

23            THE COURT:  Well, you go ahead and I will react.

24            THE DEFENDANT:  Okay.  The first motion is

25   defendant's motion to direct production of documents and

40

1    objects and compel all evidence favorable to defendant.

2         Basically I have tried throughout the whole past

3    seven months, I have tried to obtain this information which I

4    feel is exculpatory to my defense.  And I have encountered

5    numerous problems, especially Mr. Salvato.  The Public

6    Defender's Office, I mean the Federal Defenders, Mr.

7    Nachmanoff and Ms. Minter are doing the best that they can,

8    but just the fact that they received my case in such a late

9    stage and stuff that they are dealing with now, which I

10   appreciate greatly, I just feel like a lot of the stuff isn't

11   getting attention or is not, we are not able to get it because

12   of the time limit, the time restraints.

13        So, I basically filed this motion to compel the

14   prosecution from what my understanding of the law was, that if

15   I exercise due diligence--  I mean, should I read the motion

16   or--

17        THE COURT:  No, I understand the motion.  The

18   response that the Government has given on more than one

19   occasion, because we have talked about this before, is that

20   they don't have every conversation taped because you used

21   third parties, or that's their position.

22        THE DEFENDANT:  Yeah.

23        THE COURT:  But they have said that the ones that

24   they do have, they have provided, and that they are

25   irrelevant.  And that's their obligation under the Federal

41

1   Rules of Discovery.  And so, there are no more tapes and there

2   isn't any evidence that the tapes have been tampered with

3   unless you have uncovered some evidence of tapes having been--

4             THE DEFENDANT:  I do have proof.  Are the CDs

5   available now?  I asked you guys could bring them so I could

6   show the Court.

7             MR. NACHMANOFF:  Your Honor, this may short-circuit

8   some of this discussion, and Mr. Walutes can address this

9   better than I, but he did suggest to me that perhaps they are

10  not going to go with the enhanced version of the audio tapes

11  to remove this concern of Mr. Mohamadi's.  I don't know if

12  that's the Government's position.

13            THE DEFENDANT:  That's not the--

14            MR. NACHMANOFF:  But there are both the original

15  tapes and then there are the tapes that the audio specialist

16  tried to remove the background noise.  And I don't know what

17  the Government's position is on that, but that is something

18  that Mr. Walutes raised with me.

19            THE DEFENDANT:  We are talking about the phone

20  calls, not the wire recordings.  I am referring to the phone

21  calls that were provided to me during discovery.  I can

22  basically show through the--

23            THE COURT:  What phone calls do you think are

24  missing?

25            THE DEFENDANT:  Well, I know for a fact because the

42

1  calls are 30-minute calls, and what the Government provided

2  were, they were cut in half.  All the calls, all the 30-minute

3  calls were cut in half.

4          I am not going to hang up in the middle of a call

5  each and every one of them.  And most of them were in the

6  middle of what I feel are exculpatory conversations.  And

7  during my review, reviewing of the calls, I basically

8  highlighted, as I wrote in the motion, which ones were one

9  shortened, how many of them were shortened.  And just from

10 listening to them, you can see that they were cut off.

11         And along with the CDs, the Government provided a

12 list of calls with the copies on it.  And on it it tells you

13 how long the call was.  And on those they tell you when it is

14 30 minutes or 29 minutes.  But the recordings that were

15 provided, they only went 14, 15 minutes on those calls and

16 they were cut short.

17         And there were over maybe 150 calls that are cut

18 short.  And I basically narrowed them down to the ones that

19 were in the midst of conversations that were either

20 inculpatory or exculpatory, and in that list I wrote down

21 which ones I thought were relevant.  But the fact that there

22 were so many other ones that were cut short, there is no way

23 for me to identify impeachment stuff that I can use because

24 there is a ton of witnesses that the Government is going to

25 present from these calls, people that I was communicating with

43

1   where I can stand up and refute some of the nonsense that they

2   are going to say on the stand with these calls.  And there is

3   a ton of calls missing.

4            On top of that, there are specific months where

5   calls are missing for a specific reason.  Mr. Burnham was the

6   main instigator of this whole situation, and he controlled

7   these calls.  He has deliberately withheld--  And I am not

8   accusing the prosecutor on this aspect, I feel like he didn't

9   receive them either.  I don't think he received these months

10  either.

11           And the way I can prove that is just from, A, I've

12  tried to get the investigator to get--  I think he has already

13  subpoenaed inmate calling solutions to get--  Because any time

14  I spoke with anyone, they would have to set up an account.

15  And when they set up an account, all those calls are listed

16  also with the time of the calls that they made.

17           And I asked him to get that so I can collaborate

18  with them.  But the way I can prove it is I had in my bag, I

19  had to pack everything up, I have a bag, I have a phone bill

20  of Amanda Inge she had sent me during the course when we were

21  communicating, and it shows her calls that are missing for

22  that whole month, but on her phone bill they show up.

23           And they are trying to say that it is because of

24  these three-way calls, using other pin codes.  Mr. Burnham

25  from the get-go has been vigilant on every single call.  If I

44

1    made a three-way, I would get charged on that day and be sent

2    out of the unit.

3           So, that is not the case because there is cameras

4    inside the unit.  The stuff I was doing--  When I was making

5    three-ways and stuff in Fairfax, they weren't able to monitor.

6    But when I came to Alexandria, as soon as I started making

7    three-ways, numbers were immediately blocked, I stopped, I

8    stopped making three-ways.

9           THE COURT:  What month are you talking about where

10   you think that there are calls which are missing?

11          THE DEFENDANT:  I have the exact dates.  There is an

12   important call on 6/30/08 that if you follow the calls, as I

13   did, you can see where the conversation was left out.  Where

14   it was in midst of the conversation and certain parts were

15   left out.

16          7/2 to 7/27, all those calls are missing.  7/27 to

17   8/16, all those calls are missing.  8/17--  Basically all the

18   periods I have listed--  I have only had one charge, two

19   charges while I was in Alexandria.  The first five months I

20   didn't have any charges.  All the charges occurred after they

21   initiated the so-called undercover operation.  Then they

22   started piling on the charges for ridiculous stuff, like I had

23   an argument with a deputy because he wouldn't let my roommate

24   take a shower.  Stuff like that.

25          There weren't any issues before that where it would

45

1  cause me to go to the hole where I can't use the phone.  Just

2  from the calls that you see, that's all I did, I was on the

3  phone all day.

4          But the reason why certain ones are very important

5  is because they deal with the intent with some of the

6  accusations the Government is making, I wanted to refute with.

7  For example, they are claiming that the address was obtained a

8  certain way, which I plan on refuting with phone calls.  But

9  what they did was they blocked out that whole month of phone

10 calls.

11         And then this conversation that I had with Amanda

12 that they have specifically held out.  And I know for a fact

13 because I know the conversations I had.  And it refutes a lot

14 of the stuff that they are saying.

15         THE COURT:  Okay.

16         THE DEFENDANT:  So, the calls is the one thing.

17         Then dealing with the audio and visual recordings,

18 it is processed sound.  These are digital calls.  And once we

19 go to trial, you will see my stance as to the so-called murder

20 for hire sting.  And it will explain what the real, what was

21 really going on during that period.

22         And what they did with the audio and visual is, for

23 example, if you take a book and you take out two chapters of

24 it and then with those two chapters try to explain the whole

25 book, that's what they did with these calls.  They processed

46

1    the stuff that they wanted be heard.

2            That's why if you look at the transcript, there is

3    so much stuff that doesn't make sense.  And there is specific

4    parts where I feel it is very exculpatory that have been

5    processed out.

6            And so, I know for a fact that they have been

7    tampered with because if you look at the visitation--  What

8    was the date on the visitation?  I think it was the 22nd

9    visitation, and there is another visitation on the 29th.  If

10   you look at the 22nd visitation, it has the full phone call

11   with me talking and the informant talking.

12           When you look at the 29th call, they have taken me

13   out and just have the informant talking.

14           So, there is a lot of stuff where they have changed

15   it.  And from what I have read from Starks, for them to

16   introduce all this stuff, they need to prove that none of it

17   has been altered or--  I mean, I have the list of--

18           THE COURT:  I understand the cases.  And you

19   understand you have a right to completeness.  So that if

20   sections have been put in by the Government that they want to

21   use, you have a right to use other portions of that that

22   exist.

