1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
              Defendant.      :
                              :
------------------------------:
```

V O L U M E   1 of 5


TRIAL   TRANSCRIPT


March 10-11 & 15-18, 2010


Before:  Liam O'Grady, Judge


And a Jury



APPEARANCES:

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

2

<u>INDEX</u>

Opening Statement of Mr. Walutes            132


Opening Statement of Mr. Corey              152

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| RICHARD A. BRYAN | | |
| | DIRECT | 161 |

3

1              NOTE:  The case begins in the absence of the jury

2    panel as follows:

3    JURY PANEL OUT

4              THE CLERK:  Criminal case number 1:09-cr-179, the

5    United States of America versus Mirwais Mohamadi.

6              MR. WALUTES:  Good morning, Your Honor.  Ronald

7    Walutes and Michael Ben'Ary for the United States.

8              We are also joined at counsel table, if that is okay

9    with the Court, by Special Agent Vic Castro of Alcohol,

10   Tobacco, Firearms and Explosives.  And also our paralegal,

11   Sarah Dickinson, who will be handling the Sanctions for me.

12             THE COURT:  All right.  Good morning to you all.

13             MR. NACHMANOFF:  Good morning, Your Honor.  Michael

14   Nachmanoff on behalf of Mr. Mohamadi.  Along with Whitney

15   Minter and Jeff Corey.

16             We also have Martha Day, who has just stepped out

17   for one moment, but is our paralegal.  And with the Court's

18   permission, we would ask that she be allowed to remain inside

19   the bar.

20             THE COURT:  Certainly.

21             MR. NACHMANOFF:  Thank you.

22             THE COURT:  Good morning to each of you.

23             Good morning, Mr. Mohamadi.

24             THE DEFENDANT:  Good morning, Your Honor.

25             THE COURT:  All right.  We have set this time for

4

1    any remaining motions.  I've had the opportunity to review the

2    additional motions that you handed to the deputy clerk a few

3    minutes ago.

4            And in addition, I did not rule on a couple of the

5    last motions filed yesterday by counsel for Mr. Mohamadi

6    because I didn't have enough information.

7            Is there anything else beyond that is still--  You

8    received my orders yesterday on the remaining, what I think

9    are the remaining outstanding motions, right?

10           MR. NACHMANOFF:  Yes, Your Honor.  And thank you for

11   having done that.  I think it's narrowed tremendously what

12   there is to discuss this morning.

13           There are a couple of very small, discrete matters

14   that I would like to ask the Court to either address or to

15   clarify if the Court is willing to do that.  And perhaps we

16   could do that first and then address Mr. Mohamadi's pro se

17   matters.

18           THE COURT:  That's fine.

19           MR. NACHMANOFF:  With regard to the tapes, the

20   transcripts.  It's been, I know, a somewhat confusing series

21   of motions and responses coming out.  I think the Court has

22   tried to resolve all of them, and so there are two discrete

23   issues that I would like to try to clarify.

24           I understand the Court's order with respect to the

25   four transcripts that Mr. Walutes identified I think on Sunday

5

1  night, and the Court has ordered that those can come in, and

2  we understand that ruling.

3          THE COURT:  All right.

4          MR. NACHMANOFF:  There is only one area of conflict

5  between that order and the order that the Court granted on

6  Monday which was resolving Friday's arguments.  And the Court

7  had granted in part some of our motions and identified I think

8  by letter Exhibit A, B, C, D, and G, I think, I am not sure

9  which ones they were.

10          But in order for those two things to be consistent,

11  there was one portion of the transcript which is on disk 2 at

12  page 17, lines 12 and 13, and Mr. Walutes referred very

13  specifically to it, that was excluded by this Court's order on

14  Monday and then included by granting the Government's motion

15  on Tuesday.

16          If I am--

17          MR. WALUTES:  Mr. Nachmanoff is dead on.  I think

18  that we could resolve this very simply because I understood

19  the Court's order--  I apologize, I did not mean to file my--

20  I didn't know there was an order coming at me, Your Honor,

21  when I filed that second addendum.  And so, I think the ships

22  passed.

23          But my intention is to only admit page 12, the first

24  top couple lines, I think the first six lines.  But there is

25  some discussion of grease on the bottom of the page.  My guess

6

1    is that that's what the Court felt was unnecessary in this

2    trial.  And I have excluded it, it will not be used in the

3    transcripts in this trial.

4              And so, as I--  I don't know if we have a copy of

5    that transcript.  I think I can get my hands on the transcript

6    in short order, Your Honor.

7              Oh, the .380, Your Honor, I understand the Court's

8    ruling on the .380.  Frankly, I am not looking to put the .380

9    statement in at this point.  It's hanging out there by itself.

10   I'm not looking for that.

11             But earlier he had mentioned pages 12 and 13.  On

12   page 13 there is a discussion about some of the sex acts a

13   prostitute would do.  My guess is the Court felt that really

14   went over the line of what was needed.

15             So, I have curtailed it.  It just has the top six or

16   seven lines on page 12, which simply say that when you're

17   talking about prostitution on the phone, always act like it's

18   legit.  Always say it's legit when you're on the phone.  And

19   that's all I was trying to get in, Your Honor.

20             When it gets to specific sex acts and the discussion

21   of grease, I have understood the Court's ruling to be that

22   that does not come on the transcript.

23             THE COURT:  All right.

24             MR. WALUTES:  I was hoping that solves--  The .380 I

25   also have out, Your Honor.

7

1              MR. NACHMANOFF:  Okay.  Not to make this more

2     confusing.  Very specifically, the .380 is what I was

3     referring to.  The Government has represented they are not

4     introducing it.  That makes it consistent with this Court's

5     order on Monday.

6              It was page 17, lines 12 and 13, that's what I was

7     referring to, not pages 12 and 13.

8              MR. WALUTES:  I'm sorry.

9              MR. NACHMANOFF:  That's okay, it was just the .380.

10             THE COURT:  All right.

11             MR. NACHMANOFF:  So, that's one issue.  The other

12    issue I think again is the product of just the confusion of

13    how many different things there are going on here.

14             I understand that the Government is not seeking to

15    introduce the transcripts from disks 6 and 7.  Those are the

16    transcripts that we got on Friday and discovered that that was

17    the first time we had seen the transcripts.

18             The Government has said they are not trying to

19    introduce them in their case in chief, and so the Court has

20    ruled that there is nothing that needs to be done with that.

21             THE COURT:  Right.

22             MR. NACHMANOFF:  The one thing that I want to

23    clarify that I think is important is that my understanding

24    from the Government's conversations and also their subsequent

25    submission is that they intend to introduce the entire audio

8

1    tape.

2         So, they intend to introduce audio tape which they

3    want to go back to the jury.  They are not going to talk about

4    it necessarily or include the transcript, but they think that

5    the entire tape is admissible.  And we object to that on a

6    variety of grounds.

7         I am not sure the Court needs to rule on it now, but

8    I want the Court to be aware that we object to the entire tape

9    going back on 404(b) grounds, on 403 grounds.

10        The Government's argument has been that they need to

11   establish that Mr. Bryan didn't have the opportunity to turn

12   on and off the tape.  Clearly they can establish that by

13   talking to the agent about how the tape worked and talking to

14   Mr. Bryan about it.

15        Having the jury hear a tape that involves

16   conversations with other inmates, involves Mr. Bryan going to

17   the bathroom, involves a whole variety of things that we

18   think, you know, are 403 and extraneous to the case, that it

19   wouldn't be appropriate to put in the entire audio tapes.

20        What we would like to fight about ultimately is the

21   transcripts that are coming in and what the Government intends

22   to put on in its case in chief.  And we may have a best

23   evidence rule about whether the CDs and the transcripts should

24   go back.

25        But the one thing I wanted to clarify is, if I was

9

1   understanding the Government correctly, that things beyond

2   what are in the transcripts they intend to try and ask to be

3   admitted.

4           THE COURT:  All right, thank you.  All right.

5           MR. WALUTES:  Your Honor, should I just respond to

6   those motions?

7           THE COURT:  Yes, please.

8           MR. WALUTES:  On that, Your Honor, the Government

9   stands behind the representations we made in writing, which is

10  we do not seek to use any other transcripts other than the

11  ones we identified to counsel.

12          Second, it is our belief that the fact, and I intend

13  to argue if the Court permits it, that the inmate had no

14  capacity to start and stop the tape and that the entire tape

15  is there available.  The Government would like to be able to

16  move that into evidence.

17          Now, whether it is admitted is a different question,

18  Your Honor.  And, obviously, the Court may reserve ruling on

19  whether it gets admitted to see the whole way the case is

20  defended.

21          But I understand the Court's rulings about the

22  murder for hire.  I have instructed the witness not to

23  discuss--  I am sorry, not the murder for hire, Your Honor,

24  but for the portions discussing alleged previous murders.

25          THE COURT:  Previous murders, right.

1          MR. WALUTES:  As well as the Court's ruling on the

2   drugs.

3          THE COURT:  Drugs.

4          MR. WALUTES:  And then the unnecessary detail in

5   some areas as to prostitution.  And those three I have

6   instructed the witnesses as recently as yesterday that those

7   we will not be going into.  The witness, frankly, was happy.

8          The availability of the tape is a different matter,

9   Your Honor.  It may be that the Court ultimately sees an

10   argument or defense raised that doesn't engage, that there are

11   other things on the tapes that are relevant and the Court

12   doesn't admit it.

13          And then the Government's suggestion would be that

14   the Court simply say after the Government moves it in that the

15   Court found it not to be admissible.

16          But I would like the Government to look like we are

17   not hiding anything on that tape, Your Honor.

18          THE COURT:  All right, I understand your argument.

19   I will wait and see how the case comes in and evidence comes

20   in and make a decision at that time.

21          All right.  Mr. Nachmanoff.

22          MR. NACHMANOFF:  Thank you, Your Honor.  Turning to

23   the final motions in limine that we had filed.  The Court

24   ruled on three out of the five.

25          The two that are left we would ask the Court to

11

1   address, simply in the interests of whether or not the

2   Government intends to refer to them in opening.  I don't know.

3          One of them is whether or not the Court is going to

4   allow in the testimony from the cab driver regarding the

5   defendant allegedly saying that he had a hatred for the United

6   States.

7          I think that really is 403 unfairly prejudicial

8   information.  It does not go to any of the elements of the

9   offense.  It does not go to any issue that will be in dispute

10  regarding identification.

11         I would not like many other parts of those

12  conversations to come in, including statements about his

13  Afghan heritage, but I understand that that certainly does

14  relate ultimately to the issue of identification.

15         Whether or not a person said that they had a hatred

16  towards America, which would enflame the passions of the jury,

17  lead them to conclude that he was potentially a bad person,

18  might lead them to base their decision not on the evidence and

19  the law as instructed, I would ask that that be eliminated

20  from the case.

21         And if so, I think it's important that the

22  Government perhaps have an opportunity to speak with the

23  witness to make sure that it doesn't come out by accident in

24  some way.

25         The other unresolved issue is the testimony that we

12

1    anticipate may be elicited from Amanda Inge that we got in the

2    Jencks materials regarding the fact that she alleges that Mr.

3    Mohamadi had a gun at some point and fired it out of a moving

4    car.

5            Both of those, clearly, for all the reasons that we

6    have stated previously, would constitute both 404(b) and 403.

7    And we would ask the Court to keep those out as well.

8            There is a lot of evidence in this case.  Injecting

9    these extra things in is simply not necessary at this point

10   and it would be appropriate to exclude them.

11           THE COURT:  All right.  Mr. Walutes.

12           MR. WALUTES:  Your Honor, we haven't had an

13   opportunity--  I appreciate the Court, frankly, trying to

14   narrow the issues and move this case, which is deeply

15   appreciated, but it is not our intention in any way to bring

16   in the witness protection program.  And defense counsel tells

17   the Court that he is not going to inquire into it.

18           I will assure the Court that these witnesses are

19   terrified, particularly the taxicab driver who believed that

20   there were repeated efforts to kill him.

21           And so, if there is a questioning of these people

22   about things that are going to go to their safety, their

23   personal safety--  I don't think the taxicab driver would

24   mention the witness protection program.  When I've talked

25   about the issue with him--  He has had to move his house, he

1    has absorbed a lot of personal costs.

2              But it is not our intention to bring it out.  And if

3    the questions don't come on cross, I don't believe that door

4    ever gets opened, Your Honor.

5              On the Afghan thing, Your Honor, some background I

6    think is important.  The taxicab driver testified, that part

7    of his case has been tried in December of '08, he testified

8    the defendant told him, I'm from Afghanistan, I hate

9    Americans.  He tells that, he testified to it, and the jury

10   did not convict him.

11             So, Your Honor, I think it's a hard road for them.

12             I think the Court should proceed with great caution

13   when we start instructing the victim--  This victim is not a

14   government agent going into a jail with a wire.  This is

15   someone being robbed with a gun.

16             And it explains to the jury the context in which the

17   defendant would just announce that he was from Afghanistan.  I

18   am Afghani, I hate Americans.  He is talking to an Ethiopian

19   immigrant who he thinks at that point in the conversation is

20   Muslim.

21             And so, we believe it is relevant.  We don't believe

22   that the prejudice under a 403 analysis comes anywhere close

23   to it, Your Honor, because it came out in the state trial, the

24   objection wasn't even made.  And the jury did not lose, go

25   blindly and convict the man, which I believe is the standard

14

1    in the Fourth Circuit.

2            As to the gun, Your Honor.  Again, some background.

3    This is the defendant's girlfriend.  He had a gun with her

4    when he was living with her immediately preceding.  Only one,

5    a black semiautomatic.  He has it in her apartment when he

6    starts the trip with Ms. Kim Riley, the craigslist prostitute.

7            And so, that is this gun.  It is in the apartment

8    where this crime begins under the Government's theory of this

9    case.

10            The defense counsel, the defendant obviously knows

11   about his possession of the weapon.  It's never something that

12   has not been disclosed to them until recently.  They have

13   interviewed Amanda Inge down in Miami with the Federal Public

14   Defender's Service investigators down there.  They are aware

15   of all these details.

16            The one I understand that they are troubled by is

17   that approximately two months before this shooting Amanda Inge

18   sees him shoot the weapon out of her car.

19            And, Your Honor, I can--  Frankly, I think the

20   easiest way to solve that problem is if I could ask leave of

21   the Court to ask a direct question.  I would say, have you

22   seen it discharged?  Have you seen it fired?  Not that it

23   wasn't fired at a range, unless they want to go there.

24            But the point I make, Your Honor, is that the

25   instructions, and we haven't gotten there, but they require

1    the Government to prove that the firearm can discharge.

2              Assuming the jury doesn't believe the witness saying

3    on 6/12 that that's the gun, how does the Government get that

4    If they don't credit Ms. Riley saying she saw a round

5    chambered or they see the real gun on 6/12?

6              I think the Government is entitled to a witness'

7    testimony that her boyfriend in her apartment had a gun, it

8    was a black semiautomatic, and she saw it discharged.  It

9    worked.

10             Your Honor, if I could, because I wasn't heard, the

11   other one is Ms. Riley saying that when she is put in fear,

12   when the gun is put to her temple, he says, I will kill you, I

13   have done it before.

14             Your Honor, my problem with that is, that is not the

15   same as an inmate going in and saying to another inmate, what

16   have you done in the past?  It looks like a fishing pole might

17   be involved, which is my guess why the Court kind of had some

18   concerns.  But this is the victim.

19             And the Government under the robbery instruction,

20   again we haven't gotten there, but it says in the robbery

21   instruction, in the presence of another against their will by

22   means of actual or threatened force, violence, fear, immediate

23   or future.

24             And, Your Honor, I think that saying to somebody--

25   I think honestly, Your Honor, she told me yesterday if she is

16

1    questioned by Mr. Nachmanoff on cross, she didn't believe he

2    had actually killed other people.  She just believed he was

3    trying to terrify her.  Which was accomplished.

4           And so, Your Honor, I believe that statement is

5    admissible.  I understand the Court has ruled, but we hadn't

6    been heard.  And so, I would ask the Court to consider the

7    context of that again.

8           That is the victim, no Government actor, no fishing

9    pole, in that car who is having a gun placed to her temple.

10          And if Mr. Nachmanoff--  In fact, I am willing to do

11   it by direct question if Mr. Nachmanoff would prefer me to be

12   the one doing this.  But I am willing to say and make sure

13   that the witness would answer that question that, did you

14   actually believe he had killed other people, I believe the

15   answer would be, no, I did not believe that, I just thought he

16   was trying to terrorize me.

17          I would ask the Court to reconsider the ruling.  I

18   know you have already ruled on it, Your Honor, but I would ask

19   you to reconsider that.

20          THE COURT:  All right.

21          MR. NACHMANOFF:  Your Honor, very briefly.  I know

22   the Court has got a lot in front of it and the jury is

23   waiting.

24          On this issue of the hatred of America.  I think

25   it's, frankly, really grossly inappropriate to suggest that

1   there is a relationship between someone being from Afghanistan

2   and having a discussion about whether or not the taxi driver

3   is Muslim and suggesting there is a hatred of America.  These

4   things are totally separate.  There are millions of Afghans

5   who love this country.

6           The assumption that that helps deal with the

7   identification issue is just not fair I think to many, many

8   Afghan people and people of Afghan descent.

9           Second, I just want to be clear with regard to the

10  firing of the gun.  We had no knowledge of that from any

11  source whatsoever until the grand jury testimony was disclosed

12  in which she talked about that.

13          And certainly we think the gun should be out

14  altogether with regard to Ms. Inge, but certainly any

15  reference to it being fired in any way is both 404(b) and 403

16  and should stay out.

17          THE COURT:  All right.  Well, I am going to allow

18  the testimony regarding the gun seen in possession of the

19  defendant prior to the first of the robberies in May of 2007.

20  I think, again, you're talking about the weapon, a weapon

21  consistent with the one used in the robberies.

22          And as I ruled on the back end of allowing the

23  recovery of the weapon, I think that it's intrinsic to the

24  charges themselves and not 404(b) evidence at all.

25          I will leave it in--  I do believe that the

1   circumstances behind the firing of the gun approximately two

2   months before the first robbery are unnecessary and

3   prejudicial and are not probative.

4           So, if Mr. Walutes will ask the question the way he

5   indicated he would, I think we will avoid that issue.

6           I'm going to grant defendant's motion to redact from

7   the statements of the witnesses the hatred of the United

8   States and also, I've done it before.

9           One, the prior state action was one where there

10  were--  Well, there was only one robbery charge and one

11  firearm charge, and it is a completely different case than the

12  one we have before us where we have multiple robberies and

13  then efforts to kill the cab driver and intimidate witnesses

14  and tamper with the grand jury.

15          So, I think it's a far different case.  And I think

16  that the Government can prove the element of the offense of

17  the robbery by allowing Ms. Riley to testify to the first

18  half.  Which is, he put the gun to her head and she said Mr.

19  Mohamadi indicated that he was going to kill her if he didn't

20  get the money.  Without going into the second part of the

21  statement, I have done it before.

22          If a question is inartfully asked on

23  cross-examination and there is a response, then we will deal

24  with that.  If the testimony somehow comes out, we will deal

25  with it then.  But let's take a moment before those witnesses

19

1    testify to remind them of the boundaries.

2         All right.  Mr. Nachmanoff.

3         MR. NACHMANOFF:  Your Honor, there are two very

4    brief motions in limine or issues that I would like to address

5    prior to opening statement just to make sure that we've

6    resolved them in case the Government intends to address them.

7         Given what's happening right now with time and the

8    jury, I don't know if the Court wants to table those and raise

9    them before opening statement so we can clarify them or now.

10        THE COURT:  Go ahead, let's do it now.

11        MR. NACHMANOFF:  Okay.  One is very simple.  There

12   is information in some of the police reports regarding Mr.

13   Mohamadi's alleged reaction to the fake newspaper story.

14   There is some photographs and there was observation of him

15   reacting when the confidential informant came in to show the

16   photographs.

17        The way the reports are written, they suggest that

18   there might be testimony elicited that we think would be

19   inappropriate.  Which is the way it is described is that Mr.

20   Mohamadi was physically ecstatic and jubilant.

21        In other words, talking about how he felt.  Which I

22   think is--

23        THE COURT:  Yeah, they can testify to what they

24   observed, not what their impressions were of how he was

25   feeling.

20

1        MR. NACHMANOFF:  I wanted to be clear on that.

2   Obviously, his physical reactions or something that they can

3   see.  But how he was feeling or describing the emotions we

4   think is inappropriate and speculative.

5        THE COURT:  I agree with you.  Go ahead.

6        MR. NACHMANOFF:  In a similar vein, there was

7   testimony or there is information in one of the reports from

8   Agent Castro indicating that he held up four fingers.  And

9   Agent Castro speculated that that meant somehow that it had to

10  do with the payment of $4,000.

11       Again, certainly that might be argument, but I don't

12  think it would be appropriate to give the speculation as to

13  what that meant.  Certainly, the fact that four fingers were

14  held up--

15       THE COURT:  Well, if the witness, if he was supposed

16  to be paid $4,000 and that has been established, then that's

17  not speculation.  You know, the jury can disregard it and give

18  it whatever weight, but the fact that he raises the four

19  fingers--

20       MR. NACHMANOFF:  Certainly, no argument that the

21  fact that he raises four fingers.  Any testimony about what

22  the defendant may have meant, however, would be speculation on

23  the part of whoever observed it.

24       THE COURT:  Well--  All right.  I don't see a real

25  problem with that one because I think it has been

21

1    established--  If it has been established that there was an

2    agreement to pay $4,000 plus other amounts of other things of

3    value, and the witness is testifying as to what he believes

4    the four fingers meant, then the jury is going to understand

5    that that is just his impression of what it meant.

6              So, if it's relevant for when the question is asked,

7    I don't see a prejudice there.

8              Let's go to the--  Anything else?

9              MR. NACHMANOFF:  One final small issue.  Which is

10   that there appears to be in the grand jury testimony

11   information from Ms. Riley that Mr. Mohamadi allegedly used

12   cocaine after they had sex and before they went downtown.

13             We would ask that that be excluded as, again,

14   injecting something regarding bad conduct that is not at

15   issue.  It is not relevant to the robberies.  And we would ask

16   that it be excluded.

17             THE COURT:  Are you seeking to admit the use of the

18   cocaine?

19             MR. WALUTES:  Yes, Your Honor.  She was paid on an

20   hourly--  I mean, she is a very expensive--  It is a very

21   expensive business transaction occurring here.

22             It is her belief that people who use cocaine get

23   very clingy.  And so, it made sense to her.  It was not a

24   weird or an alerting situation when he used the cocaine.

25   According to her, it is not unusual.

22

1              But his then subsequent asking of her to keep

2    prolonging their business transaction for a protracted period

3    of time seems more informed.

4              Your Honor, frankly, on the charges here, I don't

5    see a significant degree of prejudice.  And this is the

6    witness' testimony of the relationship that was going on

7    between her and the defendant.

8              And part of the concern from the Government is that,

9    obviously, whether the jury will listen to this witness in the

10   first place.  But if we start to change her testimony and

11   allow not to have the rich details, that I am hoping the jury

12   will get over the shock of seeing a prostitute talking to

13   them, I would like her to be able to talk about it.  And so,

14   any of the jurors, hopefully all of the jurors who care to

15   listen to her testimony and weigh it--   I mean, I actually

16   think the prejudice is to the Government in this instance,

17   Your Honor.  It is a prostitute talking.

18             We would like her voice heard.  And we would like

19   her to be able to give detail as to what was going on.

20             I understand the Court's ruling and I will instruct

21   her not to say that he had said prior murders.  But, Your

22   Honor, I would actually like to be able to have some of the

23   detail.  I don't believe it is terribly prejudicial under the

24   context of this case.

25             THE COURT:  All right.  I will withhold ruling on

23

1    that.  Let's not mention it in the opening statement, and I

2    will give you a ruling before Ms. Riley testifies.

3              Yes, sir.

4              MR. NACHMANOFF:  To turn to the pro se matters, just

5    so that the record is clear.  Mr. Mohamadi has asked that I

6    communicate to you.  And he has done his best under the

7    restrictions that he is under to give me these things so that

8    I could get them to the Court.

9              I noted in our footnote in our notice of filing that

10   with regard to the double jeopardy motion, he had tried to

11   send that.  That is a somewhat voluminous motion, and it had

12   come from Northern Neck incomplete.

13             So, it was submitted.  I believe the Court has

14   already ruled on that and denied it.  As I noted in the

15   footnote, he advised me that he wants the Court to know that

16   he would like to take an interlocutory appeal on that matter.

17             So, I wanted to make sure that the Court was aware

18   of that.

19             Likewise, he submitted motions to us yesterday which

20   have now been given to the Court.  One of them is a motion to

21   dismiss or continue the trial based on the denial of his right

22   to retain counsel.

23             That is also a motion that he had tried to send from

24   Northern Neck but had come through incomplete.  So, I wanted

25   the Court to be aware that that was something that he had made

24

1    an effort to do.

2           There were two other motions that have now been

3    submitted as well, something about clarifying detention, and

4    then there is an outrageous governmental conduct motion.

5           Let me be clear about something, Your Honor.  Docket

6    number 140--  I take it back, I am sorry.  Docket number 134

7    was the motion to dismiss for violation of statutory Speedy

8    Trial Act.  The Court denied that motion.

9           My error in putting these things together attached a

10   second motion behind it.  I did not realize that, and it was

11   also titled a Motion to Dismiss for Governmental Outrageous

12   Conduct.

13          I would ask the Court--  That was my error, not Mr.

14   Mohamadi's.  He had asked me to retract that, to strike that,

15   and have the Clerk's Office take it out.  Again, I take

16   responsibility for it.  It was not intended to be attached.

17   We have gotten a lot of pieces of paper in this case.

18          And so, if the Court would at some later time

19   instruct the Clerk to simply take that out so that it's not

20   part of the record, I don't think it should be held against

21   Mr. Mohamadi.

22          This motion for outrageous governmental conduct that

23   he submitted this morning is the one that he wants considered.

24   I have advised him that the Court actually did deny that

25   outrageous governmental conduct motion.

25

1          So, if the Court simply wants to be clear about

2     ruling on the new motion, I know he would probably appreciate

3     that.

4          THE COURT:  All right.  Well, I will grant the

5     motion to strike that.

6          MR. NACHMANOFF:  Thank you.  Finally, he has yet

7     another motion this morning, it has not been copied, I have

8     not seen it.  It is titled a Motion to Dismiss Indictment For

9     Selective Prosecution.

10          We will endeavor to have it copied.  I told him I

11     could not submit it to the Court until I've given a copy to

12     the Government, but he wanted to be sure to, for the Court to

13     know he had one final pretrial motion.

14          THE COURT:  All right.  If we can have someone copy

15     that, we will be happy to look at it.

16          Well, I've spent a significant amount of time--  Mr.

17     Mohamadi's pro se motions are involved and they go back to his

18     arrest on the state charges and prior to that and give a

19     history which required an extended amount of time.  But I have

20     ultimately ruled the way I did after reading each and every

21     one and considering each and every one of his motions.

22          Most of them were denied without prejudice because

23     it's up to the Government to prove what they say they can

24     prove.  And if they don't, then you have excellent counsel who

25     will bring that to the Court's attention at the end of the

26

1    Government's case.

2              There is what is called, as I am sure you know, a

3    Rule 29.  Which means they haven't met this element, that

4    element, interstate commerce, intent.  As you know, it's the

5    Government's burden to prove each and every element of each of

6    the charges.

7              So, I have denied most of these without prejudice.

8    We will get to the substance of your motions when the

9    Government has rested its case in chief.

10             I am going to deny the motion to continue the trial

11   so that you can attempt to hire counsel.  As you are aware,

12   you are not entitled to your choice of counsel, but competent

13   counsel.

14             And we have, this case has been going on for a very

15   long time, and you had Mr. Brown begin as counsel.  And then

16   Mr. Jenkins entered an appearance.  And then the Public

17   Defenders were involved in the case during the year 2009 and

18   filed upwards of ten motions on your behalf.  And then Mr.

19   Salvato, who I know you are displeased with, was counsel of

20   record for a period of time.

21             The Government filed or provided extensive discovery

22   upwards of eight or nine months ago I think for the most part.

23             And, obviously, given the number of motions that

24   your present counsel has filed, they have been able through

25   their own efforts to review and file motions in limine on the

27

1    many tapes that were provided to them in discovery.  And they

2    have obtained on your behalf a much more discrete trial and

3    much more focused trial on the charges against you versus some

4    of the extraneous matters which, frankly, are not irrelevant

5    given the charges here, but they are prejudicial.

6              Your statements regarding prior history of

7    committing murder or being a cocaine dealer--  I mean, the

8    Government is not out beyond its limits in moving for that

9    because it's criminal behavior and in part which is consistent

10   with the behavior that they have charged in the indictment.

11   But it is highly prejudicial, and I found that it should not

12   be admitted and am not going to admit it.

13             So, your counsel has been able to fundamentally

14   change the Government's case to one which focuses on the

15   identified charges.

16             I am going to deny independently your motions to

17   hire a jury specialist or audio/video analyst or a specialist

18   to look at the tapes.  There just is no evidence before me

19   that the tapes have been manipulated.  And if something occurs

20   during the trial that changes my mind, we will deal with it at

21   that time.

22             The motion for a bond hearing, I don't know whether

23   you had a bond hearing--  You were already in custody, so you

24   were transferred into custody.  Well--

25             THE DEFENDANT:  My time expired in October--

28

1          THE COURT:  I'm sorry?

2          THE DEFENDANT:  My time expired from the state

3   probation revocation in October of '09.

4          THE COURT:  So, you're being held just based on

5   these charges?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.  Well, if counsel wants to

8   file a motion for a bond hearing, then a Magistrate Judge will

9   hear that motion.

10         The motion for denial of due process.  I went

11  through the best I could with the documents that you gave me

12  the history of the charges against you, you know, how you went

13  from Fairfax to Alexandria, the time that went by while Judge

14  Kline was considering the revocation motion and his

15  frustration.  And I have no question that he was frustrated at

16  the length of time that it took.  And then your coming here

17  and being federally charged.

18         I don't find that that rises to a level of a

19  violation of your due process.  It is a process which perhaps

20  took longer than it should have, but I do not believe--

21         THE DEFENDANT:  The fact that they delayed trial

22  just so they could get this undercover operation, that is not

23  prejudicial?  In fact, the prosecutor intentionally delayed

24  trial and lied to the Court.

25         THE COURT:  Well, I don't find that that in fact

29

1    occurred.

2            THE DEFENDANT:  It is in Mr. Brown's motion.

3            THE COURT:  I have your statement, but I don't have

4    anything beyond that.  So, as I said previously in the order,

5    and will repeat now, I do not find that there has been a

6    violation of your rights of due process.

7            And as to whether there is a potential entrapment

8    defense, that is something that you can raise in your case in

9    chief if you decide with counsel that that's what you want to

10   do.

11           So, I will deny the pending motions that have just

12   been brought to my attention.  And your exception is noted.

13   And what you have done is frame arguments if an appeal is

14   necessary.  You now have had the time to put all those before

15   the Court.  They are rulings which are going to be subject to,

16   if you are convicted, they will be subject to a review by the

17   Fourth Circuit Court of Appeals.

18           And I know you hope that doesn't come to pass.  But

19   if it does, at least you have been permitted to file each of

20   these motions.

21           And I will consider the one that you have got on the

22   table before counsel once we get some copies made.

23           All right.  Anything else before we bring the jury

24   in?

25           THE DEFENDANT:  Thank you, Your Honor.

30

1          THE COURT:  How long do you think this case is going
2   to take?

3          MR. WALUTES:  I think we will finish next week, Your
4   Honor.

5          THE COURT:  All right.  Then I will tell the jury a
6   week-and-a-half and we'll see what happens there.

7          All right, anything else before we bring the jury
8   in?

9          MR. WALUTES:  Not from the Government, Your Honor.

10          THE COURT:  Mr. Mohamadi, you have a right to come
11   to side bars if you wish to.  As I am sure you understand, if
12   you do that, of course, the Marshals Service will come with
13   you.  And it may be something that jurors recognize as being
14   consistent with someone who is in custody versus not in
15   custody.  But discuss that with your counsel.

16          I will tell you that most defendants waive the right
17   to come to the side bars, but everybody, every defendant has
18   that right.  And you have that right as well.

19          So, discuss that and we will go accordingly.  All
20   right.

21          MR. NACHMANOFF:  Your Honor, at the appropriate
22   time, we had submitted some proposed voir dire questions, I am
23   sure the Court has seen those.  The only one that I think we
24   didn't include, and I am not sure whether it is appropriate or
25   not, is whether or not there has been any media coverage and

1    whether or not anyone has read or heard anything about the

2    case.  I am not sure if there has been or not.

3              THE COURT:  That's a standard question I ask.  So, I

4    will be asking that.  And I will be asking most of the

5    questions that you have--  Are there any you want withdrawn?

6              MR. NACHMANOFF:  I don't think so, Your Honor.  We

7    will look at that as you are--  I can't remember if there is a

8    question now about his status as a convicted felon.  Of

9    course, we would not want anything like that asked given the

10   posture of the case now trying to remove it.

11             THE COURT:  No, that wasn't included.  But it

12   references, you may hear that Mr. Mohamadi was not born in

13   this country.  And you still want that one in?

14             MR. NACHMANOFF:  If I could let Ms. Minter address

15   some of these issues.

16             THE COURT:  Yes.

17             MR. NACHMANOFF:  Thank you.

18             MS. MINTER:  Your Honor, I don't think at this point

19   there is a need to withdraw any of the questions.

20             I believe that there was a proffered question

21   regarding incarceration, which would, of course, still be

22   relevant as I assume the Government still intends to introduce

23   evidence of incarceration.

24             THE COURT:  Yeah, I am going to ask that.  All

25   right.

32

1              Okay.  All right, then let's get our jury up and we

2    will come back in when the jury is up here and ready.

3              All right, we are in recess.

4              NOTE:  At this point a recess is taken; at the

5    conclusion of which the case continues in the presence of the

6    jury panel as follows:

7    JURY PANEL IN

8              THE CLERK:  Criminal case number 1:09-cr-179, the

9    United States of America versus Mirwais Mohamadi.  This case

10   is on for trial by jury.

11             THE COURT:  All right.  Will counsel please identify

12   themselves for the record again and for the members of our

13   jury panel.

14             MR. WALUTES:  Good morning, Your Honor.  Ron Walutes

15   for the United States.  I am an Assistant United States

16   Attorney in the Eastern District of Virginia based here in

17   Alexandria.

18             MR. BEN'ARY:  Good morning, Your Honor.  Good

19   morning, ladies and gentlemen.  I am Michael Ben'Ary, I am

20   also an Assistant United States Attorney here in the Eastern

21   District.

22             AGENT CASTRO:  Hello.  My name is Victor Castro, I

23   am a Special Agent with ATF.

24             THE COURT:  All right.  Mr. Nachmanoff, would you

25   identify the persons in your team.

33

1              MR. NACHMANOFF:  Thank you, Your Honor.  I am

2    Michael Nachmanoff.  And with me is Whitney Minter, Jeff Corey

3    and Martha Day.

4              THE COURT:  All right.  All right.  Well, welcome,

5    ladies and gentlemen.  My name is Liam O'Grady, and I will be

6    the trial judge in this case.

7              Let's--  The first thing we are going to do is we

8    are going to have roll call.  So, when you hear your name,

9    please identify by saying "here."  And we will, after we get

10   our roll call finished, we will proceed from there.

11             All right.

12             THE CLERK:  Ladies and gentlemen, as I call your

13   name, if you would please stand, answer present and then be

14   seated.

15             NOTE:  The jury panel is called and sworn.

16             THE COURT:  Well, good morning again, ladies and

17   gentlemen.  You've been summoned here today as prospective

18   jurors in a criminal case.  The case is styled the United

19   States versus Mirwais Mohamadi.  And you have already been

20   introduced to the lawyers for the United States and counsel

21   for Mr. Mohamadi.

22             In a minute I'm going to ask you a series of

23   questions.  Some people call it voir dire, some people call it

24   voir dire.  It's just a series of questions which will give

25   the counsel for both parties a little more information so that

34

1    they can select the right jury for this case.  And it's

2    anything but an empirical undertaking, but it is important

3    that we get candid answers to some of the questions that we

4    ask.

5             And if any question that I ask is sensitive in

6    nature, we will allow you to approach the bench and answer the

7    question at the bench.  Most of them are fairly standard

8    questions which you I think would expect to have asked.

9             And I am going to ask the questions in such a way

10   that if I don't get a hand raised, I'll assume that the answer

11   is in the negative and I will go to the next question.

12            So, if I ask a question such as, does anyone have

13   any family members who are involved in law enforcement, I

14   would expect that there would be some hands.  But if I don't

15   get any hands raised, then I move on to the next question.

16            So, please raise your hand high up in the air so

17   that I will notice it or one of my able-bodied staff will

18   recognize the hand up.

19            As I indicated, this is a criminal case.  Mr.

20   Mohamadi has been charged by indictment with ten violations of

21   the criminal code.  He has--  The indictment against him is

22   not evidence, it's an accusation.  And we will talk a little

23   bit more about that in a minute.  He has pled not guilty and

24   requested a trial by jury on the offenses.  I am sorry, it is

25   nine counts.

1          In Counts 1 and 2 Mr. Mohamadi is charged, and 3 and

2     4, he is charged with on May 26 and May 27 of 2007 with armed

3     robbery of two separate victims and using a firearm in those

4     offenses.

5          In Counts 6 and 7 he is charged with solicitation to

6     commit murder for hire, one on September 12 of 2007 and one on

7     November 1, 2007.

8          And he is charged in Count 8 with murder for hire on

9     November 12, 2008.

10          In Counts 9 and 10 he is charged with tampering with

11    witnesses who were to appear in front of the grand jury in the

12    Eastern District of Virginia.  And those are dates of May 22

13    and December 8 of 2008 and March 5 of 2009.

14          Let me begin by asking, Mr. Walutes, would you

15    identify your witnesses who you expect to testify during your

16    case in chief.

17          MR. WALUTES:  Yes, Your Honor.  Sorry, Your Honor,

18    it got lost in my papers.  I have got it.

19          The Government expects to call Mr. Richard Bryan.

20    Mr. Steve Greene, he is an expert with the Alcohol, Tobacco

21    and Firearms.  Mr. Randy Pressley.  Detective Tom Lawn with

22    the Fairfax County Police Department.  Mr. Stephen Grant.  Ms.

23    Kimberly Riley.

24          A crime scene investigator, Thomas Ground with the

25    Alexandria City Police Department.  Officer Keith Crane with

36

1    the Sheriff's Office of the Alexandria City Sheriff.  Mr. Mark

2    Vasquez, a fingerprint examiner with the Alexandria Police

3    Department.

4            Mr. Gebru Haile, he is a taxicab driver in the

5    District of Columbia.  Officer Brian Fromm, he is a canine

6    officer with the Alexandria Police Department.  Detective

7    Robert Hickman, he is a detective with the Alexandria City

8    Police Department.

9            Detective Brian Wise, he is detective with the

10   Metropolitan Police Department for the District of Columbia.

11   Officer Holly Paige, she is with Metropolitan Police

12   Department, currently in the Fifth District.

13           Mr. Andrew James Schap, he was employed in the

14   District of Columbia.  Ms. Jessica Hull.  Ms. Silvia

15   Escamilla.

16           Deputy Sheriff George Burnham with the Alexandria

17   Sheriff's Department.  Lieutenant Brian Johnson with the

18   Fairfax County Sheriff's Department.

19           Ms. Amanda Inge, she currently resides in Florida.

20   And Special Agent Victor Castro, who has already introduced

21   himself.

22           That's the witnesses the Government expects to call,

23   in addition to an employee of T-Mobile who I don't know the

24   name of right now.

25           THE COURT:  All right.  Thank you, Mr. Walutes.

1          Do any of you recognize any of the names that were

2    just called out by Mr. Walutes?

3          All right.  Do any of you know any of the attorneys

4    in the case either for the Government or for Mr. Mohamadi?

5          Yes, ma'am.

6          JUROR RICKARD:  My name is Kirsten Rickard.

7          THE COURT:  I am sorry, please stand.  What was your

8    name?

9          JUROR RICKARD:  Kirsten Rickard.

10         THE COURT:  All right.  Ms. Rickard, who do--

11         JUROR RICKARD:  I am sure Mr. Walutes doesn't

12   remember, but I worked for his dad and his brother-in-law for

13   about five years, and we met at a lot of family functions and

14   stuff at the office in Annandale.

15         THE COURT:  All right.  Thank you, Ms. Rickard.

16   What occupation was--  What was his occupation?

17         JUROR RICKARD:  Real estate attorney.

18         THE COURT:  Real estate attorney.

19         JUROR RICKARD:  Title insurance, underwriting, title

20   maintenance.

21         THE COURT:  All right.  But you don't know Mr.

22   Walutes personally, is that right?

23         JUROR RICKARD:  Well, he had been in and out of the

24   office there, yes.  And we had been to parties at his dad's

25   house.

1          THE COURT:  All right.  How long ago was that?

2          JUROR RICKARD:  '80s, early '90s, '80s.

3          THE COURT:  All right.  Any reason to believe that

4    you can't be fair and impartial in this case?

5          JUROR RICKARD:  No.

6          THE COURT:  All right.  Thank you, Ms. Rickard.

7          Anyone else?  All right.

8          Mr. Nachmanoff, have you determined that you will--

9    The defendant is under no obligation to call any witnesses

10   because the burden of proof is always on the Government.  But

11   if you are aware already of witnesses who you may call, please

12   identify them at this time.

13         MR. NACHMANOFF:  Thank you, Your Honor.  At this

14   time we are not prepared to disclose any witnesses without

15   knowing what the Government's evidence will be.

16         THE COURT:  All right.  Thank you, sir.

17         Do any of you know Mr. Mohamadi?  All right.

18         The attorneys estimate that the case will take today

19   and tomorrow and most of next week to complete the evidence.

20         Do any of you have a conflict that cannot be

21   rescheduled or moved that would prevent you from serving on

22   the jury in this case for that length of time?

23         And, unfortunately, let me preface it by stating

24   that it's a very limited number of events that would excuse

25   you.  You know, inconvenience, there is inconvenience for

39

1   everyone.  Having to rearrange some meetings, having to

2   arrange for daycare, having to move some nonessential dates

3   around, unfortunately, is just not good cause.  And if I

4   excused jurors for that reason, then we would have no juries

5   because it's always inconvenient.

6            And so, let me state in advance, I understand that

7   it is inconvenient.  It's also a privilege, as those of you

8   who are going to serve on this jury, to serve as jurors

9   because it makes us the best country in the world at

10  administering justice because of the members of the

11  community's willingness to come forward and serve as jurors.

12           So, maybe I have discouraged a few of you from

13  raising your hands.  But if you have prepaid vacation plans,

14  if you have obligations where you are a key person giving a

15  speech in Topeka, Kansas on a date that's been prearranged, if

16  you are a single mother without any ability to make

17  arrangements, those are the types of things that I'll be happy

18  to consider.

19           So, let's start over here on the left-hand side.

20  Anybody raise your hand over there?  Yes, sir.  Please tell

21  us, stand, and tell us your name.

22           JUROR McKAMEY:  Verne McKamey.  And I am good

23  through March 17, but on the 18th my wife and I are booked to

24  travel to Arizona to witness the marriage of my niece.

25           THE COURT:  All right.

40

1          JUROR McKAMEY:  So, if that fits, I'm okay.

2          THE COURT:  All right.  Thank you, Mr. McKamey.  Is

3     it McKamey, is that correct?

4          JUROR McKAMEY:  McKamey.

5          THE COURT:  McKamey.  All right.  All right, anybody

6     else in the first row?  Yes, ma'am.

7          JUROR NORDSTROM-GERAGHTY:  I am scheduled to go on

8     business travel to Belgium next week.

9          THE COURT:  To Belgium?

10         JUROR NORDSTROM-GERAGHTY:  Yes, sir.

11         THE COURT:  And your last name, ma'am?

12         JUROR NORDSTROM-GERAGHTY:  Nordstrom-Geraghty.

13         THE COURT:  Is there nobody who can go in your

14    stead?

15         JUROR NORDSTROM-GERAGHTY:  Unfortunately, no.  Our

16    other two managers will be in Turkey and our other manager

17    will be in Kabal.

18         THE COURT:  All right.  And I am sorry, Ms.

19    Nordstrom-Geraghty.  All right, thank you.

20         Anyone else?  Yes, ma'am.

21         JUROR SAIYED:  Your Honor, my father is 80 years

22    old, and he has an immigration appointment tomorrow--

23         THE COURT:  He has what kind of appointment?

24         JUROR SAIYED:  Immigration for the fingerprint, and

25    this is his second appointment.

41

1            THE COURT:  All right.  And there is no one else

2    that can take him to that office?

3            JUROR SAIYED:  I have nobody, no.  It is just for

4    tomorrow.

5            THE COURT:  What's your last name, ma'am?

6            JUROR SAIYED:  Saiyed, S-a-i-y-e-d.

7            THE COURT:  Saiyed.  All right.  Thank you, Ms.

8    Saiyed.

9            All right.  Anybody else on the left side?

10           All right, let's go to middle then.  Yes, sir.

11           JUROR HAMILTON:  Your Honor, my name is Chris

12   Hamilton.  I serve as a deputy director of one of the research

13   centers at Georgetown University.  And the request for

14   proposal for the $100 million grant that supports our center

15   came out this past Monday.  I faxed in a deferral letter, but

16   we didn't know the exact date the RFP was going to come out.

17   But, obviously, this has a fixed response time by the

18   government.  It is a very short time frame.

19           THE COURT:  What's the time frame?

20           JUROR HAMILTON:  The whole time frame is 60 days.

21           THE COURT:  Okay.  All right.  Thank you, Mr.

22   Hamilton.

23           JUROR HAMILTON:  Thank you.

24           THE COURT:  Anyone else?  Yes, ma'am.

25           JUROR BAKER:  My name is Susan Baker.  And I work

42

1   for Immigration and Customs Enforcement.  And we have business

2   meetings in Lansing, Michigan on Tuesday.  So, I am scheduled

3   for travel for Monday through Wednesday of next week.

4            THE COURT:  Can that not be rescheduled, Ms. Baker?

5            JUROR BAKER:  No, it is already scheduled which

6   people are already involved.

7            THE COURT:  All right.  Thank you, Ms. Baker.

8            Yes, sir.

9            JUROR KEPPLINGER:  My name is Gary Kepplinger.  I am

10  scheduled to fly down to New Orleans Thursday.  And there is a

11  reception in honor of my daughter and her fiancee on Saturday.

12  So, depending upon timing, it could be a bit dicey.

13           THE COURT:  When are you scheduled to go, Mr.

14  Kepplinger?

15           JUROR KEPPLINGER:  Thursday morning.

16           THE COURT:  Thursday morning.  Tomorrow, tomorrow

17  morning?

18           JUROR KEPPLINGER:  No, next week.

19           THE COURT:  Oh, next week.  And have you already

20  paid for the flights?

21           JUROR KEPPLINGER:  Yes, sir.

22           THE COURT:  All right.  Anyone else?  Yes, ma'am.

23           JUROR RICKARD:  Hi.  Kirsten Rickard again.  I am a

24  single mother.  And I also work on commission only.  So, if I

25  was to miss work for the next three days and next week, it

43

1    would cause a great financial hardship.  I am the head of my

2    household and I have two sons.

3            THE COURT:  All right.  Thank you, Ms. Rickard.

4            Yes, ma'am.

5            JUROR LINK:  Hi.  I know this may not sound

6    important, but I am a high school English teacher, and our

7    state tests are next week, and I am trying to prepare them for

8    that.

9            And also, I have to do tutorial after school with my

10   students.  And I am trying to get them their research hours

11   in.  And if they don't get those in, they can't graduate in

12   June.  And I am the only one that is supplying these research

13   hours for them.

14           THE COURT:  All right.  And your last name?

15           JUROR LINK:  Lori Link.

16           THE COURT:  Link.  Where do you--  Well, is it part

17   of Fairfax County?

18           JUROR LINK:  Prince William County.  They have to do

19   the research paper, we send it out of state to get graded.

20   And if they do not pass that research paper, they cannot

21   graduate.  So, this is the last chance for seven seniors that

22   I have.

23           THE COURT:  All right.  And when is that paper due?

24           JUROR LINK:  It's due the beginning of April.  They

25   have to do 45 hours.  And because of the snow last month, we

44

1    weren't able to meet.  And then we have spring break at the

2    end of March.  So, we were not able to meet then.  So, I am

3    trying my best right now to get the 45 hours in.

4              THE COURT:  All right.  Thank you, Ms. Link.

5              Yes, sir, in the back.

6              JUROR GILLIGAN:  My name is John Gilligan.  I work

7    for Code Plus Components, a component manufacturer.  And I

8    have got time sensitive layouts and drawings that need to be

9    done.

10             Unfortunately, with the economy, we don't have

11   anyone else left that is able to do what I am doing right now.

12   And with the weather, everything has been pushed to this

13   current time frame.

14             THE COURT:  All right.  Thank you, Mr. Gilligan.

15             Anyone else in the middle?

16             Anyone else on the right-hand side?  My right.  Yes,

17   sir, in the front row.

18             JUROR DWYER:  Your Honor, Kevin Dwyer.  I started my

19   own corporation ten years ago, and I am sort of an

20   owner/operator, I wear all the hats in the business.  So, my

21   business ceases to exist.

22             THE COURT:  What type of business is it, Mr. Dwyer?

23             JUROR DWYER:  Heating and air conditioning,

24   emergency service, commercial and residential.

25             THE COURT:  And you are the head of the office,

45

1    owner, head of the office?

2            JUROR DWYER:  And the employee.

3            THE COURT:  I am sorry.

4            JUROR DWYER:  I am the single employee.

5            THE COURT:  You are the single employee.  All right.

6    Thank you, sir.

7            Yes, sir.  Let's go--  Yes.  Go ahead.  We will do

8    it row to row.

9            Yes, ma'am.

10           JUROR BURRELL:  Just assuming that there are no

11   continuances, I am good until March 30, but I have a prepaid

12   vacation scheduled that day on March 30.

13           THE COURT:  All right.  I don't think that will be a

14   problem.  What was your last name, ma'am?

15           JUROR BURRELL:  Kathleen Burrell, B-u-r-r-e-l-l.

16           THE COURT:  Thank you, Ms. Burrell.

17           All right.  Next row back, anyone?  Yes, sir.

18           JUROR ARRINGTON:  My name is Gerald Arrington.  My

19   wife is going, leaving Sunday to go for training to go to

20   Afghanistan.  So, I have to take care of my sons.

21           THE COURT:  How old are your sons?

22           JUROR ARRINGTON:  Ten.

23           THE COURT:  All right.  She is in the service?

24           JUROR ARRINGTON:  She is in the Air Force Reserves.

25           THE COURT:  All right.  And there is no one else who

46

1    can get your kids a little early off the bus?

2              JUROR ARRINGTON:  No, sir.

3              THE COURT:  You don't have any family in the area?

4              JUROR ARRINGTON:  The nearest family is in

5    Baltimore.

6              THE COURT:  All right.  Thank you, sir.

7              Anyone else?  Yes, ma'am.

8              JUROR ELLIS:  My name is Suzanne Ellis.  And I have

9    a problem with anything past the 17th.  I promised a friend to

10   take her to Kentucky.  Her mother is in a nursing home, and

11   this may be the last time she gets to see her.  And she had

12   already made arrangements and lodging for everything which

13   can't be changed.

14             THE COURT:  And you're driving her, is that correct?

15             JUROR ELLIS:  Yes.

16             THE COURT:  Thank you, Ms. Ellis.

17             Yes, ma'am.

18             JUROR SAVAGE:  I am Sherry Savage.  I am the

19   business manager for my company, and I am scheduled to present

20   our budget to our Board for review on the 17th of March.

21             THE COURT:  And tell me your last name again.

22             JUROR SAVAGE:  Savage, sir.

23             THE COURT:  And I think I understood what you said,

24   but you are scheduled to make a presentation to your Board on

25   the 17th, is that correct?

47

