214

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
            Defendant.        :
                              :
------------------------------:
```

V O L U M E   2 of 5


TRIAL  TRANSCRIPT


March 10-11 & 15-18, 2010


Before:  Liam O'Grady, Judge


And a Jury


APPEARANCES:

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

215

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| RICHARD A. BRYAN | | |
| | CROSS | 231 |
| | REDIRECT | 285 |
| STEVE C. GREENE | | |
| | DIRECT | 302 |
| | CROSS | 313 |
| RANDY N. PRESSLEY | | |
| | DIRECT | 319 |
| | CROSS | 333 |
| THOMAS LAWN | | |
| | DIRECT | 356 |
| | CROSS | 363 |
| | REDIRECT | 366 |
| STEPHEN GRANT | | |
| | DIRECT | 367 |
| | CROSS | 391 |
| | REDIRECT | 402 |
| TIMOTHY EVANS | | |
| | DIRECT | 405 |
| | CROSS | 408 |
| | REDIRECT | 411 |
| BRIAN FROMM | | |
| | DIRECT | 413 |
| | CROSS | 426 |

216

KEITH CRANE

DIRECT        446
CROSS         449

THOMAS GROUND

DIRECT        451
CROSS         473
REDIRECT      480

RICHARD A. BRYAN

DIRECT        489
CROSS         491
REDIRECT      493

217

2              NOTE:  The March 11, 2010 portion of the case begins
in the absence of the jury and the witness as follows:

3     JURY OUT

4              THE COURT:  All right, good morning to counsel and

5     Mr. Mohamadi.

6              I wanted to address the subject of the cocaine used,

7     allegedly used by Mr. Mohamadi during the time that he was

8     with Ms. Riley.  And I looked at it and the Government's

9     explanation, did a little research.

10             I don't think it fits under 404(b).  I don't think

11    it's in furtherance of any of the prongs of 404(b) that would

12    be required for its admissibility.  So, I am going to exclude

13    it from evidence.

14             So, if you need an opportunity to discuss that with

15    Ms. Riley before she testifies, we will take the time to do

16    so.

17             I have also looked at Mr. Mohamadi's latest filings

18    pro se.  I am not going to hear argument on them at this time.

19    Again, for the most part, they are issues that need to be

20    addressed at the close of the Government's case and/or after

21    discussion with counsel as to what, if any, trial decisions

22    that need to be made by Mr. Mohamadi after the Government has

23    closed its case in chief.

24             There is a motion to clarify conditions of

25    detention, Mr. Mohamadi believes that he was not given credit

218

1    for a 90-day period of time while he was in Fairfax.  And that

2    as a result, the Virginia state has improperly or erroneously

3    concluded he is not eligible for release until mid-April when

4    he believes he is eligible for release.

5           If counsel would look into that and see.  Mr.

6    Mohamadi, of course, had a Rule 5 hearing, but he may or may

7    not have had a bond hearing.  And certainly if he is eligible

8    for conditions of release and wants to seek one, if his time

9    is actually up in the state court, then we should do that.

10          So, if you would take a look at that when you get a

11   chance.

12          All right.  Anything else before we start this

13   morning?

14          MR. WALUTES:  Not from the Government, Your Honor.

15          THE COURT:  All right.  Speak to your counsel, Mr.

16   Mohamadi.

17          MS. MINTER:  The Court's indulgence, Your Honor.

18          THE COURT:  Yes, sir.

19          MR. COREY:  Your Honor, Mr. Mohamadi has a matter

20   that he would like to address relating to one of his pro se

21   motions regarding some evidence that you said once he had

22   evidence of, he should come forward and address the Court with

23   that evidence.

24          THE COURT:  All right.  We will do that at the end

25   of one of our breaks, but I don't want to delay the jury.  So,

219

1  after we excuse the jury for one of our breaks, I will hear

2  Mr. Mohamadi at that time.

3            Thank you.

4            MR. COREY:  Thank you.

5            THE COURT:  All right.  Let's get our jury in, Joe.

6  Do we have our witness?

7            MR. WALUTES:  Should I have him come in?

8            THE COURT:  Yes, let's have Mr. Bryan come in.

9            NOTE:  The witness enters the courtroom.

10            THE MARSHAL:  Judge, we are missing one juror.  My

11  mistake.

12            THE COURT:  All right.  Well, we are missing a

13  juror, Mr. Walutes.  Let's have Mr. Bryan stay out.

14            I am sorry, Mr. Bryan, if you would step out, but be

15  available in the next minute or two, sir.  Thanks.

16            NOTE:  The witness leaves the courtroom.

17            THE COURT:  All right, Mr. Mohamadi, we are missing

18  a juror.  So, have you discussed what you would like to tell

19  me with your counsel and have they--

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  Have they told you the positive and

22  negative?  I mean, any admission you make, anything you say

23  here in the courtroom, of course, could be used against you,

24  you know that, right?

25            THE DEFENDANT:  I understand, Your Honor.

220

1          THE COURT:  Okay, then go ahead.  What is it that
2    you want to discuss?  And please come to the podium so the
3    record will reflect--

4          THE DEFENDANT:  My motion--  Good morning, Your
5    Honor.

6          THE COURT:  Yes.

7          THE DEFENDANT:  In my motion to compel favorable
8    evidence, I stated that there were missing, periods of phone
9    calls that were missing.  And the Government claimed that it
10   was because I was using different pin codes, which I refuted.
11   Because if that was the case, I would have used a different
12   pin code when I was discussing the case with Amanda where I
13   had the witness tampering and all the other cases that they
14   have recorded if that's the case.

15         I clearly explained how Mr. Burnham was not only
16   monitoring me from the phone calls, which is the normal
17   procedure, but he was also watching me from the cameras.

18         So, regardless of which pin code I used, he was able
19   to see at what time I made a call and go to the phone records
20   and get the phone call.  Which he has shown calls where I used
21   a different pin code to call an attorney because I didn't want
22   them to hear my conversations with the attorney.

23         Now, in regards to missing calls, I was able to
24   obtain back when I was in communication with Ms. Inge, one of
25   the Government witnesses, she had sent me a phone bill.  And

221

1    in this phone bill it identifies the calls I made to her from

2    Alexandria jail, all of them identified.  And then the exact,

3    they coordinate exactly with one of the missing periods of

4    calls.

5            And then on top of it, I also have the stuff that

6    was provided from the Government in regards to the calls I

7    made in Alexandria.  And it clearly describes during that

8    period where the calls, there is that big chunk of time

9    missing.

10           And I am still waiting for my attorneys to get phone

11   bills for the other individuals where I have that are missing.

12   But I am still waiting.  But I am able to provide this.

13           And then on a second note, I have the CDs, I have

14   the CDs the Government, thank you, I have the CDs the

15   Government provided also for me to review in regards to the

16   Alexandria calls.  And with that, to prove, once you play the

17   CD, I have the number of calls that I identified in my motion

18   that I said they were shortened.

19           If you were to look on this document where it

20   identifies the call, what time it was made and duration, you

21   will see that the calls, the durations are 30 minutes, but the

22   CD provides only 15 minutes of that call and it is cut short.

23           And there is--  It's all the--  I went through it,

24   as Mr. Salvato identified in his previous motion hearing, he

25   explained I have been diligently going through the calls.

222

1    That's what I did during the seven months where he just didn't

2    do anything.

3            So, during that period I reviewed all of the calls

4    that were provided by the Government.  There is a lot of stuff

5    missing.  There is stuff missing in regards to intent.  There

6    is stuff missing with regards to how I obtained the address

7    and all that stuff.  And all this stuff is important stuff

8    because they are insinuating their own motives and intent.

9            But in these calls there is very important stuff in

10   there.  There is important conversations with Ms. Inge that I

11   think is very relevant now that she has made a third story in

12   regards to her testimony.

13           So, I think it's very relevant that I show the jury

14   her personal phone calls when she gets on the stand, her own

15   words, the same way they are using my words against me.  I

16   should be entitled to present that evidence also.

17           THE COURT:  All right.  Well, I will look at the

18   additional information you have now.  But as you know, we've

19   reviewed this issue a couple of times.  The Government has

20   gone back at least twice in response to what clearly are

21   periods of time where phone calls are not recorded.  Or if

22   they were, they are no longer available.

23           And they have, as I understand it, the Alexandria

24   Detention Center officials have searched through their records

25   for all the calls that they can identify while you were there

223

```
1    made by you, and they have produced the ones that they have.

2              THE DEFENDANT:  I understand.

3              THE COURT:  All right.  So, if you have got more

4    specific records of telephone calls, then I will look at it

5    and I will require the Government to go back again to the

6    detention center and seek those.

7              THE DEFENDANT:  I appreciate that, Your Honor.

8              THE COURT:  Okay.

9              THE DEFENDANT:  But one of the issues that I am

10   asserting is the fact that one of their witnesses, Mr.

11   Burnham, is the one that is involved in recording phone calls.

12   He has the full liberty to do what he wants with these calls.

13   He is the one that made these CDs that were shortened.  He is

14   the one that instigated this whole case.  And one of the

15   assertions that I am making is that he has done some unethical

16   acts in this process by withholding calls.

17             And another issue I would like to present is--

18             THE COURT:  Well, he is a member of the police

19   department.

20             THE DEFENDANT:  I understand that.

21             THE COURT:  And the detention center operates

22   separately--

23             THE DEFENDANT:  So, was Scott Peterson, he was part

24   of a law enforcement agency also, but, I mean, you can't just

25   because he is in law enforcement, that doesn't preclude him
```

224

1    from any negative behavior.

2              THE COURT:  I understand.  All right.  Thank you,

3    have a seat.

4              THE DEFENDANT:  Can I just address one last issue,

5    Your Honor, and I am going to sit down?

6              THE COURT:  Yes, sir.

7              THE DEFENDANT:  I understand the Court denied my

8    Sixth Amendment motion.  I have very, very important,

9    important testimony in regards to that.

10             I was moved to Alexandria just so I can have

11   communication with my attorneys.  My attorneys are not coming

12   to speak to me.  When I come here, I am trying to rely

13   information to them.  It causes confusion because they can't

14   listen to you and listen to me at the same time.

15             But at the same token, they are not coming to the

16   jail to even discuss testimony with me, discuss

17   cross-examining, what we are going to do or anything.  I am

18   coming in here unprepared and unable to defend myself

19   properly.

20             THE COURT:  That doesn't mean they are not working

21   on your behalf, just because they are not sitting with you at

22   the detention center.  They are working on your behalf, they

23   are working with what they have to prepare cross-examination

24   of the witnesses.  And I know you have your own thoughts on

25   how it should be done, but it's not your ideas solely that

225

1    they are working from.

2              THE DEFENDANT:  But it's my life, Your Honor.  If I

3    wanted to present a certain defense, I should be entitled to

4    be able to present my defense.  The Government has free

5    liberty to do whatever they want.  I just want to present a

6    valid, substantial defense to my case because I know the

7    consequences of this trial is going to end up--

8              THE COURT:  And I am sure--  The Government's case

9    is going to go on through most of next week.  And without

10   question, you are going to have time during that period of

11   time to discuss it with your counsel.

12             THE DEFENDANT:  I just want to note for the record

13   that I am being forced to have representation by attorneys

14   that I did not hire, and I am not being given the opportunity

15   to hire counsel in my defense as I have done always in my

16   past.  I just want to note--

17             THE COURT:  And you filed that motion.  I denied it.

18   I explained the history of counsel that you had had and their

19   competency.  And that under the law, you are not entitled to

20   your counsel of choice.  You are entitled to competent

21   counsel.  You've hired counsel on multiple occasions.  You

22   fired them each time.  Every one of those counsel was an

23   attorney in good standing in this district with a stellar

24   reputation.  I think you have--

25             THE DEFENDANT:  Your Honor, I have to interrupt--

226

1              THE COURT:  Stop.

2              THE DEFENDANT:  I have to interrupt.  The

3    Government--

4              THE COURT:  You have admitted in your own

5    pleadings--  Stop.  You have admitted in your own pleadings

6    that you have no question that your counsel are competent that

7    you have presently have, and that your only complaint before

8    this morning was that you were afraid they had not had time to

9    develop, to look and all the discovery.  And I rejected that.

10             Clearly they have gone through extensive review of

11   all the telephone calls, all the calls, all of the discovery

12   available.  And they have successfully limited the

13   Government's case in many different regards based on the hard

14   work that they have done.

15             So, we're done for this morning.  Now, we're done,

16   we're done.  Have a seat.  All right.  You made--

17             THE DEFENDANT:  Your Honor, the stellar reputation--

18   Okay.

19             THE COURT:  You have made your record.  Okay, Mr.

20   Mohamadi.

21             THE DEFENDANT:  It's a joke man.  It's not a fair

22   trial.  It's a joke.

23             THE COURT:  Mr. Walutes, did you want to respond?

24             MR. WALUTES:  I just wanted to make sure, I want to

25   give the Court accurate information.  Mr. Burnham, of whom was

227

1  just spoken, is actually now employed with the Alexandria

2  Sheriff's Department.  He is in charge of the telephone

3  system.  So, he has been and he will be available, obviously,

4  for cross.

5           I will note that he has I think 32 years as a police

6  officer before he has come over.  So, he is not a--  This is a

7  fairly experienced individual.

8           But I just wanted to make that--

9           THE COURT:  So, he is going to be a witness?

10          MR. WALUTES:  He will be.  And I expect toward the

11  end, Your Honor.  So, there is time, obviously.

12          I don't have, as Mr. Mohamadi has now told me for

13  the first time today, apparently Ms. Inge I guess in a period

14  when they were communicating sent to him a phone bill.  I

15  have, obviously, never seen a copy of that.

16          If that's copied and provided to me, I will actually

17  explicitly ask for a review to be made for those dates and

18  times to give the Court most accurate information as it

19  exists, as I understand it, from the Alexandria phone system.

20          Finally, Your Honor, if I could, and I only do this

21  because apparently we have some time, I understood, I did not

22  know because I was giving an opening, but I understand the

23  defendant held up a sign saying liar.  I was told that by

24  assistants who were in the back.

25          Apparently it was directed towards the back.  I

228

1    don't know whether any jurors saw it.

2           I just want that on the record, Your Honor.  I think

3    as the case goes on, I know the Court has already dealt with

4    this issue, but it didn't put on what it was.  And if there is

5    an occasion to have this case go up to the Fourth Circuit, I

6    just wanted to make a record on what the sign said.

7           THE DEFENDANT:  That sign was to my family.  That

8    wasn't to the jury, that was to my family that was sitting

9    behind me.

10          THE COURT:  I understand.  But you understand the

11   risks in doing something like that, as I explained to you.

12   Because even though you put it, you started to put it back

13   like that, prior to being removed from your hands, that it

14   went this way.

15          And that I don't believe a juror could have seen it,

16   given the limited amount of time, and also given the fact that

17   it was in the back of the notebook as it was coming around, it

18   would have been upside-down, I think.

19          But those are the types of things that have

20   consequences.

21          THE DEFENDANT:  I have got my three younger sisters

22   in the back and I am being accused of running a prostitution

23   ring.  So, come on.

24          THE COURT:  Listen, listen.

25          THE DEFENDANT:  With no proof.

229

1          THE COURT:  You just listen to your counsel and

2    understand that these things have consequences.  And we have

3    talked about that before.  All right.

4          You have a choice of being here or you have a chose

5    of being down in the cellblock.  All right.

6          Let's bring our jury in.

7          MR. WALUTES:  May I get the witness?

8          THE COURT:  Yes, if you would get Mr. Bryan, please.

9    Thank you.

10          MR. WALUTES:  Your Honor, can I also tell the Court

11    that I apparently pulled over some of the communication

12    equipment behind me last night as I was pulling files out.

13          The headphones may no longer operate.  We still

14    would have open courtroom audio, but apparently the

15    headphones, it is some problem that I may have incurred

16    myself.  Just so the Court, if there is a request by the

17    defense to use the headphones, I wanted to make sure you

18    understood that it was apparently me who did it.

19          THE COURT:  Have we had an opportunity to look at

20    it?

21          MR. WALUTES:  We had tried to fix it this morning

22    for almost an hour.  So far it is not successful.

23          THE MARSHAL:  Judge, we need two more minutes.

24          MR. WALUTES:  The videos can still play, the audio

25    will still play in the open courtroom, but the headphones

230

1    would not.  For whatever that is worth.

2              THE COURT:  Do you have further tapes you want to

3    play?

4              MR. WALUTES:  I do not, Your Honor.  I think we may

5    be past that.  Actually we won't need the headphones again

6    until late next week.  Hopefully the problem is resolved.

7              But to the extent that I placed defense counsel at a

8    disadvantage, I just wanted to make clear that it was

9    apparently me that did it.

10             Your Honor, I should also say since we have the

11   extra second, I am aware that defense counsel according to all

12   the assistants, quickly pulled it down.  So, obviously, the

13   Government appreciates that.

14             NOTE:  At this point the jury and the witness return

15   to the courtroom; whereupon the case continues as follows:

16   JURY IN

17             THE COURT:  Good morning, please be seated.

18             Good morning to each of you.  And I hope you had a

19   pleasant evening and also a not too difficult commute in this

20   morning, and I appreciate you all being here.

21             Did you all heed my request that you not discuss the

22   case with anyone and not do any research or investigation on

23   your own?  Can I have a nod of heads?

24             Thank you.  As I have indicated, it is very

25   important.

R.A. Bryan - Cross

231

1              All right.  Mr. Corey, cross-examination.

2              Of course, Mr. Bryan, you are still under oath, sir.

3              MR. COREY:  Thank you, Your Honor.

4              RICHARD A. BRYAN, having been called by counsel for

5    the United States, having previously duly affirmed, continues

6    to testify and state as follows:

7         CROSS-EXAMINATION

8    BY MR. COREY:

9    Q.   Good morning, Mr. Bryan.

10   A.   Good morning.

11   Q.   Mr. Bryan, isn't that true that you were arrested on

12   May 21, 2009?

13             MR. WALUTES:  Objection.

14   A.   Yes.

15             MR. WALUTES:  It is improper impeachment.

16             MR. COREY:  Your Honor, this goes directly to the

17   witness' credibility as a drug user--

18             THE COURT:  You can ask him whether he was convicted

19   of a offense, but let's ask the question properly.  The arrest

20   is not proper impeachment.

21   BY MR. COREY: (Continuing)

22   Q.   Mr. Bryan, were you convicted of possession of cocaine

23   stemming from possession that occurred in Pennsylvania in

24   May 2009?

25   A.   No.

R.A. Bryan - Cross

232

1    Q.   Isn't it true that--

2              MR. WALUTES:  Objection.  Again, Your Honor, this is

3    improper.  If he intends to go outside of Rule 609, he needs

4    to have the Court's permission ahead of time, and that should

5    be asked outside the presence of the jury, Your Honor.  The

6    man is only in court--

7              THE COURT:  Come to the bench.

8              NOTE:  A side-bar discussion is had between the

9    Court and counsel out of the hearing of the jury as follows:

10   AT SIDE BAR

11             MR. WALUTES:  Your Honor, I shouldn't have had to

12   make those objections in open court.  I ask the Court to ask

13   the jury to disregard that, it was improper, it should not

14   have occurred.

15             THE COURT:  What is the cocaine?

16             MR. COREY:  The witness had possessed cocaine and

17   marijuana in May of 2009 shortly after and while still working

18   with the Government.  It goes directly to his credibility as a

19   witness, Your Honor.

20             THE COURT:  Has he been convicted of an offense, or

21   is it an arrest, what is it?

22             MR. COREY:  It's an arrest that Agent Castro and the

23   Government resolved as part of their working with the witness,

24   we believe.

25             MR. WALUTES:  Your Honor, when they went up to pick

R.A. Bryan - Cross

233

1    him up for a court appearance, they saw drugs.  They called

2    the local authorities and asked him if they would like the

3    prisoner.  They said they didn't want to make a charge.

4            So, they then took him back to Alexandria.  They

5    reported it to his Probation officer.  The Probation officer

6    then reported it to the Court and there was a revocation of

7    his probation.  That's it.

8            There was no conviction.  And I believe that under

9    Rule 609 at a minimum he should have asked the Court's

10   permission before he started this inquiry.

11           MR. COREY:  Your Honor, we are presenting a case

12   that the Government's witnesses are not credible.  And,

13   therefore, his drug use, any drug use speaks directly to that

14   credibility at a time in which he is clearly in some way

15   working with the Government.  In fact, Agent Castro was

16   involved in this arrest.

17           So, we think that that evidence directly speaks to

18   his credibility as a witness.

19           THE COURT:  Clearly it is something you needed to

20   get out before this hearing and give me time to understand

21   whether it's credible or not.  It requires either Agent Castro

22   to testify or someone who had more personal knowledge of this

23   or documentation, et cetera.  I have none of that.

24           And at this stage there is an allegation and an

25   allegation only.  He has not been charged.  He has not been

R.A. Bryan - Cross

234

1    convicted of the offense.  I don't know whether he admitted to

2    the use of the cocaine in the revocation hearing.

3              MR. COREY:  He did, sir.

4              THE COURT:  All right.  Ask him whether he admitted

5    to use of cocaine and his sentence was revoked as a result.

6    And have you got anything else that is going to cause the same

7    kind of an issue?

8              MR. COREY:  No, Your Honor.

9              MS. MINTER:  Your Honor, that line of inquiry goes

10   not only to the witness' drug use, which the Government knows,

11   of course, is a proper basis for impeachment, it impeaches him

12   as a witness--

13             THE COURT:  That's why I have just ruled the way I

14   have.  Go ahead.  Thank you.

15             MS. MINTER:  It also goes, however, to the

16   credibility of the Government's case because the lead case

17   agent on this case is the one who encounters the drug use and

18   encounters the marijuana, the cocaine, and then continues to

19   rely on this witness as a pivotal witness--

20             THE COURT:  Castro is going to testify.  And if you

21   believe you have impeachment, proper impeachment, you can go

22   into that with Castro.  How does that impeach Mr. Bryan?

23             MS. MINTER:  I think Mr. Bryan will be the

24   appropriate person to testify to what his actions were at that

25   time period.  Obviously, Agent Castro would be the one to

R.A. Bryan - Cross

235

1    testify to the fact that he knew about Mr. Bryan's drug use.

2    But I think in terms of Mr. Bryan's admission, that's

3    appropriate coming out through Mr. Bryan.

4              THE COURT:  I am not going to allow that.  But you

5    can ask him wasn't he as a result of his-- Did he admit to

6    having possessed cocaine in Pennsylvania.  Hopefully he will

7    answer yes.  Then we will move on.

8              MS. MINTER:  Just clarification, Your Honor.  There

9    was marijuana recovered at the scene as well, if we could

10   inquire into both of those.

11             THE COURT:  Marijuana and cocaine.  Okay, you can

12   ask the question.

13             NOTE:  The side-bar discussion is concluded;

14   whereupon the case continues before the jury as follows:

15   BEFORE THE JURY

16             THE COURT:  Go ahead, sir.

17             MR. COREY:  Thank you.

18   BY MR. COREY: (Continuing)

19   Q.   Mr. Bryan, in Pennsylvania in May of 2009 you admitted to

20   using cocaine, isn't that right?

21   A.   Yes.

22   Q.   And marijuana as well, isn't that right?

23   A.   Yes.

24   Q.   I would like to go back to yesterday regarding your

25   comment that jail is not that bad.

R.A. Bryan - Cross

236

1           You recall saying that, right?

2    A.    Yes.

3    Q.    Now, Mr. Bryan, jail is not that bad.  Does that mean

4    that you would be willing to go there for an offense you

5    didn't commit?

6    A.    No.  What I meant was it's not like a war zone.  It's not

7    dangerous as what people think.

8    Q.    Well, isn't that true that you can't always trust people

9    in jail though, right?

10   A.    Of course.

11   Q.    In fact, you have spent some time in jail, so you know

12   what it's like, right?

13   A.    Yes.

14   Q.    And I think yesterday you said it's common for people in

15   jail to talk about their cases?

16   A.    Yes.

17   Q.    Now, isn't it also common for people in jail to lie about

18   their cases?

19   A.    Yes.

20   Q.    So, sometimes people make things up about their cases,

21   don't they?

22   A.    Yes, they do.

23   Q.    And in fact, you lied while you were in jail, didn't you?

24   A.    Yeah, probably.  Yes, I mean.

25   Q.    For example, you lied when you were talking to Mr.

R.A. Bryan - Cross

237

1    Mohamadi?

2          Let me direct your attention to one of those

3    examples.  For example, you talked about washing Mr. Haile's

4    address.  You said, quote, I fucking washed the address, but I

5    remember some of it.

6          That wasn't true, was it?

7    A.   Of course it wasn't.

8    Q.   You didn't really wash the address?

9    A.   No.  I said that yesterday.

10   Q.   So, you did that because the Government told you to do

11   it, right?

12   A.   Yes.

13   Q.   So, you are just following the Government's instructions?

14   A.   Yes.

15   Q.   They told you to set Mr. Mohamadi up?

16   A.   Yes.

17   Q.   I wonder if you could help us understand a little bit

18   about the setup of the Alexandria Detention Center.  The

19   detention center has some common areas, doesn't it, like areas

20   where you are free to walk and talk to other inmates?

21   A.   Yes.

22   Q.   So, you are not just stuck in your cell the whole day?

23   A.   No.

24   Q.   And these common areas can get kind of loud, isn't that

25   right?

238

1    A.    Fairly.

2    Q.    And in fact, I think we heard on the tapes yesterday they

3    can be quite loud at times?

4    A.    Yes, they can.

5    Q.    So, isn't it true that the some of the recordings we

6    heard yesterday didn't capture all of your conversation?

7    A.    Yes.

8    Q.    There were gaps in there, right?

9    A.    Small ones, but, yes.

10   Q.    I also want to understand a little bit about your first

11   meeting with Mr. Mohamadi.  You said yesterday, I believe,

12   that you met him sometime before September 2008?

13   A.    Yes.

14   Q.    Now, do you recall more precisely when that was?  Was it

15   August, sometime earlier than that?

16   A.    Well, August is right before September.

17   Q.    Well, could it have been August or some earlier month?

18   A.    It was probably around right before September, like I

19   said yesterday.

20   Q.    Well, you said before September yesterday.

21   A.    Yeah, that's what I just said right now, just a little

22   bit before September.

23   Q.    Okay.  And you met in the kitchen, is that right?

24   A.    Yes.

25   Q.    You both had a job working in the kitchen?

R.A. Bryan - Cross

239

1    A.    Yes.

2    Q.    Isn't that true that you and Mr. Mohamadi had a fight

3    over taking some food out of the kitchen?  A fight or

4    disagreement?

5    A.    I'm sorry, I can't remember.  I can't remember that.  It

6    might be true, but I cannot remember me fighting over food or

7    anything.

8    Q.    So, I want to understand the timeline a little bit as

9    well.  Your first recorded conversation with Mr. Mohamadi was

10   on November 12, 2007, that's right, isn't it?

11   A.    Yes.

12   Q.    And so, you met him sometime in August and then your

13   first recorded conversation is in November.  So, there is a

14   lot of conversations in between those two points in time,

15   wasn't there?

16   A.    Not really.  No, not really.

17   Q.    Well, certainly you talked to him?

18   A.    Oh, yeah, we had talked, but--

19   Q.    Now, the first conversation, you seemed to know him quite

20   well?

21   A.    The first conversation?

22   Q.    The first recorded conversation on November 12, it wasn't

23   as if you had just met him then?

24   A.    Yeah, of course.  I didn't meet him just then.

25   Q.    So, there were without a doubt conversations before

240

1  November 12 that were not recorded?

2  A.   Well, yeah, of course.

3  Q.   And also to understand the timeline, you had another

4  recorded conversation on November 17, is that right?

5  A.   Yes.

6  Q.   And you had some conversations with Mr. Mohamadi between

7  November 12 and November 17?

8  A.   Yes.

9  Q.   So, in total, the two recorded conversations when you

10 were in the jail, that's only a portion of the total

11 conversations you have ever had with Mr. Mohamadi?

12 A.   Well, you didn't ask me what kind of conversations we

13 had.  You just said that, asked me if we had conversations.

14 Q.   Well, I am just trying to understand if you had other

15 conversations that were not recorded?

16 A.   Well, yes, but are you talking about this situation--

17 Q.   That's exactly my question, if you have had other

18 conversations.

19 A.   Well, yeah, of course, yes.

20 Q.   I would like to also understand how it came to be that

21 you became a government agent.

22         Now, you testified yesterday that you first met with

23 some agents on November 7, 2007, do you remember that?

24 A.   Yes.

25 Q.   Do you recall who you met with on November 7?

R.A. Bryan - Cross

241

1   A.   Vic Castro and Tom Buckley.

2   Q.   And you requested this meeting?

3   A.   Yes.

4   Q.   And how did you go about setting this meeting up?

5   A.   Well, actually, somebody told me that I can, that they

6   can have somebody talk to me.

7   Q.   Somebody told you?

8   A.   Yes.

9   Q.   What do you mean?  Who?

10  A.   Someone told me that they could have somebody help me

11  out.

12  Q.   Who told you?

13  A.   Another inmate.

14  Q.   And who was this inmate?

15  A.   I can't really remember the name.

16  Q.   And so, what did you do next?  Did he give you the name

17  of Agent Castro?

18  A.   No, no.  I actually was going to go ahead and just talk

19  to one of the white shirts, but I decided to wait around.  And

20  then they came and talked to me.

21  Q.   You mean they came and talked to you, I don't understand.

22  A.   Vic Castro and Tom Buckley.

23  Q.   Yeah, but how did they know to come talk to you?  You

24  must have told someone to come to talk to you?

25  A.   Well, I didn't know what to do and I didn't know who to

R.A. Bryan - Cross

242

1    talk to.  And somebody basically directed me towards them.

2    Q.   Have you worked with these agents in the past?

3    A.   No.

4    Q.   Now, when you went to talk to them, they gave you

5    instructions on how you should talk to Mr. Mohamadi, isn't

6    that right?

7    A.   Yes.

8    Q.   Did they tell you to get information about Mr. Mohamadi's

9    pending robbery charge?

10   A.   No.

11   Q.   Now, isn't it true they gave you very specific

12   instructions on how you should talk to Mr. Mohamadi?

13   A.   Well, actually, there was just certain information that

14   they needed, and it was basically up to me on how to get it.

15   Q.   Well, but didn't they give you specific instructions?

16   A.   Yes, they gave me specific instructions, but not directly

17   exactly what to say.

18   Q.   How about the mailing, they told you to do the mailing?

19   A.   Yes.

20   Q.   So, they did give you pretty specific instructions?  It

21   wasn't just up to you?

22   A.   No.  Well, I didn't say it was all up to me, but they

23   didn't put words in my mouth or anything.

24   Q.   But they did tell you to do certain things?

25   A.   Yes.

R.A. Bryan - Cross

243

1   Q.   Isn't it true this is not the first time you have worked

2   as a government agent?

3   A.   No, this is the first time.

4   Q.   Didn't you meet with the ATF six months before you ever

5   met with Mr. Mohamadi?

6   A.   No.

7   Q.   Are you sure?  Do you know who William Portillo is?

8   A.   Yes.

9   Q.   Who is he?

10  A.   My cousin.

11  Q.   Didn't you tell William Portillo that you cooperated with

12  the ATF in February 2008?

13  A.   No.

14  Q.   Now, before you became an agent for the Government, you

15  had a detainer in Washington, D.C., didn't you?

16  A.   Yes.

17           MR. WALUTES:  Objection.

18           MR. COREY:  Your Honor, this would go, this goes

19  directly to--

20           MR. WALUTES:  Your Honor, again, we had this

21  conversation.

22           THE COURT:  Sustained.

23           MR. COREY:  This goes directly to the witness'

24  credibility.

25           THE COURT:  Approach the bench.  Obviously we are

R.A. Bryan - Cross

244

1    not communicating well.

2              NOTE:  A side-bar discussion is had between the

3    Court and counsel out of the hearing of the jury as follows:

4    AT SIDE BAR

5              MR. COREY:  Your Honor--

6              THE COURT:  Come on, I asked you whether there is

7    anything else coming up that fits in the category, and you

8    said no.

9              So, obviously, we are not communicating very well.

10   So, what's this?

11             MR. COREY:  This goes directly to his state of mind

12   with respect to cooperation with the Government.  He had a

13   detainer pending at the time.  After he stopped cooperating,

14   the detainer was lifted.  That's all we want to question him

15   about.

16             THE COURT:  Is there any basis why you believe that

17   his cooperation is the reason the detainer was lifted?  Did

18   you do an investigation of that?

19             MR. COREY:  Yes, we did look into it.  We don't know

20   why the detainer was lifted, but we want to question him about

21   it.  It is a fair area of cross-examination.  It speaks

22   directly to his working with the Government.

23             THE COURT:  What do you know about the detainer?

24             MR. WALUTES:  Your Honor, it was subject to

25   cross-examination in the state trial when Mr. Bryan testified.

R.A. Bryan - Cross

245

1    Under the Court's direction, he was only asked as to the

2    underlying offense.

3              In that case he still had the detainer, I believe,

4    he said he had a detainer.  Oh, no, I think he had a detainer,

5    but D.C. would not extradite him.

6              If I recall correctly, it is a misdemeanor, maybe

7    marijuana possession.  But D.C. won't pay for the transport of

8    a person with that charge.

9              Mr. Larry Brown, who was counsel at that time, did a

10   cross-examination on the detainer as a reason for bias.

11             But my point here, Your Honor, is that we are now

12   years late other, there is no detainer--

13             MR. COREY:  I am sorry.

14             MR. WALUTES:  I am done, I am sorry.

15             MR. COREY:  Well, it's relevant for the time period

16   issue, it goes directly to his state of mind at the time about

17   his willingness to participate as an agent for the Government.

18   He had this detainer hanging over his head.  It goes to his

19   motivation.

20             THE COURT:  What was the testimony at the trial?

21   Was he aware, did he seek the Government's help in having the

22   detainer lifted?

23             MR. WALUTES:  He doesn't make any statement of that

24   nature, Your Honor.  At the trial he does admit, if I

25   remember, again, I don't want to give it verbatim, although I

R.A. Bryan - Cross

246

1    have it at my desk, my recollection is that he admits that

2    there was a detainer from D.C.

3          Mr. Brown made a number of insinuations that it was

4    the detainer, that the Commonwealth had made some sort of deal

5    with him to get rid of the detainer.  Those were all denied by

6    the witness.

7          THE COURT:  You can ask him whether a detainer was

8    lodged and whether it was lifted, but you are stuck with his

9    answer.

10          Are you going to ask him whether it was lifted

11    because of his cooperation with the Government, or are you

12    going to leave that one out there?

13          MR. COREY:  No, we are not going to go into that.

14          THE COURT:  You can do it on redirect.

15          MR. WALUTES:  I understand, Your Honor.

16          MR. NACHMANOFF:  Your Honor, I don't want to argue

17    by committee.

18          THE COURT:  That's what we are doing here.

19          MR. NACHMANOFF:  I understand the concern.  But let

20    me say to the Court, if I may.  The client is indicating that

21    perhaps he wants to exercise his Faretta rights.  He hasn't

22    asked me to ask that directly yet this morning, but we are

23    trying very hard to work with him in a way that comports with

24    our ethical obligations but also pursues every avenue that we

25    can to try and adequately defend him while pursuing a theory

R.A. Bryan - Cross

247

1    of defense that makes sense.

2            There are issues that we may inquire into that are a

3    product of that process, and I don't want the Court to think

4    that we have not thought through the various areas.  Not to go

5    back and argue about other things, but reviewing 609, which we

6    have looked at in some detail, it only requires notice with

7    regard to convictions that are more than ten years old.  And

8    these are issues where there are issues of bias and other

9    areas of impeachment.

10           So, whether or not there are convictions or whether

11   or not the detainer was lifted by the Government may or may

12   not be the case, but these are areas of inquiry that we are

13   trying to pursue.

14           THE COURT:  And I have just ruled that you are

15   allowed to do it.

16           Here is my motivation.  I don't like side bars.

17   Juries hate side bars.  They are sitting there wondering what

18   we are keeping them from understanding.  It's the first

19   question I get when I go back after a jury trial, what was

20   going on there.

21           So, we do these at breaks.  If we have got issues

22   like this to raise, let's raise the ticklish ones at breaks

23   outside the presence of the jury.  That's so we are not

24   delaying them.

25           That's why I am asking you about whether there is

R.A. Bryan - Cross

248

1    anything else coming up.  It's not because I want to ruin your

2    ability to surprise somebody with it.  I am not going to get

3    in the middle of your trial strategy.  But let's get this

4    stuff out outside the presence of the jury so we are not

5    delaying them.

6            MR. COREY:  This should be all, Your Honor.

7            THE COURT:  All right, thank you.

8            NOTE:  The side-bar discussion is concluded;

9    whereupon the case continues before the jury as follows:

10   BEFORE THE JURY

11           THE COURT:  I am sorry for the delay.  Sometimes

12   things come up unexpectedly.  We will try to keep our

13   side-bars to a minimum.  I know they are a distraction.  Thank

14   you.

15           All right, Mr. Corey, please go ahead, sir.

16           MR. COREY:  Thank you, Your Honor.

17   BY MR. COREY: (Continuing)

18   Q.   So, just to go back to where we were, you had a detainer

19   in Washington, D.C. at the time you became a Government agent,

20   is that right?

21   A.   I still have a detainer.

22   Q.   You still have?

23   A.   Yes.

24   Q.   Now, you have received some benefits from the Government

25   as a result of testifying in this case, is that right?

R.A. Bryan - Cross

249

```
1   A.   Yes.

2   Q.   About $700?

3   A.   Yes.

4   Q.   And did you also ask Mr. Walutes if he would write a

5   letter of recommendation for you?

6   A.   Yes.

7   Q.   For the armed forces?

8   A.   Yes.

9   Q.   And he agreed to do that?

10  A.   Yes.

11  Q.   Now, Mr. Bryan, you are a convicted felon, right?

12  A.   Yes.

13  Q.   And you were convicted in 2005 of two counts of attempted

14  robbery?