23           THE DEFENDANT:  My issue is the fact that it is

24   processed sound.  I have tried to--

25           THE COURT:  What do you mean by processed sound?

47

1          THE DEFENDANT:  Because there is so much background

2     noises, their operator has the ability to clear certain things

3     and has the option not to clear certain things.  And what I am

4     saying is that they didn't clear all of the conversations for

5     specific reasons because--  I mean, during the whole

6     conversation he is leading the conversation.  The Government

7     told him before he was strapped up, okay, go get this and go

8     get him to say this.  And he basically led the whole

9     conversation, trying to implant all the specific stuff for the

10    prosecution to occur, which I commend them on that--

11         THE COURT:  You think that there is conversation on

12    there where you said something different than --

13         THE DEFENDANT:  I know--

14         THE COURT:  -- the Government alleges and that they

15    haven't enhanced the sound on that portion?

16         THE DEFENDANT:  Exactly.

17         THE COURT:  I understand.

18         THE DEFENDANT:  Yes, sir.  And you can tell from the

19    recording where it blurs out.  I mean, they have, it's audio

20    and visual.  So, with the audio and visual, I forget what type

21    of system they used, but what they do is it's processed onto

22    the mechanism, then they have to upload it onto a digital,

23    either a laptop.  And so, there is just so much room for them

24    to alter and do whatever.

25         I'm not saying that they did it in bad faith or

48

1    whatever.  There is no way I can prove that they did anything,

2    but I know for a fact there is parts of the conversation that

3    have been processed out just by the fact that the video will

4    blur out, but the sound will still keep going.

5           So, there is just a lot of stuff that I don't think

6    is--  I would just like for it to be processed where I get

7    everything for the Court to be able to--

8           THE COURT:  Let's hear from the Government on that.

9    Have a seat for a minute.

10          Mr. Ben'Ary.

11          MR. BEN'ARY:  Thank you, Your Honor.  Your Honor,

12   after receiving the defendant's motion we did again speak to

13   the officials at the Alexandria City Jail to ensure that we do

14   have the complete set of the defendant's phone calls.  And

15   secondarily that what we have is in its original condition.

16   That is to say, has not been tampered with.

17          We have been assured on more than one occasion that

18   we do have everything that they collected and that it has not

19   been tampered with.

20          Now, there is some automation involved in the jail

21   recording, the jail telephone call recording process.  It is

22   conceivable that it may not have recorded a call here or

23   there.  But everything that we have has been produced, and it

24   has been produced in its original fashion.

25          THE COURT:  Well, did you ask them why there was

49

1    absence of calls for periods of time?  I mean, you may not

2    have been aware of the specific times where Mr. Mohamadi

3    believes calls were recorded but not produced, you know, the

4    6/30 and the periods of July and August of '08.

5            MR. BEN'ARY:  I think it's our understanding that--

6    Pardon?  Okay.

7            We have checked with those specific dates where

8    there are absences, and again they have been produced,

9    everything that we have.

10           The only explanation we can figure out as to why

11   there are gaps with absences, it's a combination of Mr.

12   Mohamadi's actions in trying to evade the recording system and

13   his loss of telephone privileges.

14           THE COURT:  All right.  The other argument that Mr.

15   Mohamadi raises is that portions of the audio visual tapes

16   have been redacted, I guess.  Or some of the favorable

17   information the Government has enhanced and the unfavorable

18   evidence it hasn't.

19           Tell me how the process worked with the production

20   of the tapes.

21           MR. BEN'ARY:  There are essentially two sets.  There

22   is an original, which is just as it was recorded.

23           THE COURT:  That has been produced.

24           MR. BEN'ARY:  That's been produced.  And as the

25   defendant says, there is pretty loud background noise in

50

1    portions of that.  So, we undertook to sort of clean it up

2    through enhancement.

3          So, in that sense we do have an altered set, but the

4    way it was altered is the background noise was sort of toned

5    down for the entire tape.

6          Now, we are sort of discussing which one ends up

7    being more useful for the jury.  At this point I think it is

8    our plan to introduce both.  And we have a witness who

9    actually performed the enhancement who will testify and be

10   subject to cross-examination as to the procedures that he used

11   to clean up, so to speak, the background noise.

12         THE COURT:  Will his testimony be that he cleaned

13   up, removed the background noise of the entire tape versus

14   just portions of it?

15         MR. BEN'ARY:  The entire recording.

16         THE COURT:  Okay.

17         THE DEFENDANT:  Now I am just waiting for the

18   investigator to get the subpoenas to come back from the stuff

19   so I can prove the calls that are missing, that the calls

20   actually did take place.

21         And the fact that they are claiming that I dodged

22   these calls by doing other methods, I just want to say that

23   that did not happen.  Mr. Burnham was very vigilant, there is

24   cameras there.  When I would try to get on the phone with

25   someone else that would make a call to make a three-way for

1    me, he would find out, the next day I would get a charge.

2              So, that is just false because he wasn't just going

3    off the calls, he was monitoring me on the digital cameras

4    that Alexandria is equipped with.  So, that's not true.  And

5    once we get the subpoenaed calls, I can show exactly that the

6    calls were made and they are purposely holding them and not

7    providing them.

8              THE COURT:  All right.

9              THE DEFENDANT:  Now, before I got to the calls, I

10   skipped a lot of stuff.  There is a lot of--  Like, for

11   example, the defendant's Sprint phone bill that was obtained

12   by Detective Hickman in 2007.

13             Mr. Brehm when he had my case, he took it upon

14   himself to get all the stuff that was filed in Alexandria

15   jail, I mean Alexandria courts.  And while going through all

16   that stuff, I saw a subpoena that Detective Hickman had filed

17   to Sprint to get my phone bill and anything relating to it,

18   text messages and all that stuff, because Ms. Riley claimed

19   that I sent her a text message of Amanda Inge's address and

20   all this other stuff.  Which they haven't provided a copy of a

21   text message, phone call.

22             And she was the main reason how I was targeted.  She

23   provided the officer with my name and number.  And from that

24   point forward I was the only suspect.  But they haven't

25   provided anything, proven that I did make that call.

52

1          And my whole stance from the beginning is that I
2    want my phone bill and my records to prove that I never called
3    her, never sent her a text.  And I have been trying to get
4    these calls since day one.  I have numerous telephone calls
5    where I even called a friend that works at Sprint corporate to
6    try to obtain this stuff.
7          But once I was charged with this federal count, I
8    received that document where Detective Hickman had received
9    it.  And then upon reviewing the supplement, I saw that he,
10   Detective Hickman actually stated in his supplement that I
11   received the defendant's phone bill and saw that he didn't
12   make any calls.
13         I received so-and-so's phone bill, the victim, and
14   saw that these calls were made.  But these calls weren't
15   provided in state court.  These calls haven't been provided
16   for federal court.  And I think the investigator has filed a
17   subpoena to try to obtain these calls so I could prove, we
18   have got the cell site, trying to get the cell site locations
19   and the calls so I can prove my stance on that fictitious
20   robbery.
21         Number two, Amanda's phone bill for the phone she
22   shared with her boyfriend, which is the 703 number, where she
23   alleges originally to the police officers in their report that
24   I called her during the next day leaving voicemails.
25         Now, the police officers, they received all this

1    information back in June of '07.  It would have just took a

2    matter of a couple phone calls to obtain these voice messages

3    which were allegedly left on her voicemail.  But her phone

4    bill, those calls haven't been provided also.

5            So, I am trying to get that to prove that, you know,

6    she lied from the beginning.  And all those conversations that

7    I had with her over the phone where I called her and tried to

8    give her advice about pleading the Fifth, I was the one--  She

9    wrote me.  My family didn't inform me that she had received

10   the grand jury.  She wrote me while I was in jail, she was in

11   Florida, and she said, look, I got a grand jury thing.  I

12   don't have any money for a lawyer.  The guy that she was with

13   just left her.

14           So, my whole stance was on trying to protect her

15   because she originally lied to the police, but that's a whole

16   different situation.  But this call, the phone bill for that

17   number is very relevant to my defense and very exculpatory.