```
 1              JUROR SAVAGE:  Yes, sir.

 2              THE COURT:  All right.  And that can't be given in

 3    the evening, for instance, or on a different day?

 4              JUROR SAVAGE:  No, sir.

 5              THE COURT:  All right.  Thank you, Ms. Savage.

 6              Anyone else?  Yes, sir.

 7              JUROR FITZGERALD:  Yes, Your Honor, my name is

 8    Maurice FitzGerald.  Last week I lost my mother.  And right

 9    now we are a little bit tied up with funeral arrangements,

10    finishing all the arrangements.  I haven't worked in a couple

11    days, and it is kind of hard on me, frankly.

12              THE COURT:  All right.  Thank you, Mr. FitzGerald.

13    I am sorry for the loss of your mother.

14              Anyone else?  All right.  Do any of you have a

15    physical disability that would prevent you from sitting

16    through a trial?

17              Yes, sir.

18              JUROR BRYANT:  I have a prostate problem where I

19    have to get up and go to the restroom a lot.  I am taking

20    medication.

21              THE COURT:  Okay.  It's my general rule that I try

22    and pay attention to the jury.  And if anybody needs a comfort

23    break, all they have to do is raise their hand and we will

24    take a break.

25              Will that help you, sir?
```

48

1           JUROR BRYANT:  Yes, sir, that will be fine.

2           THE COURT:  All right, thank you.

3           Do any of you have a problem--  Oh, and your name

4    again, sir?

5           JUROR BRYANT:  George Bryant.

6           THE COURT:  All right.  Thank you, Mr. Bryant.

7           Do any of you have a problem seeing or hearing that

8    would prevent you from understanding the testimony or

9    observing the evidence?

10          Do any of you have any difficulty in understanding

11   the English language?

12          Do any of you have any interest in the trial or the

13   outcome of this case?

14          Have any of you served as jurors in a criminal or

15   civil case or as a member of a grand jury in either federal or

16   state court in Virginia or elsewhere in the past?

17          And let me first start with the left section.  Yes,

18   sir.

19          JUROR SIGMAN:  Dale Sigman.  I don't know if

20   military courts-martial count, but I was on the court-martial

21   board.

22          THE COURT:  Well, you are the first person to tell

23   me that.  But, yes, sir, military courts-martial, you sat as a

24   juror?

25          JUROR SIGMAN:  Yes, I did, sir.

49

```
1              THE COURT:  How long ago was that?

2              JUROR SIGMAN:  It has been, I think it was probably

3    '94, '95 time frame.  Out in California.

4              THE COURT:  All right.  And Was it a criminal case,

5    or military--

6              JUROR SIGMAN:  Fraternization, officer with an

7    enlisted, plus sexual misconduct.

8              THE COURT:  And was the jury able to reach a

9    decision in the case?

10             JUROR SIGMAN:  Yes.

11             THE COURT:  Don't tell me what it is.  I just want

12   to know if you were able to reach a decision?

13             JUROR SIGMAN:  Yes.

14             THE COURT:  All right.  Thank you, sir.

15             Yes, sir.

16             JUROR HEIZER:  Chris Heizer.  It was in state court

17   up in Maryland and it was for armed robbery of a 7-Eleven

18   store.

19             THE COURT:  All right.  How long ago was that?

20             JUROR HEIZER:  It was, I believe it was '96.

21             THE COURT:  All right.  And Was the jury able to

22   reach a decision, Mr. Heizer?

23             JUROR HEIZER:  Yes, sir.

24             THE COURT:  All right.  Thank you, sir.

25             Yes, sir.
```

50

1                   JUROR JACOBS:  Paul Jacobs.  I was a juror in a

2     court-martial in the late '70s in the Army, and we did reach a

3     decision.

4                   THE COURT:  All right.  Thank you, Mr. Jacobs.

5                   Anyone else?  Yes, ma'am.

6                   JUROR EDMONDS:  Gail Edmonds, Your Honor.  I was in

7     a county court last year.

8                   THE COURT:  All right.  And tell me your name again.

9                   JUROR EDMONDS:  Gail Edmonds.

10                  THE COURT:  All right, Ms. Edmonds.  And was it a

11    civil or a criminal case?

12                  JUROR EDMONDS:  Criminal case.

13                  THE COURT:  All right.  And was the jury able to

14    reach a decision?

15                  JUROR EDMONDS:  Yes.

16                  THE COURT:  And that was approximately a year ago?

17                  JUROR EDMONDS:  Yes.

18                  THE COURT:  All right.  Thank you, Ms Edmonds.

19                  Yes, sir.

20                  JUROR BRYANT:  George Bryant, sir.  I served in

21    Stafford County in a criminal case about five years ago.

22                  THE COURT:  About five years ago.  Was the jury able

23    to reach a decision, Mr. Bryant?

24                  JUROR BRYANT:  Yes, sir.

25                  THE COURT:  All right, thank you.

51

1          Anyone else?  Yes, sir, in the back.

2          JUROR WHYTE:  Richard Whyte.  I served on a criminal

3    case in Raleigh, North Carolina in 2003.  The jury wasn't

4    asked to reach a verdict as the case, it was called plea

5    bargained, I guess.

6          THE COURT:  During the middle of the trial?

7          JUROR WHYTE:  During a recess.

8          THE COURT:  All right.  Thank you, Mr. Whyte.

9          All right.  Any of you that answered yes to that

10   last question, would that experience of prior jury service

11   affect your ability to be fair and impartial in this case?

12   All right, thank you.

13         Have you or any member of your family or close

14   friend every been employed with, and I am going to go down a

15   list, so please listen carefully, bear with me, either a law

16   enforcement agency, a prosecutor's office, a forensic

17   scientist, a correctional officer, a security officer, or a

18   drug treatment counselor, or a firearms dealer?

19         If your answer is yes to any of those, please raise

20   your hand.  Yes, ma'am.

21         JUROR OLMSTED:  Lauren Olmsted.  My father is a

22   federal law enforcement instructor and trainer for the

23   Department of Interior.

24         THE COURT:  I didn't hear any of that.  I am sorry,

25   you need to speak up.

52

1          JUROR OLMSTED:  My father is a coordinator and

2     instructor for the Department of Interior law enforcement.

3          THE COURT:  All right.  And your last name again, I

4     am sorry?

5          JUROR OLMSTED:  Olmsted.

6          THE COURT:  Olmsted.  All right.  Thank you, Ms.

7     Olmsted.

8          Yes, sir, the first row.

9          JUROR STRANDBERG:  Steve Strandberg.  My brother is

10    a state court officer in New York state.

11         THE COURT:  He is a courtroom deputy?

12         JUROR STRANDBERG:  He is a union rep actually now.

13    He is not in the courtroom.

14         THE COURT:  Okay.  And who is he employed by?

15         JUROR STRANDBERG:  New York State Court Officers

16    Association.

17         THE COURT:  All right.  Thank you, Mr. Strandberg.

18         Yes, sir, in the back.

19         JUROR McALLISTER:  Your Honor, Steve McAllister.  I

20    am a former narcotics agent for the U.S. Army Criminal

21    Investigation Division.

22         THE COURT:  I lost you.  I am for a former officer

23    for--

24         JUROR McALLISTER:  Former narcotics officer for Army

25    Criminal Investigation Division.

53

1          THE COURT:  All right.  How long ago was that, sir?

2          JUROR McALLISTER:  1985 was my last case.

3          THE COURT:  All right, thank you.

4          Yes, sir.

5          JUROR TAYLOR:  Richard Taylor.  Juvenile

6    corrections, mid-'90s, late '90s.

7          THE COURT:  You were a juvenile corrections officer

8    or counselor in the--

9          JUROR TAYLOR:  Yes, sir.

10          THE COURT:  All right.  And where was that?

11          JUROR TAYLOR:  Alexandria.

12          THE COURT:  City of Alexandria?

13          JUROR TAYLOR:  Yes, Northern Virginia.

14          THE COURT:  All right.  And that ended in the late

15    '90s, is that right?

16          JUROR TAYLOR:  Probably '96, '97, somewhere around

17    there was my last year.

18          THE COURT:  All right.  What were your duties in

19    that position, sir?

20          JUROR TAYLOR:  Equivalent of a guard, supervisor of

21    kids, doing intakes, things of that nature.

22          THE COURT:  All right.  Thank you, sir.

23          All right.  Someone else?  Yes, sir.

24          JUROR LITZINGER:  Randy Litzinger.  I have two

25    cousins that are involved, one was a police officer, now he is

54

1   security, head of security.  Another cousin was in the

2   military and is also involved in some sort of security, I am

3   not sure exactly what area he is in.

4           THE COURT:  All right.  Mr. Litzinger, are those

5   cousins, they live locally here that you see them on a regular

6   basis, or they live in other--

7           JUROR LITZINGER:  One I see regularly, one I see

8   about once a year.  One is in California, one is closer to

9   here.

10          THE COURT:  All right.  Thank you, sir.

11          Yes, sir.

12          JUROR HEIZER:  Chris Heizer.  I have a sister that

13  does counseling for a house, it's up in Baltimore, for

14  battered women that have drug addictions who are trying to get

15  back into society after they have been in prison.

16          THE COURT:  All right.  Thank you, Mr. Heizer.

17          Yes, front row.  Yes, sir.

18          JUROR KEPPLINGER:  My name is Gary Kepplinger.

19  Before I retired last May one of my functions in my office, I

20  supervised about 20 criminal investigators in our office of

21  special investigations at the GAO.

22          THE COURT:  All right.  Thank you, Mr. Kepplinger.

23          Yes, sir.

24          JUROR JACOBS:  Paul Jacobs.  My brother works for

25  the prison system in Maryland.

55

1            THE COURT:  In Maryland?

2            JUROR JACOBS:  Yes.

3            THE COURT:  What is his position there?

4            JUROR JACOBS:  He is in charge of training now, but

5    he was a guard or supervisor of guards before that.

6            THE COURT:  All right.  Thank you, Mr. Jacobs.

7            Anyone else?  Yes.  Second row.  Yes, sir.

8            JUROR GUYER:  My name is Aaron Guyer.  My

9    stepsister's husband is a police officer in Nashville,

10   Indiana.

11           THE COURT:  All right, thank you.  What was your

12   last name again?

13           JUROR GUYER:  Guyer, G-u-y-e-r.

14           THE COURT:  Guyer.  Okay.  Thank you, Mr. Guyer.

15           All right, second row.  Yes, ma'am.

16           JUROR COLLINS:  Does brother-in-law count as family?

17           THE COURT:  Yes.

18           JUROR COLLINS:  Okay.  My brother-in-law is an FBI

19   agent.

20           THE COURT:  All right.  Where is he located?

21           JUROR COLLINS:  In D.C.

22           THE COURT:  Okay.  Is he a special agent with the

23   FBI?

24           JUROR COLLINS:  Yeah, he just relocated here about a

25   year-and-a-half ago.

56

```
 1                THE COURT:  All right.  And your last name again?