15  A.   Yes.

16  Q.   And that conviction was here in Alexandria?

17  A.   Yes.

18  Q.   How much time did you serve?

19  A.   Ten months and 17 days.

20  Q.   After getting out, you were on probation, is that right?

21  A.   Yes.

22           MR. COREY:  The Court's indulgence one moment.

23           THE COURT:  Yes, sir.

24           THE DEFENDANT:  Your Honor, can I represent myself?

25  I am not letting--
```

R.A. Bryan - Cross

250

1          THE COURT:  No, we will talk that about at break.

2          THE DEFENDANT:  No.  I don't want this guy to get

3    off the hook.  My lawyer is not listening to me.

4          THE COURT:  Stop, stop.  I am going to remove you.

5          Ladies and gentlemen, we are going to take a break

6    now and we will come back shortly.  You are excused at this

7    time.

8          NOTE:  At this point the jury leaves the courtroom;

9    whereupon the case continues as follows:

10   JURY OUT

11         THE COURT:  All right, have a seat.

12         Mr. Mohamadi, come to the podium.

13         Mr. Bryan, you are excused at this time for a

14   moment, sir.  Thank you.

15         NOTE:  The witness leaves the courtroom.

16         THE COURT:  Go ahead.

17         THE DEFENDANT:  Your Honor, I refuse to let this

18   liar get away with so many lies.  I will waive my right to

19   representation because my attorney will not even look at the

20   questions that I have placed for him to ask this witness.  I

21   have firsthand experience with this individual.  My attorneys

22   have--

23         THE COURT:  Have you communicated that to your

24   counsel?

25         THE DEFENDANT:  I have tried to speak to him.  He

R.A. Bryan - Cross

251

1   will not even speak to me.  He won't even acknowledge the fact

2   that--  I was like, look--  I asked him, look, I said, can you

3   please at least read these questions before you let this guy

4   get off the stand?  He said no.

5          How is that cooperating with me?  That is extremely

6   frustrating.  I will waive my right to representation.  I will

7   not let this guy get off the stand.

8          THE COURT:  We are going to take a five-minute

9   break.  You have written out the questions?

10         THE DEFENDANT:  I am almost done with them.  Because

11  the questions that I had placed, they are still in Warsaw,

12  they weren't transported up with me.  And I am trying to make

13  up for it now.

14         I am not making any excuses on that aspect, but the

15  fact of the matter, the problem right now is that I am trying

16  to give these questions to him now and he won't even look at

17  them before he lets this guy get off the stand.

18         THE COURT:  See, you can't be listening to me and

19  listening to the witness and doing--

20         THE DEFENDANT:  No, during the break, I am saying

21  during the break.

22         THE COURT:  We haven't had a break except for a few

23  moments.  All right, we are going to take a break right now.

24  You are going to sit down right there, you are going to

25  consult with your counsel about additional questions you would

R.A. Bryan - Cross

252

1    like to ask, and we will come back in about ten minutes.  All

2    right.

3              THE DEFENDANT:  Thank you very much, Your Honor.

4              THE COURT:  All right.  Now, calm down now.  All

5    right.

6              THE DEFENDANT:  I am calm, Your Honor.

7              THE COURT:  You are hurting yourself by the

8    outbursts.  The jury doesn't know you, and they just react to

9    what they see.  So, be aware of that.  Okay.

10             THE DEFENDANT:  I think the accusations already have

11   enflamed them as much.  I just want to have the facts

12   presented, that's all, that's my only intention.

13             THE COURT:  All right.  The other way to do that

14   instead of jumping up is to say, Your Honor, may we have a

15   side-bar and we do it over there.

16             THE DEFENDANT:  Okay.  I apologize, I will do that.

17             THE COURT:  No, that's all right.

18             All right, let the jury know we are going to take a

19   ten-minute recess.

20             MR. NACHMANOFF:  Excuse me, Your Honor, before the

21   Court leaves.

22             THE COURT:  Yes, sir.

23             MR. NACHMANOFF:  Does the Court want us to go back

24   on to the side area if the Marshals will permit it in order to

25   speak with him privately about these matters, or does the

R.A. Bryan - Cross

253

1    Court--

2              THE COURT:  You should have privacy.  And if you can

3    arrange some chairs over here, if that works, is that all

4    right?

5              THE MARSHAL:  Thank you, Your Honor, we can do it

6    right here.

7              MR. WALUTES:  The Government can step out, Your

8    Honor.  I, frankly, am happy to do that.

9              THE COURT:  Maybe that's--  Either way, but you

10   certainly should have privacy.  All right, we are in recess.

11             NOTE:  At this point a recess is taken; at the

12   conclusion of which the case continues in the absence of the

13   jury and the witness as follows:

14             THE COURT:  All right, Mr. Nachmanoff.

15             MR. NACHMANOFF:  Your Honor, I think we are faced

16   with a number of options that I would ask the Court to

17   resolve.  And I lay these options out not in any way endorsing

18   any one of them.

19             And I will tell the Court, as I have told Mr.

20   Mohamadi, we absolutely want to be his lawyers.  We would like

21   to continue to be his lawyers and to do our best to endeavor

22   to defend him.

23             One option--  We have tried to work with him during

24   this break and go over the questions that he had written.

25   Since the time of the break he has written many more

R.A. Bryan - Cross

254

1    questions.  He is writing more questions now as I speak.

2            So, we have reviewed some of those questions with

3    him.  Some of those are new, and some of those are in the

4    process of being written down now.

5            We have offered to ask some of those questions on

6    his behalf.  We have advised him that those are not

7    necessarily questions that we would ask, but we would

8    certainly do that if the Court advises us that that is how it

9    would like to proceed.  Whether that will be satisfactory to

10   Mr. Mohamadi, I don't know.

11           Another option the Court could consider is to allow

12   Mr. Mohamadi to conduct his own cross-examination.  That would

13   be unusual.  I will tell the Court that I had that experience

14   with Judge Ellis several years ago in which a client exercised

15   his Faretta rights.  I was appointed as stand-by counsel.  But

16   the reality at trial was that I was asked to sometimes take

17   over questioning.  It was a hybrid.

18           I am not, again, endorsing that as an experience

19   that I felt was successful, but it was done by Judge Ellis in

20   this courthouse a number of years ago.

21           The final option, of course, is to allow Mr.

22   Mohamadi to proceed pro se.  Again, this is a discussion

23   that's arisen at other times.  The Court went through a

24   colloquy with him when we were not his lawyers before.  He

25   decided to have our office, and the Court reappointed us, to

R.A. Bryan - Cross

255

1   represent him.

2          I, again, am not encouraging him to do that, but

3   ultimately, as this Court is aware and as our ethics rules

4   require, there are certain decisions reserved to the clients,

5   fundamental decisions.  There are others that are decisions of

6   strategy that are reserved to lawyers.

7          We always want to be on the same page with our

8   clients and to be pursuing strategies that they are in

9   agreement with, but sometimes that is not possible due to

10  differing views of how the law will apply or how the law

11  should apply.

12         I pass no judgment whatsoever on Mr. Mohamadi's

13  desire to present his case the way he wants to.  I think he

14  should be allowed to do that.  I think he should be allowed to

15  preserve issues.  This Court gave him the opportunity to file

16  motions.  He has taken full advantage of that to preserve

17  issues.  We have been a conduit of that information to the

18  Court as the Court instructed.

19         How the Court wants to resolve this witness is, you

20  know, I think needs to be resolved now.  However, it will

21  probably be a blueprint for how the next witnesses are dealt

22  with.

23         THE COURT:  All right.  I agree with you there.  And

24  I agree with the rest of the comments you have made.

25         Mr. Mohamadi, please come to the podium, sir.

R.A. Bryan - Cross

256

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  You have had a half an hour now, or

3   almost a half an hour to talk to your counsel about potential

4   further cross-examination questions.  And have you done so?

5           THE DEFENDANT:  Yes, Your Honor, I have attempted to

6   do that.

7           THE COURT:  All right.  And based on your

8   conversation with your attorneys, how do you want to proceed

9   at this time?

10          THE DEFENDANT:  If it's possible, I would like to

11  cross-examine this witness.  Just this witness, but if the

12  Court will allow me, that is.

13          THE COURT:  Well--

14          THE DEFENDANT:  But if not, I would like them to

15  read my questions.

16          THE COURT:  You want them to read your questions?

17  Have you finished writing out your questions?

18          THE DEFENDANT:  Yeah, I just have two more questions

19  and that's it, but--  I can just provide what I have now

20  because I know the Court doesn't have time.

21          Your Honor, I just want to express that I truly,

22  truly do appreciate the importance of trial, this is my

23  constitutional right to have a trial.  And I understand how

24  important this is.  And I just want to make sure the necessary

25  facts are related.  Whether they get allowed or not allowed,

R.A. Bryan - Cross

257

1    that's up to the Court's discretion.  I just want to make sure

2    that the attempt was made.

3              THE COURT:  All right.  Have a seat.  What--  Have

4    you gone over the questions?  I mean--

5              MR. COREY:  As best we can, Your Honor, yes.

6              THE COURT:  Well, why don't you try and ask the

7    questions.  He is fully aware of--  Well, Mr. Mohamadi has

8    significant experience in this stage, the trial parameters.

9    He has gone through the state robbery trial.  He is aware of

10   the consequences of asking questions which may not get an

11   answer that he thinks he is going to get.

12             And he clearly is not competent to understand

13   completely what the rules of evidence are, but he certainly

14   understands that he wants to undermine the credibility of Mr.

15   Bryan.  And he is asking questions which he hopes will do

16   that.  And--

17             MR. NACHMANOFF:  Your Honor, we will certainly

18   endeavor to do that.  I guess I feel obliged to put on the

19   record that we are placed in a very difficult ethical

20   position.  Which is, to the extent we are given questions and

21   it is our judgment that those questions would harm his

22   defense, being the ones to ask those questions really places

23   us in almost an impossible position that would make us party

24   to being ineffective as opposed doing our jobs to defend him

25   under our ethical rules.

R.A. Bryan - Cross

258

1          THE COURT:  And you have told him that.  And if he

2    still insists on the questions being asked, then he is doing

3    so at his own peril and you are only doing it at his request

4    and at the direction of the Court.

5          So, I don't think that he can then argue down the

6    road that you were ineffective in any way for having asked the

7    questions that he demanded that you ask.

8          MR. NACHMANOFF:  Well, let me be clear.  We are

9    not--  If he has claims that we were ineffective, we have no

10   problem with that, that's not our intention.  We are trying to

11   help Mr. Mohamadi.  We will continue to try to help Mr.

12   Mohamadi.  What we don't want to do is be a party to harming

13   him if it conflicts with our ethical obligations.

14         THE COURT:  All right.  It is a most difficult

15   position to be in, but I think the questions should be asked

16   by counsel at this stage versus Mr. Mohamadi.  One, because

17   they can be, questions can be formed in perhaps a more

18   structured nature given that it is cross-examination.

19         And, two, the jury has seen you as counsel up to

20   this date.  And if you are going to continue as counsel,

21   because I have not had a request that Mr. Mohamadi represent

22   himself although given the opportunity to tell me that, then

23   the continuity purposes, for purposes of continuity, I think

24   we should have counsel ask the questions.

25         Mr. Mohamadi, you understand that these questions,

R.A. Bryan - Cross

259

1    they may be improper under the rules of evidence.  If they

2    are, there is going to be an objection made for whatever

3    reason.  I am going to rule on the objection and we are going

4    to move to the next question.

5            There isn't going to be a colloquy back and forth.

6    The Federal Rules don't work that way.  You make an objection,

7    relevance, I rule on it.  And you have got to behave while

8    this is going on or you are going to be excluded.

9            THE DEFENDANT:  Can I just say one thing, Your

10   Honor?

11           THE COURT:  Yes, sir.

12           THE DEFENDANT:  Your Honor, as everyone knows, I am

13   not an attorney.  So, maybe I didn't form the questions

14   correctly in the amount of time I have had to write these

15   down, it was a bit of a rush.  I might not have put them in

16   the proper legal form.  I would just like that the context of

17   the question be addressed in a proper legal form.

18           In that sense, when they read the question the way I

19   wrote it and it is not proper because of the way it is

20   presented, I would ask the attorney to adjust it then after

21   the Court has ruled that is not proper, to form it then into

22   the proper context to ask the question that I am trying to

23   intend to get out of him.

24           I don't want them to just read that question and

25   because I didn't form it in a legal form, it will be denied,

R.A. Bryan - Cross

260

1    and then I am deprived of getting an answer to that question.

2           THE COURT:  I understand.

3           THE DEFENDANT:  I would ask that after being denied,

4    that they at least just be given an opportunity to adjust it

5    in a legal manner to ask that question.

6           And I understand I can't ask certain questions

7    regarding certain type of testimony and certain type of stuff,

8    I understand that, but I don't think I put it in exactly the

9    proper legal form, but I think the questions that I am asking

10   are very relevant to my case.  And I would wish that my

11   attorney would address as to why they are so relevant.  That's

12   why I asked Mr. Nachmanoff--

13          THE COURT:  Okay.  I have got it.

14          THE DEFENDANT:  It would be difficult for them to

15   ask these questions because they don't know what the

16   intentions are or--  Like, for example, I would know it would

17   be for plan or motive, for knowledge or something.  They

18   wouldn't know what it is for and they wouldn't be able to

19   answer the Court as why they were asking this question,

20   whether it is for the truth of the matter asserted or for

21   what.

22          So, that's the dilemma that I am in right now.  But

23   if I had had the ample opportunity where the attorney was

24   coming to visit with me and speak to me and we were able to,

25   you know, talk and discuss these issues and not have to do

R.A. Bryan - Cross

261

1    this in trial, this issue wouldn't be presented in front of

2    you.

3               THE COURT:  All right.  All right.  Well, that's why

4    I want counsel to ask the questions is because they can turn,

5    as I have just said, they can turn what you have written and

6    place it in a form where it's not objectionable for form

7    basis.

8               So, all right, have a seat.

9               THE DEFENDANT:  I thank the Court for its patience.

10              THE COURT:  All right.  Who is going to continue the

11   cross-examination with these questions?

12              Mr. Corey, are you going to do that?  Or, Mr.

13   Nachmanoff, are you going to do that?

14              MR. NACHMANOFF:  Your Honor, frankly, I think I

15   should take over this matter under these conditions.  But I am

16   fully willing to try to put these questions into a proper

17   form, but I must tell the Court that being given questions as

18   they are being written doesn't really provide an opportunity,

19   a meaningful opportunity to be able to do that.

20              THE COURT:  Well, do you want to take ten minutes

21   now and go over these questions?

22              Mr. Nachmanoff, do you want ten more minutes to go

23   over these questions and do that?

24              MR. NACHMANOFF:  Certainly, Your Honor.

25              THE COURT:  All right.  Then tell me when you are

R.A. Bryan - Cross

262

1    ready.  If you need 15, take 15.  But we are not going--

2         Mr. Mohamadi, as is absolutely clear from all of our

3    conversations over the last almost a year now, you are never

4    going to be satisfied that you have had ample time to prepare

5    for trial.  And I understand that that's never going to

6    change, and I understand your frustration about it.

7         But you have had months and months and months where

8    you knew who the witnesses were going to be.  You have had

9    available discovery.  You have done a tremendous amount of

10   investigation on your own and research on your own.  And as

11   you have indicated, come up with cross-examination questions

12   on many different occasions.  And I have listened to you

13   during the course of the last several days.  I realize your

14   level of frustration is high and you do not believe this

15   proceeding is fair to you.

16             THE DEFENDANT:  Constitutional.

17             THE COURT:  But it's going forward.

18             THE DEFENDANT:  I understand.

19             THE COURT:  And we will do the best we can to work

20   with you, but you need to understand this proceeding is going

21   forward --

22             THE DEFENDANT:  I understand that.

23             THE COURT:  -- with you, without you.  And you write

24   these questions out.  If there are other witnesses, you give

25   them to your counsel in advance.  And we are not going to have

R.A. Bryan - Cross

263

1    delayed disruptions of this trial going forward.

2              All right.

3              THE DEFENDANT:  That's not my intention, Your Honor.

4              THE COURT:  All right.  Then we will take a brief

5    recess to allow counsel to review those questions.  All right.

6              NOTE:  At this point a recess is taken; at the

7    conclusion of which the case continues in the presence of the

8    jury and the absence of the witness as follows:

9    JURY IN

10             THE COURT:  All right.  Let's get Mr. Bryan, please.

11             NOTE:  The witness returns to the courtroom.

12             THE COURT:  Mr. Nachmanoff, resume cross-examination

13   at this time, sir.

14             MR. NACHMANOFF:  Thank you, Your Honor.

15   BY MR. NACHMANOFF: (Continuing)

16   Q.   Mr. Bryan, on direct you stated that you were going to be

17   released in November, is that right?

18   A.   Yes.

19   Q.   November 2008?

20   A.   Yes.

21   Q.   And I think the date was November 17, is that right?

22   A.   Yes.

23   Q.   Okay.  And you were in fact released on that date, right?

24   A.   Yes.

25   Q.   And you told Mr. Mohamadi that you were going to be

264

1  released before you were released in your conversations with

2  him, is that right?

3  A.   I am sorry, come again.

4  Q.   In the jail when you were talking with Mr. Mohamadi, you

5  told him that you were going to be released in November,

6  right?

7  A.   Yes.

8  Q.   Okay.  Now, at that time you testified on cross just

9  before the break that there was this detainer from D.C.,

10 right?

11 A.   Yes.

12 Q.   And you said it is still out there somewhere?

13 A.   Yes.

14 Q.   Is that right?

15 A.   Yes.

16 Q.   That means you haven't served the time in D.C.?

17 A.   No.

18 Q.   Okay.  So, you are just walking around, is that right?

19 A.   Well, I have actually served time in D.C., but since I

20 violated probation I am going to have go back.

21 Q.   Right.  And that's what the detainer means, right?

22 A.   Yes.

23 Q.   That's a document --

24 A.   Yes, yes.

25 Q.   -- that means you should be spending time in jail?

R.A. Bryan - Cross

265

1   A.   Well, that's up to the judge.  I am not sure yet because

2   it's not that big.

3   Q.   Right.  But for some reason you walked out of jail on

4   November 17, 2008?

5   A.   Well, yes.  D.C. actually won't pick up people that have

6   misdemeanor charges for D.C.  I even actually asked the

7   counselor if I can get it taken care of so I get it sent over

8   there--

9   Q.   You were telling her you wanted--

10          MR. WALUTES:  Objection, Your Honor.  We ask the

11   witness be allowed to finish his answer.

12          THE COURT:  Just wait--

13   A.   I actually asked the counselor if I can be sent over

14   there so I can go ahead and get this stuff over with.  And she

15   said that they won't come pick me up from D.C. to Alexandria,

16   they won't come pick me.

17   BY MR. NACHMANOFF: (Continuing)

18   Q.   You wanted to get it taken care of?

19   A.   Yes.

20   Q.   That was November 2008?

21   A.   Yes.

22   Q.   And you wanted to get that taken care of because you knew

23   you had to serve some time in D.C.?

24   A.   Yes.

25   Q.   You haven't served that time yet?

R.A. Bryan - Cross

266

1    A.    No.

2    Q.    So, you didn't care enough to go across to D.C. and serve

3    it?

4    A.    Well, it's not that I don't care, but I wanted to have

5    this taken care of.

6    Q.    What's this?

7    A.    Well, this whole situation, this case.

8    Q.    You've been waiting to resolve this matter before you go

9    to D.C. to serve your time?

10   A.    Yes.

11   Q.    So, you also testified on direct that Mr. Mohamadi

12   trusted you because he was a Muslim, is that right?

13   A.    I guess so.  I didn't--

14   Q.    Well, was that your testimony?

15   A.    I can't really remember that that's why he trusted me,

16   saying that's why he trusted me.  But if I did, then--

17   Q.    I am talking about your testimony from yesterday.

18   A.    Oh, no, the relation that we had was that we were

19   Muslims.  I didn't say that he trusted me because I was one.

20   Q.    So, your understanding was that he was Muslim?

21   A.    Yes.

22   Q.    Do you have any problems with Mr. Mohamadi?

23   A.    No.

24   Q.    Now, you worked together in the kitchen, is that right?

25   A.    Yes.

R.A. Bryan - Cross

267

1    Q.    That is kind of a special job, trustee?

2    A.    Yes.

3    Q.    So, if you do well in jail, you get to work in the

4    kitchen?

5    A.    Yeah.  Some people get in trouble and they still get to

6    go down there to the kitchen.

7    Q.    And when you work in the kitchen, it gives you a lot of

8    access to food that maybe other people don't get?

9    A.    Yes.

10   Q.    Was there an incident involving food that was taken out

11   of the kitchen when it wasn't supposed to be?

12   A.    I have done that a couple of times.

13   Q.    So, when you were working in the kitchen, you broke the

14   rules?

15   A.    Yes.

16   Q.    And you took food out when you weren't supposed to?

17   A.    Yes.

18   Q.    And do you remember an incident where you got in trouble

19   for that?

20   A.    Yes.

21   Q.    And do you remember an incident with Mr. Mohamadi?

22   A.    That I don't remember.

23   Q.    In which he took the fall for you taking food out?

24   A.    Actually, actually I was sent up to administrative block

25   for that.  So, I actually went up there and--

R.A. Bryan - Cross

268

1   Q.   So, there was more than one time when you got in trouble

2   for taking food out?

3   A.   No, because I believe that was the only time I was sent

4   up to the administrative block.

5   Q.   Isn't it true there is bad blood between you because of

6   what happened in the kitchen?

7   A.   Bad blood between--

8   Q.   You and Mr. Mohamadi.

9   A.   No.

10  Q.   What were the hours that you worked in the kitchen?

11  A.   Well, in the beginning I worked in the morning shift.

12  And in the evening I worked--  I mean, towards the end of my

13  stay I worked in the evenings.  So, it was about from 1 to I

14  think 8 o'clock or 7.

15  Q.   And what were your duties?

16  A.   Oh, I had a few duties.  Sometimes I prepped food.

17  Sometimes I--  I would just help around, actually.  I was what

18  they call a floater.

19  Q.   Was that Mr. Mohamadi's job too?

20  A.   I can't really remember what Mr. Mohamadi's job was.

21  Q.   But you were on the same shift?

22  A.   Yes.

23  Q.   Now, you remember testifying in the state trial?

24  A.   Yes.

25  Q.   Okay.  That was December of 2008?

R.A. Bryan - Cross

269

1    A.    Yes.

2    Q.    You remember talking about in the state trial, that you

3    met with Mr. Mohamadi in your cell and got information from

4    him?

5    A.    That I had him in my cell?

6    Q.    Right.

7    A.    Well, he moved into my cell.

8    Q.    Was that during the time that you were working in the

9    kitchen?

10   A.    Yes.

11   Q.    Okay.  Now, while you were working in the trustee block,

12   did you discuss the problems that your mother was having with

13   drugs and owing money to the Government and her paychecks

14   being garnished and things like that?

15   A.    Well, I didn't say anything about her using drugs, but I

16   did say that, you know, she did have some problems with the

17   IRS.

18   Q.    And did you also tell Mr. Mohamadi while you were in the

19   trustee block together that one of your cousins threw away all

20   of your clothes?

21   A.    Yes.  Most of them, yes.

22   Q.    You lost almost all of them?

23   A.    Well, yeah, most of them.

24   Q.    Okay.  And did Mr. Mohamadi tell you he was going to give

25   you some money to help get you on your feet when you got out?

R.A. Bryan - Cross

270

1   A.   No.

2   Q.   Didn't you offer to help Mr. Mohamadi with his upcoming

3   trial because you told him you were getting out and when you

4   were out you could help him do something?

5   A.   No.  I just said that I would think about it.  And that

6   was out of fear.  I had a little bit of time left and I did

7   not want to get caught up with a fat eye on the way out or

8   anything.

9   Q.   Wait a second.  On direct you testified the jail wasn't

10  such a tough place, didn't you?

11  A.   Well, yeah.

12  Q.   You said it wasn't a war zone I think on cross earlier?

13  A.   Yes, I said that.

14  Q.   Now you're telling me that you were worried about getting

15  a fat eye?

16  A.   Yes.

17  Q.   Does that mean that you were worried about getting

18  punched?

19  A.   Or getting beat up or whatever, whatever the case may be.

20  Q.   Because that happens sometimes in jail?

21  A.   Yeah, it does happen sometimes, yeah.

22  Q.   In fact, that happened to you while you were in jail in

23  Alexandria, didn't it?

24  A.   No, he didn't touch me.

25  Q.   Not Mr. Mohamadi.  You were punched by another inmate,

R.A. Bryan - Cross

271

1   weren't you?

2   A.   Yes, yes.

3   Q.   So, jail is a pretty tough place, isn't it?

4   A.   Depends, really.  It's not as--  It's not a war zone,

5   but--

6   Q.   On that date it must have been pretty tough?

7            MR. WALUTES:  Objection.  Which day?

8   Q.   The day he got punched in the face.

9   A.   It wasn't in the face.

10  Q.   You testified on direct that you met with Vic Castro and

11  Tom Buckley, is that right?

12  A.   Yes.

13  Q.   That was November 7, 2008?

14  A.   Yes.

15  Q.   Okay.  You then spoke to Mr. Mohamadi after that, right?

16  A.   Yes.

17  Q.   And the tape recording that was played yesterday was on

18  November 12 when you were wired, right?

19  A.   Yes.

20  Q.   When you were acting as an agent for the Government,

21  right?

22  A.   Yes.

23  Q.   Okay.  But after November 7 you spoke with Mr. Mohamadi

24  on November 8, 9th, 10th?

25  A.   I tried to avoid him as much as possible, but a few words

R.A. Bryan - Cross

272

1    here and there.

2    Q.   My question was, you talked with him on November 7, 8th,

3    9th and 10th, right?

4    A.   Yes.

5    Q.   And those weren't recorded, right?

6    A.   Yes.

7    Q.   And that was the point at which on November 7 Agent

8    Castro told you to collect information about Mr. Mohamadi,

9    right?

10   A.   No.  I wasn't supposed to--  I was avoiding him so he

11   wouldn't say anything without me being wired.

12   Q.   Why?  They didn't trust you?

13   A.   Well, I mean, I don't know the procedure, but, I mean, I

14   don't know how--  I was just following orders.

15   Q.   Where were you housed during those days, November 7, 8th,

16   9th, 10th?

17   A.   The fourth floor, I think 4AB I think it was.  4G, sorry,

18   4G.

19   Q.   4G?

20   A.   Yes.

21   Q.   And where was Mr. Mohamadi housed during those days

22   before the recording?

23   A.   Before the recording?  Well, he was in 4AB, the

24   administrative side, and then he was moved over to 4G, I don't

25   remember exactly what day or anything, but--

R.A. Bryan - Cross

273

1    Q.    So, on November 7 when you went to speak to Agent Castro

2    and Detective Buckley, you testified on direct that the reason

3    you did that was because Mr. Mohamadi had already talked to

4    you about this supposed murder for hire plot, right?

5    A.    Yes.

6    Q.    And when was that before November 7?

7    A.    Maybe like a week-and-a-half, couple weeks, I think.  I

8    can't really remember.  It wasn't long before.

9    Q.    So, maybe the beginning of November?

10   A.    Yeah, maybe.

11   Q.    And before November 7 when you met with the agents, had

12   you agreed to carry out this supposed plot?

13   A.    No.

14   Q.    But when you went and talked to Agent Castro and

15   Detective Buckley, you gave them a lot of details, right?

16   A.    Well, yeah, I gave them details, but it wasn't,

17   obviously, enough.

18   Q.    Well, you say it wasn't enough because they sent you back

19   in there with a wire?

20   A.    I guess.  I don't--

21   Q.    Well, you tell me.

22   A.    I mean, I did tell them details, but it wasn't as

23   detailed until--  You can obviously hear it.

24   Q.    Well, they told you as part of their instructions that

25   they wanted you to get that information that you had already

R.A. Bryan - Cross

274

1  obtained but now on tape, is that right?

2  A.   Yes, yes.

3  Q.   And yet you said you hadn't agreed to do the murder for

4  hire plot?

5  A.   Yes.

6  Q.   But somehow you had collected all this information?

7  A.   Yes, because he was basically talking straight into my

8  head.

9  Q.   Did you lie to the Government regarding this operation?

10 A.   No, sir.

11 Q.   Well, on cross earlier you admitted and on direct that

12 you lied, you lied in jail, right?

13 A.   Yes, I have lied in jail.

14 Q.   And part of the reason you lied was at the direction of

15 the Government, they told you to lie, right?

16 A.   Which situation?  Which time?  What are you--  Can you

17 just come again with that, please.

18 Q.   Well, on November 7 when you met with Agent Castro and

19 Detective Buckley, they told you what to do?

20 A.   Yes.

21 Q.   And they wanted you to collect information from Mr.

22 Mohamadi, right?

23 A.   Yes.

24 Q.   And that required you to lie about what you were doing?

25 A.   Yes.

R.A. Bryan - Cross

275

1   Q.   And you did?

2   A.   Yes.

3   Q.   And in fact, we heard on the recordings you said a lot of

4   things, right?

5   A.   Yes.

6   Q.   And lot of them were lies?

7   A.   Yes.

8   Q.   Okay.  So, other than on the recordings, there are other

9   times when you lied in jail too, right?

10  A.   Yes.

11  Q.   In fact, there were other times when you lied to Mr.

12  Mohamadi?

13  A.   Which time?

14  Q.   I am sure there were many times.  That's my question to

15  you.

16            MR. WALUTES:  Objection, Your Honor, as to the

17  commentary.

18            THE COURT:  Yeah, just ask the questions.

19  BY MR. NACHMANOFF: (Continuing)

20  Q.   My question is, isn't it true that there were times when

21  you lied to Mr. Mohamadi that are not recorded?

22  A.   Probably.

23  Q.   And on the recordings, just as you have admitted, there

24  were times when you lied?

25            MR. WALUTES:  Objection, asked and answered.

R.A. Bryan - Cross

276

1          THE COURT:  Let's move on, please.

2     BY MR. NACHMANOFF: (Continuing)

3     Q.   Well, let me be more specific.  You talked about, on the

4     recordings, how you weren't going to use drugs again, didn't

5     you?

6     A.   Yes.

7     Q.   And you did, didn't you?

8     A.   Yes.

9     Q.   You also stated that you weren't going to go back to your

10    old neighborhood and hang out with gang member friends, right?

11    A.   Yes.

12    Q.   And that's not true either, is it?

13    A.   No, I haven't been back to my neighborhood.

14    Q.   Isn't it true that in May of 2009 when you had the

15    marijuana and the cocaine, you told the agents that one of the

16    reasons you were upset is because you had gone back to your

17    old neighborhood and you had gotten in trouble for

18    cooperating?

19    A.   No.

20    Q.   Didn't you say that you were upset because you felt bad

21    that you had cooperated and you had been given a hard time by

22    your old friends and family?

23    A.   Well, I am not upset that I am cooperating or anything.

24    Q.   That's not my question.  Let me ask it again.

25          In May when Agent Castro traveled all the way up to

R.A. Bryan - Cross

277

1    Pennsylvania to see you--

2    A.   Yes.

3    Q.   You told him that you had had a problem when you got out

4    of jail?

5    A.   Well, I wasn't in my old neighborhood.  I was actually

6    living that way, in Fairfax.

7    Q.   Well, let me be specific.  Did you have a hard time when

8    you got out of jail because you had cooperated?

9    A.   It's not that I--  Well, yeah, people were talking about

10   me, yeah, I guess in that aspect I was having a hard time.

11   Q.   So, the answer is yes?

12   A.   Yes.

13   Q.   And it made you feel bad?

14   A.   Well, yes, that's my family.

15   Q.   And in fact, that was one of the reasons you explained to

16   the agents that you had fallen off the wagon and had the

17   marijuana and cocaine, right?

18   A.   Yes.

19   Q.   Okay.  When you were meeting with Mr. Mohamadi during the

20   visits to the jail, did you exchange notes with him to

21   communicate?

22   A.   Yes.

23   Q.   Now, on direct you were asked about talking with him

24   using code words, right?

25   A.   Yes.

278

1    Q.   You don't really need to use code words if you can just

2    hold up a piece of paper, do you?

3    A.   Yes.

4    Q.   Now, you testified earlier on cross and on direct that

5    you had never been an informant for the Government before, is

6    that right?

7    A.   Yes.

8    Q.   And when you testified at the state trial, you also said

9    that you had never been an informant before, right?

10   A.   Yes.

11   Q.   And that was under oath, just like you are under oath

12   now?

13   A.   Yes.

14   Q.   But you have previously worn a wire and received

15   instructions from law enforcement, haven't you?

16   A.   Yes.

17   Q.   And in fact, when you testified in December of 2008, you

18   had been cooperating with Agent Castro just three weeks

19   earlier, hadn't you?

20   A.   Yes.

21   Q.   So, that was a lie, wasn't it?

22   A.   Yes.

23   Q.   And it was under oath, wasn't it?

24   A.   Yes.

25   Q.   Earlier you talked about deciding to go to the

R.A. Bryan - Cross

279

1   authorities about this supposed murder for hire plot, right?

2   A.   Yes.

3   Q.   And you said you had never cooperated before, so you

4   didn't know who to go to, right?

5   A.   Yes.

6   Q.   And that you talked to somebody, somebody.  You didn't

7   tell us what his name was.  What was that guy's name?

8   A.   Well, I told you I didn't remember the person's name.

9   Q.   You can't remember his name, you just know there was a

10  guy that told you?

11  A.   Yes.

12  Q.   And he told you that Vic Castro was the guy to go to?

13  A.   No.

14  Q.   What did he tell you?

15  A.   That he would try to get somebody to talk to me, but he

16  didn't tell me a name or anything.

17  Q.   Okay.  And you were then asked the question, well, how

18  did you get to Mr. Castro and Mr. Buckley.  And you said they

19  appeared.  Is that right?

20  A.   Yes.

21  Q.   So, was that by magic?

22  A.   I don't know.  No magic.

23  Q.   You don't know how they showed up?

24  A.   They walked in the building.  I don't know how they

25  showed up, but they showed up.

R.A. Bryan - Cross

280

1   Q.   Well, let me get this straight.  You think they walked in

2   the building and decided to come see you just as a happy

3   coincidence?

4   A.   Well, no, earlier I had said that somebody got them to

5   come in, I guess, or asked.  I don't know, I am the one that

6   asked for help and--

7   Q.   You asked another inmate to find you somebody to talk to?

8   A.   Well, I didn't ask him to find somebody.  I just told him

9   that I was in a rut.  And then--

10  Q.   Let me get this straight.  You decided that this thing

11  was so important that you needed to talk to the Government

12  about it, is that right?

13  A.   Yes.

14  Q.   And you had never cooperated before?

15  A.   No.

16  Q.   And your family doesn't like cooperation?

17  A.   The majority, no.

18  Q.   And your neighborhood.  So, you really don't like

19  cooperating?

20  A.   No.

21  Q.   Okay.  And so, you have didn't know who to talk to?

22  A.   No.

23  Q.   And you decided to just trust in another inmate in the

24  Alexandria Detention Center?

25  A.   It was probably very foolish, but, yes.

R.A. Bryan - Cross

281

1    Q.    Because in the jail if you are known to be cooperating,

2    that's not a good thing, right?

3    A.    Well, that person was supposedly cooperating.

4    Q.    Okay.  So, that person maybe was cooperating and you

5    thought he could help?

6    A.    Yeah.

7    Q.    So, you put your trust in him?

8    A.    Well, I didn't trust him.  I was still very shaky.

9    Q.    And then these agents appear.  And you assumed that this

10   guy contacted them and they happened to be the right people on

11   a murder for hire plot to come talk to you?

12   A.    I guess so.

13   Q.    So, your testimony under oath today is that you didn't

14   call Vic Castro?

15   A.    Yes, I did not call him.

16   Q.    You didn't call Detective Buckley?

17   A.    I did not call Detective Buckley.

18   Q.    And I believe, and correct me if I am wrong, that you

19   testified you thought about going to a white shirt, and that's

20   like--

21   A.    Yes, a shop sergeant or a lieutenant.

22   Q.    Sergeant or lieutenant.  But you didn't do that?

23   A.    But I didn't, know.

24   Q.    So that these people just appeared out of nowhere?

25   A.    They came from somewhere.

R.A. Bryan - Cross

282

1    Q.    And you want the jury to believe that?

2    A.    Well, yes.

3    Q.    Okay.  Isn't it true that you helped in another

4    undercover operation in order to try to get somebody else some

5    benefit?

6    A.    No.

7    Q.    Isn't it true that that inmate was Ibrahim Hamed?

8    A.    Well, I didn't do that, but I know that name.

9    Q.    Have you been paid by other inmates to give information

10   to the ATF?

11   A.    No.

12   Q.    Now, you claimed on direct that you were offered a high

13   position in the prostitution operation, is that right?

14   A.    Yes.

15   Q.    And you don't have any evidence to support that this

16   prostitution operation really existed, do you?

17           MR. WALUTES:  Objection, Your Honor.  At this point

18   I am going to ask if we go up to the door, that we go through

19   it.

20           THE COURT:  I have made some previous rulings on the

21   admissibility of certain testimony, and the Court will be

22   prepared to reverse those rulings if you go into this line of

23   questioning.

24   BY MR. NACHMANOFF: (Continuing)

25   Q.    I have one further question.  Well, I would like the

283

1    answer to that question, please.

2              THE COURT:  No.  The question will be struck unless

3    you want to open up an entire new line of questioning.

4              THE DEFENDANT:  Open it up.  Open it up.

5              MR. NACHMANOFF:  Yes, Your Honor, we will pursue

6    that line of questioning.

7              THE DEFENDANT:  Open it up.

8              THE COURT:  Go ahead.

9    BY MR. NACHMANOFF: (Continuing)

10   Q.   Do you remember the question?

11             THE COURT:  Repeat the question, please.

12   Q.   The question was, you testified on direct that you were

13   given this high position, you were offered the opportunity to

14   have this high position in the prostitution business, is that

15   right?

16   A.   Yes.

17   Q.   Okay.  Now, I am asking you what evidence, what evidence

18   was there that you were aware of, other than what Mr. Mohamadi

19   supposedly told you, that this business existed?

20   A.   Well, I can't remember the inmate's name, but he

21   basically destroyed a relationship in there, flipped

22   somebody's female, somebody's girlfriend, and got her to make

23   money for him, you know, turn.

24             And he, like I said, I can't remember the inmate's

25   name, but I remember how crushed he was.  And he is pretty

R.A. Bryan - Cross

284

1    well educated in that trade.

2    Q.   Well, let me see if I understand you.  We talked earlier

3    and you talked on direct, on cross, that people talk a lot in

4    jail, right?

5    A.   Yes, yes.

6    Q.   And people lie a lot in jail, right?

7    A.   Yes.

8    Q.   And sometimes people talk tough in jail, right?

9    A.   Yes, they do.

10   Q.   And even though it is not a war zone, sometimes people

11   get beat up, bad things happen?

12   A.   Yes.

13   Q.   So, you are telling me you heard some information from

14   another inmate about something that supposedly happened on the

15   outside?

16   A.   No, I heard it from Omar.

17   Q.   Well, thank you.  That's my point.  You don't know

18   anything about this prostitution business other than perhaps

19   what you think Omar said, isn't that right?

20   A.   That's what I know what Omar said.

21   Q.   But you don't know if what Omar said is true?

22   A.   100 percent?  No.

23   Q.   You don't know by any percent, do you?

24   A.   Maybe 95.

25   Q.   Now, you have never met with me, have you?

285

1    A.    No.

2    Q.    You have never met with anyone from the defense team,

3    have you?

4    A.    No.

5    Q.    You met with the Government a lot in this case, haven't

6    you?

7    A.    Well, for about a week-and-a-half before I come here I

8    have been talking to them.

9    Q.    A week-and-a-half before today?

10   A.    Yes.

11   Q.    Okay.  And they asked you questions and got you ready for

12   your testimony?

13   A.    Yes.

14   Q.    Did you meet with them more than once?

15   A.    Yes.

16   Q.    How many times?

17   A.    Maybe like four or five.

18   Q.    Four or five times in the last week-and-a-half?

19   A.    Maybe, yeah, maybe four, four or five.  I can't remember

20   the exact number of times.

21          MR. NACHMANOFF:  I have no further questions.  Thank

22   you.

23          THE COURT:  Thank you.  Redirect?

24          MR. WALUTES:  Yes, Your Honor, thank you.

25       REDIRECT EXAMINATION

R.A. Bryan - Redirect

286

BY MR. WALUTES:

Q.   How long is the wire that you wore?  How long are the tapes on November 12 and November 17 total, Mr. Bryan?

A.   A few hours.

Q.   Two hours?

A.   Yeah, like two hours.

Q.   And were you asked to listen to all those tapes?

A.   Yes.

Q.   Were you asked to review transcripts of those tapes?

A.   Yes.

Q.   Were you asked to initial--  Were you asked to actually listen to it twice, one enhanced and once unenhanced?

A.   Yes, I actually listened it more than just twice.