18           Second, Mr. Haile made a claim of, you know, moving

19   from D.C. to Alexandria to D.C., just all these stories of the

20   suspect making calls.  I requested, I think Mr. Velarde also

21   subpoenaed his phone bill with the cell sites to confirm if

22   actually he did, if all this really did happen.

23           And I have also offered it to the Government.  They

24   haven't provided any of this stuff either.  So, you know, I

25   figured--

54

1          Also number four, the mental health file, I think is

2    very relevant to my defense because I don't have access to

3    this stuff.  And the fact that I committed suicide or I tried

4    to commit suicide two weeks--  That's funny?  I tried to

5    commit suicide because I had just received a letter of my

6    daughter going to the hospital and just overall everything,

7    being accused of robbing a cab driver.  My dad was a cab

8    driver and died in his cab, he had a heart attack and was

9    found in his cab.  Just accumulation of all this stuff

10   affected me to the point where, you know, after two years, my

11   trial being delayed numerous times, it got to me.

12          I am not a quitter, I have never been a quitter.

13   You know, I broke down and that incident occurred.  And then

14   probably two weeks after they get all these recordings under a

15   different pretense than what they are trying to present--

16   Which I will, you know, defend against in trial.  But I think

17   these mental health records are very important to show that

18   why didn't they provide me with the normal routine of when

19   someone tried to commit suicide.  They are supposed to be put

20   in examination and reviewed.  It's a two-week process that

21   Alexandria normally does.  After two days they put me right in

22   the unit with this informant.

23          So, that is kind of very relevant to the defense of

24   entrapment that I would like to pursue if the Court allows me

25   to pursue that.  And just--

55

1          THE COURT:  An entrapment defense?

2          THE DEFENDANT:  Yes, sir.  Also, I have got motions

3    identifying that stuff also.

4          Now, the radio runs from Alexandria, I know there is

5    a ton of stuff.  Once you get a chance to review all the

6    different incident reports, you will see a conflict of how the

7    timing of when they met with Mr. Haile and when they met with

8    Riley, who miraculously popped up.  I was robbed also,

9    blas-a-blah, this is the number of the guy that robbed me,

10   yadida.

11         So, I just basically wanted the radio runs to

12   confirm what actually happened because there are so many

13   different conflicts in the reports of timing.

14         So, I think this is very important to prove when

15   actually Riley did get involved and when the police who came

16   on the scene--  Because what they are alleging is that they

17   were there inside of five minutes and that's why the canine

18   tracked it all the way to Amanda's apartment.

19         But in the original report, the cab driver tells

20   Detective Hickman there was people around that area.  But the

21   canine guy claims that there was nobody around, so the dog

22   could pick up the scent, make left turns and right turns

23   because no one had stepped on it.  There is a lot of conflicts

24   with that.

25         Also I asked for number seven is Kimberly Riley and

56

1  Gebru Haile's bank statements.  And from everything I have

2  read with the Hobbs Act, interstate commerce, they can come

3  and say anything.  They could say, oh, Kimberly Riley was an

4  entrepreneur or this or that.  And without me having any type

5  of, any way of proving it, they are going to be allowed to say

6  anything they want.

7         And I feel like these bank records will verify if

8  she is actually what she claims she is, running a business or

9  whatever, and if Mr. Haile actually earns this supposed

10  amount.  It is just something I really need to defend against

11  this, the effect on interstate commerce.

12         Then Richard Bryan's recorded phone calls at

13  Alexandria Jail.  I definitely need this pertaining to what

14  type of conversations he had with police officers.  During the

15  recording he actually gets on the phone and speaks on the

16  phone.

17         And I just think it's very important that I get an

18  opportunity to view his phone calls to see what was going on

19  with him at that period and hopefully something exculpatory

20  could show up in that in regards to the truth and not the

21  nonsense that is being presented.

22         Now, number nine, the original 911 call which is

23  also addressed in one of the motions, this was not provided in

24  the state court.  This is another incident where this, you

25  know, alleged gun in this D.C. club just pops up all of a

1    sudden in this federal case where they all of a sudden

2    provided this 911 call which is not the original 911 call, it

3    doesn't show--

4              THE COURT:  This is the 911 call--

5              THE DEFENDANT:  With Mr. Haile.

6              THE COURT:  On the 12th, okay.

7              THE DEFENDANT:  Yes, sir.  And it doesn't have a

8    time, a date, what number was called, it was just a version

9    that was added on to a disk which they could have done

10   anything to.

11             And there is a lot of variations where it seems like

12   he has been cut off.  And I have got serious problems with

13   this call because, A, they didn't provide this in state court

14   and all of a sudden now they have it.

15             And when he was asked the description, he starts to

16   speak, and his speech is mumbled up, but then in the end of

17   the call the lady says, she repeats everything that he told

18   her.  And she says, oh, so, it was a black individual,

19   blas-a-blah.

20             Now, that was a very important disputed factor in

21   the state court where he originally told Mr. Lion that it was

22   a black individual, then he told Detective Hickman it was a

23   dark complected person.  Then he came to the preliminary and

24   he said, oh, no, he was Middle Eastern, I know Middle Eastern

25   people.  Then he came to trial and he said, changed it up

58

1    again.

2            So, there are just so many lies that are occurring.

3    I felt just felt, you know, something is not right with this

4    911 call.  I would like to get the original form and the names

5    of the dispatchers in case Mr. Velarde would like to interview

6    them to find out what they have to say about it.

7            The training of the canine.  They claim that the

8    canine is able to make left turns, right turns and all that

9    stuff.  I have never heard of that, but I am not a police

10   officer and I don't have--  I have never heard of them doing

11   that.  And I would just like to get something, some type of

12   prove to what they are saying because, like I said before,

13   they are going to get up on the stand and say all type of

14   stuff.  I would just like to have an opportunity to see what

15   the official training guidelines of these facts are.

16           Number 11, Ms. Riley claims that she was an escort

17   and she had ad on craigslist.  Now on craigslist, all these

18   adds, craigslist has had a lot of problems from what I have

19   seen in the Washington Post and a lot of cases and stuff.

20           Now, everything on the Internet leaves a footprint.

21   So, that's why I asked for her alleged craigslist

22   advertisement that I allegedly called because I was so

23   desperate to get her companionship.  And I would like to see

24   that ad since she was working that night and I called her from

25   that ad.  But that hasn't been provided, a copy hasn't been

59

1    provided.  It is just, you know, hearsay.

2         Number 12 is camera footage.  You know, the

3    locations that Mr. Haile claims that, you know, I flagged him

4    down, this is a downtown area.  I used to do construction, I

5    have done some jobs in that area remodeling offices and stuff.

6    All of these buildings have security cameras.  Every corner

7    there is banks.  It's a very commercial area that this alleged

8    incident occurred.  And there is tons of opportunities for

9    camera views.

10        And I don't want to be funny, but just watching TV

11   and all the different reality cop shows and stuff, they are

12   able to track down gas stations where a suspect ran off.  And

13   they are like, okay, boom, we've got them on this camera view.

14   I mean, it is 2009, I would think that they would provide some

15   type of evidence linking me to this stuff.

16        So, now I am just trying to backtrack because I am

17   innocent, it's much easier for me to prove that I am innocent

18   because all this stuff is in my favor.

19        And I have tried to get counsel--  I gave this list

20   to Mr. Salvato.  It's all this list that I gave to Mr.

21   Walutes, I gave to Mr. Salvato.  He did not obtain one item.

22        And so, number 13, now this is any evidence linking

23   defendant to the new allegations made in the District of

24   Columbia regarding unrelated incident where a firearm was

25   obtained.

60

1          In these reports it is alleged that this individual

2     threatened a dancer at Camelot and then ran to a cabbie, broke

3     his window, and then dropped the gun and ran off.  Now, in

4     this process I can't imagine when he wiped the gun off and got

5     the prints off of the gun.  This seems like an accident.

6          So, in this day and age you would think they would

7     have the resources to get a print off the gun to link it to me

8     instead of just, you know, making up this whole fictitious

9     story.

10          And then just the fact that, you know, I mean, Ms.

11    Minter already addressed this issue, but I have a lot of

12    problems with this.  And I feel like this is turning into a

13    circus.  But I will leave that alone.

14          But I would basically ask for any evidence that

15    linked me to it besides just testimonial evidence.