 2                JUROR COLLINS:  Collins, Bridget Collins.

 3                THE COURT:  All right.  Thank you, Ms. Collins.

 4                Yes, sir, in the middle.

 5                JUROR LEWE:  Jung Lewe, L-e-w-e.  Did you say

 6      friends of--

 7                THE COURT:  Close friends, yes, sir.

 8                JUROR LEWE:  I have a very close friend who is a

 9      Secret Service agent in California.  And a friend that was a

10      police officer for Fairfax County.

11                THE COURT:  All right.  Thank you, Mr. Lewe.

12                Anybody else?  Yes, sir.

13                JUROR JACOBY:  Timothy Jacoby.  A close personal

14      friend that was up until just recently a corrections officer,

15      a guard.  And also a cousin who is a public defender in

16      Baltimore.

17                THE COURT:  All right.  Where was your friend the

18      guard?

19                JUROR JACOBY:  Rappahannock.

20                THE COURT:  In Virginia?

21                JUROR JACOBY:  Yes.

22                THE COURT:  All right.  Thank you, Mr. Jacoby.

23                Yes, ma'am.

24                JUROR BAKER:  Susan Baker.  I work for Customs and

25      Immigration Enforcement.  However, I do not--  I have an
```

57

1    administrative position.

2              THE COURT:  Thank you, Ms. Baker.

3              Mr. Heizer is--  Oh, yes, sir.

4              JUROR HAMILTON:  Chris Hamilton.  Two of my family's

5    closest friends and the gentlemen I coach soccer with, one is

6    a Fairfax County police officer, one is a Fairfax City police

7    officer.  And a former business associate of mine who I worked

8    with for a number years was a former director of the ATF.

9              THE COURT:  Okay.  Thank you, Mr. Hamilton.

10             Mr. Heizer again.

11             JUROR HEIZER:  My goddaughter's father is a U.S.

12   Marshal, and he is married to one of my wife's best friends.

13             THE COURT:  Where is he a U.S. Marshal?

14             JUROR HEIZER:  He works in D.C.

15             THE COURT:  He works in D.C.  All right.  Thank you,

16   Mr. Heizer.

17             Yes, sir.

18             JUROR EDWARDS:  My name is Jimmy Edwards.  My wife

19   is a forensic chemist for DEA.

20             THE COURT:  Okay.  Again, your last name?

21             JUROR EDWARDS:  Edwards.

22             THE COURT:  Edwards.  She is presently a DEA

23   forensic chemist?

24             JUROR EDWARDS:  That's correct.

25             THE COURT:  All right.  Thank you, Mr. Edwards.

58

1              Yes.

2              JUROR RICKARD:  Kirsten Rickard.

3              THE COURT:  Right.

4              JUROR RICKARD:  My cousin is a U.S. Marshal.  He is

5     based in New York, but he does a lot of work going back and

6     forth to D.C.  When he does, he stays at our house.

7              My one neighbor is a Fairfax County Sheriff, and two

8     of them are town of Vienna police officers.

9              THE COURT:  All right.  Thank you, Ms. Rickard.

10             Anybody else in the middle?

11             Okay, let's go to this here.  The second row.

12             JUROR BURRELL:  Kathleen Burrell.  My brother is a

13    police officer with Chester County, Pennsylvania.

14             THE COURT:  In Chester County, Pennsylvania.  All

15    right.  Thank you, Ms. Burrell.

16             Yes, sir.

17             JUROR BARBER:  My name is Shawn Barber.  I have a

18    stepfather who is a Marshal, and two good friends that are

19    Fairfax detectives.

20             THE COURT:  All right.  Thank you, Mr. Barber.

21    Where is your father a Marshal?

22             JUROR BARBER:  In Florida.

23             THE COURT:  In Florida?

24             JUROR BARBER:  Florida, D.C., back and forth.

25             THE COURT:  All right.  Thank you, sir.

59

1             Yes, ma'am, in the back.

2             JUROR WOOLS:  I have friends and neighbors whose

3  husbands work for the Secret Service in D.C.

4             THE COURT:  All right.  And your last name, ma'am?

5             JUROR WOOLS:  Wools.

6             THE COURT:  I am sorry, again?

7             JUROR WOOLS:  Wools.

8             THE COURT:  All right.  Thank you, Ms. Wools.

9             Yes, ma'am.

10            JUROR CRAWFORD:  Your Honor, my name is Sidney

11  Crawford.

12            THE COURT:  That's all right.

13            JUROR CRAWFORD:  I have friends and neighbors, one

14  is a sheriff in Arlington County, and his wife is a TSA agent.

15            THE COURT:  All right.  And your last name again?  I

16  am sorry.

17            JUROR CRAWFORD:  Crawford.

18            THE COURT:  Crawford.  All right.  Thank you, Ms.

19  Crawford.

20            Any other hands?  Yes, sir.

21            JUROR FITZGERALD:  Name is FitzGerald.

22            THE COURT:  Mr. FitzGerald.

23            JUROR FITZGERALD:  My wife's brother-in-law is a

24  probation officer in Burgen County, New Jersey.

25            THE COURT:  Okay.  Thank you, Mr. FitzGerald.

60

1           Anyone else?  Yes, ma'am.

2           JUROR SAVAGE:  Sherry Savage.  Sir, my brother is a

3    corrections officer in Jackson, Michigan.

4           THE COURT:  All right.  Thank you, Ms. Savage.

5           Yes, sir.

6           JUROR WHYTE:  Richard Whyte.  I have family members

7    that served as correctional officers in the Arizona prison

8    system.  And my next door neighbor was an FBI agent with the

9    counterterrorism task force.

10           THE COURT:  All right.  Thank you, Mr. Whyte.

11           Anyone else?  Yes, ma'am.

12           JUROR SCOTT:  I am Kim Scott.  I have a lot of

13    neighbors who work for government agencies, CIA, State

14    Department.  My next door neighbor works for the CIA.

15           THE COURT:  All right.  Thank you, Ms. Scott.

16           Anyone else?  Yes, sir.

17           JUROR McNABB:  My name is Samuel McNabb.  The Junior

18    ROTC instructor that worked for me, a sergeant, was a

19    corrections officer at the Fort Lee corrections facility, the

20    federal prison there.

21           THE COURT:  All right.  All right.  Thank you, Mr.

22    McNabb.

23           Anyone else?  Yes, ma'am.

24           JUROR LOUGHRAN:  Cynthia Loughran.  I have a

25    long-time friend since '79 that is a retired Secret Service

61

1    agent.

2              THE COURT:  All right.  Thank you, Ms. Loughran.

3              All right.  Any of you who answered yes to my last

4    question and explained your relationship with any of the

5    identified categories, would that prevent you from being fair

6    and impartial and deciding this case just on the evidence that

7    is admitted and the law that I give you?

8              All right, thank you all.

9              Would you give any greater weight to the testimony

10   of a law enforcement officer over a lay witness simply because

11   of their employment as a law enforcement officer?

12             Do you or any member of your family have any legal

13   training or background either as a lawyer, a paralegal, a

14   legal secretary?

15             All right, let's start over here.  Anybody in this

16   section?  Yes, ma'am.

17             JUROR KRASELSKY:  My husband is an attorney, but he

18   doesn't practice at all.

19             THE COURT:  All right.  And your last name?

20             JUROR KRASELSKY:  Kraselsky.

21             THE COURT:  All right.  Thank you, Ms. Kraselsky.

22             Yes, sir.

23             JUROR McKAMEY:  Verne McKamey.  I am not a lawyer,

24   but I work in government contracts and involved with that kind

25   of contract law.

62

```
1            THE COURT:  All right.  Thank you, Mr. McKamey.

2            Anyone else?  Yes, ma'am.

3            JUROR SAIYED:  My cousin's wife in New Jersey, she

4  is immigration lawyer.

5            THE COURT:  All right.  Thank you, Ms. Saiyed.

6            Yes, ma'am.

7            JUROR OLMSTED:  My father-in-law is currently the

8  head of Metro's law division, he is their head lawyer.

9  Formerly a criminal lawyer.

10            THE COURT:  Okay.  Now, I lost you on my

11  father-in-law is a lawyer.

12            JUROR OLMSTED:  My father-in-law is the head lawyer

13  for the Metro system, and was formerly a criminal lawyer as

14  well.

15            THE COURT:  All right, thank you.  And your last

16  name again, I am sorry?

17            JUROR OLMSTED:  Olmsted.

18            THE COURT:  Olmsted.  Thank you, Ms. Olmsted.

19            Anyone else?  Yes, sir.

20            JUROR LITZINGER:  Randy Litzinger.  My aunt is a

21  legal secretary.  And my father with his job used to work with

22  and is close friends with a lot of attorneys in Pennsylvania.

23            THE COURT:  All right.  Thank you, sir.

24            Anyone else on this side?

25            All right.  Let's go to the middle then.  Yes, sir.
```

63

1          JUROR KEPPLINGER:  I am a lawyer.  I was formerly a

2    general counsel at GAO and now doing private consulting.

3          My daughters are both lawyers, one is in Pittsburgh

4    and one is in Philadelphia.  And my wife is working for a

5    patent law firm out of California.

6          THE COURT:  All right.  And I am sorry, your last

7    name again, sir.

8          JUROR KEPPLINGER:  Kepplinger.

9          THE COURT:  Kepplinger.  It must be interesting

10   conversations around the holiday dinner tables.

11         JUROR KEPPLINGER:  Scintillating.

12         THE COURT:  All right.  Anyone else?  Yes, ma'am.

13         JUROR COLLINS:  Yes, sir.  My husband--  Collins,

14   Bridget Collins.  My father-in-law, sister-in-law and

15   brother-in-law are all attorneys.

16         THE COURT:  What type of law do they practice?

17         JUROR COLLINS:  Well, one was in commercial

18   industry.  My brother is also the one who is the FBI agent.

19   So, that's the one who is practicing.  And my sister-in-law

20   actually changed careers just a year or two ago, she was in

21   aviation law.

22         THE COURT:  She was in aviation law.  All right.

23   Thank you, Ms. Collins.

24         Ms. Rickard.

25         JUROR RICKARD:  I have been a real estate secretary

64

1    or worked in a law firm as a paralegal since 1986.  I

2    currently am doing contract work.  And I work for, one of the

3    contracts is with a criminal attorney in Fairfax, and the

4    other lady is a family attorney in Fairfax.

5              THE COURT:  All right.  Thank you, Ms. Rickard.

6              Anybody else in the middle?

7              All right, let's go to the far side, Your Honor.

8              JUROR BURRELL:  My niece is an EEOC lawyer with the

9    federal government in D.C.

10             THE COURT:  All right.  Thank you, Ms. Burrell.

11             Yes, ma'am.

12             JUROR FOX:  I am an attorney.

13             THE COURT:  All right.  Last name?

14             JUROR FOX:  Fox.

15             THE COURT:  And what type of law do you practice,

16   Ms. Fox?

17             JUROR FOX:  Right now I am just doing contract work,

18   but I was a family law attorney.

19             THE COURT:  All right.  Have you done criminal

20   defense work or prosecution work in the past?

21             JUROR FOX:  No.

22             THE COURT:  All right.  Thank you, Ms. Fox.

23             Anyone else on the far side?  Yes, ma'am.

24             JUROR ELLIOTT:  Colleen Elliott.  My brother is a

25   city attorney for the city of Philadelphia.

65

1              THE COURT:  Your brother is a city attorney in

2      Philadelphia?

3              JUROR ELLIOTT:  Yes.

4              THE COURT:  Practicing criminal law?

5              JUROR ELLIOTT:  Well, he defends the city, or cops

6      that work for the city.

7              THE COURT:  All right, thank you.

8              Anyone else?  All right.

9              Would that experience that you have or family

10     members and conversations with them prevent you from being

11     fair and impartial in this trial?

12             All right, thank you.

13             Let me ask these next two questions jointly.  And I

14     will ask you to come forward and we will have a side-bar so

15     that you can answer with a bit of confidentiality.

16             The two questions are, have you or any member of

17     your family or any close friend been the victim of a crime?

18             And second, have you ever been involved in any court

19     or criminal matter that concerned yourself, any member of your

20     family or a close friend either as a defendant, a witness, or

21     as a victim?

22             All right.  So, if the answer--  Let me have a show

23     of hands as to how many people we have?  All right.

24             Mr. Ruelas, if you would get people to line up, and

25     we will hear your answers to that question at the side-bar.

66

1           And I apologize, you will hear some noise which

2    prevents the conversations at side bar from being heard, and

3    it's annoying to put it kindly, but necessary.  So, I

4    appreciate your listening nonetheless.

5           All right, I will see counsel at side-bar.

6           NOTE:  A side-bar discussion is had between the

7    Court and counsel out of the hearing of the jury panel as

8    follows:

9    AT SIDE BAR

10          THE COURT:  Good morning.

11          JUROR NORDSTROM-GERAGHTY:  Good morning.  Allyson

12   Nordstrom-Geraghty.

13          THE COURT:  Yes.  And you answered, Ms.

14   Nordstrom-Geraghty, and what's your experience?  The questions

15   that I asked you, either a victim of a crime or family

16   members.

17          JUROR NORDSTROM-GERAGHTY:  Yes.  Personally myself,

18   my family were victims of a crime.  My brother is a multiple

19   felon.

20          THE COURT:  Your brother is a--

21          JUROR NORDSTROM-GERAGHTY:  Multiple felon.

22          THE COURT:  All right.

23          JUROR NORDSTROM-GERAGHTY:  He has been out of prison

24   for two years.  His multiple felonies are either drug-related

25   or were for firearms, illegal firearms in the state of

67

1   Virginia.  We have had money stolen from us.  My car was

2   stolen once.  And that's about it.

3          THE COURT:  All right.  Would that experience that

4   you have had with your brother prevent you from being fair and

5   impartial in this case?

6          JUROR NORDSTROM-GERAGHTY:  I have strong feelings

7   towards what happened to my brother.  They are not sympathetic

8   feelings.

9          THE COURT:  All right.  But the answer to my

10  question is, if I instruct you to deliberate and reach a

11  verdict in this case only based on the evidence you hear and

12  the law that I give you, would you follow that instruction?

13         JUROR NORDSTROM-GERAGHTY:  Yes, sir.

14         THE COURT:  All right.  Thank you very much.

15         Yes, ma'am.

16         JUROR LOUGHRAN:  While my husband was in charge of

17  an installation, our house was broken into.  I came home to

18  the people in the home.  And I ran back out as soon as I saw

19  them and went to get my husband who was getting out of the

20  car.  And the people went out the other door.  And that was

21  the extent of it.  They never found who did it.  By the time

22  security got there, they were long gone.

23         THE COURT:  All right.  Your name is Loughran, is

24  that right?

25         JUROR LOUGHRAN:  Yes.

68

1            THE COURT:  How long ago did this happen?

2            JUROR LOUGHRAN:  That happened about '91.

3            THE COURT:  Where was that?

4            JUROR LOUGHRAN:  Griffiss Air Force base.

5            THE COURT:  It was an Air Force base.

6            JUROR LOUGHRAN:  Yes.  He was in charge of the

7    installation.

8            THE COURT:  All right.  Was anything taken from the

9    home?

10           JUROR LOUGHRAN:  Yes.

11           THE COURT:  All right.

12           JUROR LOUGHRAN:  They went in and took all my

13   underwear.  And so, it was spread on the outside of the house.

14   And the base was going through closure, and they think it was

15   just people trying to intimidate my husband, who had nothing

16   to say in the BRAC closure.

17           THE COURT:  Would that experience affect your

18   ability to be fair and impartial in this case?

19           JUROR LOUGHRAN:  No, not at all.

20           THE COURT:  All right.  Thank you, Ms. Loughran.

21           Ms. Saiyed.

22           JUROR SAIYED:  Yes, sir.  My sister's son--

23           THE COURT:  Your sister's son.

24           JUROR SAIYED:  He came to America five years ago.

25   And he was, I don't know exact age, but he pled then, he was

69

1    maybe 18, and he was involved.

2            He is also, I don't know the name of the disease,

3    but according to, he has five years less than his age.  And he

4    was involved in picking stuff, and he was a misdemeanor.

5            THE COURT:  He was charged with theft, misdemeanor

6    theft?

7            JUROR SAIYED:  Yes.

8            THE COURT:  And was he convicted of that charge?

9            JUROR SAIYED:  I don't understand what--

10           THE COURT:  Did he go to jail?

11           JUROR SAIYED:  No.

12           THE COURT:  Okay.

13           JUROR SAIYED:  They take him, but on the same day he

14   was back.

15           THE COURT:  They deported him?

16           JUROR SAIYED:  No, no.

17           THE COURT:  Okay.  Oh, he was arrested, but he was

18   released?

19           JUROR SAIYED:  Yes.

20           THE COURT:  Okay.  And how long ago did that happen?

21           JUROR SAIYED:  I would say one-and-a-half to two

22   years.

23           THE COURT:  Where was he coming from?

24           JUROR SAIYED:  India, but he live in Orange County.

25           THE COURT:  Orange County, Virginia?

70

1             JUROR SAIYED:  Yes.

2             THE COURT:  Would that experience of your sister's

3    son prevent you from being fair and impartial in this case?

4             JUROR SAIYED:  Not at all.

5             THE COURT:  All right.  Thank you, Ms. Saiyed.

6             Yes, ma'am.

7             JUROR ZEMPEL:  I am Synneva Zempel.

8             THE COURT:  Okay, Ms. Zempel.

9             JUROR ZEMPEL:  I am not sure if it is relevant or

10   not, but my mother's cousin's wife used to be a bank teller.

11   The bank that she worked at was robbed years ago.  I don't

12   know actually know if she was there at the time or not.  So, I

13   am not sure if you would consider that a victim.

14            THE COURT:  All right.  Well, thank you for coming

15   forward and telling us that.  Would your knowledge of that

16   event prevent you from being fair and impartial in this case?

17            JUROR ZEMPEL:  No, I really don't know much about

18   it.

19            THE COURT:  All right.  Thank you, Ms. Zempel.

20            This is Ms. Olmsted, whose voice carries

21   approximately four feet.

22            Good morning, Ms. Olmsted.

23            JUROR OLMSTED:  I have had two charges of petty

24   larceny that I have done community service for.  I also had

25   two charges against me filed with the Magistrate Judge, but

71

1   they were pending, they were never followed through with.  And

2   I have also raped when I was younger, but I never filed a

3   complaint against them.

4           THE COURT:  How old were you when you were

5   assaulted?

6           JUROR OLMSTED:  19.

7           THE COURT:  19.  How long ago was that?

8           JUROR OLMSTED:  Two years.

9           THE COURT:  And the other charges that were placed

10  against you but were withdrawn in front of a magistrate, what

11  was the nature of those charges?

12          JUROR OLMSTED:  One was assault from someone that

13  was staying in our apartment, and one was grant theft auto by

14  my parents.

15          THE COURT:  All right.  Misunderstanding as to

16  whether you had permission to drive the car?

17          JUROR OLMSTED:  Yeah.

18          THE COURT:  All right.  Would those experiences

19  affect your ability to be fair and impartial in this case?

20          JUROR OLMSTED:  No.

21          THE COURT:  All right.  Thank you, Ms. Olmsted.

22          Good morning.

23          JUROR THOMAS:  Good morning.

24          THE COURT:  Your last name, please?

25          JUROR THOMAS:  Thomas, Valerie.

72

```
 1              THE COURT:  Ms. Thomas.

 2              JUROR THOMAS:  Yes.

 3              THE COURT:  What response do you have to the

 4    questions I asked?

 5              JUROR THOMAS:  My brother was murdered in 2005.

 6              THE COURT:  I am so sorry to hear that.  And when,

 7    2005?

 8              JUROR THOMAS:  In April.

 9              THE COURT:  Where did that take place?

10              JUROR THOMAS:  Charleston, South Carolina.

11              THE COURT:  Did they prosecute anyone for that?

12              JUROR THOMAS:  They found the person that did it,

13    but he was inappropriately handled by the arresting officers

14    so he was never brought to trial.

15              THE COURT:  All right.  And would that experience

16    prevent you from being fair and impartial in this case?

17              JUROR THOMAS:  No, it would not.

18              THE COURT:  All right.  Well, I am very sorry to

19    hear that.  Thank you, Ms. Thomas.

20              JUROR THOMAS:  Okay.

21              THE COURT:  Good morning, sir.

22              JUROR SIGMAN:  Good morning, sir.  How are you

23    doing?

24              THE COURT:  Fine, thank you.

25              JUROR SIGMAN:  My name is Dale Sigman.  And I have a
```

73

1   son, my oldest son about two years ago down in Woodbridge was

2   robbed, pistol whipped.  They took his wallet.  His girlfriend

3   was with him, they took her purse.  He refused to give up the

4   car, so they hit him across the face with the gun.  They took

5   off and I guess they were hitting a couple places up and down

6   on Old Keene Bridge Road in Woodbridge.

7           THE COURT:  Did they apprehend them?

8           JUROR SIGMAN:  No.

9           THE COURT:  So, no one was ever prosecuted for the

10  charge?

11          JUROR SIGMAN:  No.

12          THE COURT:  How old was your son?

13          JUROR SIGMAN:  Two years ago.  He would be 22.

14          THE COURT:  Would that experience prevent you from

15  being fair and impartial in this case?

16          JUROR SIGMAN:  That's a good question.

17          THE COURT:  It is an important question.

18          JUROR SIGMAN:  I think so.

19          THE COURT:  Let me ask it a different way.  If I

20  instruct you to decide this case just based on the evidence

21  you hear from the witness stand--

22          JUROR SIGMAN:  Yeah, I can do that.

23          THE COURT:  And the law that I give you, can you do

24  that?

25          JUROR SIGMAN:  Yeah.  I am an engineer, I

74

1    am a program analyst, and I do this all the time.

2         THE COURT:  You can focus on what the requirements

3    are?

4         JUROR SIGMAN:  Oh, yes.

5         THE COURT:  Thank you, Mr. Sigman.

6         JUROR SIGMAN:  Thank you.

7         THE COURT:  Good morning, sir.

8         JUROR TAYLOR:  Richard Taylor.  I pled no contest to

9    a DUI in 2000.

10         THE COURT:  In the year 2000?

11         JUROR TAYLOR:  I believe it was 2000, right around

12   there.

13         THE COURT:  All right.  And Where was that?

14         JUROR TAYLOR:  That was actually out in Loudoun

15   County.

16         THE COURT:  Okay.  And did you successfully complete

17   what, the ASAP program?

18         JUROR TAYLOR:  Yes, as much fun as that was.

19         THE COURT:  I am sure it was.  Would that experience

20   prevent you from being fair and impartial in this case and

21   deciding it just on the evidence you hear and the law that I

22   give you?

23         JUROR TAYLOR:  I don't think so, no.

24         THE COURT:  All right.  So, no bias, prejudices came

25   out of that experience?

75

```
 1              JUROR TAYLOR:  No.

 2              THE COURT:  All right.  Thank you, Mr. Taylor.

 3              Good afternoon, sir.

 4              JUROR RODAL:  Good morning.  I am John Rodal.

 5              THE COURT:  All right, Mr. Rodal.  What experience

 6    do you have?

 7              JUROR RODAL:  In 1983 I was returning home from a

 8    date with a girl that I had been dating for approximately a

 9    month, and her ex-boyfriend met us in the driveway with a gun,

10    took her to an abandoned house about three houses down and

11    shot her.

12              THE COURT:  In 1983?

13              JUROR RODAL:  1983.

14              THE COURT:  All right.  Did she survive?

15              JUROR RODAL:  She did.  She did.

16              THE COURT:  All right.  Was he prosecuted for that?

17              JUROR RODAL:  He was, but I believe that there was a

18    plea deal of some sort because I never appeared, never gave

19    any--

20              THE COURT:  You never had to testify?

21              JUROR RODAL:  Never had to testify, correct.

22              THE COURT:  Okay.  And would that experience prevent

23    you from being fair and impartial in this case?

24              JUROR RODAL:  No.

25              THE COURT:  All right.  Thank you, Mr. Rodal.
```

1              Good morning, ma'am.

2              JUROR TROWER:  Good morning.

3              THE COURT:  Give us your last name.

4              JUROR TROWER:  Trower.

5              THE COURT:  All right, Ms. Trower.

6              JUROR TROWER:  Yes.

7              THE COURT:  Please tell us what your experience is.

8              JUROR TROWER:  For me it was a home break-in and

9     theft.  And for my sister it was robbery by gunpoint, robbery

10    at gunpoint.

11             THE COURT:  So, you had your home burglarized?

12             JUROR TROWER:  Yes.

13             THE COURT:  Were you home at the time?

14             JUROR TROWER:  No.

15             THE COURT:  All right.  And was anyone prosecuted as

16    a result of that break-in?

17             JUROR TROWER:  No.

18             THE COURT:  No?  They never found out who did it?

19             JUROR TROWER:  They never found out.

20             THE COURT:  Did you lose personal property?  Was

21    anything taken?

22             JUROR TROWER:  Items, yes, household appliances,

23    jewelry, that kind of stuff.

24             THE COURT:  All right.  When did that take place?

25             JUROR TROWER:  In the '90s.

77

```
 1              THE COURT:  In the '90s.  Where did it take place?

 2              JUROR TROWER:  I was living in Fairfax.

 3              THE COURT:  All right.  So, it was in Northern

 4    Virginia?

 5              JUROR TROWER:  Yes.

 6              THE COURT:  All right.  And your sister was robbed?

 7              JUROR TROWER:  By gunpoint in Ohio, in Columbus.

 8              THE COURT:  And how long ago was that?

 9              JUROR TROWER:  Two years ago.

10              THE COURT:  Did they prosecute anyone for that

11    offense?

12              JUROR TROWER:  They didn't catch the person.

13              THE COURT:  They didn't catch the person.  Was she

14    injured in that robbery?

15              JUROR TROWER:  No.

16              THE COURT:  Okay.  All right.  Would those

17    experiences prevent you from being fair and impartial in this

18    case and deciding this case just on the evidence you hear from

19    the witness stand and the law that I give you?

20              JUROR TROWER:  No.

21              THE COURT:  All right.  Thank you very much.

22              JUROR TROWER:  You're welcome.

23              THE COURT:  Good morning.

24              JUROR YAGGIE:  Good morning.

25              THE COURT:  Tell us your last name.
```

1          JUROR YAGGIE:  Judy Yaggie.

2          THE COURT:  Ms. Yaggie, do you have a response to my

3    questions?

4          JUROR YAGGIE:  I have a nephew, my sister's son was

5    shot and killed, it was his stepson, a little over a year ago.

6          THE COURT:  Your sister's son was shot?

7          JUROR YAGGIE:  Shot and killed by his stepson.

8          THE COURT:  By his stepson.  I am so sorry to hear

9    that.  By the use of a firearm?

10          JUROR YAGGIE:  Yes.

11          THE COURT:  All right.  Where did that take place?

12          JUROR YAGGIE:  Columbus, Georgia.

13          THE COURT:  All right.  And was the stepson charged

14    in the offense?

15          JUROR YAGGIE:  Nothing has happened about it yet.

16    Supposedly my nephew was breaking and entering, and he had

17    been threatening to them.  And I think it is being overlooked

18    a little bit.

19          THE COURT:  So, he hasn't been charged with a crime?

20          JUROR YAGGIE:  No, I don't believe so.

21          THE COURT:  All right.  Would that tragic event

22    prevent you from being fair and impartial in this case and

23    deciding this case just based on the evidence and --

24          JUROR YAGGIE:  I don't think so.

25          THE COURT:  -- the law that I give you?

79

```
1              JUROR YAGGIE:  No.

2              THE COURT:  No?  All right.  Thank you, Ms. Yaggie.

3         Good morning, ma'am.

4              JUROR DONOVAN:  Good morning.

5              THE COURT:  Last name?

6              JUROR DONOVAN:  Donovan.

7              THE COURT:  Ms. Donovan.

8              JUROR DONOVAN:  My brother was a defendant in a

9    criminal case.

10             THE COURT:  All right.  And What was he charged

11   with?

12             JUROR DONOVAN:  He was a meth addict or something.

13   It was meth.

14             THE COURT:  Methamphetamine?

15             JUROR DONOVAN:  Conspiracy, yes.

16             THE COURT:  Conspiracy to distribute it to others?

17             JUROR DONOVAN:  Yes.  Although he never made a penny

18   out of it and he never sold anything.

19             THE COURT:  He was an addict himself?

20             JUROR DONOVAN:  He knew the group, but he was a

21   never a member of that.  He frequented the place.  So, when

22   they raided it, he was there, he was one of them.