Q.   Okay.  Were you asked to look at the transcripts and make corrections, things that perhaps the court reporter didn't understand?

A.   Yes.

Q.   Were some of the Muslim words used in the discussion between you and Mr. Mohamadi, were they spelled incorrectly?

A.   Yes.

Q.   How much of the time you just said to Mr. Nachmanoff, the four or five times for about a week-and-a-half, how much of that would you estimate was consumed in listening to the wire and trying to make sure that the transcripts were correct, and that the clips, that you could initial them and such?

R.A. Bryan - Redirect

287

1    A.   Probably took up most of the time.

2    Q.   You were asked if you were certain that what Mr. Mohamadi

3    said, actually--  You said that you know that he flipped

4    somebody.

5         I am sorry, just in case everybody in the courtroom

6    might not know what a flip is, what does a flip mean as you

7    used it when you were asked if you had ever seen anything that

8    Mr. Mohamadi had done that led you to believe that his

9    discussions were about, were really about prostitution?

10   A.   Well, he, I guess through visitation, talked--

11        MR. NACHMANOFF:  Objection, the answer included the

12   word "guess."  It is speculation.

13        THE COURT:  Well, the question was what did you mean

14   when you used the word "flipping"?  So, let's start there.

15        THE WITNESS:  Okay.  He convinced someone's

16   girlfriend into prostituting for him on the outside.

17        THE COURT:  All right.  She went from somebody

18   else's girlfriend to working for Mr. Mohamadi, is that what

19   you are saying?

20        THE WITNESS:  Yes, yes.

21        THE COURT:  All right.  Ask your next question.

22   BY MR. WALUTES: (Continuing)

23   Q.   Did you have discussions about that with Mr. Mohamadi?

24   A.   Well, yes.

25   Q.   Did you also have discussions about that with the other

R.A. Bryan - Redirect

288

1    inmate whose girlfriend was being flipped?

2    A.   Yes, a couple of times, but it was very short.  He was

3    kind of, didn't really talk too much because of that.

4    Q.   Did you see the way it impacted the other inmate?

5    A.   Yes.

6    Q.   Did that lead you to believe that Mr. Mohamadi when he

7    talked about prostitution knew what he was talking about?

8    A.   Yes.

9    Q.   Did it lead you to believe that Mr. Mohamadi really did

10   have prostitutes?

11   A.   Yes.

12   Q.   What did you think about that?  Personally, not about--

13           MR. NACHMANOFF:  Objection.  What he thinks about it

14   is irrelevant.

15           THE COURT:  I will allow the question.  I assume

16   there is a follow-up to this.  Go ahead.  You can answer the

17   question.

18   A.   What do I think about that?  I don't know.  I mean, I

19   think it's dirty.  I have got a sister and a mother.  That's

20   about all I did really think about it.

21   BY MR. WALUTES: (Continuing)

22   Q.   And yet you wore a wire and talked to Mr. Mohamadi in

23   great detail about prostitution, didn't you?

24   A.   Yes.

25   Q.   And some of the things you said, were they troubling to

289

1    you personally?

2    A.    Yes.

3    Q.    Well, why did you do that?

4    A.    I had to, I guess, be on his level so that he would be

5    able to talk to me and feel comfortable enough to talk to me.

6    Q.    The point I want to make, Mr. Bryan, is did you have to,

7    or do you feel--  Why did you decide to help federal agents?

8    A.    Like I said yesterday, I just, I was just getting out and

9    I just could not believe that God was putting something like

10   this in front of me.  And I knew, I knew what I had to do, but

11   I was just shaky about doing it because it was my first time

12   ever.

13          And I just, you know, if that would have gone

14   through, I would have felt like trash.

15   Q.    You say gone through, what are you talking about?

16   A.    The hit.  If it would have been, if he would have gotten

17   somebody else to do that would have really have done it, I

18   mean, anybody would have felt sick if you didn't say anything,

19   you know.

20   Q.    Do you remember the questions that Mr. Nachmanoff just

21   asked you about your testimony in the state in December of

22   2008?

23   A.    Yes.

24   Q.    Have you had an opportunity to read over that transcript?

25   A.    Yes.

290

1    Q.    Okay.  Do you remember, were you permitted in that trial

2    to talk about the murder for hire?

3    A.    No.

4    Q.    Were the tapes that, the wire that you had worn, was that

5    permitted to be played for the trial, the jury?

6    A.    No.

7    Q.    So, they never got to hear about the murder for hire?

8    A.    No.

9    Q.    Okay.  What were you allowed to testify to?

10   A.    Just about the robbery.

11   Q.    And that's it?

12   A.    That's it.

13   Q.    How long were you actually even on the stand?

14   A.    Maybe ten minutes.

15   Q.    Okay.

16   A.    Maybe.

17   Q.    That was something somebody else told you?  It wasn't

18   like you were trying to mislead anyone?

19   A.    Yeah.  I wasn't trying to mislead.

20   Q.    And if I could ask, do you remember what your testimony

21   was in that ten minutes or so about what you said in that

22   courtroom about whether you had ever been an undercover for

23   the law enforcement?

24   A.    The exact words, I can't really remember.  I'm sorry.

25   Q.    If I gave you a copy of the transcript, would you be able

R.A. Bryan - Redirect

291

1   to see the exact words?

2   A.   Yes.

3           MR. WALUTES:  Your Honor, at this time I would ask

4   for it to be permitted, I don't know if the Court wants me to

5   tab it or if the Court wants me to give him the entire

6   transcript.

7           THE COURT:  Direct him to the portion you want him

8   to look at.

9           And see if that refreshes your recollection.

10  BY MR. WALUTES: (Continuing)

11  Q.   Do you have it in front of you, Mr. Bryan?

12  A.   Yes.

13  Q.   Okay.  Now, December 8 of 2008 on page 145--

14          MR. NACHMANOFF:  Your Honor, I object.  If you are

15  trying to refresh recollection, I think the appropriate thing

16  to do is ask him after he reads it if his memory has been

17  refreshed.

18          THE COURT:  Do you want him to read the whole

19  transcript, is that what you want?

20          MR. NACHMANOFF:  No, Your Honor.  If he is just

21  directing him to the spot, I have no objection.

22          THE COURT:  I think that's what he is doing.

23          MR. NACHMANOFF:  I apologize.

24          THE COURT:  No problem.

25  BY MR. WALUTES: (Continuing)

R.A. Bryan - Redirect

292

1    Q.   If I could direct your attention to page 145, Mr. Bryan,

2    and ask if you would look at the area of line 18.  I don't

3    mean to limit your review to just that line, but if you could

4    look a couple above and a couple below.

5    A.   Okay.

6    Q.   And ask if that refreshes your mind as to the exact

7    testimony you gave to the trial jury in Alexandria under the

8    constraints you have just discussed as to whether you had ever

9    been an undercover before?

10            Does that refresh you as to what the exact words

11   were?

12   A.   Yes.

13   Q.   Okay.  Could you tell us now what the exact words were of

14   your testimony under oath before a jury in Alexandria on

15   December 8 of 2008?

16            What was the question you were asked?

17   A.   Now, have you ever operated as an informant for law

18   enforcement.

19   Q.   What was your answer?

20   A.   No.

21   Q.   If I could now direct your attention to page 149 and the

22   cross-examination now.  Earlier is the state asking you that

23   question.

24            But if I could ask you to look at page 149 and

25   direct your attention to the area of line 5.  Again, if you

R.A. Bryan - Redirect

293

1    would look a couple before and a couple behind just to make

2    sure that refreshes your memory.

3    A.    I have it.

4    Q.    Okay.  What, if any, question--  Does this refresh your

5    memory?

6    A.    Yes, a little bit.

7    Q.    What was the question, the exact question that the

8    defense attorney asked you under oath in front of a jury in

9    the Commonwealth on December 8 of 2008?

10   A.    And you say that you never worked, you never worked or

11   never worked as a paid informant for the Police Department.

12   Q.    And what answer, if any, did you give?

13   A.    Once again, no, I didn't.

14   Q.    Okay.  Now, if I could ask you to look through the rest

15   of that transcript.  Do you ever again in that transcript

16   discuss whether you had ever acted as an undercover agent for

17   any law enforcement in your life?

18           If you could look through the entire transcript of

19   that 10 or 15-minute appearance and see if there is any other

20   discussion in that transcript about ever having acted or

21   helped law enforcement ever in your life?

22   A.    No.

23   Q.    Okay.  And so, I guess the confusion I have is, when Mr.

24   Nachmanoff just asked you a question whether you lied in the

25   state trial, I am asking you what is it in that testimony that

R.A. Bryan - Redirect

294

1    was a lie?

2    A.    I am sorry, I didn't lie.

3    Q.    Now, if I could move to the questions you were just asked

4    about why you thought the defendant might be a Muslim.

5            Do you remember that question?

6    A.    Yes.

7    Q.    Okay.  Does it make a difference who the inmate who was

8    asking you to do a murder?

9    A.    No, it doesn't make a difference.

10   Q.    If it had been a Christian or an atheist, would it have

11   made any difference?

12   A.    No.

13   Q.    Would you still have tried to help the cab driver?

14   A.    Yes.

15   Q.    Okay.  Why exactly did you think that Mr. Mohamadi might

16   be Muslim?

17   A.    We went to jumu'ah.

18   Q.    I am sorry, you have to explain.

19   A.    Jumu'ah prayer.  It's Islamic services for Friday.

20   Q.    Does the Alexandria Adult Detention Center actually make

21   available to anybody who may be an inmate or a guest different

22   types of religious services?

23   A.    Yes.

24   Q.    Okay.  So, when you are in the Alexandria Jail, do you

25   have the opportunity to exercise your right to follow whatever

R.A. Bryan - Redirect

295

1   religion you may be?

2   A.   Yes.

3   Q.   Did you exercise that right while you were in the

4   Alexandria Jail?

5   A.   Yes.

6   Q.   Okay.  When you were going to services for your faith,

7   did you see others in those services?

8   A.   Yes.

9   Q.   It is a group event?

10  A.   Yes.

11  Q.   Did you see this defendant in any of those services?

12  A.   Yes.

13  Q.   Okay.  During the wires that we watched yesterday, were

14  there some terms that are unique to the Muslim faith as you

15  understand it?

16  A.   Yes.

17  Q.   Okay.  Did this defendant use those terms?

18  A.   Yes.

19  Q.   Did that suggest to you that he may be familiar with the

20  faith?

21  A.   Yes.

22  Q.   If he wasn't Muslim, would it make a difference to you?

23  A.   No.

24  Q.   I am sorry, you were asked a lot of questions.  A couple

25  of them I want to give you an opportunity to explain just so

296

1    we can understand what was going on.

2            Somebody punched you, is that correct?

3    A.   Yes.

4    Q.   What was that about?

5    A.   Well, I was working out.  And a guy was sitting right

6    here.  And it's universal weights, so I can't really move out

7    of the way.  And I rubbed on his back, you know.  And he made

8    a big deal out of it.  And I tried to walk away.  So, that's

9    why he didn't punch me in my face.  He actually-- He didn't

10   necessarily connect fully.  He just got me in the back of my

11   head because I was walking away towards the deputy's desk.

12   And then when the deputy came around, he was already walking

13   away, and I just didn't, you know, I didn't say anything.  I

14   just went back to the cell.  And then they came in and talked

15   to me.

16   Q.   Did you actually press charges or anything?

17   A.   No.

18   Q.   Why not?

19   A.   I am not really sure, you know.  I just-- I am not

20   really sure.  I think I just had a whole bunch of other stuff

21   to really worry about.  I couldn't get moved out of that

22   block.

23   Q.   And do you remember a question about, I am not sure I can

24   find the name, there was a discussion, I think a couple

25   discussions in the cross-examination both before the break and

1    after about a cousin of yours?

2    A.    Yes.

3    Q.    Is his name Portillo?

4    A.    Yes.

5    Q.    Is he someone who admires the fact that you have come

6    forward?

7    A.    No.

8    Q.    Can you explain that?

9    A.    It's just, you know, I love him to death, but he's just,

10   you know, he's just mad, you know.

11   Q.    Why is he mad with you?

12   A.    Because they don't do that, you know.

13   Q.    Don't do what?

14   A.    Tell on people.

15   Q.    Do you remember the questions about your mother?

16   A.    Yes.

17   Q.    And the IRS?  Is your mother a wealthy person?

18   A.    No.

19   Q.    Without telling us where you live now, is it a good

20   place?

21   A.    I want to move, but--

22   Q.    And the money that you were given from ATF, the $700, is

23   that actually reward money?  What was that money for?

24   A.    So, I can eat.  Just for everyday expenses, you know.

25   Q.    And everyday expenses for what?

R.A. Bryan - Redirect

298

1    A.    For being down here and, you know, with this case.

2    Q.    So, when you were asked--

3    A.    Taking my time up, basically, I guess.

4    Q.    So, when you were asked to come down and look at these

5    tapes and initial them and make sure the transcripts had the

6    right words in the right places, is that what the money is

7    being given to you for?

8    A.    Yes.

9    Q.    And you use it for what?

10   A.    For the gas, me coming down here, or whoever gave me a

11   ride, I pay them.

12   Q.    And in fact, because of your--  Well, ATF came to your

13   house last summer, correct?

14   A.    Yes.

15   Q.    Why did they come to your house?

16   A.    Because I violated probation.

17   Q.    Did you stay in contact with them?

18   A.    No.

19   Q.    And at some point they come to see you?

20   A.    Yes.

21   Q.    Did the Probation department come to see you?

22   A.    No.

23   Q.    So, it was the agents that came to see you?

24   A.    Yes.

25   Q.    When they came to see you, did they find drugs?

R.A. Bryan - Redirect

299

1   A.   No.

2   Q.   Did they just ignore that?

3   A.   No.

4   Q.   What did they do when they found drugs?

5   A.   They told me they were going to tell my Probation officer

6   and gave me a hard time about it.

7   Q.   And did your Probation officer do anything when the

8   agents told them that they found drugs on you?

9   A.   Well, part of my violation of probation, I can't really

10   remember what my Probation officer sent me about the

11   violation, but I just know that he was informed.

12   Q.   And what did the judge do to you when he heard that you

13   had violated probation?

14   A.   Sentenced me to three months.

15   Q.   And did you serve those three months?

16   A.   Yes.

17   Q.   Nobody got you out of jail?

18   A.   No one.

19   Q.   And that's because the federal agents came to see you and

20   they caught you with the drugs in the apartment?

21   A.   Yes.

22   Q.   You said that when the defense attorney asked you about

23   that I had offered to write a letter of recommendation to you

24   for the Army, do you remember?

25   A.   Yes.

R.A. Bryan - Redirect

300

1   Q.   Are you thinking of going in the Army?

2   A.   Yes.

3   Q.   Why are you thinking of going in the Army?

4   A.   Because I feel like that's my last option.

5   Q.   You realize the risks inherent to representing this

6   country?

7   A.   I am to that point where I don't even, that doesn't even

8   matter now, I just want to at least be on that path.

9   Q.   Okay.  And what was it that you were offered in terms of

10  this letter?  Can you explain to the jury, what was that you

11  think you might get from me?

12  A.   That I am bilingual, I am a good person, I help out.

13  Q.   Anything else?

14  A.   If there is, I can't remember right now.

15  Q.   And have you talked to an Army recruiter?

16  A.   Yes.

17  Q.   Do they think that--  Did you explain to them about your

18  conviction?

19  A.   Yes.

20  Q.   Did they think there might be an opportunity to still be

21  able to join the United States Army?

22  A.   Yes.  They said they are going to do whatever it takes.

23        MR. WALUTES:  Now, the only other thing that I would

24  ask, Your Honor, is an ability to play some expanded portions

25  of the wire so that the jury can hear discussions about the

301

 1   prostitution consistent with what the Government believes the

 2   testimony has been.  I understand that it is being contested.

 3           So, we would like to actually have the opportunity

 4   to play some expanded portions of the transcript so the jury

 5   can determine for themselves whether or not they are relevant

 6   to helping them resolving that issue.

 7           Your Honor, the caution I have is I am going to need

 8   a break because I don't think the audio visual anticipated

 9   that we would have this opportunity.

10           THE COURT:  Yeah.  And let's--  I will reserve

11   ruling to see what portions of the transcripts you want to

12   play and also for time to set it up.

13           So, Mr. Bryan will be, he won't be excused at this

14   time, he will be subject to further recall.

15           Mr. Nachmanoff.

16           MR. NACHMANOFF:  Your Honor, I don't know if Mr.

17   Walutes is finished, I just had a few brief questions for

18   recross.

19           THE COURT:  I think he indicated--  Is that correct?

20   You indicated--

21           MR. WALUTES:  Up to that point.  I object to recross

22   though, Your Honor.  I don't know what the Court's practice

23   is, I don't actually remember.  We have actually had at this

24   point one cross-examination and then a second

25   cross-examination.

S.C. Greene - Direct

302

1          THE COURT:  Yeah, we're done.

2          MR. NACHMANOFF:  Very good, Your Honor.

3          THE COURT:  Thank you, Mr. Nachmanoff.

4          All right, Mr. Bryan, you are excused at this time.

5  You are subject to recall.  So, you are, one, to remain in the

6  courthouse until you are excused.

7          And two, you are not to discuss your testimony with

8  anyone until your testimony is completed.  All right?

9          THE WITNESS:  Yes.

10          THE COURT:  All right, then you are excused at this

11  time.

12          NOTE:  The witness stood down.

13          THE COURT:  Call your next witness.

14          MR. WALUTES:  Your Honor, the Government would call

15  to the stand Mr. Steve Greene, the ATF expert.

16          THE COURT:  All right.  Ladies and gentlemen, when

17  we have breaks like this, feel free to stand up and stretch

18  and whatever keeps you most comfortable.  All right.

19          NOTE:  The witness is sworn.

20          THE COURT:  Go ahead, sir.

21          MR. WALUTES:  Thank you, Your Honor.

22          STEVE C. GREENE, called by counsel for the United

23  States, first being duly sworn, testifies and states:

24      DIRECT EXAMINATION

25  BY MR. WALUTES:

S.C. Greene - Direct

303

1   Q.   Good afternoon, sir.  Could you please in loud voice so

2   everyone in the room has an opportunity to hear you tell us

3   your name.

4   A.   Steve Craig Greene.

5   Q.   How are you currently employed?

6   A.   I work for the Bureau of Alcohol, Tobacco, Firearms and

7   Explosives.

8   Q.   And what is your job title?

9   A.   I am a technical surveillance specialist.

10  Q.   Do you have any specialized training in the field of

11  forensic video image and audio analysis?

12  A.   Yes, I do.

13  Q.   What is that training?

14  A.   Since 1997 I have attended over 100 training courses in

15  forensic video image and audio processing.  That includes

16  vendor specific training by the companies from the hardware

17  and software products that I use in the lab.  And I have also

18  attended annual regional and national conferences in these

19  disciplines.

20  Q.   Are you a member of any professional affiliations in

21  these fields?

22  A.   Yes, I am.

23  Q.   And could you tell us what those are.

24  A.   Since 1997 I have been a member of the National Technical

25  Investigators Association.  And I was a member of the Law

304

1    Enforcement Emergency Services Video association from 2000 to

2    2008.

3    Q.   And prior to joining ATF in 2004, were you previously

4    employed in this field?

5    A.   Yes, I was.

6    Q.   And I wonder if you might be able to tell us what those

7    previous relevant employment opportunities were.

8    A.   Yes.  I was employed by the U.S. Forest Service Law

9    Enforcement Investigations in Missoula, Montana.  I was hired

10   as a contractor, as an electronic, performing electronic

11   technician and inventory management duties.  And then in 2000

12   I was hired on full-time by the U.S. Forest Service doing the

13   same job.

14   Q.   And how long did you operate the forensic video lab for

15   the United States Forest Service?

16   A.   I operated it for about nine years.  I started the lab in

17   1995 and worked in the lab until 2004 when I was hired by the

18   ATF to operate their audio and video lab.

19   Q.   And what, if any, degree did you obtain from college,

20   sir?

21          MS. MINTER:  Your Honor, I don't mean to interrupt,

22   but I assume the Government intends to introduce Mr. Green as

23   an expert, and we would not have any objection to that motion.

24          THE COURT:  All right, thank you.

25          MR. WALUTES:  That does actually speed it up.  I

S.C. Greene - Direct

305

1    appreciate Ms. Minter's interruption, Your Honor.

2    BY MR. WALUTES: (Continuing)

3    Q.   If I could ask you to look at Government's Exhibit 25A,

4    and ask if that's a copy of your CV?

5    A.   Yes, that is.

6    Q.   Is it accurate?

7    A.   Yes, it is.

8         MR. WALUTES:  Your Honor, I move its admission at

9    this time.

10        THE COURT:  Any objection to 25, the CV?

11        MS. MINTER:  There is no objection, Your Honor.

12        THE COURT:  All right, it will be received.

13        MR. WALUTES:  At this time, Your Honor, I would

14   offer him as an expert in the field of forensic video and

15   image and audio analysis and ask the Court to instruct the

16   jury if the Court does that.

17        THE COURT:  I don't.

18        MR. WALUTES:  Then I just offer him as an expert at

19   this point, Your Honor.

20        THE COURT:  Any objection to that?

21        MS. MINTER:  There is not, Your Honor.

22        THE COURT:  All right.  He will be received as

23   qualified to discuss those topics.

24        MR. WALUTES:  Thank you, Your Honor.

25   BY MR. WALUTES: (Continuing)

S.C. Greene - Direct

306

1    Q.    Mr. Greene, did you have an opportunity to review a video

2    and audio recording that was generated inside the Alexandria

3    Adult Detention Center on November 12 and November 17 at 2008?

4    A.    Yes, I did.

5    Q.    Is the jail typically an acoustically challenging

6    environment?

7    A.    Yes, it is.

8    Q.    A lot of echo?

9    A.    Yes.

10   Q.    What, if anything, did you do to the wire, whatever

11   length it is, that was generated within the Alexandria

12   Detention Center on November 12 of 2008 and November 17 of

13   2008?

14   A.    Okay.  I received the recordings from Agent Castro.  And

15   I first to do the processing, I fill out a processing note

16   form for every piece of evidence that I receive.  I visually

17   inspect the recordings.  They were on CDR and they all seemed

18   to be in good condition.

19          I then placed the CDR in a computer.  And on the CDR

20   there is a--

21   Q.    If I can interrupt you, Mr. Greene.  What is a CDR?

22   A.    It's a compact disk.

23   Q.    Thank you.

24   A.    Okay.  I put the compact disk, it had a proprietary

25   software player and the audio video recordings on it.  The

S.C. Greene - Direct

307

1   player enables you to open up and view the audio and video

2   recordings.  On that player you are also able to export the

3   audio/video recordings to then make copies and do further

4   processing.

5           I exported an audio/video recording and also just

6   the audio recording.  So, I had two different recordings.

7           I brought the audio/video recording into my video

8   work station.  And then I imported just the audio WAV file

9   into my forensic audio processing software.  With that

10  software, I applied several filters to eliminate the

11  background noise and the echo that was in the jail and to

12  better clarify and hear what was being said on the recording.

13          After doing the best analysis I could with the

14  training I have had and experience, I made a processed audio

15  recording and saved all the settings and the notes from that

16  processing.

17          Then I grabbed the processed audio file and also

18  imported that into my video work station.

19          From there I put the audio/video clip on a timeline

20  and then the processed audio recording on the timeline and

21  then synced them up visually and audibly so I could match the

22  original audio with the processed audio to make sure it is

23  synced up with the video.

24          After I did that, I then made a DVD video with the

25  processed audio.  I made that and then I also, with all the

S.C. Greene - Direct

308

1   processed audio files, I made a separate DVD data disk.

2           I repeated that basically for all the recordings

3   that I received.

4   Q.   Okay.  If I could--  The original, what you were given

5   from the field agent, do you actually do anything to the

6   original?

7   A.   I just, you just, using the player that's on the original

8   disk, you are able to make a copy, an exact copy of the audio

9   and video.  And then once you are done with that, you can put

10  the original away and you don't need the original anymore.

11  And doing that process doesn't alter or change any of the

12  data.

13  Q.   Okay.  So, the original stayed original?

14  A.   Yes.

15  Q.   It was returned to the agent in the same condition you

16  received it?

17  A.   Yes.

18  Q.   And then I think I have been using enhanced, but I think

19  you call it processed.  Is that the term of art?

20  A.   Yes.

21  Q.   The processed recording, when you said that you were

22  attempting to remove echo and trying to focus on the

23  conversation, when you put settings in order to try to

24  accomplish that, are you actually listening to every bit of

25  the conversation and changing the settings, or do you use

309

1   whatever the processing is and make it the same change

2   uniformly through the conversation?

3   A.   The background noises and the recordings were basically

4   the same throughout, so I was able to use the same settings,

5   one setting for the entire recording on the different filters.

6   Q.   So, you are not actually trying to change--

7   A.   No.

8   Q.   You are not listening to the conversation necessarily,

9   you are just trying to make sure the conversation can be

10  heard?

11  A.   Yes.

12  Q.   Did you remove anything from the conversation when you

13  were processing it?

14  A.   No.

15  Q.   Did you add anything?

16  A.   No.

17  Q.   If I could ask you to go to what's now marked as

18  Government's Exhibit 26A through 26K, which I believe are the

19  original recordings from the wire on November 12 of 2008.

20          Do you recognize those?

21  A.   Yes, I do.

22  Q.   And how do you recognize them?

23  A.   I have initialed all the CDRs, the compact disks, and

24  also I write down in my processing notes the serial number

25  from every disk.

310

1    Q.    If I could turn your attention now to 27A through 27C,

2    which I believe is the processed set of what is marked as

3    Government's Exhibit 26A through K.

4              Is that correct?  Do you see the three disks?

5    A.    Yes.

6    Q.    27A, 27B and 27C?

7    A.    Yes.

8    Q.    Are those the disks that you then create?

9    A.    Yes.

10   Q.    How do you recognize those?

11   A.    There is an ATF label that I put on the disks.  And also

12   there is a serial number on the inner hub that I also record.

13   Q.    Okay.  And that is the product of your work for the first

14   wire that was generated on November 12 of 2008 inside the

15   Alexandria Detention Center?

16   A.    Yes, it is.

17   Q.    And then if I could turn your attention to the second set

18   of that wire, which I believe is now marked as 29A through

19   29C--  Actually, before we get there, it went from--

20   Actually, I can't do the math real fast in my head, but it

21   went from A to K and then down to just three disks.

22              Does that mean something was removed?

23   A.    No.  I just, I was able to put the data that the disks

24   that came in were in on compact disks.  They are smaller data

25   size than on a DVD, so I was able to fit more recordings on

S.C. Greene - Direct

311

1    one disk.

2    Q.   So, the same information that is in A through K still

3    shows up on what is now A through C processed?

4    A.   Yes.

5    Q.   Okay.  You are just switching from a compact disk to a

6    DVD?

7    A.   Yes.

8    Q.   I am sorry, I interrupted myself.  If you could look now

9    at what is marked Government's Exhibit 29A through 29C.

10   A.   Yes.

11   Q.   Do you see that?

12   A.   Yes.

13   Q.   Is that the originals, is that the originals of the

14   November 19?

15   A.   Yes, they are.

16   Q.   How do you recognize them?

17   A.   My initials that are on each disk.

18   Q.   Then if I could ask you to look at what I think is the

19   processed disks that are now generated from 29A through C to

20   be now just one DVD, is that Government's No. 30?

21   A.   On 30 is one--  Yes.

22   Q.   How do you recognize that, sir?

23   A.   My ATF label.

24   Q.   And that is the enhanced, I am sorry, the processed wire

25   that was worn inside the Alexandria Jail on November 17 of

S.C. Greene - Direct

312

1   2008?

2   A.   Yes.

3   Q.   Did you also attempt to work with some audio and video

4   that was generated from a visitation that occurred in the

5   Alexandria Jail a short time thereafter?

6   A.   Yes.

7   Q.   If I could ask you what is now Government's Exhibit 37A

8   through 37C, and ask if those were the exhibits generated from

9   the November 29, 2008 visit that occurred in the jail?

10  A.   I'm sorry, 37--

11  Q.   37A through 37C.

12  A.   Yes.  These are the originals.

13  Q.   And how do you recognize them?

14  A.   With my initials on them.

15  Q.   Okay.  And also then 37D, which I believe is the

16  processed, is that a DVD as well?

17  A.   Yes, it is.

18  Q.   Did these come in as CDs as well and turn into DVDs when

19  you were done?

20  A.   Yes.

21  Q.   And No. 37D, that's the processed that you were able to

22  do with those audio and visuals?

23  A.   Yes, it is.

24       MR. WALUTES:  Thank you, Mr. Greene, those are all

25  the questions I have.

S.C. Greene - Cross

313

1              Your Honor, that's all the questions the Government

2    has.

3              THE COURT:  All right.  Any cross-examination?

4              MR. WALUTES:  Actually, did you prepare--  May I

5    interrupt Your Honor?

6              THE COURT:  Yes, sir.

7    BY MR. WALUTES: (Continuing)

8    Q.   Did you generate a report, Mr. Greene?

9    A.   Yeah, I have my notes, yes.

10   Q.   And if I could ask you to look at Government's Exhibit

11   No. 25B.  And I apologize to the Court for not--

12             Do you see that?

13   A.   Yes.

14   Q.   Does that record the serial numbers and such that you

15   were referencing earlier?

16   A.   This records my--

17   Q.   The information that you just indicated?

18   A.   It records the labels that, the labels of the disks that

19   I received and the labels of the disks that I made.

20             MR. WALUTES:  Okay.  I'm sorry, Your Honor, I don't

21   think I need to admit that.  I apologize for the interruption.

22   I think I misunderstood what that was.

23             THE COURT:  All right.

24        CROSS-EXAMINATION

25   BY MS. MINTER:

S.C. Greene - Cross

314

1    Q.    Mr. Greene, you have very extensive training in video and

2    audio recordings, correct?

3    A.    Yes.

4    Q.    And that includes body worn video?

5    A.    Yes.

6    Q.    And it sounds like from your earlier testimony that you

7    have experience not only with body worn video, but with body

8    worn video worn in detention centers?

9    A.    Yes.

10   Q.    So, you have done this type of work before?

11   A.    Yes.

12   Q.    And reviewed recordings before that originated in a

13   detention center?

14   A.    Yes.

15   Q.    Okay.  And certainly they are very noisy places?

16   A.    Yes, they are.

17   Q.    I imagine there is a substantial amount of background

18   noise that is generated on those recordings?

19   A.    Yes.

20   Q.    Probably more than average?

21   A.    Yes, can be.

22   Q.    And a body worn mike is placed where on the individual?

23   A.    It would be somewhere on the person.

24   Q.    Okay.  Is it typically concealed?

25   A.    Yes.

S.C. Greene - Cross

315

1  Q.   Okay.  So, under clothing generally?

2  A.   It could be.  I don't know how the setup was.  I don't

3  know where the microphone was placed.

4  Q.   Okay.  But if it was placed under clothing, that would

5  pose additional noise problems as well?

6  A.   It could, yes.

7  Q.   So, you can't say that a body worn mike would pick up

8  every single thing that was said in a conversation?

9  A.   No.

10  Q.   Okay.  So, there could be some words that are missed or

11  some sentences that are missed?

12  A.   There could be, yes.

13  Q.   Okay.  You described receiving these sets of recordings

14  from Agent Castro, is that correct?

15  A.   Yes.

16  Q.   That's the gentleman seated to my right between the other

17  two attorneys?

18  A.   Yes, it is.

19  Q.   And when he presented you with the CDs, you described

20  them as originals.

21  A.   Yes.

22  Q.   Do you know whether those are in fact the very first

23  disks that were generated, or were they copies of documents,

24  excuse me of CDs?

25  A.   The disks on there state, they were written down as

S.C. Greene - Cross

316

1  originals.  So, I accept that as original disks.

2  Q.   Okay.  But you are unaware personally of whether that was

3  the first thing created from the recording or whether that was

4  a copy that was made for your use?

5  A.   I don't know that.

6  Q.   And what was the delivery mechanism for these?  Were they

7  in an envelope?  Were they just handed to you naked?  Were

8  they--

9  A.   I believe they were in individual sleeves and hand

10  delivered to me.

11  Q.   Did you return them in the condition that they were

12  placed, that you received them in?

13  A.   I should have, yes.

14  Q.   Okay.  So, there were no seals of any sort that you had

15  to break to open that?

16  A.   Not on the individual CDs.  If they were in an envelope,

17  in an evidence envelope, then, yes, they would have been

18  sealed.

19  Q.   Okay.  But you don't recall any on the CDs themselves?

20  A.   No, no.

21  Q.   And you testified earlier about a procedure that you will

22  probably have to explain in a little more detail for us

23  lawyers.  You described taking an audio/video clip and putting

24  it on a timeline.

25  A.   Yes.

S.C. Greene - Cross

317

1   Q.    What does that mean?

2   A.    Basically it's putting it in an video editing work

3   station.  So, it allows you to look on a timeline from the

4   beginning of the video to the end to then play the video and

5   have a marker, you know, follow where you are watching the

6   video.

7           Okay.  So, on a video editing work station, you are

8   able to visually see where, say it's a 30-minute recording,

9   anywhere in that 30 minutes you can put a marker and start,

10  play the video back and forth.  Okay.

11          So, by putting it in there, then I am able to make a

12  DVD recording, DVD video recording.

13  Q.    And then did I understand that you said you placed the

14  audio clip, the clip that was solely the audio also on a

15  timeline?

16  A.    Yes.  In my editing work station there is, you can have

17  several video tracks and audio tracks on the timeline.  So, I

18  was able to have the one video clip, the video track with the

19  original audio below it, and then a second audio track of the

20  processed audio.

21          So, then I can listen to the processed audio and the

22  original audio while watching the video.

23  Q.    You said that you then did that, you played the two of

24  them together, I think "synced" was the exact term?

25  A.    Yes, synced it up.

1   Q.   When you do that, do you affirmatively watch the entire

2   video from start to finish?

3   A.   You watch, I watch for the beginning and I look for

4   certain noises and certain things on the video to visually see

5   if the sounds that are on the original and the processed match

6   up.

7           You can move it around a little bit.  And I did move

8   it just a little bit to make sure it synced up, and I watched

9   throughout the recording to the very end to see if the ending,

10  end audio still matches up.  And they do.  And they did.

11          MS. MINTER:  The Court's indulgence, Your Honor.

12          THE COURT:  Yes, ma'am.

13          MS. MINTER:  Nothing further, Your Honor.

14          THE COURT:  All right, thank you.  Any redirect?

15          MR. WALUTES:  No, Your Honor.

16          THE COURT:  May M. Greene be excused?

17          MR. WALUTES:  He may, Your Honor.

18          THE COURT:  All right.  You are excused with our

19  thanks, Mr. Greene.  Please don't discuss your testimony with

20  anyone until the case is over.  All right, have a good day.

21          NOTE:  The witness stood down.

22          THE COURT:  All right.  Next witness.

23          MR. BEN'ARY:  Your Honor, the Government would like

24  to call Randy Pressley.

25          THE COURT:  All right.  Are you all comfortable

R.N. Pressley - Direct

319

1    going a little further before we have our lunch break?  All

2    right.

3              How is the temperature here?  Are you all cold?

4    Yeah, I am frozen up here, but I am always cold.  So, we will

5    try to get the heat up.  Yeah, let's take it up a few degrees.

6              NOTE:  The witness duly affirms.

7              MR. BEN'ARY:  May I proceed, Your Honor?

8              THE COURT:  Yes, sir.

9              RANDY N. PRESSLEY, called by counsel for the United

10   States, first duly affirming, testifies and states:

11        DIRECT EXAMINATION

12   BY MR. BEN'ARY:

13   Q.   Good afternoon, Mr. Pressley.

14   A.   How are you?  Good afternoon.

15   Q.   Can I ask you to make sure that you keep your voice up

16   and try to speak into the microphone to make sure that all the

17   members of the jury can hear you.  Okay?

18   A.   All right.

19   Q.   Would you tell the members of the jury your name, please.

20   A.   Randy Nicholas Pressley.

21   Q.   Mr. Pressley, I have some questions to ask you about some

22   time that you were in the Fairfax County Adult Detention

23   Center.

24              Were you in the Fairfax County Adult Detention

25   Center around September of 2007?

320

1    A.   Yes.

2    Q.   And while you were there, is there anyone else in the

3    room right now that was serving time in the Fairfax County

4    Adult Detention Center with you that you recognize?

5    A.   Yes, he was, Mohamadi.

6    Q.   And where is this Mr. Mohamadi seated in the courtroom?

7    And if you could describe an article of his clothing, please.

8    A.   He is sitting with the blue shirt and the tie.

9         THE COURT:  I will note the identification of Mr.

10   Mohamadi.

11   Q.   Thank you.  How did you come to know Mr. Mohamadi while

12   you were both in the Fairfax County Adult Detention Center?

13   A.   We were both in the same cell block at the same time, and

14   we was acquainted with each other.

15   Q.   I may have overinstructed you to get close to the

16   microphone.  I apologize.

17   A.   Okay.

18   Q.   You were in the same cell block at the Fairfax County

19   Adult Detention Center?

20   A.   Yes.

21   Q.   And were you--  How would you describe your relationship

22   with Mr. Mohamadi?  Were you friends, acquaintances?  How

23   would you describe it?

24   A.   Well, we was on a talking basis.  We was, we shared some

25   of the same religious beliefs to a degree.

R.N. Pressley - Direct

321

1   Q.   Okay.  And you would speak to Mr. Mohamadi from time to

2   time while you were serving time there?

3   A.   Yes, sir.

4   Q.   Okay.  Now, did you have occasion while you were in the

5   Fairfax County Adult Detention Center to contact defendant Tom

6   Lawn of the Fairfax County Police Department?

7   A.   Yes.

8   Q.   And could you tell the members of the jury, what was it

9   that caused you to contact Detective Lawn?

10  A.   Well, there was a time where the Fairfax County Jail, we

11  went through a month where they put the Muslims in the same

12  pod together.  And during this month there was a time where

13  Mr. Mohamadi was in the same cell pod or cell block with me.

14  And he approached me about a matter dealing with his legal

15  affairs in Alexandria, Virginia.

16  Q.   Let me stop you there for a moment.  This month where the

17  Fairfax County Adult Detention Center houses Muslim inmates

18  together, does that coincide with part of the Islamic faith

19  known as Ramadan?

20  A.   Yes.

21  Q.   Does Ramadan include some eating, some dietary

22  restrictions?

23  A.   Yes.

24  Q.   So, is that why they house the Muslim inmates together

25  during that month, to better deal with the eating restrictions

R.N. Pressley - Direct

322

1   primarily?

2   A.    Yes.

3   Q.    And you said that the defendant and you had had some

4   conversations during this month of Ramadan about his legal

5   matters in Alexandria city?

6   A.    Yes.

7   Q.    What did the defendant tell you about his legal matters

8   in Alexandria city?

9   A.    Well, he approached me and informed me that he was

10  dealing with a robbery of a taxicab driver in Alexandria.  And

11  he had some concern that this taxicab driver was going to be

12  able to show up and testify and point him out, things of that

13  nature.

14  Q.    Did he tell you that he had in fact committed the robbery

15  of the cab driver in Alexandria city?

16  A.    Yeah.  The think about it was that he had some concern

17  that the taxicab driver would be able to identify him.

18  Q.    Okay.  And what did he tell you about how he was going to

19  deal with that?  Describe the conversations from that point.

20  A.    Well, pretty much he, it was a matter of him being

21  nervous about the situation.  He didn't want the dude to show

22  up in court, you know.

23        So, what he did was that he--  I had already been

24  dealing with some legal affairs in Fairfax.  And I guess, you

25  know, it was hoping, it was hopeful, we always have a tendency

323

1    to hope that there would be some degree of early release

2    dealing with some after-trial matters that may occasionally

3    get some individuals out with the courts.

4            And I shared that with Mohamadi.

5    Q.   Let me stop you there for a minute because I want to ask

6    you some questions about that last answer.  You are talking

7    about having the individuals in jail had hope of something

8    happening after their trial where they would be able to be

9    released early.

10   A.   Yes.

11   Q.   Were you in that situation during this time period when

12   these conversations with the defendant were going on?

13   A.   Yes.

14   Q.   And so, did you communicate the hope of early release,

15   your early release to the defendant?

16   A.   Yes.

17   Q.   Okay.  And then after you made it known to the defendant

18   that you were hopeful of an early release, what happened after

19   that?

20   A.   Well, after that, you know, he informed me that if this

21   was the case, you know, if this was the case that I did have

22   an opportunity to get out, if you would take care of an issue

23   for me.

24   Q.   And what did he ask you to do?

25   A.   He told me, you know, like I said, he talked about this

R.N. Pressley - Direct

324