16          THE COURT:  I think it's testimonial.

17          THE DEFENDANT:  Okay.  And the clubs that they

18    allege that the suspect was at, there is security footage

19    there.  Why didn't the D.C. officers get the security footage

20    from there?

21          And from the reports that I read, they didn't have a

22    name.  These individuals didn't identify me.  They identified

23    a bald-headed guy, blas-a-blah, that came into the club and

24    just tipped.

25          Now, I don't know who this individual was making

61

1    this allegation, but my daughter's mother was a waitress at

2    Camelot.  So, the fact that she would just say that just, it

3    just doesn't make any sense.  Because if she was referring to

4    me, she would say, oh, that's Jamie's, that's Jamie's, her

5    daughter's father.

6           So, there is just a lot of stuff with this whole

7    situation that really, really irks me.  But anyway, long story

8    short.

9           Number 14, the Government provided letters written

10   to Amanda during this whole two-year period, but what they

11   didn't provide is in all my letters, from the letters I wrote

12   to the Court, I always provide a number at the top.

13          So, what they did was they basically copied under

14   the number part where--  From reading the letters, they are

15   all jumbled up, they are not full letters.  Certain parts are

16   kept cut, certain part aren't in.  They just took certain

17   pages out of the letters which are normally five or six-page

18   letters, and I tried to make some sense of them, but they are

19   all just scrambled.

20          So, I was hoping I could get the pages, the copies

21   of them with the page numbers on them so I could put them

22   together appropriately.

23          Number 15 is all e-mails between Detective Hickman

24   and Victor Castro.  This is a disputed issue where when I

25   wrote a letter to Mr. Castro to discuss with him, my whole

62

1    intention was--  Because when Mr. Bryan came to my trial, he

2    alleged that he was never an informant and never worked for

3    law enforcement when the trial was on December 8.  And just in

4    November he made the recordings with a wire on him.  I don't

5    understand how he wasn't affiliated with any type of law

6    enforcement.  So, he committed perjury on the stand.

7            And my whole thing was I am just wondering, I know

8    how the police talk nowadays, they know the laws and the rules

9    that prohibit them from getting certain types of evidence.

10   So, what they do is they get around it by the way they talk.

11           So, instead of telling him, okay, you're working for

12   me, they will use indirect methods.  Which is something that I

13   exposed during that conversation with Mr. Castro where I said,

14   look, I got information for you.  And then he basically said,

15   well, I can't promise anything, that's up to the prosecutor,

16   but if you, if you have something substantial, then we'll

17   think about it.  That's basically soliciting an informant and

18   basically making him an active informant.

19           But it is just the way they do it.  They get on the

20   stand and then they say, oh, he was never working for me.

21   Which is going to be an issue that we are going to deal with

22   this so-called Fairfax individual that claimed that I hired

23   them and this is supposed to be some random act.  That's why I

24   wanted that on record.

25           But one of the issues is during that conversation he

63

1   originally said, oh, I just got involved in that, I didn't

2   know anything about it.  But in Mr. Hickman's report on June 5

3   he called Mr. Castro and asked him to run a gun check.

4          Now, that was just one e-mail.  And it's kind of a

5   coincidence that he called him then and now all of a sudden he

6   is working on this case.

7          I mean, the fact that he has been involved, I feel

8   like he has been involved from the get-go.  And there is just

9   a lot of stuff they are not telling me.  So, I feel like I

10  have the right to have all the e-mails that pertain to me.

11  Not all of the police business, all the other confidential

12  stuff, but I feel like I should have the right to a subpoena

13  to have all the e-mails that pertain to me.

14         Number 16, all e-mails between AUSA Walutes and

15  defendant's previous attorneys Robert Jenkins and Larry Brown.

16  This is the issue that I have had, and I feel like this is a

17  Sixth Amendment violation.  I mean, it is just proof by the

18  way he just stood up here and defended Mr. Jenkins' actions.

19         Mr. Jenkins was the individual that caused me not to

20  be able to contact attorneys at Alexandria Jail.  Mr. Jenkins,

21  the individual that he claims is so ethical, made a three-way

22  call because he was so hard pressed on getting me as a client.

23  He would call me at the jail, and I tried to be nice to him, I

24  was like, look--

25         THE COURT:  What relevance does that have to

64

1    anything in the case?

2           THE DEFENDANT:  Because Mr. Jenkins came and spoke

3    to me.  And I feel like he went and had conversations with Mr.

4    Walutes regarding my case.  Because when Mr. Jenkins came to

5    speak to me, he didn't even have my file and he had already

6    told me testimony that Amanda had given him that he told me

7    that Mr. Walutes had given him.  That's how I knew what was

8    going on.

9           THE COURT:  Well, that's his job.

10          THE DEFENDANT:  I understand, but for him to tell

11   him something, he would have had to offer him something.  I

12   know Mr. Walutes isn't Santa Claus, he is not going to just

13   give him information freely before the indictment even came.

14   But I just want e-mails regarding me between them.

15          THE COURT:  All right.  Let me--  The name of the

16   alleged person in the cab who evidently was a witness, was

17   this person a witness to the crime?

18          THE DEFENDANT:  No.  The story changed.  Originally

19   the guy says he came back to his car, he found the keys that

20   were thrown in the bushes, 3 o'clock in the morning.  God

21   knows how long, if this had occurred, how long that would take

22   to find keys that were thrown in the bushes at 3 in the

23   morning.  He grabbed the keys, came back to court.

24          In the original report he said he went to a friend's

25   apartment in the complex, but then he came to trial and said,

1    you know, this dramatic scene where he runs out into the

2    street and waving and this guy comes and picks him up.  I feel

3    like this person is actually someone he knows in that

4    complex--

5            THE COURT:  So, you want to know the name of the

6    friend who picked him up after the robbery?

7            THE DEFENDANT:  To get the particulars of what

8    occurred afterwards because I feel like there is a conflict as

9    in the time.

10           THE COURT:  All right.  Who is Portillo and why do

11   you want his call?

12           THE DEFENDANT:  He is the informant's cousin.  And

13   while Mr. Portillo was incarcerated, Mr. Bryan had went home.

14   In lieu of his help to law enforcement, they gave him a

15   reprieve and didn't let him go to the D.C. for the time he was

16   supposed to serve there.  While he went home, what he did was

17   he went and broke into another one of their cousin's homes to

18   retrieve a firearm and other items, which Mr. Portillo told me

19   during a conversation in jail.  And what I did was I asked

20   him, so, when did you find this out?  And he was like, oh,

21   when I got home I talked to the other cousin.

22           And I was, oh, you talked to him over your phone?

23   He was like, yeah.  And I said, did you use your inmate

24   account?  He said yes.

25           So, I want this.  And we have already had an

1     investigator go talk to him which corroborated everything that

2     I said.  And just in case he changes his story, if the

3     Government goes and intimidates him like they have done other

4     witnesses, I just want to have that as proof that this

5     incident did occur.

6             THE COURT:  Okay.  Let's go to Kimberly Riley's

7     records of arrest and convictions.

8             THE DEFENDANT:  Well, she is a self-proclaimed

9     prostitute.  I can imagine if she is in that--

10            THE COURT:  The Government is required to produce

11    her record.

12            THE DEFENDANT:  But I just wanted to kind of--

13    Because I know this, I am familiar with this individual.  And

14    how I know this individual is going to come up, but it wasn't

15    under the context of me calling her for any prostitution acts

16    or paying her for prostitution acts.  I have never had sex

17    with this individual.  So, I know of this individual because

18    of another incident that will be, you know, portrayed in

19    court, hopefully.

20            THE COURT:  All right.  We have discussed the calls.

21    Number 26 is the--

22            THE DEFENDANT:  These are calls from Fairfax that

23    are missing.  There is a couple calls that are missing where I

24    called Mr. Brown on three-way before I hired him--

25            THE COURT:  We have already gone through the calls.

67

1          THE DEFENDANT:  Okay.  What is the stance on the

2     calls?  I mean, are we waiting until I get the subpoena and

3     prove that these calls are missing or what?

4          THE COURT:  I am going to talk about that in a

5     second.

6          THE DEFENDANT:  Okay.

7          THE COURT:  So, you have had letters seized from you

8     from January of 2010?