23             THE COURT:  Okay.  How long ago was that?

24             JUROR DONOVAN:  Five years.

25             THE COURT:  Five years ago.  Was that here in
```

80

1    Northern Virginia?

2              JUROR DONOVAN:  Yes.  It was right here in this

3    courtroom.

4              THE COURT:  He was charged federally with it?

5              JUROR DONOVAN:  Yes.

6              THE COURT:  What was the result of that?

7              JUROR DONOVAN:  He was convicted.

8              THE COURT:  Did he plead guilty?

9              JUROR DONOVAN:  No, he went to trial.

10             THE COURT:  He did go to trial and he was convicted.

11   What kind of sentence did he receive?

12             JUROR DONOVAN:  He got 16 years.

13             THE COURT:  16.

14             JUROR DONOVAN:  Yeah, he was offered a deal and he

15   refused it.  And because he went to trial, all the other guys,

16   he was the only one who had worked actually, the other guys

17   did it full-time.  And because he went to trial, all the

18   others got their sentences reduced.

19             THE COURT:  So, they cooperated against him?

20             JUROR DONOVAN:  Yes, against him.

21             THE COURT:  All right.  And would that experience of

22   your brother prevent you from being fair and impartial in this

23   case and deciding this case just on the evidence that you hear

24   and the law that I give you?

25             JUROR DONOVAN:  No.

81

1          THE COURT:  All right.  Thank you.

2          Good morning, sir.

3          JUROR DEVEREAUX:  Good morning.

4          THE COURT:  Your last name.

5          JUROR DEVEREAUX:  Devereaux, John Devereaux.

6          THE COURT:  All right.  What has occurred to you or

7    a family member?

8          JUROR DEVEREAUX:  Yes.  My brother was murdered,

9    sawed-off shotgun to his stomach.

10          THE COURT:  Did they prosecute anyone for the

11   charge?

12          JUROR DEVEREAUX:  They did, but he got probation and

13   walked.

14          THE COURT:  He got probation?

15          JUROR DEVEREAUX:  He got probation, yeah.

16          THE COURT:  How long ago did this occur?

17          JUROR DEVEREAUX:  '93.

18          THE COURT:  1993?

19          JUROR DEVEREAUX:  Yes.

20          THE COURT:  Where did this occur?

21          JUROR DEVEREAUX:  In Waco, Texas.  That's where I am

22   originally from.

23          THE COURT:  I'm sorry to hear that, that's terrible.

24          Would that event prevent you from being fair and

25   impartial in this case and deciding this case only on the

82

1    evidence that you hear that is admitted and the law that I

2    give you to follow?

3              JUROR DEVEREAUX:  No, I don't think so.

4              THE COURT:  All right.  Thank you, Mr. Devereaux.

5              Good morning again.  Your last name again?

6              JUROR LINK:  Link, L-i-n-k.

7              THE COURT:  Ms. Link.

8              JUROR LINK:  My aunt was convicted of being an

9    accomplice to armed robbery and kidnapping.  She was just

10   released in the '90s.

11             THE COURT:  She was convicted of being an

12   accomplice?

13             JUROR LINK:  In armed robbery and kidnapping.

14             THE COURT:  All right.  And she was sent to the

15   penitentiary?

16             JUROR LINK:  Sentenced, yes.

17             THE COURT:  How long was she sentenced to?

18             JUROR LINK:  17 years.

19             THE COURT:  17 years?

20             JUROR LINK:  Yes.

21             THE COURT:  She has now been released?

22             JUROR LINK:  Yes.

23             THE COURT:  Is she living with you?

24             JUROR LINK:  No.

25             THE COURT:  Where did this take place?

83

1              JUROR LINK:  Minnesota.

2              THE COURT:  Minnesota.  All right.  And would that

3    experience, her experience and your knowledge of it prevent

4    you from being fair and impartial in this case, in deciding

5    this case just on the evidence and the law that I give you?

6              JUROR LINK:  Honestly, it is going to weigh on my

7    mind.  I am going to have that in the back of my mind.

8              THE COURT:  Did she go to trial and plead not guilty

9    and was convicted, or did she plead guilty--

10             JUROR LINK:  No.

11             THE COURT:  She went to trial and was convicted?

12             JUROR LINK:  Yes, she was convicted.  She went to

13   trial, yes.

14             THE COURT:  All right.  Was there a firearm involved

15   in that case?

16             JUROR LINK:  Yes, she had a firearm.  And then my

17   cousin had to live with us because of this.

18             THE COURT:  So, the cousin came to live you with you

19   because of this?

20             JUROR LINK:  Yes.

21             THE COURT:  All right.  Thank you, Ms. Link.

22             JUROR LINK:  You are welcome.  Thank you.

23             THE COURT:  Good morning, Mr. Heizer.

24             JUROR HEIZER:  Good morning.  Chris Heizer.

25             THE COURT:  Yes, sir.

84

1          JUROR HEIZER:  My first wife's sister, when she was

2     divorcing her husband she lived with us, she was moving out to

3     an apartment, and she was assaulted and robbed.  And she

4     didn't, I don't think she reported it, but she ended up going

5     back to New York to live with her folks because of what

6     happened.

7               THE COURT:  How long ago was that?

8               JUROR HEIZER:  It was in the late '80s.

9               THE COURT:  Late '80s.  Would that unfortunate event

10    prevent you from being fair and impartial in this case and

11    deciding it just on the evidence that you hear and the law

12    that I give you?

13              JUROR HEIZER:  Well, in terms of deciding, I think I

14    could be fair and impartial, but I don't have much sympathy

15    for people that do those kinds of things.

16              THE COURT:  I understand that.  But I am going to

17    have a set of written instructions that you are required to

18    follow.  You will consider the following elements of the

19    offenses, and it is the Government's burden to prove each and

20    every element of each offense that the defendant is charged

21    with.

22              And if I tell you that you are required to follow

23    those instructions--

24              JUROR HEIZER:  I would follow them.

25              THE COURT:  All right.  Thank you, sir.

85

1          Good morning, sir.  Your name again, sir.

2          JUROR GUYER:  Aaron Guyer.  G-u-y-e-r.  Back in 2003

3    one of my best friends at the time was accused of raping my

4    stepfather's sister's niece in the house.  And I filled out a

5    written statement about the event in question.

6          I do not believe it ever went further than an

7    investigation.  I don't think it went to trial or anything

8    like that.

9          THE COURT:  All right.  And your friend was never

10   prosecuted for the alleged assault?

11         JUROR GUYER:  Never prosecuted, but he was alleged.

12         THE COURT:  Would that experience prevent you from

13   being fair and impartial in this case and deciding this case

14   only on the evidence that you hear and the law that I give

15   you?

16         JUROR GUYER:  No.

17         THE COURT:  All right.  Thank you, Mr. Guyer.

18         All right.  Good morning, sir.

19         JUROR GILLIGAN:  Good morning, Your Honor.  My name

20   is John Gilligan.

21         THE COURT:  Mr. Gilligan.

22         JUROR GILLIGAN:  Two instances.  The first is when I

23   was younger, I was in an armed robbery.

24         THE COURT:  You were the victim of an armed robbery?

25         JUROR GILLIGAN:  Yes, sir.

86

1          THE COURT:  And how old were you at the time?

2          JUROR GILLIGAN:  I was 14 at the time.

3          THE COURT:  All right.  Was a firearm used in it?

4          JUROR GILLIGAN:  Yes, a shotgun.

5          THE COURT:  All right.  And where did this take

6     place?

7          JUROR GILLIGAN:  This took place in Scranton,

8     Pennsylvania.  It was a corner store, gentleman came in with

9     a, armed with a shotgun, pointed it at myself and the store

10    owner and demanded the money.  The store owner was not

11    inclined to give him the money, so it was quite an intense

12    situation where the owner kept saying, go ahead and shoot.  It

13    was a little crazy for someone to deal with at that time.

14          As it turned out, there was no shots fired.

15    Eventually the gentleman ran when the owner's dog came around

16    the corner.  That was the end of the incident itself.

17          THE COURT:  Was he prosecuted?

18          JUROR GILLIGAN:  Yes, sir, he was.  He was sent to

19    jail.

20          THE COURT:  He was sent to jail?

21          JUROR GILLIGAN:  Yes, sir.

22          THE COURT:  Did you have to testify in the case?

23          JUROR GILLIGAN:  I did not.  I had to, because of my

24    age I think they had, the officers came over to my house and

25    showed me mug shots where I had to pick him out of the mug

1    shots, but they didn't have me testify at the trial.

2              THE COURT:  All right.  What's your other incident?

3              JUROR GILLIGAN:  The other incident was I had a

4    brother-in-law, that was about seven years ago was, was in a

5    department store, it was basically a hostage situation where

6    they took him and about four other members of the store, as

7    the store opened, bound them and gagged them, and put them in

8    a room and stole merchandise and money from the store.

9              THE COURT:  Was anyone prosecuted in that case?

10             JUROR GILLIGAN:  No, there was no one prosecuted.  I

11   think they had the gentleman arrested, but there was no

12   prosecution.

13             THE COURT:  All right.  And how long ago was that?

14             JUROR GILLIGAN:  I think that was about six or seven

15   years ago.

16             THE COURT:  And where did that take place?

17             JUROR GILLIGAN:  That was in this general area, it

18   was Best Department Store, they are now out of business.  It

19   might have been in Germantown, but I am not sure which store

20   it was.  He has kind of moved around a lot.

21             THE COURT:  All right.  Would either of those events

22   prevent you from being fair and impartial in this case,

23   deciding this case just on the evidence you hear and the law

24   that I give you?

25             JUROR GILLIGAN:  I would hope not.

1          THE COURT:  Well, if I instruct you that you are not

2    allowed to consider anything other than the evidence you hear

3    and the law that I give you, would you follow that

4    instruction?

5          JUROR GILLIGAN:  I would think I would, but,

6    respectfully, I don't think you take your life situations out

7    of any scenario that you are dealing with.

8          THE COURT:  Thank you, sir.

9          JUROR GILLIGAN:  You are welcome.  Thank you.

10          THE COURT:  Yes, ma'am.

11          JUROR BAKER:  It's really intimidating coming up

12    here like this.

13          THE COURT:  Good morning, Ms. Baker.  How are you?

14          JUROR BAKER:  Fine.  How are you?

15          THE COURT:  All right.

16          JUROR BAKER:  In 2002 I had to charge my husband

17    with assault.  And I was able to get a restraining order.

18    When he was under the restraining order, he still attacked me

19    out in P.G. County.  I was living in Fairfax County at the

20    time.  He was charged with assault there.  He spent about a

21    month in jail.

22          Actually, he went to jail when they arrested him.

23    They arrested him on the campus of the University of Maryland

24    and they put him in P.G. County Jail, and he was charged with

25    assault.  But he got probation because it was his first thing.

89

1    But anyway--

2             THE COURT:  Very unfortunate, I'm sorry.

3             JUROR BAKER:  Yeah, thanks.

4             THE COURT:  How long ago did this happen?

5             JUROR BAKER:  Between 2002 and 2003.

6             THE COURT:  All right.  Have you had any problems

7    since?

8             JUROR BAKER:  He has moved away, thank goodness.  Of

9    course, we are divorced.

10            THE COURT:  All right.  Would those events prevent

11   you from being fair and impartial in this case, in deciding

12   this case--

13            JUROR BAKER:  I don't think so.

14            THE COURT:  If I instructed you to decide this case

15   just on the evidence that is admitted and the law that I give

16   you, would you follow that?

17            JUROR BAKER:  Yes.

18            THE COURT:  All right.  Thank you, Ms. Baker.

19            Good morning, Mr. Hamilton.

20            JUROR HAMILTON:  Good morning.

21            THE COURT:  Tell us, sir.

22            JUROR HAMILTON:  I was the victim of a crime.  I was

23   a second lieutenant, platoon leader in the Army.  I was doing

24   nonjudicial punishment to get a soldier out of the Army for a

25   variety of bad behaviors, including drug offenses.  The

90

1    soldier began a minor campaign of intimidation, smashed the

2    car window of my car.  Glass on the car seat, jabbed into the

3    car seat of my baby daughter's car seat, things like that.

4    Phone calls.  The military police took action, a lot of

5    questioning.  Charges on that were never brought.

6            But eventually after a tumultuous eight weeks or so

7    he was chaptered out of the Army.

8            THE COURT:  How long ago did that happen?

9            JUROR HAMILTON:  That was 1993.

10           THE COURT:  1993.

11           JUROR HAMILTON:  So, it was quite a few years ago.

12           THE COURT:  It looks like you were 12 at the time.

13           JUROR HAMILTON:  Yeah, I was a very young, 23-year

14   old second lieutenant.

15           THE COURT:  Would that experience prevent you from

16   being fair and impartial in this case?

17           JUROR HAMILTON:  Not anything that I am personally

18   aware of, no, Your Honor.

19           THE COURT:  Thank you, Mr. Hamilton.

20           JUROR HAMILTON:  Thank you.

21           THE COURT:  Yes, sir.

22           JUROR ECKHARDT:  I am Richmond Eckhardt.  My

23   daughter appeared in court for DUI and marijuana possession.

24           THE COURT:  All right.  And how long ago was that?

25           JUROR ECKHARDT:  It was 2005/2006 time range.

91

1          THE COURT:  All right.  And where did that occur?

2          JUROR ECKHARDT:  The one in Loudoun County was a

3   DUI.  In Fairfax County it was possession of marijuana.

4          THE COURT:  All right.  What was the result of those

5   charges?

6          JUROR ECKHARDT:  She was found guilty of both.

7          THE COURT:  Did she go to trial or did she plead

8   guilty?

9          JUROR ECKHARDT:  She went to trial on both.

10          THE COURT:  In both of them?

11          JUROR ECKHARDT:  Yes.

12          THE COURT:  All right.  And was found guilty?

13          JUROR ECKHARDT:  Yes.

14          THE COURT:  And did she serve any period of

15   incarceration?

16          JUROR ECKHARDT:  She did.  I think about a week in

17   Loudoun County.

18          THE COURT:  All right.  For the DWI?

19          JUROR ECKHARDT:  Yes.

20          THE COURT:  All right.  Would that experience

21   prevent you from being fair and impartial in this case and

22   just deciding this case on the evidence you hear and the

23   instructions I give you?

24          JUROR ECKHARDT:  No.

25          THE COURT:  All right.  Thank you, Mr. Eckhardt.

92

1         Good morning.

2         JUROR ELLIS:  Good morning.

3         THE COURT:  Your last name again?

4         JUROR ELLIS:  Ellis.

5         THE COURT:  Ms. Ellis.  Tell us.

6         JUROR ELLIS:  My husband was the victim of an

7  assault about two years ago.

8         THE COURT:  Okay.

9         JUROR ELLIS:  We had this woman living in our house,

10  and she began behaving erratically.  And he said something to

11  her, she just went off on him and threw something at him, hit

12  him in the head.  And he called the police.  And they said,

13  okay, we are going to charge her with assault, she is the one

14  that started it.  It went to court, she was given probation.

15         And then there is another incident.  He also was

16  charged with assault himself here in, he was shopping one day

17  and he got upset with a store clerk and slammed something down

18  on the counter.  And the security guard came over and said, I

19  saw you throw that at the clerk.  Neither the clerk or him

20  said that he did that, but they called him to court.

21         And when they got there, none of the witnesses

22  showed up.  So, they decided just to drop it.

23         And then this year in December our son's house was

24  broken into and quite a few valuable items were taken.  And he

25  is still upset about that.

93

1          THE COURT:  In the latest incident with your son,

2    was anyone prosecuted for the thefts?

3          JUROR ELLIS:  They are still looking.  They think it

4    was a teen-age gang looking for drug money.

5          THE COURT:  Where did that take place?

6          JUROR ELLIS:  Florida.

7          THE COURT:  In Florida?

8          JUROR ELLIS:  Yes.

9          THE COURT:  All right.  And How long ago was your

10   husband charged with assault and the charges were dismissed?

11         JUROR ELLIS:  It has got to be about six years, I

12   guess.

13         THE COURT:  Where was that?  Was that locally?

14         JUROR ELLIS:  It was Fairfax County.

15         THE COURT:  Fairfax County?

16         JUROR ELLIS:  Yes.

17         THE COURT:  All right.  And How about the incident

18   where he was the victim of an assault, how long ago was that?

19         JUROR ELLIS:  That was about two years ago.

20         THE COURT:  All right.  Was your husband a witness

21   in that case?

22         JUROR ELLIS:  Yes.

23         THE COURT:  That went to trial and she was found

24   guilty, or did she plead guilty?

25         JUROR ELLIS:  She pleaded guilty.

94

1            THE COURT:  All right.  Did she leave the house at

2     that stage?

3            JUROR ELLIS:  Yes, for a while.

4            THE COURT:  All right.  Would any of those

5     experiences prevent you from being fair and impartial in this

6     case and deciding it only on the evidence you hear from the

7     witness stand and the law that I give you?

8            JUROR ELLIS:  No, I don't think so.

9            THE COURT:  All right.  Thank you, Ms. Ellis.

10            Good morning.

11            JUROR WOOLS:  Hi.  Last name is Wools, W-o-o-l-s.

12            THE COURT:  All right, please tell us.

13            JUROR WOOLS:  In the summer of 2005 my home was

14     broken into.  A detective was called out, but there was

15     nothing, they didn't catch him.  There was nothing taken

16     except for my purse was laying right by the door.  So, they

17     came through the garage.

18            THE COURT:  Grabbed your purse and--

19            JUROR WOOLS:  Grabbed my purse and left.  Nobody was

20     hurt.

21            THE COURT:  All right.  And that was in Northern

22     Virginia?

23            JUROR WOOLS:  That was in Leesburg, Virginia, yes.

24            THE COURT:  In 2005?

25            JUROR WOOLS:  2005, the summer, yes.

95

1          THE COURT:  Would that burglary, theft, prevent you

2    from being fair and impartial in this case and deciding this

3    case just on the evidence you hear and the law that I give

4    you?  Was that a no?

5          JUROR WOOLS:  No, it would not.

6          THE COURT:  Thank you very much.

7          JUROR WOOLS:  Yes, thank you.

8          THE COURT:  Thank you, Ms.  Wools.

9          Good morning, sir.  Your last name again.

10         JUROR WHYTE:  Whyte.

11         THE COURT:  Whyte, yes.

12         JUROR WHYTE:  About 25 years ago my family lived in

13   Los Angeles, and over a period of about, I want to say it was

14   probably 18 months, our house was burglarized by the same

15   person who also vandalized cars, who accosted our family

16   driving around our neighborhood.

17         And the case eventually resulted in us, eventually a

18   friend of the family who was a Los Angeles County police

19   officer lived in the neighborhood ended up catching the

20   person.  And the case went to court.  We were supposed to

21   serve as witnesses, but we never did end up serving as

22   witnesses.

23         And the person was sentenced to some prison

24   sentence, I couldn't tell you what it was.  It has been a very

25   long time ago.

96

1              THE COURT:  All right.  Would that experience

2    prevent you from being fair and impartial in this case and

3    deciding this case only on the evidence that you hear and the

4    law that I give you?

5              JUROR WHYTE:  No, I don't think so.

6              THE COURT:  All right.  Thank you, sir.

7              Good morning.

8              JUROR SAVAGE:  Good morning, sir.

9              THE COURT:  You are Ms. Savage?

10             JUROR SAVAGE:  Yes.

11             THE COURT:  All right.  Tell us what your response

12   is.

13             JUROR SAVAGE:  What was the question again?

14             THE COURT:  Well, it was either a victim of a crime,

15   you or a family member or close friend.  Or that you have been

16   charged yourself with an offense.  Or whether you have been a

17   victim in a case in court.

18             JUROR SAVAGE:  Got it, sir.

19             THE COURT:  All right.

20             JUROR SAVAGE:  While on vacation my mom and dad were

21   mugged.

22             THE COURT:  How long ago was that?

23             JUROR SAVAGE:  Eight years ago, I would guess.  They

24   were mugged and my mom was sexually assaulted.

25             THE COURT:  At the same time during the mugging?

97

1          JUROR SAVAGE:  During the mugging, yes.  It was in

2    the Bahamas.  And our house was burglarized about six years

3    ago.

4          THE COURT:  Okay.  In Northern Virginia?

5          JUROR SAVAGE:  Yes, in Alexandria.

6          THE COURT:  All right.  Was anybody prosecuted in

7    either of those instances?

8          JUROR SAVAGE:  I don't believe so, sir.  If they

9    were, I wasn't informed of that.

10          THE COURT:  All right.  And would the experiences

11    your family members had in the burglary, would that prevent

12    you from being fair and impartial in this case and deciding it

13    only on the evidence that you hear and the law that I give

14    you?

15          JUROR SAVAGE:  No, sir.

16          THE COURT:  All right.  Thank you, Ms. Savage.

17          JUROR BURRELL:  Kathleen Burrell.

18          THE COURT:  Yes, good morning, Ms. Burrell.

19          JUROR BURRELL:  A victim of vandalism and theft of

20    landscaping, I guess really.

21          THE COURT:  All right.  The building where you

22    lived?

23          JUROR BURRELL:  Where we work, we own a building.

24          THE COURT:  All right.  Where is that?

25          JUROR BURRELL:  In Prince William County.

98

1              THE COURT:  And how long ago was that?

2              JUROR BURRELL:  The vandalism was about three years

3    ago, two or three years ago.  And the theft of the landscaping

4    was probably about 15 years ago.

5              THE COURT:  Okay.  What was the value of the

6    vandalism?  How much was the loss?

7              JUROR BURRELL:  Negligible.  It was graffiti on the

8    building.  And my husband caught the young perpetrator, he was

9    a high school student.

10             THE COURT:  A high school student?

11             JUROR BURRELL:  Yes.

12             THE COURT:  Was anyone prosecuted in any of those

13   cases?

14             JUROR BURRELL:  No.

15             THE COURT:  Would either of those experiences

16   prevent you from being fair and impartial in this case?

17             JUROR BURRELL:  No.

18             THE COURT:  All right.  Thank you, Ms. Burrell.

19             All right.  Let's complete answering the questions

20   and ask the next question anyway.  Or do you want to do

21   strikes right now for cause?

22             MR. WALUTES:  Whichever the Court would rather.  I

23   do have two that I would make at this time, for juror 23 and

24   43.  Both of them for different reasons were impacted by the

25   crime.  And neither of them were able to say that they would

99

1    be able to do this.

2         23 is--

3         THE COURT:  Ms. Ellis?

4         MR. WALUTES:  Ms. Ellis.  Her husband was assaulted.

5         THE COURT:  She answered she could be fair and

6    impartial, I thought.

7         MR. WALUTES:  If that's true, then I withdraw it,

8    Your Honor.  I didn't hear that.  I am sitting back and it is

9    not as easy.  I appreciate the Court repeating many of the

10   answers.

11        MS. MINTER:  If I may, Your Honor, I actually had

12   that she had said I don't think so.

13        THE COURT:  I thought she said I think so.

14        MS. MINTER:  No, no, I apologize.  I believe the

15   question was whether it would impact her in this case, and her

16   response was I don't think so.  So, she did answer in the

17   negative, but she equivocated in her answer.  Which I think is

18   probably what caused Mr. Walutes some concern.

19        We don't have any objection to that, Your Honor.

20        THE COURT:  To her being struck for cause?

21        MS. MINTER:  Correct.

22        THE COURT:  And 43 is Ms. Litzinger.  No, Lori Link.

23        MR. WALUTES:  She was the one, Your Honor, who had a

24   sister charged with kidnapping and robbery.  And she had

25   actually had to take her sister's child in and raise the

100

1    child.  And she didn't give the Court any clear answer that

2    she would be able to put that aside.

3             THE COURT:  I thought she said that she can't be

4    fair.  Any objection to striking her for cause?

5             MS. MINTER:  The Court's indulgence, please.

6             There is no objection, Your Honor.

7             THE COURT:  She was one that I was going to strike.

8             MS. MINTER:  We would have a couple proposed motions

9    as well, Your Honor.

10            THE COURT:  Okay.

11            MS. MINTER:  Your Honor, in order starting with

12   number 28, Mr. Gilligan.  Your Honor, looking quite simply at

13   the fact that he relayed about being the victim himself of an

14   armed robbery as a young child, I think that is problematic.

15            But the answer that I wrote down in response to the

16   Court's question about whether that would affect him was, I

17   hope not.  And I think that's equivocating as well.

18            THE COURT:  Yeah.  Any objection to striking him?

19            MR. WALUTES:  I don't have any objection.

20            THE COURT:  Yeah, he was on my list.

21            MS. MINTER:  Your Honor, with respect to number 32,

22   Mr. Heizer, he--

23            THE COURT:  Not much sympathy.

24            MS. MINTER:  Exactly, Your Honor.  He also has

25   relayed a number of personal experiences that in addition to

1    his, I believe it was his ex-wife's sister, he had also

2    indicated that he had friends in law enforcement.

3         But I think his comment that he doesn't have much

4    sympathy indicates that he really can't weigh the evidence in

5    a neutral manner.

6         MR. WALUTES:  Your Honor, we oppose that.  Frankly,

7    the Court can get up and ask everyone in this courtroom, does

8    anyone have sympathy for a crime of violence, And I think you

9    would get that from every single juror.

10        The question is whether he would be able to put the

11   lack of sympathy aside in deciding whether this man is guilty

12   of the charge.  He is not being asked to have sympathy or no

13   sympathy.

14        THE COURT:  I did ask him would you follow my

15   instructions to decide the case based only on the evidence and

16   the law that I give you.  And he did say yes to that.

17        So, I won't strike him for cause.

18        MS. MINTER:  I would ask if the Court would consider

19   allowing for additional questioning then of that juror because

20   I certainly understand the Government's points, and I know

21   sympathy isn't the issue, but the concern is that his comment,

22   his unprovoked comment reflects on his ability to really in

23   fact be a neutral trier of fact.

24        THE COURT:  What other questions am I going to ask

25   him?  I asked him the point blank question of whether he would

102

1    follow my instructions that he decide the case just on the

2    evidence that was admitted and the law that I gave.  And I

3    think I asked the question I needed to ask and he said yes.

4            So, you can use a, certainly use a peremptory strike

5    on him if you wish, but I am not going to bring him back up.

6            Anybody else?

7            MS. MINTER:  The Court's indulgence, please, Your

8    Honor:

9            Your Honor, with respect to number 59, Ms. Rickard,

10   I believe is how it is pronounced.

11           THE COURT:  I think she ought to be excused for

12   cause just because of her family situation.

13           MS. MINTER:  We have no objection to that.

14           THE COURT:  She is the single mother with two kids.

15   I am going to excuse Ms. Rickard.

16           MR. WALUTES:  Very well, Your Honor.

17           THE COURT:  I propose that we let Mr. McKamey out,

18   49, he has got the trip already.

19           MR. WALUTES:  Starting on the 18th, Your Honor?

20           THE COURT:  Yes.

21           MR. WALUTES:  There is no way we are done before the

22   18th, Your Honor, in my best treatment.

23           MS. MINTER:  Yes.

24           THE COURT:  All right.  And Mr. FitzGerald, his

25   mother just passed away, he needs to make arrangements.

103

1          MS. MINTER:  Yes, yes.

2          MR. WALUTES:  Without objection, Your Honor.

3          MS. MINTER:  Without objection, Your Honor.

4          THE COURT:  Okay.  Mr. Kepplinger says he has a

5    flight to New Orleans next Thursday for a family wedding.  Any

6    objection to striking him for cause?

7          MS. MINTER:  There is no objection, Your Honor.

8          THE COURT:  Okay.  All right, that's all I had at

9    this time.  We will have another opportunity to discuss.

10         MS. MINTER:  Your Honor, I think actually we did

11   have one additional.  One additional for cause, Your Honor,

12   would be number 68, Mr. Sigman.

13         THE COURT:  His son was robbed.

14         MS. MINTER:  Yes.  And his response to that was, you

15   know, I think probably the best, the most honest answer on

16   that.  You know, he viewed it--  I don't have verbatim what he

17   said, but his answer was effectively that--  Mr. Nachmanoff

18   does have that verbatim.  He said, good question.

19         But I think it certainly exhibited some concern that

20   it wasn't going to affect him.

21         MR. WALUTES:  Your Honor, we oppose that one.  I

22   recall he actually went on at quite some length about how he

23   is an engineer by employment and that he focuses on the

24   evidence.  And if told to focus on the evidence, he could

25   easily do that.  And he felt very comfortable with that

104

1    because of what he does every day, is what he said.

2             THE COURT:  No, I am not going to strike him for

3    cause.  But if he is selected, you can decide whether to

4    strike him with a challenge.

5             MS. MINTER:  There was one other individual, Your

6    Honor, who I believe had a scheduling difficulty that Mr.

7    Nachmanoff had brought to my attention.

8             MR. NACHMANOFF:  Mr. Hamilton.

9             THE COURT:  He has got the $100,000 project, he has

10   got 60 days to do it.

11            MR. NACHMANOFF:  Hundred million I think he said.

12            THE COURT:  $100 million.

13            MS. MINTER:  We do not have any objection to him

14   being excused for cause.

15            THE COURT:  I am not going to strike him for cause.

16   He can work in the evenings if he needs to.  And clearly he is

17   not alone on that project and can work on it.

18            THE LAW CLERK:  Did Ms. Nordstrom-Geraghty say she

19   had a trip to Belgium next week?

20            THE COURT:  Yes, thank you for reminding me.  My

21   handwriting is so bad that I wrote down trip.  Yes, she is

22   scheduled to leave next week for Belgium.  And two other

23   people in her office are going to be somewhere in Turkey I

24   believe she said.

25            So, I propose that we excuse her for cause, conflict

105

1    in scheduling.  Any objection to that?

2            MS. MINTER:  No objection.

3            MR. WALUTES:  No objection.  Can I ask what her

4    number is?

5            THE COURT:  54.

6            MR. WALUTES:  Thank you.

7            THE COURT:  All right, let's complete the

8    questioning.  And we will come back--

9            MS. MINTER:  I apologize, Your Honor.  We had one

10   last.  Ms. Thomas, her brother was murdered.  She seemed

11   fairly emotional even as she was answering the Court's

12   questions.  And I think that calls into question her ability

13   to view the evidence in a neutral manner.

14           THE COURT:  I asked her whether it would affect her

15   ability to decide this case.  And she said, no, it wouldn't.

16   So, I don't find cause to strike her.

17           She was a little emotional about it, as you can

18   imagine, but she also said she could put it aside.

19           All right.  So, your exception is noted to that, to

20   all of those.

21           All right, let's complete our questioning.

22           NOTE:  The side-bar discussion is concluded;

23   whereupon the case continues before the jury panel as follows:

24   BEFORE THE JURY PANEL

25           THE COURT:  All right, thank you for your patience.

106

1    We just have a few more questions.

2           Is there any member of the jury panel who is a

3    member of any organization that advocates a change in the

4    nation's firearms laws?

5           Yes, sir.  Your last name again.

6           JUROR McALLISTER:  McAllister, Your Honor.

7           THE COURT:  Mr. McAllister.

8           JUROR McALLISTER:  I am a safety officer and a

9    firearms instructor with the National Rifle Association.

10          THE COURT:  You are presently an instructor at NRA?

11          JUROR McALLISTER:  Yes, sir.

12          THE COURT:  All right.  Thank you, Mr. McAllister.

13          Anyone else?

14          Mr. McAllister, would that prevent you from being

15   fair and impartial in this case and deciding it only on the

16   evidence that you hear and the law that I give you?

17          JUROR McALLISTER:  No, it would not.

18          THE COURT:  All right, thank you.

19          Have any of you acquired any information about this

20   case?  Or have any reference back in 2007 and 2008, and

21   continuing into 2009, have any of you obtained or reviewed any

22   information from news media or other sources about this case?

23   All right.

24          And I don't mean to suggest that there were any, but

25   with as many ways as people communicate today, I would have no

1    way of knowing that.

2           Is there anyone here who believes that just because

3    the defendant, Mr. Mohamadi, has been indicted by a grand

4    jury, that he must be guilty of something or he wouldn't be

5    here?

6           Have any of you formed any opinion as to guilt or

7    innocence of Mr. Mohamadi at this stage?  Thank you.

8           Are any of you sensible to any bias or prejudice

9    against the United States government or Mr. Mohamadi?

10          You are going to hear allegations that Mr. Mohamadi

11   was involved in the operation of a prostitution business,

12   which is unlawful.  And it will be for a limited purpose, and

13   I will instruct you on the limited circumstances that you may

14   consider it because he is not charged with any unlawful

15   operation of a prostitution business.

16          Do any of you believe that just because he

17   participated in that, may have participated in that activity,

18   that he is likely to be engaged in the offenses for which he

19   stands charged which are unrelated?

20          You may hear that Mr. Mohamadi was not born in this

21   country.  And does that create any bias or prejudice toward

22   Mr. Mohamadi?

23          Do you or a close friend or member of your family

24   drive a taxicab for a living?

25          Ms. Saiyed.

1           JUROR SAIYED:  My ex-husband.

2           THE COURT:  Your ex-husband?

3           JUROR SAIYED:  Yes.

4           THE COURT:  How long ago was that?

5           JUROR SAIYED:  He is still.

6           THE COURT:  He is still driving.  All right.  Would

7    that affect your ability to be fair and impartial in this

8    case?

9           JUROR SAIYED:  No, I don't think so.

10          THE COURT:  All right.  Thank you, Ms. Saiyed.

11          Anyone one else?  Yes, sir.

12          JUROR HUSSAIN:  My brother, he drives a cab.

13          THE COURT:  He drives a cab in D.C. now?

14          JUROR HUSSAIN:  Yes, sir.

15          THE COURT:  And your last name, sir?

16          JUROR HUSSAIN:  Hussain, H-u-s-s-a-i-n.

17          THE COURT:  All right.  What cab company does he

18   work for?  Or does he drive his own cab?

19          JUROR HUSSEIN:  I think Empire.

20          THE COURT:  I am sorry?

21          JUROR HUSSAIN:  Empire Cab.

22          THE COURT:  Empire Cab?

23          JUROR HUSSAIN:  Maybe.  He change sometimes.

24          THE COURT:  All right.  And one of the victims in

25   this case as alleged by the Government is a taxicab driver who

1    was robbed at gunpoint.

2             Would your brother's employment and what you know

3    about that affect your ability to be fair and impartial in

4    this case, sir?

5             JUROR HUSSEIN:  No.

6             THE COURT:  All right.  Thank you, Mr. Hussain.

7             All right.  Are any of you familiar with the EOS

8    Apartments located on Van Dorn Street in Alexandria, Virginia?

9             Yes, sir, last name.

10            JUROR BARBER:  Name is Barber.

11            THE COURT:  Mr. Barber.

12            JUROR BARBER:  Yeah, I drive a delivery truck up

13   here, so I know where pretty much all these places are.

14            THE COURT:  All right.  Any particular recognition

15   of that apartment complex?

16            JUROR BARBER:  No, just in and out of there all the

17   time delivering packages and stuff.

18            THE COURT:  All right.  Is there any reason why that

19   would--  There will be testimony about the apartment complex.

20   Is there any reason to believe that that would affect your

21   ability to fair and impartial in this case?

22            JUROR BARBER:  No.

23            THE COURT:  All right.  Thank you, Mr. Barber.

24            All right.  In order to render a verdict in this

25   case as to each separate count, you must all agree on the

110

1    verdict.  In other words, the verdict must be unanimous.

2            And that's a decision that each of you must make

3    individually, whether you believe that the Government has

4    proven its case beyond a reasonable doubt.

5            While you, of course, will listen to other jurors

6    with their own views, you ultimately will decide each of these

7    counts on your own based on the instructions that I give you

8    and the evidence that you hear.

9            Do any of you believe that you individually would be

10   too uncomfortable to make that decision or that you might be

11   convinced to change your position based on the pressures by

12   other persons in the jury?  Thank you.

13           Do you understand that the defendant, Mr. Mohamadi,

14   is presumed to be innocent?

15           And do you further understand that the Government

16   must prove his guilt beyond a reasonable doubt?

17           Do you understand that the defendant is not required

18   to produce any evidence?  The burden always rests on the

19   Government to prove each and every element of each of these

20   offenses.

21           Is there anyone that for any other reason believes

22   that they are unable to serve as a juror and render a verdict

23   in this case based on the evidence or the law that I give you?

24           All right.  Let me see counsel at side-bar again.

25           NOTE:  A side-bar discussion is had between the

111

1   Court and counsel out of the hearing of the jury panel as

2   follows:

3   AT SIDE BAR

4           THE COURT:  Did I already excuse Ms. Baker, number

5   3?

6           MR. WALUTES:  I don't have her as excused, Your

7   Honor.

8           THE COURT:  All right.  She has got the trip to give

9   a presentation at INS in Michigan or Minnesota on Monday.

10          THE CLERK:  In Michigan, yes.

11          THE COURT:  Michigan.  Any objection to excusing

12  her?

13          MR. WALUTES:  Your Honor, if I could, it's just that

14  I don't know where we are in the numbers, how many we have.

15  Do we have three spares?

16          MS. MINTER:  Of the people that have been struck?

17          MR. WALUTES:  Oh, no, I am sorry.  If we are going

18  to excuse her, I frankly don't care about her government

19  meeting.  I am more sympathetic to the man whose wife is being

20  deployed to Afghanistan and he has the two children.

21          THE COURT:  Mr. Arrington.

22          MR. WALUTES:  Mr. Arrington.  Because, obviously, he

23  has got a lot going on in his life, and there may be

24  distractions for him and there may be emergencies if his

25  children get sick or something else.  It doesn't sound like he

112

1    has a backup plan in place right now or one that he has

2    tested.

3              So, if we have the ability to excuse people, I would

4    just suggest that Mr. Arrington go first.

5              THE COURT:  I think we perhaps should excuse them

6    both.  I think we have got--  Let's see, we brought in--  How

7    many do we have?

8              THE CLERK:  We have 66 present.  You have struck so

9    far eight for cause.

10             THE COURT:  We have got plenty of jurors then.

11             MR. WALUTES:  All right.

12             THE COURT:  Let's strike for cause Mr. Arrington who

13   has a wife leaving and has two ten-year olds, I believe.

14             And Ms. Baker for cause for her trip.

15             Ms. Saiyed has the trip to the Immigration office

16   for her father, and I was not going to excuse her for cause

17   unless anybody--

18             MS. MINTER:  We have no objection, Your Honor.

19             THE COURT:  Do you want to let Ms. Saiyed side go?

20             MR. WALUTES:  I have no objection either, Your

21   Honor.

22             THE COURT:  Oh, all right.  All right, then 63, Ms.

23   Saiyed, we will excuse her for cause.

24             That still leaves us with 53.  Anyone else for cause

25   that we didn't deal with?

113

1          MS. MINTER:  I don't believe so, Your Honor.  And I

2     apologize if my note taking caused me to miss it, but did the

3     Court inquire--  We have proposed questions about Mr.

4     Mohamadi's exercise of his right not to testify, and I don't

5     know if the Court had inquired into that.

6          THE COURT:  I don't think I asked that.  I should

7     have.  I don't know how I missed it.  All right, I will ask

8     that question.

9          Any other questions?

10          MS. MINTER:  For the record, Your Honor, we would

11     submit that all of the questions that we proffered in our

12     written voir dire would be appropriate, and ask the Court to

13     note our objection to any that weren't read.

14          THE COURT:  All right.  Well, I may have not

15     articulated them exactly the same way, but I think I asked

16     virtually every one of your questions.  But your exception is

17     noted.

18          Anything else?

19          MR. WALUTES:  Not for the Government, Your Honor.

20          THE COURT:  All right.  I will ask whether everyone

21     understands that the defendant has a right not to testify and

22     no inference can be made by his failure to testify.  Again,

23     the burden is always on the Government.

24          Should we give people a break, or should we select a

25     jury?  Or are you all ready to go?  Do you need a break?

114

1           THE CLERK:  Yes.  Sorry.

2           THE COURT:  I will break after I ask this last

3    question, take ten minutes, and we will come back and select

4    our jury.

5           All right.  Thank you.

6           NOTE:  The side-bar discussion is concluded;

7    whereupon the case continues before the jury panel as follows:

8    BEFORE THE JURY PANEL

9           THE COURT:  Ladies and gentlemen, as I asked a few

10   moments ago, and when I stated that the burden is on the

11   Government to prove each and every element of each offense

12   beyond a reasonable doubt, and that the defendant isn't

13   required to put on any evidence, I should have also asked you

14   at that time whether you understand also that a defendant is

15   not required to testify in his own case, and that no inference

16   can be made by his failure to testify.  Because, as I have

17   indicated earlier, the burden is on the Government to prove

18   each and every element of the case beyond a reasonable doubt.

19           Are all of you willing to follow those instructions

20   as well?  All right, thank you all.

21           All right, we are going to take a ten-minute recess,

22   and then we will come back and we will select the jury at that

23   time.

24           All right, then we are in recess for ten minutes.

25           NOTE:  At this point a recess is taken; at the

1    conclusion of which the case continues as follows:

2              THE COURT:  All right, ladies and gentlemen, at this

3    time we will begin our selection of our jury.

4              THE CLERK:  Ladies and gentlemen, as I call your

5    name, would you please come forward and have a seat in the

6    jury box as instructed by our Marshal.

7              Number 42, Jung Lewe.  Number 64, Sherry Savage.

8    Number 47, Steven McAllister.  Number 65, Kimberly Scott.

9    Number 35, Paul Jacobs.  Number 67, Harry Shubargo.  Number

10   76, Richard Whyte.  Number 34, Syed Hussain.  Number 53,

11   Katherine Nguyen.  Number 1, Christian Anspach.  Number 21,

12   Jimmy Edwards.  Number 8, Kathleen Burrell.

13             NOTE:  The lawyers exercise their strikes.

14             THE CLERK:  The following jurors are excused with

15   the thanks of the Court and may return to your seats in the

16   courtroom.  Number 8, Kathleen Burrell.  Number 64, Sherry

17   Savage.  Number 47, Steven McAllister.  And number 76, Richard

18   Whyte.

19             NOTE:  The above-named jurors return to their seats

20   in the courtroom.

21             THE CLERK:  Number 50, Samuel McNabb.  Number 74,

22   Valerie Thomas.  Number 32, Christopher Heizer.  Number 30,

23   Aaron Guyer.

24             NOTE:  The lawyers exercise their strikes.

25             THE CLERK:  The following jurors are excused with

116

1    the thanks of the Court and may return to your seats in the

2    courtroom.  Number 32, Christopher Heizer.  Number 74, Valerie

3    Thomas.

4              NOTE:  The above-named jurors return to their seats

5    in the courtroom.

6              THE CLERK:  Number 68, Dale Sigman.  Number 10,

7    Bridget Collins.

8              NOTE:  The lawyers exercise their strikes.

9              THE CLERK:  Juror number 68, Dale Sigman, you may

10   return to your seat in the courtroom with the thanks of the

11   Court.

12             NOTE:  The above-named juror returns to his seat in

13   the courtroom.

14             THE CLERK:  Number 36, Timothy Jacoby.

15             NOTE:  The lawyers exercise their strikes.

16             THE CLERK:  Mr. Jacoby, you may return to your seat

17   in the courtroom with the thanks of the Court.

18             NOTE:  The above-named juror returns to his seat in

19   the courtroom.

20             THE CLERK:  Number 11, Michael Crampton.

21             NOTE:  The lawyers exercise their strikes.

22             THE CLERK:  Mr. Crampton, you may return to your

23   seat in the courtroom with the thanks of the Court.

24             NOTE:  The above-named juror returns to his seat in

25   the courtroom.

117

1          THE CLERK:  Number 62, Wayland Safford.

2          NOTE:  The lawyers exercise their strikes.

3          THE CLERK:  Mr. Safford, you may return to your seat

4    in the courtroom with the thanks of the Court.

5          NOTE:  The above-named juror returns to his seat in

6    the courtroom.

7          THE CLERK:  Number 7, George Bryant.

8          NOTE:  The lawyers exercise their strikes.

9          THE CLERK:  Mr. Bryant, you may return to your seat

10   in the courtroom with the thanks of the Court.

11         NOTE:  The above-named juror returns to his seat in

12   the courtroom.

13         THE CLERK:  Number 18, Kevin Dwyer.

14         THE COURT:  Can I see--  No need.  Thank you.

15         NOTE:  The lawyers exercise their strikes.

16         THE CLERK:  Mr. Dwyer, you may return to your seat

17   in the courtroom.

18         NOTE:  The above-named juror returns to his seat in

19   the courtroom.

20         THE CLERK:  Number 12, Tiffany Crawford.

21         Number 14, Michael Davidson.  Number 52, Victor

22   Mercado.  Number 17, Cholina Donovan.  Number 77, Thy Linh

23   Wools.

24         NOTE:  The lawyers exercise their strikes.

25         THE CLERK:  The following jurors are excused with

118