1    cab driver.  And then he told me, you know, he would like this

2    cab driver to be dealt with.  You know, pretty much he wanted

3    him to be murdered pretty much.

4    Q.   Okay.

5         MS. MINTER:  Object to the characterization unless

6    that's what he said.

7         THE COURT:  Overruled.  Go ahead.

8    BY MR. BEN'ARY: (Continuing)

9    Q.   Did he provide you any information about the cab driver?

10   A.   No.  He said as time goes on, he would provide me with

11   the information.

12   Q.   Okay.  And did you discuss with the defendant what was in

13   it for you?  If you were to in fact get released early as you

14   had hoped and if you had in fact located this cab driver and

15   murdered him as the defendant requested, what would be in it

16   for you?

17   A.   Well, he offered, he offered $10,000 for this.

18   Q.   And what did you think about the defendant's ability to

19   actually come through with that amount of money?

20   A.   Well, it wasn't, it wasn't--  If he was, he was able to

21   do it, I didn't really pretty much question his ability to be

22   able to do it.

23   Q.   Okay.  And how many times would you say you discussed

24   murdering this cab driver with the defendant?

25   A.   It was quite a few times, actually, you know.

R.N. Pressley - Direct

325

1    Q.   And so, as I mentioned before, or I insinuated before,

2    did you, based on what the defendant told you, contact

3    Detective Lawn of the Fairfax County Police Department?

4    A.   Yes.

5    Q.   How did you know Detective Lawn?

6    A.   Well, Detective Lawn was the detective on my existing

7    case right now.

8    Q.   He investigated you for the crime for which you were

9    actually serving?

10   A.   Yes.

11   Q.   And what was your opinion of Detective Lawn?  Why did you

12   choose him?

13           MS. MINTER:  Objection, relevance.

14           THE COURT:  Sustained.

15   BY MR. BEN'ARY: (Continuing)

16   Q.   How did you go about contacting Detective Lawn?

17   A.   Through the mail, sir.  Through the mail.

18   Q.   You sent him a letter?

19   A.   Yes.

20   Q.   And did Detective Lawn in fact come to see you?

21   A.   Yes.

22   Q.   About how long was it in between your first conversation

23   with the defendant about murdering this cab driver and when

24   Detective Lawn came to see you?

25   A.   Probably within the span of a few days.

R.N. Pressley - Direct

326

1    Q.    Okay.  And did you meet with Detective Lawn?

2    A.    Yes.

3    Q.    And did Detective Lawn listen to you and give you some

4    instruction as to what he would like you to do next?

5    A.    Yes.

6    Q.    What did Detective Lawn ask you to do?

7    A.    The Detective Lawn--

8              MS. MINTER:  Objection, hearsay.

9              MR. BEN'ARY:  Your Honor--

10             THE COURT:  What's your response?

11             MR. BEN'ARY:  Your Honor, it's offered at this point

12   just to explain the subsequent actions of Mr. Pressley.

13             THE COURT:  All right.  It will be received for that

14   limited purpose.

15   BY MR. BEN'ARY: (Continuing)

16   Q.    What did Detective Lawn tell you to do?

17   A.    He told me to, he told me to continue to, he advised me

18   to continue to talk to this individual about his intentions.

19   I guess it would be to see what he wanted and how he wanted

20   this thing carried out.

21   Q.    Okay.  And did you have any--  Was that essentially all

22   of his instructions to you at that point?

23   A.    Pretty much.  It's been so long ago, I mean--

24   Q.    And after that, did you have further discussions with the

25   defendant about having this cab driver murdered?

327

1   A.   Yes.

2   Q.   And did you try to introduce the defendant to an

3   undercover officer from the Fairfax County Police Department?

4   A.   Yeah.  That was, that was one of the ideas of Detective

5   Lawn that he made mention of on one of his visits.  That see

6   if he would be able to meet, wanted to meet anybody so he can,

7   you know, like the Fairfax County police, but in the disguise

8   of somebody else, you know.

9   Q.   Okay.  And did you in fact go back and try to get the

10  defendant to meet with an individual who was an undercover

11  police officer?

12  A.   Yes.

13  Q.   How did the defendant react to that suggestion?

14  A.   Well, pretty much he didn't want anybody to be aware

15  that, he didn't want to make himself known that he was going

16  to be--

17       MS. MINTER:  Your Honor, I would object to the

18  speculation.  He can say what the statements were.

19       THE COURT:  Yeah.  Let's ask Mr. Pressley questions

20  so he understands that you want the conversation, not how he

21  interpreted it, but what was actually said.

22       MR. BEN'ARY:  I understand, Your Honor.  Thank you.

23       THE COURT:  All right.

24  BY MR. BEN'ARY: (Continuing)

25  Q.   When you went back and suggested to the defendant that he

328

1  meet with this undercover officer, what did the defendant tell

2  you?

3  A.   He said no.

4  Q.   Did he tell you--

5  A.   He said he didn't want to meet with anybody.

6  Q.   Did he tell you why he didn't want to meet with anybody?

7  A.   He just said he don't want to be known by anybody.  He

8  said he just wanted to deal with me.

9  Q.   Okay.  Based on that, did you, based on the fact that

10  this undercover plan didn't look like it was going to come to

11  pass, did you contact Detective Lawn again?

12  A.   Yeah, I told him about it.

13  Q.   Did you write him another letter in fact?

14  A.   Yes.

15  Q.   And did you meet with Detective Lawn again?

16  A.   Yes.

17  Q.   And did you receive more instruction from Detective Lawn

18  at that point?

19  A.   Well, the detective, I can't remember what exactly

20  Detective Lawn stated--

21         THE COURT:  Just ask him what he did in response to

22  having met with Detective Lawn a second time.

23         MR. BEN'ARY:  Sure.  If I may just rephrase, Your

24  Honor.

25         THE COURT:  Maybe.

R.N. Pressley - Direct

329

1              MR. BEN'ARY:  Thank you.

2    BY MR. BEN'ARY: (Continuing)

3    Q.   After this plan to introduce the defendant to an

4    undercover detective didn't work, what happened from there

5    between you and the defendant?

6    A.   Well, after that I went back to the pod after that.  And,

7    you know, we still discussed the matter.  He explained to me

8    that he actually really did want it to happen, you know, he

9    just didn't want it to happen that way, you know.

10             If I can do it, if I can get out and I can carry it

11   on through, then that would be the best way in his eyes to

12   take the situation.  Instead of involving somebody else and he

13   would have to meet and deal with that individual.

14   Q.   Okay.  And I thought I understood, but let me make sure

15   that everyone understands.

16             At some point after the defendant refuses to meet

17   with this undercover officer, you are transferred back to a

18   different pod?

19   A.   No, we are in the same pod for a little over a month.

20   Q.   Okay.  And you continue to have discussions during that

21   time?

22   A.   Yes.

23   Q.   And you have just described those.  And were you in fact

24   able to get early release?

25   A.   No.

R.N. Pressley - Direct

330

1    Q.   And are you in fact still serving your sentence on the

2    charge that was holding you in Fairfax?

3    A.   Yes.

4    Q.   During your discussions with the defendant, did he

5    mention a girlfriend, his girlfriend to you?

6    A.   Yeah, I was aware that he was dealing with a female, yes.

7    Q.   And did he mention what this girlfriend did for a living?

8    A.   Yeah, she was a stripper.

9    Q.   And did he mention a specific establishment where she

10   worked?

11           MS. MINTER:  Your Honor, I would object to the

12   leading at this point.

13           THE COURT:  All right.  Sustained.

14   BY MR. BEN'ARY: (Continuing)

15   Q.   What, if anything, did the defendant tell you about where

16   his girlfriend worked as a stripper?

17   A.   She worked at an establishment called Crystals

18   Restaurant.

19   Q.   Okay.  And I want to switch gears for a minute.  And we

20   have just talked about this charge that you are currently

21   serving time on, it's the same charge that you were serving

22   time on when these conversations with the defendant occurred,

23   correct?

24   A.   Yes.

25   Q.   What was the charge in that case?

R.N. Pressley - Direct

331

1    A.    I have a robbery and a carjacking.

2    Q.    Okay.  And do you have other felony convictions on your

3    record?

4    A.    Yes.

5    Q.    How many felony convictions do you have on your record?

6    A.    There is two, and a probation violation.

7    Q.    And are there others besides the robbery, carjacking and

8    probation violation that you just described?

9    A.    No, not as an adult.

10   Q.    Now, based on your cooperation with the Government in

11   this case, was your sentence for the carjacking, robbery

12   reduced?

13   A.    No.

14   Q.    Did you get a reduction of any sentence based on your

15   cooperation?

16   A.    No.

17   Q.    Were there charges that could have been brought that

18   weren't brought because of your cooperation?

19   A.    No.

20   Q.    Tell the members of the jury, what benefit have you

21   gotten out of your cooperation with the Government in this

22   case?

23   A.    None.

24   Q.    Why did you come forward and notify Tom Lawn that this

25   defendant was trying to have a witness murdered?

R.N. Pressley - Direct

332

1   A.   Well, at first it was kind of crazy because the approach

2   of him coming to you with something like that, coming to me

3   with something like that, the serious nature of what he was

4   asking.

5        So, my thing was, I didn't want later on to be

6   caught up in any type of investigation dealing with somebody

7   getting murdered by maybe Mr. Mohamadi discussing this affair

8   with somebody else and my name being mentioned.

9        So, I wanted me to be clear of that, you know.  That

10  was my intention, making sure that I was going to be left out

11  if this happened to resurface.  Which it did.

12  Q.   And then once you notified Detective Lawn and he was

13  making requests of you, why did you follow through?  Why did

14  you follow through with your cooperation with law enforcement?

15  A.   Well, actually, when it came back up, you know, I felt

16  that--  I mean, I actually did it, I am not lying about it,

17  you know what I am saying, I brought it to him.  So, I went on

18  because at the time I felt that was the best thing to do.

19       MR. BEN'ARY:  May I have the Court's indulgence for

20  one moment, please?

21       THE COURT:  Yes, sir.

22       MR. BEN'ARY:  Thank you.  Mr. Pressley, the defense

23  is going to have some questions for you.  Please answer their

24  questions, sir.

25       MS. MINTER:  Your Honor, at a certain point in my

333

1    questioning I would like to ask the Court for a ruling on a

2    certain matter pursuant to the Court's earlier instructions

3    about raising issues with the Court.

4              THE COURT:  Right.

5              MS. MINTER:  I don't know if the Court would like to

6    take that up at this time or--

7              THE COURT:  Do you have--  I mean, we will break in

8    the next 10 or 15 minutes.

9              MS. MINTER:  I do have some preliminary.

10             THE COURT:  When you have your preliminary questions

11   completed, then we will break for lunch and we will take it up

12   at that time.

13             MS. MINTER:  Very well, Your Honor.

14             THE COURT:  Thank you.

15        CROSS-EXAMINATION

16   BY MS. MINTER:

17   Q.   Mr. Pressley, you've cooperated with the police before,

18   correct?

19   A.   No.

20   Q.   Never?

21   A.   Never.

22   Q.   You are Randy Nicholas Pressley, correct?

23   A.   Yes.

24   Q.   The same Randy Nicholas Pressley who was convicted of

25   carjacking and robbery in Fairfax County?

R.N. Pressley - Cross

334

1    A.    Yes.

2    Q.    In 2007?

3    A.    Yes.

4    Q.    You were sentenced in July 2007?

5    A.    Yes.

6    Q.    Okay.  And your attorney was Mr. William Krem, correct?

7    A.    Yes.

8    Q.    And you just indicated that you have never cooperated

9    with the police before?

10   A.    Nothing that beared any fruit.

11   Q.    Okay.  Well, my question is, have you ever cooperated

12   with the police before?

13   A.    On this particular situation right here with this, with

14   these two charges, yes, I had brought to mention some

15   incidents with the police department through Detective Lawn,

16   but none of those incidents ever brought any fruit.

17   Q.    Okay.  Well, let's be clear.  When you say these

18   incidents here, you are talking about your carjacking and your

19   robbery, is that correct?

20   A.    I am talking about other crimes of things that came

21   through to me, that's what I am talking about.

22   Q.    Okay.  Well, things other than what you have just

23   testified about here today involving Mr. Mohamadi?

24   A.    Yes.

25   Q.    Things involving other people?

335

1    A.    Other people, yes.

2    Q.    Correct?

3    A.    Yes.

4    Q.    And it's not just Detective Lawn that you have given

5    information to, correct?

6    A.    Detective Lawn had always brought somebody else whenever

7    he came to see me.

8    Q.    Okay.  Somebody like Detective Steve Needels?

9    A.    I can't remember his name.  I can't remember that

10   detective.

11   Q.    Okay.  Detective Austin?

12   A.    I can't--  These detectives that came, I had never, you

13   know, I never had a conversation with these people.  It was

14   only just a conversation between me and Detective Lawn.

15   Q.    But there were other law enforcement officers there?

16   A.    Yes, there were other detectives that came.

17   Q.    And just to be clear, that's you giving information about

18   other individuals not related to Mr. Mohamadi?

19   A.    Yes.

20   Q.    And other circumstances and crimes not related to Mr.

21   Mohamadi?

22   A.    Yes.

23   Q.    Okay.  And in fact, you gave information about someone

24   who committed a bank robbery, correct?

25   A.    Yes.

R.N. Pressley - Cross

336

1   Q.   And somebody who committed a rape?

2   A.   Yes.

3   Q.   Okay.  And you gave all of that information before you

4   were sentenced in July 2007, correct?

5   A.   Yes.

6   Q.   Okay.  And you were willing to, with respect to that

7   robbery case, you were willing to testify, weren't you?

8   A.   Yes.

9   Q.   Against that person?

10  A.   Yes.

11  Q.   And with respect to the individual charged with the rape,

12  you were willing to testify against that person as well?

13  A.   Yes.

14          THE COURT:  Wait until she finishes her question so

15  that we can hear your answer.

16          THE WITNESS:  All right.

17  BY MS. MINTER: (Continuing)

18  Q.   Now, before you went to sentencing in 2007 for your

19  carjacking and your robbery case, one of the prosecutors in

20  Fairfax County wrote a letter detailing the cooperation that

21  you had given, correct?

22  A.   No.

23  Q.   No?

24  A.   No.

25  Q.   So, Assistant Commonwealth's Attorney Ian Rodway never

337

1   wrote a letter?

2   A.   That letter was for my lawyer, that was my understanding.

3   Q.   Okay.  But he wrote a letter which explained the

4   cooperation that you had done, correct?

5   A.   Oh, I never seen it.  The letter that I seen was for my

6   lawyer.  It was under the impression that the letter that was

7   written, I think it was called a sentence memorandum, was for

8   my lawyer.

9   Q.   Okay.  Well, that is not my question.  My question is,

10  did Assistant Commonwealth's Attorney Ian Rodway write a

11  letter that explained the cooperation that you had done?

12  A.   I can't answer that because I never seen any letter.

13  Q.   Okay.  So, the answer is you don't know?

14  A.   I don't know.

15  Q.   Now, you mentioned a sentencing memo.  Your lawyer wrote

16  a sentencing memo, correct?

17  A.   Yes.

18  Q.   And he gave that document to the Court?

19  A.   Yes.

20  Q.   Correct?

21  A.   Yes.

22  Q.   In fact, he gave it to the judge while he was in court?

23  A.   Yeah.

24  Q.   For your sentencing.  So, you saw that happening?

25  A.   Yeah, I seen that.

R.N. Pressley - Cross

338

Q.   And in that sentencing memo he asked the judge to give
you a lower sentence because you had given this cooperation?

A.   If I can remember, he just asked the judge to follow my
Guidelines.  Which my Guidelines was pretty good anyway.

Q.   So, he didn't ask the judge to take into account your
cooperation?

A.   Yeah.

Q.   When he was determining your sentence?

A.   Yeah.  And go with my Guidelines though.  He didn't,
there wasn't, there wasn't a time where he asked them to
reduce any sentence because there was nothing that ever beared
from any of the information that I gave to the police.

Q.   Well, did you want your lawyer to tell the judge about
the work you had done?

A.   Well, I mean, that was one of his, that was one of his
ideas.  That was one of my lawyer's ideas.  I mean, if you are
willing to assist the prosecution, then, you know, we can
possibly, I can possibly see if the judge will help you and
get a lower sentence.

        That was his intention of doing, in writing that
letter.

Q.   And you wanted a lower sentence?

A.   I mean, I am not going to object, I am not going to tell
him no.  Yeah, I wanted a lower sentence.

Q.   And all of this happened before you spoke with Mr.

339

1    Mohamadi in November, correct?

2    A.    No--

3          THE COURT:  September or--

4    Q.    Excuse me, Your Honor.  September.  September.  Well, you

5    were sentenced in July, correct?

6    A.    Yes.

7    Q.    Of 2007?

8    A.    Yes, this happened after, yeah.

9    Q.    And you spoke to him in September of 2007?

10   A.    Yeah.

11   Q.    Okay.  So, your sentencing and this whole conversation

12   with your attorney took place prior to your conversations with

13   Mr. Mohamadi that you have just told us about?

14   A.    Right.  I am having trouble with the dates because I

15   couldn't even remember when I got sentenced.  It just has been

16   awhile ago, so--

17   Q.    And this was Mr. Krem who indicated to you that it was

18   possible to get a lower sentence based on your cooperation,

19   correct?

20   A.    Yes.

21   Q.    Okay.  And that's why you wanted Mr. Krem contacted in

22   reference to this case, correct?

23   A.    Yes.

24   Q.    Because you wanted Mr. Krem to ask for a reduction in

25   your sentence if you were going to testify here today,

340

1    correct?

2    A.   No, not--  Basically it was if anything bear fruit with

3    any situation that I brought to, to the, to law enforcement,

4    that he would see if the judge would readdress my sentence in

5    cooperation with whatever outcome I may have helped with any

6    type of information I provided.

7    Q.   Okay.  So, you thought that Mr. Krem could ask the Court

8    to reduce your sentence based on any cooperation you gave to

9    law enforcement, correct?

10   A.   Yeah.

11   Q.   Now, when you spoke with Mr. Mohamadi in September, you

12   were still at the Fairfax County Adult Detention Center,

13   correct?

14   A.   Yes.

15   Q.   But you already received your sentence and that was your

16   testimony, correct?

17   A.   Yes.

18   Q.   And that sentence was 15 years with seven suspended on

19   the carjacking, correct?

20   A.   Yes.

21   Q.   And five years on the robbery?

22   A.   Right.

23   Q.   And those sentences were run concurrent?

24   A.   Yes.

25   Q.   And so, that was a sentence of eight years to serve,

R.N. Pressley - Cross

341

1    correct?

2    A.    Yes.

3    Q.    And that's the most time you have ever been sentenced to?

4    A.    Yes.

5    Q.    Now, Mr. Pressley, I assume you don't particularly like

6    being in jail?

7    A.    No.

8    Q.    There are limitations on almost everything you can do,

9    correct?

10   A.    Right.

11   Q.    What you can eat?

12   A.    Right.

13   Q.    When you can watch TV?

14   A.    Right.

15   Q.    The stuff you can have in there?

16   A.    Right.

17   Q.    When you use the phone?

18   A.    Right.

19   Q.    You get locked down for part of the day?

20   A.    Right.

21   Q.    And you actually had some medical problems while you were

22   in Fairfax?  You contacted the nurse about--

23   A.    Oh, yes.

24   Q.    Some medical problems?

25   A.    Yes.

R.N. Pressley - Cross

342

1   Q.   Which has to be tougher when you are in the jail?

2   A.   Right.

3   Q.   You can't go out and see the doctor whenever you want,

4   it's up to them, correct?

5   A.   Right.

6   Q.   Now, you testified in response to the Government's

7   questions that you sent two letters to Detective Lawn,

8   correct?

9   A.   Right.

10  Q.   And you sent those two letters before you spoke with him,

11  correct?

12  A.   To Detective Lawn?

13  Q.   To Detective Lawn, excuse me.

14  A.   Yes, yes.

15  Q.   So, he came to see you in response to your letters?

16  A.   Right.

17  Q.   Now, you indicated that Mr. Mohamadi thought that you

18  were getting out on a motion for reconsideration?

19  A.   Yes, that's what it would have been.

20  Q.   And that's because you had talked to him about your case?

21  A.   No, that was before.  I had already addressed--  I mean,

22  that type of motion, you know, a lot of us already do it.  If

23  you are in a situation where you are going to sentencing, and

24  you think that--

25  Q.   Well, my question, Mr. Pressley, is Mr. Mohamadi was

R.N. Pressley - Cross

343

1   aware that you were hoping for a reconsideration?

2   A.   Oh, yeah, yeah, yeah.

3   Q.   And he knew that because you told him that?

4   A.   Yeah.

5   Q.   And that's because you were talking about your case?

6   A.   Yeah.

7   Q.   And the sentence you got?

8   A.   Yeah.

9   Q.   The facts of your case?

10  A.   Right.

11  Q.   You will have to answer out loud for the court reporter.

12  A.   Right.

13  Q.   And the sentence?

14  A.   Right.

15  Q.   And the charges?

16  A.   Right.

17  Q.   All of those details about your case?

18  A.   Right.

19  Q.   And people frequently share that information in the jail?

20  A.   Yes.

21  Q.   Probably most of what people talk about in the jail?

22  A.   Yes.

23  Q.   Including Mr. Mohamadi?

24  A.   Yes.

25  Q.   Now, the conversations you had with Mr. Mohamadi weren't

R.N. Pressley - Cross

344

1    recorded, correct?

2    A.    No.

3    Q.    And you certainly talked to him many times?

4    A.    Yes.

5    Q.    Most of those conversations weren't about anything to do

6    with this, correct?

7    A.    About his case?

8    Q.    Correct.

9    A.    Most of them were.

10   Q.    But certainly you had conversations that weren't about

11   that?

12   A.    Yes.

13   Q.    And Mr. Mohamadi is a big talker, likes to talk a lot?

14   A.    Yes.

15   Q.    About a lot of stuff?

16   A.    Yes.

17   Q.    Kind of boisterous?

18   A.    Yes.

19   Q.    You said in response to the questions earlier that you

20   tried to introduce another person to Mr. Mohamadi, correct?

21   A.    Yes.

22   Q.    And that person would have been an undercover officer?

23   A.    Yes.

24   Q.    You didn't tell Mr. Mohamadi it was an undercover

25   officer?

R.N. Pressley - Cross

345

1    A.    No.

2    Q.    You told him it was someone who could get the job done?

3    A.    Yes.

4    Q.    And you told him it was somebody who would be out and

5    available to get the job done?

6    A.    Yes.

7    Q.    Now, Mr. Pressley, you didn't actually kill anyone --

8    A.    No.

9    Q.    --  in connection with this?

10   A.    No.

11   Q.    You didn't take any steps to do that?

12   A.    No.

13   Q.    You didn't obtain a weapon?

14   A.    No.

15   Q.    You didn't try and find the cab driver's house?

16   A.    No.

17   Q.    You didn't drive by the cab driver's house?

18   A.    No.

19   Q.    Mr. Pressley, you are a user of narcotics, correct?

20   A.    Marijuana.

21   Q.    Okay.  And you have used other controlled substances in

22   this past?

23   A.    No.  Alcohol, I drink.

24   Q.    And indeed, you have been ordered as part of your

25   probation to participate in substance abuse treatment?

R.N. Pressley - Cross

346

1   A.   Everybody does.

2   Q.   My questions is if you had been ordered to participate?

3   A.   Yes.

4   Q.   And in fact, you were ordered to participate in

5   in-patient substance abuse treatment?

6   A.   Since I have been locked up?

7   Q.   In the past.

8   A.   Oh, yeah, yeah.

9   Q.   Where you would stay there 24 hours a day?

10  A.   Yeah.

11  Q.   Now, Mr. Pressley, you have met with the Government, the

12  attorneys?

13  A.   Yes.

14  Q.   For the United States to discuss your case?

15  A.   Yes.

16  Q.   And specifically to discuss what would happen at trial?

17  A.   Yes.

18  Q.   Okay.  And what would you say at trial?

19  A.   Yes.

20  Q.   How many times did you meet with them?

21  A.   Twice.  Once was at a grand jury hearing about a year

22  ago.

23  Q.   Well, my question is how many times you have met with

24  them?

25  A.   Twice.

347

1          MS. MINTER:  The Court's indulgence please, Your

2     Honor.

3          THE COURT:  Yes, ma'am.

4          MS. MINTER:  Your Honor, I may have some additional

5     questions, but I think at this point I am at the point where I

6     would need to have a conversation with the Court.

7          THE COURT:  All right.

8          All right, then let's take our lunch break.  We will

9     break until 2 o'clock, and we will come back at that time and

10    hear further testimony.

11         All right, you are excused at this time.

12         NOTE:  At this point the jury leaves the courtroom;

13    whereupon the case continues as follows:

14    JURY OUT

15         THE COURT:  All right.  I assume that Mr. Mohamadi

16    has a set of questions he would like you to ask in addition to

17    the examination you have already--  I am sorry.

18         Mr. Pressley, you are excused at this time.  You are

19    just in the middle of your examination, so don't discuss your

20    testimony with anyone.  All right, sir?

21         THE WITNESS:  All right.

22         THE COURT:  All right.  We will see you after lunch.

23         NOTE:  The witness leaves the courtroom.

24         THE COURT:  Thank you.  All right.

25         MS. MINTER:  Your Honor, with respect to

348

1   impeachment, there are two convictions that Mr. Pressley has

2   from 1996.  Those are outside the standard ten-year window;

3   however, due to Mr. Pressley's numerous probation violations

4   since then, they are admissible.

5          But given the Government's response and reliance on

6   609 with respect to an earlier witness, I just wanted to bring

7   it to the Court's attention that we do intend to inquire into

8   that.

9          THE COURT:  Was he a juvenile at the time?  That's

10  what he seemed to be suggesting when he said, I don't have

11  anything as an adult, I think he said.

12         MS. MINTER:  I assume, Your Honor, that those were

13  in reference to the two--  Mr. Ben'Ary, I don't remember the

14  exact words, but had inquired whether he had additional

15  felonies.  He indicated he did, and then he indicated nothing

16  further.

17         I would assume that those felonies refer to the

18  specific robbery and use of a firearm charges that I intend to

19  inquire into.

20         So, I don't think he is necessarily excluding them,

21  but they have not been fully inquired into at this point.

22         THE COURT:  So, the 1996 charges are robbery and a

23  use of a firearm in the course of a robbery?

24         MS. MINTER:  They are, Your Honor.

25         THE COURT:  And the defendant was an adult?

R.N. Pressley - Cross

349

1          MS. MINTER:  Yes, Your Honor.

2          THE COURT:  And he served a sentence of--  What kind

3    of sentence did he serve on that?

4          MS. MINTER:  Your Honor, the sentence was five years

5    with four-and-a-half suspended on the robbery, and three years

6    on the use of a firearm charge.

7          THE COURT:  Okay.

8          MS. MINTER:  But to be clear, Your Honor, it is not

9    the sentence on the underlying charge that brings it because,

10   of course, had he received enough time, that could also bring

11   it within the ten-year window.

12          It is the probation violations that he received

13   since then that tie back to the original sentencing.  In other

14   words, they pull that conviction forward into the ten-year

15   time period.

16          And I do have two cases I could pass up to the Court

17   if the Court would like to look at them.

18          THE COURT:  All right, I will look at those at the

19   break.  I mean, I think that Rule 609 makes it pretty clear it

20   is a discretionary call.

21          Yes, Mr. Ben'Ary, I--  Well, go ahead.

22          MR. BEN'ARY:  Your Honor, I don't mean to short

23   circuit, but I am not contesting the use of those two

24   convictions for impeachment purposes.

25          THE COURT:  All right.  That makes it easier.  They

R.N. Pressley - Cross

350

1    will be allowed.

2              MS. MINTER:  Thank you, Your Honor.

3              Your Honor, then I would just ask that we have

4    leeway to continue our cross-examination after we have been

5    able to consult with Mr. Mohamadi and review his questions.

6              THE COURT:  All right.  Do you believe Mr. Mohamadi

7    has further questions he would like you to ask?

8              MS. MINTER:  I do, Your Honor.  If I could review

9    those with him briefly before we go to lunch and then resume

10   the examination.

11             THE COURT:  All right.  Then you will be permitted

12   that time.

13             And you have written them out, Mr. Mohamadi?

14             MS. MINTER:  He has, Your Honor.

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All right.  Then let's get that done and

17   we will come back and continue cross-examination at 2 p.m.

18             All right, we are in recess then.

19             NOTE:  At this point a lunch recess is taken; at the

20   conclusion of which the case continues in the presence of the

21   as follows:

22   JURY IN

23             THE COURT:  All right, good afternoon.  We will

24   continue cross-examination at this time.

25             Ms. Minter.

R.N. Pressley - Cross

351

1          MS. MINTER:  Thank you, Your Honor.

2     BY MS. MINTER: (Continuing)

3     Q.   Mr. Pressley, when you were in the Fairfax Adult

4     Detention Center, you would use other inmate accounts because

5     yours had a deficit, is that correct?

6     A.   Say it again.

7     Q.   When you were an inmate at the Fairfax Adult Detention

8     Center, you would use other inmates' commissary accounts to

9     hold your money because you had a deficit in your account,

10    correct?

11    A.   Yes.

12    Q.   And you would ask other inmates if they would be willing

13    to let your family deposit money in their account, correct?

14    A.   Yes.

15    Q.   And then you would spend the money out of that account?

16    A.   Yes.

17    Q.   And did you that with Mr. Mohamadi?

18    A.   I can't recall if I ever utilized his account or not.

19    Q.   Okay.  Do you recall speaking with him about it, asking

20    if he would be willing?

21    A.   No.  As a matter of fact, there was another individual in

22    there by the name of Ahmed, and I was using his account, I

23    know I used his account for sure.  But I can't never recall

24    using Mr. Mohamadi's account.

25    Q.   But you might have?

R.N. Pressley - Cross

352

1   A.   I can't recall.

2   Q.   So, if you can't recall, you may have or you may not

3   have, correct?

4           MR. BEN'ARY:  Objection.

5           THE COURT:  Sustained.  Ask your next question,

6   please.

7   BY MS. MINTER: (Continuing)

8   Q.   Mr. Pressley, you are familiar with the setup of the

9   Fairfax County Adult Detention Center, correct?

10  A.   Yes.

11  Q.   And you are aware of how the units are and how the cells

12  are, correct?

13  A.   Yes, ma'am.

14  Q.   You are aware that at certain times all the doors are

15  locked to the cells?

16  A.   Yes.

17  Q.   You are aware that at certain times they are unlocked?

18  A.   Yes.

19  Q.   And you as an inmate don't have any control over that, do

20  you?

21  A.   No.

22  Q.   The deputies in the jail control that?

23  A.   Yes.

24  Q.   Okay.  And at certain times they open up all the doors?

25  A.   Yes.

R.N. Pressley - Cross

353

1    Q.   Certain times they close all the doors?

2    A.   Yes.

3    Q.   That's regardless of whether the inmate is there in their

4    particular cell, correct?

5    A.   Well, you can't be in, you can't be in nobody else's cell

6    at that particular time.  When the doors is open, you can go

7    in any cell you want.  But when the doors close, you can't get

8    caught in nobody else's cell.

9    Q.   Okay.  So, when the doors are open, you go in anybody's

10   cell, there is no key or anything you would need?

11   A.   No.

12   Q.   The doors are just open?

13   A.   Yes.

14   Q.   Okay.  And you have been Mr. Mohamadi's cell, correct?

15   A.   Yes.

16   Q.   Okay.  And you had an opportunity to see what was in his

17   cell?

18   A.   Yes.

19   Q.   And on one occasion another inmate actually saw you in

20   Mr. Mohamadi's cell looking at materials?

21           MR. BEN'ARY:  Objection, calls for speculation.

22           THE COURT:  No, I will allow the question.

23   Overruled.

24   A.   There was never a time where me and Mr. Mohamadi ever

25   spoke with anybody else in the cell.

R.N. Pressley - Cross

354

1   BY MS. MINTER: (Continuing)

2   Q.   That wasn't my question.  I understand your answer.  My

3   question is, if you will listen carefully, there was an

4   occasion where you were in Mr. Mohamadi's cell and another

5   inmate observed you in there by yourself, correct?

6   A.   No.

7   Q.   So, nobody would take the stand and testify to that?

8   A.   No.

9        MR. BEN'ARY:  Objection, calls for speculation.

10       THE COURT:  All right.  Sustained.  Go ahead.

11  BY MS. MINTER: (Continuing)

12  Q.   Mr. Pressley, you talked earlier, you answered questions

13  in response to the questions that the Government's lawyer

14  asked you and the questions that I asked you, and you talked

15  about people who talk about their cases?

16  A.   Yes.

17  Q.   And you spent a fair amount of time researching your own

18  case while you were there, correct?

19  A.   Yes.

20  Q.   And you went to the law library frequently?

21  A.   Yes.

22  Q.   And you educated yourself about your own case?

23  A.   Yes, I did.

24  Q.   So, you probably knew a lot about the legal system and

25  how it worked, correct?

1    A.    Just pertaining to my situation.

2    Q.    But other inmates would ask you for advice assuming that

3    you knew about the legal system?

4    A.    Yes.

5    Q.    Mr. Pressley, we talked earlier about your conviction for

6    carjacking and robbery from 2007.

7    A.    Yes.

8    Q.    In addition to those convictions, in 1996 you were

9    convicted of robbery?

10   A.    Yes.

11   Q.    And in 1996 you were convicted of use of a firearm as

12   well?

13   A.    Yes.

14           MS. MINTER:  Nothing further.

15           THE COURT:  All right.  Any redirect?

16           MR. BEN'ARY:  No, thank you, Your Honor.

17           THE COURT:  All right.  May this witness be excused?

18           MR. BEN'ARY:  Yes, Your Honor, thank you.

19           THE COURT:  Any need to hold Mr. Pressley?

20           MS. MINTER:  No need, Your Honor.

21           THE COURT:  All right.  Mr. Pressley, you are

22   excused at this time, sir.  You are not to discuss your

23   testimony with anyone until this trial is over.  All right?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  All right.  Have a good afternoon.

T. Lawn - Direct

356

1          THE WITNESS:  All right now.

2          NOTE:  The witness stood down.

3          THE COURT:  All right, next witness.

4          MR. BEN'ARY:  Your Honor, the Government would like

5     to call Detective Tom Lawn, please.

6          NOTE:  The witness is sworn.

7          THOMAS LAWN, called by counsel for the United

8     States, first being duly sworn, testifies and states:

9          DIRECT EXAMINATION

10    BY MR. BEN'ARY:

11    Q.   Good afternoon, Detective.

12    A.   Good afternoon, sir.

13    Q.   Would you tell the members of the jury, please, your name

14    and occupation.

15    A.   Yes.  My name is Thomas Lawn.  It is L-a-w-n.  I am a

16    police officer with Fairfax County, employed as a detective.

17    Q.   How long have you been an employee of the Fairfax County

18    Police Department, sir?

19    A.   23 years.

20    Q.   And is there a current unit within the police department

21    that you are assigned to?

22    A.   Yes, sir, the robbery unit.

23    Q.   How long have you had that assignment?

24    A.   About six years, since 2003, October of 2003.

25    Q.   As part of your job with the Fairfax County Police

T. Lawn - Direct

357

1    Department, did you have an occasion to investigate an

2    individual by the named of Randy Pressley?

3    A.    Yes, I did.

4    Q.    Can you tell the members of the jury what was your

5    investigation into?

6    A.    It was the investigation of a robbery and a carjacking.

7    It was what we call a strong arm robbery of a pizza driver in

8    Fairfax County in March of 2006.

9    Q.    Okay.  And was Mr. Pressley eventually convicted of

10   charges associated with the events you were investigating?

11   A.    Yes, he was.

12   Q.    And did Mr. Pressley spend time because of your charges

13   or the charges that you investigated in the Fairfax County

14   Adult Detention Center?

15   A.    Yes, he did.

16   Q.    At some point after Mr. Pressley was convicted, did you

17   receive contact from Mr. Pressley from the Fairfax County

18   Adult Detention Center?

19   A.    I did, sir.

20   Q.    What did you receive?

21   A.    I received a letter in the U.S. mail, came to my office

22   at the Criminal Investigation Division.

23   Q.    Do you remember what date it was that you received that

24   letter?

25   A.    I received it on September 18, 2006.

T. Lawn - Direct

358

1   Q.   And was it dated?

2   A.   Yes.  Actually, I am sorry, 2007 is when it was,

3   September, it was after the offense, obviously.

4   Q.   Okay.

5   A.   It was dated, it was postmarked the day before, the 17th.

6   Sometimes it takes a day or two for the mail to get to us

7   within the office.

8   Q.   And based on what you read in the letter, did you

9   actually go to the Fairfax County Adult Detention Center and

10  meet with Mr. Pressley?

11  A.   Yes, I did.

12  Q.   And did Mr. Pressley convey some information to you?

13  A.   Yes, sir, he did.

14  Q.   Without telling us what it was exactly that Mr. Pressley

15  told you, did you take some steps based on the information

16  that he gave you?

17  A.   Yes, I did.

18  Q.   What did you do once you learned whatever information

19  that Mr. Pressley gave you?

20  A.   I verified the information that he gave me to make sure

21  he gave me the name of a person.  I verified that person did

22  exist and that person's identity.  And then what he described

23  to me and explained to me appeared to be legitimate

24  information.  I did go and speak with him about it after that.

25  Q.   With Mr. Pressley?

T. Lawn - Direct

359

1  A.   Yes, I did.  The same day I got the letter actually, I

2  went to speak with him.

3  Q.   Okay.  And did you, after having a discussion with Mr.

4  Pressley, discuss with him a course of action that you would

5  like him to undertake?

6  A.   Yes, I did.

7  Q.   And describe that course of action to the members of the

8  jury, please.

9  A.   I had approached him, I spoke to somebody in our

10  narcotics unit, a supervisor that has the detectives that work

11  undercover.  They generally have a different appearances.

12  Obviously longer hair, beards, that kind of thing so they

13  don't look like a policeman.  Approached him.  Basically I

14  came up with a cover story, as we call it, something to tell

15  the person that sounds feasible.

16          And once I did that, I had gone to the, to speak

17  with Mr. Pressley.  The first time I went to see him, he

18  basically told me what had happened.  When I went to see him--

19  That would be the first time, I'm sorry, the 18th.  When I got

20  the letter, I went and spoke to him.  And he basically told me

21  what happened.  Left there.  He gave me information.  Keep

22  myself on track here.

23          Then when I went back to him, once I obtained a

24  cover story and arranged for a detective when called upon to

25  actually go ahead in and meet with the person in the jail, I

T. Lawn - Direct

360

1    didn't know if you want me to name the person I was dealing

2    with or not, but I did that.  So, I went back and spoke with

3    him again.

4    Q.   Okay.  And did you convey this plan involving the

5    undercover detective to Mr. Pressley?

6    A.   I did, on the 20th of September.

7    Q.   And did this undercover detective eventually meet with

8    the individual that Mr. Pressley was talking about?

9    A.   No, he did not.

10   Q.   And what was your next step after it became obvious to

11   you that this meeting with the undercover wasn't going to

12   occur?

13   A.   Once I determined that it wasn't going to happen, I had

14   gone back--  I actually had received another letter, I had

15   received a second letter from Mr. Pressley stating that it

16   didn't look like--

17          MS. MINTER:  Objection, hearsay.

18   A.   Okay.

19   Q.   Well, you received a second letter from Mr. Pressley and

20   you read it.  And based on the information that was contained

21   in the letter--

22   A.   I went back to see him, sir, on the 27th of September.

23   Q.   Okay.  And when did it become clear that this plan to

24   introduce the undercover detective into the mix wasn't going

25   to come to fruition?

T. Lawn - Direct

361

1    A.   I confirmed that when I spoke with him that day.  It was

2    in the letter.  And then when I went and spoke with Mr.

3    Pressley in person again, it became clear to me that it wasn't

4    going to happen.

5    Q.   Okay.  And who is the individual who Mr. Pressley told

6    you was the reason that he was contacting you?

7    A.   The person who was asking--  It was Mohamadi, Mr.

8    Mohamadi.

9    Q.   Okay.

10   A.   Mirwais Mohamadi was the name I identified eventually.

11           THE COURT:  Please come a little closer to the

12   microphone, Detective.

13           THE WITNESS:  I'm sorry, sorry, Your Honor.

14   BY MR. BEN'ARY: (Continuing)

15   Q.   Have you ever dealt with Mirwais Mohamadi?

16   A.   No, sir.

17   Q.   What did you do after learning that Mr. Mohamadi wasn't

18   going to meet with this undercover detective?

19   A.   I contacted Detective Hickman in the city of Alexandria

20   and met with him and the victim.

21           MS. MINTER:  Objection, relevance.

22           THE COURT:  Overruled.

23   A.   Met with a victim of the case that he was working on that

24   was tied into this.  And I basically explained to that victim

25   what was occurring, a plan that had been reported to us.

T. Lawn - Direct

362

1  BY MR. BEN'ARY: (Continuing)

2  Q.    Who was the victim?

3  A.    Mr., I believe it's Haile or Haile, H-a-i-l-e, I am not

4  sure how you say his name.

5  Q.    And what did you tell Mr. Haile along with Detective

6  Hickman?

7  A.    I told him what I had been contacted--  I don't know what

8  I can say or not say without causing an issue.  I spoke with

9  him about what had been reported to us and what I had been

10 investigating and what steps I had taken.

11 Q.    Okay.  And what was it that you actually were able to--

12 What did you actually say to Mr. Haile when you met with him?

13           MS. MINTER:  Objection, Your Honor.

14           THE COURT:  What's the relevance of this.  We don't

15 need to go any further.  I think it was relevant to say that

16 it was reported to Detective Hickman in Alexandria.  I think

17 that's about as much probative value from that.

18           So, let's move on.

19           MR. BEN'ARY:  I understand, Your Honor.

20           THE COURT:  All right.

21           MR. BEN'ARY:  If I could have the Court's indulgence

22 for one moment, please.

23           THE COURT:  Yes, sir.

24           MR. BEN'ARY:  Those are my questions for Detective

25 Lawn.  Thank you.

T. Lawn - Cross

363