9          THE DEFENDANT:  Yes.

10          THE COURT:   Number 26.

11          THE DEFENDANT:  When the Court on 1/7, I think it

12     was 1/7, when you allowed me to go back to Alexandria, all of

13     my stuff was pilfered.

14          As you can see how I keep my notes, I had all of my

15     trial strategies and stuff inside note pads.  And when I

16     received them back a day later, they were all ripped out.  And

17     just a lot of stuff had happened.

18          And on the phone call in the second visitation, I

19     clearly told the informant, I said, look, if you change up on

20     me, I am just going to use your notes.  Because a lot of the

21     dialog that we had, I was on lock-down after the suicide

22     attempt.  And what he would do, 4G and 4AB aren't connected

23     together.  They specifically put me there so he could come

24     talk to me.

25          But the deputy which I would like to call as a

68

1   witness can prove that he was at my door-- Because I never

2   spoke to him while I was out. The whole time I was out, I was

3   on the phone, which the phone calls can prove. While I was on

4   punitive, you are only allowed a certain amount of time out.

5   And I can support that with the calls that I made. And all

6   the dialog was made through letters. And I kept those

7   letters.

8           And in that phone call that they are not giving me

9   from the visitation where they are just providing the inside,

10  I basically-- Without revealing too much, these letters were

11  missing from the stuff that I received back. Not only were

12  these letters missing, there is request forms where I had a

13  lot of Sixth Amendment violations where I had dialog with the

14  staff. And some of the staff were able to, were communicating

15  with me and letting me know-- Like, for example, when I

16  wasn't allowed to speak to any attorneys, I was constantly, I

17  have always kept a paper trail with all this stuff, I have got

18  stacks and stacks of stuff.

19          THE COURT: All right, we will request the

20  Alexandria Jail look for any --

21          THE DEFENDANT: Compel the letters.

22          THE COURT: -- letters that you have. I don't need

23  argument on the remainder. The Government is required to give

24  up any information which is favorable to you which they have

25  in their possession, and they have agreed to do that. I don't

1    know if there has been an exchange of that material.  But to

2    the extent they have material that is favorable to you, they

3    are required to produce it, and they will produce it.

4           THE DEFENDANT:  I just identified the operating

5    procedures because I've seen other cases where people had to

6    make diligence.  The only reason I ask that is because Mr.

7    Hickman came on the stand and made that whole situation where,

8    oh, he made a camera recording of one witness but didn't make

9    it of the other one.  That is not his normal procedures.

10          So, that's going to be a very difficult individual

11   to cross-examine when they are just going to say anything.

12   So, I wanted these procedures and stuff so I could basically,

13   you know, refute some of the nonsense that they are going to

14   say.

15          Especially with this, with the little murder for

16   hire operation.  And I will get the standard operating

17   procedures for that, so I will be able to cross-examine Mr.

18   Castro.  And I feel like that's a very necessary item that I

19   need to help me cross-examine.

20          THE COURT:  Okay.

21          THE DEFENDANT:  In regards to all statements with

22   Alexandria, Fairfax, all the other--  I added the FBI and CIA

23   to be funny, I apologize.  But for Alexandria/Fairfax

24   specifically, there is conversations that I have had with a

25   Fairfax police officer, for example.  There is a deputy there

70

1    that I was cooperating with and giving information to in

2    regards to a lot of stuff who was aware of my conversations

3    with individuals that were involved in the escort stuff where

4    Mr. Walutes claimed that I am running this prostitution ring

5    from jail.  But anyway, that's another story.

6            But these individuals have conversations that I have

7    had.  And in the course of that, I was able to give

8    information on a murder suspect, information that I was able

9    to obtain communicating with these individuals.  And I

10   provided that to Detective Bond, the Fairfax County police

11   officer.  And immediately a couple days after they were able

12   to obtain it.  Unlike the Government's stance where they go

13   and create crimes, I was able to help them on a situation that

14   actually occurred and was actually a real crime.

15           THE COURT:  What detectives did you talk to in

16   Fairfax?

17           MR. NACHMANOFF:  Detective Robert Bond.

18           THE COURT:  Bond?

19           THE DEFENDANT:  Yes, sir.  And that's going to be

20   another factor in my defense when--

21           THE COURT:  Do you have want any notes--

22           THE DEFENDANT:  Any conversations that I have had

23   with any law enforcement that they have on me regarding their

24   files and stuff.

25           THE COURT:  All right.  Let's hear from Mr. Walutes

1   or Mr. Ben'Ary on the additional discovery requests.

2          MR. BEN'ARY:  Your Honor, as an initial response, I

3   would simply say that we are aware of our discovery

4   obligations under the rules and under the United States

5   Constitution and have complied.

6          There are records that the defendant requests that

7   are not in our control and custody, such as third-party--

8          THE COURT:  So, you don't have the Sprint bills from

9   Riley or the phone bills from Amanda or voicemails or --

10         MR. BEN'ARY:  Surveillance videos.

11         THE COURT:  -- bank statements.  If I recall

12  correctly, there was some investigation done to determine

13  whether there were surveillance videos taken of the area

14  around where the robbery of Ms. Riley allegedly occurred, and

15  there weren't any recovered, do I recall that correctly?

16         MR. BEN'ARY:  That is correct.

17         THE COURT:  All right.

18         MR. BEN'ARY:  There was a latent fingerprint, we

19  have provided this to defense counsel, a latent fingerprint

20  recovered from the gun.  And that was raised somewhere in this

21  list.  While our information is that it is not a usable print

22  for identification purposes, we are going to I think get it

23  this afternoon.  We have an official from D.C. bringing it

24  over, and we will provide it.

25         THE COURT:  All right.

1          MR. BEN'ARY:  I kind of don't know exactly which

2   ones Your Honor would like me to address.

3          THE COURT:  Well, the 911 call in D.C., that's been

4   provided, is that right?

5          MR. BEN'ARY:  For the June incident outside of

6   Ozio's has been.

7          THE COURT:  It's not the original 911 call?  It's

8   coming off a compilation disk, or is it the original, do you

9   know?

10          MR. BEN'ARY:  I think it's the original recording.

11          MR. WALUTES:  Your Honor, I practiced there for

12   15 years.  I had the U.S. Attorney's Office in D.C., it's all

13   digital, but they e-mailed all the 911s and the police radio

14   runs and I gave all those to defense counsel.

15          THE COURT:  All right.

16          MR. WALUTES:  Your Honor, also, I am not sure the

17   Court is clear on this, but when the defendant was--  And I

18   apologize, I don't mean the Court to have two Government

19   attorneys arguing--

20          THE COURT:  No, that's fine.

21          MR. WALUTES:  But when he was talking, he spoke

22   really to two different 911 calls.  Mr. Ben'Ary has just

23   answered the Court of the 6/12 911 relating to the 404(b)

24   motion this morning.  But the other 911 call which will be

25   admitted into evidence by the Government, assuming the Court

73

1   finds it admissible, is the 911 call that Mr. Haile, the

2   taxicab driver, placed.

3           And on that call, obviously, the defendant has

4   listened to it, the operator says to Mr. Haile, is he black,

5   the person who robbed the taxicab.  And he says, he's from

6   Afghanistan.

7           So, I mean, the tape we will listen to, but, Your

8   Honor, I think it's being inaccurately described by the

9   defendant.

10          The point the Government makes is it is the operator

11  from Alexandria who interjected the race, which was in error.

12  The victim actually on the tape says, Afghani.

13          THE COURT:  All right.

14          MR. NACHMANOFF:  Your Honor, not to make things any

15  more confusing, but I just want to be clear.  The only other

16  911 call I wanted to make it clear on would be any 911 call

17  from D.C. on May 27.  And my understanding is that there is no

18  record of such a 911 call which would have been placed by

19  Kimberly Riley to the police department, is that correct?  I

20  just want to make sure.

21          MR. WALUTES:  When they gave me their disclosure,

22  I--  Ms. Riley testified in the grand jury that she had placed

23  a 911 call in D.C.  I, using my same sections, asked them to

24  search their records.  They have no 911 call for Ms. Riley.  I

25  don't know whether the answer there is that she stopped--  The

74

1    testimony says that D.C. would not respond to her call for

2    assistance.