```
 1    the thanks of the Court and may return to your seats in the

 2    courtroom.  Number 52, Victor Mercado.  Number 17, Cholina

 3    Donovan.

 4              NOTE:  The above-named jurors return to their seats

 5    in the courtroom.

 6              THE COURT:  Any objection to the composition of the

 7    jury panel?

 8              MR. WALUTES:  Not from the Government.

 9              THE COURT:  All right, let's approach the bench

10    then.

11              NOTE:  A side-bar discussion is had between the

12    Court and counsel out of the hearing of the jury panel as

13    follows:

14    AT SIDE BAR

15              THE COURT:  All right.  What's the objection to the

16    panel, the composition of the jury panel?

17              THE DEFENDANT:  The order they were called in.

18              THE COURT:  The order that they were called in?  It

19    was a random selection process.  Their names are individually

20    placed in a--  They are selected randomly, individual pieces

21    of paper.  And it's done by the deputy clerk who hasn't chosen

22    any individual.  They are all mixed in and tumbled together

23    and randomly pulled out.

24              THE DEFENDANT:  I am sorry, I apologize.  I

25    recognize--  I recognize number 30 from a bar in Fairfax.
```

119

```
1              THE COURT:  Number who?

2              THE DEFENDANT:  Number 30 from Fairfax.  I wasn't

3    able to see him because he was in the back, but when he got on

4    the jury, I saw that I recognized him from a bar in Fairfax.

5    I am from West Springfield.

6              THE COURT:  Mr. Guyer?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  He was removed, right?

9              THE DEFENDANT:  No, he is still there.

10             THE CLERK:  Guyer is still there.

11             THE COURT:  Well, he didn't recognize you, sir.

12             THE DEFENDANT:  Of course.  I have changed, I have

13   lost like 30 pounds since I had the altercation with the group

14   that he was up there with.

15             THE COURT:  How do you know?  How do you recognize

16   Mr. Guyer?

17             THE DEFENDANT:  When he came up, when he was on the

18   jury, I was able to see him.

19             THE COURT:  Where did you come in contact with him?

20             THE DEFENDANT:  A bar in Fairfax.

21             THE COURT:  A bar in Fairfax?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Are you a personal friend of his?