```
 1              THE COURT:  All right, thank you.

 2   Cross-examination.

 3              MS. MINTER:  The Court's indulgence.

 4              THE COURT:  Yes.

 5              MS. MINTER:  Thank you, Your Honor.

 6      CROSS-EXAMINATION

 7   BY MS. MINTER:

 8   Q.   Just to be clear, Detective, you received these letters

 9   in the mail from Mr. Pressley, correct?

10   A.   Yes, ma'am.

11   Q.   You did not initiate contact with him?

12   A.   No, ma'am.

13   Q.   Obviously, you had had prior encounters with him, but

14   with respect to what you have testified to today, he initiated

15   the contact?

16   A.   This was initiated through the letters in the mail, yes,

17   ma'am.

18   Q.   And you testified that you established a plan to use an

19   undercover officer?

20   A.   Yes, ma'am.

21   Q.   Why an undercover officer?

22   A.   Because like I was explaining earlier, normally in a

23   situation where we are dealing with somebody that's in the

24   jail, if they are looking to talk to somebody to do something

25   that's a criminal act, we are not going to send normally a
```

T. Lawn - Cross

364

1    clean-cut looking person like a police officer in.

2             If you're talking to another inmate saying I want to

3    do something, we wouldn't bring in somebody who obviously

4    looks like a police officer and say, this is a friend of mine,

5    he can do this for you.

6    Q.    So, you wanted an undercover officer who would look like

7    an inmate?

8    A.    Right.  Who would look less I guess law-enforcement

9    oriented, is the best way to put it, I guess, yes, ma'am.

10   Q.    And why not use an inmate?  For example, Mr. Pressley in

11   this case, why not use Mr. Pressley to assist you?

12   A.    It's not something that we normally do in Fairfax.  Cases

13   that I have investigated, normally it's just easier to use a

14   police officer to go in there.

15   Q.    Why is it easier?

16   A.    Because they know rules of evidence, that kind of thing,

17   I guess.  I don't know that our agency actually uses inmates,

18   I am not sure because I have never dealt with it.  So, I would

19   be speculating.  I have never done it personally.

20   Q.    Now, you described this plan to use the undercover

21   officer to Mr. Pressley, correct?

22   A.    Yes.  I shared the cover story with him.  You know, if

23   you discuss this, this is what you should say.

24   Q.    Okay.  And the cover story involved identifying this

25   undercover agent as someone who could possibly carry out this

T. Lawn - Cross

365

1   act, correct?

2   A.   Yes.

3   Q.   And the cover story would have relayed that this

4   individual was immediately or shortly thereafter available to

5   carry out the act, correct?

6   A.   Yeah, I don't think it dealt with available.  I think the

7   cover story was that somebody could come and meet with him if

8   he was willing to do that, like a visitation.  So, it would

9   have been, we would have presented it with someone on the

10  outside that could come in and meet with Mr. Mohamadi.

11  Q.   So, the undercover officer would have presented

12  themselves as someone who was not currently an inmate?

13  A.   Right, someone who Mr. Pressley contacted and said, hey,

14  I can, yes.

15  Q.   And to your knowledge, Mr. Pressley cooperated with that

16  plan?  He delivered the information you asked him to deliver?

17  A.   That's what he told me.

18  Q.   And he followed your instructions as far as you know?

19  A.   I believe so.

20  Q.   Okay.  And the offer was not accepted to meet with the

21  undercover officer, as far as you know?

22  A.   That's correct.

23          MS. MINTER:  The Court's indulgence, Your Honor.

24          Nothing further.

25          THE COURT:  All right.  Thank you, Ms. Minter.  Any

366

1    redirect?

2         MR. BEN'ARY:  Just very briefly.

3        REDIRECT EXAMINATION

4    BY MR. BEN'ARY:

5    Q.   On the potential use of an undercover in this case, Mr.

6    Haile was not in the Fairfax County Adult Detention Center,

7    correct?

8    A.   No.  No, sir.  Not to my knowledge.

9    Q.   And Mr. Pressley was incarcerated?

10   A.   Yes, he was.

11   Q.   You were aware that he had received recently a lengthy,

12   somewhat lengthy sentence, over a year, correct?

13   A.   Yes.

14   Q.   So, you knew that he was not going to be available to

15   actually go seek out Mr. Haile on the outside, is that

16   correct?

17   A.   Yes, he wouldn't have been an option anyway, he wasn't

18   going anywhere.

19         MR. BEN'ARY:  Thank you.

20         THE COURT:  All right.  May Detective Lawn be

21   excused?

22         MR. BEN'ARY:  From the Government, yes, Your Honor.

23         MS. MINTER:  Yes, Your Honor.

24         THE COURT:  All right.  Detective, you are excused,

25   sir.  Please don't discuss your testimony until the case is

S. Grant - Direct

367

1    over.  All right?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  You are free to go.  Have a good

4    afternoon.

5              THE WITNESS:  Thank you, Your Honor.

6              NOTE:  The witness stood down.

7              THE COURT:  Next witness.

8              MR. WALUTES:  Your Honor, the United States calls

9    Stephen Grant.

10             THE COURT:  All right.

11             NOTE:  The witness is sworn.

12             THE COURT:  Good afternoon.  Go ahead, sir.

13             MR. WALUTES:  Thank you, Your Honor.

14             STEPHEN GRANT, called by counsel for the United

15   States, first being duly sworn, testifies and states:

16        DIRECT EXAMINATION

17   BY MR. WALUTES:

18   Q.   Good afternoon, sir.

19   A.   Good afternoon.

20   Q.   Thank you.  I just want to make sure we are talking in a

21   loud enough voice.

22             Could you please tell us your name.

23   A.   Stephen Grant.

24   Q.   And how old are you, Mr. Grant?

25   A.   33.

368

1           THE COURT:  Please come a little closer, just a

2  little bit closer to the microphone.  Thank you.

3  Q.   And how far did you go in school, sir?

4  A.   I went to George Mason University, and six credits from

5  graduation.

6  Q.   And what line of work does your father do?

7  A.   He is a pastor.

8           MS. MINTER:  Objection, relevance.

9           THE COURT:  Overruled.  Go ahead.

10 BY MR. WALUTES: (Continuing)

11 Q.   Mr. Grant, were you in the Fairfax County Adult Detention

12 Center back in the fall of 2007?

13 A.   Yes.

14 Q.   Do you recall when you were released from the Fairfax

15 Jail?

16 A.   November 4.

17 Q.   Who was your cellmate at the time you were in the Fairfax

18 Jail?

19 A.   Joshua Puryear.

20 Q.   Can you spell that?

21 A.   P-u-r-y-e-a-r.

22 Q.   Is Mr. Puryear still incarcerated?

23 A.   He is incarcerated under a different charge in a

24 different facility.

25 Q.   Would it be fair to say that you know his charge?

369

1   A.   He is charged with murder.

2   Q.   And what, if anything, were you told back in the days

3   before your release from the Fairfax Jail on November 4 of

4   2007 by Mr. Puryear concerning a job?

5        MS. MINTER:  Objection, hearsay.

6        THE COURT:  Sustained.

7   BY MR. WALUTES: (Continuing)

8   Q.   Were you told something by Mr. Puryear?  Don't tell us

9   what it was, but were you told something?

10  A.   Yes.

11  Q.   At some point did another inmate approach you?

12  A.   Yes.

13  Q.   And what was the other inmate's name?

14  A.   Omar.

15  Q.   And do you know approximately how many days before your

16  release on November 4 of 2007 you were approached by Omar?

17  A.   Approximately three days.

18  Q.   In addition to Mr. Puryear, did anyone else talk to you

19  about what Omar was speaking of?

20  A.   I am not sure I understand the question.

21  Q.   Did you know Omar before he approached you a few days

22  before your release?

23  A.   No.

24  Q.   Did the person named Omar ever express to you why he felt

25  he could talk to you?

S. Grant - Direct

370

1    A.   The problem that I am having is did the person named

2    Omar--

3    Q.   I am sorry.  Do you see Omar in the courtroom today?

4    A.   Yes.

5    Q.   Could you identify him by his location?

6    A.   He is right here.

7              MR. WALUTES:  Your Honor, could the record--

8              THE COURT:  I will note the identification of Mr.

9    Mohamadi.

10   BY MR. WALUTES: (Continuing)

11   Q.   Had you met Mr. Mohamadi prior to those few days prior

12   your release on November 4, 2007?

13   A.   No.

14   Q.   Did Mr. Mohamadi ever express to you why--  That anybody

15   had ever vouched for you?  Was there a conversation about why

16   he thought he could have a conversation with you?

17   A.   I understand.  When I first was introduced to Omar, the

18   only person that the two of us both knew name was Dominik

19   Brown.  And I guess, I can't tell you why Omar spoke to me,

20   but I am assuming it was because he had a conversation with

21   Dominik Brown.

22             MS. MINTER:  Objection, speculation.

23             THE COURT:  Sustained.

24   A.   He had asked me--

25             MR. WALUTES:  I am sorry, let me ask the question.

371

1          THE COURT:  Yeah, wait for the next question.

2          Go ahead.

3          MR. WALUTES:  Thank you.

4   BY MR. WALUTES: (Continuing)

5   Q.   Did the person you have identified as Omar, did he talk

6   about Dominik Brown to you?

7   A.   Yes.

8   Q.   Okay.  And is Dominik Brown someone known to you?

9   A.   Yes.

10  Q.   Do you know Dominik Brown's street name?

11  A.   Dogg.

12  Q.   Okay.  And how many years have you known Dominik Brown?

13  A.   Since we were, since I was a juvenile.

14  Q.   Are you scared of Dominik Brown?

15  A.   Yes.

16          MS. MINTER:  Objection, relevance.

17          THE COURT:  Overruled.

18  BY MR. WALUTES: (Continuing)

19  Q.   Up to this point when the person--  Do you know actually

20  know Omar's full name?

21  A.   I don't know how to pronounce it.

22  Q.   Okay.  When you spoke to him for those three days before

23  you were released, you just addressed him as Omar?

24  A.   Yes.

25  Q.   So, if I can use that then.  Up to the point when you are

372

1    talking to Omar a few days before you are released on November

2    4, 2007, had you ever helped law enforcement?

3    A.   No.

4    Q.   Did Dominik Brown know that fact about you?

5    A.   Yes.  By saying, helping law enforcement, I assume you

6    mean cooperating--

7    Q.   Yes, snitching on somebody else.

8    A.   Okay.  No.

9    Q.   Doing their bidding?

10   A.   No.

11   Q.   What did Omar say to you when he approached you?

12   A.   I can't even remember specifically what was said except

13   that, the gist of it was I was struggling financially and I

14   just had a daughter the month before, she was a month old at

15   the time, and I was really going through it, you know,

16   financially--

17          MS. MINTER:  Objection, nonresponsive.

18          THE COURT:  Overruled.

19   A.   And he was in a situation where he had, was facing a

20   robbery charge.  And there was a witness that, a cab driver

21   who had witnessed the robbery.  And if I could kill the

22   taxicab driver, he would give me $10,000 in cash and a BMW.

23   Q.   Okay.  Let me talk about that for a second.  In terms of

24   his charge, you just understood it to be a robbery charge,

25   correct?

S. Grant - Direct

373

1    A.   A robbery charge.  And I think a violation of probation.

2    Q.   Okay.  And the taxicab driver, is he the one who was

3    robbed or was he the witness?

4    A.   I have no idea.  But what he told me was that he was a

5    witness.

6    Q.   And were any notes taken as you spoke with Omar?

7    A.   Yes.

8    Q.   And can you tell the jury what notes?

9    A.   The way Fairfax County is, you are locked out of your

10   cells in the daytime.  And came a point when the cells opened

11   up, and my cellmate brought Omar into the room.

12   Q.   This is Mr. Puryear?

13   A.   Yes.  And that's when we started to go into detail about

14   the murder, and I started to realize that it was more serious

15   than I knew.

16   Q.   And at some point are notes taken?

17   A.   Yes.  We have inmate handbooks.  And that's where in the

18   inmate handbook, in between the paragraphs and the sentences

19   where he wrote his sister's phone number, the cab driver's

20   name, the code names that we were going to use to talk about

21   it on the phone in the spaces of the paragraphs.  So that, you

22   know, you couldn't just flip through the pages and read what

23   was written.  You would have to know what page it was on.

24   Q.   I know you said that you were approached by Omar a few

25   days before your release on November 4 of 2007.  Was it just

374

1    one approach, or did you have repeated contact with him in

2    those last few days before--

3    A.   Repeated contact.

4    Q.   And while you were in discussions with Omar, the person

5    you know only as Omar, did you have some suspicions that

6    people were checking you out?

7    A.   Yes.

8    Q.   And can you describe that to the jury?

9    A.   Well, I knew he had spoken with Dominik Brown, and I knew

10   that my cellmate--

11            MS. MINTER:  Your Honor, I would object to the

12   hearsay and the speculation, unless he can give specific

13   admissible information.

14            MR. WALUTES:  Can I lay a foundation, Your Honor?

15   BY MR. WALUTES: (Continuing)

16   Q.   Did you know those facts from speaking with Omar?

17   A.   Yes.

18            THE COURT:  All right.  Go ahead, then.

19   Q.   I am sorry, do you remember the rest of your answer or

20   had you finished?

21   A.   He had told me that he had spoken with Dominik Brown.

22   And then Josh, my celly, cellmate at the time--

23            MS. MINTER:  Objection, hearsay.

24            THE WITNESS:  No, it's not hearsay.

25            THE COURT:  Don't tell him what this other third

S. Grant - Direct

375

1    person said.  Just what Omar said.

2            THE WITNESS:  I wasn't saying that he said anything.

3    I was just saying that my cellmate who was in the cell at the

4    time, I know he had gone through my paperwork.

5    BY MR. WALUTES: (Continuing)

6    Q.   And why do you know that?

7    A.   Because he was the only one who was, had access to the

8    cell and--

9            MS. MINTER:  Objection, speculation.

10   Q.   My question is, why do you think--

11           THE COURT:  Overruled.  Okay.  Let's not talk over

12   each other.  You are making an objection.  Let the objection

13   be made, let's rule on it, then we will move on.

14           MR. WALUTES:  Sorry, Your Honor.

15           THE COURT:  That's all right.  I overruled the

16   objection.  Go ahead.

17   BY MR. WALUTES: (Continuing)

18   Q.   Why do you think, Mr. Grant, that your paperwork had been

19   gone through?

20   A.   I know it had been gone through because it wasn't how I

21   left it.

22   Q.   Did you discuss with Omar what would happen if this

23   witness was murdered?

24   A.   Yes.

25   Q.   And what was that discussion?

S. Grant - Direct

376

1    A.   Well, he wouldn't be able to testify at his trial and

2    Omar would come home.

3    Q.   Did you tell that to Omar, or did Omar tell that to you?

4    A.   He told that to me.

5    Q.   Did you, were you--  Did you believe that you were the

6    first person he had spoken to about this?

7    A.   Yes, I did.

8    Q.   When did you first make the decision to reach out to law

9    enforcement?

10   A.   Once I really believed that the taxicab driver was going

11   to die.

12   Q.   Did you speak to law enforcement during those last few

13   days when you were still locked up, or did you wait until you

14   were released?

15   A.   The day that I was being released from Fairfax County I

16   spoke with an officer just so that he would know that the

17   taxicab driver's life was in danger.

18   Q.   I am sorry, could you tell me again what it is that Omar

19   offered you if you were willing to do this murder for him?

20   A.   $10,000 in cash and a BMW.

21   Q.   Was there anything else?

22          MS. MINTER:  Objection, asked and answered.

23          THE COURT:  Overruled.

24   A.   That I could make some money driving around some girls in

25   a prostitution ring.

377

1    BY MR. WALUTES: (Continuing)

2    Q.   Did the person you know only or you knew primarily as

3    Omar, did he discuss with you a method by which you might be

4    able to speak with him after your release on November 4 of

5    2007?

6    A.   I spoke with him several times after my release.

7    Q.   Okay.  But are inmates' calls recorded?

8    A.   Inmates' calls are recorded, yes.  Telephone calls to

9    your attorney are not.  And he knew Larry Brown's secretary,

10   Silvia, and that's how we would speak to each other.

11   Q.   Once you were being released, the same day you were being

12   released I believe was your testimony, you said you spoke to a

13   police officer.

14        Did the police officer give you a plan or suggest a

15   method by which you might be helpful to that police officer?

16   A.   Yes.  He had several ideas, but I think he was

17   ineffective.

18   Q.   Okay.  But rather than commenting on whether the police

19   officer was ineffective, I wonder if you could tell us not

20   what he was saying to you, but what plans do you try, if you

21   made any effort to assist law enforcement?

22   A.   Silvia, the secretary of Larry Brown, at one point was

23   supposed to do bring me a gun on Richmond Highway.  The

24   officer told me not--

25        MS. MINTER:  Objection, lack of foundation.

378

1          THE COURT:  Yeah, let's back up a little bit.

2          MR. WALUTES:  I am happy to do that, Your Honor.

3          THE COURT:  Thank you.

4    BY MR. WALUTES: (Continuing)

5    Q.   I am sorry.  And so, while you are still in the jail, are

6    you talking to Omar, the person you knew as Omar about what

7    Silvia would provide to you, or is this after you have been

8    released?

9    A.   After I have been released.

10   Q.   Okay.  And after you have been released, who tells you

11   that you Silvia will bring you a gun?

12   A.   Omar did.

13   Q.   Okay.  And do you just go get the gun, or do you do

14   something first?

15   A.   I called the officer that I was involved with and I had

16   first told.  And he told me not to accept the gun from Silvia.

17   Q.   Okay.  Did he tell you why?

18   A.   He said--

19          MS. MINTER:  Objection, hearsay.

20          MR. WALUTES:  It's not offered for the truth of the

21   matter, Your Honor.  It is more of an effort to try to explain

22   the context of these discussions.

23          THE COURT:  Is he going to be a witness?

24          MR. WALUTES:  He is not, Your Honor.

25          THE COURT:  Okay.  Then objection sustained.  He can

1    address what he did after the discussion with the police

2    officer.

3    BY MR. WALUTES: (Continuing)

4    Q.   After you had that discussion with the police officer,

5    did you pick up the gun?

6    A.   No, I did not.

7    Q.   Okay.  And was there anything that you were doing that

8    you thought you were being asked to do when you were having

9    conversations with either Silvia or with Omar, not telling me

10   what the police officer told you, but after having had the

11   conversation with the police officer, was there something that

12   you were doing in the further discussions with Omar and/or

13   Silvia?

14   A.   If you are referring to searching for the taxicab's

15   address?

16   Q.   Did you do that?

17   A.   Yes.

18          MS. MINTER:  Your Honor, I think we need to clarify

19   what the question is.  If the witness knows, he give the

20   answer.  If he doesn't know, he should say he doesn't know.

21          THE COURT:  He asked him whether he did anything

22   further based on conversations with Silvia and Omar.  I think

23   that's a proper question.  That's the answer that he got.

24   Overruled.

25   BY MR. WALUTES: (Continuing)

S. Grant - Direct

380

1    Q.   And was there ever a point at which you tried to insert

2    an undercover?

3    A.   It was talked about, but there was never a point where we

4    tried to insert an undercover.  There was, Omar had asked me

5    to come and visit him at the Fairfax County Jail.  And the

6    officer had wanted to audio tape the visitation conversation.

7    Q.   Did that actually ever happen?

8    A.   No, I went to visit him, but it wasn't recorded.

9    Q.   Did you ever pick up a gun as Omar had told you Silvia

10   would provide?

11   A.   I did not go to pick up the gun.  As I told you, the

12   officer had told me not to.

13   Q.   So, you never got to pick up--

14            MS. MINTER:  Objection, hearsay.

15            THE COURT:  Overruled.

16   BY MR. WALUTES: (Continuing)

17   Q.   I am sorry, just wait for the question because otherwise

18   we can't figure out if it is appropriate.

19            Other than not ever being able to pick up the gun

20   and making a meeting where it didn't get recorded, were you

21   able to do anything else to try to help law enforcement on

22   this potential risk to the taxicab driver.

23   A.   Could you ask the question again?

24   Q.   Let me ask it a little different, if I might.

25            Do you know whether Omar 's offer of a BMW or the

S. Grant - Direct

381

1    $10,000 was actually legitimate?  That there was any reason to

2    believe that that actually existed?

3    A.   Yes.

4    Q.   How do you know that?

5    A.   I went to his house.

6    Q.   When you say his house, Omar's house?

7    A.   Well, the address he gave me.

8    Q.   And do you recall today where that is?

9    A.   It's in Springfield, by Franconia Springfield Parkway.

10   The street I think is Viola.

11   Q.   Do you remember if anyone else resided there?  Was it

12   empty because Omar was at Fairfax, or is there someone else

13   there when Omar is in Fairfax?

14   A.   His sister.

15   Q.   Okay.  Do you remember today his sister's name?

16   A.   Myra.

17   Q.   And was anything shown to you when you went to visit the

18   defendant's sister to help convince you that there was

19   actually $10,000 or a BMW?

20   A.   I had phone conversations with Myra.  But the way the

21   garage is set, it had a window, and I could check out the BMW

22   through the window.

23   Q.   So, you actually saw a BMW?

24   A.   Yes.

25   Q.   And it was at the house that Omar told you it would be

S. Grant - Direct

382

1    at?

2    A.    Yes.

3    Q.    At some point did federal agents, put aside the Fairfax

4    relationship, at some point did federal agents come and find

5    you?

6    A.    Two years after I had told the officers that the cabbie

7    was in danger, federal agents showed up at my door.

8    Q.    Okay.  At that point did they ask you what you knew about

9    this taxicab driver potential murder?

10   A.    Yes.

11   Q.    I am sorry?

12   A.    Yes, they did.

13   Q.    Okay.  At that point did they ask if you had anything,

14   any documents or any notes?

15   A.    Yes, they did.  And I told them I had the book that I had

16   received the instructions in.

17   Q.    Okay.  And is this the book that you were discussing

18   earlier, the inmate handbook?

19   A.    Yes.

20   Q.    So, you still had it two years after?

21   A.    Yes.

22   Q.    If I could ask, with the Court's assistance, if you would

23   look at what is now marked Government's Exhibit No. 40 for

24   purposes of identification, and ask you if you recognize that,

25   Mr. Grant?

383

```
1    A.    Yes, sir.

2    Q.    Do you see that, sir?

3    A.    Yes, sir.

4    Q.    What is it?

5    A.    It is the inmate handbook.

6    Q.    And does it have the items that you earlier discussed

7    written in it?  If you could actually take it out of the

8    plastic sleeve so you could look at it.

9    A.    Yes, it does.

10            MR. WALUTES:  Okay.  Your Honor, we would move the

11   admission of Government's 40 at this time, and ask permission

12   to publish it.

13            THE COURT:  Any objection?

14            MS. MINTER:  There is no objection.

15            THE COURT:  All right, you may publish it.

16   BY MR. WALUTES: (Continuing)

17   Q.    Is that the cover, Mr. Grant, on the screen--  I am

18   sorry, to the left of you down low there is a screen.

19            Is that the cover of what you are looking at?

20   A.    Yes, sir.

21   Q.    Okay.  Does this have both a marking of when you brought

22   this, were looking at this book in front of the federal grand

23   jury as well as the exhibit sticker for today?