3              It's not clear to me whether she has--  What she did

4    was call the District.  Those would not be recorded.  Or if

5    she stopped a police officer in DuPont Circle, those obviously

6    wouldn't be recorded.  But there is no 911, and I have written

7    that in the disclosure letter and given that in writing to Mr.

8    Nachmanoff.

9              THE COURT:  All right, thank you.  The records which

10   would include notes that Mr. Mohamadi made while he was in

11   Alexandria and any letters that he has written to Amanda, Mr.

12   Mohamadi says he got an incomplete version.  Have you

13   requested at all information coming from Mr. Mohamadi?  And

14   what is your response?

15             MR. WALUTES:  Your Honor, I frankly have stayed out

16   of that.  I am not sure that those aren't Sixth Amendment

17   privileged communications.  So, I have never seen these

18   articles that Mr. Mohamadi is discussing with the Court today.

19   I don't think, appropriately, I should see it.

20             I am aware and I have made current defense counsel,

21   I can't recall in my mind today whether that was Mr. Salvato

22   or Mr. Nachmanoff, but I am aware that there were times where

23   he was being moved from one jail to the other and the jail

24   officials were very displeased to see him in possession of

25   surveillance photographs generated inside the institution.

75

1    They thought that that compromised their ability to securely

2    run the institution.

3              Apparently Mr. Salvato provided to Mr. Mohamadi the

4    discovery that was given to Mr. Salvato.  I told the Marshals

5    that I believed that material was properly generated in

6    discovery and it should not be kept from the defendant.

7              So, it is my hope that it was all returned to the

8    defendant.  Frankly, I think that that should be worked

9    between Mr. Nachmanoff and the Marshals.  I would prefer not

10   to ever have that material show up on my desk because I have a

11   different concern with that.

12             As to the other point the Court just raised--

13             THE COURT:  Amanda's letters.

14             MR. WALUTES:  Oh.  I personally copied those, Your

15   Honor.  So, if there is an error--  I think I copied them

16   accurately.  I know he has just told the Court that he always

17   places page numbers on it, but my recollection is there are

18   not page numbers on everything.  It looked to me like there

19   was a shortage of paper, he is trying to jam things onto pages

20   and scraps of paper.

21             In any case, I believe I made an accurate, as an

22   officer of the Court I am telling you I believe I made an

23   accurate copy.  The originals of the letters are available for

24   the defense counsel, any defense counsel to look at.  As they

25   are, obviously, under Rule 16.  I am compelled and have no

76

1    problem with showing them.

2           They look garbled to me as well, Your Honor.  I

3    think Mr. Mohamadi accurately describes that.  It should be

4    clear, I asked Ms. Inge for all letters that he had ever given

5    to her.  It is only what she happened to have, often without

6    an envelope and not kept in any order.

7           So, it isn't that the Government shuffled the

8    evidence.  It was presented to us in the condition it's in.

9    And if my recollection serves me correct, there isn't a page

10   number on all of them.  Sometimes there is, sometimes there

11   isn't.

12          THE COURT:  All right.  Well, Mr. Mohamadi, I have

13   looked at the discovery, additional discovery matters that you

14   have requested.  We have heard in more detail from the

15   Government what they have, what they don't have, what's been

16   produced, and what hasn't been produced, and explanation of

17   why.

18          The Government has represented that it has complied

19   with its discovery obligations.  A lot of the materials that

20   you seek are not within the control of the Government, and

21   they are under no obligation to go search for them.

22          They clearly have searched for many of the items you

23   believe would be relevant to your defense because they also

24   would be relevant to the prosecution, such as looking for

25   surveillance videos and 911 calls and corroboration of the

1   weapon found on June 12 being yours.  And I am sure to their

2   displeasure they didn't exist as support for the prosecution

3   and they don't exist for your purposes as well.

4          So, I don't find any of the materials that you seek

5   not being, either having been produced or produced in the form

6   that was, in which it was presented to the Government and

7   otherwise that the Government is obligated.

8          So, without additional information, as in you get

9   corroboration that the Government is wrong and that the police

10  department has got materials--

11         THE DEFENDANT:  I have that evidence for you, Your

12  Honor.

13         THE COURT:  Then we will revisit it, but that's

14  where we are at this time.

15         THE DEFENDANT:  Can I move--

16         THE COURT:  I didn't ask--  Let me, before I forget,

17  Officer Bond from Fairfax, do you have--

18         MR. WALUTES:  I've never heard of that name before,

19  Your Honor.  I will, after we leave today, I appreciate that

20  through the Court the Court got the name, I will see if I can

21  obtain such information.  It is unknown to me.

22         I should also say, Your Honor, I don't mean to have

23  Mr. Ben'Ary, who has been graciously assisting me in the last

24  stuff, but some of this historical, and I don't mean to have

25  him--  I took the defendant's motion with those dates from

78

1   Alexandria and sent it by a PDF file over to the Alexandria

2   Jail and asked them to double-check those dates.

3            After a couple hours they got back to me and said,

4   it does not exist.  Obviously, the parties are free to explain

5   that.

6            Mr. Burnham, Deputy Burnham, to the extent defense

7   counsel or the defendant believes there is some animosity or

8   some other bias, he is going to be a Government witness.  And

9   so, they are free to obviously in testimony, as the Court has

10  observed, to make whatever concerns known to the jury through

11  that witness.  They will have him under oath when they examine

12  him.

13           THE DEFENDANT:  You see, the issue with that is I am

14  not going to get any thrills off catching him in a lie.  I

15  want this evidence to present.  And from my understanding, it

16  is the prosecutors's fundamental right to seek truth, not just

17  to seek a prosecution.  And that's just, maybe I am

18  misguided--

19           THE COURT:  That's true.

20           THE DEFENDANT:  So, I just figured, you know, the

21  fact that he is not practicing diligence in going after

22  concrete conclusive evidence is just, you know, bothersome.

23  And me being in the position that I am, I am not able to, you

24  know, take any initiative because of my alleged actions.

25           So, I am left at a position where my hands are tied.

1    And I feel like it is violating my Constitutional rights to

2    present a full defense, which is, you know, the Constitution

3    has prescribed and the Supreme Court--

4            THE COURT:  I understand.  I read your pleading and

5    I read it carefully.

6            THE DEFENDANT:  So, if they just turned the eye the

7    other way, I mean, where does that leave me?

8            THE COURT:  Well, that's not what is being said.

9            THE DEFENDANT:  But if I am giving them the specific

10   items, I just at least ask to at least make some type of

11   effort into obtaining this.  They are just refusing--

12           THE COURT:  I think you just heard that as soon as

13   they got the specific dates in your discovery response, they

14   sent it to the Alexandria Sheriff's Department and said, Mr.

15   Mohamadi says these records are missing, go check again.  And

16   they did.  So--

17           THE DEFENDANT:  What about the Sprint phone bill, my

18   Sprint phone bill that was subpoenaed by Detective Hickman?

19           THE COURT:  Does the Sprint phone bill exist?

20           MR. WALUTES:  Your Honor, I got the request by

21   e-mail from Mr. Nachmanoff last night, and I have forwarded

22   that request to Detective Hickman and asked him to come see me

23   on Monday.  I do intend to see if I am perhaps missing

24   something.  I know this case was tried once before on Mr.

25   Mohamadi in the state.

1          THE COURT:  Right.

2          MR. WALUTES:  I mean, obviously, he can get these

3   records himself, Your Honor.  But if I have them, and I mean I

4   broadly, I will find them and I will give them to him.

5          I don't believe they exist.  I told that to Mr.

6   Nachmanoff in writing yesterday.  And I will try to continue

7   to find if they do exist.  And if they do, and it wouldn't

8   surprise me in my history, that through further questioning

9   they do, if they do, and I will conduct the further

10  questioning in advance of trial, and if they do, I will give

11  them to the defense counsel promptly.

12         THE COURT:  All right.  Thank you.

13         All right.  Let's talk about the grand jury records.

14         THE DEFENDANT:  Your Honor, I am sorry to interrupt.

15  Just about the other stuff, there is a lot of other stuff that

16  is very exculpatory.  Like, for example, I mean, am I going to

17  be deprived of it?  I don't understand the Court's ruling on

18  all the other stuff.  I have listed about 30 items.  So--

19         THE COURT:  And I will issue an order.  I don't

20  think you're entitled to any of the other remaining requests

21  that you have made.  And for the reasons why I stated broadly.