24             THE DEFENDANT:  No.  I remember the group he came up

25   in, it was a bunch of friends.  My friends from George Mason,
```

120

1    they were throwing a party there.

2            THE COURT:  All right.

3            THE DEFENDANT:  There was an altercation.  The group

4    that he came with weren't from George Mason.  I don't know

5    what their affiliation was, but--

6            THE COURT:  Did you talk to him at that time?

7            THE DEFENDANT:  No.  We had an altercation.  Couple

8    guys I was with from Mason got into an altercation with the

9    group he was with.

10           THE COURT:  All right.

11           THE DEFENDANT:  I remember him specifically, sir.

12           THE COURT:  All right.  Do you object to his being

13   on the jury panel?  He obviously doesn't know, doesn't

14   recognize Mr. Mohamadi.

15           THE DEFENDANT:  My appearance has changed a lot in

16   the past three years I have been incarcerated.

17           THE COURT:  Do you have a motion to have him excused

18   for cause?  I am sure he doesn't recognize Mr. Mohamadi.  The

19   only photographs that I see being admitted are identification

20   photographs perhaps of your tattoos.  Are they going to be--

21   Those are exhibits?

22           THE DEFENDANT:  I had clothes on in the bar, sir, so

23   there is no way he is able to see those.

24           THE COURT:  Okay.  I don't see cause to excuse him.

25           THE DEFENDANT:  We had an altercation with his

1    friends, the group he was with.  He got into a big huge

2    argument.

3            THE COURT:  That isn't going to be in evidence, is

4    it?

5            MR. WALUTES:  No, Your Honor.

6            THE COURT:  And he doesn't recognize you.  I asked

7    them specifically whether anybody recognized you.

8            THE DEFENDANT:  But that's what he says, Your Honor.

9    It's up to you what you want to do.  I was just saying that I

10   recognize him.

11           THE COURT:  Do you want him excused?

12           MR. WALUTES:  Your Honor, the Government defers to

13   the Court.  We have no feeling on it.

14           THE COURT:  All right.  All right, let's excuse

15   number 30.  I will give the defendant--  You are out of

16   strikes, right?  You are out of challenges?

17           MS. NACHMANOFF:  Yes.

18           THE COURT:  All right.  I will give you an

19   additional one more, so you at least have a choice of two

20   other individuals.

21           THE DEFENDANT:  Thank you, Your Honor, I appreciate

22   that.

23           THE COURT:  Any other objection to the composition

24   of the panel?

25           THE DEFENDANT:  No objection, Your Honor.

122

1              THE COURT:  Okay.  All right, let's call one, this

2    is for--  Any other objections?

3              MS. MINTER:  For the record, Your Honor, I would

4    object to the composition of the panel as not being a fair

5    cross-section of the population.

6              THE COURT:  My only comment to that is that it is an

7    extraordinary cross-section of the community.  It's males,

8    females, I counted at least seven African-Americans, there are

9    Middle Eastern people on the jury.  So, your exception is

10   noted.

11             Okay.  All right.  Then we are going to call one.

12   You have got a strike.  And then if not, we will call a second

13   one, that will be the regular juror.

14             THE DEFENDANT:  Thank you, Your Honor.

15             THE COURT:  So, Mr. Guyer will be excused.

16             NOTE:  The side-bar discussion is concluded;

17   whereupon the case continues before the jury panel as follows:

18   BEFORE THE JURY PANEL

19             THE CLERK:  Mr. Guyer, you are excused with the

20   thanks of the Court and may return to your seat in the

21   courtroom.

22             NOTE:  The above-named juror returns to his seat in

23   the courtroom.

24             THE CLERK:  Number 4, Shawn Barber.

25             NOTE:  The lawyers exercise their strikes.

123

1          THE CLERK:  Mr. Barber, you may return to your seat

2    in the courtroom with the thanks of the Court.

3          NOTE:  The above-named juror returns to his seat in

4    the courtroom.

5          THE CLERK:  Number 61, Robert Rose.

6          THE COURT:  Any other objections to the composition

7    of the jury panel?

8          MR. WALUTES:  Not from the Government, Your Honor.

9          THE COURT:  Mr. Nachmanoff?

10         MR. NACHMANOFF:  No, Your Honor.

11         THE COURT:  All right.  Then I will declare the

12   panel free from exception.

13         And if you would administer the oath.

14         THE CLERK:  Ladies and gentlemen, if you would now

15   please stand, raise your right hand, and after the oath is

16   administered please respond by stating "I shall."

17         Would the defendant please rise and face the jury.

18         NOTE:  The jury for the case is sworn.

19         THE COURT:  All right, ladies and gentlemen, we have

20   completed our jury selection process, and I am going to excuse

21   those who have not been called to serve in this case.  And I

22   want to thank you all for coming forward and participating in

23   the process and being willing members of the community.

24         In case you are wondering, the persons who did not

25   appear whose names were called will be contacted.  And they

124

1    face consequences for not appearing if they don't have a valid

2    excuse for not being here today.

3           As I say in each of these trials, I will be able to

4    hear the collective sigh of relief from the elevator when you

5    exit here, but I want you to know that you're not getting the

6    opportunity to serve on a jury is a lost opportunity.  It's

7    something that those of you who have served previously

8    understand the importance of.

9           Our system of justice, as I said, is the greatest in

10   the world because our jurors from the community come and serve

11   and bring their life's experiences to the courtroom and

12   deliberate very seriously on serious matters.

13          So, you are missing out on that opportunity.

14   Perhaps in the not too distant future you will get an

15   opportunity to serve on another case.

16          So, my heartfelt thanks to all of you, and you are

17   excused at this time.

18          NOTE:  Those jurors not selected for jury duty are

19   excused and leave the courtroom.

20          THE COURT:  All right, ladies and gentlemen, let me

21   give you some preliminary instructions to help you in the

22   beginning.

23          The case will proceed with--  And I am going to give

24   you a lunch break in just a few minutes and we will break for

25   an hour and give you an opportunity to call folks that you

125

1   need to get in touch with to tell them you won't be returning

2   this afternoon and you will be serving as jurors in this case.

3          I am also going to allow you to bring cell phones

4   into the courthouse, which is prohibited normally, and keep

5   them back in the jury room.  So that if you need to get in

6   touch with family members, babysitters, kids, business

7   associates, you are able to do so on the breaks.  But you are

8   not to bring them here into the courtroom, but leave them back

9   in the jury room.  The jury room has a telephone, bathrooms.

10         Mr. Ruelas is my Courtroom Security Officer, he is

11  in charge of communications with me should you need to

12  communicate with me.  And we will do our very best to make the

13  time you spend with us as comfortable as possible.

14         We will take, for your information, we will start

15  each day at 9 and we will go until 5:30 or 6.  We will take an

16  hour for lunch.  And we will take 15-minute breaks in the

17  mid-morning and mid-afternoon, as I said, for approximately

18  15 minutes.

19         After lunch break in a few minutes the case will

20  begin by the Government will open, give you an opening

21  statement on what it expects to prove during the course of the

22  trial.  The defense may then give its opening statement.  They

23  are not required to give you an opening statement at this time

24  if they choose not to.

25         The evidence will then begin and will be presented

1   through the witnesses who will be on the stand and under oath.

2   The defendant may cross-examine those witnesses if they

3   choose.  And the Government's case will proceed until it's

4   completed.

5           And as I indicated, the defendant may, if he

6   chooses, present his own witnesses, but is under no obligation

7   to call any witnesses because, as I said, the burden is on the

8   Government.

9           At the conclusion of all the evidence, the attorneys

10  will present their closing arguments to summarize and

11  interpret the evidence, and I will instruct you on the law

12  after that.  At that time you will retire and select a

13  foreperson and deliberate and arrive at your verdict.

14          You must not be influenced in any degree by any

15  personal feeling of sympathy for or prejudice against the

16  Government or the defendant for each is entitled to the same

17  fair and impartial consideration.

18          The law applicable to the case, I am going to give

19  you some initial instructions now and then more lengthy

20  instructions at the end of the case.  It's your duty to

21  determine the facts from the evidence and the reasonable

22  inferences arising from such evidence.  And in doing so, you

23  must not engage in guesswork or speculation.

24          The evidence from which you will find the facts

25  consists of testimony from the witnesses, documents and other

127

1   exhibits entered into evidence, and any facts that the lawyers

2   agree or stipulate to or that I may instruct you to find.

3          The admission of evidence is governed by rules of

4   law and evidence that have been developed over many years.

5   And the purpose of the rules is to protect the fairness and

6   the accuracy of the fact-finding process.

7          From time to time it may be the duty of the lawyers

8   to make objections.  It's my duty to rule on those objections

9   and determine whether you can consider certain evidence.

10  Don't concern yourself with any objection or hold it against

11  either party for making an objection.  If the objection is

12  overruled, then treat the answer like any other.

13         If you are instructed that some evidence of evidence

14  is received for a limited purpose only, you must follow that

15  instruction.

16         Statements, arguments and questions by lawyers are

17  not evidence, nor is the opening or closing, opening

18  statements or closing arguments.

19         You must not consider testimony or exhibits to which

20  an objection was sustained or which has been ordered stricken

21  by me.

22         Nor should you consider anything you may have seen

23  or heard outside of the courtroom.  You are to decide this

24  case solely on the evidence presented here.

25         There are two kinds of evidence, direct and

1  circumstantial.  Direct evidence is the direct proof of a

2  fact, such as the testimony of an eyewitness.

3         Circumstantial evidence is proof of facts from which

4  you may infer or conclude that other facts exist.

5         I will give you further instructions on these

6  evidentiary considerations, but keep in mind that you may

7  consider both kinds of evidence.

8         After the conclusion of all of the evidence and

9  after I read the instructions of law, counsel will make their

10 closing arguments.  In their closing arguments, again, they

11 will refer to the testimony that they have heard, but what

12 they say in their closing arguments is not evidence.  It is

13 their personal recollection of the evidence.

14        It is important for you to keep in mind that no

15 statement or ruling or remark or gesture which I make during

16 the course of this trial is intended to indicate my opinion of

17 the facts.  You are to determine the facts of the case.

18        In that determination, you alone must decide upon

19 the believability of the evidence and its weight and value.

20 You may consider among the following in weighing the testimony

21 of any witness.  Their appearance, attitude and behavior.  The

22 interest of the witness in the outcome of the trial.  The

23 relation of the witness to any party in the case.  The

24 inclination of the witness to speak truthfully or not.  The

25 probability or improbability of the witness' statement.  And

129

1   all other facts and circumstances in evidence.

2            Thus, you may give the testimony of any witness such

3   weight and value as you may determine the testimony is

4   entitled to receive.

5            Please pay careful attention to the testimony of the

6   witnesses because contrary to what you have seen on

7   television, it's not possible to call witnesses back to repeat

8   their testimony, nor is it possible to have their testimony

9   read while you, called back and read while you are

10  deliberating.

11           As you know, this is a criminal case.  There are

12  three basic rules that you must keep in mind.  First, the

13  defendant is presumed innocent until proven guilty.  The

14  indictment against the defendant brought by the Government is

15  only an accusation and nothing more and it is not proof of

16  guilt or anything else.  The defendant, therefore, starts out

17  with a clean slate.

18           Second, the burden of proof is on the Government

19  until the very end of the case.  The defendant has no burden

20  to prove his innocence or present any evidence or to testify.

21  And since the defendant has the right to remain silent, the

22  law prohibits you from arriving at your verdict by considering

23  that the defendant may not have testified.

24           Third, the Government must prove the defendant's

25  guilt beyond a reasonable doubt.  I will give you further

130

1   instructions on this point later, but bear in mind that this

2   is a criminal case and it's different than a civil case.

3           Until the case is submitted to you, you must not

4   discuss the case among yourselves or with anyone else, and you

5   must not remain within hearing distance of anyone who is

6   discussing the case.

7           To avoid the possible appearance of impropriety, I

8   strongly urge that until this case is concluded you not talk

9   at all with anyone connected with this case as a party,

10  witness, attorney or, for that matter, me.

11          Do not read or listen to anything touching on this

12  case.  If anyone should try to talk to you about it, bring it

13  to my attention immediately.

14          Do not try to do any research or investigate the

15  case on your own.

16          After the case has been submitted to you, you must

17  discuss the case only in the jury room when all members of the

18  jury are present.

19          You are to keep an open mind and you should not

20  decide any issue in this case until the case is submitted to

21  you for deliberation under the instructions that I give you.

22  Remember, there are two sides to every story.

23          I am going to allow to you take notes during the

24  course of the trial as well.  They are for your personal use

25  and recollection.  They are not to be shared with other

131

1    members of the jury.  They are just for your use and not for

2    anyone else's.

3            When you are excused for recesses, you will go back

4    to the jury room.  As I indicated, we have got telephones and

5    restrooms, and you will have your cell phones there.  And we

6    will try and keep any breaks that we take to a minimum, with

7    the exception of the breaks that I have described earlier.

8    And if we need time to resolve some matters, we will let you

9    know through Mr. Ruelas that it will be a few more minutes,

10   and we will continue the case as soon as we can.

11           All right, is there a request for a rule on

12   witnesses?

13           MR. NACHMANOFF:  There is, Your Honor.

14           THE COURT:  All right.  Then there will be a rule on

15   witnesses that the witnesses remain inside of the courtroom

16   until they are called.  That they not leave without being

17   excused.  And they not discuss the case or the testimony with

18   other witnesses or third parties during the course of the

19   trial, with the exception of contact with counsel prior to

20   their testimony.  If you would communicate that to the

21   witnesses.

22           All right, then we are going to take an hour.  We

23   will come back at 2:35 and we will hear opening statements at

24   that time.

25           All right, you are excused at this time.  Thank you.

132

1          NOTE:  At this point the jury leaves the courtroom;

2   whereupon the case continues as follows:

3   JURY OUT

4          THE COURT:  All right.  How much time do you want

5   for opening, Mr. Walutes?

6          MR. WALUTES:  Your Honor, I have a six-page opening.

7   I am sure Norm doesn't want me to go--  He wants me to make an

8   effort to go slow.  I think probably 20, 25 minutes, Your

9   Honor, if I keep it at a reasonable pace.

10          THE COURT:  That's fine.  Mr. Nachmanoff.

11          MR. NACHMANOFF:  That's fine.  Mr. Corey will be

12   giving the opening, but that should be sufficient time.

13          THE COURT:  All right.  All right, anything else

14   then?

15          MR. WALUTES:  Not from the Government, Your Honor.

16          THE COURT:  All right, then we will come back and we

17   will hear opening statements.  Thank you.

18          We're in recess.

19          NOTE:  At this point a lunch recess is taken; at the

20   conclusion of which the case continues in the presence of the

21   jury as follows:

22   JURY IN

23          THE COURT:  All right, Mr. Walutes, whenever you are

24   ready, sir.

25          MR. WALUTES:  Thank you, Your Honor.

133

1              Ladies and gentlemen, good afternoon.  This case,

2    this trial is about a man who thought he could beat the

3    justice system.

4              You will hear that this defendant, Mirwais Mohamadi,

5    also known as Omar, tried to kill a witness, a taxicab driver

6    named Gebru Haile.  He didn't try once.  He tried three times.

7              And when that proved unsuccessful, you will hear

8    that Mr. Mohamadi then had a witness lie for him in his first

9    trial in the Commonwealth of Virginia which involved only the

10   taxicab, which occurred on December 8 of 2008, a trial in

11   which the jury was unable to reach a verdict.

12             Mr. Mohamadi, you will hear in the course of this

13   trial, uses violence and the threat of violence as a tool, a

14   tool of intimidation.

15             You will hear the case began over Memorial Day

16   weekend, May 26 to May 27 of 2007.  That's very late that

17   Saturday and very early morning of the following Sunday, May

18   27, 2007.

19             You will hear that he used his small, black,

20   semiautomatic .380 firearm in two separate robberies to take

21   from people working all they had earned that day.

22             You will hear this began when Mr. Mohamadi had a

23   fight with his girlfriend.  She left to go to work.  He stayed

24   in her apartment at 175 South Reynolds in Alexandria, Virginia

25   over between Seminary and Duke over by Landmark Mall right

134

1    next to 395 and Van Dorn.  If you are not familiar with this

2    area, you come from a different part of the Eastern District,

3    we will have diagrams.  And you will hear that address

4    discussed a number of times over the following days.

5           When his girlfriend left for work, Mr. Mohamadi

6    hired an expensive prostitute to come to that apartment 117,

7    it's on the ground floor, that's going to become important,

8    and he had sex with her and he paid her hundreds of dollars.

9           You will hear that he then asked if she would

10   accompany him to go to his favorite clubs in the District of

11   Columbia, something she was willing to do as long as he paid

12   her more money.  Additional funds are exchanged.  You will

13   hear between 1,300, $1,500 was given to her.

14          Mr. Mohamadi had no car.  So, when they left that

15   apartment, they drove into the District of Columbia in her

16   car.  You will hear she came into Virginia because he hired

17   her.  He found her on craigslist.  And you will hear that she

18   used her car to drive into the District of Columbia.

19          At some point, and now we are in the early morning

20   of Sunday, May 27 of 2007, she said to him, your time is up.

21   He said, how about if I pay you some more money and it goes

22   longer.  She says okay, but she wanted to see the money.  He

23   says, I don't have it, take me to an ATM machine, I will get

24   it.

25          So, they get into her car, they drive to the bank,

135

1    his bank's ATM so he won't pay a surcharge.  You will hear at

2    this point she starts to get nervous because she uses a GPS,

3    and when she starts passing the ATMs that belong to his bank,

4    he says to her, I see a friend in the alley, pull here.  She

5    pulls in.  He produces what she recognized as a small, black

6    semiautomatic, she believes to be a .380.  He puts it to her

7    head after chambering a round in it.  And in fear for her

8    life, he takes all that he had paid her and all the money that

9    she had earned as a prostitute earlier.

10          He takes her cell phone, he takes her car keys, he

11   tells her not to move.  He backs out of the alley, puts her

12   keys and the cellphone down.

13          He then runs into DuPont Circle.  You will hear

14   that's where Mr. Haile, Gebru Haile, the taxicab driver, picks

15   him up.  Mr. Haile will testify, we hope tomorrow.  Mr. Haile

16   is not a native American, he was born in Ethiopia.  You will

17   hear he has been in this country for about eight years, and he

18   supports himself using a taxi.

19          You will hear Mr. Haile tell you about his

20   interactions with this defendant.  You will hear that the

21   defendant first told him he wanted to go to Landmark, back to

22   this area in Alexandria.  But once in the cab he said, no, he

23   changed his mind, he wanted to go to Georgetown.  Which was

24   okay with Mr. Haile, Mr. Haile started to take him to

25   Georgetown.

136

1          The defendant ultimately changed his mind again and

2    asked to be taken into Virginia.  You will hear Mr. Haile say

3    that they crossed the Memorial Bridge, we are now going across

4    the Potomac the first time with Mr. Haile.

5          Once in Virginia, the defendant again changes his

6    mind and asks to be taken back to the District of Columbia.

7    Mr Haile will tell you he used the 14th Street Bridge, but at

8    this point had concerns.

9          Mr. Haile will tell you that he wanted to see some

10   money from the defendant.  Understand, it is 3 in the morning,

11   May 27, Memorial Day weekend, he is picking people up outside

12   bars, he wants to make sure this customer is going to be able

13   to pay his fare.

14         He will tell that you the defendant showed him a wad

15   of money.  You will hear from Ms. Riley, the prostitute, that

16   he had robbed moments earlier that it was a wad of money that

17   he took from her.

18         Mr. Haile will tell you at the Holocaust Museum he

19   changed his mind for the final time, asked to go to his

20   girlfriend's apartment.  You will hear him tell you, Mr.

21   Haile, that, the girlfriend's apartment, because he asked for

22   some breath mints and some gum so he could try to get any

23   trace of alcohol off of his breath.

24         Mr. Haile will describe to you other things that the

25   defendant shares with him.  He says he is from Afghanistan.

137

1   He asked Mr. Haile if he would like a prostitute.  He asked

2   Mr. Haile if he was armed.  And when Mr. Haile says he does

3   not carry a gun, the defendant, Mr. Mohamadi, asked Mr. Haile

4   if he wanted a gun.

5          They get to the Duke Street exit on 395.  Mr. Haile,

6   the defendant tells him how to get into the apartment complex,

7   the EOS Apartments off of Van Dorn.  And there are some people

8   in the parking lot even at that hour.  Mr. Mohamadi tells Mr.

9   Haile to keep moving, goes a little further into the parking

10  lot.

11         At that point Mr. Mohamadi produces a small, black

12  semiautomatic.  Unlike Ms. Riley, Mr. Haile does not know the

13  model.  Mr. Haile was then robbed of all the money he had

14  earned that day as a taxicab driver.

15         He is told by Mr. Mohamadi that he is going to, Mr.

16  Mohamadi is going to leave the cab.  He takes Mr. Haile's cell

17  phone and keys as well as his money.  He says he is going to

18  go rob a Spanish guy.  And if he waits, he will come back for

19  him.  He runs off.

20         Mr. Haile watches him run to the point where he can

21  no longer see him.  Mr. Haile gets out of his cab, runs over

22  and takes his keys from where he saw them tossed by Mr.

23  Mohamadi.  Mr. Haile then runs out to the road, flags down a

24  taxicab and he calls for help.

25         You will hear Mr. Haile's call for help recorded on

138

1    May 27 of 2007 before any police officers have arrived.  You

2    will hear him say to the dispatcher, I have just been robbed

3    by somebody who said he was from Afghanistan, a bald man with

4    a gun.

5              You will hear that the police come, and you are

6    going to a number of the police officers.  They actually knock

7    on the neighbors' doors.  They use a tracking dog, track the

8    scent of the robber into an apartment complex, the same

9    apartment complex that I think belongs to Mr. Mohamadi's

10   girlfriend.

11             You will hear that as they are processing the scene,

12   Ms. Riley, the expensive prostitute, arrives.  She will

13   testify in this case.  She will tell you that when she asked

14   for help in D.C., she was denied help.  She went to where she

15   was staying in Maryland at this time.  And at that point the

16   Maryland police told her, you should go to Alexandria where

17   this all started.

18             And so, she drove back to the scene.  And when she

19   got there, she saw police.  They asked how she was involved.

20   She explained the situation.  They asked if the passenger door

21   to her car had been cleaned recently.  She said yes, it has,

22   it was cleaned two days ago before Memorial Day weekend.  And

23   they dusted it for fingerprints.

24             You will hear she described the man not only as

25   bald, but also as having a big block tattoo across his back.

139

1    Understand, Ms. Riley had a different opportunity to observe

2    than Mr. Haile.

3          At that point the Alexandria detectives-- Another

4    critical point, I am sorry, I left it out. As he was coming,

5    as Mr. Haile was driving the defendant to his girlfriend's

6    apartment in Alexandria, he was asked over and over again by

7    the defendant to use Mr. Haile's cell phone. And Mr. Haile

8    allowed him to do that. That cell phone was never given back

9    to Mr. Haile and it wasn't tossed as Ms. Riley's had been in

10   the District of Columbia. It was actually removed from the

11   scene. It was not found that night, you will hear.

12         When the Alexandria detectives start this

13   investigation, and as you will hear from T-Mobile who provided

14   service at that point to Mr. Haile, they pulled his numbers

15   from the time of the robbery and they find one number called

16   seven or eight times.

17         They also went to the landlord and they checked to

18   see who apartment 117 belonged to. It's the same person, Mr.

19   Mohamadi's girlfriend, Amanda Inge.

20         You will hear she is interviewed and she tells the

21   detectives that she had had a fight with Mr. Mohamadi that

22   night and she had left to go to work, left him in her

23   apartment. That when she got back from work, he was not in

24   her apartment. She left her car parked in the parking lot,

25   was upset, called a girlfriend and went to the girlfriend's

140

1    house to spend the rest of the early morning of Sunday, that

2    night, to sleep.

3              You will hear that she got a number of calls from

4    the defendant that night using a strange number to her, not

5    one that she had associated with him previously.  That when

6    she reached out to him, he told her to get his stuff out of

7    her apartment and that he had done something stupid.

8              You will hear the police left a card under her door.

9    When she actually checks on that, they tell her that they had

10   a robbery in the parking lot.  When she asked Mr. Mohamadi

11   what went on, he says, I did something stupid, I robbed a cab

12   driver.

13             June 1, 2007, five days after this robbery, Mr.

14   Haile is asked to come to the Alexandria Police Department to

15   look at a photo spread, six photographs.  He picks out Mr.

16   Mohamadi's photograph, says that's the man who robbed him.

17             Four days later Ms. Riley is asked to come to the

18   city of Alexandria Police Department.  She looks at the same

19   photo spread of six photographs, she picks out Mr. Mohamadi's

20   photograph, that's the man who robbed me.

21             You will then hear fingerprint examiner results came

22   back, and you will hear the fingerprint examiner testify in

23   this case that the fingerprints lifted from Ms. Riley's car

24   are Mr. Mohamadi's.

25             As disturbing as that crime of violence is, it pales

141

1   to the truly chilling rest of the charges.  You will hear that

2   one month before the state trial began on December 8 of 2008,

3   Richard Bryan, an inmate at the Alexandria Adult Detention

4   Center, was approached by Mr. Mohamadi and asked if he would

5   kill a witness in his trial one month away.  You will see Mr.

6   Bryan, he will be the very first witness in the Government's

7   case today.

8           Mr. Bryan will tell you he was getting released from

9   jail in about ten days.  He had served his sentence.  You will

10  hear he was convicted.  He had served his sentence and he was

11  getting out.  He will tell you that the defendant had earlier

12  told him months earlier in September of 2008 that he had

13  robbed a cab driver.

14          Mr. Bryan will tell you that it's not unusual to

15  hear people talk about their cases.  Mr. Bryan will also tell

16  you that his entire life he had never helped the cops.  That

17  wasn't held up in esteem in his neighborhood.

18          He will tell you though that when Mr. Mohamadi

19  approached him in November of 2008, a month before his trial,

20  and asked him to kill the taxicab driver, that Mr. Bryan

21  thought about it.  He will tell you he didn't go to the police

22  that first day.  He will tell you he thought about it for a

23  couple days, and then in a moment of courage he asked to speak

24  to law enforcement.

25          You will hear federal law enforcement agents

142

1    interviewed Mr. Bryan, and ultimately asked him first to go

2    back and say he would do the murder.  You will hear in this

3    case they do that so that Mr. Mohamadi won't look for anyone

4    else in the jail, somebody who might not be as courageous or

5    like-minded as Mr. Bryan turned out to be.

6            You will hear that the agents then asked him to wear

7    a wire, a body wire.  And in this case the Government--  Mr.

8    Bryan could not turn that tape on, he couldn't turn it off.

9    He is wired up.  He goes back into the jail.  And this

10   afternoon hopefully you will see, not only hear this defendant

11   talk about killing Mr. Haile, but you will see this defendant

12   talk about killing Mr. Haile.

13           Because although Mr. Bryan didn't know it, the ATF

14   equipment, the microphone wasn't simply a microphone, it was

15   also camera.  Now, Mr. Bryan wasn't told because the agents

16   didn't want him to do anything that might burn him.

17   Understand, this is a man who is being released in ten days

18   and he is wearing a wire inside the jail.

19           You will hear the tapes, and some of them Mr. Bryan

20   will explain to you.  And one of them recorded on November 12

21   of 2008, disk 10, page 2, Mr. Mohamadi is saying to Mr. Bryan,

22   who is listed as CI, confidential informant when this was

23   written.  Mr. Mohamadi:  As long as people don't know shit --

24   Excuse my language, ladies and gentlemen -- you have nothing

25   to worry about.  You have, I notice, you have a problem

143

1    slipping up because you want assurance.  CI:  Yeah, yeah.

2         Mr. Mohamadi:  You like assurance.  Do not go out

3    reaching for anyone's assurance when you get out, dog.  CI:

4    Yeah, yeah, yeah, I know, I'm not, I'm not, hell no.

5         Mr. Mohamadi:  I'm trying to tell you, dog, you need

6    to decide right now whether you're going to do it or not, you

7    know what I'm saying.  CI:  No, I am, I decided awhile ago.

8    That's not the issue.  All right.  So, look, write his name on

9    the envelope and you just write mine on the money order.

10        Mr. Mohamadi:  Yeah, that's what I'm saying.  Yeah.

11   CI:  All right, I'm going to write this down for you and

12   stuff.  No look.

13        Mr. Mohamadi:  Write the name down, write that shit

14   down for me.  CI:  I'm killing Gebru this week, you know what

15   I'm saying.

16        Mr. Mohamadi:  Insha-allah.

17        You will hear Mr. Bryan is asking him to repeat

18   things that Mr. Mohamadi had already heard.  And Mr. Mohamadi,

19   not suspecting that he was being taped, rather thinks that he

20   has somebody who might do a murder who is talking too much.

21        You will hear this afternoon, hopefully, this man

22   give Mr. Haile's address, his home address in Maryland to the

23   man he is asking to do the murder.  You will hear him describe

24   Mr. Haile.  And next week or maybe tomorrow if we are lucky

25   you will see Mr. Haile and you will see the birth defect over

144

1    his eye or birth mark.

2           You will hear him talk about shooting him in the

3    chest first and then in the head.

4           You will hear him try to pronounce Mr. Haile's name.

5    He actually pronounces it Mr. Haley.  H-a-i-l-e is the way Mr.

6    Haile spells his last name.  That's not how he pronounces it,

7    but the defendant apparently didn't know that.

8           And you will hear him offer Mr. Bryan a position in

9    his prostitution business as well as $4,000 if he will do this

10   murder for him.

11          You will hear they spoke by telephone after Mr.

12   Bryan got out.  You will hear they spoke in code about flower

13   pots.  Mr. Bryan will explain that to you.  Essentially the

14   flower pot was the defendant's way of getting rid of the gun

15   after the murder.  Mix some cement into a flower pot and toss

16   it into a river.

17          You will hear that during these tapes Mr. Mohamadi

18   said he would be watching the newspaper.  You will hear on

19   November 22 at the request of the federal agents, November 22

20   of 2008, Mr. Bryan goes back into jail.  Now he is a free man,

21   he is just helping federal law enforcement.  He goes back into

22   the jail for a visit and he shows a fake newspaper article to

23   Mr. Mohamadi.  A fake newspaper article announcing the murder

24   of Mr. Haile.  You will hear him tell you that he saw Mr.

25   Mohamadi pump his hand in the air and smile.

1          More chilling, you will hear, is that when the

2    federal investigators started to look into this case, they

3    found out that Mr. Mohamadi had hired or tried to hire,

4    solicit two other inmates in a different jail to kill Mr.

5    Haile in 2007.  You will meet both of those inmates.

6          The first, Mr. Randy Pressley.  Mr. Pressley is

7    approached in the fall of 2007 by Mr. Mohamadi, who asks him

8    to help him find the taxicab driver and kill him.

9          You will hear Mr. Pressley has a pretty serious

10   record.  Mr. Pressley was disturbed.  Mr. Pressley asked to

11   speak to law enforcement.  Mr. Pressley thought he was getting

12   released because he had a sentencing coming up that he thought

13   would go well.

14         Mr. Pressley will be speaking from the back, he is

15   incarcerated.  The sentence didn't go quite as well as he had

16   hoped.

17         But Mr. Pressley was asked by the Fairfax County

18   Police Department to try to introduce an undercover police

19   officer to Mr. Mohamadi, somebody that a jury might be willing

20   to completely believe.  He tried.  But Mr. Mohamadi wouldn't

21   deal with anybody that no one could vouch for.  And that

22   effort failed.

23         You will hear a second inmate, who thinks he is the

24   first inmate that was approached by Mr. Mohamadi, that in

25   November of 2007 everybody knew he was getting out in four

146

1    days.  And although his record is long, it is not violent.

2    You will hear he is approached, Stephen Grant, you will hear

3    he is approached first by other people who said they might

4    have a job for him, and then by Mr. Mohamadi four days before

5    he is being released.

6           You will hear Mr. Mohamadi ask him to find Mr. Haile

7    and to kill him for him.  He offered him 10,000 and a position

8    in his prostitution business.

9           You will hear from both Mr. Grant and Mr. Pressley

10   tomorrow, and you will hear both of them tell you that prior

11   to this they had never helped the cops.  But in this instance,

12   they did.

13          Mr. Grant will tell you that Mr. Mohamadi had a way

14   of communicating with him to avoid the telephone, the inmate

15   telephone system.  And you are going to learn in the course of

16   this trial that inmate calls both in the Fairfax Jail in 2007

17   and the Alexandria Jail in 2008 and '9 are recorded.

18          You will hear that Mr. Mohamadi had convinced his

19   attorney's receptionist to take his calls and to three-way

20   them back out onto the street.  Calls to the attorneys are not

21   recorded in the same way that the inmates are.

22          And Mr. Grant will tell you that he received

23   instructions from Mr. Mohamadi in that way.  Mr. Mohamadi was

24   trying to get him to pick up a gun, opportunities he believes

25   he had to pick up a gun.  The Fairfax County police told him

147

1    not to go to any meetings until they could be there because it

2    was of no value to them to have a gun delivered that they

3    couldn't see and take possession of.

4            You will hear ultimately that neither of those cases

5    was an undercover officer able to be inserted.  In neither of

6    those case did anything more happen than have the Fairfax

7    County Police Department go to Mr. Haile back in 2007 and 2008

8    and warn him to take care of his personal safety.

9            You will meet the receptionist who three-wayed all

10   the defendant's calls.  You will hear the federal government

11   has immunized her, that we have given her immunity if she will

12   testify truthfully.

13           She will tell you that the defendant, Mr. Mohamadi,

14   first asked her for little things, to connect him to his

15   mother, and she started doing that.  And after the family,

16   then to bigger things.

17           She will tell you ultimately she started dropping

18   off money from his prostitution business and other things.

19           And as the Court told you in the preliminary remarks

20   this morning, this information is not being given for any

21   prostitution business.  It is being given to you show you that

22   when Mr. Mohamadi is asking people to do a murder, he is

23   offering something and it is not just fantasy.  That it is

24   real, he really did have a position in a prostitution business

25   and he really did have thousands of dollars to pay somebody if

148

1    they would kill the witness.

2            Finally, ladies and gentlemen, Mr. Haile will be

3    testifying.  When those efforts proved unsuccessful, you will

4    hear that this man, Mr. Mohamadi, tampered with a witness.

5    You will hear that his girlfriend testified in the state trial

6    back on December 8 of 2008.  That she testified that she is

7    not his girlfriend, that she was dating another person who was

8    bald at that time, and that was the person who had called her

9    on the stolen cell phone that belonged to the taxicab driver.

10           You will hear that jury could not reach a decision.

11           Amanda Inge will testify in this trial.  She too has

12   been immunized by the federal government.  You will hear, she

13   will tell you that it was Mr. Mohamadi who told her to go see

14   his sister.  And that the sister told her to blame it on

15   another man, a man she has never dated who happened to be

16   bald.

17           Mr. Mohamadi wanted his girlfriend to deny that they

18   were boyfriend/girlfriend and to blame it on an innocent man.

19           You will hear not just her testimony, but apparently

20   Mr. Mohamadi found out that she had been ordered before the

21   federal grand jury sitting in this courthouse back on March 5

22   of 2009.  You will hear her testify and you will hear the call

23   that he makes to her before, through a friend, Dogg, to her

24   telling her what to say in the federal grand jury proceedings.

25           March 4, 7:52.  Ms. Inge is Miami, Florida.  The

149

1   defendant is in an Alexandria Jail.  His call is going through

2   Dogg.  Understand why.  The defendant doesn't want to be

3   calling a federal grand jury witness and have the jail phone

4   number, her number show up on his jail account and his number

5   show up on her call in case the federal agents start checking

6   everyone's phones to see why this witness keeps testifying

7   this way.

8           So, he used a friend to three-way call to mask the

9   number.  Mr. Mohamadi talking to his friend Dogg, whose real

10  name is Dominik Brown.  Mr. Mohamadi:  Tell her don't talk to

11  nobody until she get, oh, man, attorney, huh.  Mr. Brown:  He

12  said he don't talk to nobody until you talk to the attorney.

13          At this point there is two cell phones involved and

14  he is relaying it.  The call from the jail is capturing it.

15          Mr. Mohamadi:  And tell her that whatever the

16  attorney you get--  Mr. Brown:  Yeah, she know that.

17          Mr. Mohamadi:  Tell her, whatever attorney you get,

18  tell them you want to plead the Fifth.

19          Now, understand, ladies and gentlemen, the only

20  sworn testimony she has given is that he isn't involved.  But

21  he is telling her, plead the Fifth, that she has done

22  something wrong.

23          Mr. Brown:  He said whatever attorney you can, tell

24  them you want to plead the Fifth.  She said she know.

25          Mr. Mohamadi:  All right.  Man, tell her I said,

150

1   man, be good, man.  Mr. Brown:  Said be good.  All right, she

2   said be good.  She not the one acting up.

3           Mr. Mohamadi:  Yeah, trying not to, man.  Mr. Brown:

4   All right.  Said, take it easy.  Hey, I think them people

5   coming to pick her up, Shorty.

6           Mr. Mohamadi:  I know man, no bullshit.  Mr. Brown:

7   And she, I almost tripped up, she was like I'm supposed, I'm

8   arriving there at 11:55 and they--  I mean, she was like, and

9   they--  Then she said, my friend is going to pick me up.

10          Mr. Mohamadi:  Wow.  Mr. Brown:  She was getting

11  ready to say, sounded like she was getting ready to say they.

12          Mr. Mohamadi:  Yeah, man.  Mr. Brown:  I don't know,

13  but she sound like she going to keep it gangster.  I don't

14  know.

15          You will then hear the second call that night.  I

16  will spare you reading it today, but you are actually going to

17  hear the audio of him telling her to write it down and then

18  having her read pack when she is to say in the grand jury.

19          And finally, you will hear the calls after the

20  appearance where he says, where Mr. Brown informs Mr. Mohamadi

21  the day after her grand jury appearance that she has told him

22  through a text message that she has pled the Fifth and they,

23  Feds, are pissed.

24          You will hear their call where Mr. Mohamadi says:

25  That's not good news.  The Feds don't get pissed, they

151

1    immunize.

2            Ms. Inge will tell you that what she told the

3    Alexandria police in the days following the robbery of Mr.

4    Haile is the truth.  And although not proud of it, she did lie

5    in the state trial that occurred on December 8 of 2008.

6            This defendant is charged with nine charges.  The

7    first four are the two acts of violence.  The one that began

8    with the prostitute that he hired, taking her into Washington,

9    carrying his gun, because it obviously didn't come in her car,

10   across state lines, putting it to her head, taking all the

11   money she had earned.

12           And then the return trip with the second

13   businessman, the zig-zag across the Potomac, Mr. Haile back to

14   Alexandria.  The gun, taking all the money that the taxicab

15   driver had earned that night.

16           Three counts of murder for hire.  The first two are

17   solicitation, that occurred in Fairfax, the third in

18   Alexandria.

19           And finally, two counts of witness tampering.  The

20   first, the successful witness tampering, having her provide

21   the false testimony about his involvement with a gun, the

22   charges that are here now in federal court.  And secondly, the

23   effort to have her lie before a federal grand jury on March 5

24   of 2009.

25           You are the judges of the facts.  And at the end of

152

1    this trial we will have an opportunity to come before you

2    after you have heard the testimony of the witnesses and judge

3    them for yourself and after you have had an opportunity to see

4    the evidence, and we will ask you to convict him of all nine

5    charges.

6            Mr. Haile's voice was not silenced and he hasn't

7    given up on the system.  He will be heard.

8            The prostitute was denied service in the District of

9    Columbia, but her voice will be heard.

10           And the three inmates who have never helped law

11   enforcement and don't know about each other, will all be

12   heard.

13           At that point we will ask you to hold this man

14   accountable.

15           THE COURT:  All right, thank you.

16           Mr. Corey.