24   A.    Yes, sir.

25   Q.    And is this the book in which writings were made when you
```

384

1    were speaking with Omar?

2    A.    Yes, sir.

3    Q.    Okay.  If you could now open it to the page in which

4    there is markings.  Okay.  Perhaps we could do this by

5    paragraph or just focus on the very top.

6           Is there a name on the top there, in the top left

7    corner?  Could you read it to us, Mr. Grant, so that--

8    A.    G-e-b-r-u.

9    Q.    Okay.  What does that say?

10   A.    Gebru.

11   Q.    Okay.  And whose name is that?

12   A.    The taxicab's last name.

13   Q.    Okay.  Now, that name there, is that written by you or by

14   Omar?

15   A.    That's Omar.

16   Q.    Okay.  I am sorry, now if we could go down a little bit

17   lower.  On the very bottom, I know I am jumping, but if we go

18   to the very bottom, the last three lines.

19           Can you blow that up.  Give us just a second, Mr.

20   Grant.

21           Okay.  Below 131 and above 132, do you see some

22   handwriting in there?

23   A.    Yes.

24   Q.    Okay.  What is that?

25   A.    H-a-i-l-e.

S. Grant - Direct

385

1    Q.    Okay.  And whose handwriting is that?

2    A.    I believe that's Omar's.

3    Q.    Okay.  And why is--  Who is--  What does Haile mean?

4    A.    That's the taxicab man's name.

5    Q.    Okay.  Do you know the taxicab man's name, first name?

6    A.    That was the name.  That was the name I was supposed to

7    use.  I don't know which is his first, which is his last.

8    Q.    I see.  Why is his name, why is one part of it at the top

9    of the page and one at the bottom?

10   A.    I believe so that, you know, they wouldn't put the two

11   names together.

12   Q.    Okay.  When Omar is writing this, where are you?

13   A.    In my cell.

14   Q.    Okay.  Are you supposed to walk out of the Fairfax County

15   Jail with this book?

16         Tell me how that works, if you know.  From your own

17   personal experience, not anybody else's experience, do you

18   know what happens when you walk out of Fairfax--

19   A.    You can take the book and you are charged for it.

20   Q.    How much does the jail charge you for that?

21   A.    I am not sure.

22   Q.    Okay.  But you got charged for this one?

23   A.    Yes.

24   Q.    And you still had it when the federal agents came to you

25   two years later?

386

1   A.   Yes.

2   Q.   Okay.  Then if we could, under Class One, if we could

3   just focus on what the writing is there?

4        Do you see that telephone number?  Do you see that

5   number written in hand, Mr. Grant?

6   A.   Yes.

7   Q.   And what is that, if you remember today?

8   A.   I think that was his sister's phone number, cell phone

9   number.  I am not sure, but I think that's what it is.

10       MS. MINTER:  Your Honor, I would object to the

11  speculation.

12       THE COURT:  Objection overruled.  I think he is

13  qualified enough so the jury understands that he is not sure,

14  but he believes that's what it is.

15  BY MR. WALUTES: (Continuing)

16  Q.   Is there another number on that page?

17  A.   I think that was--

18  Q.   If we could--

19  A.   They were contact numbers.

20  Q.   Okay.  If we could enlarge the other numbers.

21       Do you see the other 703 number?  Is that a 703

22  number?

23  A.   Yes.

24  Q.   Okay.  And you are not sure who those numbers are today,

25  but your understanding when this was being written back a few

1    days before you were released on November 4, 2007, is that

2    these are numbers that are contact numbers?

3    A.    Yes.

4    Q.    Okay.  Then are there some other writings on that page in

5    the middle?

6            Back to that page, right there.

7            Do you see between 114 and 115, do you know what

8    that is?

9    A.    That's the sister's name.

10   Q.    Could you tell me what that is because I don't want to

11   put words in your mouth?

12   A.    Myra.

13   Q.    M-y-r-e?

14   A.    a.

15   Q.    a.  Thank you.  And there is another below that between

16   116 and 117.  Do you see that name?

17   A.    Mike Rowe.

18   Q.    Do you know what that is?  Do you recall today?

19   A.    It was an alias name that we were going to use, a code

20   name to talk about.

21   Q.    Then between 118 and 119, do you see what a word there?

22   A.    It says, color.

23   Q.    Do you recall today what that was for?

24   A.    It was just code.  So when we talked about it, I would

25   remember Rowe, what we had decided would be how we talked

388

1    about it.

2    Q.   Okay.  And all the writings on this page are written when

3    you are with Omar?

4    A.   Yes.

5    Q.   Okay.  And then on the back of this inmate hook is there

6    some?

7    A.   Yes.

8    Q.   And do you write this when you are with Omar?

9    A.   No.

10   Q.   When do you write this?

11   A.   When I was leaving the jail.

12   Q.   Why do you write this when you are leaving the jail?

13   A.   Because I only referred to him as Omar, I didn't know his

14   name.

15   Q.   How did you know his name in order to write this as you

16   were leaving the jail?

17   A.   It was on his wristband.

18   Q.   So, you didn't know the name by heart, but you were able

19   to memorize the spelling?

20   A.   Yes.

21   Q.   Okay.  Once you are out of the jail and you are not being

22   watched, you write it down?

23   A.   Yes.

24   Q.   Why do you write your celly's name down as well?

25   A.   Because he was to be released soon, and I just wanted to

389

1    know his name, he was in the room at the time that I spoke

2    with Omar.

3    Q.   Understood.  And there is a number there, 1998.  Do you

4    know what that is?

5    A.   That's his inmate number.

6    Q.   Okay.  And then you tell the Fairfax police officer about

7    this information?

8    A.   Yes.

9    Q.   Does he take the book from you?

10   A.   No.

11   Q.   Okay.  Now, if we can put aside the exhibit for a second.

12        When you are taking down this information and

13   talking to the inmate you knew as Omar a few days before your

14   release, were you actually thinking about doing the murder?

15   A.   Absolutely not.

16   Q.   Why, why do you talk to him about it?

17   A.   Well, I am thinking that he has already told me that he

18   wants the cabbie dead, which would put me in danger now for

19   knowing.  And also, it bothered me.

20        And at the end of the day, I just didn't want the

21   cabbie to get killed, and that was it.

22   Q.   And why do you decide to go to the police when you get

23   released?

24   A.   Because I didn't want the cabbie to get killed.

25   Q.   Is there any doubt in your mind as you were speaking to

390

1    Omar for those three days or whatever, few days before your

2    release, is there any doubt in your mind that he meant to have

3    that cab driver killed?

4    A.   No.

5    Q.   Was there anything that occurred in your conversations

6    with him after leaving the jail through Silvia, the attorney's

7    receptionist or whatever she was, was there any doubt in your

8    mind in the course of those conversations that he meant to do

9    have someone kill that cabdriver?

10   A.   No.

11              MS. MINTER:   Objection, hearsay and speculation.

12              THE COURT:   Overruled.

13   BY MR. WALUTES: (Continuing)

14   Q.   Have you received any benefit from the Government for

15   testifying either before the federal grand jury or here today?

16   A.   No.

17   Q.   And then I wanted to go to your convictions, if I could,

18   Mr. Grant.  I don't mean any disrespect, but the jury has a

19   right to know.

20              Since 1997 you have a large number of felony

21   convictions, isn't that true?

22   A.   Yes, sir.

23   Q.   And is it true that you have 18 felonies, primarily

24   burglaries and larcenies, but also the possession of a

25   controlled substance, is that correct?

1    A.    Yes, sir.

2    Q.    I want to be clear, those are all felonies?  So, even the

3    possession was a felony charge?

4    A.    Yes, sir.

5    Q.    Okay.  And you also have two misdemeanor offenses for

6    identity fraud and distribution of controlled paraphernalia,

7    is that as well correct?

8    A.    Yes, sir.

9    Q.    Okay.  And how much time, if you have a sense of it, how

10   much time did you spend in jail as punishment for those

11   charges?

12   A.    Six-and-a-half years.

13   Q.    And how old are you today?

14   A.    33.

15   Q.    How do you survive in jail?

16   A.    Stay quiet.  You just stay quiet.

17          MR. WALUTES:  Thank you, Your Honor.  Those are all

18   the questions I have.

19          THE COURT:  All right.  Cross-examination.

20      CROSS-EXAMINATION

21   BY MS. MINTER:

22   Q.    Mr. Grant, at the time that you spoke with Mr. Mohamadi

23   initially, you were still in the Fairfax Adult Detention

24   Center, correct?

25   A.    Yes, ma'am.

S. Grant - Cross

392

1   Q.   And as soon as you got released, you contacted law

2   enforcement?

3   A.   The same day.

4   Q.   And you were incarcerated at that time for a probation

5   violation, correct?

6   A.   Incorrect.

7   Q.   Okay.  You were incarcerated for a controlled substance

8   offense?

9   A.   Yes.

10  Q.   You were released to probation, however?

11  A.   Yes.

12  Q.   And you are required to follow the rules of probation,

13  correct?

14  A.   Yes.

15  Q.   And there are quite a few of them?

16  A.   Yes.

17  Q.   You have to report to your Probation officer?

18  A.   Yes.

19  Q.   You have to have clean urines?  Meaning they test you for

20  drugs?

21  A.   Yes.

22  Q.   You have to have a job?

23  A.   Yes.

24  Q.   You can't get any new charges or any new arrests?

25  A.   Yes.

393

1    Q.   And if you do that, there is a substantial risk of

2    incarceration, correct?

3    A.   Yes.

4    Q.   You can go back in front of the judge and you could get

5    in your case up to five years in jail, correct?

6    A.   Yes.

7    Q.   You have met with law enforcement agents for the

8    Government regarding this case?

9    A.   Yes.

10   Q.   And attorneys for the Government regarding this case?

11   A.   Yes.

12   Q.   How many times did you meet with them?

13   A.   I don't know.

14   Q.   One time?  100 times?  Somewhere in the middle?

15   A.   Less than ten times.

16   Q.   Okay.  And you discussed this trial?

17   A.   This trial?

18   Q.   Yes.  What would happen at this courthouse?

19   A.   No.

20   Q.   You never discussed what would happen here?

21   A.   Oh, yes.  I thought you was talking about the original

22   detectives that I spoke with.

23   Q.   And you discussed your testimony for the trial here?

24   A.   Yes.

25   Q.   And the Government agents have informed your Probation

394

1   officer that you are working with them?

2   A.   Yes.

3   Q.   Now, just to be clear, Mr. Grant, you said that you spoke

4   with law enforcement the day you were released from

5   incarceration?

6   A.   Yes.

7   Q.   And you approached them, correct?

8   A.   Yes.

9   Q.   They did not approach you?  Now, you have been a witness

10  previously, correct?

11  A.   Yes.

12  Q.   You have taken the stand and taken the oath and told what

13  you know about the case?

14  A.   Yes.

15  Q.   That was the case of Commonwealth of Virginia against

16  Shenandoah Langston?

17  A.   Yes.

18  Q.   And you were a witness for the Government?

19  A.   I was a witness that they forced me to come.  He had

20  asked me previously about cooperation.  They had, I had shown

21  to their, in their opinion I had shown knowledge of what had

22  happened.  And they forced me to come in to court to testify.

23  Q.   You testified for the Government, correct?  You were

24  subpoenaed by the Government?

25            MR. WALUTES:  Your Honor, I am going to object.

395

1          THE COURT:  Hold on, hold on, one person at a time.

2     The objection is?

3          MR. WALUTES:  Your Honor, I want to be clear on the

4     record when she says Government, whether it is the state or

5     the federal government.

6          MS. MINTER:  That's fine, Your Honor.

7          THE COURT:  All right.

8     BY MS. MINTER: (Continuing)

9     Q.   To clarify, Mr. Grant, that case, when I say Commonwealth

10    versions Shenandoah Langston, that was a case in the state

11    court, correct?

12    A.   Yes.

13    Q.   Okay.  And the Commonwealth refers to the Commonwealth of

14    Virginia?

15    A.   Yes.

16    Q.   Okay.  So, the prosecutors who were prosecuting Mr.

17    Langston on behalf of Virginia, they are the ones that had you

18    brought to court?

19    A.   I was a co-defendant.

20    Q.   Okay.

21    A.   I was arrested on that case.

22    Q.   But with respect to the trial for Mr. Langston--

23    A.   There was no trial for Mr. Langston.

24    Q.   Okay.  What were you brought to court for?

25    A.   It was a preliminary hearing, and his charges were

S. Grant - Cross

396

1   dropped.

2   Q.   Okay.  So, you went to the preliminary hearing and you

3   testified?

4   A.   Yes.

5   Q.   Okay.  And you were incarcerated yourself at the time,

6   correct?

7   A.   At which time?

8   Q.   At the time that you testified at the preliminary

9   hearing?

10  A.   No.

11  Q.   You were not?

12  A.   I was not.

13  Q.   So, you would not have been transported as a prisoner to

14  the hearing?

15  A.   No, I was not.

16  Q.   Okay.  So, any documentation that says you were

17  transported would be incorrect?

18  A.   It would be incorrect.

19  Q.   Mr. Grant, you described going to a home where Mr.

20  Mohamadi's sister was at, correct?

21  A.   Yes, sir.  Yes, ma'am.  Yes, ma'am.

22  Q.   Who did you speak with when you were there?

23  A.   I didn't speak to anyone when I was there.

24  Q.   So, you went to the property?

25  A.   Yes.

397

1  Q.   And you peeked in the window I think--

2  A.   I knocked on the door because he told me that Myra would

3  be home at the time.  She wasn't there.  When I talked to him

4  the next time, he had told me that she didn't come until the

5  afternoon, but that I could slip through the garage to see the

6  BMW.

7  Q.   And that's what you did?

8  A.   Yes, ma'am.

9  Q.   And did you advise law enforcement agents before you went

10 to the house?

11 A.   No.

12 Q.   So, you did that on your own?

13 A.   Yes.

14 Q.   And you went twice, do I understand that correctly?

15 A.   I don't remember how many times I went, but more than

16 once.

17 Q.   More than once.  Now, you have described a number of

18 conversations you had with Mr. Mohamadi?

19 A.   Yes.

20 Q.   And none of those conversations were recorded in any way?

21 A.   No.

22 Q.   You've also told us today about this inmate handbook that

23 you had?

24 A.   Yes.

25 Q.   You said that you advised the police officer that you

S. Grant - Cross

398

1    spoke with that you had the book?

2    A.    Yes.

3    Q.    And you advised them why it was important, correct?

4    A.    Yes.

5    Q.    That it had information about this case?

6    A.    Yes.

7    Q.    Okay.  And they did not take that from you?

8    A.    They did not take it from me.

9    Q.    And you described a visit that you made to the jail.

10   A.    Yes.

11   Q.    But you said quite clearly that that jail visit was not

12   recorded?

13   A.    Correct.

14   Q.    Now, Mr. Grant, you testified you've spent a fair amount

15   of time in jail, in prison, correct?

16   A.    Yes, ma'am.

17   Q.    And lots, lots of people in jail, in prison talk about

18   their cases, correct?

19   A.    Yes, ma'am.

20   Q.    What they are there for, what their charges are?

21   A.    I don't know what lots of people are, but I guess.

22   Q.    Okay.  You certainly have heard people talk about their

23   cases?

24   A.    Yes.

25   Q.    What their charges are?

1   A.   Yes.

2   Q.   What they are accused of doing?

3   A.   Yes.

4   Q.   What they think is going to happen to them?

5   A.   Yes.

6   Q.   How much time they might get?

7   A.   Yes.

8   Q.   All those things?  And Mr. Mohamadi talked about his

9   case, clearly?

10  A.   Without going into too much detail, yes, he referred to

11  his case.

12  Q.   Okay.  And, Mr. Grant, you are a user of illegal

13  narcotics, correct?

14  A.   No.

15  Q.   You were not using illegal narcotics when you were

16  convicted?

17          MR. WALUTES:  Objection.  Your Honor, she has asked

18  the witness if--

19          THE COURT:  I think--  She didn't provide any time

20  frame.  So, she has now asked a second question to provide

21  time frame.

22          I will allow the question.  And he has answered, I

23  think he answered no.

24  BY MS. MINTER: (Continuing)

25  Q.   Well, in 2008 you were convicted of possession of

S. Grant - Cross

400

1    controlled substances, right?

2    A.    Yes.

3    Q.    You weren't using those controlled substances?

4    A.    No.

5    Q.    So, you were convicted of possessing them, but you didn't

6    use them?

7    A.    Yes.

8    Q.    And in 2005 you were convicted of possession of drug

9    paraphernalia, correct?

10   A.    Yes.

11   Q.    In Fairfax County?

12   A.    Yes.

13   Q.    And you weren't using controlled substances then?

14   A.    No.  Yeah, that one, the difference is the latter one

15   that you asked me about was cocaine, which I don't use.  And

16   the one that was before that was marijuana, which at the time

17   I used.

18   Q.    Okay.  So, you have been a user of controlled substances?

19   A.    Previously, yes.

20   Q.    Now, Mr. Grant, you have been convicted of a number of

21   crimes?

22   A.    Yes, ma'am.

23   Q.    Okay.  You said I believe 18 felonies?

24   A.    Yes, ma'am.

25   Q.    Okay.  And those include convictions for larceny?

1  A.   Yes, ma'am.

2  Q.   Which is a crime of lying, or, excuse me, a crime of

3  stealing?

4  A.   Yes, ma'am.

5  Q.   Okay.  And you have been convicted of identity fraud?

6  A.   Yes, ma'am.

7  Q.   Which is a crime of lying?

8  A.   Yes, ma'am.

9  Q.   The Court's indulgence, Your Honor.

10         THE COURT:  Yes, ma'am.

11 Q.   Mr. Grant, with respect to the discussions you had with

12 Mr. Mohamadi, as a result of those conversations you did not

13 kill any cabdrivers or any witnesses, correct?

14 A.   Correct.

15 Q.   You never took any steps towards doing that, correct?

16 A.   Correct.

17 Q.   Okay.  You didn't go purchase a firearm on your own?

18 A.   No.

19 Q.   You didn't drive by the individual's house?

20 A.   No.

21 Q.   And Mr. Mohamadi never provided you with any information

22 for where this individual lived, correct?

23 A.   No.

24 Q.   The Court's indulgence, Your Honor.

25         Mr. Grant, did you provide information to law

S. Grant - Redirect

402

1   enforcement regarding prior counsel of yours?

2   A.   Did I provide information--

3   Q.   Were you approached by law enforcement agents about an

4   attorney who had represented you?

5   A.   Yes.

6   Q.   Okay.  And did you provide them information about that

7   attorney?

8   A.   I wasn't approached by law enforcement--  I think you are

9   talking about Larry Brown, is that what you are talking about?

10  Q.   Correct.

11  A.   Well, the public defender of Alexandria city contacted

12  me, Melinda Douglas, to ask me about how I felt Larry Brown

13  represented me.

14  Q.   My question is regarding law enforcement.

15  A.   Well, no, I did not provide law enforcement with any

16  information about Larry Brown until I spoke to the prosecutor

17  in this case.

18            MS. MINTER:  Nothing further.

19            THE COURT:  All right, thank you.  Any redirect?

20            MR. WALUTES:  Just very briefly, Your Honor.

21            THE COURT:  Yes, sir.

22       REDIRECT EXAMINATION

23  BY MR. WALUTES:

24  Q.   When was the--  You said you were compelled to testify in

25  a preliminary hearing for the state?

S. Grant - Redirect

1   A.   Yes.

2   Q.   Do you remember today when that was?

3   A.   That was 2006.

4   Q.   And your recollection today, four years later, was that

5   you were out at that point, that you weren't locked up at that

6   point?

7   A.   I wasn't.  I know I came in just like I came in this

8   courtroom today.

9   Q.   Okay.  Obviously, the testimony to the state was a year

10  before you were approached by Omar in the Fairfax Jail?

11  A.   Yes.

12  Q.   And by being--  Are you scared of the person--

13  A.   Yes.

14  Q.   So, by being compelled to testify against the person that

15  you are scared of by the state of Virginia, did that create in

16  your mind some thinking that you were an agent of the

17  Government?

18  A.   No.

19           MR. WALUTES:  I have no further questions, Your

20  Honor.

21           THE COURT:  All right.  May Mr. Grant be excused?

22           MR. WALUTES:  He may from the Government, Your

23  Honor.

24           MS. MINTER:  The Court's indulgence, Your Honor.

25           We would ask that he not be accused, Your Honor.

S. Grant - Redirect

404

1   That he remain subject.

2          MR. WALUTES:  Your Honor, I would ask that he placed

3   on call so he doesn't have to sit around the courthouse for

4   the next--

5          MS. MINTER:  That's fine, Your Honor.

6          THE COURT:  Thank you.  All right, you are subject

7   to recall in the case at a later time.  You don't have to

8   remain here in the courthouse, but you need to make sure that

9   if you are contacted, you are accessible for further testimony

10  here.  All right.  So, you are compelled to return by Court

11  order.

12         As a result, you are not to discuss your testimony

13  with anyone until either you resume your testimony or the case

14  is ended.  All right, sir?

15         THE WITNESS:  All right.

16         THE COURT:  And I am sure that the court personnel

17  will notify you if you are not going to be needed for further

18  testimony as soon as that decision is made.

19         All right.  Have a good afternoon.

20         THE WITNESS:  Thank you.

21         NOTE:  The witness stood down.

22         THE COURT:  Next witness.

23         MR. BEN'ARY:  Your Honor, thank you.  Timothy Evans,

24  please.

25         NOTE:  The witness is sworn.

T. Evans - Direct

405

1              TIMOTHY EVANS, called by counsel for the United

2      States, first being duly sworn, testifies and states:

3          DIRECT EXAMINATION

4      BY MR. BEN'ARY:

5      Q.    Good afternoon, Mr. Evans.

6      A.    Yes, hello.

7      Q.    I just ask you to keep your voice up so all the jurors

8      can hear you, please.

9      A.    Okay.

10     Q.    Tell the members of the jury your name and how you are

11     employed, please.

12     A.    My name is Timothy Evans, and I am a manager for

13     T-Mobile's law enforcement relations group.

14     Q.    And could you give the members of the jury just a brief

15     description of what it is you do for T-Mobile.

16     A.    Manage the day-to-day operations of the law enforcement

17     relations group, and I am also the custodian of records for

18     T-Mobile.

19     Q.    Okay.  And getting into the subject of T-Mobile's

20     records, does T-Mobile as part of its normal ordinary course

21     of business keep records pertaining to its cellular phone

22     subscribers?

23     A.    Yes, we do.

24     Q.    And are those records maintained electronically?

25     A.    Yes.

T. Evans - Direct

406

1   Q.   And at the time that these records are made by T-Mobile,

2   are they made by a process or an employee that has knowledge

3   of the information recorded, whether it be the subscriber

4   information or incoming or outgoing telephone calls?

5   A.   Yes.

6   Q.   And does T-Mobile as part of its normal ordinary course

7   of business--  Let me strike that.  I will jump ahead here.

8            The incoming and outgoing call records, are those

9   generated by the subscriber's calling activities?

10  A.   Yes.

11  Q.   And was T-Mobile asked via subpoena to provide records,

12  both subscriber records and incoming and outgoing cellular

13  phone calls associated with 240-262-3221?

14  A.   Yes, we were.

15  Q.   And did T-Mobile generate the requested records?

16  A.   Yes, we did.

17           MR. BEN'ARY:  Your Honor, if I could ask the

18  assistance of the Court Security Officer to ask the witness to

19  take a look at Exhibit 19, please.

20           THE COURT:  All right.  19?

21           MR. BEN'ARY:  1-9, yes, sir.

22           THE COURT:  1-9.  All right.

23  BY MR. BEN'ARY: (Continuing)

24  Q.   Mr. Evans, do you have Exhibit 19 in front of you?

25  A.   Yes, I do.

407

1    Q.    And is it more than one page?

2    A.    Can I take this out?

3    Q.    Please.  Let me ask you to just take a quick look at both

4    pages there.

5          Do you recognize those two pages?

6    A.    Yes, I do.

7    Q.    And are those T-Mobile business records, the first page

8    containing subscriber information for the phone number that I

9    listed and the second page reflecting cellular telephone

10   activity from that same telephone number?

11   A.    Yes, they are.

12   Q.    And is Exhibit 19 a business record of T-Mobile made

13   pursuant to the process that we just talked about, kept in the

14   regular ordinary course of T-Mobile's business activities?

15   A.    Yes.

16         MR. BEN'ARY:  Your Honor, I am going to offer

17   Exhibit 19 into evidence.

18         THE COURT:  Any objection?

19         MR. NACHMANOFF:  No objection, Your Honor.

20         THE COURT:  All right, it will be received.

21         MR. BEN'ARY:  Those are my questions.  Thank you,

22   Mr. Evans.

23         THE COURT:  Are you going to move the admission of

24   19 at this time or not?

25         MR. BEN'ARY:  I am sorry, I would like to move 19

T. Evans - Cross

408

1    into evidence.  I thought--

2              THE COURT:  I am sorry, you are absolutely right.

3    It is received.  All right, cross-examination.

4              MS. MINTER:  The Court's indulgence, please.

5         CROSS-EXAMINATION

6    BY MR. NACHMANOFF:

7    Q.   Good afternoon, Mr. Evans.

8    A.   Hello.

9    Q.   The records that you were asked to provide were requested

10   by law enforcement, is that correct?

11   A.   Yes, they were.

12   Q.   By subpoena?

13   A.   Yes.

14   Q.   And you provided exactly what was asked for on the

15   subpoena, is that right?

16   A.   Yes.

17   Q.   And that exhibit that you have is two pages, is just

18   reflecting one date for that subscriber number, is that

19   correct?

20   A.   That is correct, yes.

21   Q.   That's May 27, 2007?

22   A.   Yes.

23   Q.   And so, what you provided is exactly what was asked for?

24   In other words, no other dates prior to May 27, 2007, or after

25   May 27, 2007, were requested, is that right?

T. Evans - Cross

409

1    A.    That I don't know.

2    Q.    Okay.  In other words, why you are here today is simply

3    to say that that one piece of paper comes from T-Mobile, is

4    that right?

5    A.    Well, actually it is two pieces of paper come from

6    T-Mobile.

7    Q.    Right.  But you can't say whether or not other requests

8    were made for additional subscriber numbers or for additional

9    dates?

10   A.    No, I cannot.

11   Q.    Okay.  Now, in your capacity and as custodian of records,

12   does T-Mobile have the ability to identify where calls come

13   from?  In other words, the cell site information?

14   A.    Where calls come from?

15   Q.    Yes.  In other words, to identify where a call was placed

16   from or placed to?

17   A.    We can identify where a particular cell site if there is

18   an outgoing phone call from a cell phone.

19   Q.    In other words, it is attached to a GPS so that you could

20   know that that phone was within a geographical area near that

21   cell site, is that right?

22   A.    Yes.

23   Q.    Okay.  That information is not reflected on that

24   document, is it?

25   A.    No, it is not.

T. Evans - Cross

410

1    Q.   And it was not requested, is that right?

2    A.   Not to my knowledge, no.

3    Q.   And if it had been requested, then you would have

4    provided it?

5    A.   That's correct, yes.

6    Q.   Is the document that you have there a copy of the

7    original document created by T-Mobile, or is it the original?

8    A.   This appears to be a copy.

9    Q.   Okay.  And do you know where that original is?

10   A.   No, I do not.

11   Q.   And have you compared that document that is before you

12   now with the original?

13   A.   Excuse me?

14   Q.   Have you compared the document that is before you now

15   with the original document?

16   A.   No, I have not.

17   Q.   So, all you can say is that appears to be a copy of a

18   T-Mobile record that is kept in the ordinary course of

19   business?

20   A.   That is correct, yes.

21        MR. NACHMANOFF:  Thank you.  I have no further

22   questions.

23        THE COURT:  Any redirect?

24        MR. BEN'ARY:  Very briefly.

25        THE COURT:  Yes.

T. Evans - Redirect

411

1           REDIRECT EXAMINATION

2     BY MR. BEN'ARY:

3     Q.   Were you provided by e-mail with those documents and were

4     you given a chance to actually check the electronic records of

5     T-Mobile to ensure that those records contain accurate

6     information?

7     A.   Yes, I did.

8     Q.   Did you actually perform that check?

9     A.   Yes, I did.

10    Q.   And are those two pages accurate?

11    A.   Yes, they are.

12    Q.   And when did you do that?

13    A.   It was a couple days ago when I talked with you on the

14    phone.

15              MR. BEN'ARY:  Thank you, sir.

16              THE COURT:  All right.  May Mr. Evans be excused?

17              MR. BEN'ARY:  Yes.

18              THE COURT:  Do you need to hold Mr. Evans?

19              MR. NACHMANOFF:  No, Your Honor.

20              THE COURT:  All right.  Mr. Evans, you are excused

21    with our thanks, sir.  You free to go.  Please don't discuss

22    your testimony until the trial is over.  Have a good

23    afternoon.

24              THE WITNESS:  Thank you.

25              NOTE:  The witness stood down.

T. Evans - Redirect

412

1          THE COURT:  Next witness.

2          MR. BEN'ARY:  Your Honor, my next witness is going

3   to be referring to one of our overhead exhibits that we will

4   need the easel for.  I want to alert the Court to that.  I am

5   not sure where in the courtroom you would like for that to be

6   set up.

7          THE COURT:  You are going to ask the witness to step

8   down and use the easel or just refer to it?

9          MR. BEN'ARY:  It would be my preference to do it

10  closer to the jury to use it, but however the Court normally

11  does it.

12         THE COURT:  Well, normally I keep the witnesses in

13  the witness box and you can put your exhibits where they will

14  do some good so that the jury can see them.

15         What type of testimony are you talking about?

16         MR. BEN'ARY:  Your Honor, the next witness is

17  Officer Fromm, he is a canine officer with Alexandria City

18  Police Department.  We can try to do it using the electronic

19  courtroom technology.  He is going to trace, I expect him to

20  trace the course of a canine track.

21         THE COURT:  All right.  Let's try it that way.  And

22  if not, we will consider having him come down and use the

23  demonstrative.

24         All right, Officer Fromm.  Are you able to go

25  another witness before we take our afternoon break, is that

413

1    all right?  All right, thank you.

2           Are you all warm enough now?

3           A JUROR:  Much better.  Thank you.

4           THE COURT:  Okay.

5           NOTE:  The witness is sworn.

6           THE COURT:  Good afternoon.  Go ahead, Mr. Ben'Ary.

7           MR. BEN'ARY:  Thank you, Your Honor.

8           BRIAN FROMM, called by counsel for the United

9    States, first being duly sworn, testifies and states:

10        DIRECT EXAMINATION

11   BY MR. BEN'ARY:

12   Q.   Good afternoon, Officer.

13   A.   Good afternoon.

14   Q.   I ask you to keep your voice up so all the members of the

15   jury can hear you, please.

16          Would you state your name and occupation for the

17   jury.

18   A.   Brian Fromm, police officer with the city of Alexandria.

19   Q.   And how long have you been employed as a police officer

20   with the city of Alexandria?

21   A.   14 years.

22   Q.   And is there a particular unit within the Alexandria City

23   Police Department that you are signed to?

24   A.   Yes.

25   Q.   What is that?

B. Fromm - Direct

414

1    A.    The canine unit.

2    Q.    Could you briefly explain your job responsibilities to

3    the members of the jury, please.

4    A.    I work a patrol dog.  I have a dog in my car that I take

5    wherever he is needed.

6    Q.    Okay.  Do you work with one particular dog?

7    A.    Yes.

8    Q.    And what's the dog's name that you work with?

9    A.    His name is Titan.

10   Q.    And what type of dog is Titan?

11   A.    He is a German Shepherd.

12   Q.    How long have you and Titan been working together as a

13   team?

14   A.    Five-and-a-half years.

15   Q.    And as part of your responsibilities in being teamed up

16   with Titan, do you and Titan undergo training?

17   A.    Yes.

18   Q.    And describe the training that both you and Titan undergo

19   to perform your duties with the Alexandria City Police

20   Department?

21   A.    When I first got Titan, we went through a 14-week patrol

22   dog school, that's where we were taught all of the basics of

23   building searching and tracking and article search, all

24   things, obedience, agility.

25              And then he is also a drug dog, and we went through

B. Fromm - Direct

415

1   more training with that.

2   Q.   Okay.  You mentioned the term in your previous answer

3   "tracking"?

4   A.   Yes.

5   Q.   What is tracking?  Could you describe that for the

6   members of the jury, please.

7   A.   Tracking is when I use Titan, Titan's ability to smell to

8   follow a trail that a person left when they fled the scene of

9   an incident.

10  Q.   Okay.  And is there particularized training with respect

11  to tracking?

12  A.   Yes.

13  Q.   Could you describe what training you and Titan had with

14  respect to tracking.

15  A.   We do a lot of training tracks on our training nights.

16  We do training once a week on Wednesday nights, or Wednesdays

17  I should say, I'm sorry.  And one of the other officers in the

18  unit or a rookie officer will start at a point, a corner of a

19  building, a vehicle door, a window, and they will lay a track

20  from where they started to where they end.

21       And part of the training is Titan has to follow that

22  track to completion.

23  Q.   Okay.  And are you also certified as a team with Titan in

24  tracking?

25  A.   Yes.

B. Fromm - Direct

416

1    Q.   What's the name of the organization that does that

2    certification?

3    A.   The United States Police Canine Association.

4    Q.   And is that an annual certification?

5    A.   Yes.

6    Q.   And for what years have you and Titan been certified as a

7    team in tracking?

8    A.   2006, 2007, 2008, 2009.

9    Q.   And what goes into the certification process by the

10   United States Police Canine Association?

11   A.   They do a certification trial where we respond out to a

12   location that they have established for the certification.  It

13   involves someone from the association, there is volunteers,

14   they will lay out a certification track.  And a certification

15   track is 50 to 75 yards long.  Each leg is 50 to 75 yards

16   long.  There are three legs.  We have a start point, it will

17   go out 50 to 75 yards.  There will be a turn, it will go

18   anywhere and another 50 to 75 yards.  Then there will be

19   another turn and that third leg will 50 to 75 yards.

20         On each one of those legs they will have an article,

21   a screwdriver, a shotgun shell, a credit card, a piece of

22   leather, a key.  And Titan's job also is as he is running the

23   track, he also has to find the articles that they have dropped

24   down.

25   Q.   Okay.  Are you familiar with the term "cross track"?

B. Fromm - Direct

417

1    A.    Yes.

2    Q.    What is a cross track?

3    A.    Cross track is when he is on a track, we will come up to

4    an instance where someone has walked across our track.  And

5    Titan has to discern between the older track that he is on or

6    the more recent fresh track, and he has to continue on the

7    track that he was working.

8              At the certification trials there is a cross track

9    on one of the legs and he has to work through it and continue

10   the track.

11   Q.    And have you completed tracks with Titan while on duty

12   with the Alexandria City Police Department?

13   A.    Yes.

14   Q.    Could you estimate for the members of the jury about how

15   many times you have done that?

16   A.    We have probably run tracks 200 to 250 times over the

17   five years that we have worked together.

18   Q.    And could you describe when you are called out to a scene

19   with the Alexandria City Police Department, what is your

20   routine with Titan?

21   A.    My routine with Titan when we are called to attempt to

22   run a track is I get him out of the car.  I have a 15-foot

23   leash, it is called a tracking line.  And I will take him over

24   to the area.  The person will say, I last saw the person over

25   there and they ran from that direction.

B. Fromm - Direct

418

1          I will take him into that area.  I will put him into

2    a sit.  And he is wearing a collar, his choke chain collar.

3    If anyone has dogs or if they are familiar with it, but a

4    choke chain collar has two rings on a collar, so there is a

5    live ring and dead ring.  And a live ring is when we do all of

6    our obedience and all of our other activities on the live

7    ring.  And the live ring is where when you have got the chain,

8    if you pull on it, the live ring will correct him.  You know,

9    give him a little correction.  If he is acting up or

10   misbehaving, I give him a correction.

11          So, when he is on a track, I don't want him to pull

12   his chain to constrict his air flow so he is having a hard

13   time breathing.  I put the tracking line on what is called the

14   dead ring where it is not going to do anything to him.  It is

15   just going to, if he is pulling on it, we are just going to

16   play tug of war.  He is going to pull on the leash and I am

17   going to be pulling back.  He is not constricting anything.

18          So, I put the tracking line on his dead ring and

19   then I give him a command and a gesture to the ground, I tell

20   him to seek a track.

21          And then he will put his nose down and he will work

22   on it and try to find where the start track is and then he

23   will go off.

24   Q.   Can you as Titan's teammate on this tracking theme, can

25   you recognize his behavior during a track as opposed to not

B. Fromm - Direct

419

1   during a track?

2   A.   Yes.

3   Q.   How is his behavior during a track?

4   A.   When he is on a track, his head is down, his nose is to

5   the ground.  He is breathing heavily.  Sometimes if it is

6   quiet, I can actually hear him snorting when he is taking deep

7   breaths.  And his tail is up in the air and his tail is

8   wagging.  I mean, he is happy when he is on track.

9   Q.   And can you tell if Titan is either not able to pick up a

10  track or if he loses a track?

11  A.   When he has lost it or he has missed a turn or he is not

12  able to get a track, his nose isn't to the ground, his tail

13  isn't wagging, he is just kind of, his head is up, he is

14  looking around, he is just kind of going around in a cone,

15  like in a circle trying to pick up something and there is

16  nothing there.  And he will just keep his head up and just

17  keep looking.

18          But when he is on the track, his nose is down, his

19  head is down, his tail is up and he is gone.

20  Q.   Okay.  I want to direct your attention to May 27, early

21  morning, 2007.

22          Were you on duty at that time?

23  A.   Yes.

24  Q.   And was it in your capacity with the Alexandria City

25  Police Department as a canine officer?

B. Fromm - Direct

420

1    A.   Yes.

2    Q.   Did you respond to an area of Alexandria city known as

3    the EOS 21 Apartment complex?

4    A.   Yes.

5    Q.   Is that an area that you would recognize from an overhead

6    shot?

7    A.   Yes.

8            MR. BEN'ARY:  Your Honor, I would ask to display

9    Exhibit No. 16, please.

10           THE COURT:  That's already been produced to

11   defendant and defense counsel.  Any objection to displaying

12   that at this time?

13           MR. NACHMANOFF:  No, Your Honor.

14           THE COURT:  All right.  Then that will be put up on

15   the screen then.  Go ahead.

16   BY MR. BEN'ARY: (Continuing)

17   Q.   We are going to try to use some technology here, Officer.

18   A.   Okay.

19   Q.   Now, you can touch on the screen and actually draw lines,

20   and we are going to try to go about it that way.

21           Do you recognize, there is sort of a group of

22   buildings that forms almost like plus signs in the middle of

23   Exhibit 16A there?

24           Do you recognize what that complex is?

25   A.   Yes.

B. Fromm - Direct

421

1    Q.    What is that?

2    A.    That's the EOS Apartment complex.

3    Q.    Okay.  And that's where you responded on the early

4    morning hours of May 27, 2007, for a report?

5    A.    Yes.

6    Q.    Okay.  And about what time was that?  I said early

7    morning.  Do you remember about what time it was?

8    A.    I was dispatched to the call at 3:50, 3:50 in the

9    morning, and I arrived on the scene at 3:54.

10   Q.    Okay.  And once you arrived on scene there, what did you

11   do?

12   A.    I located where the cab driver and his cab were parked,

13   and I asked him just quickly where did the guy go, what

14   happened.

15   Q.    And could you put a dot on the location on the map, just

16   by touching it?

17   A.    With my finger?

18   Q.    In the approximate area, sure.

19   A.    Right about--  Nope, that's off to the right.

20   Q.    I think I clear that.  Hang on.  Okay, try again.

21   A.    I guess right about there.  Still a little bit to the, it

22   needs to be a little bit to the right.  If you want to clear,

23   I can try one more time.

24   Q.    If that's in the approximate area?

25   A.    Yeah.

B. Fromm - Direct

422

1    Q.   What's the building number for that building?  Did you

2    have occasion to find that out?

3    A.   I am pretty sure it is 201 South Reynolds Street.

4    Q.   Okay.  And you got, I understand you got some, you

5    identified an individual who was the cab driver and you got

6    some indication of where the subject had went?

7    A.   Yes.

8    Q.   And at that point--  Well, before you do that.

9         Were there a lot of people around at 3:59 in the

10   morning?

11   A.   At 3:50, 3:55 in the morning, no, I didn't see anyone

12   around, it was just police and the victim.

13   Q.   Okay.  Are you familiar with a term called

14   "contamination"?

15   A.   Yes.

16   Q.   What is contamination?

17   A.   Contamination is when there is a track that we would like

18   to try and run, and it has just been overrun by people.  And

19   he can't, he can't run that track, there is just too much

20   other smells in the area.

21        Titan is a German shepherd.  He is not a bloodhound.

22   A bloodhound can run a track anywhere pretty much.  A German

23   shepherd just smells most recent disturbed scent.  And if it

24   has been overrun by people, there are too many spells there,

25   he can't run the track that we are trying to run.

B. Fromm - Direct

423

1    Q.   Did you have a concern when you arrived on this scene on

2    May 27 about contamination?

3    A.   No, none at all.

4    Q.   And what did you do once you spoke to the cab driver and

5    got a general direction of the robber?

6    A.   I took Titan over to the area of the cab and the corner

7    of the building where the cab driver said the suspect ran.

8    And I put Titan in a sit and I put his tracking line on him,

9    and I gave him the command to seek track.

10   Q.   What did you observe Titan do?

11   A.   He smelled the area for a few brief seconds, then put his

12   nose down, and then he took off in a northern direction along

13   the side of 201 South Reynolds Street in the parking lot.

14   Q.   All right.  Can you trace the route of the track that you

15   just described?

16   A.   Yeah, I will try here.  We will see.

17        We started at the side of the building there and we

18   went up through here.  Up along the side of tennis court.  And

19   then we went to the west behind the building along the tennis

20   court up--  I didn't go down like that.  And then we went

21   around the front of the building to there.  That is probably

22   my--

23   Q.   That's okay.

24   A.   I'm sorry.  I don't know if you want me to use my pen tip

25   to try it.  So, my finger might be messing it up.

424

1            We went in a northern direction from the side of 201

2    South Reynolds Street, along the east side of the tennis

3    court, there is a parking lot there.  Once we got to the

4    corner of the tennis court and the building, he immediately

5    turned in a western direction.  Went along behind that

6    building, between the building and the tennis court.  And he

7    turned around the building on the western edge.  And then as

8    he went along the front of the building, he tracked right to

9    the front door of the building.

10   Q.   What was the number of that building?

11   A.   175 South Reynolds Street I think it was.  I might be

12   wrong.

13   Q.   And I am going to clear this.

14   A.   I am sorry for the mess.

15   Q.   No, no.  Which building there is 175?

16   A.   That one.

17   Q.   Okay.  What did you do once you reached the front door of

18   building of 175?

19   A.   We stopped the track at that point.

20   Q.   And why didn't you track into the apartment building 175?

21   A.   He can't track in an apartment building.  Hallways where

22   people are walking, taking out trash, going to the elevator

23   checking mail, there is other dogs in that building.  I mean,

24   there are too many smells, there is too much scent in the

25   building to run a track that I could testify to in a building.

B. Fromm - Direct

425

1          Not only that, he is trained as a patrol dog and I

2   don't want someone to open a door and step out on him and he

3   may think they are a bad guy, and he could potentially bite

4   that person.  It is too dangerous, too risky.

5   Q.   Is Titan trained to do something if he encounters a

6   suspect when he is making a track?

7   A.   He is trained, if I don't give the person commands and

8   the person gives up, if Titan finds him on his own, he is

9   trained to apprehend that person by biting them.

10  Q.   The Court's indulgence for one moment.

11          I just want to ask you a couple more questions about

12  that diagram.  I am not going to make you draw this time.

13  A.   Okay.

14  Q.   Does 395 the highway appear on this?

15  A.   395 does not appear on this.

16  Q.   How about 236, Van Dorn?  Can you just give an

17  orientation of where--

18  A.   Yes.  This is Van Dorn Street right here.

19  Q.   Okay.

20  A.   And this is going to be 236 right here.  This is Landmark

21  Mall up there.

22  Q.   Okay.

23  A.   So, this is the north, that's the west, and that's the

24  east, and that's the south.

25          MR. BEN'ARY:  Okay.  Thank you, Officer.

B. Fromm - Cross

426

1              Thank you, Your Honor.

2              THE COURT:  All right, thank you.

3              Cross-examination.

4              MR. NACHMANOFF:  Thank you, Your Honor.

5      CROSS-EXAMINATION

6   BY MR. NACHMANOFF:

7   Q.   Good afternoon, Officer Fromm.

8              So, you testified that you and Titan have worked

9   together for five-and-a-half years, is that right?

10  A.   Yes, November of 2004.

11  Q.   And you described your training with Titan, and it sounds

12  like he both is a tracker and a drug-sniffing dog, is that

13  right?

14  A.   Yes.

15  Q.   Okay.  And you've done many, many tracks with him in your

16  capacity as an Alexandria police officer, is that right?

17  A.   Yes.

18  Q.   And he is pretty good at what he does?

19  A.   I think he is.

20  Q.   But tracking, I take it, does have an error rate?

21  A.   There can be, yes.

22  Q.   And so that there can be times when dogs give false

23  positives, for example, on drug sniffs, which is a different

24  area?

25  A.   It can happen, but it hasn't in Titan's training.  In our

B. Fromm - Cross

427

1    tracks, in our training tracks, he has always ran the track

2    that has been laid down for him.  We have needed some

3    assistance, of course, he is not perfect, but we've always

4    completed our tracks in training.

5    Q.   Right.  And to be clear, you're talking about the

6    training that's set up in order to try and test him and make

7    sure that he is following a scent that has been late down by

8    people that are creating the track?

9    A.   Yes.

10   Q.   And you have done tracks out in Alexandria to investigate

11   crimes, correct?

12   A.   Yes.

13   Q.   And I take it that in some of those cases he has found

14   tracks and in others perhaps he couldn't pick up a scent?

15   A.   Yep.

16   Q.   And for example, in this case although Titan picked up a

17   track, you can't say whether or not that track was absolutely

18   correct, can you?

19   A.   I can say--  What I can say is that there was no one else

20   in the area when we arrived on scene.  And Titan put his nose

21   down and he ran a track from the cab to the front door of the

22   building.

23   Q.   But let me be clear.  Nobody was arrested or caught at

24   the end of that track, is that right?

25   A.   No.

B. Fromm - Cross

428

1   Q.   And today here testifying, you have no idea who the

2   defendant is as a result of your investigation, do you?

3   A.   Not my investigation, no.  My investigation was just the

4   track.

5   Q.   Right.  So, you can't say that Mr. Mohamadi committed any

6   crime on May 27?

7   A.   I don't know.

8   Q.   And you can't say that he was there at the apartment

9   building on that date, can you?

10  A.   No.  I don't know him.

11  Q.   You responded very quickly, I think you testified it took

12  you about four minutes?

13  A.   Yes.

14  Q.   To get to the location, you were dispatched at 3:50?

15  A.   Yes, I was dispatched at 3:50.

16  Q.   And you arrived at 3:54 a.m.?

17  A.   Yes.

18  Q.   And if I could have your assistance, please, thank you

19  very much, to put up the exhibit, I think it's Exhibit 16.

20  Thank you.

21        The spot, if I can get you to try and do it again,

22  that you responded to was right off South Reynolds Road, is

23  that right?

24  A.   Yes, South Reynolds Street.

25  Q.   Street, I am sorry.  And when you arrived, there was a

B. Fromm - Cross

429

1    taxicab there?

2    A.    Yes.

3    Q.    And the cab driver was exactly where when you arrived?

4    A.    When I arrived, I do not recall exactly where he was.  I

5    don't believe he was in his cab, but he was at his cab.

6    Q.    So, when you say at his cab, you mean he was standing

7    outside?

8    A.    Next to it, yeah.

9    Q.    But he wasn't sitting in the driver's seat?

10   A.    Not when I arrived.

11   Q.    He wasn't inside.  And when you arrived, there was

12   already another police officer on the scene?

13   A.    Yes.

14   Q.    Okay.  Was that Officer Lion?

15   A.    I do not recall who the officer was.  It may have been

16   him.  I do remember him there.

17   Q.    Was there more than one officer that you can remember?

18   A.    No, there was hardly anyone there.  Because we had a hard

19   time finding him initially.  We were initially dispatched to

20   another location, and then as Officer Lion was driving around

21   he found the cab driver there and we all arrived on his scene.

22   Q.    So, you recall Officer Lion being there?

23   A.    Yes.

24   Q.    You are just not sure he was the one that was physically

25   present when you arrived?

B. Fromm - Cross

430

1    A.    No, I don't remember if he was the only one there.

2    Q.    I see.  Okay.  Very good.  And in addition to the cab

3    driver, was there another person, another civilian who was

4    there with him?

5    A.    I don't remember.

6    Q.    Okay.  And do you remember any other people, any

7    technicians, anyone else associated with the Alexandria Police

8    Department?

9    A.    No.

10   Q.    Okay.  And what about other people, did you see anyone

11   who was going into the apartment buildings?

12   A.    No, this was 3:50 in the morning.  There was no one

13   around.

14   Q.    So, when you arrived at 3:54, other than you and Titan,

15   possibly Officer Lion and the cab driver, there were no other

16   people near the cab itself?

17   A.    No.

18   Q.    And you didn't observe anyone in the surrounding area?

19   A.    No.

20   Q.    Of course, you can't say whether there were other people

21   around immediately before you arrived, correct?

22   A.    I wasn't there.

23   Q.    So, you can't know?

24   A.    Right.

25   Q.    You testified on direct that you very quickly I think

B. Fromm - Cross

431

1   spoke with the cab driver, is that right?

2   A.    Yes.

3   Q.    And the reason for that was to get enough information so

4   that you could begin your job with Titan?

5   A.    Yes.

6   Q.    And when you spoke to him, was he calm?

7   A.    I don't remember anything significant about his behavior

8   standing out.  So, I would say that he was calm.

9   Q.    So, he wasn't screaming?

10  A.    No.

11  Q.    Or hysterical?

12  A.    No.

13  Q.    You asked him questions, he was able to give you

14  information?

15  A.    Yes.

16  Q.    And the information that you collected from him was

17  directly related to where did the person go?

18  A.    Yes.

19  Q.    Because you wanted to get a sense of what direction

20  perhaps to begin the search?

21  A.    Yes.

22  Q.    And he told you that the robbery had taken place right

23  there where the cab was parked?

24  A.    Well, not where--  I don't recall if--  No, I don't

25  believe he said the robbery happened where the cab was parked.

B. Fromm - Cross

432

1    I think he said the robbery happened in my cab.  I don't know

2    where in the cab he was talking about.  Maybe as he was

3    driving, maybe it happened over here, he drove here, he parked

4    and the guy ran.  The robbery happened in the cab and he said

5    the guy ran out of the back door of the passenger side in that

6    direction.

7    Q.   Okay.  So, to be clear, you don't know whether or not the

8    robbery that took place occurred while the cab was moving or

9    while it was stationary?

10   A.   Right.

11   Q.   And you don't know if the robbery that the cab driver

12   described happened at the location where the car is parked or

13   maybe at some point before the car got there?

14   A.   Maybe ten feet before.  I just know that the guy ran from

15   that spot.

16   Q.   What you understood was that the cab driver was saying it

17   was at that point that the person got out of the car?

18   A.   Yes.

19   Q.   Got out of the back seat.  And then he pointed you in the

20   direction?

21   A.   Yes.

22   Q.   Okay.  And that direction, if you can just mark it

23   again--

24   A.   I believe the cab was parked right about there.

25   Q.   Right.

B. Fromm - Cross

433

1    A.    And then the guy, he said the guy ran that way.

2    Q.    Right.  Okay.  And that large mark that you have made now

3    is on what was at that time a tennis court, is that right?

4    A.    No.  There is a little parking lot, there is a little

5    parking lot between the tennis court and that building that

6    runs in a north/south direction.

7    Q.    Right.  In other words, where the vertical line is,

8    that's the little parking lot?

9    A.    Yes.

10   Q.    Where the horizontal line is would be--

11   A.    That was a mistake.

12   Q.    Would be where the tennis courts were?

13   A.    Yeah, there is a tennis court there, but that has nothing

14   to do with this.

15   Q.    And so, Titan picked up a scent and went straight up

16   along that small parking lot?

17   A.    Yes.

18   Q.    And then turned along the top end of that tennis court?

19   A.    Yes.

20   Q.    And you followed it?

21   A.    Yes.

22   Q.    And this occurred, in relation to 3:54, within two

23   minutes?

24   A.    Yeah, within minutes.

25   Q.    So, in other words, what you needed to do was talk to the

B. Fromm - Cross

434

1   cab driver, and then put the dead ring, if I am using the

2   right terminology?

3   A.   His tracking line on the dead ring, yep.

4   Q.   On Titan?

5   A.   On his collar.

6   Q.   And then give him a chance to find a scent?

7   A.   Yes.

8   Q.   And then as he goes, he goes running or walking?  I mean,

9   it's quick?

10  A.   It's a fast pace.  For him it's a trot.  For me it's a

11  jog.

12  Q.   As you start to jog with Titan, there is another officer

13  with you or you are by yourself?

14  A.   There was another officer with us, yes.

15  Q.   And were there more people arriving as you went off with

16  Titan?

17  A.   I couldn't say.  Once I left with Titan, there was just

18  the backup officer with me.  So, as more people arrived, I

19  don't know because I wasn't there anymore.

20  Q.   And so, at a jog you go up through the parking lot and

21  then you turn down along the back of 175, apartment 175, is

22  that right?

23  A.   Yes.

24  Q.   Okay.  So, you are between the apartment building and the

25  tennis court?

B. Fromm - Cross

435

1   A.   Yes.

2   Q.   All right.  And again, I realize it is hard, but maybe

3   you could, maybe we can erase that.  I am the worst person to

4   do this.  Okay.

5   A.   We went right through here.

6   Q.   Right, perfect.  Okay, If you can stop there.  That's

7   perfect.

8   A.   Yeah.

9   Q.   So, at 3:54 you get out of the car, it takes two minutes

10  to start, and then you are jogging.  And that entire process

11  takes you what, maybe five minutes to get to that far green

12  dot on 175, is that fair to say?

13  A.   I wouldn't say five minutes.  Just a couple minutes.  I

14  mean, he is going and I am keeping up with him.

15  Q.   So, sometime right around 4 a.m.?

16  A.   Yes.

17  Q.   Very close to 4 a.m.?

18  A.   Yes.

19  Q.   And when you get to that point, you are interrupted by

20  two residents that come out of their apartment, is that

21  correct?

22  A.   Yes.

23  Q.   And the apartment that they live in is the very corner

24  apartment where the end of your green dot is located?

25  A.   Yes.

B. Fromm - Cross

436

1    Q.   And that's apartment 119, correct?

2    A.   I believe so.

3    Q.   And that's a ground floor apartment?

4    A.   Yes.

5    Q.   So, in other words, when they come out, they are just

6    walking straight out?

7    A.   Well, their balcony, their railing, I mean, their balcony

8    is ground level.

9    Q.   Ground level.  And you are at ground level?

10   A.   Yes.

11   Q.   So, there is a railing separating you, but it is not up

12   on a different floor?

13   A.   Right.

14   Q.   Okay.  And you see them, right?  You can't miss them?

15   They come out because they see that you are the police?

16   A.   Right.

17   Q.   And don't tell me what they say, but they provide you

18   with information, correct?

19   A.   Yes.

20   Q.   And at that point do you stop and interview them, or are

21   you literally sort of speaking to them as Titan continues to

22   follow the scent?

23   A.   It is the second.  I am just asking them a couple

24   questions.  I have got backup officer with me.  When I am

25   running a track, I don't have time to stop and interview

B. Fromm - Cross

437

1    people because then our track stops.  I am letting Titan work

2    out the turn, and they are providing me with information, and

3    then we keep going on the track.

4    Q.   So, let me ask you this question.  I realize this is all

5    happening very quickly.  They give you information.  And you

6    are continuing to move with Titan?

7    A.   Yes.

8    Q.   Do they go back into their apartment, or does the other

9    officer stop to speak with them?

10   A.   The other officer stops to speak with them.

11   Q.   And so, you kept going by yourself?

12   A.   Yeah.

13   Q.   And you go up along the side of the building and follow

14   it around to the front door which is right in the middle of

15   the other side of 175, is that correct?

16   A.   Yeah.

17   Q.   Okay.  Can you just draw that?  I realize it is hard to

18   do it artfully.

19   A.   There.

20   Q.   Okay.  And so, the main entrance to 175 South Reynolds is

21   right there?

22   A.   Yes.

23   Q.   And that's the point at which Titan stops tracking?

24   A.   Well, that's the point I stopped him.  I mean, we are at

25   the front door of the building.  If I let him go--  I mean, I

B. Fromm - Cross

438

1    am not going to go into a building because of why I described

2    earlier.

3    Q.   Let me ask this question.  Is Titan trying to go into the

4    building?

5              In other words, if he were permitted to continue his

6    track, is that what he is physically trying to do?

7    A.   Yes.  He went right to the front door.  I mean, he is

8    kind of looking at me like, you know, hey, come on, open the

9    door.

10   Q.   Did that lead you to conclude that the person whose track

11   you were following had gone into 175?

12   A.   Yes.

13   Q.   Did you then immediately call for back up thinking that

14   the person who robbed the cab driver might been in that

15   building?

16   A.   Well, yeah, I let the on scene Sergeant know where our

17   track went and what Titan's behavior, his track led me to

18   believe based on our previous training and experience.  And

19   that's when the other officer, the Sergeant sent other

20   officers to the area to I believe help secure that building.

21   Q.   Now, you are there with Titan.  And I assume the other

22   officers didn't arrive immediately, they had to come from

23   somewhere else?

24   A.   Yes.

25   Q.   And the other officer who was with you, and I think that

B. Fromm - Cross

439

1   was Officer Kirby, does that sound right?

2   A.   Officer Kirby, yes.

3   Q.   Had stopped to talk to the people in the apartment 119,

4   is that right?

5   A.   Yes.  At this point Officer Kirby is back with me.

6   Q.   So, whatever his conversation was, it was brief with

7   them?

8   A.   Yes, at that point.

9   Q.   He caught up with you at the front door, and then the two

10  of you entered 175, is that right?

11  A.   Yes.

12  Q.   Okay.  Did you take Titan?  I assume you had to take

13  Titan with you when you are working, he would always be with

14  you?

15  A.   Yes.

16  Q.   And so, although you testified earlier that he couldn't

17  track inside, it didn't mean that you couldn't go inside with

18  him?

19  A.   Right.

20  Q.   I assume that means you put him on a short leash?

21  A.   Yes.  I reeled his leash up and I put him on a standard

22  normal leash.

23  Q.   And I assume part of that is because you wouldn't want

24  him on a 15-foot leash if he is trained to bite people if he

25  thinks that perhaps--

440

1   A.    If they are a threat and they come and they act in a

2   threatening manner, yes.

3   Q.    So, you and Officer Kirby go inside 175.  And at this

4   point it is very close to 4 a.m., within a couple of minutes?

5   A.    Yes.

6   Q.    And this is an apartment complex in which that building

7   that you have surrounded with the green lines has several

8   apartments on multiple floors, right?

9   A.    Yes.

10  Q.    Okay.  And you searched the stairwells and the hallways,

11  is that right?

12  A.    We did walk through the stairwells and the apartment

13  hallways in case we encountered someone who was banging on

14  doors trying to get in.

15  Q.    Which is what you thought might happen given both where

16  the track ended and the fact that you ran into these people

17  who wanted to provide you with information?  Again, I am not

18  asking you what that specific information is.

19  A.    Right.

20  Q.    I take it you didn't find anyone?

21  A.    No.

22  Q.    You didn't find any suspects and you didn't even

23  encounter any of the residents --

24  A.    No.

25  Q.    -- who heard the noise or came out?

B. Fromm - Cross

441

1    A.    No.

2    Q.    Did other police officers join you since it was only you

3    and Officer Kirby going through this apartment building?

4    A.    There were other officers there.  No one was with me.  I

5    think Officer Kirby stayed in one area to secure this part of

6    the building, and I with Titan went to another part of the

7    building to check that area.

8    Q.    Did it require assistance to get into 175?

9    A.    That I don't remember.  Because it is a secure apartment

10   complex, but some of the doors of those building are broken,

11   some are propped open, some are locked.  I do not remember how

12   we were able to get into that building.  I know we were able

13   to get in.

14   Q.    But you can't say how?

15   A.    I don't remember how.  I don't remember if the door was

16   broken or somebody buzzed us in or what.

17   Q.    After did your search of the interior of the building and

18   didn't find anyone, you came back outside?

19   A.    Yes.

20   Q.    You did not make any further effort to see whether the

21   track could be found or picked up at that point, did you?

22   A.    No.  Titan had no interest in going anywhere but that

23   front door when we went around the building.

24   Q.    You have no recollection, do you, of seeing a cab come to

25   175 at around 4 a.m., do you?

B. Fromm - Cross

442

1    A.    No, I don't.

2    Q.    The Court's indulgence.

3          THE COURT:  Yes, sir.

4    Q.    Just a couple more questions, Your Honor.  Thank you for

5    your patience.

6          Officer Fromm, when you arrived and spoke to the cab

7    driver, you responded in four minutes.  Do you know at what

8    time the robbery was alleged to take place in relation to your

9    arrival.

10   A.    No.  All I know is that it happened before 3:50 because

11   that's when the cab driver called to report the robbery.

12   Q.    Was it your understanding that it was very close to the

13   time when the call was made that had dispatched you?

14   A.    Yes.

15   Q.    Was that consistent with the fact that you found a track

16   quickly and that it was a strong track?

17   A.    Yes.

18   Q.    Is that because the more time goes by, the weaker a track

19   is?

20   A.    It can, yes.

21   Q.    And to your knowledge, had the cab been moved from the

22   spot where the cab driver said the suspect had exited?

23   A.    Not to my knowledge.  The rear passenger door was still

24   open when I arrived.

25         MR. NACHMANOFF:  I have no further questions.

443