22  And I am not going to repeat myself now, but I will put it in

23  writing for you so that you will have a record of it.

24         THE DEFENDANT:  Thank you, Your Honor.

25         THE COURT:  Yes, sir.  The grand jury records, I am

81

1   going to deny your motion for disclosure of the grand jury

2   selection records and records of the members of the grand

3   jury.  There is no evidence here that the grand jury is

4   composed of anything other than a communitywide membership and

5   that any group has been excluded intentionally from being

6   considered for service on the grand jury.

7           The grand jury is a confidential proceeding.  The

8   members of the grand jury are, of course, identified, but

9   their privacy rights would extend to not providing their

10  addresses and --

11          THE DEFENDANT:  Your Honor, I just--

12          THE COURT:  -- contact information.  Let me finish

13  and then you can go.

14          If in reviewing the Jencks materials that you

15  receive your counsel believes that there has been an improper

16  attempt to influence the grand jury, then that's something

17  that we will revisit at that time.

18          The grand jury has considered the indictment.  They

19  had it in written form.  The foreperson of the grand jury

20  signed the indictment back in April '09 and has attested that

21  the evidence, probable cause existed as to each of these

22  counts.

23          So, I will hear you very briefly on that if you want

24  to be heard.  I did read your pleading.

25          THE DEFENDANT:  And from what I see, there is parts

1    missing out of my pleading.  I don't think you received the

2    full motion.

3           But what I would like to assert, and I understand

4    the Court has already made a ruling, is that from my

5    understanding from the cases, I have an unqualified right to

6    be able to inspect these records to be able to file a motion

7    and say, okay, this isn't a fair cross-section under the Jury

8    Selection Services Act.  How am I supposed to make that

9    motion, you know what I mean, unless I have--  I don't have

10   that information.

11          And from my understanding is that that has to be

12   provided for a defendant to make that--

13          THE COURT:  You have to make a showing that there is

14   some problem.

15          THE DEFENDANT:  After, after--  There is no way I

16   can make a showing if I don't know this.  It's like I can't

17   tell you what an apple tastes like until I eat an apple.

18          So, I don't understand how I am supposed to say it

19   wasn't a fair cross-section of the community if I have never

20   seen the grand jury or had any idea of who was in the grand

21   jury.

22          THE COURT:  All right, I understand your position.

23          All right.  We have done the motion to strike the

24   surplusage from the indictment previously.  I have looked

25   again at your pleading today asking for much of the same and

83

1    further support.  I am going to deny the motion to strike the

2    surplusage from the indictment, having found previously and

3    finding today that the indictment does not contain surplusage.

4            Is it prejudicial?  Yes.  Some of the evidence, some

5    of the allegations in the indictment, they are all

6    prejudicial.

7            THE DEFENDANT:  Of course.  No, my issue was with

8    the continuing factor.  He is making a complete Hobbs Act

9    robbery.  And the way he has worded it, I think he maybe made

10   a mistake and made it into a conspiracy form where the overt

11   acts are relevant.  But in a completed Hobbs Act robbery,

12   overt acts have nothing to do with preparation, planning.  All

13   that stuff has no relevance upon what is statutorily

14   prohibited, a robbery that affects interstate commerce.

15           So, in that indictment I was hoping to see the

16   robbery, the acts and how that was constituted and how the

17   interstate commerce was affected.  All the other stuff

18   predating that, he basically initiated that whole continuing--

19           THE COURT:  Well, if the evidence doesn't conform to

20   the indictment, he is not going to go back--

21           THE DEFENDANT:  No.  What I am trying to understand,

22   it's like a hybrid.  I mean, am I defending against a

23   conspiracy, or am I defending against a completed Hobbs Act

24   robbery?

25           THE COURT:  He has identified different overt acts

84

1  which were a part of the planning and course of the Hobbs Act

2  robbery, which he is entitled to do under the case law.

3          THE DEFENDANT:  But from what I have read in the

4  Hobbs Act, and I am not refuting what the Court is saying, and

5  I understand I'm not a lawyer, but what I have read is that

6  there is different requirements for each different type of

7  Hobbs Act.  Just like there is a different requirement for

8  distribution compared to a conspiracy to distribute.

9          THE COURT:  You are mixing up requirements versus

10  what may be offered in evidence as furtherance of a crime--

11          THE DEFENDANT:  Statutory elements though.  Just

12  like, my issue is with the Hobbs Act.  It is a very

13  complicated matter.  And what I feel like the prosecution is

14  doing he is basically putting together all the different types

15  of Hobbs Act requirements.  There are set requirements for

16  each different offense.  They are all unique in their own

17  ways.

18          And what this indictment on that one offense--  The

19  one with Haile is correctly placed, that's why I didn't

20  challenge that.  My challenge is against Count 2 where he

21  starts it off with this continuing stuff.

22          And from what I've read, and I don't have it on

23  hand, but I have a ton of Hobbs Act cases where they clearly

24  separate the qualifications and what is required of all the

25  different allegations of a Hobbs Act, there it's conspiracy to

1    commit Hobbs Act.  There is attempt.  There is, you know,

2    extortion.  They are all varied and they have their own set of

3    requirements.

4           Now, my problem is, by him making that into a

5    continuing factor, he is basically combining two different

6    types of offenses.  That, basically, you know, confuses my

7    defense.  What am I defending against?

8           I am not questioning the Court, but I just wish the

9    Court would kind of look into that because this is a very

10   disputed issue among the districts.

11          THE COURT:  You can be sure that your counsel will

12   be looking at it too because the Hobbs Act is a complex

13   statute, just like the Racketeering Act statute.

14          And there are--  You know, on the one hand the

15   Government is allowed to try and prove the offense in multiple

16   ways, but the jury has to unanimously find that the elements,

17   each of the elements--

18          THE DEFENDANT:  But these are two different charges,

19   Your Honor.

20          THE COURT:  There are multiple counts.

21          THE DEFENDANT:  No, I mean, just in that one

22   indictment, that one allegation, there is two different

23   charges being alleged on that one--

24          THE COURT:  I understand that.

25          THE DEFENDANT:  It is a conspiracy and a robbery

86

1  being charged in that event.

2          THE COURT:  I have looked at it.

3          THE DEFENDANT:  I understand.

4          THE COURT:  And I have worked with the statute many

5  times, and I find that it has been properly pled.

6          THE DEFENDANT:  I understand.

7          THE COURT:  And overt and general allegations are

8  part and parcel to the 1951 charge.

9          So, your exception is noted.  All these are now on

10 record and your exception is noted.  To the extent I don't

11 grant your motions, the matter is preserved for review by an

12 appellate court.

13         THE DEFENDANT:  I'm supposed to hold my breath and

14 hope something happens on appeal?

15         THE COURT:  Well--

16         THE DEFENDANT:  I'm not looking for a technicality

17 to weasel out of a conviction.  I just want a fair trial.  And

18 just, you know, I just want a proper trial.  But I am not

19 going to question the Court's decision.  I respect the Court's

20 decision.

21         THE COURT:  Okay.  We have discussed the motion for

22 the wiretap evidence.  I think the response makes it pretty

23 clear that this is not classic Title 3 evidence.

24         THE DEFENDANT:  Why isn't it not?

25         THE COURT:  It's taped conversations of criminal

87

1    activity which the Government is not required to go through

2    the formality of requesting a wiretap under Title 3 of the

3    Surveillance Act.

4            THE DEFENDANT:  So, what is the whole purpose of

5    2518 with the requirements?

6            THE COURT:  Well, we can have a discussion about

7    that--

8            THE DEFENDANT:  I'm sorry.  I just thought they

9    would have to go to a Magistrate Judge and offer, from the

10   cases that I have, that they would have to offer--  And it

11   says that Title 3 does apply to inmates.

12           THE COURT:  Yeah, but these are consensual

13   recordings of telephone calls that you initiated or received,

14   and--

15           THE DEFENDANT:  I am referring to the wire stuff

16   too, the oral interception also.

17           THE COURT:  By the informant being wired up?

18           THE DEFENDANT:  Yes.

19           THE COURT:  And again, the Wiretap Act doesn't cover

20   it.