17           MR. COREY:  Ladies and gentlemen, this case is about

18   a rush to judgment.  The evidence will show that this is a

19   case where the Government was so quick to blame someone that

20   time and time again they made mistakes, they failed to follow

21   up on leads, they missed opportunities, and they did not ask

22   the questions that needed to be asked.  Instead, early on they

23   targeted Mr. Mirwais Mohamadi as a suspect.

24           The evidence will show that the Government's case is

25   deeply flawed and that the Government has rushed to judgment.

153

1    Ladies and gentlemen, Mr. Mohamadi is an innocent man.  You

2    must find him not guilty on all counts.

3              Now, you just heard the Government's opening.  Of

4    course, the Government's opening statement is not evidence.

5    When you do hear and see the evidence, you will see what the

6    Government's case is based on, testimony that cannot be

7    believed, jailhouse recordings that do not stand for the

8    proposition that the Government wants you to believe they

9    stand for.

10             The weaknesses of the Government's case can also be

11   seen by what evidence the Government is not going to present.

12   You are not going to see hard evidence.  This is not a case

13   based on hard science.  The Government does not have DNA

14   evidence.  They don't have hair samples or fibers.  And you

15   will not hear evidence from any eyewitness who saw Mr. Haile

16   or Ms. Riley get robbed.

17             The Government's rush to judgment began in the early

18   morning hours of May 27, 2007.  The Alexandria Police

19   Department received a report that a cab driver, Mr. Haile, had

20   been robbed.  Mr. Haile had picked up the suspect in the

21   DuPont Circle area of Washington, D.C. about 2:30 a.m.  The

22   suspect and Mr. Haile drove around for some time, first to

23   Georgetown, then back to Virginia, then back to D.C., and back

24   to Virginia, eventually stopping at the EOS 21 Apartment

25   complex here in Alexandria.

154

1          Now, after spending all this time with the suspect,

2    Mr. Haile could not provide a consistent description of what

3    the man looked like.  Mr. Haile first described the man as a

4    black male.  Later he described the man as a Hispanic male.

5          After the robbery the Alexandria Police Department

6    examined Mr. Haile's cab for physical evidence.  The

7    Government collected fingerprint samples from the cab.  Not a

8    single one of the samples connects Mr. Mohamadi to this

9    robbery.

10          The Government also tried to get a fingerprint

11    sample off a pen that the robber allegedly used while he was

12    in the cab.  The evidence will show that the Government sample

13    wasn't any good, the print was of no value.

14          So, what did the Government do?  They threw the pen

15    away.

16          When the Alexandria Police Department learns of the

17    robbery, they dispatch their officers to the scene.  The first

18    officer on the scene is Officer Lion.  He arrives at about

19    3:52 a.m.  Other officers arrive moments later.  They run

20    around the apartment complex and cannot find the robber.  The

21    obvious question is, where did the robber go?

22          The Alexandria Police Department later learned that

23    the robber had taken Mr. Haile's cell phone at 4:01 a.m.

24    Right as the officers searching the apartment complex, the

25    suspect calls the Yellow Cab Company using Mr. Haile's cell

155

1    phone.

2           The suspect has the Yellow Cab Company pick him up

3    at 175 South Reynolds Street, the address of the apartment

4    complex.  The Alexandria Police Department learned this fact,

5    and yet they never call the Yellow Cab Company.  The evidence

6    will show they never followed up with the Yellow Cab Company

7    to find out where the suspect went.

8           Now, as the police are investigating the robbery,

9    something strange happens.  Early in the morning on May 27 a

10   woman walks up to an ongoing crime scene investigation.  This

11   woman was Kimberly Riley.

12          The evidence will show Ms. Riley told the police a

13   story.  Ms. Riley does not tell the officers she is a

14   prostitute.  She does not claim she had been to the apartment

15   complex to have sex with a man for money.

16          Later she changes her story.  When she first walks

17   up to the police, her story was that a man and her had gone to

18   a club in Washington, D.C.  After leaving the club, she and

19   this man pull into an alley.  She told the police that while

20   they were in the alley, this man pulled a gun out and held it

21   to her head.

22          She told the police that the man said, do you want

23   to die?  And demanded money from her.  She told the police

24   that the man said, don't try to follow me or I'll kill you.

25          So, what did Ms. Riley do next?  She went back to

156

1    the apartment complex.  She told the Alexandria police that

2    after being robbed, she first reported the robbery to the D.C.

3    police.  She claims that she then drove from D.C. to Bethesda

4    where she had a hotel room.

5           Now, she had a hotel room in Bethesda because she

6    didn't live in this area.  She had traveled to the area to

7    have sex with clients who live in the area.

8           So, she goes back to her hotel room, according to

9    her story, after being robbed.  She changes her clothes.  At

10   that point she has been awake for the entire night, now it's

11   almost dawn.  And then, according to her story, she gets back

12   in her car.

13          According to her story, she drives all the way from

14   Bethesda to Alexandria and she goes back to the apartment

15   complex.  The same apartment complex where, according to her

16   story, there was a man who wanted to rob her.  Conveniently,

17   she shows up at the apartment complex and finds police on the

18   scene ready to listen to her story.

19          The evidence will show that Ms. Riley is not the

20   only person in this case who is not credible.  Ms. Amanda Inge

21   is another questionable individual that the Government is

22   relying on.  In May of 2007 Ms. Inge was renting an apartment,

23   was renting apartment 117.  At that time Ms. Inge was friends

24   with Mr. Mohamadi.

25          However, Ms. Inge had a number of male friends.  At

157

1    the time of the robbery, she was employed as a topless dancer.

2    At the time, she was also a drug addict.

3         And the evidence will show that Ms. Inge can't get

4    her story straight.  Shortly after the robbery Ms. Inge told

5    Detective Hickman that Mr. Mohamadi had admitted to her that

6    he had robbed a cab driver.

7         Then in 2008 she gives an entirely different version

8    of events when she testifies at the state trial and when she

9    speaks to Mr. Mohamadi's attorney.  She told Mr. Mohamadi's

10   attorney that she had lied to the police to get back at Mr.

11   Mohamadi.

12        Now she has changed her tune again.  She has been

13   given immunity by the Government to testify that her original

14   story was true.

15        Ladies and gentlemen, this is what happens when you

16   rush to build a case, you end up making a case that is not

17   credible based on people that are not credible.

18        The evidence will also show that shortly after the

19   robbery the Alexandria Police Department made things even

20   worse.  Detective Hickman called Ms. Riley for an interview.

21   The purpose of the interview was to show Ms. Riley a photo

22   lineup.

23        The evidence will show that Detective Hickman did

24   something very different than a photo lineup.  He sat down,

25   opened up his case file so Ms. Riley could see one and only

158

1    one photo.  That photo was of Mr. Mohamadi.

2              The photo was not presented in a group of photos.

3    It was not presented as part of a photo lineup process.  The

4    photo was just sitting by itself on the inside front cover of

5    Detective Hickman's case file.

6              Detective Hickman then left the room, came back in

7    and tried to show Ms. Riley a photo array, but the evidence

8    will show the damage was already done.

9              So, what happened next?  The Commonwealth of

10   Virginia brought a case against Mr. Mohamadi.  They alleged in

11   the case that Mr. Mohamadi was responsible for the robbery of

12   the cab driver.

13             A few months later Mr. Mohamadi was in jail with

14   this charge hanging over his head.  And what had happened to

15   Mr. Mohamadi while he was in jail?  The evidence is going to

16   show that Mr. Mohamadi had to talk very tough to survive in

17   jail.

18             Make no mistake about it, ladies and gentlemen, you

19   are going to hear evidence of Mr. Mohamadi saying some pretty

20   shocking things.  You are going to hear how he had to talk

21   tough to get by.  You are going to see how he had to build

22   himself up to his fellow inmates.  You are going to see how he

23   had to make himself out to be somebody important.  This is

24   what he had to do to get by.

25             Now, the Government has alleged this talk was more

1   than talk.  They want you to believe that Mr. Mohamadi was so

2   sophisticated that he could hatch a scheme from jail to hire

3   his fellow inmates to murder Mr. Haile.

4          Ladies and gentlemen, Mr. Mohamadi did not intend

5   for anyone to murder Mr. Haile.  What evidence is the

6   Government relying on to make this allegation against Mr.

7   Mohamadi?  They are going to have three convicted felons

8   testify.

9          For the first two inmates, you are not going to hear

10  any recordings or see any evidence of the conversations that

11  they allegedly had with Mr. Mohamadi.

12         And then there is the third inmate, Mr. Richard

13  Bryan.  Shortly before Mr. Mohamadi's state trial, the

14  Government asked Mr. Bryan to wear a wire and collect

15  information on Mr. Mohamadi.

16         Mr. Bryan was happy to wear a wire for the

17  Government.  You will see tapes and audio of Mr. Mohamadi and

18  Mr. Bryan talking talk.  Do those tapes contain some stuff

19  talk?  Yes.  Do those tapes contain some vulgar comments?

20  Absolutely.  The Government wants to you believe though that

21  this talk is more than it actually is.

22         To survive in prison, Mr. Mohamadi did not just talk

23  tough with his other inmates, he also had phone conversations

24  with Ms. Amanda Inge.  The Government has alleged that these

25  conversations constituted a crime.

160

1        What did Mr. Mohamadi say during these

2   conversations?  He told Ms. Inge to take the Fifth, and he

3   told her to tell the truth.  This is not a crime.

4        Ladies and gentlemen, you are going to hear a lot of

5   evidence in this trial.  We ask that you carefully consider

6   that evidence.  You should carefully consider the evidence of

7   who the Government is relying on to make their case and the

8   mistakes the Government made again and again after they rushed

9   to judgment.

10        After considering all the evidence, there is only

11   one result that is warranted in this case.  We ask that you

12   find Mr. Mohamadi not guilty on all counts.

13        Thank you.

14        THE COURT:  All right, thank you, counsel.

15        Call your first witness, Mr. Walutes.

16        MR. WALUTES:  Your Honor, the Government calls to

17   the stand Mr. Richard Bryan.

18        THE COURT:  All right.

19        MR. WALUTES:  Your Honor, as they are getting the

20   witness, the technological staff for me have asked if we could

21   have a break before the first audio, which I think will be in

22   a while, to allow headphones to be distributed.

23        THE COURT:  Certainly.  Just let me know.

24        NOTE:  The witness is duly affirmed.

25        MR. WALUTES:  May I proceed, Your Honor?

161

1          THE COURT:  Yes, sir.

2          RICHARD A. BRYAN, called by counsel for the United

3  States, first duly affirming, testifies and states:

4      DIRECT EXAMINATION

5  BY MR. WALUTES:

6  Q.   Good afternoon, sir.

7  A.   Good afternoon.

8  Q.   In a loud enough voice so that every member of the jury

9  can hear you, could you tell us your full name.

10  A.   Richard Anthony Bryan.

11  Q.   How old are you, Mr. Bryan?

12  A.   23.

13  Q.   How far did you go in school?

14  A.   Ninth grade, but I have my GED.

15  Q.   Mr. Bryan, were you in the Alexandria Adult Detention

16  Center back in the fall of 2008?

17  A.   Yes.

18  Q.   When did you expect to be released?

19  A.   November 17.

20  Q.   Of the same year, 2008?

21  A.   Yes.

22  Q.   Before you were released, did you meet another inmate

23  that you see in the courtroom today?

24  A.   Yes.

25  Q.   Do you know his name?

R.A. Bryan - Direct

162

1   A.   Yes.

2   Q.   What is his name?

3   A.   Mohamadi Mirwais.

4   Q.   Is that the name he used inside?

5   A.   Omar.

6   Q.   Omar?  Is that what--  When you talked to him, is that

7   what you would use?

8   A.   Yes.

9   Q.   How did you first meet him?  What were the circumstances?

10  A.   I was working in the kitchen.

11  Q.   Of the jail?

12  A.   Yes, in the jail kitchen.

13  Q.   When you first met him, were you working with law

14  enforcement?

15  A.   No.

16  Q.   Do you know approximately when that was when you first

17  met him in the kitchen?

18  A.   A little bit before Ramadan, September.  Before September

19  the same year.

20  Q.   Was there any discussion of his charges?

21  A.   Yes.

22  Q.   What was that discussion?

23  A.   Just about what he was in there for, about him robbing

24  the taxicab driver.

25  Q.   Did he tell you what--  Did he tell you if a weapon was

R.A. Bryan - Direct

163

1   used?

2   A.   A handgun.

3   Q.   Did he tell you what type of handgun?

4   A.   .380.

5   Q.   Did he say .380, or you don't know?

6   A.   No, he said .380.

7   Q.   Do you know what was taken from the taxicab driver?

8   A.   No.

9   Q.   Was it uncommon--  How long did you spend in the

10  Alexandria Jail altogether?

11  A.   Ten months and 17 days.

12  Q.   Was it uncommon in your experience in the Alexandria Jail

13  for inmates to sometimes give some general information about

14  their charges?

15  A.   Yes.

16  Q.   Uncommon or common?

17  A.   Common, common, sorry.  It is common.

18  Q.   Did you take any notes when you were talking to Omar in

19  the kitchen?

20  A.   No.

21  Q.   Did you tell anybody in law enforcement what he had said?

22  A.   No.

23  Q.   Why not?

24  A.   Well, it's--  I only had a little bit of time until I got

25  out.  That basically went in one ear and went out the other.

R.A. Bryan - Direct

164

1   Q.   Had you ever helped law enforcement in your life at that

2   point?

3   A.   No.

4   Q.   Why not?

5   A.   My family would despise me.  And where I grew up at, they

6   don't do that.

7   Q.   Is there a common thread between you and Mr. Mohamadi,

8   Omar, at this point?

9   A.   Can you repeat the question a different--

10  Q.   Was there something that the two of you had in common in

11  the jail back in September of 2008?

12  A.   Yes, Muslims.  I am a Muslim, we believe in the same

13  faith.

14  Q.   How often would you say that you had seen Mr. Mohamadi?

15  A.   Well, when I was in that, in that same block, the jail

16  block, I mean, the kitchen, every day.

17  Q.   Were there any problems between the two of you?

18  A.   No.

19  Q.   Did there come a point when something more serious was

20  discussed between the two of you?

21  A.   Yes.

22  Q.   Do you know when that was?

23  A.   Around September.  It was right before I got out.

24  Q.   Okay.  September is when you first met Mr. Mohamadi?

25  A.   No.  Right before September is when I met him.  Right

R.A. Bryan - Direct

165

1    before Ramadan.

2    Q.   Then you get out on November 17?

3    A.   Yes, November 17.  This was discussed probably right

4    after Ramadan then.

5    Q.   So, do you have any idea of the exact date?  Can you give

6    us a month?

7    A.   November.

8    Q.   What was discussed?

9    A.   A plot to murder Gebru, the cab driver.

10   Q.   When that was discussed, how did that make you feel?

11   A.   Confused.

12   Q.   Why confused?

13   A.   Because I was just getting ready to get out and I didn't

14   know why God was throwing this in front of me.  Just a little

15   freaked out.

16   Q.   What did you see your choices as?

17   A.   Well, my choices were to avoid him.  My choice at that

18   particular time wasn't to talk to the police.  My choice was

19   just to kind of forget about it and just go home, until the

20   pressure built up.

21   Q.   What pressure built up?

22   A.   The enthusiasm, the enthusiasm that he had and just the

23   detail out of nowhere.

24   Q.   Did you ultimately make a decision?  Did you ultimately

25   make a choice?

166

1  A.   Yes.  Inside of me, yes, I did ultimately make a choice.

2  Q.   Why?

3  A.   Because I feel like it had to have been a sign from God

4  because it was just before I got out, and I was doing the

5  right thing the whole time I was there, you know.  And no one

6  has ever approached me with something like that.  And I didn't

7  even, I didn't even think I was that kind of person that he

8  would even look at and say, yeah, he would do it.  And it's

9  too much for me to even handle, you know.

10 Q.   What choice did you ultimately make?  What did you decide

11 to do?

12 A.   To talk to the police.

13 Q.   Who did you speak with?

14 A.   Vic Castro and Tom Buckley.

15 Q.   Do you know what agency Mr. Castro is with?

16 A.   The ATF.

17 Q.   Did they give you instructions?

18 A.   Yes.

19 Q.   What instructions did they give you?

20 A.   To accept the offer.

21 Q.   Did they explain why they wanted you to say you would do

22 the murder?

23 A.   Yes.  So that they wouldn't--  So that he wouldn't get

24 anybody else to do it maybe that would really do it.

25 Q.   Were you willing to act like you were going to do a

R.A. Bryan - Direct

167

1   murder for him?

2   A.   Yes.

3   Q.   How did Mr. Mohamadi know when you were getting out?

4   A.   I told him.

5   Q.   Can you describe the plan he gave you to kill the taxicab

6   driver?

7   A.   Yes.  He wanted me to disguise myself.  Have a driver.  I

8   guess where Gebru was living and how he looked like and stuff

9   like that, he just gave me details on how he looked like.  And

10  told me how to disguise myself as a pizza deliveryman or UPS

11  man or even a detective.  And to be able to penetrate and get

12  to the apartment and get them to open the door so that I can

13  shoot them, or Gebru Haile.

14  Q.   Were you offered anything if you would do this for Mr.

15  Mohamadi?

16  A.   No.  Oh, sorry, yes.

17  Q.   What were you offered?

18  A.   Money.

19  Q.   Anything other than money?

20  A.   Yes.

21  Q.   What else?

22  A.   I guess a high position in his prostitution ring.

23  Q.   Did you actually believe he had a prostitution ring?

24  A.   Yes.

25  Q.   Why?

168

1    A.   Because he is pretty educated on that.  I don't know if--

2    I mean, he pretty much knows real well what he is doing with

3    that.

4    Q.   Did he tell where Mr. Haile lived?

5    A.   Yes.

6    Q.   Where was that?

7    A.   Tacoma Park, Maryland.

8    Q.   Do you know whether he had--  Did he ever tell you that

9    he tried to hire somebody else to do this for him?

10   A.   Yes, he did.

11   Q.   Was anything mailed to you by him?

12   A.   Yes.

13   Q.   After you got out, I am talking about after November 17

14   of 2008, did you receive or did he mail something to you that

15   you saw?

16   A.   Well, I didn't, I didn't actually receive it, but he

17   e-mailed something out.

18   Q.   How do you know that?

19   A.   Well, through the ATF.  Oh, actually, he filled it out in

20   front of me, money to--

21   Q.   I'm sorry.

22   A.   I'm sorry.

23   Q.   You are jumping on top--  As long as we go one at a time.

24   What was he mailing to you that you saw?

25   A.   Money.

R.A. Bryan - Direct

169

1   Q.   And do you know how much?

2   A.   $250.

3   Q.   And why was he mailing you that money?

4   A.   To get clothes and stuff like that for the hit and so I

5   can get on my feet.

6   Q.   Were any telephone calls made as part of this plan?

7   A.   Yes.

8   Q.   Why?

9   A.   To see if I got all the stuff together and if I was in

10  the act of doing what I was supposed to do.

11  Q.   Were you able to talk clearly on that call, or was there

12  a code?

13  A.   Yes, there was a, there was some code.

14  Q.   Can you explain what the code was to the jury?

15  A.   Well--  No, the conversation word for word and the exact

16  code for everything, like when we were talking about the

17  flowers and stuff like that--

18  Q.   That's the part I wanted you to explain.  Can you explain

19  what the flowers stood for.

20  A.   Well, the flowers were to dispose of the firearm when I

21  was done with the hit.

22  Q.   When did he need the murder done by, do you know?

23  A.   Yes.

24  Q.   And when?

25  A.   Before his court indicate.

170

1    Q.    Okay.  Did you know when his court date was?

2    A.    December, the exact date I am for the sure, but in the

3    beginning of December.

4    Q.    Of the same year?

5    A.    Yes.

6    Q.    2008?

7    A.    Yes.

8    Q.    Was there ever a point when you discussed this with Mr.

9    Mohamadi where you didn't think he was serious?

10   A.    No.

11             MR. COREY:  Objection, Your Honor, calls for

12   speculation.

13             THE COURT:  Overruled.

14   BY MR. WALUTES: (Continuing)

15   Q.    Did there come a time when you were asked to wear a wire

16   inside the jail?

17   A.    Yes.

18   Q.    And to be clear, you are still an inmate inside the jail?

19   A.    Yes.

20   Q.    Did that scare you?

21   A.    Yes.

22   Q.    Why?

23   A.    Well, like I am probably going to say this a few times,

24   but I was just getting ready to go home, and that was probably

25   the last thing that I actually wanted to do.

R.A. Bryan - Direct

1   Q.   Have you had an opportunity to listen to that tape before

2   coming in this courtroom today?

3   A.   Yes.

4   Q.   Back in November before you wore the wire the first time,

5   did you know it had a videotape as well?

6   A.   No.

7   Q.   When you did wear the wire, did you have an on and off

8   switch?  Could you start and stop the tape when you were

9   inside the jail?

10  A.   No.

11  Q.   And right before you wore the wire, were you trying to

12  avoid Omar?

13  A.   Yes.

14  Q.   Why?

15  A.   So that he wouldn't keep talking about the hit and so I

16  could have it taped.

17  Q.   Having spent a number of months in the Alexandria

18  Detention Center, is it a noisy place?

19  A.   Yes.

20  Q.   Do you get used to it?

21  A.   Yes.

22  Q.   When you listened to the tapes before coming into this

23  courtroom today, were there two sets of each tape?

24  A.   Yes.

25  Q.   One of them an enhanced tape where--  Is one of them the

R.A. Bryan - Direct

172

1    original and one of them an enhanced tape?

2    A.    Yes.

3    Q.    Could you describe the two sets and what's different

4    about the two sets?

5    A.    Well, the original version, certain things that I would

6    say and that Omar would say was clearer, and sometimes the

7    video would be clearer.  And as well as the same on the

8    enhanced, there are certain clips that are, that you can hear

9    better and you can see better.

10   Q.    How many times did you wear a wire inside the Alexandria

11   Adult Detention Center?

12   A.    Three times.

13   Q.    Three?

14   A.    Twice, twice.

15   Q.    And have you listened to the wire that you wore both on

16   the first time, November 12, and the second time, November 17

17   of 2008?

18   A.    Yes.

19   Q.    If you would look at what's marked now for purposes of

20   identification as Government's Exhibits 26A through 26K, and

21   27A to 27--  Let's just due the first one, 26A through 26K.

22         Do you recognize that, Mr. Bryan?

23   A.    Yes.

24   Q.    How do you recognize it?

25   A.    My initials.

R.A. Bryan - Direct

173

1   Q.   And what is it?

2   A.   Excuse me?

3   Q.   I'm sorry, what is it?  What is 26A through 26K?

4   A.   Okay.  One is the original copy, one is the enhanced.

5   Q.   Okay.  Would the enhanced be 27A to 27C?

6   A.   Yes, actually--  Yes, they would be.  These are actually

7   to the original.

8   Q.   Okay.  If you could look through, if you would just do me

9   the favor of looking at 26A, and then look at each individual

10  disk and make sure that your initials are on each one of them.

11  And then the same thing for 27.

12          Do you see your initials on each one?

13  A.   Yes.

14  Q.   And is that the entire recording, the entire time you

15  wore the wire the first time on November 12 of 2008?

16  A.   Yes.

17  Q.   Is it a fair and accurate representation of everything

18  that is discussed in front of you while you were wearing that

19  wire?

20  A.   Yes.

21  Q.   If you could now look at what is marked as Government's

22  Exhibit No. 29A through 29C and 30 marked now for purposes of

23  identification.  And I ask you if you recognize those disks?

24  A.   Yes.

25  Q.   How do you recognize them?

R.A. Bryan - Direct

174

1    A.    My initials.

2    Q.    Okay.  And what are they?

3    A.    The original, originals, original copies.

4    Q.    Would it also be the enhancement?

5    A.    Yes, and the enhancement.

6    Q.    And is that the entire recording the second time you wore

7    the wire on November 17 of 2008?

8    A.    Yes.

9    Q.    Is there anything in there that wasn't discussed, that

10   wasn't recorded?

11   A.    No.

12           MR. WALUTES:  Your Honor, at this time the

13   Government moves for their admission.  I understand the Court

14   is not going to rule at this point, but I just wanted the

15   Court to note the Government is moving that at this point

16   based on that evidence.

17           THE COURT:  Well, is there any objection to both the

18   original and the enhanced CDs?

19           Is that correct, Mr. Walutes, that's what you are

20   moving?

21           MR. WALUTES:  Yes, Your Honor, for both the

22   November 12 of 2008 as well as the second time a wire is worn

23   on November 17 of 2008.

24           THE COURT:  Any objection?

25           MR. COREY:  Your Honor, we object to anything other

175

1    than the original tapes being played.

2            THE COURT:  All right.  Well, the witness has

3    indicated, unless I missed something, that he has listened to

4    both versions and that the enhanced version accurately

5    reflects the conversation.

6            So, I will overrule the objection.  Your exception

7    is noted.

8    BY MR. WALUTES: (Continuing)

9    Q.   Mr. Bryan, have you had an opportunity to review a series

10   of transcripts made from the recordings you made inside the

11   Alexandria Adult Detention Center on these two days,

12   November 12 and November 17 of 2008?

13   A.   Yes.

14   Q.   The Court's indulgence, Your Honor.

15           THE COURT:  Yes, sir.

16   Q.   I want to make sure I do this correctly.

17           With the assistance of the Court Security Officer,

18   if I could hand--  Mr. Bryan, if I could ask you to look at

19   transcripts of four portions taken from the wire.  Three of

20   them from November 12 of 2008 and one of them from November 17

21   of 2008 when you wore the wire inside the jail the second

22   time.

23           Do you recognize those four transcripts?

24   A.   Yes.

25   Q.   And how do you recognize them?

176

1   A.   My initials and date.

2   Q.   Did you have an opportunity to sit in front of a

3   videotape player and compare that transcript to ensure that

4   the transcript was an accurate recording of what you were

5   hearing when you were watching the videotape of the wire

6   inside the jail in the three instances on November 12 and the

7   one on November 17?

8   A.   Yes.

9   Q.   And are those transcripts a fair and accurate recording

10  of the words spoken?

11  A.   Yes.

12  Q.   When it says CI on that transcript, who would CI be?

13  A.   Me.

14  Q.   Okay.  When it says Mohamadi on that transcript, who

15  would Mohamadi be?

16  A.   Omar.

17  Q.   Okay.  Is that the defendant in the courtroom today?

18  A.   Yes.

19  Q.   And when you were watching the videotape, did you ensure

20  that those were accurate, that the person who was speaking was

21  Mr. Mohamadi?

22  A.   Yes.

23  Q.   And did you also ensure that the person who was supposed

24  to be you was in fact you when you watched the tape?

25  A.   Yes.

177

1   Q.   And if could ask you to look at what is marked as

2   Government's Exhibit--  If I could ask you to look at clips

3   from the wire that correspond to those transcripts, I believe

4   they are now marked as Government's Exhibit 27D, 27A--  I am

5   sorry, let me try to start again.  27D, 28A, 28B and 28C.

6           Do you see those four disks in there?

7   A.   Yes.

8   Q.   Are those the clips that correspond to the transcripts?

9   A.   Yes.

10  Q.   And are those fair and accurate portions taken from the

11  entire wire?

12  A.   Yes.

13          MR. WALUTES:  Your Honor, at this time we would move

14  the portions in so that we might enable ourselves, if the

15  Court is so inclined, to play some of these for the jury.

16          THE COURT:  All right.  Any objection?

17          MR. COREY:  No, Your Honor.

18          THE COURT:  All right.  They will be received.

19          MR. WALUTES:  Your Honor, at this time the

20  Government asks permission of this Court to play the first

21  recording, which is November 12 of 2008, and to distribute

22  copies to the jury.

23          But we would ask if the Court might permit for a

24  momentary pause to allow the distribution of headphones to the

25  jury.

178

1          I don't know if the Court wants to take a recess or

2    if the Court wants to simply--

3          THE COURT:  No.  How long--  I mean, they are--

4          MR. WALUTES:  Your Honor, I am being told it might--

5          THE COURT:  You know what, it's time for a

6    mid-afternoon break anyway.

7          Let's take 15 minutes at this time, and we will

8    equip you with the audio equipment so you may hear the

9    recording better.

10         And that will give you an opportunity to set that

11   up.

12         MR. WALUTES:  Thank you, Your Honor.

13         THE COURT:  All right.  All right, then we are in

14   recess now for 15 minutes.

15         NOTE:  At this point a recess is taken; at the

16   conclusion of which the case continues in the absence of the

17   jury and the witness as follows:

18   JURY OUT

19         MR. BEN'ARY:  Your Honor, I was wondering if before

20   the jury comes in, if we could take up one brief housekeeping

21   matter with the Court.

22         THE COURT:  Go ahead.

23         MR. BEN'ARY:  I understand that there is

24   approximately an hour of audio playback that we're going to

25   put on directly following this.

R.A. Bryan - Direct

179

1            One of the Government's witnesses is an inmate, Mr.

2    Pressley.  I understand the Marshals Service, he is housed at

3    Northern Neck, and the Marshals Service is waiting to see

4    whether we are going to get him today or whether he needs to

5    be transported back.

6            It looks like we are not going to get to him today.

7    He is not even our next witness.

8            So, I just wanted to see maybe if the Court knew

9    about what time we go to today so we could just ask him to be

10   kept.

11           THE COURT:  We are not going to go much past 5:30, I

12   don't think.  If the jury is willing to stay a little longer

13   than that, I will be happy to stay longer.  But I think

14   especially on the first day of trial, they may be ready to

15   finish up for the day by 5:30.

16           So, we are never going to get to Mr. Pressley.

17   Let's have him returned tomorrow.

18           THE MARSHAL:  Thank you, Your Honor.

19           MR. BEN'ARY:  Thank you.

20           THE COURT:  All right.  Thank you.

21           MR. NACHMANOFF:  Your Honor, frankly, it's the

22   related housekeeping matter.  Which is that I think the

23   Government probably has at least 45 minutes or an hour to go.

24   So, I think the most we will do is get through direct.  I

25   wanted to be sure that the Court would allow us to begin the

R.A. Bryan - Direct

1    cross tomorrow.

2            Frankly, it's not worth discussing, but we had

3    asked, but the Government had declined our request to know

4    what the witnesses would be today.  And so, being able to

5    start tomorrow, and we do now have that witness list, so we

6    have a sense--

7            MR. WALUTES:  We have no objection, Your Honor.

8            THE COURT:  All right.

9            MR. WALUTES:  If the Court is inclined, we think

10   that is appropriate.

11           THE COURT:  All right.  Then you think you have got

12   about an hour of direct?

13           MR. WALUTES:  I certainly do, Your Honor.

14           THE COURT:  All right, then that's going to be a

15   good stopping point.

16           MR. NACHMANOFF:  Thank you, Your Honor.

17           THE COURT:  When you have the opportunity, Mr.

18   Nachmanoff, please let Mr. Mohamadi know that he may give

19   testimony not only verbally, but also with writings.  And that

20   if he publishes information during the course of the trial, he

21   might be subject to cross-examination and give up his right

22   not to testify.

23           So, I want him to be aware of the fact that while he

24   may think that certain things that he does in the courtroom

25   don't have consequences, that they very much do have

1    consequences.

2              MR. NACHMANOFF:  Yes, Your Honor.

3              THE COURT:  All right, thank you.  All right, are we

4    ready for our jury?

5              MR. WALUTES:  We are, Your Honor.

6              THE COURT:  All right, let's bring our jury in.

7              MR. WALUTES:  Your Honor, may the witness take the

8    witness stand.

9              THE COURT:  Yes, let's have our witness return, Mr.

10   Bryan.

11             NOTE:  At this point the jury returns to the

12   courtroom; whereupon the case continues as follows:

13   JURY IN

14             THE COURT:  Good afternoon.  Do you all have

15   headsets?  All right.

16             Then proceed, Mr. Walutes.

17             MR. WALUTES:  Your Honor, I wonder if I might also

18   ask the CSO to hand out the first set of transcripts as to the

19   very first portion.

20             THE COURT:  All right.

21             MR. WALUTES:  Your Honor, I also apologize, this is

22   the first time I have actually used this technology, but

23   apparently I am being asked to ask each juror to turn on the

24   infrared device.  Apparently they are not already turned on.

25   Otherwise we may start without them.

                                                                    182

1              THE COURT:  All right.  It lights up when it is on,

2     correct?

3              MR. WALUTES:  Correct, Your Honor.

4              THE COURT:  All right.

5              MR. WALUTES:  The batteries are working?

6              THE COURT:  Has everybody got a red light on their

7     audios?  All right, good.

8              MR. WALUTES:  Thank you, Your Honor.  At this time

9     if the Government may play the first clip.

10             THE COURT:  Yes, sir.

11             MR. WALUTES:  Thank you.

12             NOTE:  The audio is played.

13    BY MR. WALUTES: (Continuing)

14    Q.   Okay.  Mr. Bryan, you saw the transcript in front of you?

15    A.   Yes.

16    Q.   I wanted to ask, if I could, some of the terms and what

17    they mean in this discussion.  If I could ask on page 4 where

18    Mr. Mohamadi says:  They're going to drill everybody, they can

19    go and drill everybody that I know.

20             Do you see that on line 16?

21    A.   Yes, yes.

22    Q.   What's he talking about?

23    A.   He's talking about--

24             MR. COREY:  Objection, Your Honor, calls for

25    speculation.

R.A. Bryan - Direct

183

1          THE COURT:  Sustained.  Lay a foundation.

2          MR. WALUTES:  Thank you, Your Honor.

3    BY MR. WALUTES: (Continuing)

4    Q.   Did you understand--  Were you part of this conversation?

5    A.   Yes.

6    Q.   And who were you talking to?

7    A.   Omar.

8    Q.   Okay.  And did you understand what he meant when he said

9    that?

10   A.   Yes.

11   Q.   Okay.  Did you have to stop and ask him to explain when

12   you were having this conversation?

13   A.   No.

14   Q.   Okay.  What was your understanding of what he meant?

15   A.   My understanding is that law enforcement was going to

16   interrogate everybody around him or related to him, question

17   them.

18   Q.   On page 6 and 7, do you see where there is a discussion

19   about someone who is dilly and waiting four hours?

20   A.   Yes.

21   Q.   And what is being discussed here between the two of you,

22   if you understood it?

23          Or what was your understanding of what the two of

24   you were discussing?

25   A.   Well, the individual that I was picking, which was a

184

1    cousin of mine, I was just saying that dilly, basically

2    meaning that she is dumb and she is not aware.

3    Q.   And why was he concerned about whether she was aware or

4    not?

5    A.   Because she, I guess anyone would ask why they would be

6    waiting for a few hours for no reason.

7    Q.   And then if I could ask you to turn your attention to

8    page 10 I think it's where it's first--  Page 10 to 12, where

9    there is a discussion about the after effect.  And I think

10   that's--  Let's see if I can find it again.  I'm sorry.

11           There is a discussion about when you are full of

12   yourself as you driving away, the after effect.

13   A.   Yes.

14   Q.   What do you understand that conversation to be?

15   A.   Well, to act as normal as possible and act like I didn't

16   do anything wrong.  Just basically I'm just carrying on

17   everyday life.

18   Q.   And the discussion about these people who can pick up on

19   negative vibes.

20           Who are the people that can pick up on negative

21   vibes?

22   A.   The police.

23   Q.   And on page 15, there is a term on line 6, actually Mr.

24   Mohamadi uses it first on line 5, but then you use it on line

25   6 during the discussion about whether it's okay to kill Mr.

1    Haile in front of his children.

2              Excuse me, if I mispronouncing it, Mr. Bryan, but

3    kafar--

4    A.   Kafar.

5    Q.   What is the term "kafar"?  Do you understand that term?

6    A.   Yes.

7    Q.   What meaning do you understand it to have?

8    A.   A nonbeliever.

9    Q.   Okay.  Is that something in the Muslim faith, as you

10   understand it?

11   A.   Yes.  A nonbeliever of Islamic faith.

12   Q.   Okay.  What is Mr. Mohamadi telling you, as you

13   understood it, during this conversation?

14   A.   Are you talking about line--

15             MR. COREY:  Objection, Your Honor, calling for

16   speculation.

17             THE COURT:  Overruled.  It was his understanding

18   what they were discussing, right, wasn't that the question?

19             MR. WALUTES:  Correct, Your Honor.

20             THE COURT:  All right.

21   BY MR. WALUTES: (Continuing)

22   Q.   How did you understand this conversation?  Why was it

23   okay to kill the man in front of his children because he is a

24   kafar?

25   A.   Well, because some Muslim extremists believe that, that

R.A. Bryan - Direct

186

1    they are worthless and--

2            MR. COREY:  Objection, Your Honor, relevancy.  Move

3    to strike this.

4            THE COURT:  Sustained.  Go ahead, let's move on.

5            MR. WALUTES:  Could I ask Your Honor if this witness

6    shares that belief?

7            THE COURT:  Well, I thought the question was what

8    does he understand kafar to mean.  And then further, what--

9    The further discussion about killing the cab driver, that he

10   is saying that they are extremists who believe that that is

11   all right.  Is that--  Maybe I didn't--  Ask your question

12   again and I will rule on it.

13   BY MR. WALUTES: (Continuing)

14   Q.   I'm sorry, if I could just have the definition again of

15   what a kafar is.

16   A.   A nonbeliever of the Islamic faith.

17   Q.   Okay.  And are there some, I don't want to characterize

18   people one way or the other, but are there some people, as you

19   understand it, in the faith who think it is okay to harm a

20   nonbeliever?

21           MR. COREY:  Objection.

22           THE COURT:  Sustained.  Why don't you ask him if he

23   has had a discussion with Mr. Mohamadi about that if you want

24   to lay--

25   BY MR. WALUTES: (Continuing)

R.A. Bryan - Direct

187

1    Q.   Have you had a discussion about--  Thank you Your Honor.

2            Have you had a discussion with Mr. Mohamadi about

3    nonbelievers?

4    A.   Yes.

5    Q.   Has he expressed to you whether it's okay to harm a

6    nonbeliever?

7    A.   Yes.

8            MR. COREY:  Objection, Your Honor, it's irrelevant.

9            THE COURT:  Overruled.

10   BY MR. WALUTES: (Continuing)

11   Q.   And is it okay to harm a nonbeliever as he has explained

12   it to you during your discussions about harming Mr. Haile?

13   A.   As he explained, yes.

14           MR. WALUTES:  Your Honor, I will move on if that's

15   okay at this point.

16           THE COURT:  All right.

17           MR. WALUTES:  Your Honor, at this point I ask

18   permission to play the second of the clips.

19           THE COURT:  Yes, sir.  Do you want to hand out

20   transcripts of that as well?

21           MR. WALUTES:  Yes, please.

22           THE COURT:  Whenever you are ready.

23           NOTE:  The audio is played.

24   BY MR. WALUTES: (Continuing)

25   Q.   And this tape, first, Mr. Bryan, there are some points in

R.A. Bryan - Direct

188

1    the transcript where there is just no audible for a long time.

2    And I wonder if I could actually draw your attention to

3    page 17, line 14, the very beginning.

4           There is some food being brought to you, do you see

5    that?

6    A.   Yes.

7    Q.   And do you and Mr. Mohamadi stop talking about the murder

8    when other inmates are around?

9    A.   Yes.

10          MR. COREY:  Objection, leading, Your Honor.

11          THE COURT:  Sustained.

12   BY MR. WALUTES: (Continuing)

13   Q.   Why is there a pause, Mr. Bryan, if you could explain?

14   A.   Well, we were trying to be discreet about the whole

15   situation.

16   Q.   And then on page 18, line 1, you say:  He too far away to

17   hear it.

18          Do you see that?

19   A.   Yes.

20   Q.   And what are you talking about?

21   A.   Well, what I'm talking about is, I was either talking

22   about another inmate or one of the deputies, somebody that was

23   pretty much maybe close enough to hear what we were talking

24   about.

25   Q.   Okay.  And I wonder if you could describe for the trial

189

1   jury here where were you and Mr. Mohamadi inside the jail when

2   this conversation occurs?

3   A.   On the top tier, the far corner.

4   Q.   Are you--  Is there a wall anywhere around you?

5   A.   Yes, there was a wall right behind us.

6   Q.   Okay.  And so--

7   A.   And to the right of us.

8   Q.   Can anybody come up behind you without you seeing them?

9   A.   No.

10  Q.   And so, how is the only way that somebody can approach

11  the two of you?

12  A.   From the front.

13  Q.   And are you monitoring who is coming close to you?

14  A.   Yes.

15  Q.   And do you discuss, is there any discussion while this

16  whole wire is going on, not just this transcript, but is there

17  a discussion about this murder when anyone is close?

18          MR. COREY:  Objection, leading, Your Honor.

19          THE COURT:  I will allow that question.  Go ahead.

20  BY MR. WALUTES: (Continuing)

21  Q.   Is there any discussion about the murder when any other

22  inmate or sheriff is close?

23  A.   No.

24  Q.   On page 22 you say that you had washed the address.

25          Do you recall that?

1    A.    Yes.

2    Q.    And had you actually washed the address?

3    A.    No.

4    Q.    Why do you say that you had washed the address?

5    A.    Because I needed Omar to repeat the address of Mr. Gebru

6    Haile.

7    Q.    Your Honor, at this time if we could play the third tape,

8    the third and final from--  I am sorry, one more question if I

9    might as we are handing out these.

10            Where was Mr. Mohamadi in relation to you as your

11   back is to the wall and there is space in front of you to see

12   anyone approaching?

13   A.    To the left of me.

14   Q.    To your left?

15   A.    To my left, yes.

16   Q.    Is his back also against the wall?

17   A.    Yes.

18            MR. WALUTES:  I am sorry, Your Honor, if we could

19   hand the transcripts out now.  Thank you.

20            May we play it, Your Honor?

21            THE COURT:  Yes, sir, whenever you are ready.

22            NOTE:  The audio is played.

23   BY MR. WALUTES: (Continuing)

24   Q.   Mr. Bryan, if you could turn your attention to page 2,

25   line 13.  Actually, starting at line 9 and then going down to

191

1    line 13.  There is a discussion about assurance.

2              What was your understanding of this discussion about

3    assurance and why it was happening?

4    A.   Well, because I wasn't--  Well, I had to keep asking him

5    the same question basically over and over again so that I can

6    get it recorded.  It's not that I personally need assurance,

7    but it seemed like that at that time for him.

8    Q.   And if I could ask you to turn your attention to what's

9    now marked as Government's Exhibit 31, and ask you if you

10   recognize that exhibit?

11   A.   You said 31?

12   Q.   31.  Do you have it in front of you?

13   A.   Yes.

14   Q.   The clip of the November 17.  Is there a disk in there?

15   A.   Yes.

16   Q.   Okay.  And have you listened to that clip from

17   November 17 wire that you wore, the second time?

18   A.   Yes.

19   Q.   And is that--  How do you recognize it?

20   A.   My initials.

21   Q.   Is that a fair and accurate conversation recorded by the

22   wire between you and Mr. Mohamadi?

23   A.   Yes.

24   Q.   Have you also compared it to the transcript?

25   A.   Yes.

R.A. Bryan - Direct

192