```
1              THE COURT:  All right, thank you.  Any redirect?
2              MR. BEN'ARY:  No, thank you, Your Honor.
3              THE COURT:  All right.  Do you want to move
4    Exhibit 16 in, the diagram?
5              MR. BEN'ARY:  Yes, please.
6              THE COURT:  Any objection to 16?
7              MR. NACHMANOFF:  No, Your Honor.
8              THE COURT:  All right, 16 is in.
9              May this witness be excused?
10             MR. BEN'ARY:  Yes.
11             MR. NACHMANOFF:  Your Honor, if we could have the
12   same arrangement, that he could certainly be excused, but
13   possibly subject to recall if we need him.
14             THE COURT:  Yes, sir.  You are subject to recall.
15   You are excused at this time, but don't go on a lengthy
16   vacation without letting us know.
17             THE WITNESS:  No.
18             THE COURT:  And please don't discuss the testimony
19   you have given so far with anyone until the case is over.
20             THE WITNESS:  Yes, sir.
21             THE COURT:  All right.  Thank you, sir.  Have a good
22   afternoon.
23             NOTE:  The witness stood down.
24             THE COURT:  All right, we are going to take our
25   afternoon recess at this time.  We will take 15 minutes.
```

444

```
 1              Ms. Wools, I am going to check with you on when I
 2      think it's too cold because, obviously, we have the same
 3      thermometer.
 4              All right, we are going to take 15 minutes and then
 5      we will resume the testimony.
 6              NOTE:  At this point a recess is taken; at the
 7      conclusion of which the case continues as follows:
 8              THE COURT:  Call your next witness.
 9              MR. BEN'ARY:  Keith Crane, Deputy Keith Crane.
10              NOTE:  The witness is sworn.
11              THE DEFENDANT:  Your Honor, can I approach the
12      bench?
13              THE COURT:  Everyone approach the bench.
14              NOTE:  A side-bar discussion is had between the
15      Court and counsel out of the hearing of the jury as follows:
16      AT SIDE BAR
17              THE COURT:  Yes, sir.
18              THE DEFENDANT:  I apologize for this.  I just wanted
19      to note that Mr. Walutes was smiling, making facial gestures
20      with the black individual with the tie.
21              THE COURT:  Who is?
22              THE DEFENDANT:  Mr. Walutes.  He is smiling,
23      nodding, making gestures to the black individual with the
24      jury.
25              MR. WALUTES:  As an officer of the Court, Your
```

445

1    Honor, I can tell you, I didn't look at any juror.  I don't

2    know what Mr. Mohamadi saw.  I don't know what Mr. Mohamadi

3    saw, but I made no gesture.

4              THE DEFENDANT:  You didn't smile at him?

5              MR. WALUTES:  I am not going to be questioned by the

6    defendant, but I have told the Court as an officer of the

7    Court--

8              THE DEFENDANT:  I just feel uncomfortable with him

9    smiling and nodding to jury members and them smiling and

10   nodding back at him.

11             THE COURT:  All right.  You have put it on the

12   record.  No one is to have any contact with our jurors.  And

13   anything more than you are allowed to look at the jurors, of

14   course.

15             THE DEFENDANT:  It was a nod and the smile that

16   bothered me, sir.

17             THE COURT:  Okay.  No one is to have any contact

18   with jurors other than, you know, looking at the them.  And

19   certainly no communications with them.  All right.

20             THE DEFENDANT:  Thank you, Your Honor.

21             THE COURT:  Yes, sir.

22             NOTE:  The side-bar discussion is concluded;

23   whereupon the case continues before the jury as follows:

24   BEFORE THE JURY

25             THE COURT:  All right, Mr. Ben'Ary, whenever you are

446

1    ready, sir.

2              MR. BEN'ARY:  Thank you, Your Honor.

3              KEITH CRANE, called by counsel for the United

4    States, first being duly sworn, testifies and states:

5        DIRECT EXAMINATION

6    BY MR. BEN'ARY:

7    Q.   Good afternoon, Deputy.

8    A.   Good afternoon.

9    Q.   Could you tell the members of the jury, please, your name

10   and occupation.

11   A.   My name is Keith Crane.  I am employed with the city of

12   Alexandria Sheriff's Department, deputy sheriff there, and I

13   work in booking.

14   Q.   I am sorry.  How long have you worked for the Sheriff's

15   Department in Alexandria city?

16   A.   Over 23 years.

17   Q.   And as part of the booking department over there, do you

18   take fingerprints of people taken into custody?

19   A.   Yes, I do.

20   Q.   And could you give a description of that process for the

21   members of the jury, please.

22   A.   It all depends on what the charge is.  So, we will take

23   fingerprints, whether it is a misdemeanor--

24              THE COURT:  Come a little closer to the microphone

25   so we can hear you.

K. Crane - Direct

447

1    A.    Whether it is a misdemeanor or a felony, depends on if

2    you do a palm and all that.  But we have a machine that we use

3    that does the prints, we just do each finger one time, and the

4    prints are on the paper, copies of what we did.

5    Q.    Do you take steps to ensure that the fingerprints that

6    get put on this printout match the individual who is being

7    printed?

8    A.    Right.  We have to process the person in, get all the

9    information, their name, where they are from, date of birth,

10   basic information.  Then we roll each finger.  Then I have the

11   person sign the card at the end.

12   Q.    Okay.  Are you familiar with an individual named Mirwais

13   Mohamadi?

14   A.    Yes, I am.

15   Q.    Do you see him in the courtroom right now?

16   A.    Yes, I do.

17   Q.    Would you point him out, please, or just describe where

18   he is sitting in the courtroom.

19   A.    He is the gentleman sitting in the front here wearing the

20   blue shirt and tie.

21         THE COURT:  I will note the identification of Mr.

22   Mohamadi.

23   Q.    Let me ask, with the help of the Court Security Officer,

24   if you could look at what is marked for identification as

25   Exhibits 10A through 10C.

448

1    A.    Can I take the card out?

2    Q.    Yes, please.

3    A.    Okay.  Okay.

4    Q.    Do you recognize what those are?

5    A.    Yes, sir.

6    Q.    What are those?

7    A.    Fingerprints I took of Mr. Mohamadi.

8    Q.    How do you know that you took them?

9    A.    On the back the person that does the process has the name

10   and serial number on there.

11   Q.    It says Keith Crane underneath 0266?

12   A.    Yes, that's my badge number.

13   Q.    How do you know that these prints that you took belong to

14   this defendant, Mr. Mohamadi?

15   A.    Well, his name is on the card.  We have a photograph, we

16   take a photograph that prints on the card itself, his photo is

17   there too.

18   Q.    And did the defendant sign the card on the first page in

19   your presence?

20   A.    Yes, he did.

21   Q.    And can you tell what date you took these known prints?

22   A.    These fingerprints were taken September 9, 2008.

23          MR. BEN'ARY:  Your Honor, I would offer Government's

24   Exhibit 10A through 10C into evidence.

25          THE COURT:  Any objection?

449

1          MR. NACHMANOFF:  No objection.

2          THE COURT:  All right.  10A through C will be

3    received.

4          MR. BEN'ARY:  Those are my questions, Your Honor.

5          THE COURT:  All right.  Cross-examine.

6          MR. NACHMANOFF:  Very briefly, Your Honor.

7      CROSS-EXAMINATION

8    BY MR. NACHMANOFF:

9    Q.   Good afternoon, Deputy Crane.

10   A.   Good afternoon.

11   Q.   Just a couple of questions.  You are responsible for

12   taking fingerprints and booking at the Alexandria Detention

13   Center, is that correct --

14   A.   Yes.

15   Q.   -- as part of your duties?  Are you also then

16   responsible, have access to how those prints are maintained?

17   A.   No.  I just take the fingerprints.  Then after the

18   fingerprints are taken, they are sent next door to the police

19   department.

20   Q.   Okay.  But you are familiar with how to retrieve

21   fingerprints?

22   A.   Somewhat.

23   Q.   And as a law enforcement officer, are you or others in

24   your department able to retrieve fingerprints if they are

25   doing an investigation?

K. Crane - Cross

450

1    A.    What do you mean?

2    Q.    If they want to look up fingerprints of a particular

3    individual, if they have identifying information?

4    A.    They, you have to go next door to the police department

5    for that.

6    Q.    And if you go there and you are a police officer, or a

7    Deputy Sheriff, you could get them, is that right?

8    A.    I might be able to get--  The machine that we have, it

9    keeps the fingerprints for about, for the last 25 to 30 people

10   that we do.  So, after a certain amount of time it just, you

11   know, it just carries over.

12            So, I couldn't go back and, you know, say today pull

13   up this set of prints, I can't do that.

14   Q.    Right.  But, for example, these prints, to get these

15   prints that you just identified --

16   A.    Right.

17   Q.    -- and that have been admitted into evidence, they are

18   kept in an archive, is that right?

19   A.    Right, they are kept somewhere.

20   Q.    Okay.  And police officers have access to that archive?

21   A.    Yes.

22   Q.    They don't have to get special permission from a court to

23   go and get a copy of someone's fingerprints, do they?

24   A.    I don't--  That's something with the police department.

25   I don't do that.

T. Ground - Direct

451

1   Q.   And so, you don't know who else might have access to

2   these fingerprint cards of Mr. Mohamadi?

3   A.   Correct.

4           MR. NACHMANOFF:  Thank you.  No further questions.

5           THE COURT:  May Officer Crane be, Deputy Crane be

6   excused?

7           MR. WALUTES:  Yes, sir.

8           THE COURT:  All right, you are excused with our

9   thanks, Deputy Crane.  Please don't discuss your testimony

10  with anyone until the trial is over.  You are excused at this

11  time.  Thank you.

12          THE WITNESS:  All right, thank you.

13          NOTE:  The witness stood down.

14          THE COURT:  All right, next witness.

15          MR. BEN'ARY:  Your Honor, Detective Thomas Ground,

16  please.

17          NOTE:  The witness is sworn.

18          THOMAS GROUND, called by counsel for the United

19  States, first being duly sworn, testifies and states:

20      DIRECT EXAMINATION

21  BY MR. BEN'ARY:

22  Q.   Good afternoon, Detective.

23  A.   How are you?

24  Q.   Could you tell the members of the jury, please, your name

25  and occupation.

452

1  A.   My name is Thomas Ground.  And I am a police officer with

2  the Alexandria Police Department.

3  Q.   Is there a particular part of the police department that

4  you are assigned to?

5  A.   Currently I am assigned to the Criminal Investigations

6  Bureau.

7  Q.   And what does the Criminal Investigations Bureau do?

8  A.   It's made up of numerous detectives, and currently I am

9  in the Property Unit.

10  Q.   Okay.  How long have you worked at the Alexandria City

11  Police Department?

12  A.   Just over six years.

13  Q.   And were you, as part of your duties there, were you ever

14  tasked with investigating crime scenes?

15  A.   Yes, sir.

16  Q.   And also with the collection of evidence?

17  A.   Yes.

18  Q.   And as part of those responsibilities, were you also

19  responsible for photographing crime scenes?

20  A.   Yes.

21  Q.   Are you familiar through your employment and your

22  training with the term "latent fingerprints?

23  A.   Yes.

24  Q.   What is a latent fingerprint?

25  A.   Well, first, latent means invisible.  So, you won't be

T. Ground - Direct

453

1    able to see it.

2            So, a latent fingerprint or latent print is a

3    fingerprint that you can't see through the human eye.

4    Q.   Can you collect a latent fingerprint?

5    A.   Yes.

6    Q.   Have you personally collected latent fingerprints as part

7    of your job with the Alexandria City Police Department?

8    A.   Yes.

9    Q.   How do you collect a latent fingerprint?

10   A.   You collect a latent fingerprint either by using

11   fingerprint powders and/or by chemical process.

12   Q.   Okay.  And are you familiar with the term "lift card"?

13   A.   Yes.

14   Q.   What's a lift card?

15   A.   A lift card is used once you develop a fingerprint, a

16   latent print on any type of surface, you lift it with tape and

17   then put that on to a latent lift card.

18   Q.   Okay.  So, if you are able to develop a latent print on a

19   surface, let's say a table with powder or chemical process,

20   you can use a lift card to actually remove it, preserve it for

21   further examination, take it back?

22   A.   Yes, sir.  What you do is take the tape, lift the print,

23   put it on the lift card, which would make that latent print

24   visible.

25   Q.   Okay.  And are you familiar through your training and

T. Ground - Direct

454

1    work with the Alexandria City Police Department with the term

2    "elimination prints"?

3    A.    Yes.

4    Q.    What are elimination prints?

5    A.    Elimination prints are prints of a known subject that are

6    used to compare against a set of unknown prints.

7    Q.    Okay.  And why are elimination prints collected?

8    A.    For example, at a crime scene you would take elimination

9    prints from the victim, which could be compared against any

10   fingerprints that were developed and lifted at a crime scene.

11   Q.    Okay.  I want to draw your attention back to May 27,

12   2007.

13         Were you employed with the Alexandria City Police

14   Department on that date and on duty in your capacity as a

15   crime scene investigator?

16   A.    Yes.

17   Q.    And did you respond to an area around 201 South Reynolds

18   Street in Alexandria city on that date?

19   A.    Yes.

20   Q.    And describe that area, the area right around 201 South

21   Reynolds Street?

22   A.    That's actually an apartment complex with numerous brick

23   buildings.

24   Q.    Is that the EOS 21 Apartment complex?

25   A.    Yes, sir.

455

1    Q.   And why did you respond on that date?  What caused you to

2    go there?

3    A.   A robbery call had come out, and my Captain instructed me

4    to respond to the area to process the crime scene.

5    Q.   Okay.  And what did you find when you arrived on scene?

6    A.   When I arrived on the scene, I met with the officer, the

7    primary officer, Officer Lion, and briefly spoke with him.

8             And then I also observed a 1999 green Crown Victoria

9    cab.

10   Q.   Okay.  And without telling us what Officer Lion said to

11   you, based on that conversation did you proceed to take

12   photographs of the taxicab?

13   A.   Yes, sir.

14   Q.   If I could ask, with the help of the Court Security

15   Officer, for you to take a look at what's marked for

16   identification Exhibit 15A--  Well, let's start with 15A.

17            Do you recognize that?

18   A.   Yes, sir, I do.

19   Q.   What is 15A?

20   A.   15A was the taxicab receipt that I recovered on the rear

21   passenger floorboard of the taxicab.  And this was the back

22   side of the receipt which had a number on it.

23   Q.   Is that a photograph of the receipt, or is that the

24   actual receipt itself?

25   A.   That's the photograph, sir.

T. Ground - Direct

456

1  Q.   And does the photograph accurately show what you recall

2  as being the receipt found, that you found on the back floor

3  of the taxi?

4  A.   Yes, sir.

5          MR. BEN'ARY:  Offer 15A into evidence.

6          THE COURT:  Any objection?

7          MR. COREY:  No objection, Your Honor.

8          THE COURT:  All right, it will be received.

9          MR. BEN'ARY:  Can we publish, Your Honor?

10         THE COURT:  Yes, sir.

11  BY MR. BEN'ARY: (Continuing)

12  Q.   Let me have you flip and turn to 15B, please.

13         What is 15B?

14  A.   15B is going to be the front side of the taxicab receipt

15  that I collected.

16  Q.   Again, that's a photograph?

17  A.   Yes, sir.

18  Q.   Does that fairly and accurately depict the front side of

19  the receipt that you collected?

20  A.   Yes.

21         MR. BEN'ARY:  Offer 15B into evidence and ask to

22  publish, please.

23         THE COURT:  Any objection?

24         MR. COREY:  No, Your Honor.

25         THE COURT:  All right, it will be received.  Go

T. Ground - Direct

457

1    ahead.

2           Any exhibit that has been admitted, you can publish

3    if you wish to.  You don't need to ask each time.

4           MR. BEN'ARY:  Thank you, Your Honor.

5    BY MR. BEN'ARY: (Continuing)

6    Q.   Let me ask you to look at 15C, please, Detective.

7           What is that?

8    A.   It's the back side of a $10 bill.

9    Q.   And what's the significance of that $10 bill?

10   A.   This $10 bill was also photographed and collected on the

11   rear passenger's side floorboard of the taxicab.

12   Q.   And is that photograph a fair and accurate depiction of

13   the bill that you found in the back of the taxicab?

14   A.   Yes, sir.

15          MR. BEN'ARY:  Offer 10C into evidence.

16          THE COURT:  15C?

17          MR. BEN'ARY:  I am sorry, 15C.

18          MR. COREY:  No objection.

19          THE COURT:  All right, it will be received.

20   BY MR. BEN'ARY: (Continuing)

21   Q.   Would you take a look at 15D, please.

22          What is that.

23   A.   That's the front side of the $10 bill.

24   Q.   Okay.  Fair and accurate depiction of the bill, the same

25   bill as 15C?

T. Ground - Direct

458

1   A.   Yes, sir.

2           MR. BEN'ARY:  I would offer 15D, please.

3           THE COURT:  Any objection?

4           MR. COREY:  No objection.

5           THE COURT:  It will be received.

6   BY MR. BEN'ARY: (Continuing)

7   Q.   Take a look, if you would, Detective, at 15E.

8           What is that?

9   A.   It's a picture of a black pen.

10  Q.   Okay.  And what's the significance of the black pen?

11          Where did you take that photograph?

12  A.   I observed and photographed that black pen in the center

13  console of the taxicab.

14  Q.   And is this a photograph of where it was before you

15  collected it?

16  A.   Yes, sir.

17  Q.   And is that photograph a fair and accurate depiction of

18  where you found the black pen?

19  A.   Yes.

20          MR. BEN'ARY:  I would offer that exhibit into

21  evidence, please.

22          THE COURT:  Any objection to 15E?

23          MR. COREY:  No objection, Your Honor.

24          THE COURT:  Thank you.  It is received.

25  BY MR. BEN'ARY: (Continuing)

T. Ground - Direct

459

1    Q.   Detective, please take a look at 15F.

2         What is 15F?

3    A.   It's the same exact photograph of the pen, just showing a

4    little bit more of the interior of the taxi.

5         MR. BEN'ARY:  I would offer 15F into evidence.

6         THE COURT:  Any objection?

7         MR. COREY:  No objection, Your Honor.

8         THE COURT:  All right, it will be received.

9    BY MR. BEN'ARY: (Continuing)

10   Q.   Take a look at 15G, please.

11        What is that?

12   A.   It's a picture of the front dashboard of the taxicab.

13   Q.   And is that a fair and accurate depiction of the front

14   dash of the taxi?

15   A.   Yes.

16        MR. BEN'ARY:  Offer 15G into evidence, please.

17        THE COURT:  Any objection?

18        MR. COREY:  No objection, Your Honor.

19        THE COURT:  All right, it will be received.

20   BY MR. BEN'ARY: (Continuing)

21   Q.   Take a look, please, Detective, at 15H.

22        What is 15H?

23   A.   It's another photograph of the front interior of the

24   taxicab.

25        MR. BEN'ARY:  I offer 15H into evidence.

460

1                THE COURT:  Any objection?

2                MR. COREY:  No objection, Your Honor.

3                THE COURT:  All right.

4     BY MR. BEN'ARY: (Continuing)

5     Q.   Take a look, please, Detective, at 15I.

6                What is 15I?

7     A.   It's a photograph of the $10 bill and the taxicab receipt

8     being photographed prior to being collected inside the

9     taxicab.

10               MR. BEN'ARY:  Offer 15I in evidence.

11               THE COURT:  Where is this in the taxicab?

12               THE WITNESS:  The rear passenger floorboard.

13               THE COURT:  All right.  Any objection?

14               MR. COREY:  No objection, Your Honor.

15               THE COURT:  All right, it will be received.

16    BY MR. BEN'ARY: (Continuing)

17    Q.   Take a look, please, Detective, at 15J.

18               What is 15J?

19    A.   Again, it's another picture of the $10 bill and taxicab

20    receipt that was photographed prior to being collected.

21               MR. BEN'ARY:  I would offer 15J into evidence.

22               MR. COREY:  No objection, Your Honor.

23               THE COURT:  All right, it will be received.  Thank

24    you.

25    BY MR. BEN'ARY: (Continuing)

1    Q.   Take a look at 15K, please.

2          What is 15K?

3    A.   15K is a photograph of the interior of the rear seat of

4    the taxicab.

5          MR. BEN'ARY:  Offer 15K into evidence.

6          THE COURT:  Any objection?

7          MR. COREY:  No objection, Your Honor.

8          THE COURT:  All right, it is received.

9    BY MR. BEN'ARY: (Continuing)

10   Q.   Take at look 15L, please.

11         What is 15L?

12   A.   15L is a photograph of the passenger side exterior of the

13   taxicab.

14         MR. BEN'ARY:  Offer 15L into evidence, please.

15         THE COURT:  Any objection?

16         MR. COREY:  No objection, Your Honor.

17         THE COURT:  All right, it is received.

18   BY MR. BEN'ARY: (Continuing)

19   Q.   Take a look at 15M, please.

20         What is 15M?

21   A.   15M is a photograph of the exterior driver's side of the

22   taxicab.

23         MR. BEN'ARY:  Offer 15M into evidence.

24         MR. COREY:  No objection, Your Honor.

25         THE COURT:  It is received.

1  BY MR. BEN'ARY: (Continuing)

2  Q.   Take a look, please, at 15N.

3        What is 15N?

4  A.   It's a photograph of the rear license plate of the

5  taxicab.

6        MR. BEN'ARY:  Offer 15N into evidence.

7        THE COURT:  Any objection?

8        MR. COREY:  No objection, Your Honor.

9        THE COURT:  Okay.

10  BY MR. BEN'ARY: (Continuing)

11  Q.   Take a look , please, at 15O.

12        What is that.

13  A.   Again, it's a picture of the rear of the taxicab.

14        MR. BEN'ARY:  Offer 15O into evidence.

15        THE COURT:  Any objection?

16        MR. COREY:  No objection, Your Honor.

17        THE COURT:  It is received.

18  BY MR. BEN'ARY: (Continuing)

19  Q.   Take a look at 15P, please, Detective.

20        What is that?

21  A.   It's an overall photograph showing the taxicab in

22  relation to 201 South Reynolds Street.

23        MR. BEN'ARY:  I would offer 15P into evidence.

24        THE COURT:  Any objection?

25        MR. COREY:  No objection, Your Honor.

T. Ground - Direct

463

1              THE COURT:  It is received.

2    BY MR. BEN'ARY: (Continuing)

3    Q.   Two more.  Take a look at 15Q, please.

4              What is 15Q?

5    A.   It's another overall photograph showing the location of

6    the taxicab in front of 201 South Reynolds Street.

7              MR. BEN'ARY:  Offer 15Q into evidence.

8              MR. COREY:  No objection, Your Honor.

9              THE COURT:  It is received.

10   BY MR. BEN'ARY: (Continuing)

11   Q.   And take a look at, please, at 15R.

12             What is 15R?

13   A.   15R is a photograph of the awning at 201 South Reynolds

14   Street to show the location.

15             MR. BEN'ARY:  I offer 15R into evidence, please.

16             THE COURT:  Any objection?

17             MR. COREY:  No objection, Your Honor.

18             THE COURT:  All right, it is received.

19   BY MR. BEN'ARY: (Continuing)

20   Q.   Now, Detective, you collected, based on your testimony, a

21   $10 bill and a taxicab receipt from the back area of the taxi,

22   is that correct?

23   A.   Yes, sir.

24   Q.   What did you do with the $10 bill and the receipt?

25   A.   I collected the $10 bill and receipt after they were

T. Ground - Direct

464

1    photographed.  Collected them, took them back to the crime

2    scene lab and had them processed for latent prints.

3    Q.    And did you find latent prints on either the $10 bill or

4    the taxicab receipt?

5    A.    No latent prints were found on the $10 bill.  A latent

6    print or prints were found on the taxicab receipt.

7    Q.    Okay.  And did you develop that print and put it onto a

8    lift card?

9    A.    Yes, sir.

10   Q.    Now, there were a couple of photographs of--  Actually

11   before I get to that, take a look--  Do you have the book in

12   front of you?  Are Exhibits 17A and 17B in that book?

13   A.    Yes, sir, there is 17A.

14   Q.    Take a look at 17A and B, please.

15          What are 17A and B?

16   A.    17A and B are, 17A would be the envelope where the latent

17   lifts were kept.

18          17B, after latent prints were developed, it was

19   turned into a lift card and filed with the rest of the latents

20   recovered at the scene.

21   Q.    Okay.  And which particular latent does 17B relate to?

22   A.    17B relates to the latent that was developed on the

23   taxicab receipt.

24          MR. BEN'ARY:  Offer 17A and B into evidence.

25          THE COURT:  Any objection?

T. Ground - Direct

465

1          MR. COREY:  Your Honor, it is unclear if he is

2    testifying from his own knowledge--

3          THE COURT:  I am sorry, I thought he said he was the

4    one that lifted the prints.  Is that inaccurate or is that--

5          MR. COREY:  I think he said it would be.  I am not

6    sure if he has personal knowledge of that.

7          MR. BEN'ARY:  I can him that, Your Honor.

8          THE COURT:  All right, go ahead, ask the follow-up

9    question.

10   BY MR. BEN'ARY: (Continuing)

11   Q.  Did you actually develop and lift the latent off the

12   receipt that is now marked as Exhibit 17B?

13   A.  Yes, sir.

14          THE COURT:  All right, it will be received.

15   Q.  There was some discussion and we looked at some

16   photographs of a pen that was sitting in an area of the

17   taxicab.  Do you recall that?

18   A.  Yes, sir.

19   Q.  And did you collect that pen?

20   A.  Yes, I did.

21   Q.  What did you do with it after you collected it?

22   A.  That was collected and taken down to the crime scene lab

23   to be processed for latent prints.

24   Q.  Did you actually--  Go ahead.

25   A.  I am sorry.

T. Ground - Direct

466

1    Q.    Did you actually process the pen for latent prints?

2    A.    Yes, sir, I did.

3    Q.    And what were the results of that?

4    A.    It was Super Glue fumed, and it was came back with

5    negative results for latent prints, and was discarded.

6    Q.    Okay.  What does Super Glue fumed mean?

7    A.    You put in an airtight chamber where Super Glue fumes are

8    released on top of it which would adhere to sweat, oils,

9    anything like that that you could leave a latent print with.

10   Q.    Okay.  And as I understand your testimony just now, you

11   didn't collect any latent prints off the pen, is that right?

12   A.    No, sir.

13   Q.    Okay.  Did you also process the taxicab itself for latent

14   fingerprints?

15   A.    I did.

16   Q.    Did you focus your efforts on a particular area of the

17   taxicab?

18   A.    Yes, sir.

19   Q.    What area did you focus on?

20   A.    I focused mainly on the rear passenger door of the

21   taxicab.

22   Q.    Okay.  And did you--  How did you go about, describe the

23   process of how you processed the rear area of the taxicab for

24   latent prints.

25   A.    Well, initially I focused on that area due to the fact

T. Ground - Direct

467

1  that I was advised the suspect had only entered and exited

2  that particular door.

3          So, upon processing, I did a powder process on the

4  interior and exterior of that door, including the glass, door

5  handles.

6  Q.  Okay.  And after you engaged in that powder process that

7  you talked about, did you find latent prints?

8  A.  Yes, sir.

9  Q.  And did you collect latent prints using lift cards as we

10 just talked about?

11 A.  Yes.

12 Q.  And if you could look at what's marked for identification

13 as Exhibits 17C through 17N, just take a moment, look at those

14 exhibits, please.

15         Do you recognize what's marked for identification as

16 17C through 17N?

17 A.  Yes.

18 Q.  Are those the envelopes, the envelope and the lift cards

19 that you processed and lifted from the taxicab on May 27, '07?

20 A.  Yes.

21         MR. BEN'ARY:  I would offer 17C through 17N into

22 evidence.

23         THE COURT:  Any objection?

24         MR. COREY:  No objection.

25         THE COURT:  They are received.

T. Ground - Direct

468

1   BY MR. BEN'ARY: (Continuing)

2   Q.   Did you also take elimination prints on the scene there

3   from an individual named Gebru Haile?

4   A.   Yes, sir.

5   Q.   Take a look, please, at Exhibit 17O.

6        Do you recognize 17O?

7   A.   Yes.

8   Q.   What is 17O?  You can take it out of the sleeve if you

9   need.

10  A.   It's the elimination card that I took the victim's

11  fingerprints on.

12       MR. BEN'ARY:  Offer 17O into evidence.

13       THE COURT:  Any objection?

14       MR. COREY:  No objection.

15       THE COURT:  It will be received.

16  BY MR. BEN'ARY: (Continuing)

17  Q.   While you were on scene, Detective, on May 27, '07, did

18  another vehicle arrive that became relevant to your

19  investigation?

20       MR. COREY:  Objection, leading.

21       THE COURT:  Overruled.

22  BY MR. BEN'ARY: (Continuing)

23  Q.   I can it again if you need.

24  A.   I am good.  Yes, sir, a 2007 Infinity FX35 SUV pulled

25  onto the scene.

469

1    Q.    Okay.  And did you, without testifying as to what anyone

2    else told you, did you learn something that caused you to

3    process the Infinity SUV?

4    A.    Yes, sir.  I spoke to the driver of that vehicle, who had

5    explained to me that--

6              THE COURT:  Don't tell what that person said to you.

7    After you spoke to the driver of the vehicle, what did you do?

8              THE WITNESS:  I realized that both cases were

9    related.

10             MR. COREY:  Objection.

11             THE COURT:  He can testify what he believes based on

12   what he heard.  Rephrase the question.

13   BY MR. BEN'ARY: (Continuing)

14   Q.    Based on what you learned speaking to this driver, did

15   you process the SUV for latent fingerprints?

16   A.    Yes.

17   Q.    Did you focus on any particular area of the Infinity SUV?

18   A.    Yes.

19   Q.    What area did you focus on?

20   A.    I focused solely on the front passenger side door and

21   window area of the SUV.

22   Q.    Okay.  And did you have occasion to take only four

23   photographs of the Infinity SUV?

24   A.    Yes.

25   Q.    Take a look, please, at what is marked Exhibit 1A.

T. Ground - Direct

470