21           THE DEFENDANT:  Okay.

22           THE COURT:  But your exception is noted.  I think

23   that's all I am going to hear argument on.  If there is one

24   highlighted topic you haven't covered in your pleadings that

25   you want me to be aware of--

88

1          THE DEFENDANT:  We haven't addressed the destruction

2     of evidence.

3          THE COURT:  Yeah.  I don't find there has been any

4     destruction of evidence.  I can see that from the record.  I

5     don't need anything further.

6          THE DEFENDANT:  There is evidence of a piece of

7     paper that is being offered into evidence.  There is no way I

8     can prove that that paper wasn't left by a different pen

9     writing.  They didn't do any type of tests confirming that

10    that pen was used.

11         THE COURT:  They did do an affirmative test.  They

12    checked it for fingerprints.

13         THE DEFENDANT:  No.  What I am referring to is the

14    document that has the number on it, and they claimed, the

15    suspect claims that that pen was used to write something down.

16    And now they are offering that document that was found in the

17    bottom of the cab as proof as to, okay, this is what the

18    suspect wrote on.

19         My whole argument is I can't prove or disprove if

20    that was written by that pen because they never even checked

21    if that pen was the same ink color as that document.  They

22    never checked if it was the same type of ink.  They didn't

23    conduct any type of test to preserve that fact, but they are

24    offering this document into evidence.

25         THE COURT:  Well, the pen and the document are

1   different exhibits, number one.

2           THE DEFENDANT:  But they are tied in together.

3           THE COURT:  They attempted to find evidence that you

4   had used the pen.  They were unable to do so.  And whether the

5   pen should have been thrown out at that stage is debatable,

6   but it wasn't done at the behest of the Government.  They

7   weren't trying to make sure you couldn't look at the pen.  It

8   was destroyed in the course of the forensic examination that

9   was done, and so you can't attribute intentional obstruction

10  under those facts.

11          THE DEFENDANT:  The Fourth Circuit held that, in

12  Elliott they held that the fact that they didn't follow

13  procedures is bad faith by itself.  And like I gave the

14  example, this is tied together, the note and the pen.  There

15  is no, I don't understand why they would throw away the pen

16  when that pen ties it, but--

17          THE COURT:  All right.  Your record is preserved on

18  that as well.  All right.

19          THE DEFENDANT:  One last, DuBo, the defective

20  indictment where they don't allege the mens rea.

21          THE COURT:  They have sufficiently pled the acts

22  that were committed under the statute in a notice pleading as

23  is allowed under the federal laws.  They are going to have to

24  prove the elements of the offense in trial.

25          THE DEFENDANT:  I understand.

90

1          THE COURT:  And intent is an element that clearly

2     has to be, specific intent they are going to have to--

3          THE DEFENDANT:  So, why is knowingly used when

4     alleging offenses under the statutes?  I figured that was an

5     important element of something that needs to be established.

6     And I didn't quote the cases that I have, but I found a ton of

7     cases where that is a fatal error if it is presented to the

8     Court prior to trial.

9          THE COURT:  Well, they have in each of these counts

10    alleged that you intentionally, knowingly acted in either

11    committing a robbery by means of a firearm through force,

12    violence and fear of injury.  These are all intentional acts.

13    And so, they have alleged properly that you have done these

14    acts intentionally and knowingly.  The acts themselves are

15    specifically laid out in the violation.

16          So, they have complied with their statutory

17    requirement for purposes of the indictment.

18          THE DEFENDANT:  So, why was DuBo reversed then?  I

19    am just curious.

20          THE COURT:  Well, because it didn't sufficiently

21    plead the elements of the offense.  But that's not the case

22    here.

23          THE DEFENDANT:  Okay.

24          THE COURT:  All right.  All right, Mr. Nachmanoff,

25    anything else in morning?

1          MR. NACHMANOFF:  No.  Thank you, Your Honor.

2          THE COURT:  All right.  Then we will await any

3   further pleadings.  And we will look to get them on Monday in

4   time so perhaps we can deal with them on Monday.  You will

5   continue to get discovery.  Mr. Walutes is going to check with

6   Detective Hickman and Detective Bond, see whether there is any

7   other evidence that needs to be produced.  And we will go from

8   there.

9          All right.  Anything else, Mr. Walutes?

10          MR. WALUTES:  No, Your Honor.

11          THE COURT:  All right.  Thank you all.  Well, there

12   is one matter.  Have a seat.

13          The behavior issue.  You have done very well today.

14   You are a bright guy.  You have on occasion gotten frustrated.

15   And you are not frustrated today because I think you have had

16   an opportunity to be involved in the proceeding.  I think

17   things are going as well as they could given the fact that you

18   are charged with a bunch of serious charges and the positions

19   you have taken.

20          We are going to select a jury on Wednesday, it is

21   going to take a couple hours.  I will be asking a lot of

22   questions.  And then you are going to be confronted with

23   witnesses who are going to accuse you of things that you have

24   denied and certainly you don't want to hear.

25          The way you behave is important to you, important to

92

1    how this jury receives you.  That you don't act out when you

2    are upset about something being said against you.  And, of

3    course, I am required to conduct a trial in an orderly fashion

4    and make sure that disruptions in the trial don't occur so

5    that the evidence can't be brought to the jury for their

6    consideration.

7            Now, I have had, you know, we have had this

8    conversation before, and there have been times when you were

9    upset.  As I said, there are different things that can be done

10   that is allowed, that Courts are allowed to do.  They are

11   allowed to, you know, gag you or tie you up.  I mean, those

12   are all case law.  That's not something that I would do.

13           There are more modern ways of allowing a proceeding

14   to continue in a nondisruptive fashion.  One is to exclude you

15   from the courtroom and have you watch the proceeding from down

16   in a holding cell.  And this courtroom is set up for that.

17           Another one, and, frankly, I have been requested, is

18   to put a stun belt on you.  And that's been used several times

19   in the last several years.  It's a pretty extreme--

20           THE DEFENDANT:  Get a stun belt put on me?

21           THE COURT:  It's a belt that goes around your waist.

22   And if you attempted--

23           THE DEFENDANT:  So, I am getting one during trial?

24           THE COURT:  No, you're not.

25           THE DEFENDANT:  Oh, I'm sorry.

1          THE COURT:  You're not getting one to start trial.

2     But if I get information where I am concerned about the safety

3     of the people around you, then it's an option.  And I want you

4     to know about it in advance.  It's something that I, it's a

5     last resort as far as I am concerned, but it is out there.

6     And I wanted you to know it now so you could think about the

7     behavior aspect of the trial.

8          THE DEFENDANT:  Contrary to the allegations, and I

9     know it's a major concern with all the stuff that is being

10    presented against me, but I just want the Court to know that I

11    do have some level of integrity and I don't plan on debasing

12    myself in any form or fashion.

13         THE COURT:  And I believe you.  You know, it's just

14    going to be a control issue when you are in actual trial and

15    things are--

16         THE DEFENDANT:  I already know I am going to get

17    convicted.  I just want to put up a good fight.  I'm not, I'm

18    not really concerned--  I mean, the way it looks, he is

19    getting everything, he has got a blank check, he can do

20    everything he wants, he can create evidence.

21         So, I am already resolved to the fact that I am

22    going to be convicted, and I am just going to have to hold my

23    breath and wait for an appeal.

24         But I just want the Court to know, you don't have to

25    worry about any problems, I am not going to be surprised by

94

1   anything.  I already know what to expect, Your Honor, and I

2   promise you that I won't--

3            THE COURT:  Well, you may be surprised by the way

4   the trial goes in a more positive fashion.

5            THE DEFENDANT:  I hope so, Your Honor.  I can only

6   hope.

7            THE COURT:  All right.  Then we are in recess, and I

8   will be in touch with you on Monday when we look at these

9   additional motions.

10            THE DEFENDANT:  Thank you for allowing me to write

11   those motions.

12            THE COURT:  Yes, sir.

13   -----------------------------------------------
                         HEARING CONCLUDED

14

15

16

17

18

19            I certify that the foregoing is a true and

20        accurate transcription of my stenographic notes.

21

22

23
                      /s/  Norman B. Linnell
24                    Norman B. Linnell, RPR, CM, VCE, FCRR

25