```
1   Q.   Is that a fair and accurate transcript?

2   A.   Yes.

3           MR. WALUTES:  Your Honor, if we could distribute the

4   transcript of November 17 of 2008 at this time.

5           THE COURT:  All right, you may.

6   BY MR. WALUTES: (Continuing)

7   Q.   Do you have this transcript in front of you, Mr. Bryan?

8   A.   Yes.

9   Q.   This transcript is actually two clips on one transcript,

10  is that correct?

11  A.   Yes.

12          MR. WALUTES:  Your Honor, if we may play it at this

13  time.

14          THE COURT:  Yes, sir.

15          NOTE:  The audio is played.

16  BY MR. WALUTES: (Continuing)

17  Q.   On page 4, Mr. Bryan, there is a discussion of hand

18  signals.

19          Do you see that?

20  A.   Yes.

21  Q.   What are you talking about here?

22  A.   Well, the hand signal was the way to confirm that the hit

23  was, went through, that I had completed the task.

24  Q.   And when the hand signal is given, would you be inside

25  the jail or outside the jail?
```

R.A. Bryan - Direct

193

1    A.    I was outside of the jail.  Or I would have been on

2    outside of the jail, yes.

3    Q.    When you are discussing it, you are inside, but--

4    A.    Yes.

5    Q.    On page 11, is there a discussion here about the phones?

6    A.    Yes.

7    Q.    And what is your understanding of the discussion here

8    about, on the conversations with the phones?

9    A.    Well, just that we had to be real, real careful about

10   what we say over the phone.  That they will be hearing the

11   whole conversation and hearing the recordings and stuff.

12   Q.    Was the mail used at any time during this planning?

13   A.    Yes.

14   Q.    And if I could ask you to look at Government's Exhibit

15   No. 21 and ask you if you recognize that?

16   A.    Yes.

17   Q.    What is that, Mr. Bryan?  What is Government's Exhibit

18   No. 21?

19   A.    An envelope.

20   Q.    Does it have a return address written on it?

21   A.    Yes.

22   Q.    Does it have an address on it?

23   A.    Yes.

24   Q.    Who is the name of the return address?

25   A.    Mirwais Mohamadi.

R.A. Bryan - Direct

194

1   Q.   And what is the address?

2   A.   2001 Mill Road, Alexandria, Virginia, 22314.

3   Q.   What is at 2001 Mill Road?

4   A.   The city jail, Alexandria Detention Center.

5   Q.   Do you see where it is being sent to?

6   A.   Yes.

7   Q.   And what is the name of who it is being sent to?

8   A.   Herman Diaz.

9   Q.   And is there also an address?

10  A.   Yes.

11  Q.   Okay.  Who is that person or who is supposed to be that

12  person?

13  A.   That person is supposed to be my cousin.

14  Q.   And the address, in reality what is that address?  Where

15  did that address come from?

16  A.   Oh, from the ATF.

17  Q.   Did you use your own personal address?

18  A.   No.

19  Q.   Did you use any personal address for any of your family?

20  A.   No.

21  Q.   And then inside that envelope, what's inside that

22  envelope?

23  A.   It should be a money order.

24  Q.   Not what should be.  If you could actually reach in there

25  and pull it out.

R.A. Bryan - Direct

195

1    A.    Okay, okay, okay.

2              Yes, a money order.

3    Q.    And how much is that money order made out to?

4    A.    $250.

5    Q.    And who is it made payable to?

6    A.    Myself, Richard Bryan.

7    Q.    And the memo line, what inmate is having those funds

8    drawn on his account?

9    A.    Mohamadi, Mirwais.

10   Q.    What was this $250 for?

11   A.    To get clothes and stuff like that for the hit, to

12   prepare myself for the hit.

13             MR. WALUTES:  Your Honor, at this time I would move

14   the admission of Government's Exhibit 21.

15             THE COURT:  Any objection?

16             MR. COREY:  No, sir.

17             THE COURT:  All right, it's received.

18   BY MR. WALUTES: (Continuing)

19   Q.    If I could ask you to look at Government's Exhibit

20   No. 22.

21             Do you recognize that, sir?

22   A.    Yes.

23   Q.    What is it?

24   A.    The top number under shish kabab is Omar's cousin's cell

25   phone number.

196

1   Q.   And is there another number on that exhibit?

2   A.   Yes.

3   Q.   And what is the other number?

4   A.   The other one is in code, it's Gebru Haile's address and

5   cab number.

6   Q.   And was this scrap of paper--  When was this scrap of

7   paper created?  When was it written?

8   A.   It was right before I got out.  Maybe a couple days.

9   Q.   And who gave you the information on here?

10  A.   Omar.

11         MR. WALUTES:  Your Honor, I would move the admission

12  of Government's Exhibit 22 at this time.

13         THE COURT:  Any objection?

14         MR. COREY:  No objection.

15         THE COURT:  It will be received.

16         MR. WALUTES:  I would ask permission to publish 22

17  so to have this witness explain the information contained in

18  the bottom number.

19         THE COURT:  Yes, sir, go ahead.

20  BY MR. WALUTES: (Continuing)

21  Q.   Mr. Bryan, do you see this exhibit?

22  A.   Yes.

23  Q.   Okay.  On the bottom do you see the area code?

24  A.   Yes.

25  Q.   Okay.  Could you explain to us what the information in

1  those numbers really is?

2  A.   Well, the 7401, the first four numbers, is his building

3  number.

4  Q.   Whose building number?

5  A.   Gebru Haile's building number.

6  Q.   Okay.

7  A.   419, the next three numbers, is Gebru Haile's apartment

8  number.

9       And 54 is, the next two numbers, 54, is Gebru

10 Haile's cab number.

11      And 0 is just to fill in the extra number that is

12 missing.

13 Q.   And who gave you that information?

14 A.   Omar.

15 Q.   If I could next ask you to look at Government's

16 Exhibit 23.

17      Do you see that, sir?

18 A.   Yes.

19 Q.   Again, if you could explain what that is.

20 A.   That's actually Gebru Haile's cab.

21 Q.   Where was this scrap of paper written?

22 A.   It was around the same time that the shish kabab paper.

23 Q.   Inside or outside of the jail?

24 A.   Inside.

25 Q.   Who gave you the information to record on this piece of

1    paper?

2    A.    Omar.

3    Q.    Is it a fair and accurate depiction of the piece of paper

4    that you were given?

5    A.    Yes.

6             MR. WALUTES:  Your Honor, if I could move the

7    admission of Government's Exhibit No. 24 at this time.  I am

8    sorry, 23 at this time, and ask permission to publish it.

9             THE COURT:  Any objection?

10            MR. COREY:  No objection.

11            THE COURT:  Thank you.  Go ahead.

12   BY MR. WALUTES: (Continuing)

13   Q.    Could you tell us what, for those of us who can't read

14   sideways, what is this information, Mr. Bryan?

15   A.    It is Gebru Haile's cab description.

16   Q.    And if you could just read it to us since--

17   A.    Ford Crown Victoria, '99, green.  And the last, those

18   numbers at the end are his license plate number.

19   Q.    Who gave you all that information?

20   A.    Omar.

21   Q.    If I could ask you next to turn your attention to

22   Government's Exhibit No. 24.

23            What is that item?  Do you know what that is?

24   A.    Yes.

25   Q.    And what is it?

R.A. Bryan - Direct

199

1   A.   It's Candy's cell phone.

2   Q.   Who is Candy, as you understand it?

3   A.   A friend of Omar.

4   Q.   And is that an accurate depiction of the piece of paper?

5   A.   Yes.

6   Q.   And where was that piece of paper written?

7   A.   It was written in the jail.

8        MR. WALUTES:  Your Honor, I would move the admission

9   of Government's Exhibit 24 at this time.

10       THE COURT:  Any objection?

11       MR. COREY:  No objection.

12       THE COURT:  24 will be received.

13  BY MR. WALUTES: (Continuing)

14  Q.   And those pieces of paper that were written inside the

15  jail, who did you give those to, Mr. Bryan?

16  A.   The ATF agent, Vic Castro.

17  Q.   Did you have a conversation with Mr. Mohamadi after you

18  were released from jail?

19  A.   Yes.

20  Q.   And if I could ask you to look at what is now marked as

21  Government's Exhibits 32A and 32B for purposes of

22  identification, and ask what those are?

23  A.   The jail call.

24  Q.   And actually, I think I jumped ahead of myself to ask you

25  about that.

R.A. Bryan - Direct

200

1          Once you were released from jail, did you and Mr.

2    Mohamadi have a telephone conversation?

3    A.   Yes.

4    Q.   And was that recorded?

5    A.   Yes.

6    Q.   Okay.  And have you had an opportunity to listen to that

7    recording?

8    A.   Yes.

9    Q.   And do you recognize both 32A and 32B?

10   A.   Yes.

11   Q.   How do you recognize them?

12   A.   My initials.

13   Q.   Are those the same conversation?

14   A.   Yes.

15   Q.   Are they actually recorded on opposite ends of the

16   telephone line?

17   A.   Yes.

18   Q.   One recorded by the jail and one recorded by you on your

19   cell phone?

20   A.   Yes, yes.

21   Q.   Are they both accurate captures of the telephone

22   conversation that you and Mr. Mohamadi had?

23   A.   Yes.

24          MR. WALUTES:  Your Honor, at this time I would move

25   the admission of Government's Exhibit 32A and 32B.

R.A. Bryan - Direct

201

1              THE COURT:  Any objection?

2              MR. COREY:  No objection.

3              THE COURT:  They will be received.

4    BY MR. WALUTES: (Continuing)

5    Q.   How many conversations did you have with Mr. Mohamadi

6    using the phone?

7    A.   One.

8    Q.   After this telephone conversation, did you have occasion

9    to visit him in the jail?

10   A.   Yes.

11   Q.   How many times did you visit him?

12   A.   Excuse me?

13   Q.   I'm sorry, how many times did you visit him?

14   A.   Twice.

15   Q.   And if I could focus on the first visit on November 22 of

16   2008.  Was that visit recorded?

17   A.   Yes.

18   Q.   Have you had an opportunity to review that recording?

19   A.   Yes.

20   Q.   If I could ask you to look at Government's Exhibit 34A

21   and 34B.

22          And ask you if you recognize those items?  I think

23   one is video and one is audio of the--

24   A.   Yes.

25   Q.   How do you recognize those two?

1    A.   My initials.

2    Q.   And are they fair and accurate captures, as far as they

3    go, are they fair and accurate of the visit you made on

4    November 22 of 2008 with Mr. Mohamadi?

5    A.   Yes.

6         MR. WALUTES:  Your Honor, I would move the admission

7    of 34A and 34B.

8         THE COURT:  Any objection?

9         MR. COREY:  No objection.

10        THE COURT:  They will be received.

11   BY MR. WALUTES: (Continuing)

12   Q.   Mr. Bryan, are these, the quality of this audio, is it as

13   good as the quality of the wire, in your opinion, that you

14   wore inside the jail?

15   A.   I think they have their ups and their pros and cons.

16   Q.   Can you describe in your own words what happened during

17   your visit on November 22 to see Mr. Mohamadi?

18   A.   Well, excitement.

19   Q.   Actually, if you could start with, why do you go, why do

20   you go to see him?

21   A.   Oh, to confirm that the hit was made.

22   Q.   Did you bring anything with you when you went to confirm?

23   A.   Yes.

24   Q.   What was it that you brought?

25   A.   I brought a newspaper article.

R.A. Bryan - Direct

203

1    Q.    If you could look at what is marked now as Government's

2    Exhibit No. 35.

3            Do you recognize that item?

4    A.    Yes.

5    Q.    What is it?

6    A.    It's the newspaper article, the police report.

7    Q.    And is it a fair and accurate depiction--  Is it actually

8    the newspaper that you brought into the jail on November 22?

9    A.    Yes, it is actually.

10           MR. WALUTES:  Your Honor, at this point I would ask

11   to admit Government's Exhibit 35.

12           THE COURT:  Any objection?

13           MR. COREY:  No objection.

14           THE COURT:  It's received.

15           MR. WALUTES:  And permission to publish, Your Honor.

16           THE COURT:  Yes, sir.

17   BY MR. WALUTES: (Continuing)

18   Q.    Okay.  Can you see this on your screen actually, Mr.

19   Bryan?

20   A.    Yes.

21   Q.    I am told if you tap on the screen, you could actually

22   start where the article starts.  Could you tap it and see if

23   it makes a mark?

24   A.    Yes.

25           MR. WALUTES:  Your Honor, would it be okay if this

R.A. Bryan - Direct

204

1    witness actually read this so that we can ensure that everyone

2    has an opportunity at this point to see what is on this

3    article?

4              THE COURT:  Go ahead.

5    BY MR. WALUTES: (Continuing)

6    Q.   Mr. Bryan, could you read the paragraph or the caption

7    there that you have just marked, starting:  Fatal shooting.

8    A.   Okay.  Fatal shooting, Tacoma Park.  A cab driver was

9    shot as he entered, as he exited his cab in the 7400 block of

10   New Hampshire Avenue last night.  The Montgomery County police

11   offered very few details of the investigation and would not

12   confirm certain issues of the incident as of late last night.

13            A neighbor of the victim who asked not to be

14   identified reported that the victim was Gebru Haile, who was

15   an Ethiopian immigrant.  The neighbor also reported that

16   Haile's body was found next to his cab after police were

17   called to the area after gunfire was heard.

18            A second neighbor, who also did not want to be

19   identified, stated that recent neighborhood violence in result

20   of gang activity and street robberies.

21            A police source indicated that the county police are

22   looking into recent MS-13 gang activity that includes the

23   robbery of a Chinese food deliveryman who was robbed and shot

24   in the leg last week.  That incident occurred two blocks from

25   last night's shooting death.

R.A. Bryan - Direct

205

1    Q.   Mr. Bryan, when you went to see Mr. Mohamadi on

2    November 22 of 2008, did you show that block to him?

3    A.   Yes.

4    Q.   Obviously you can't get inside his head, but I wonder if

5    you can describe to the jury his physical reaction as he was

6    reading that.

7          Did you read it to him or did he read it?

8    A.   I read it.  Oh, actually, he read it.  Sorry.

9    Q.   Okay.  And how does he read it while you are on--  If you

10   could describe how you do a visit at the Alexandria Jail.

11   A.   Well, there is glass dividing the visitor and the inmate.

12   And, of course, you can see.  So, I put the article up to the

13   glass so that, to give him time to read it.

14   Q.   And as he was reading it or after he read it, did he make

15   any physical reaction?

16   A.   Yes.

17   Q.   And can you describe what that was.

18          Okay.  If you could describe what you just did

19   because there is a court reporter here and it's hard for him

20   to do signals.  If you could describe what you just did.

21   A.   Put my hand in the air with joy.

22   Q.   But which--

23          MR. COREY:  Objection, Your Honor, calls for

24   speculation.

25          THE COURT:  Sustained.  Try again.

206

```
1   BY MR. WALUTES: (Continuing)

2   Q.   First off, which hand?

3   A.   My right hand.

4   Q.   Okay.  Is it in a fist?

5   A.   In a fist.

6   Q.   And it's held in the air?

7   A.   Yes.

8   Q.   Is it stationary or is it pumped?

9   A.   It's pumped.

10  Q.   And did you see any facial display exhibited by Mr.

11  Mohamadi that you could see?

12  A.   Yes.

13  Q.   I am not asking what it is a sign of, but what facial

14  expression?

15  A.   Mouth open, eyes wide.

16  Q.   Do you make--  Is there any discussion about--  Are there

17  any other, any discussion about payment or anything of that

18  nature on this first visit on November 22 of 2008?

19  A.   Is there--

20  Q.   A discussion of payment or money?

21  A.   No.

22  Q.   Okay.  Do you go back to see Mr. Haile again?

23          THE COURT:  Mr. Mohamadi.

24  Q.   I am sorry, Mr. Mohamadi.  Thank you, Your Honor.  Excuse

25  me.
```

207

1          Mr. Mohamadi, did you have a second visit with Mr.

2  Mohamadi?

3  A.   Yes.

4  Q.   And on November 29, 2008, was that in a similar

5  situation, with a glass partition between the two of you on

6  opposite sides?

7  A.   Yes, yes.

8  Q.   At that point is there any--  What was the purpose of

9  that visit?

10  A.   To get the money situation taken care of.

11  Q.   If you could look at what is marked as Government's

12  Exhibits 37A through 37C and 37D.

13          What are those, sir?

14  A.   These are the recordings.

15  Q.   Is that the recordings of the November 29, 2008 visit?

16  A.   Yes.

17  Q.   Are those fair and accurate?

18  A.   Yes.

19  Q.   To be clear, those also, like all the recordings, have

20  both the original set as well as the enhancement?

21  A.   Yes.

22  Q.   And how do you recognize it?

23  A.   My initials.

24          MR. WALUTES:  Your Honor, at this time I would move

25  the admission of Government's Exhibit 37A through 37D.

R.A. Bryan - Direct

208

1          THE COURT:  Any objection?

2          MR. COREY:  No objection.

3          THE COURT:  They will be received.

4   BY MR. WALUTES: (Continuing)

5   Q.   What was discussed, Mr. Bryan?

6   A.   On the second visit?

7   Q.   Yes, please, on November 29 of 2008.

8   A.   How we were going to get, how I was going to get paid.

9   Q.   And how were you going to get paid?

10  A.   I was going to send my supposedly intern to go pick up

11  the money from his cousin.

12  Q.   And do you see the man that we have been discussing

13  today, Mr. Mohamadi, in the courtroom today?

14  A.   Yes.

15  Q.   And could you point him out?  Can you describe an article

16  of clothing that he is wearing?

17  A.   Suit, gray suit.

18          MR. WALUTES:  Your Honor, if the record could

19  reflect the identification of Mr. Mohamadi by this witness.

20          THE COURT:  Yes, it will.

21  BY MR. WALUTES: (Continuing)

22  Q.   Is there any doubt that this is the man who asked you to

23  kill Mr. Haile?

24  A.   Yes.  Oh, there is no doubt, no doubt.

25  Q.   What was the conviction for which you served time in the

R.A. Bryan - Direct

209

1    Alexandria Jail?

2    A.    Attempted robbery.

3    Q.    How do you survive in jail?

4    A.    It's not that difficult.  You just stick to yourself.

5    Just--  It's not what people think.  It's not that bad.

6              MR. WALUTES:  Your Honor, those are all the

7    questions I have.  Thank you.

8              THE COURT:  All right.  All right, we are going to

9    end for tonight at this time and resume cross-examination in

10   the morning.  Does 9 o'clock work for everyone?  All right.

11             Then we will be back, we will begin our testimony

12   again at 9 a.m. tomorrow morning.

13             For your scheduling purposes, we won't sit on

14   Friday.  I have a morning docket that is quite lengthy, and it

15   wouldn't be productive for us to come in for just a portion of

16   the day.

17             We will hear testimony tomorrow, and then I would

18   expect that we would resume on Monday morning at 9 o'clock.

19             It is very important that you not discuss this case

20   with anyone tonight.  Not do any research.  Not do any

21   investigation.  Not go to where you think something may have

22   occurred.  Not do anything but enjoy an evening thinking about

23   something else.

24             You hear stories all the time about jurors doing

25   Internet searches to find out some of the crazy, wild things

1    that they think may bring them further along in the case or

2    for various reasons disregard the order that they get.  It's a

3    violation of a Court order and there are legal consequences to

4    violating the order of the Court not to do any investigation

5    or talk about the case with anyone.

6            And there are also real ramifications in that it is

7    likely a mistrial would have to be declared, we would have to

8    start all over again, and there would be a great expenditure

9    of resources.

10           So, for all those reasons please do not discuss the

11   case or do any research, but instead enjoy the evening.  And I

12   will ask you each morning that we come back whether you have

13   heeded my request before we begin our day's testimony, it's

14   that important.

15           All right, you are excused for the evening.  Thank

16   you, and we will see you tomorrow at 9 a.m.

17           NOTE:  At this point the jury leaves the courtroom;

18   whereupon the case continues as follows:

19   JURY OUT

20           THE COURT:  All right.  Anything else tonight?

21           MR. WALUTES:  Not from the Government, Your Honor.

22           THE COURT:  All right.

23           MR. NACHMANOFF:  Your Honor, if I may.  I would ask

24   that Mr. Bryan be excused.

25           I would only make one request.  Which is that if he

R.A. Bryan - Direct

211

1    has any notes with him, we would like those notes disclosed.

2    I am not saying that he does have notes with him, but to the

3    extent there are any writings, he has any writings, we would

4    ask that they be disclosed now.

5              THE COURT:  Do you have any writings in your

6    possession, Mr. Bryan?

7              THE WITNESS:  No.

8              THE COURT:  All right.  Then you are in the middle

9    of your testimony, so you are not to discuss the testimony

10   that you have given here today with anyone, even your counsel.

11             You may discuss further testimony that's unrelated

12   to that which you have given, but you are not to discuss your

13   testimony with anyone that you have given here this afternoon.

14             Do you understand that, sir?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  And you are also clearly not to do any

17   research or do anything other than enjoy an evening thinking

18   about something else.  And be back here, you are ordered to be

19   back here by 9 o'clock tomorrow morning to resume your

20   testimony.  All right?

21             THE DEFENDANT:  Okay.

22             THE COURT:  All right, then you are excused at this

23   time, sir.

24             THE DEFENDANT:  Thank you.

25             NOTE:  The witness stood down.

R.A. Bryan - Direct

212

1          THE COURT:  I can't resist--  I should actually

2     ignore it.

3          Mr. Corey, you keep staring at me and you have got a

4     real serious look on your face.  And I know that you are not

5     trying to intimidate me or anything, but each time I make a

6     ruling you have that very serious look and you are staring at

7     me, and I'm going, why do you keep staring at me.

8          Now, so, it's a learning experience, I think, that

9     you look somewhere else when the judge--  Actually, I have

10    sustained maybe a majority of the objections you have made.

11    But it seems that when I don't, you just give me that hard

12    stare.

13         And I can promise you that the next judge won't say

14    anything, but he will go why is that guy staring at me.  And

15    he must think I am as dumb as a rock.

16         MR. NACHMANOFF:  Your Honor, if it makes you feel

17    any better, he stares at us that way too.

18         MR. COREY:  Your Honor, it is how I show affection.

19         THE COURT:  All right.  I suspected that was the

20    case.  All right.  Well, I don't know what to tell you.

21         MR. COREY:  I will do my best to lighten up.  Thank

22    you, sir.

23         THE COURT:  That's one of those--  That is something

24    that you learn now and you ought to keep with you going

25    forward.  And I did not take any umbrage at all.

213

1            MR. COREY:  Certainly none was intended, Your Honor.

2            THE COURT:  All right.  Well, I had to get that off

3    my chest.  All right.

4            We are in recess and we will see you all at

5    9 o'clock tomorrow morning.

6            NOTE:  The March 10, 2010 portion of the case is

7    concluded.

8        ------------------------------------------------

9

10

11

12

13

14

15

16

17

18

19            I certify that the foregoing is a true and

20        accurate transcription of my stenographic notes.

21

22

23                       _____
                          /s/  Norman B. Linnell
24                       Norman B. Linnell, RPR, CM, VCE, FCRR

25