```
 1              Do you recognize 1A?
 2   A.   Yes, sir.
 3   Q.   What is that?
 4   A.   It's the front angle of the Infinity SUV.
 5              MR. BEN'ARY:  Offer 1A into evidence.
 6              THE COURT:  Any objection?
 7              MR. COREY:  No objection.
 8              THE COURT:  All right, it is received.
 9   BY MR. BEN'ARY: (Continuing)
10   Q.   Take a look at 1B, please.
11              What is that?
12   A.   It's the exterior driver's side of the Infinity SUV.
13              MR. BEN'ARY:  Offer 1B into evidence, please.
14              THE COURT:  Any objection?
15              MR. COREY:  No objection, Your Honor.
16              THE COURT:  It's in.
17   BY MR. BEN'ARY: (Continuing)
18   Q.   Take a look at 1C, please.
19              What is 1C?
20   A.   1C is a picture of the rear, exterior rear of the
21   Infinity SUV.
22              MR. BEN'ARY:  Offer 1C into evidence.
23              THE COURT:  Any objection?
24              MR. COREY:  No objection, Your Honor.
25              THE COURT:  It is received.
```

471

1    BY MR. BEN'ARY: (Continuing)

2    Q.    Take a look, please, at 1D.

3            What is 1D?

4    A.    It's a picture of the rear license plate of the Infinity

5    SUV.

6            MR. BEN'ARY:  Offer 1D into evidence.

7            THE COURT:  Any objection?

8            MR. COREY:  No objection, Your Honor.

9            THE COURT:  All right, it is received.

10   BY MR. BEN'ARY: (Continuing)

11   Q.    And lastly, take a look at 1E, please.

12           What is 1E?

13   A.    1E is a picture of the exterior passenger's side of the

14   silver Infinity SUV.

15           MR. BEN'ARY:  Offer 1E into evidence.

16           THE COURT:  Any objection?

17           MR. COREY:  No objection, Your Honor.

18           THE COURT:  It is received.

19   BY MR. BEN'ARY: (Continuing)

20   Q.    Now, it's maybe a little difficult to see on the screen,

21   but there appear to be--  You have the actual photographs?

22   A.    Yes.

23   Q.    Could you describe, what are the dark sort of dotted

24   areas along the area of the passenger door just where the

25   metal meets the window?

472

1    A.    The dark colored spots?

2    Q.    Yes.  Front door, sorry.

3    A.    After I powder processed that vehicle, the powder adheres

4    to substances, such as perspiration, oils, things like that.

5    And that's what it adhered to.

6    Q.    Okay.  So, that's fingerprint powder that you applied?

7    A.    Yes, sir.

8    Q.    Okay.  Did you collect latent fingerprints from the

9    passenger area of the SUV?

10   A.    Yes.

11   Q.    I would like you to take a moment and look at what has

12   been marked as Government's Exhibit 3A through 3H, please.

13          Do you recognize 3A through 3H?

14   A.    Yes.

15   Q.    What are those?

16   A.    That is the, all the latent fingerprint cards and the

17   card holder.

18   Q.    I am sorry?

19   A.    The card holder, the manila envelope.

20   Q.    Okay.  Are those the latent prints that you developed and

21   collected using lift cards from the SUV?

22   A.    Yes.

23          MR. BEN'ARY:  I would offer 3A through 3H in

24   evidence.

25          THE COURT:  Any objection?

T. Ground - Cross

473

1          MR. COREY:  No objection, Your Honor.

2          THE COURT:  All right, they will be received.

3   BY MR. BEN'ARY:  (Continuing)

4   Q.   And did you take elimination prints from the driver of

5   the SUV, Kimberly Riley?

6   A.   Yes.

7   Q.   Take a look at 3I, please.

8          What is 3I?

9   A.   It's a photograph of the elimination print card.

10  Q.   From Ms. Riley?

11  A.   Yes.

12         MR. BEN'ARY:  I would offer 3I into evidence.

13         THE COURT:  Any objection?

14         MR. COREY:  No objection, Your Honor.

15         THE COURT:  All right, thank you.  It is received.

16         MR. BEN'ARY:  Those are my questions.  Thank you,

17  Detective.

18         THE COURT:  All right.  Cross-examination.  Mr.

19  Corey, now that you are all warmed up having gotten up and

20  down 14 times.

21         MR. COREY:  It is my afternoon workout.

22      CROSS-EXAMINATION

23  BY MR. COREY:

24  Q.   Good afternoon, Mr. Ground.

25  A.   How are you?

474

1   Q.   You testified that you were involved in the investigation

2   on May 27 at the apartment complex in Alexandria.  How long

3   had you been a crime scene investigator at that time?  This

4   was 2007.

5   A.   Approximately a year.

6   Q.   Approximately a year?

7   A.   Yes, sir.

8   Q.   Now, I think you also said you transferred out of that

9   department, is that right?

10  A.   Correct.

11  Q.   And why did you transfer out of that department?

12  A.   To become a detective.

13  Q.   So, you are no longer doing crime scene work?

14  A.   That's correct.

15  Q.   Now, when you responded to the scene, do you recall what

16  time you arrived?

17  A.   Not off the top of my head.  It would be documented in my

18  report.

19  Q.   And at some point you spoke to the cab driver, is that

20  correct?

21  A.   That's correct.

22  Q.   And was he calm when you talked to him?

23  A.   He seemed okay.

24  Q.   And he told you where the robber had been in his vehicle,

25  is that right?

1    A.   Correct.

2    Q.   Did he tell you about places that the suspect had touched

3    and so forth?

4    A.   Yes.

5    Q.   Did he describe where the robber was sitting in the

6    vehicle?

7    A.   Yes.

8    Q.   Now, I think you testified on direct that the cab was

9    green.  Isn't it blue?  Those photographs seem to show that it

10   is blue.

11          MR. BEN'ARY:  Objection to the second part of that.

12          THE COURT:  It's a compound question perhaps, but it

13   is cross-examination.

14          What color do you believe the car is?

15          THE WITNESS:  I believe at first glance that evening

16   it appeared to be a green color.  When the flash hits it, it

17   could make it look to be a different color.

18          THE COURT:  Okay.  Next question.

19   BY MR. COREY: (Continuing)

20   Q.   Okay, I want to understand sort of where you tested in

21   the cab.  It's fair to say you didn't test every area of the

22   cab, is that right?

23   A.   That's correct.

24   Q.   So, you only tested a few of the areas.  Did you test,

25   for example, the seat?

T. Ground - Cross

476

1  A.   No, sir.

2  Q.   Did you test the inside door handle?  When someone gets

3  in the car, you know, they close the door and put their hand

4  on the car door?

5  A.   Are you asking did I?

6  Q.   Yes.  Did you?

7  A.   No.

8  Q.   You didn't test that area.  How about the radio, did you

9  test the radio?

10  A.   No.

11  Q.   And at some point did you become aware that the suspect

12  allegedly touched the radio in the cab?

13  A.   Yes, I was.

14  Q.   But you didn't test the radio?

15  A.   No, sir.

16  Q.   And what condition was the cab in, was the outside of the

17  cab in?

18  A.   Fair.

19  Q.   Sorry?

20  A.   Fair.

21  Q.   Fair.  So, the radio though would have been probably a

22  pretty easy area to test, right?  You have got smooth

23  surfaces, it's just plastic?

24  A.   It looks smooth, but it is a textured surface just the

25  same.  Which it is very difficult to develop and/or lift a

T. Ground - Cross

477

1    latent fingerprint off of a textured surface.

2    Q.   So, on the interior of the cab is it true you didn't take

3    any prints?  You didn't collect any prints from the interior

4    of the cab?

5    A.   No, sir.

6    Q.   You only collected print from the exterior?

7    A.   Yes.

8    Q.   And with respect to the second vehicle, in the case of

9    that vehicle you also only took prints from the exterior, is

10   that right?

11   A.   Correct.

12   Q.   And in fact, I think you said you only tested a very

13   defined area of that second vehicle, is that right?

14   A.   Yes, sir, it was.

15   Q.   So, you didn't look at other vehicles or other areas of

16   the vehicle whether it was on the outside or inside?

17   A.   I did do the, solely the front passenger's side door of

18   the silver SUV interior and interior.

19   Q.   I want to talk about the pen for a second.  You said, you

20   testified that you found a pen inside the cab, is that right?

21   A.   That's correct.

22   Q.   And had you learned the cab driver alleged that the

23   robber had touched this pen?

24   A.   Yes.

25   Q.   And you said you picked up this pen, and I believe you

478

1    said you had it forwarded to the lab for analysis, is that

2    right?

3    A.   Yes, sir.

4    Q.   And so, if I recall you correctly, you said that the

5    analysis came back negative?

6    A.   Correct.

7    Q.   Was that your analysis?

8    A.   Yes, sir.

9    Q.   So, that's your opinion that it came back negative?

10   A.   Yes.

11   Q.   And did you have anyone else double-check that?

12   A.   No.

13   Q.   So, that was it, you just threw it away after that?

14   A.   If I cannot develop any minutia on that pen, for example,

15   it is of no more evidentiary value and it is discarded.

16   Q.   Well, that's your opinion though, right?

17   A.   Correct.

18   Q.   Now, did you test the ink inside of the pen?  Do you know

19   what color the ink was?

20           Do you even know if the pen worked?

21   A.   No.

22   Q.   So, you didn't take a very close look at this pen?

23   A.   It was photographed and collected and processed for

24   latent prints.

25   Q.   So, if I understood your testimony correctly, you

T. Ground - Cross

479

1   collected fingerprint samples, is that right?

2   A.   Correct.

3   Q.   Now, you didn't collect any other kind of evidence, is

4   that right?

5   A.   Correct.

6   Q.   So, you didn't try to sample for hair or fibers, is that

7   right?

8   A.   No.

9   Q.   And you didn't try to collect any DNA evidence, is that

10  right?

11  A.   No.

12  Q.   So, the Police Department has the capability to collect

13  hair and fibers, is that right?

14  A.   Yes.

15  Q.   So, you could have done this?

16  A.   Yes.

17  Q.   But you chose not to?  In this case you didn't think it

18  was warranted?

19  A.   Yes, but I am also under the direction of others working

20  on the case.

21  Q.   So, someone else told you not to collect the evidence?

22  A.   No.  After speaking with them, it was just determined

23  that I was going to process it for latent prints and collect

24  any physical evidence.

25  Q.   I want to make sure I understand your job in addition to

480

1  collecting the fingerprints.  You don't analyze those prints,

2  do you?

3  A.   No, sir.

4  Q.   So, you don't draw conclusions about what those prints

5  mean or don't mean?

6  A.   No.

7  Q.   So, you can't say anything with respect to whether those

8  prints have anything to do with Mr. Mohamadi, is that right?

9  A.   No.

10        MR. COREY:  The Court's indulgence.

11        THE COURT:  Yes, sir.

12        MR. COREY:  No further questions, Your Honor.

13        THE COURT:  All right, thank you.

14        Any redirect?

15        MR. BEN'ARY:  Briefly, Your Honor, if I may.

16        THE COURT:  Yes, sir.

17     REDIRECT EXAMINATION

18  BY MR. BEN'ARY:

19  Q.   You didn't test the interior areas of the taxicab or the

20  SUV, is that right?

21  A.   Other than the powder process of the windows, no.

22  Q.   And why not?

23  A.   The seat in the back of the taxicab was a vinyl surface,

24  it is textured.  I have processed numerous scenes before where

25  that be the case when I first went up to the crime scene

481

1    investigations, which result in negative results for

2    developing a fingerprint successfully.

3    Q.   Okay.  And you talked about the radio.  What about the

4    inside handle of the cab?

5    A.   The same thing, it was a textured black handle, which

6    would be no great luck in yielding a latent print.

7    Q.   Okay.  And is it essentially the same explanation, the

8    SUV, that you focused on smooth surfaces?

9    A.   Correct.

10   Q.   Now, you didn't test for, you didn't test for DNA, is

11   that right?

12   A.   No.

13   Q.   In your experience--  Well, let me withdraw that.

14        You also didn't test for fibers?

15   A.   No.

16   Q.   Why didn't you test for fibers and DNA?

17   A.   We commonly don't do that on the majority of our cases.

18   And when we do, it is generally at the direction of the

19   detective handling the case.

20   Q.   And you didn't test for hair either, is that right?

21   A.   No.

22   Q.   Were you aware that both victims described this assailant

23   as bald?

24   A.   Yes.

25        MR. BEN'ARY:  Those are my questions.  Thank you.

T. Ground - Redirect

482

1          THE COURT:  All right.  May the detective be

2    excused?

3          MR. BEN'ARY:  Yes.

4          THE COURT:  All right.  Detective, you are excused

5    with our thanks, sir.  Please don't discuss your testimony

6    that you have given here with anyone until this case is

7    concluded.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Have a good afternoon.

10          NOTE:  The witness stood down.

11          THE COURT:  Next witness.

12          MR. WALUTES:  Your Honor, the Government would

13    recall Richard Bryan and we would ask permission to play one,

14    I think it is about ten pages of the transcript, one ten or 15

15    minute clip, Your Honor.  At the end of lunch I gave it to

16    defense counsel.

17          I will tell the Court, I don't believe, although I

18    can't find the copy of your earlier things, but I don't think

19    it hits any earlier problem.  It is solely on this topic, Your

20    Honor.

21          MR. NACHMANOFF:  Your Honor, if we may approach on

22    that issue before the Court decides that.

23          THE COURT:  Certainly, let's approach.  I thought I

24    asked to get a copy of anything that was going to be played.

25          NOTE:  A side-bar discussion is had between the

483

1    Court and counsel out of the hearing of the jury as follows:

2    AT SIDE BAR

3            MR. WALUTES:  Your Honor, I apologize.  I will tell

4    the Court that when the last break occurred, the Court was out

5    of the courtroom before I was and the jury was still in the

6    courtroom, so I did not want to do that.

7            I will tell you at the end of the luncheon break,

8    which I think was the last point, I gave Ms. Minter and Mr.

9    Nachmanoff the page numbers.

10           I can't find their Exhibits A through G, but I don't

11   believe this is in that, Your Honor.

12           I will tell the Court, these ten pages are only on

13   prostitution.  And it is the defendant himself talking about

14   the American way.  And he goes through in some extreme detail

15   about prostitution.

16           I will note, Your Honor, the Government didn't trap

17   this defendant.  We stood up and made our objections and said

18   the door was being opened before it was answered.  The

19   defendant at that point in an audible voice, at least the

20   Government counsel heard it, I don't know if it shows in the

21   record, said, open the door.

22           And so, Your Honor, at this point the Government

23   believes it has the right to answer that squarely.  And so,

24   the argument being made through cross-examination of this

25   witness, Mr. Bryan, is that he doesn't have any basis to

T. Ground - Redirect

484

1    believe.

2            The Court I know has been very careful to try to

3    parse things out, Your Honor, but he put this into play.  We

4    believe this is an appropriate and relevant redirect, which is

5    what this was offered for, for the delay.  The Government

6    apologizes to the Court of not being able to give this

7    transcript to the Court earlier.

8            MR. NACHMANOFF:  Your Honor, if I have may.  I am

9    not sure whether Mr. Walutes did this by mistake or not, but

10   the pages that he let me borrow actually reflect the exact

11   overlap between what he would like to introduce now and what

12   the Court excluded based on 403 previously.

13           There are ten pages here, which go I think from

14   page 35 to 44 or 34 to 44.  The Court had previously granted

15   our motion in limine to exclude pages, essentially 38 through

16   40 and then 43 and 44.

17           So, some of what Mr. Walutes is seeking to introduce

18   now was not part of the motion in limine.  Some of it was

19   squarely what the Court had decided was inappropriate.

20           As to the cross-examination, obviously, as the Court

21   knows, as well as the rest of us, the circumstances in which

22   this came up, what I would say--  Excuse me, my voice is

23   sometimes loud.  Is that my questions were quite specific.

24   They were as to whether or not Richard Bryan was aware of any

25   information other than Mohamadi's statements.

T. Ground - Redirect

485

1          And so, while the Court certainly did warn counsel

2     and the defendant, this is simply a reflection of Mohamadi's

3     statements, which were not at issue.

4          In other words, we were not suggesting that there

5     was no discussion.  What we were suggesting was that he had no

6     independent information other than what Mohamadi said.  And I

7     think that's what came out in the cross.

8          The Government then on redirect certainly did go

9     into what Richard Bryan thought might be additional

10    information to corroborate this.

11         THE COURT:  With the other individual and the

12    girlfriend.

13         MR. NACHMANOFF:  Exactly.  So, I would suggest that

14    the Court's original ruling should stand with regard to the

15    really unfair prejudice of the detailed information that had

16    been identified and excluded earlier.

17         If the Government is insisting on pursuing this

18    matter, at the very least what I would ask is that it be

19    redacted to reflect those portions that were not subject to

20    the original motion in limine.

21         MR. WALUTES:  Your Honor, that is not the question

22    that was asked.  The question was, did he tell you anything.

23    And that is exactly into the wire, Your Honor.  And here we

24    have it.

25         Now, I understand that as part of the photographing,

T. Ground - Redirect

486

1    there was some explicit language, but, Your Honor, it is

2    explicit only to prostitution.

3           The other one that was available to me was the

4    grease and some specifics.  And this doesn't have, Your Honor,

5    this doesn't have anything about murder, it has nothing about

6    another drug--

7           THE COURT:  It doesn't have anything graphic in it

8    about the acts that they are to commit and the detail.  And I

9    excluded the other one for that reason because it talked about

10   the grease and the $100 for this and anal sex, and I thought

11   that was too prejudicial.  I don't see any of that in this.

12          MR. NACHMANOFF:  Your Honor, if I could--

13          MR. WALUTES:  Let me give the Court 38 and 39.  They

14   give fairly graphic descriptions of the way the photography

15   was to be--

16          THE COURT:  But I have admitted from another, there

17   was, one of the clips, one of the Exhibits A through G or

18   whatever I allowed, it was exactly this type of discussion

19   about how to pose the women.  And I found that to be

20   admissible.

21          MR. NACHMANOFF:  Correct, Your Honor.  And that

22   would be page 34 to 37, which were not previously excluded.

23          What I would suggest, Your Honor, is perhaps rather

24   than do this now at the very end of the day with the jury

25   here, is that since we are going to have a break, we can look

T. Ground - Redirect

487

1   at this in more detail and parse out what the Court had

2   excluded previously and make a decision then as to whether or

3   not my specific questions opened the door as to some of this

4   coming in.

5          MR. WALUTES:  Your Honor, we object to that.  This

6   witness testified today, he was subject to cross.  There was a

7   long delay and then more cross.  And I think the jury has a

8   right to hear this witness' testimony together.

9          I understand the Court is not going to rule out all

10   of this, but this is dead into what was the cross-examination,

11   Your Honor.  And the Government noted it and the defendant

12   said very loudly, open the door.

13          Your Honor, frankly, that is as if testimonial from

14   this defendant.  The Government should be allowed--  The

15   Government should be allowed to answer that, Your Honor.  We

16   have relevant evidence, it's not unduly prejudicial, we have

17   it set it up and prepared to go now.  We ask the Court to

18   permit that.

19          THE COURT:  Well, Mr. Mohamadi opened the door

20   through the questioning.  He was asked by his own counsel and

21   warned by the Court that it would open up the door.  He opened

22   up the credibility of Mr. Bryan as to whether he had a basis

23   for knowing and believing that there was actually a

24   prostitution ring being operated by Mr. Mohamadi that was put

25   at issue.

488

1          He was explicitly told not to go into that line of

2     questioning if it was going to be put at issue.  He said,

3     bring it on.  And this is not excludable under 403 as the

4     other portions were.  It's been made relevant by the decision

5     of Mr. Mohamadi to put Mr. Bryan's credibility at issue.

6          It is a focus of the indictment in that it is part

7     of the value of the services involved with solicitation to

8     murder the witness.

9          So, it is central to the Government's case to prove

10    that there was a valid offer, and it will be admitted.

11          MR. WALUTES:  We will play it right now.

12          THE COURT:  Your exceptions are noted.

13          THE DEFENDANT:  Can I put something on the record,

14    Your Honor?

15          THE COURT:  Yes, sir.

16          THE DEFENDANT:  I just want to say that I can show

17    you the paper with the questions I had set up.  I respect the

18    Court's ruling, I don't expect to change it.  I am just saying

19    I can show you the paper that I explicitly asked what is the

20    evidence that he based his opinion off, outside of my

21    testimony.

22          I never contested and said that--  Oh, oh, I totally

23    I understand the ruling.  I just want to put that on the

24    record.

25          THE COURT:  You heard my question--

R.A. Bryan - Direct

489

1              THE DEFENDANT:  That's why I said, open it up,

2      because I was hoping to have some type of evidence in terms of

3      me operating a business at that time.

4              THE COURT:  All right, I have made my ruling.

5              THE DEFENDANT:  I respect the Court's ruling.

6              THE COURT:  All right, your exception is noted.

7              THE DEFENDANT:  Thank you.

8              NOTE:  The side-bar discussion is concluded;

9      whereupon the case continues before the jury as follows:

10     BEFORE THE JURY

11             MR. WALUTES:  Your Honor, if Mr. Bryan might take

12     the witness stand again.

13             THE COURT:  Yes, sir.

14             RICHARD A. BRYAN, recalled by counsel for the United

15     States, having been previously sworn, testifies and states:

16         DIRECT EXAMINATION

17     BY MR. WALUTES:

18     Q.   Mr. Bryan, do you recall the questioning earlier today

19     about the prostitution business that you were being offered

20     the role in and the basis of why you believed that?

21     A.   Yes.

22             MR. WALUTES:  Your Honor, at this time the

23     Government would ask permission to play an additional clip

24     from the first of the four that we did already, which is disk

25     8.  Also made on the first visit, November 12 of 2008,

R.A. Bryan - Direct

490

1   pages 34 to 40--  I am sorry, 34 to 44, which I believe is the

2   end of that recording.

3            THE COURT:  All right.  And you have that segmented

4   out?

5            MR. WALUTES:  Yes.  And if we could ask for

6   distribution of the transcript to the jurors at this time.

7            THE COURT:  All right.  Well, Mr. Bryan, did you

8   also review these for accuracy?

9   BY MR. WALUTES: (Continuing)

10  Q.   Mr. Bryan, did you review every transcript for accuracy?

11  A.   Yes.

12  Q.   And have you had an opportunity to look--  Your Honor, I

13  can hand a copy to him.  I don't think we have initials on

14  these because I didn't have it clipped in this fashion, but I

15  can tell the Court that the total pages were initialed, but I

16  am not trying to go into the total pages, I am only trying to

17  go into portion of it.  I don't want to put in an initial that

18  was made to a different packages than what is now being used.

19           THE COURT:  Let's give Mr. Bryan a copy of the

20  transcript and make sure that he has reviewed this portion as

21  well.

22           Mr. Bryan, take a moment.  And this is just a

23  portion of the November 12 taped conversation, is that

24  correct, Mr. Walutes?

25           I'm sorry, remind me when is this conversation

R.A. Bryan - Cross

491

1    occurring?

2            MR. WALUTES:  Disk 8, Your Honor, which is the first

3    of the transcripts from November 12 of 2008.

4            THE COURT:  This is the--

5            MR. WALUTES:  It's a wire inside the Alexandria

6    Adult Detention Center on the very first day that Mr. Bryan

7    wore a wire.

8            THE COURT:  All right, thank you.

9    BY MR. WALUTES: (Continuing)

10   Q.   Have you reviewed it, Mr. Bryan?

11   A.   Yes, I have.

12   Q.   Is that a transcript that you previously reviewed for

13   accuracy?

14   A.   Yes.

15           MR. WALUTES:  Your Honor, at this point if we may

16   ask permission of the Court to play it.

17           THE COURT:  Yes, you may.

18           NOTE:  The recording is played.

19           MR. WALUTES:  Thank you, Your Honor.  Your Honor, I

20   was no further questions.

21           THE COURT:  All right.  Cross-examination.

22           MR. NACHMANOFF:  Thank you, Your Honor.

23       CROSS-EXAMINATION

24   BY MR. NACHMANOFF:

25   Q.   Mr. Bryan, you just heard that recording, and that was

R.A. Bryan - Cross

492

1   your voice, right?

2   A.   Yes.

3   Q.   And Mr. Mohamadi, correct?

4   A.   Yes.

5   Q.   And you were both doing a lot of talking, right?

6   A.   Yes.

7   Q.   You were doing quite a bit of talking about this supposed

8   prostitution business yourself, weren't you?

9   A.   As in me saying yeah, yeah, yeah.

10  Q.   Yeah.  And talking about quite a few of the details about

11  how this business would supposedly work, right?

12  A.   Yes.

13  Q.   Now, you testified I think on direct that this subject

14  made you pretty uncomfortable, didn't it?

15  A.   Yes.

16  Q.   And you didn't like talking about this subject?

17  A.   No.

18  Q.   And you didn't like using this language?

19  A.   No.

20  Q.   So, you were acting there, right?

21  A.   Yes.

22  Q.   Very convincingly, weren't you?

23  A.   Thank you, yes.

24  Q.   You were also talking a lot in the future tense, you are

25  talking about what you are going to do, right?

R.A. Bryan - Redirect

493

1    A.    Yes.

2    Q.    So is Mr. Mohamadi, isn't he?

3    A.    Yes.

4    Q.    In fact, you're talking about something that hadn't

5    really happened yet, weren't you?

6    A.    Yes.

7    Q.    Okay.  So, in fact, this was all talk, wasn't it?

8    A.    Well, I guess it was, yeah.  I mean, I talked.

9    Q.    And he talked?

10   A.    And he talked.

11   Q.    And there is nothing else to it, is there?

12   A.    I am not sure about the laws, you know.  I just know that

13   that's what we talked about.

14   Q.    You don't have any piece of paper, any hard piece of

15   evidence to corroborate that this business ever existed, do

16   you?

17   A.    No, I don't.

18          MR. NACHMANOFF:  Thank you.  I have no further

19   questions.

20          THE COURT:  All right.  Any redirect?

21     REDIRECT EXAMINATION

22   BY MR. WALUTES:

23   Q.    I am sorry, you say you had no hard evidence.  But what

24   was the wire, Mr. Bryan?

25   A.    I apologize.  I just didn't really understand the

494

1    question, I guess.

2    Q.   Were you the one describing the business on this wire?

3    A.   No.

4    Q.   Who was?

5    A.   Omar.

6            MR. WALUTES:  Thank you.  I have no further

7    questions, Your Honor.

8            THE COURT:  All right.  May Mr. Bryan be excused at

9    this time, or do you want him subject to further possible

10   call?

11           MR. NACHMANOFF:  No, thank you, Your Honor.

12           THE COURT:  All right.  Mr. Bryan, you are excused

13   at this time and you are free to go.  Don't discuss your

14   testimony with anyone until the case is over.

15           Do you understand that, sir?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  All right.  You are excused.  Have a

18   good afternoon.

19           THE WITNESS:  Thank you.

20           NOTE:  The witness stood down.

21           THE COURT:  All right, I think we have gone far

22   enough for today.

23           So, as I indicated, we are not going to sit

24   tomorrow, and we will come back here on Monday at 9:00 a.m.

25   Does that work for everyone?

495

1          All right, hopefully you have time to get caught up

2    on what you have missed the last couple days.  And otherwise

3    hopefully you will enjoy the weekend.  Please, again, no

4    research, no investigations.  I don't think there is anything

5    going to be printed about this, but I don't know that for a

6    fact.  And please don't go looking for anything.  Just enjoy

7    your time away from the courthouse, and hopefully enjoy the

8    weekend.  And we will see you at 9 o'clock on Monday morning

9    and we will resume testimony at that time.

10          All right, then you are excused with my thanks.

11          NOTE:  At this point the jury leaves the courtroom;

12    whereupon the case continues as follows:

13    JURY OUT

14          THE COURT:  All right, have a seat.  Mr. Mohamadi,

15    you have got your hand up?

16          THE DEFENDANT:  Your Honor, I am sorry for trying to

17    interrupt.  I would just like to have had an opportunity to

18    inform my sisters to, you know, step out of the room before

19    all this stuff.  But it's pointless now.

20          But I just wanted to clarify something that is

21    really, really bothering me, and I was just wondering if I

22    could get the Court's wisdom on this.

23          Now, I keep getting accused of operating a

24    prostitution business, but they offered evidence of talk about

25    committing these acts in the future.  Now, are they--  That's

496

1    what I don't understand.

2            THE COURT:  I don't think, and you can talk with

3    your counsel about that, I don't think they were trying to

4    prove that you were actually operating a prostitution

5    business.  They have to show that there was consideration of

6    value for Mr. Bryan shooting Mr. Haile.

7            So, they need to show that this is more than just

8    pie in the sky stuff.  And that Mr. Bryan believed that there

9    was consideration.  And it's an element of the offense.  They

10   are not trying--  You are not charged with running a

11   prostitution ring, and that's not going to be part of the

12   Government's proof.

13           All right, so it is what it is.  It's the talk.

14           THE DEFENDANT:  I just wish they would have put in

15   this voluminous indictment and that way I would have an

16   opportunity to defend against it.  That's my only issue, and I

17   apologize for interrupting.

18           THE COURT:  That's quite all right.  All right,

19   anything else tonight?

20           MR. WALUTES:  Not from the Government, Your Honor.

21           THE COURT:  All right, then we will resume testimony

22   on Monday.  You believe your case will probably go most of

23   next week, if not all of next week, is that right?

24           MR. WALUTES:  I don't, Your Honor.  I actually think

25   that we will be done Tuesday or Wednesday.

497

1            THE COURT:  All right.

2            MR. WALUTES:  We are better than I think halfway

3      through.

4            THE COURT:  Okay.  Well, let's designate jury

5      instruction people then at least to have a conference about

6      which ones you disagree with by the end of--  Well, on Tuesday

7      give me a list of the ones that are not agreed on.

8            I tell you right now, I rely heavily on the O'Malley

9      instructions and am comfortable with them because they are

10     tried and tested.  But let's designate somebody, and by close

11     of business tell me on Tuesday which ones are not agreed upon.

12           MR. WALUTES:  Understood, Your Honor.

13           THE COURT:  All right, have a good weekend.  We will

14     see you all on Monday at 9 a.m.

15           We are in recess.

16           NOTE:  The March 11, 2010 portion of the case is

17     concluded.

18        -------------------------------------------------

19

20

21           I certify that the foregoing is a true and

22        accurate transcription of my stenographic notes.

23

24
                        /s/  Norman B. Linnell
25                 Norman B. Linnell, RPR, CM, VCE, FCRR