498

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :      Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
            Defendant.        :
                              :
------------------------------:


V O L U M E   3 of 5


TRIAL  TRANSCRIPT


March 10-11 & 15-18, 2010


Before:  Liam O'Grady, Judge


And a Jury


APPEARANCES:

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

499

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| KIMBERLY M. RILEY | | |
| | DIRECT | 501 |
| | CROSS | 527 |
| | REDIRECT | 565 |
| MARK VASQUEZ | | |
| | DIRECT | 573 |
| | CROSS | 590 |
| | REDIRECT | 600 |
| GEBRU HAILE | | |
| | DIRECT | 602 |
| | CROSS | 642 |
| | REDIRECT | 681 |
| ANDREW SCHAP | | |
| | DIRECT | 696 |
| | CROSS | 700 |
| HOLLY PAIGE | | |
| | DIRECT | 702 |
| | CROSS | 707 |
| Silvia ESCAMILLA | | |
| | DIRECT | 710 |
| | CROSS | 725 |
| JESSICA HULL | | |
| | DIRECT | 732 |
| | CROSS | 737 |
| | REDIRECT | 744 |

500

BRIAN WISE

|  | DIRECT | 747 |
|  | CROSS | 753 |

ROBERT HICKMAN

|  | DIRECT | 758 |
|  | CROSS | 773 |
|  | REDIRECT | 788 |

K.M. Riley - Direct

501

1           NOTE:  The March 15, 2010 portion of the case begins

2    in the presence of the jury as follows:

3    JURY IN

4           THE COURT:  Good morning, ladies and gentlemen.  I

5    hope you all had a pleasant weekend.  It was a little bit on

6    the rainy side, but otherwise I hope it was enjoyable.

7           Did you all heed my request that you not do any

8    research or investigation or talk about this case with

9    anybody?  Nod of heads?

10          Thank you all very much.  All right, Mr. Walutes

11   call your next witness, sir.

12          MR. WALUTES:  Thank you, Your Honor.  The Government

13   would call Ms. Kimberly Riley.

14          NOTE:  The witness is sworn.

15          MR. WALUTES:  May I proceed?

16          THE COURT:  Yes.

17          MR. WALUTES:  Thank you, Your Honor.

18          KIMBERLY M. RILEY, called by counsel for the United

19   States, first being duly sworn, testifies and states:

20      DIRECT EXAMINATION

21   BY MR. WALUTES:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   In a loud and clear voice so that everybody in the room

25   can you hear, can you tell us your name.

K.M. Riley - Direct

502

1   A.   Kimberly Michelle Riley.

2   Q.   And how far did you go in school, Ms. Riley?

3   A.   Until 10th.

4   Q.   10th grade?

5   A.   Yes.

6   Q.   Were you working during Memorial Day weekend in 2007

7   during the evening of May 26, 2007, through the early morning

8   of the following day on May 27 of 2007?

9   A.   Yes.

10   Q.   Can you describe your line of work at that time.

11   A.   I'm an escort.  At the time, yeah.

12   Q.   And in May of 2007, how did you advertise?

13   A.   Through craigslist.

14   Q.   Did you make any arrangements that brought you into the

15   Commonwealth of Virginia that evening on Saturday, May 26 of

16   2007?

17   A.   Yes.

18   Q.   And how did you make those arrangements?

19   A.   By a phone call.

20   Q.   And did you come to an address in the city of Alexandria

21   of 175 South Reynolds Street, apartment 117?

22   A.   Yes.

23   Q.   And did the customer that you were coming to see at that

24   address give you a name?

25   A.   Yes.

K.M. Riley - Direct

503

1          MS. MINTER:  Your Honor, I am going to object to the

2    leading at this point.  Preliminary questions are fine, but--

3          THE COURT:  Well, I think that's where we are.  We

4    are still at the preliminary questions.  You can lead for a

5    little bit longer, not when we get to the substance of the

6    matters.

7          Go ahead, sir.

8          MR. WALUTES:  Thank you, Your Honor.

9    BY MR. WALUTES: (Continuing)

10   Q.   What, if any, name did the customer give you that

11   evening?

12   A.   Omar.

13   Q.   And how were you able to find that location in

14   Alexandria?

15   A.   Through my GPS Garmon.

16   Q.   Where were you traveling from when you first came into

17   the Commonwealth of Virginia?

18   A.   Rockville Pike in Rockville.

19   Q.   Would that be in Maryland?

20   A.   Yes.

21   Q.   And do you recall the type of vehicle that you were

22   traveling in that day?

23   A.   Yes, an Infinity truck.

24   Q.   Was it a leased or rental car?

25   A.   Rental.

K.M. Riley - Direct

504

1    Q.   And was it clean?

2    A.   Yes, I cleaned--

3             MS. MINTER:  Objection, leading.

4             THE COURT:  Sustained.

5    BY MR. WALUTES: (Continuing)

6    Q.   What was the condition of your rental vehicle?

7    A.   It was brand new and clean.

8    Q.   What was the original sum, if any, that brought you into

9    the Commonwealth of Virginia to see Omar?

10   A.   I don't understand.

11   Q.   Was any money discussed?

12   A.   Oh, yes, yes.

13   Q.   And how much money was discussed?

14   A.   We discussed about 5 to 600 at first.

15   Q.   And how much would 5 to 600, how much of your time would

16   that cover?

17   A.   About an hour-and-a-half to two hours.

18   Q.   And when you arrived at apartment 117, do you recall how

19   you got into the apartment?

20   A.   It was on the back door, the side door.  He was waiting

21   outside.

22   Q.   And at some point were you paid?

23   A.   As soon as we went inside, yes.

24   Q.   Okay.  And in what form were you paid?

25   A.   They were in big bills.

K.M. Riley - Direct

505

1    Q.    Cash?

2    A.    Yes, cash.

3    Q.    Do you recall about what time it was that you arrived at

4    that apartment that you went in through the side or back door

5    that he was waiting at?

6    A.    I say around like 10 at night, 8, around that time.

7    Q.    And was he alone?

8    A.    Yes, with two Yorkies.

9    Q.    When you say two Yorkies, for those who may not know what

10   a Yorkie is, what is a Yorkie?

11   A.    It is a teacup Yorkie terrier.  It's a dog.

12   Q.    Where were the two Yorkies?

13   A.    They were in the play pen--  Well, not the play pen.

14   They were in the kitchen on the floor with the baby pen, the

15   baby gate, yes.

16   Q.    So, they were in the kitchen, but they were blocked off?

17   A.    Yes.

18   Q.    And that would be inside apartment 117?

19   A.    Yes.

20   Q.    Is that the apartment that you went into with Omar?

21   A.    Yes.

22   Q.    Was anyone else in the apartment other than the two dogs?

23   A.    No.

24   Q.    Did you have an opportunity--  What happened--  Your

25   Honor, I want to use a leading question with the permission of

K.M. Riley - Direct

506

1   the Court, if I can, to direct where I am going at this point.

2          THE COURT:  Well, ask a question, we will see

3   whether it is appropriate.

4   BY MR. WALUTES: (Continuing)

5   Q.   Did you have sex at this point with Omar?

6   A.   No, not until later.

7   Q.   Okay.  Did you have sex while you were in the apartment

8   with Omar?

9   A.   Yes, yes.

10  Q.   Did you have an opportunity to see him without all of his

11  clothing on?

12  A.   Yes.

13  Q.   Did he have any markings on his person?

14  A.   Yes.

15  Q.   And could you tell us what markings you saw?

16  A.   Tattoos.

17  Q.   Could you tell us if you remember where the tattoos were

18  or the size?

19  A.   Yes.

20  Q.   Or anything you remember about them.

21  A.   He had a big one on his back like this size, and then he

22  had here and here, yeah.

23  Q.   Okay.  And do you remember--

24         THE COURT:  Just for the record, you're pointing to

25  your shoulders?

K.M. Riley - Direct

507

1          THE WITNESS:  Yes.

2          THE COURT:  All right.

3          MR. WALUTES:  Thank you, Your Honor.

4     BY MR. WALUTES: (Continuing)

5     Q.   And on the back, do you remember what it was a tattoo of?

6     A.   They were bold letters.  I remember it said something

7     like Asian or something.  I don't know exactly, but it was

8     just so long ago.

9     Q.   And at some point does the hour-and-a-half, two hours, or

10    whatever the agreed amount of time was, did that lapse?  Did

11    that come to an end?

12    A.   Yes.

13    Q.   Okay.  Are you--  What happens at that point?

14    A.   We made another arrangement for more hours.  And he went

15    ahead and paid me additional time.  And then we went outside

16    to get in my truck and started to head to D.C.

17    Q.   Okay.  If I could just pause there for a second.  How

18    much more money was agreed between you and Omar?

19    A.   Probably like, after that it was like maybe six more

20    hundred after that or seven more hundred.  On top of the money

21    that he already gave me.

22    Q.   And was that paid?

23    A.   Yes.

24    Q.   Okay.  At the beginning of the time?

25    A.   Yeah.  The first time he paid me, and then the second

K.M. Riley - Direct

508

1    time he paid me again.

2    Q.   Okay.  But both times at the front of the clock starting?

3    A.   Yes.

4    Q.   Okay.  Is that again in cash like it was the first time?

5    A.   Cash, yes.

6    Q.   And were those small bills, big bills, or do you not

7    remember?

8    A.   They were big, I think, yeah.

9    Q.   And you said you go back out to your car.  Why do you go

10   back out to your car?

11   A.   Because we were getting ready to leave to head to D.C.

12   Q.   Okay.  Whose idea was it to go to D.C.?

13   A.   Omar's.

14   Q.   Okay.  And did you understand that that was how you were

15   going to spend the additional time?

16   A.   Yes, that was our arrangement.

17   Q.   And you drove?

18   A.   Yes.

19   Q.   And who told you where to go?

20   A.   Omar.

21   Q.   And where did you go, if you remember today?

22   A.   We went to DuPont Circle at Steven's.

23   Q.   Okay.  And not telling us what you think but what you

24   saw, do you actually get to Steven's?

25   A.   Yes.

509

1   Q.   And from what you see, does it appear that people in

2   Steven's are familiar with Omar?

3   A.   Oh, yeah, you could tell they had a very tight

4   relationship.

5           MS. MINTER:  Objection, relevance.

6           THE COURT:  Overruled.

7   BY MR. WALUTES: (Continuing)

8   Q.   And how could you tell?  Again, you don't know what other

9   people are going on in their heads.

10  A.   Yes, it's from what I seen.

11  Q.   What did you see?

12  A.   When we first walked, in the valet, they took care of us.

13  And then when we went to the front, they didn't even pat him

14  down, they didn't check our IDs.  And then from there we went

15  up to the first bar, gave us free drinks.  He just kept giving

16  me like triple shots of tequila, but I wouldn't take it, Your

17  Honor, because to me it was awkward.

18          MS. MINTER:  Objection, nonresponsive.

19          THE COURT:  Yeah, okay.  Listen to the question and

20  then answer the question.

21          THE WITNESS:  Okay.  Sorry.

22          THE COURT:  Certainly.

23  BY MR. WALUTES: (Continuing)

24  Q.   At some point does the second amount of agreed time

25  expire?

K.M. Riley - Direct

510

1   A.   Yes.

2   Q.   Are you still in Steven's?

3   A.   Yes.

4   Q.   And what happens when the second extension has expired or

5   the first extension has expired?

6   A.   I told him that I needed more money or I had to go.  And

7   so, he told me that, okay, let's make another arrangement, you

8   know.  So, I started to leave.  It felt kind of weird because

9   he--

10          MS. MINTER:  Objection, relevance.

11          THE COURT:  Okay.  Listen to the question and answer

12   a little more responsively.

13          THE WITNESS:  Okay.  Sorry.

14          THE COURT:  Ask your question again.

15          MR. WALUTES:  Thank you.

16   BY MR. WALUTES: (Continuing)

17   Q.   You told him you were going to leave?

18   A.   Yes.

19   Q.   Okay.  And at that point did he want you to leave?

20   A.   No.

21   Q.   Was there another agreement?

22   A.   Yes.

23   Q.   And could you tell us what the agreement was?

24   A.   He didn't give me the money, but he said that he would

25   have to go to the bank to get more money.

K.M. Riley - Direct

511

1   Q.   And were you agreeable to helping him do that?

2   A.   Yes.

3   Q.   And what, if anything, do you do when he says he needs to

4   go to the bank?

5   A.   I went ahead to the valet area to pick up the car, and we

6   both got in the car.

7   Q.   And at that point did he tell you what type of bank he

8   wanted to go to?

9   A.   Yes, Bank of America.

10  Q.   And do you remember about what time of day we are talking

11  about now?  Is this still on Saturday or has it moved to

12  Sunday at this point?

13  A.   It was late, it was like around 2 o'clock in the morning.

14  Q.   So, 2 a.m. of the following day now, we have fallen out

15  of Saturday, we are into Sunday, May 27 of 2007?

16  A.   Right.

17  Q.   And can you describe going to take him to a Bank of

18  America.

19  A.   Yes.

20  Q.   I assume we're talking about an ATM, not an open bank at

21  2 a.m.?

22  A.   Right.

23  Q.   Can you tell us what happened.

24  A.   Okay.  I set my navigation for the Bank of America.  And

25  he kept telling me, oh, I know where it's at.  You know, so I

K.M. Riley - Direct

512

1    thought that was kind of strange because the navigation was

2    telling me to go this way.

3              MS. MINTER:  Objection.

4              THE COURT:  Overruled.  Go ahead.

5    BY MR. WALUTES: (Continuing)

6    Q.   The navigation told me to go one way, and he kept telling

7    me to go around this way.  And there wasn't any Bank of

8    America over there.

9    Q.   Okay.  What happens next?

10   A.   Then he kept telling me to go around in circles.  And so,

11   finally he told me to pull into this alley because he seen one

12   of his friends.  And so, when he stopped me, that's when he

13   pulled the gun out.

14   Q.   Okay.  Where are you--  Is your car still moving or had

15   you stopped?

16   A.   Stopped.

17   Q.   And where are you when he pulls the gun out?  Where is

18   your car parked?

19   A.   In the alley, somewhere near DuPont Circle, that area.

20   It's not far from the club at all.

21   Q.   From the Steven's club?  You have to say yes or no, he

22   can't write down nods.

23   A.   Yes, it's not far.

24   Q.   When you pulled into the alley, did you actually think

25   that Omar saw a friend?

K.M. Riley - Direct

513

1   A.   Yes.

2            MS. MINTER:  Objection, speculation.

3            MR. WALUTES:  It's her own--

4            THE COURT:  Overruled.

5   BY MR. WALUTES: (Continuing)

6   Q.   When you first pulled in, you didn't realize you were

7   being set up?

8   A.   No.  I didn't know at all.

9   Q.   And you said he pulled a gun out on you?

10  A.   Yeah, after he--  Yeah, he pulled a gun out, yeah.

11  Q.   And could you tell what type of gun it was?

12  A.   It was a long barrel .380.

13  Q.   And how do you know the model?

14  A.   Because I used to go to the shooting range and use the

15  same gun.

16  Q.   And what color is it?

17  A.   It was like a dark brown, black.

18  Q.   Do you know, did he actually do anything with the weapon

19  while you were watching him?

20  A.   Yes.  He was looking at it.  And then he, for a second,

21  and then he just cocked it back really slowly so I can see the

22  bullet, you know, just so he can show me, you know, that he

23  pulled it back.  He did it really slowly.

24           MR. WALUTES:  Your Honor, I wonder if I could ask

25  for a short break here.  There is something that has come to

514

1   my memory now that I think the Court had asked me to make sure

2   in the instructions.  I did not refresh memory.  I apologize

3   for the interruption, but I would rather do it right than to

4   do it wrong.  It's my fault entirely, Your Honor.

5            THE COURT:  All right.  Ladies and gentlemen, we are

6   going to take a brief recess and we will come back.

7            MR. WALUTES:  I think it would only take two or

8   three minutes.

9            THE COURT:  Yeah.  We will come back in just a few

10   minutes.  All right.  Then we are in recess.

11            NOTE:  At this point the jury leaves the courtroom;

12   whereupon the case continues as follows:

13   JURY OUT

14            THE COURT:  Do you want me to recess or stay?

15            MR. WALUTES:  However the Court would rather, Your

16   Honor.

17            THE COURT:  All right.

18            MR. WALUTES:  Your Honor, I could do it in open

19   court.

20            THE COURT:  Yes, let's do it in open court now.

21            MR. WALUTES:  Ms. Riley, you are being instructed

22   not to say that he told you he had killed other people during

23   this interaction.  Okay.  So, if you would just be careful not

24   to say that additional fact.

25            THE WITNESS:  Okay.  No problem.

K.M. Riley - Direct

515

1           MR. WALUTES:  Everything else is okay, but just not

2      say that he had killed other people.

3           THE WITNESS:  Okay.

4           MR. WALUTES:  I know I didn't tell that you that

5      morning, and I can't--

6           THE WITNESS:  Even if he told me that?

7           MR. WALUTES:  Correct.

8           THE WITNESS:  Okay.

9           THE COURT:  So, if you are asked a question by the

10     other side, you give them whatever the truth is, but while I

11     am asking you questions, please do not say that he killed

12     other people.

13          THE WITNESS:  Okay, I won't.

14          THE COURT:  While we were on it, we are not going to

15     discuss any use of cocaine on direct as well.

16          THE WITNESS:  Yes, okay.

17          MR. WALUTES:  That I did remember.  I apologize that

18     I didn't remember both.

19          THE COURT:  Okay, let's get our jury back in, Joe.

20          MR. WALUTES:  Thank you, Judge.  I appreciate the

21     Court's patience.

22          THE COURT:  That's the time to do it.  I appreciate

23     that.

24          THE MARSHAL:  Your Honor, they went downstairs to

25     sign in.

K.M. Riley - Direct

516

1            THE COURT:  Excuse me?

2            THE MARSHAL:  It will take five minutes.  They

3  thought they had 15 minutes.

4            THE COURT:  All right, we will take a five minute

5  recess then.

6            Joe, 20 push-ups, Joe.

7            NOTE:  At this point a recess is taken; at the

8  conclusion of which the case continues in the presence of the

9  jury as follows:

10            MR. WALUTES:  Your Honor--

11            THE COURT:  Go ahead.

12            MR. WALUTES:  Thank you, Your Honor.

13  BY MR. WALUTES: (Continuing)

14  Q.   Ms. Riley, before I had a senior moment, you were saying

15  that you saw the gun and you recognized it?

16  A.   Yes.

17  Q.   Okay.  Do you know if the gun was loaded?

18  A.   Oh, yes, it was.

19  Q.   How do you know that?

20  A.   Because when he cocked it back, I seen the bullet.

21  Q.   Okay.

22  A.   Yeah.

23  Q.   So, you saw him actually chamber a round?

24  A.   Yes.

25  Q.   And where was the gun pointed?  If you could describe

517

1  when you first see it, where is it and then what, if anything,

2  happened?

3  A.    First he went like that and then he--

4  Q.    I'm sorry, it is a private conversation you were just

5  having there.

6           Your Honor, if she may stand up for a moment to show

7  us.

8           THE COURT:  Yes.

9  Q.    Or if you can hold your hands up higher so everybody can

10  see it.

11  A.    First he went like this.  And then he went up to my head.

12  Q.    Okay.  And when you say first, you are holding your hand

13  with your finger pointed out?

14  A.    Yes.

15  Q.    In relation to you and him, where is it pointed?

16  A.    I'm sitting right here, he is right here, and--

17  Q.    Okay.  And then you said later it came up.

18           And if the Court would allow, if you could sit back

19  down the microphone will have an opportunity to amplify your

20  voice.

21  A.    Sorry.

22  Q.    Where does the gun move to when he moves it from pointing

23  it at you and his lap area?

24  A.    To my head.

25  Q.    And then does it actually touch you?

K.M. Riley - Direct

1   A.   Yeah.

2   Q.   And where does it touch you?

3   A.   Like right here.

4        THE COURT:  She pointed to the side of her head.

5   Thank you.

6   Q.   Was anything taken from you while he held the gun on you?

7   A.   Yes, the car keys and my purse and my cell phone.

8   Q.   And is your car still running or is it--

9   A.   No, it's off.

10  Q.   Does he take anything, Omar take anything from your

11  purse?

12  A.   Yes.

13  Q.   What is taken from your purse?

14  A.   He took most of my cash.  He left like probably $300 that

15  he missed.  There was some big bills and, there were more big

16  bills than the small bills.

17  Q.   Okay.  I want to talk about that for a second, if I can.

18  Do you have any sense of how much money he takes from your

19  purse?

20  A.   Yeah, like at least 1,600.

21  Q.   And where does the additional money come from?  You said

22  you got paid twice by him, about 5 to 600 the first time and

23  then another 5 to 600 the second time?

24  A.   Yeah.

25  Q.   Okay.  Where does that additional money come from?

K.M. Riley - Direct

519

1    A.    I was working during the day.

2    Q.    Back on May 26 of 2007?

3    A.    Yes.  It was pretty busy.

4    Q.    Okay.  And so, it's your belief that about 1,600 was

5    taken from your purse?

6    A.    Yeah, like 16, 18, like around that there.

7    Q.    You didn't have an opportunity to stop and count it,

8    obviously?

9    A.    No.

10   Q.    You said 300 was left behind?

11   A.    Yes.

12   Q.    Can you explain, if you understand, why the 300 was left

13   behind?  Was it in a different place?

14   A.    Oh, no, he just missed it.  It was all the way on the

15   bottom.

16             MS. MINTER:  Objection, speculation.

17             THE COURT:  Sustained.

18   BY MR. WALUTES: (Continuing)

19   Q.    In any case, some money was left in your purse?

20   A.    Yeah, because when he snatched the purse, and it was

21   happening so quick, and he kept like looking through it.  And

22   he was just like going through it and stuff.  So, he must have

23   missed it.

24             MS. MINTER:  Objection, speculation.

25             THE COURT:  All right.

520

BY MR. WALUTES: (Continuing)

Q.   And you, was the purse taken also or was it left at the end of this?

A.   Oh, he just left it right there.

Q.   And after your purse is then put back, what happens?

A.   Well, all he kept saying was, he kept asking me if I wanted to live.  And he asked me if I wanted to die tonight.  And that was the conversation.

Q.   At some point does he leave the area?

A.   Yes.

Q.   Can you describe how he leaves the area, how he leaves your vehicle and how he leaves the area.

A.   He, well--  Well, at first he kept trying to get me to call around people to get more money, and he wanted to go back to my hotel room to get more money out of the safe.  And then when I kept telling him I didn't know anyone, I am here from out of town, like nobody is going to, you know, have money that I call.

     So, finally he told me that he was going to leave.  He took the keys.  And then he pointed the gun at me and then he said that if I get out, he is going to kill me.

     So, when he got out, he started walking backwards with the gun.  And then he said he was going to catch a cab.

Q.   Okay.  At some point do you see your keys?

A.   Yeah.

K.M. Riley - Direct

521

```
 1    Q.   Is anything else left with your keys or just your keys?

 2    A.   Just my keys.

 3    Q.   Does he take your cell phone?

 4    A.   No.

 5    Q.   Is this the first time you were ever robbed in your line

 6    of work?

 7    A.   Yes.  Anything like this, never.

 8    Q.   Were you able to recover your vehicle keys that night?

 9    A.   Yes.

10    Q.   Did you decide to go to the police?

11    A.   Yes.  Actually, I drove all the way--  I called 911.  And

12    then I--  They wouldn't help me.  So, I went ahead and drove

13    all the way down to Rockville, hysterical like.  It was crazy.

14          So, I went all the way down to Rockville, and they

15    were nice enough to help me.  They told me to go back to the

16    location to where the guy lives and see if the police out

17    there can help because they are a lot more helpful out there.

18          So, I went ahead and followed the advice and went

19    back out there.  And then I seen all the cops there from

20    Alexandria.

21    Q.   Okay.  If I could go through that with you just a little

22    slower.

23    A.   Sorry.

24    Q.   At first you said you called 911 in D.C., correct?

25    A.   Yes.
```

K.M. Riley - Direct

522

1    Q.   Now, I have told you prior to taking the stand that we

2    have looked for--  That 911 calls are recorded, is that true?

3    A.   Yes.

4    Q.   And I have told you we have not been able to find a 911

5    call that you made in D.C.  Is that true, I told you that?

6    A.   Yes.

7    Q.   Okay.  Do you have any explanation for why they might not

8    have--

9    A.   Yes, because I had about four or five cell phones at the

10   time.

11   Q.   Okay.  But even if there was no call from 911 at DuPont

12   Circle at all, any idea why that wouldn't show up in their

13   records in D.C.?

14   A.   I don't know why.

15   Q.   I just wanted to go through that.

16   A.   Okay.

17   Q.   Then you get to Maryland.  Was it Maryland that you went

18   to after D.C.?

19   A.   Yes, yes.

20   Q.   After you were robbed?

21   A.   Yes.

22   Q.   You said you talked to some police there?

23   A.   Yeah.  They were standing outside, so I went up to them

24   and I told them what happened.  They were like three male cops

25   and a female cop.  And they were like telling me that I should

K.M. Riley - Direct

523

1    call the cops out there and they will help me.

2    Q.   Okay.  When you say out there, what's out there?

3    A.   Oh, Alexandria.

4    Q.   Okay.  And at that point did you decide whether you

5    should go to Alexandria or call Alexandria?

6    A.   To go there.

7    Q.   And where did you decide it would make sense to go to?

8    A.   Back to the apartment complex.

9    Q.   Is that the place that you went to earlier in the day?

10   A.   Yes.

11   Q.   And when you got there, what did you find, if anything?

12   A.   I seen a lot of cops.  And then I--  Yeah, I seen a lot

13   of cops.

14   Q.   Okay.  Did they ask you to describe Omar?

15   A.   Yes.

16   Q.   Did they ask if they could fingerprint your vehicle?

17   A.   Yeah, sure.

18   Q.   And did they ask you if he had any markings on his body?

19   A.   Yes.

20   Q.   And did you tell them about any markings that you had

21   seen?

22   A.   Yes.

23   Q.   Did they ask you to come back a few days later, about

24   nine days later, the first week of June of 2007 and look at

25   some photographs?

K.M. Riley - Direct

524

1    A.   Yes.

2    Q.   Okay.  And were you able to pick him out?

3    A.   Yeah, real quick.

4    Q.   And about a week after that, did the District of Columbia

5    detectives ask you to come in and look at some photographs?

6    A.   Yes.

7    Q.   And were you able to pick him out of that photo spread?

8    A.   Yes, no problem.

9    Q.   And do you see him in the courtroom today?

10   A.   Yes.

11   Q.   Could you identify him by an article of clothing he is

12   wearing as well as his location, the person you knew as Omar?

13   A.   Yes, there with the purple sweater.

14         MR. WALUTES:  Your Honor, may the record--

15         THE COURT:  I will note the identification of Mr.

16   Mohamadi.

17   BY MR. WALUTES: (Continuing)

18   Q.   Is there any doubt in your mind today, Ms. Riley, that

19   this is the individual who placed a gun to your head and took

20   your money?

21   A.   No, I am for sure.

22   Q.   Ms. Riley, if I could ask you to look at what is now

23   marked as Government's Exhibits 1A through 1E, and ask you if

24   you recognize that, with the assistance of the Court Security

25   Officer.

1    A.   Yes.

2    Q.   If you could look at 1A through 1E.  If you could just

3    flip through each page and make sure they are what you think

4    they are?

5    A.   Oh, yes, it is.

6    Q.   Okay.  And what is that?

7    A.   That's my rental truck that we were both in.

8    Q.   Okay.  Is that where the robbery occurred?

9    A.   Yes.

10   Q.   Is this actually photographed at the parking lot in

11   Alexandria after you had returned there at the suggestion of

12   the police in Maryland?

13   A.   Yeah, exact location.

14   Q.   And are they fair and accurate representations of your

15   vehicle at that time?

16   A.   Yes.

17            MR. WALUTES:  Your Honor, I would move the admission

18   of Government's Exhibit 1A through 1E.

19            THE COURT:  Is there any objection?

20            MS. MINTER:  No objection.

21            THE COURT:  All right, they will be received.

22            MR. WALUTES:  I guess they are already in, so we've

23   already published them once, Your Honor.  I don't think we

24   need to do it a second time.

25   BY MR. WALUTES: (Continuing)

526

1  Q.   Ms. Riley, we are done with that exhibit, I just want to

2  make sure we are on the same page.

3          If I could ask you to look at what is marked--  Were

4  you asked--  Actually, I guess I--  Were you asked to sign a

5  photo identification sheet by the detectives in Alexandria

6  when you were shown the photos?

7  A.   Yes.

8  Q.   And did you sign it?

9  A.   Yes.

10  Q.   The last thing, Your Honor, if the Court will indulge me,

11  I would like to show a blow-up of the DuPont Circle and have

12  her just place an X with her initial on where it was that she

13  believes that the bar or club is that she was at with this

14  defendant.

15          THE COURT:  All right, go ahead.

16  Q.   Ms. Riley, if you could simply place an X at the

17  approximate location of where it was that you were with Omar

18  prior to being robbed by Omar.

19          If you could take a second to orient yourself and

20  then just--

21          Okay.  If you could just put your initials next to

22  it so later on we know who that was.  Thank you.

23          Your Honor, those are all the questions the

24  Government has for Ms. Riley.

25          THE COURT:  All right.  Cross-examination.

527

1          CROSS-EXAMINATION

2    BY MS. MINTER:

3    Q.    Ms. Riley, you don't normally live in the Washington,

4    D.C. area?

5    A.    No.

6    Q.    You came here to work, correct?

7    A.    Yeah, but I have been there for almost two years.

8    Q.    Been where?

9    A.    In the D.C. area.

10   Q.    Okay.  And when you say been there two years, was that in

11   May of '07 or is that now?

12   A.    May of '07.

13   Q.    Okay.  And you had been there two years at that point?

14   A.    Yes.

15   Q.    Okay.  So, you came here approximately '05, is that your

16   testimony?

17   A.    Yeah.

18   Q.    Now, in May of 2007 you rented a car, correct?

19   A.    Yes.

20   Q.    And that was a silver Infinity?

21   A.    Yes.

22   Q.    And you rented that on May 17, correct?

23   A.    Actually, I had that rental car for about a good two

24   months, I believe.

25   Q.    Two months?

K.M. Riley - Cross

528

1    A.    Yes.

2    Q.    Okay.  The one that you were driving on the evening of

3    May 26?

4    A.    Yes.

5    Q.    And you indicated that you were living in the Washington,

6    D.C. area at that time?

7    A.    Yeah.

8    Q.    Okay.  But you were staying in a hotel?

9    A.    Yes.

10   Q.    Why is that?

11   A.    Because I was working, and it was easier for me to travel

12   to different areas.

13   Q.    Okay.  And when you say working, you said in response to

14   the prosecutor's questions that you worked as an escort?

15   A.    Yes.

16   Q.    And so, your job entails having sex with people for

17   money, correct?

18   A.    Yes.

19   Q.    And you advertised your services on craigslist, correct?

20   A.    Yes.

21   Q.    And you indicated that the individual that you met up

22   with on the evening of May 26 had responded to an ad that you

23   had placed on craigslist?

24   A.    Yes.

25   Q.    When did you place that ad?

K.M. Riley - Cross

529

1  A.   It's throughout the days.

2  Q.   I'm sorry, throughout the days, plural?

3  A.   Yeah, throughout.

4  Q.   So, do you post and repost?

5  A.   Yes.

6  Q.   Okay.  So, it's not like an ad in the newspaper where you

7  put it in once and it just stays?

8  A.   No.

9  Q.   You go back and adjust the ad?

10  A.   Yes.

11  Q.   Okay.  And is that so your ad will be one of the first

12  ones that comes up?

13  A.   Yes.

14  Q.   So, when is the last time that you had adjusted your ad

15  prior to this response?

16  A.   Oh, I don't remember.

17  Q.   Was it same day?

18  A.   I don't remember.  It was so long ago.  I don't know.

19  Q.   Do you remember if it was within a couple of months of

20  when the incident happened?

21  A.   Yeah, I would do it like routinely, like daily.

22  Q.   So, that day or the day before you would have updated?

23  A.   Yes.

24  Q.   And how long did that ad stay up?

25  A.   I have no idea.  I don't know.

K.M. Riley - Cross

530

1  Q.   Did it stay up--  Did you take it down--

2  A.   I don't know.  It was two years ago.  I don't know.  It's

3  been so long ago.

4  Q.   Well, you just testified to a number of events that

5  happened on May 26 and 27th, correct?

6  A.   Yes.

7  Q.   And you remember those?

8  A.   Yes, of course.

9  Q.   Clearly?

10  A.   Yes.

11  Q.   Okay.  Even the minor details?

12  A.   Yes, because I had to remember that.  It was

13  traumatizing.

14  Q.   Okay.  But you remember things that are not related to

15  the robbery, correct, such as where you were staying?

16  A.   Yeah, I remember because it happened.

17  Q.   But the hotel you were staying at wasn't traumatizing,

18  was it?

19  A.   No.  But I went to the location.  And when I met the

20  cops, they were right there.

21  Q.   Ms. Riley, my question is, the hotel you were staying at

22  didn't traumatize you, correct?

23  A.   No, it was a beautiful place that I stay at a lot.

24  Q.   Okay.  And you remember that hotel?

25  A.   Yes.  I have a very good relationship with the people at

K.M. Riley - Cross

531

1    the hotel.

2    Q.   Good.  Now, with respect to your ad, do you remember

3    taking it down on May 27?

4    A.   I don't remember.

5    Q.   Okay.  So, you can't say that you took it down on May 27?

6    A.   I have no idea.  I don't remember.

7    Q.   You have had, however, advertisements for your escort

8    service on craigslist since this incident, correct?

9    A.   Probably like a few times.  And then after that, no,

10   probably not.

11   Q.   The Government found you to serve a subpoena on you

12   through craigslist?

13   A.   Right.

14   Q.   Okay.  So, your advertisement was up when they subpoenaed

15   you?

16   A.   Yes.

17   Q.   Ms. Riley, how long have you been in this line of work?

18   A.   Probably off and on for a good six years.

19   Q.   And this is your only job?

20   A.   No, currently I bartend.  I no longer escort.  It's been

21   about a year.

22   Q.   Okay.  So, you started bartending about a year ago.  Were

23   you bartending in May of '07?

24   A.   No.

25   Q.   So, at that time that was your only job?

K.M. Riley - Cross

532

1    A.    Yes.

2    Q.    Okay.  And with respect not to the bartending but to the

3    escort service, when you work as an escort, you work for

4    yourself, correct?

5    A.    Yes.

6    Q.    You decide which jobs you are going to take?

7    A.    Yes.

8    Q.    You don't have a boss?

9    A.    No.

10   Q.    You don't have any employees?

11   A.    No.

12   Q.    No secretary?

13   A.    No.

14   Q.    No office?

15   A.    No.

16   Q.    You don't have any supplies or furniture or materials

17   that you order in the course of your business?

18   A.    No.

19   Q.    You don't receive a paycheck, do you?

20   A.    No.

21   Q.    Everything is paid to you in cash?

22   A.    Cash, yes.

23   Q.    In May of '07 did you have any other sources of income?

24   A.    No.

25   Q.    Any investments or anything like that?

K.M. Riley - Cross

533

1   A.   No.

2   Q.   How much, speaking to the time period that we have been

3   discussing, end of May 2007, how much on average did you make

4   in a day?

5   A.   It depends.  It varies from 100 to a thousand.  It

6   varies.

7   Q.   Okay.  So, in a week you would make 700 to 7,000?

8   A.   Yeah, I can.

9   Q.   But you don't earn the same amount every single week?

10  A.   No, it changes.

11  Q.   Now, when you received that money, I believe you said

12  that you were paid in cash, correct?

13  A.   Yes.

14  Q.   Okay.  And what would you do with that money?

15  A.   Put it in the bank after.

16  Q.   Okay.  Did you keep some of the money on your person?

17  A.   Yes.

18  Q.   Okay.  But you had access to that money, correct?

19  A.   Yes.

20  Q.   Okay.  You were able to spend the money if you chose or

21  save the money if you chose?

22  A.   Yes.

23  Q.   Ms. Riley, when you were working as an escort, did you

24  pay taxes on your income?

25  A.   No.

K.M. Riley - Cross

534

1   Q.   Do you know your yearly income in 2007?

2   A.   No.

3   Q.   How about 2008?

4   A.   No.  I never kept track.

5   Q.   Now, directing your attention to the 26th of May 2007,

6   you had indicated that you responded to a message that you

7   received from this individual?

8   A.   Yes.

9   Q.   Prior to that, you were meeting with other clients?

10  A.   Yes.

11  Q.   Okay.  And if you will tell the jury again, if you will,

12  how much money you made from those transactions?

13  A.   I don't remember.

14  Q.   Now, this individual that you met up with was a friend of

15  yours?

16  A.   Who?  Who did I meet up?

17  Q.   You have testified that you met an individual named Omar?

18  A.   Yes.

19  Q.   Okay.  And that individual was--

20  A.   He was not a friend.  He was a client.

21  Q.   He was not a friend of yours?

22  A.   No.

23  Q.   But you told the police officers that he was a friend of

24  yours?

25  A.   No, I didn't.  I never said that.

K.M. Riley - Cross

535

1    Q.   You did not say that?

2    A.   Nope, I never said that.  Never, ever, ever said that.

3    Q.   Okay.  So, it's not just that you don't remember, it's

4    that you are--

5    A.   I know for a fact that--

6         THE COURT:  Okay.  Let's let each other finish

7    before someone answers and then you ask another question.

8    Otherwise the court reporter can't take down what is being

9    said.  All right.

10   BY MS. MINTER: (Continuing)

11   Q.   So, I just want to be clear that I understand your

12   answer.  You are saying it's not that you don't recall as you

13   have mentioned with some of these other details, it's that you

14   definitely know that you never said that to a police

15   officer?

16   A.   Yeah, I know for a fact that I didn't say that.  It

17   wasn't true.

18   Q.   Now, you indicated that you received a text message from

19   this individual named Omar, is that correct?

20   A.   I don't remember that.  I'm sorry.

21   Q.   Tell us again, if you will, then how you came to learn

22   the address that you were going to?

23   A.   Oh, yeah, he sent me a text with the address, yeah.

24   Q.   Okay.  And now that you remember receiving a text

25   message, how many messages did you receive?

536

1   A.    I don't remember.

2   Q.    Do you remember if you sent a text message in exchange?

3   A.    I don't remember.

4   Q.    Do you remember at what time you received the text

5   message with the address?

6   A.    Probably around 8 or 9.  Because normally when I make

7   appointments, I don't normally write down the address, I

8   always ask the client to send me a text with the address,

9   that's my regular routine that I do.

10   Q.    And you believe that was 8 or 9 p.m.?

11   A.    Yes.

12   Q.    And am I correct that you answered in response to the

13   prosecutor's questions you arrived approximately 10 o'clock?

14   A.    Yes.  Around that time.

15   Q.    And you described some of the things that took place

16   before you actually had sex?

17   A.    Yes.

18   Q.    How long, how much time elapsed between the time you

19   arrived and when you had sex?

20   A.    We weren't there that long.  We were there for about a

21   good 30 minutes, 45 minutes.

22   Q.    Is that prior to having sex or including the sex?

23   A.    Including.

24   Q.    So, 30 minutes total.  Now, when you had sex, he took off

25   his clothes?

K.M. Riley - Cross

537

1   A.   Yes.

2   Q.   You took off your clothes?

3   A.   Yes.

4   Q.   And you were not afraid of the individual at that time?

5   A.   No.

6   Q.   And you didn't see a firearm at that time?

7   A.   No.

8   Q.   Okay.  And you were only undressed for a short while?

9   A.   Yeah.

10  Q.   And eventually you both got redressed?

11  A.   Yes.

12  Q.   Okay.  And where were you at the time that you redressed

13  yourself?

14  A.   Well, probably in the apartment where the--  Let me see.

15  Yeah, because the apartment was like a studio, so everything

16  was pretty much open.  So, really I couldn't really go

17  anywhere because it was just open area.

18  Q.   Okay.  But you redressed in the main part of the

19  apartment?

20  A.   Right.

21  Q.   And he redressed in the main part of the apartment?

22  A.   Right.

23  Q.   So, you saw him get dressed?

24  A.   Yeah.  He was showing me his tattoos too.

25  Q.   And you indicated that you remembered a tattoo on each

K.M. Riley - Cross

538

1    shoulder, correct?

2    A.   Yes.

3    Q.   Okay.  And you remember that very clearly?

4    A.   Yes.

5    Q.   Like the other details that you mentioned?

6    A.   Yes.

7    Q.   What clothing did he put on when he redressed?

8    A.   He had jeans and I believe white shirt with blue

9    lettering, I believe.  I am trying to remember.  It's just

10   been so long ago.

11   Q.   Okay.  Like a button down shirt?

12   A.   It wasn't a button down shirt.  It was a T-shirt.

13   Q.   And you did not see a firearm at that time?

14   A.   No.

15   Q.   And you said at that point there was an additional, you

16   had been paid--  Excuse me.  At that time you had been paid

17   between 5 and $600?

18   A.   Yes.

19   Q.   But you don't remember where in that range it was,

20   correct?

21   A.   Yeah, I don't.

22   Q.   And at that point when the individual asked to spend more

23   time with you, you agreed?

24   A.   Yes.

25   Q.   Because you wanted more money?

K.M. Riley - Cross

539

1    A.    Yes.

2    Q.    Okay.  And you arranged another 5 to $600?

3    A.    Yes, something around there.

4    Q.    But you don't remember the exact amount?

5    A.    Yeah, it was something around there.

6    Q.    Now, at this point you went out to your car?

7    A.    Yes.

8    Q.    And you were driving?

9    A.    Yes.

10   Q.    And he was in the passenger's seat?

11   A.    Yes.

12   Q.    And you went from Alexandria to Washington, D.C.,

13   correct?

14   A.    Yes.

15   Q.    Okay.  Is there any doubt in your mind that you were in

16   Washington, D.C.?

17   A.    I knew that we were heading to D.C. because he told me

18   that we were going to the clubs in DuPont.

19   Q.    Okay.  So, you knew when you were in D.C.?

20   A.    Yes.

21   Q.    And at that point you had discussed going to a club?

22   A.    Yes.

23   Q.    Okay.  And you weren't afraid or concerned at that time?

24   A.    No.

25   Q.    The dress code for that club, were you have able to wear

K.M. Riley - Cross

540

1    what you had on?

2    A.   Yes.

3    Q.   Okay.  But they had a dress code, correct?

4    A.   I have no idea.

5    Q.   Now, when you arrived, you were still driving?

6    A.   Yes.

7    Q.   And a driver from the valet service took your car,

8    correct?

9    A.   Yes.

10   Q.   Okay.  So, you gave him the keys?

11   A.   Yes.

12   Q.   Okay.  And he drove off with the car and parked it?

13   A.   Yes.

14   Q.   Okay.  You don't know where he parked it?

15   A.   I have no idea.

16   Q.   And you went into the club?

17   A.   Yes.

18   Q.   And you had indicated previously it was Memorial Day

19   weekend, correct?

20   A.   Yes.

21   Q.   So, it was busy?

22   A.   Yes.

23   Q.   And the club was busy?

24   A.   Yes.

25   Q.   Lots of people around?

1  A.   Yes.

2  Q.   And you in fact went to several clubs, correct?

3  A.   Not several.  What do you mean several?  Several is a

4  lot, right?

5  Q.   Well, you went to more than one club, correct?

6  A.   We went to two, one next door for like--  The first one

7  we went to, the one next door, it was like for 30 minutes, and

8  then we went to Steven's.

9  Q.   Okay.  So, you went to two clubs?

10  A.   Yes.

11  Q.   There came a time that you left Steven's and went back to

12  your car, correct?

13  A.   Yes.

14  Q.   And the valet brought the car back to you, correct?

15  A.   Yes.

16  Q.   You didn't go get your car yourself?

17  A.   No, the valet brought it.

18  Q.   Okay.  And when he brought the car back, you were driving

19  still?

20  A.   Yes.

21  Q.   And this individual was in the passenger's seat?

22  A.   Yes, Omar.

23  Q.   And tell us, if you will, what time that was that you

24  left?

25  A.   I would say about like 1:30, 2, I believe.  I don't

K.M. Riley - Cross

542

1   remember the exact time.

2   Q.   All right.  But the club was still open?

3   A.   Yes.

4   Q.   Other bars in the area were still open?

5   A.   Yes.

6   Q.   And there were people out on the sidewalks walking

7   around?

8   A.   Yes, I guess.  Yeah.

9   Q.   And there was traffic on the streets, people were still

10  driving, correct?

11  A.   Yes.

12  Q.   You were driving?

13  A.   Yes.

14  Q.   And your understanding was that you were leaving to go

15  get more money?

16  A.   Yes, he was, Omar was.

17  Q.   Okay.  And that money would eventually be given to you,

18  correct?

19  A.   Yes.

20  Q.   Now, you indicated that you were stopped in an alley?

21  A.   Yes.

22  Q.   And that is where the events that you describe took place

23  with respect to the firearm?

24  A.   Yes.

25  Q.   Okay.  Now, how long from the time that you drove into

K.M. Riley - Cross

543

1    the alley was it until you turned your car off?

2    A.   We were driving for about a good five minutes.  And then

3    when we pulled into the alley, we were there for at least like

4    30 seconds until he pulled his gun out.  It wasn't even that

5    long.

6    Q.   Okay.  And is your car running at that time?

7    A.   Yes.

8    Q.   Okay.  So, first you are see the firearm and the car is

9    still running?

10   A.   Yes.

11   Q.   And you indicated a number of things that you

12   discussed --

13   A.   Yes.

14   Q.   -- while he had the firearm?  How long did that

15   conversation take place?  Excuse me, how long did that

16   conversation take?

17   A.   Probably 20 minutes.

18   Q.   Okay.

19   A.   With the gun pointed to me for 20 minutes.

20   Q.   And just to be clear, your answers in response to the

21   prosecutor's questions were that he was holding the gun in his

22   right hand, correct?

23   A.   I don't know if it's the right hand or left, I don't

24   remember.

25   Q.   Well, a couple of minutes ago you stood up there at the

544

1   witness stand, correct?

2   A.   Yes.

3   Q.   And you demonstrated --

4   A.   Right.

5   Q.   -- for the jury what happened?

6   A.   Yes.

7   Q.   Is that in fact what happened?

8   A.   Yes, exactly.

9   Q.   And then you used your right hand to demonstrate the

10  firearm, correct?

11  A.   Yeah.  I don't know if it was right or left.  All I

12  remember was he put the gun to my head.

13  Q.   Okay.  So, your demonstration might not be exactly what

14  happened?

15  A.   It's exactly how it was, regardless if he used--  It had

16  to be the right hand because I was standing on, I mean, I was

17  sitting down on the left side so it had to be because--

18  Q.   Okay.  So, it was his right hand?

19  A.   Yes.

20  Q.   Very well.  Now, during that 20 minutes, at what point do

21  you turn your car off?

22  A.   As soon as he pulled the gun out, he cut the car off and

23  snatched the keys and snatched my purse.

24  Q.   Now, at some point other people walked into the alley,

25  correct?

K.M. Riley - Cross

545

1   A.   No.

2   Q.   No one walked into the alley?

3   A.   What I seen was there is the street, and I seen people

4   walking by.  Not in the alley, on the main road.

5   Q.   Okay.  So, you never testified that other people came by

6   while you were sitting there?

7   A.   No.  Never.  Because if someone did, I would have asked

8   for help.

9   Q.   Ms. Riley, do you remember testifying in a prior hearing

10  relating to this matter?

11  A.   Yes.

12  Q.   Okay.  And you were placed under oath, correct?

13  A.   Yes.

14  Q.   And that was on the 5th of March last year, correct?

15  A.   Yes.

16  Q.   Okay.  And the prosecutor was there?

17  A.   Who is the-- What is-- Who is that?

18  Q.   This gentleman?

19  A.   Oh, yes.

20  Q.   He was there?

21  A.   Yes.

22  Q.   And he asked you some questions?

23  A.   Yes.

24  Q.   Okay.  And you gave him answers?

25  A.   Yes.

K.M. Riley - Cross

546

1    Q.   Okay.  And you answered honestly at that point, correct?

2    A.   Yes.

3    Q.   Because you were under oath?

4    A.   Yes.

5    Q.   Okay.  And your testimony today is that you never said

6    that anyone came into the alley, correct?

7    A.   No, nobody came.

8    Q.   Well, at that prior hearing you were asked the question:

9    Okay, at some point did some people come by down in the alley

10   and start to make him nervous?

11           MR. WALUTES:  Objection, ask for page and line, Your

12   Honor, so I can actually follow.

13           MS. MINTER:  My apologies, Your Honor.

14           THE COURT:  Yes.

15           MS. MINTER:  Your Honor, I am happy to provide the

16   witness a copy of the document if the Court would prefer.  I

17   am happy to provide the Court a copy as well.  Or I can simply

18   advise Mr. Walutes of the page and line number.

19           THE COURT:  Just advise Mr. Walutes, that's fine.

20   BY MS. MINTER: (Continuing)

21   Q.   Ms. Riley, at some point the prosecutor asked you:  Okay,

22   at some point do people come by down in the alley and start to

23   make him nervous?

24           That was the question.

25   A.   Well, there were people walking by the alley.  I might

K.M. Riley - Cross

547

1    have misunderstood because I remember there were a people

2    walking--

3    Q.   Okay, Ms. Riley, Ms. Riley--

4              THE COURT:  Let her finish the answer.

5    Q.   My question to you--

6              THE COURT:  Hold on.  Hold on.  You listen to the

7    question and we will let you finish your answers.

8              And you ask specific questions if you want a

9    specific answer.  All right.

10             MS. MINTER:  Yes, Your Honor.  Thank you.

11   BY MS. MINTER: (Continuing)

12   Q.   Ms. Riley, at some point you are asked a question about

13   whether people came down the alley during your prior

14   testimony?

15   A.   Yeah.

16   Q.   Okay.  And that question was:  Okay, at some point do

17   some people come by down in the alley and start to make him

18   nervous?

19             That was the question, correct?

20   A.   Yeah.  I, probably--

21             THE COURT:  Hold on.  Listen to the questions and

22   answer the question you are asked, please.

23   Q.   That was the question, correct?  And your answer was,

24   yes.  Is that correct?

25   A.   Yes.

K.M. Riley - Cross

548

1   Q.   Now, during the 20 minutes that you are in the car, you

2   did not shout out to anyone, correct?

3   A.   No.

4   Q.   You did not honk the horn?

5   A.   No.  I didn't want to die.

6   Q.   You did not run away?

7   A.   Yeah.  He would have shot me.  I couldn't do that.  I

8   couldn't do anything.

9   Q.   You didn't run away?

10  A.   No, I couldn't even do that.  He had a gun to my head.

11  Q.   You didn't run away?

12  A.   How am I going to run away if there is a gun to my head?

13  Q.   Ms. Riley, you didn't run away?

14  A.   No, I didn't.

15  Q.   Now, you've testified in response to the prosecutor's

16  questions that a certain amount of money was taken from you

17  that evening, correct?

18  A.   Yes.

19  Q.   Okay.  And you said it could be 1,600, it could be 1,800?

20  A.   Yeah, it was like between 16, 18.

21  Q.   Okay.  Now, you also indicated that at some point that

22  evening you returned to the apartment complex?

23  A.   Yes.

24  Q.   And at that time you spoke with some other officers?

25  A.   Yes.

K.M. Riley - Cross

549

1    Q.    Okay.  And you told them that $700 had been taken?

2    A.    Oh, I have no idea.

3    Q.    You don't recall?

4    A.    I don't remember.  I don't.  I know I had way more than

5    that.  They probably misprinted that because--

6    Q.    My question, Ms. Riley, is what did you tell the police

7    officers when you arrived back at the apartment regarding how

8    much money had been taken?

9    A.    I tried explaining to them what happened.  And this was--

10   Q.    Ms. Riley, it is a very specific question.  Do you recall

11   what you told the police officers when you returned to the

12   apartment complex about how much money had been taken?

13   A.    Yeah, I don't remember what I said to them.

14   Q.    Would it refresh your recollection to view the reports

15   from that evening?

16   A.    Sure.

17   Q.    Your Honor, with the assistance of the Court Security

18   Officer.

19          Your Honor, I have a copy for the Court as well if

20   the Court would like.  I provided a copy to the Government.

21          THE COURT:  I'm fine, I don't need it right now.

22   Q.    Ms. Riley, I am going to ask you to turn to the third

23   page of that document.  It has a number 38 in the bottom

24   corner.  Do you see that page?

25   A.    Yes.

K.M. Riley - Cross

550

1    Q.   Okay.  And I am going to ask you to review--  Do you see

2    the third paragraph down on that page?

3    A.   Yes.

4    Q.   It's kind of a big one?

5    A.   Yes.

6    Q.   Okay.  In the middle of that paragraph, if you can read

7    the section that is highlighted there.  And when you are done,

8    look up so that I know you are done reading.

9    A.   Okay.

10   Q.   Okay.  You have reviewed it?

11   A.   Yes.

12   Q.   Okay.  Does that refresh your recollection about what you

13   told the officers about how much was taken?

14   A.   No.  I don't remember.  Because it was happening so

15   quick, it was overwhelming, so I don't remember.

16   Q.   So, reading this report does not refresh your

17   recollection about what you told the officer?

18   A.   What, for the third one?  The description, are you

19   talking about the description?

20   Q.   No, I am talking about the section describing how much

21   money.

22   A.   Yeah, I don't remember.  I'm sorry, it was just too much

23   going on.

24   Q.   So, reviewing that document does not help you remember?

25   A.   Yeah, it helps me remember, but I don't--

K.M. Riley - Cross

551

1    Q.   Okay.  Then if it helps you remember, what did you tell

2    the officers about how much money was taken?

3    A.   I don't remember.  It was just too much stuff going on.

4    Q.   You don't remember?

5    A.   Yeah, because I might have said 700--

6         THE COURT:  Ms. Riley, wait for a question.  Let's

7    move on.

8    BY MS. MINTER: (Continuing)

9    Q.   Ms. Riley, there also came a time when you were

10   interviewed in the District of Columbia about this event,

11   correct?

12   A.   Yes.

13   Q.   Okay.  And at that time you told the interviewers that

14   you, that $2,000 had been taken, correct?

15   A.   Yeah, about.

16   Q.   Okay.  And you indicated in response to my questions

17   earlier that you had testified at a prior proceeding to this

18   matter.  And at that time you testified that between 2,200 and

19   $2,200 had been taken?

20   A.   Yes.

21   Q.   And you told the jury here today that after this incident

22   you had 2 to $300?

23   A.   Left in my purse, yes, I remember that.

24   Q.   And you were able to keep that money?

25   A.   Yes.

K.M. Riley - Cross

552

1   Q.   And use that money?

2   A.   Yes.

3   Q.   Now, you indicated in your testimony previously that you

4   called 911 while you were in Washington, D.C., correct?

5   A.   Yes.

6   Q.   And you spoke to someone on the phone?

7   A.   Yes.

8   Q.   And they the refused to help you?

9   A.   Yes.

10  Q.   And you indicated that you are aware that the Government

11  can locate no 911 call from that time.

12  A.   No.

13  Q.   Ms. Riley, if we can talk about your testimony regarding

14  the gun that you saw.

15  A.   Yes.

16  Q.   You said it was a long gun?

17  A.   Well, just the barrel, the front part.

18  Q.   So, about six inches?

19  A.   No, not that big.  It was like this big.

20            MS. MINTER:  Your Honor, I would ask the record to

21  reflect she has indicated approximately six inches.

22            THE COURT:  Is that the barrel or is that the whole

23  gun?

24            THE WITNESS:  The whole gun is like this big.

25            THE COURT:  All right, the record will so reflect.

K.M. Riley - Cross

553

1   BY MS. MINTER: (Continuing)

2   Q.   Ms. Riley, you testified that when this incident

3   happened, you were scared?

4   A.   I was more upset.

5   Q.   You were more upset?

6   A.   Yes, because all I kept thinking was he could have killed

7   me.  And I kept thinking about my parents, how would my mom

8   feel, you know.  It was traumatizing.

9   Q.   You were upset?

10  A.   Yes.

11  Q.   Okay.  And--

12  A.   I was more mad than anything.  That never happened to me

13  before.

14  Q.   You wanted to keep your purse and your phone, correct?

15  A.   Yes.

16  Q.   So, you kept talking to him, correct?

17  A.   Yes.

18  Q.   And eventually he got distracted and did not take your

19  purse and your phone, correct?

20  A.   Yes.

21  Q.   Now, you've indicated that you met with a number of

22  police officers about this event?

23  A.   Yes.

24  Q.   Including when you returned to the apartment complex that

25  night?

K.M. Riley - Cross

554

1    A.   Yes.

2    Q.   And you spoke to an Officer Lion when you returned?

3    A.   I don't remember.  I spoke to a few.

4    Q.   But you remember speaking to the officers even if you

5    don't remember their names?

6    A.   Yes.  I don't remember their names.

7    Q.   And he asked you a number of questions about what

8    happened?

9    A.   Yes.

10   Q.   And he asked you to describe the individual --

11   A.   Yes.

12   Q.   -- that you were with?  And you gave him the description?

13   A.   Yes.

14   Q.   And that description was that it was a light skinned

15   Asian or Hispanic male, correct?

16   A.   Yes.

17   Q.   And that he had blue eyes?

18   A.   I don't remember.

19   Q.   So, your testimony today is that you don't recall what

20   you told the officers about the eye color of this individual?

21   A.   Yeah, I probably said that, yeah.

22   Q.   Okay.  And eventually you spoke on the phone to another

23   police officer, correct?

24   A.   Oh, I don't remember being on the phone.

25   Q.   Do you remember speaking to Detective Hickman

K.M. Riley - Cross

555

1    approximately four days after that?

2    A.   Yes.

3    Q.   Okay.  And you were out of town at the time, correct?

4    A.   I don't remember.

5    Q.   Okay.  But you agreed to come in and meet with him?

6    A.   Yeah, no problem.

7    Q.   And while you were on the phone, he asked you some

8    questions about what happened?

9    A.   I don't remember.

10   Q.   Do you remember him asking you to describe what the

11   individual looked like?

12   A.   Yeah, I don't remember.

13   Q.   You don't remember speaking to the detective at all?

14   A.   I remember speaking to him in his location, but not on

15   the phone, I don't remember the phone conversation.

16   Q.   Okay.  Would it refresh your recollection to review the

17   reports from that conversation?

18   A.   Sure.

19   Q.   Your Honor, with the assistance of the Court Security

20   Officer, I will hand up the document.

21          Ma'am, I am going to direct your attention to the

22   second page.  It has a 2 in the bottom right-hand corner.

23          Have you located the page, ma'am?

24          Ms. Riley, have you located the second page?

25   A.   Yes.  The second one?

K.M. Riley - Cross

556

1   Q.   It has a 2 in the bottom right-hand corner.  I am going

2   to ask you to review that first paragraph which begins with

3   the word "on."  The top paragraph.  And if you would just look

4   up when you are finished.

5   A.   Okay.

6   Q.   Okay, you have read the entire paragraph?

7   A.   Yes.

8   Q.   Okay.  Does that refresh your recollection about speaking

9   to Detective Hickman?

10  A.   I don't remember.  It was so long ago.

11  Q.   Okay.

12  A.   There were so many, I was talking to so many people.  I

13  don't remember.

14  Q.   Okay.  So, reading this document does not refresh your

15  recollection?

16  A.   No.

17  Q.   You eventually you met with the detective in Washington,

18  D.C., correct?

19  A.   Yes.

20  Q.   And at that time he asked you a number of questions about

21  what happened?

22  A.   Yes.

23  Q.   And he asked you to describe what the individual looked

24  like?

25  A.   Yes.

K.M. Riley - Cross

557

1   Q.   All right.  And you gave a description?

2   A.   Yes.

3   Q.   And you said he looked Spanish?

4   A.   Yes.

5   Q.   If I can take you back for a minute to the 26th and 27th

6   of May 2007.  While you were at these clubs, this individual

7   Omar had a friend with him, correct?

8   A.   No with him, no.

9   Q.   Okay.  You--

10  A.   He knew everybody in there.

11  Q.   Okay.  So, he spoke to a number of people there, correct?

12  A.   Yeah, the employees.

13  Q.   Okay.  And one of them gave his card to you, correct,

14  gave his contact information?

15  A.   One of his friends?  Yes.

16  Q.   Okay.  And you offered that information to Detective

17  Wise, correct?

18  A.   Yes.

19  Q.   And he declined to take that information from you?

20  A.   I don't know if he declined.  I don't know.  I don't

21  remember.

22  Q.   Okay.  But recall offering it?

23  A.   Yeah.

24  Q.   Now, you met with, you have just described the

25  conversation with Detective Hickman on the 31st of May,

K.M. Riley - Cross

558

1   correct?  Do you remember speaking to him?

2   A.   Yes.

3   Q.   Eventually you met him in person, correct?

4   A.   Yes.

5   Q.   And you had an interview?

6   A.   Yes.

7   Q.   In an office?

8   A.   Yes.

9   Q.   I am sorry, your answer?

10  A.   Yes.

11  Q.   And in an office fairly close to this courthouse?

12  A.   Yes.

13  Q.   If that rings a bell.  And you were told at that time

14  that they were not interested in pursuing you for any of your

15  prostitution-related activities, correct?

16  A.   Yeah.

17  Q.   Because you were worried about that?

18  A.   Yes.

19          MS. MINTER:  Your Honor, may we approach?

20          THE COURT:  Yes.

21          NOTE:  A side-bar discussion is had between the

22  Court and counsel out of the hearing of the jury as follows:

23  AT SIDE BAR

24          MS. MINTER:  Your Honor, I know the goal is to avoid

25  side bars, but based on the Court's earlier admonishment I

559

1    just wanted to bring to the Court's attention that it is my

2    intention to address whether Ms. Riley has previously been

3    convicted of prostitution.  It is not a 609 issue.  It goes

4    directly to motive to fabricate and bias.

5               MR. WALUTES:  I have no problem with that, Your

6    Honor, for what it is worth.

7               THE COURT:  All right, that's fine.  I think it is

8    admissible.

9               NOTE:  The side-bar discussion is concluded;

10   whereupon the case continues before the jury as follows:

11   BEFORE THE JURY

12   BY MS. MINTER:  (Continuing)

13   Q.   Ms. Riley, you have been convicted of prostitution

14   before, correct?

15   A.   Yes.

16   Q.   Okay.  And you actually spent a couple days in jail for

17   that, correct?

18   A.   Yes.

19   Q.   Now, during this meeting with Detective Hickman, he asked

20   you again questions about what happened on the 26th and 27th

21   of May, correct?

22   A.   Yes.

23   Q.   And he asked you to describe the individual you saw that

24   night, correct?

25   A.   Yes.

K.M. Riley - Cross

560

1    Q.   And he asked you about tattoos or markings?

2    A.   Yes.

3    Q.   And you gave him the same explanation that you gave here

4    today, correct, including tattoos on both shoulders?

5    A.   Yes.

6    Q.   Now, at some point during the interview Detective Hickman

7    opened his file, correct, and there were a lot of things in

8    the file?

9    A.   I don't remember.

10   Q.   Okay.  Well, I asked if he opened his file and you

11   nodded, so I am going to ask you that question out loud for

12   the court reporter.

13           MR. WALUTES:  Objection, Your Honor.

14   A.   I am sorry, I don't remember.

15           THE COURT:  She said she doesn't remember.  Go

16   ahead, ask your next question.

17   BY MS. MINTER: (Continuing)

18   Q.   At some point you told the jury that you saw a number of

19   pictures, correct?

20   A.   Right.

21   Q.   And the detective asked you, gave you a number of

22   instructions?

23   A.   Right.

24   Q.   And asked you to look at the pictures?

25   A.   Yes.

K.M. Riley - Cross

561

1   Q.   And asked you if you could identify anyone in those

2   pictures?

3   A.   Yes.

4   Q.   Prior to that occurring, you saw a picture of this

5   individual in the detective's file, correct?

6   A.   Oh, I don't remember.  I'm sorry.

7   Q.   You don't remember?

8   A.   I don't remember.

9   Q.   Do you remember saying, yep, that's him?

10  A.   I don't remember.

11  Q.   Okay.  Now, between May 27 and when you met with

12  Detective Hickman, you didn't see that individual again during

13  that time period?

14  A.   No.

15  Q.   And between--  The Court's indulgence, Your Honor.

16          Now, after you received your instructions from

17  Detective Hickman, you indicated you reviewed all these

18  photos?

19  A.   Yes.

20  Q.   And you picked the one that you thought was the robber?

21  A.   I knew for a fact.  Not thought, I knew.

22  Q.   But you picked the one that you believed?

23  A.   Yeah.

24  Q.   Ms. Riley, you are a drug user, correct?

25  A.   Drug user?  What do you mean?

K.M. Riley - Cross

562

1   Q.   Well, you were convicted of--

2   A.   Marijuana.

3   Q.   Possession of marijuana in Fairfax County?

4   A.   Yes.

5   Q.   And you have otherwise been arrested for controlled

6   substance?

7   A.   Marijuana, yes.

8   Q.   As recently as the early part of '09, correct?

9   A.   Yes.

10  Q.   The Court's indulgence, please, Your Honor.

11          THE COURT:  Yes, ma'am.

12  Q.   Ms. Riley, you indicated that you recognized the pictures

13  that the Government asked to you look at in the book of the

14  car, correct?

15  A.   Yes.

16  Q.   And you had seen those pictures before, correct?

17  A.   Yes.

18  Q.   And you examined the diagram that the prosecutors asked

19  you to look at?

20  A.   Yes.

21  Q.   And you had seen that diagram before?

22  A.   Yes.

23  Q.   And that's because you have met with the agents a number

24  of times with respect to this case, correct?

25  A.   Yes.

K.M. Riley - Cross

563

1   Q.   And the prosecutors?

2   A.   Yes.

3   Q.   And you have discussed what's going to happen here today?

4   A.   Yes.

5   Q.   And discussed your testimony?

6   A.   Yes.

7   Q.   Ms. Riley, if I could take you back to the early hours of

8   the 27th of May.  You indicated that after leaving Washington,

9   D.C. you went back to Maryland, correct?

10  A.   Yes.

11  Q.   And you spoke to law enforcement there, correct?

12  A.   Yes.

13  Q.   And I believe you said they were individuals that you saw

14  outside your hotel?

15  A.   Yes.

16  Q.   Police officers?

17  A.   Yes.

18  Q.   And you described to them what happened, correct?

19  A.   Yes.

20  Q.   And you told them that you had been robbed, am I correct?

21  A.   Yes.

22  Q.   Okay.  And you told them there was a firearm involved?

23  A.   Yes.

24  Q.   And they told you to go back to Alexandria?

25  A.   Yeah.  They were very helpful and they told me that I

564

1   should go back in Alexandria, they will help me a lot, as much

2   as possible.

3   Q.   Okay.  And did a friend tell you to go back there?

4   A.   Yeah, the officers and my friends, they gave me advice to

5   go back, yeah.

6   Q.   So, friends also told you to go back?

7   A.   Yes.

8   Q.   And so, you decided to go back there?

9   A.   Yes.

10  Q.   So, you got in your car?

11  A.   Yes.

12  Q.   And it was the same car you had been driving all night?

13  A.   Yes.  I tried not to touch anything to--

14  Q.   You left Maryland?

15  A.   Yes.

16  Q.   You drove on the beltway, is that correct?

17  A.   I don't remember.

18  Q.   You don't remember how, but you drove all the way down

19  there?

20  A.   Yes.

21  Q.   How long did that take you?

22  A.   I don't remember.

23  Q.   And you don't remember which way you came?

24  A.   I had the navigation.  The navigation would do all the

25  thinking.

565

1    Q.   Okay.  But you know that you came back to Alexandria?

2    A.   Yes.

3    Q.   Okay.  And you went back to the apartment complex?

4    A.   Yes.

5    Q.   So, you didn't just come to Alexandria, you went to the

6    specific apartment complex?

7    A.   Yes.

8    Q.   Where you had met this individual, correct?

9    A.   Yes.

10   Q.   This individual that had robbed you?

11   A.   Yes.

12   Q.   With a gun?

13   A.   Yes.

14   Q.   And threatened to kill you if you followed him?

15   A.   Yes, yes.

16        MS. MINTER:  Nothing further, Your Honor.

17        THE COURT:  All right, thank you.

18        Any redirect?

19        MR. WALUTES:  Yes.  Thank you, Your Honor.

20      REDIRECT EXAMINATION

21   BY MR. WALUTES:

22   Q.   Ms. Riley, I think you said that after you had a gun put

23   to your head and you were robbed, that you were angry?

24   A.   Yes.

25   Q.   Can you explain that.

566

A.    Because the whole time like all I kept thinking was like
I'm going to die, like he's going to kill me.  And my mom and
I, we have a very good relationship because she is Korean, so
we are together all the time.

        So, all I kept thinking about was my mother, like
how she is going to feel.  And that really pissed me off
because he could have really, really killed me and hurt me.
And that's all I kept thinking over and over.

Q.    Okay.  Going to the police and talking about your
business, prostitution --

A.    Yes.

Q.    -- is that easy to do?

A.    No, because I thought, I was scared that maybe the IRS
will get me because of the money.  And I just didn't want to
get in trouble.

Q.    And yet you still came forward?

A.    Yes.

Q.    Why did you do that?

A.    Because it was wrong.  And he could hurt someone besides
me.  And he could have really hurt me.  Because what if the
gun would have gone off?  What if it was an accident?

        MS. MINTER:  Objection, nonresponsive.

        THE COURT:  All right.  I think she has finished her
answer.  Ask your next question.

BY MR. WALUTES: (Continuing)

567

1   Q.   I guess the question I am trying to get to, Ms. Riley,

2   you understand Ms. Minter's question to you about why would

3   you come back to the scene of where the crime started,

4   Alexandria, Virginia.   Why did you do that?

5   A.   Because I was going to call 911 from there and have the

6   Alexandria police over there.

7   Q.   And did you think they would listen to you?

8   A.   Yes, because the Rockville people, they told me, the

9   lady, she told me that Alexandria, they are a lot more

10  helpful, so I should go back.

11  Q.   When you went in the grand jury on March 5 of 2009, Ms.

12  Minter showed you in a question that you were asked about--  I

13  guess, was it me asking you the questions, do you remember?

14  A.   No, I don't remember.   Sorry.

15  Q.   Somebody was asking you questions?

16  A.   Yes.

17  Q.   And Ms. Minter had the question:   Okay, at some point do

18  some people come by down in the alley and start to make him

19  nervous.

20          Do you remember that question?

21  A.   No, I don't remember.

22  Q.   I would like to--  Do you still have the grand jury

23  testimony in front of?   If you could look at page 16, line 11.

24  A.   This isn't it.

25  Q.   Do you see it?   The thick one, the one that is stapled,

568

1    it begins in the front, it says, grand jury information.

2    A.   Yeah, this isn't it.  I don't have one.  This is the

3    phone call report.

4    Q.   Perhaps if I could give you the original grand jury

5    transcript.

6            Do you see where it says on the first page, United

7    States courthouse, March 5, 2009, testimony of Kimberly

8    Michelle Riley?

9    A.   Yes.

10   Q.   Okay.  Now, if I could ask you to turn to page 16.  Do

11   you see the line 11--  Do you see how they are numbered

12   actually on the left?

13   A.   Yes.

14   Q.   Do you see line 11?  This prosecutor, whoever it was,

15   says:  Okay, at some point do some people come by down in the

16   alley and start to make him nervous?

17           Do you see the beginning of the question where it

18   says, come by?

19   A.   Yes.

20   Q.   And then it says, down?

21   A.   Yes.  That's--

22   Q.   What did you actually understand that question to mean?

23   A.   Well, I thought they were walking by, not through the

24   alley.  I didn't--  I knew that--  I didn't understand what

25   that meant.

569

1   Q.   Were you trying to trick the grand jury?

2          MS. MINTER:  Your Honor, I would say that is

3   nonresponsive in that it seems to be an answer to what she

4   thought at the time, not what her understanding of the

5   question was.

6          THE WITNESS:  That was my understanding of the

7   question.

8          THE COURT:  I will overrule the objection.  I will

9   allow the answer.  Ask your next question.

10  BY MR. WALUTES: (Continuing)

11  Q.   Were you trying to trick the grand jury?

12  A.   No.

13  Q.   Were trying to be unhelpful?

14  A.   No, I wanted to be honest.

15  Q.   And then Ms. Minter asked if you had met with federal

16  agents prior to appearing here in the courtroom today, is that

17  correct?

18  A.   Yes, one.

19  Q.   Okay.  Were you asked to look at the exhibits that you

20  would be shown in the courtroom?

21  A.   No.

22  Q.   I guess the question, did people ask you to look at an

23  interview that might have been videotaped that you gave to

24  some detectives?

25  A.   No, not today.

K.M. Riley - Redirect

570

1   Q.   Okay.  I am sorry, I didn't mean to just limit it to

2   today.

3   A.   Oh, okay, I'm sorry.

4   Q.   The days before.  Obviously today you have been waiting

5   outside.  But previous to coming down here today, did you have

6   an opportunity to look at--

7   A.   Oh, yes.

8   Q.   Okay.  And you looked at some of the exhibits as well as

9   the videotapes?

10  A.   Yes.

11  Q.   Did anybody tell you what to say in the courtroom today?

12  A.   No.  You guys just told me to be honest.

13  Q.   And the tattoos that you have described, did anybody show

14  you the tattoos?

15  A.   No.

16  Q.   They just asked you to describe them?

17  A.   Yes.

18  Q.   And my last question--  Actually, I have got a couple.

19  Is it easy to come into a federal courtroom and talk about

20  your escort business?

21          MS. MINTER:  Objection, relevance.

22          THE COURT:  Sustained.  I think we have gone through

23  this.  You have already asked questions about being difficult

24  to come in here for the other reasons as well.  Ask your next

25  question.

K.M. Riley - Redirect

571

1    BY MR. WALUTES:  (Continuing)

2    Q.   Ms. Riley, is there any doubt that the man sitting at the

3    table to my left that you have identified in this courtroom

4    was the man who held a gun to your head and took money from

5    you?

6    A.   100 percent that's him.

7              MR. WALUTES:  Thank you.  I have no further

8    questions for this witness, Your Honor.

9              THE COURT:  Thank you.  May be Ms. Riley be excused?

10             MR. WALUTES:  Yes, Your Honor.

11             THE COURT:  Ms. Riley, you are excused with our

12   thanks.  You are free to go.  Please don't discuss your

13   testimony with anyone until the trial is over.  All right.

14             THE WITNESS:  Okay.

15             THE COURT:  Have a good day.

16             THE WITNESS:  Thank you.

17             NOTE:  The witness stood down.

18             THE COURT:  All right.  Call your next witness.

19             MR. WALUTES:  Your Honor, the Government and the

20   defendant have entered into a stipulation in this trial, and

21   at this time we would ask permission of the Court to publish

22   it.

23             If I could hand a copy to the Court.  I don't know

24   the Court's practice, whether the Court would prefer the party

25   to read it or whether the Court would prefer to read it.

572

1          THE COURT:  I would prefer you to read it.  Ms.

2    Minter has seen it and knows which one you are talking about?

3          MR. WALUTES:  There is only one, Your Honor.  In

4    this it is Government's Exhibit No. 60 now marked, but it is,

5    if I might read the stipulation as to tattoos.

6          THE COURT:  All right.

7          MR. WALUTES:  Comes now the undersigned counsel and

8    hereby stipulate and agree as follows.  The tattoo on Mirwais

9    Mohamadi's back and left shoulder are depicted in color

10   photographs identified as Government's Exhibits 9A, back, and

11   9B, left shoulder.

12         The parties agree and stipulate that these are

13   accurate photographs of the two photographs on defendant

14   Mirwais Mohamadi.  They further agree that there is no tattoo

15   on the defendant's right shoulder.

16         Respectfully submitted, and it is signed by the

17   United States, Your Honor, and the defendant.

18         THE COURT:  All right.

19         MR. WALUTES:  At this time, Your Honor, I would ask

20   permission to publish 19A and 19B which are the defendant's

21   tattoos by stipulation.

22         THE COURT:  9A and 9B?

23         MR. WALUTES:  I think it is 19, Your Honor.

24         You are right, Your Honor, 9A and 9B.  Thank you for

25   the correction.

M. Vasquez - Direct

573

1               THE COURT:  Is there any objection?

2               MS. MINTER:  There is no objection.

3               THE COURT:  All right.  Then you may publish them.

4               MR. WALUTES:  And this would be 9A, Your Honor, with

5       the Asiatic.

6               And then 9B, please, the tattoo on the left

7       shoulder.

8               Thank you, Your Honor.  That's the last exhibit I

9       had.

10              THE COURT:  All right, next witness.

11              MR. BEN'ARY:  Your Honor, Mark Vasquez.

12              NOTE:  The witness is sworn.

13              THE COURT:  Go ahead.

14              MR. BEN'ARY:  Thank you, Your Honor.

15              MARK VASQUEZ, called by counsel for the United

16      States, first being duly sworn, testifies and states:

17          DIRECT EXAMINATION

18      BY MR. BEN'ARY:

19      Q    Good morning, sir.

20      A.   Good morning.

21      Q.   Would you tell the members of the jury, please, your name

22      and occupation.

23      A.   My name is Mark Vasquez, V, as in Victor, -a-s-q-u-e-z.

24      And I am employed by the city of Alexandria as a latent print

25      examiner.

M. Vasquez - Direct

574

1   Q.   How long have you been employed as a latent print

2   examiner with the city of Alexandria?

3   A.   I started working for Alexandria March 2, 2009.

4   Q.   And could you describe, please, what you do as a latent

5   print examiner?

6   A.   As a latent print examiner I compare unknown latent

7   prints recovered from crime scenes developed from evidence to

8   suspect, to known suspect, victim elimination prints and

9   officer fingerprints.

10            I also maintain fingerprint files both manually and

11  automated.  I do my searches and comparisons of those latents

12  to unknown, unknown latents to latents using manual means or

13  an Automated Fingerprint Identification System.

14            In addition to that, I report, I am sorry, prepare

15  reports of my findings.  And I also record fingerprints of

16  citizens, officers and suspects.

17  Q.   Okay.  And do you have specialized education and training

18  in the field of latent fingerprint identification?

19  A.   Yes, I do.

20  Q.   Could you describe your education and training, please.

21  A.   I have attended the federal--

22            MR. COREY:  Your Honor, pardon the interruption, if

23  the Government is offering Mr. Vasquez as an expert in

24  fingerprint comparison, we will agree to accept him in that

25  capacity.

575

1            THE COURT:  All right.  You accept that?

2            MR. BEN'ARY:  Yes.

3            THE COURT:  All right, then Mr. Vasquez will be

4    accepted for purposes of fingerprint comparisons.  Go ahead.

5            MR. BEN'ARY:  Last question on that subject.

6    BY MR. BEN'ARY:  (Continuing)

7    Q.   Could you look, please, with the help of the Court

8    Security Officer, at the exhibit marked for identification as

9    Government's Exhibit 11.

10           Do you recognize that?

11   A.   Yes, I do.

12   Q.   What is that?

13   A.   That is my work history.

14           MR. BEN'ARY:  I offer Government's Exhibit 11 into

15   evidence.

16           THE COURT:  Any objection?

17           MR. COREY:  No objection, Your Honor.

18           THE COURT:  All right, it will be received.

19   BY MR. BEN'ARY:  (Continuing)

20   Q.   You could put the book aside for a moment.

21           Mr. Vasquez, could you explain to the members of the

22   jury, please, what is a fingerprint?

23   A.   A fingerprint is the raised portion of skin found on the

24   hands, fingerprints.

25   Q.   Okay.  Why are fingerprints valuable as evidence?

M. Vasquez - Direct

576

1    A.   Because fingerprints are unique and because they are

2    permanent.

3    Q.   Okay.  And are you familiar with an inked or known print,

4    the term "inked" or "known print"?

5    A.   Yes, I am.

6    Q.   What is that?

7    A.   It's when someone is knowingly, their fingerprints and

8    thumbs are recorded by means of an ink method or a digital

9    method.

10   Q.   Okay.  And are you familiar with the term "latent print"?

11   A.   Yes, I am.

12   Q.   What is a latent print?

13   A.   Latent print usually refers to a fingerprint that is

14   developed or recovered from a crime scene and it's not readily

15   visible to the eye and it needs further developing so the

16   information or detail can be analyzed.

17   Q.   And could you explain for the members of the jury how are

18   latent prints left behind, for instance at a crime scene?

19   A.   The frictional ridge skin along the lines, there is

20   located sweat pores.  And there is a transfer of substance

21   when items are touched or handled that leaves a pattern design

22   onto a surface.

23   Q.   And you mentioned that latent prints need to be

24   developed.  How are they collected off of a surface at a crime

25   scene for analysis?

M. Vasquez - Direct

577

1    A.   Normally most of the time fingerprints are developed

2    using fingerprint powders, lifting tape and lifting cards.  An

3    area that is suspected to be handled would be processed with

4    fingerprint powders.  Once something becomes visible, then

5    lifting tape would be placed on top of that developed area and

6    then transferred onto a lift card.

7    Q.   And once a latent print is developed as you explained and

8    collected, can a latent print be compared to a known print to

9    make an identification?

10   A.   Yes.

11   Q.   And how is that comparison done?  Would you explain that

12   for the members of the jury, please.

13   A.   The comparison would be done side by side using a

14   fingerprint magnifying glass.

15   Q.   And how are you able to make an identification using that

16   comparison?

17   A.   One is going to analyze the information present on the

18   latent, looking at the three levels of detail, and comparing

19   it to the known print that he is inquiring or interested

20   about.

21   Q.   Okay.  You mentioned three levels of detail.  Could you

22   explain that concept for the jury, please.

23   A.   Yes.  The first level detail is the ridge flow of the

24   friction ridge skin.

25            Second level detail is the ridge characteristics,

M. Vasquez - Direct

578

1    which are ridge endings, ridge bifurcations, ridge dots.

2           And third level detail is actual ridge structure,

3    ridge width, edge shapes and actual pore opening, pore

4    openings that are located along the friction ridge line.

5    Q.   Okay.  Are you familiar with a term "point of

6    comparison"?  Are you familiar with that term?

7    A.   Points of comparison, yes.

8    Q.   What is that?

9    A.   It is also referred to as second level detail.  The ridge

10   characteristics, bifurcations and dots that are the three

11   basic points of identification found in fingerprints.

12   Q.   Okay.  When you make a comparison, is there a set number

13   of points of identification or points of comparison that need

14   to be present before you could make an identification?

15   A.   There is no set number.  It's up to the individual

16   examiner.  And in looking at the matching points, we also are

17   looking for any unexplainable differences between the two, the

18   latent and the known.

19   Q.   Okay.  Are all latent prints suitable for comparison?

20   A.   No.  The ones that are of no value are what they are, no

21   value, there is just not enough information present to make a

22   comparison.

23   Q.   Okay.  And what methodology do you employ when examining

24   prints for the purpose of making an identification?

25   A.   I use a method called the ACEV method.

M. Vasquez - Direct

579

1    Q.   And could you describe what ACEV is for the jury.

2    A.   It is an acronym for I analyze, compare, evaluate, and

3    the last part of that is verify.

4    Q.   Okay.  As part of your job as a latent fingerprint

5    examiner for the city of Alexandria, did you have occasion to

6    examine known or inked prints belonging to an individual named

7    Mirwais Mohamadi?

8    A.   Yes.

9    Q.   And if I could ask, would you take a look, please, at

10   what has been admitted into evidence as 10A through 10C,

11   please.

12        Feel free to remove the exhibit from the plastic

13   sleeve and look through it.

14        Are those what I have referred to as the known or

15   inked prints belonging to Mirwais Mohamadi?

16   A.   Yes, they are.

17   Q.   And did you have occasion to compare those known prints

18   to latent fingerprint evidence collected by Investigator

19   Thomas Ground of the city of Alexandria Police Department?

20   A.   Yes, I did.

21   Q.   And were the latent fingerprints that you looked at

22   collected by Investigator Ground preserved on lift cards?

23   A.   Yes, they were.

24   Q.   And let me ask if you would take a look, please, at what

25   is admitted into evidence as Government's Exhibit 3A through

M. Vasquez - Direct

580

1    3H, please.

2           Are Exhibits 3A through 3H latent lift cards

3    collected by Investigator Ground from a vehicle driven by an

4    individual named Kim Riley?

5    A.    Correct.

6    Q.    And did you examine those latent lift cards to see if

7    there were any prints of value for comparison purposes?

8    A.    I did.

9    Q.    And were there any prints on 3A through 3H that were

10   valuable for comparison purposes?

11   A.    Yes.

12   Q.    And which ones?

13   A.    I identified latent lift card number 5 of 7 marked

14   Government's Exhibit 3F.

15   Q.    And were there any others?

16   A.    No.

17   Q.    And if I could have you look at Exhibit 17A through 17N,

18   please.

19          Are 17A to 17N the latent lift cards collected by

20   Thomas Ground from a taxicab operated by Gebru Haile?

21   A.    Yes.

22   Q.    Did you examine those lift cards to determine if there

23   were any prints that were of value for comparison purposes?

24   A.    Yes.

25   Q.    And did you find prints that were of value for comparison

M. Vasquez - Direct

581

1    purposes on any of those lift cards?

2    A.    I did.

3    Q.    Which ones, please?

4    A.    Latent lift card number 1 of 11 marked Government's

5    Exhibit 17D.  Exhibit 17E, latent lift card 2 of 11.  Latent

6    lift card 3 of 11, Government's Exhibit 17F.  Latent lift card

7    10 of 11 marked Government's Exhibit 17M.

8            And there was also one latent print on item number

9    1, Government's Exhibit 17B.

10   Q.    Okay.  And was that the receipt?

11   A.    Yes.

12   Q.    Did you compare all of the prints of value with the

13   prints contained on the cards with the known prints of Mirwais

14   Mohamadi?

15   A.    I did.

16   Q.    And did you prepare reports documenting your findings?

17   A.    I did.

18   Q.    Take a look, please, at Exhibit 12.

19           Is Exhibit 12 your report with respect to the latent

20   prints lifted from the Infinity SUV?

21   A.    Yes, it is.

22           MR. BEN'ARY:  Offer Exhibit 12 into evidence.

23           THE COURT:  Any objection?

24           MR. COREY:  No objection.

25           THE COURT:  All right, it will be received.

M. Vasquez - Direct

582

1   BY MR. BEN'ARY: (Continuing)

2   Q.   If I could ask you to look at Exhibit 18, please.

3        Is Exhibit 18 the report you prepared documenting

4   your findings with respect to the latents lifted from the

5   taxicab?

6   A.   Yes, it is.

7        MR. BEN'ARY:  Offer Exhibit 18 into evidence.

8        THE COURT:  Any objection?

9        MR. COREY:  No objection, Your Honor.

10       THE COURT:  It will be received.

11  BY MR. BEN'ARY: (Continuing)

12  Q.   Mr. Vasquez, I want to focus on the latent prints from

13  the taxicab first.  Did any prints of value from the latent

14  lift cards collected from the taxicab match the known prints

15  for Mirwais Mohamadi?

16  A.   None of them were identified as Mr. Mirwais' prints or

17  belonging or being made by Mr. Mirwais.

18  Q.   And does that mean the individual who is responsible for

19  the prints on the known card--

20       MR. COREY:  Objection, Your Honor, leading.

21       MR. BEN'ARY:  I didn't get through the question,

22  Your Honor.

23       THE COURT:  Ask the question.

24  BY MR. BEN'ARY: (Continuing)

25  Q.   Does that mean that Mirwais Mohamadi never rode in that

583

1  cab?

2          THE COURT:  How does he know that?

3          MR. BEN'ARY:  I am asking him to explain based on

4  his expertise in the field of latent fingerprint examination.

5          THE COURT:  Ask him whether somebody leaves prints

6  on every occasion.  Ask him--  It is a purely hypothetical

7  question.  Ask it in that form.  He doesn't--

8  BY MR. BEN'ARY: (Continuing)

9  Q.   Well, based on your training and experience, is it

10  possible that somebody rode in that cab without leaving a

11  latent print of value for comparison purposes?

12  A.   Yes, that's possible.

13  Q.   Could you explain that for the jury, please.

14          MR. COREY:  Objection, Your Honor, calling for

15  speculation.

16          THE COURT:  No, I think he can--  Overruled.  Answer

17  the question if you can.

18  A.   Just because something is touched or handled doesn't mean

19  there is a transfer of, or a latent, identifiable latent lift

20  of value is left behind.  There is more of a chance that it is

21  of no value.  It's more common that we don't find prints of

22  value, there is not enough information left.

23  BY MR. BEN'ARY: (Continuing)

24  Q.   Okay.  Are you more likely to find a print of value, a

25  latent print of value for comparison purposes on a clean

584

1    surface versus an unclean surface?

2    A.   Yes.  I mean, obviously, the surface should be fairly

3    clean, and it increases the chance of finding a latent of

4    value.

5    Q.   Okay.  I want to move on to the Infinity SUV.  Of the

6    prints collected from the Infinity SUV, did any of the prints

7    of value that you identified match the known fingerprints of

8    Mirwais Mohamadi?

9    A.   Yes.

10   Q.   And did you prepare an exhibit demonstrating how you were

11   able to make the comparison?

12   A.   I did.

13   Q.   Could you look at Exhibit 13, please.

14        THE COURT:  Just for the record, the previous

15   testimony regarding there not being any latent prints matching

16   Mr. Mohamadi, that was on the taxicab, is that correct?

17        MR. BEN'ARY:  Correct, Your Honor.

18        THE COURT:  All right.  Thank you.

19   BY MR. BEN'ARY: (Continuing)

20   Q.   Is Exhibit 13 the demonstrative exhibit that you were

21   able to make to explain your comparisons in this case?

22   A.   Yes.

23        MR. BEN'ARY:  I would offer Exhibit 13 into

24   evidence.

25        THE COURT:  Any objection?

585

1          MR. COREY:  No objection, Your Honor.

2          THE COURT:  All right, it is received.

3          MR. BEN'ARY:  Your Honor, can we pull up Exhibit 13.

4    Your Honor, I do have a blow-up.

5          THE COURT:  This isn't going to work with, or hit

6    the screen.  So, if you want to set up and have the witness

7    come down out of the witness box, that will be permitted.

8          MR. BEN'ARY:  Thank you.

9    BY MR. BEN'ARY: (Continuing)

10   Q.   Mr. Vasquez, would you please come out of the witness

11   stand so you could explain Exhibit No. 13 for the members of

12   the jury.

13   A.   Is it possible that we could move this closer to the

14   jury?

15   Q.   Yes.

16         THE COURT:  Yes.  Joe, can you bring the screen on

17   the other side of Mr. Linnell.

18         Counsel, if you need to get up and move, please.

19   Q.   Okay.  Go ahead, Mr. Vasquez.

20   A.   The latent print that you see there was recovered from

21   the Infinity.  And the known print is the right index finger

22   of Mr. Mirwais.

23         And what I did was I analyzed first level one

24   detail, which is the ridge flow of the latent when I compared

25   it to the known print.

M. Vasquez - Direct

586

1        After I analyzed as much information of the ridge

2   flow, I also noted there was a scar just above the core, this

3   being the core area of the print, that matched the one on the

4   known.

5        I proceeded to level two detail, which is ridge

6   endings and bifurcations and dots.  And for demonstrative

7   purposes, I am going to start off with point 1 on the latent,

8   which is a ridge ending.  The known ridge ending.

9        I moved over one ridge and followed the flow down of

10  the ridge next to it towards the core and came down to point

11  2, which is a ridge bifurcation.

12       Point 1, next ridge.  Following the ridge flow down,

13  I came to point 2, which is a ridge bifurcation.

14       I then followed the outside bifurcation ridge

15  furthest away from the core and followed the ridge flow

16  downward and came to point 3, which is a ridge ending.

17       Going to the known, the outside ridge, follow the

18  flow downward, came to point 3, which is the ridge ending.

19       From point 3 I count one, two, three intervening

20  ridges.  And above the third intervening ridge is a point 4,

21  the ridge ending.

22       1, 2, 3, point 4, a ridge ending.

23       I am doing this to establish that not only are the

24  ridge characteristics the same, but they are in the same

25  spacial relationship to one another.

M. Vasquez - Direct

587

1          From point 4 I count one, two, three more ridges and

2     then the ridge above it I come to point 5, which is a ridge

3     ending.  So, I have one, two, three intervening ridges.

4          From point 4 to point 5, one, two, three and then

5     point 5, ridge ending.

6          From point 5 to 6 I count, moving towards the core,

7     two intervening ridges.  And above those two intervening

8     ridges I come to point 6, which is ridge ending.

9          Going back to the known, 1, 2, point 6, above that

10    is my ridge ending.

11         Counting from 6 to 7, I count one ridge up and

12    follow the ridge flow upward and come to point 7, which is a

13    ridge ending.

14         Point 6, next ridge up, follow the ridge flow, point

15    7, ridge ending.

16         From 7 to 8, I count towards the core one, two,

17    three intervening ridges, and I come to point 8, which is a

18    ridge ending.

19         Back to my known, one, two, three intervening ridges

20    and the next ridge up is my point 8, a ridge ending.

21         Just looking at this, there wasn't a lot of third

22    level detail.  Third level detail involves ridge structure,

23    which is finer, more minute detail--

24         THE COURT:  Hold on one second, Mr. Vasquez.  No

25    question pending?

M. Vasquez - Direct

588

1          MR. COREY:  Yes, Your Honor, there is no question

2     pending.

3          THE COURT:  All right.  Ask him what else he looked

4     at and whether he had any other observations before he goes

5     and sits down.

6     BY MR. BEN'ARY: (Continuing)

7     Q.   Okay.  You I believe started to explain third level

8     detail.  What can you explain to the members of the jury about

9     the third level detail you were able to examine here?

10    A.   Third level detail deals with ridge structure, which

11    would be shapes of ridge endings.  Would be, it also would

12    include pore structure, pore openings located on the ridge

13    lines.

14          You can see some of that on the known prints.  These

15    little white dots are actually pore openings.  And it's not

16    quite as clear as the print that was lifted from the Infinity

17    vehicle.

18    Q.   If I could just ask one more question about the exhibit.

19    Are there points of identification or points of comparison

20    that you didn't number but you could observe on this exhibit?

21    A.   Yes.

22    Q.   Could you explain that, please.

23    A.   I counted 40 matching points of ridge characteristics,

24    then I stopped counting.  So, there is more than 40.

25          And you can see over here by the point that is

589

1    marked number 2, you can see the enclosure, which is the

2    bifurcation opening up and a bifurcation opening down.  Next

3    to that bifurcation moving towards the core is a ridge ending.

4    Next to that ridge ending there is a bifurcation opening up.

5           If you go over here, you can see from point number

6    2, you can see the enclosure, bifurcation opening up,

7    bifurcation opening down, ridge ending, and another

8    bifurcation opening up.

9           MR. COREY:  Your Honor, I think the question has

10   been answered.

11          MR. BEN'ARY:  If he is not done answering--

12          THE COURT:  Ask him if he wants to make another

13   example.  There is no question pending, so it is leaving Mr.

14   Corey at a loss.

15   BY MR. BEN'ARY: (Continuing)

16   Q.   Are there other examples of points of comparison that you

17   can readily identify that aren't numbered?

18   A.   Yes.

19   Q.   Could you point one more out?

20   A.   Yes, by point 8, moving towards the core and following

21   the ridge flow downward, it comes to the enclosure, one, two,

22   bifurcation opening up.  And following the ridge flow down

23   here on this side, it opens up.

24          The same thing over here.  The next ridge over, I

25   see the enclosure here, one and two points.

590

1          MR. BEN'ARY:  Okay.  I think the witness can resume

2     the stand.

3          THE COURT:  All right.  You may return to your seat.

4     Thank you, sir.

5          MR. BEN'ARY:  Thank you, Mr. Vasquez, those are the

6     Government's questions.

7          THE COURT:  All right.  Why don't we break at this

8     time, take our mid-morning break for 15 minutes.  We will come

9     back at quarter to 12 and hear cross-examination at that time.

10         All right, we are in recess.

11         NOTE:  At this point a recess is taken; at the

12    conclusion of which the case continues as follows:

13         THE COURT:  All right, Mr. Corey.

14         MR. COREY:  Thank you, Your Honor.

15    CROSS EXAMINATION

16    Q.   Good morning, Mr. Vasquez.

17    A.   Good morning.

18    Q.   I would like to turn your attention to the prints related

19    to the taxicab.  There were 11 lift cards of prints taken from

20    the cab, is that correct?

21         THE COURT:  Let's start over again.  We are going to

22    begin cross-examination now, Mr. Corey.

23    Q.   Hello again.  Turning to the taxicab.  Isn't it correct

24    that there were 11 lift cards of prints taken from the cab?

25    A.   There were 11 latent lift cards, yes.

M. Vasquez - Cross

591

1  Q.   And according to your report, of though 11 cards, there

2  were four cards that had prints on them that were of value, is

3  that right?

4  A.   I would have to take a look at my report.

5  Q.   Go ahead.  I have a copy of it, if that would--

6  A.   I found it.  It's just a matter of turning to it.

7        THE COURT:  Which exhibit is Mr. Vasquez looking at?

8  Q.   I believe--

9  A.   Government's Exhibit 18, is that correct?

10 Q.   Yes.  So, again, according to that report, there were

11 four lift cards that had prints that were of value from the

12 cab itself?

13 A.   Lift card 1, 2, 3 are of value, and lift card 10 of 11

14 was of value.

15 Q.   So, that's four, right?

16 A.   Yes.

17 Q.   And of value, can you explain what that term means?

18 A.   That there is enough there to individualize, to identify.

19 Q.   To individualize.  So, it's a good print to run a test

20 on?

21 A.   It's of value.  I thought it could be, I could

22 individualize it, identify it.

23 Q.   And so, in addition to the four from the exterior of the

24 cab, there was also one print that was of value from the

25 taxicab receipt, is that right?

M. Vasquez - Cross

592

1   A.   Yes.

2   Q.   So, in total you had five of value prints?

3   A.   I am not sure how many prints were on each card.  If

4   there was only one latent print of value on each card, then

5   you are correct.

6   Q.   Excuse me, sorry.  Five cards with prints that were of

7   value?

8   A.   At least one of value, yes.

9   Q.   Right.  And you compared the prints on all five of these

10  cards to Mr. Mohamadi's fingerprints, is that correct?

11  A.   Yes.

12  Q.   And you determined that none of these matched Mr.

13  Mohamadi's prints?

14  A.   Yes.

15  Q.   So, you have no idea if Mr. Mohamadi ever rode in the cab

16  on May 27, 2007, or on any other date, is that correct?

17  A.   That is correct.

18  Q.   And in fact, those five cards containing prints could

19  contain anyone's prints?

20  A.   They haven't been identified, that is correct.

21  Q.   You don't know whose they are?

22  A.   No, I do not.  I do know that they weren't identified as

23  Mr. Mirwais' and they weren't identified as the driver, I am

24  not sure if I am pronouncing his last name, Haile.

25  Q.   Right.  So, they weren't either of those two individuals'

M. Vasquez - Cross

593

1    prints.  Did you compare them to anyone else's prints?

2    A.   The ones that were of value were searched through the

3    AFIS system, the Automated Fingerprint Identification System

4    database, and no match was found.

5    Q.   Now, I would like to turn for a minute to the prints from

6    the other vehicle, the vehicle belonging to Ms. Riley.

7            You testified on direct that there was one set of

8    prints that were of value, is that correct?

9    A.   I have to look at the report.

10   Q.   Yeah, I think it's Exhibit 12.

11   A.   What was your question, sir?

12   Q.   Sure.  You testified on direct that there was one set of

13   prints that were of value, isn't that right?

14           I am asking you what you testified to a moment ago,

15   not to what the report says.

16   A.   Yes, I believe there is only one--  There is 5 and 7 were

17   of value.

18   Q.   So, there were two print cards that were of value?

19   A.   Yes.  Or two latent lift cards that have at least one

20   latent print of value.

21   Q.   Well, wait a minute.  Didn't you just earlier say there

22   was one set of prints that were of value?  You don't recall

23   what you said earlier?

24   A.   No.  There is two, there are two latent lift cards that

25   had at least one print of value.

M. Vasquez - Cross

594

1  Q.   I was asking if you recalled what you said earlier?

2  A.   No, I do not.

3  Q.   So, it is your testimony now though that there are two

4  sets of prints that are of value from Ms. Riley's vehicle?

5  A.   If I misspoke earlier, I misspoke, but there were two

6  latent lift cards that had prints of value.  One was

7  identified as the right index and right middle finger, that's

8  latent lift card 5 of 7.  And number 7 of 7 was also of value,

9  but it was not searched through AFIS.

10  Q.   So, with respect to number 7 of 7, that print did not

11  match Mr. Mohamadi, is that correct?

12  A.   That is correct.

13  Q.   And you did not search that through any database, is that

14  correct?

15  A.   No, I did not.

16  Q.   Well, I would like to go back to when you first looked at

17  this print, that number 7 of 7.  Did you report your results

18  to anyone when you determined that it was not a match for Mr.

19  Mohamadi?

20  A.   When I filed this report, I identified the lifts that

21  were identified as Mr. Mirwais' and the ones that were of

22  value and then the ones that were of no value.

23  Q.   Excuse me, who do file this report with?

24  A.   With the Alexandria Police Department.

25  Q.   And so, you told the Alexandria Police Department that

M. Vasquez - Cross

595

1    one of these prints were of value and did not match Mr.

2    Mohamadi's prints effectively, is that right?

3    A.   That is correct.

4    Q.   And did they ask you to check the other print to see if

5    it matched anyone else's prints?

6    A.   No.  It was just my policy that since the fingerprint

7    wasn't Mr. Mirwais', is it possible that it should be searched

8    through the AFIS system, I looked at the lift and there wasn't

9    enough to make it suitable for AFIS.

10   Q.   I am sorry, I think you said Mr. Moya's?

11            THE COURT:  He is referring, is that the name is

12   that you have--

13   A.   The defendant, yes, the print that was identified, sir,

14   Mirwais Mohamadi.

15   Q.   Yes.  So, you concluded that that print on Ms. Riley's

16   vehicle did not match Mr. Mohamadi and yet it was a print that

17   was of value, meaning it was a good print?

18            THE COURT:  Well, he--  All right.

19   A.   It was of value, yes.  Of value.

20   Q.   And when you told this to the Alexandria Police

21   Department, just so I understand, they did not ask you to do

22   anything else with this information, is that right?

23            MR. BEN'ARY:  Objection, asked and answered.

24            MR. COREY:  I am just trying to understand.

25            THE COURT:  Overruled.  Go ahead and answer.

M. Vasquez - Cross

596

1    A.   If we are asked to compare fingerprints in the--

2    BY MR. COREY: (Continuing)

3    Q.   I'm sorry, that wasn't my question.  My--

4            THE COURT:  Well, you have got to let him answer.

5    Ask the question again.  Let's start over.

6            Ask your question, Mr. Corey.

7    BY MR. COREY: (Continuing)

8    Q.   My question was, once you told the Alexandria Police

9    Department that the prints from lift card number 7 did not

10   match Mr. Mohamadi, did they ask you--

11           THE COURT:  Through the report, that's the

12   objection.  He hasn't communicated other than through this

13   written report.  All right.  After he filed his report.

14   BY MR. COREY: (Continuing)

15   Q.   After you filed the report, did they ask you to do

16   anything with regard to print number 7?

17   A.   No.

18   Q.   And at any point did you talk to the prosecutors in this

19   case regarding the prints from Ms. Riley's car?

20   A.   Yes, I did.

21   Q.   And at any point did they ask you to follow up regarding

22   print number 7?

23   A.   No, that decision was made prior to me having any

24   discussions with the prosecution.

25   Q.   That decision, you mean the decision not to check to see

597

1   if it was anyone else's print?

2   A.   It was a decision based on my opinion of whether it was

3   suitable for AFIS or not.

4   Q.   Suitable for AFIS?

5   A.   Yes.

6   Q.   You mean your decision was to not check that print any

7   further after checking it against Mr. Mohamadi's print?

8   A.   Yes.

9   Q.   And they didn't ask you to do any other work on that

10  print?

11  A.   No.

12  Q.   Are you familiar with a process known as touch DNA?

13  A.   Probably vaguely.  Not too familiar with that term.

14  Q.   And you did not-- Pardon me.  The prints at issue here

15  were not tested for touch DNA, is that correct?

16  A.   That is correct, to my knowledge.

17  Q.   I would like to move to a different issue.  You are

18  familiar with the process for collecting fingerprints, is that

19  correct?  You have expertise in this area?

20  A.   Yes, I do.

21  Q.   So, isn't it true that as a general matter, when a

22  fingerprint is collected, you can't tell when the print was

23  left?

24  A.   I would say that is fairly true.

25  Q.   So, when a print is collected, the print could have been

M. Vasquez - Cross

598

1    left a day before, or a week before or even longer?

2    A.    It's possible.

3    Q.    And there is probably all sorts of factors that might go

4    into determining when a print is left on a surface, is that

5    right?

6    A.    A lot of that could have to do--  The time window could

7    be ascertained if you interviewed the victim, when the last

8    time that item may have been cleaned or washed.

9    Q.    How about factors such as the weather or surface

10   conditions, are those factors that are also, that you would

11   also need to know in order to determine when a print was left?

12   A.    Yes, those are also variables that come into play,

13   correct.

14   Q.    So, it's often difficult to know when a print was left on

15   a surface.  And in fact, in your job you wouldn't know because

16   you are just examining the fingerprint cards, is that right?

17   A.    That's correct.

18   Q.    Now, you have been doing fingerprint analysis for many

19   years, is that right?

20   A.    I have.

21   Q.    And have you ever made a mistake?

22   A.    What kind of mistake?

23   Q.    Well, for example, have you ever concluded that a set of

24   latent prints matched a set of known prints and then later

25   learned that your conclusion was wrong?

599

1    A.    No.

2    Q.    Well, but these kind of mistakes do happen, don't they?

3              MR. BEN'ARY:  Objection.

4              THE COURT:  Sustained.

5              MR. COREY:  I will move on.

6    BY MR. COREY: (Continuing)

7    Q.    Well, you must be familiar with the Brandon Mayfield

8    case?

9              MR. BEN'ARY:  Objection, Your Honor.

10             THE COURT:  Sustained.

11             MR. COREY:  One moment, Your Honor.

12             THE COURT:  Yes, sir.

13   BY MR. COREY: (Continuing)

14   Q.    Just briefly.  You have no knowledge how these prints

15   were obtained, right, the prints in question in this case?

16   A.    Other than the actual looking at the latent lift card

17   where they were recovered from and by whom.

18   Q.    Right.

19   A.    Who they were recovered from.

20   Q.    You were just given the lift cards?

21   A.    Yes.

22   Q.    You weren't involved in the recovery process?

23   A.    No, I was not.

24             MR. COREY:  No further questions, Your Honor.

25             THE COURT:  All right, thank you.  Any redirect?

600

1          MR. BEN'ARY:  Yes, Your Honor.

2          REDIRECT EXAMINATION

3    BY MR. BEN'ARY:

4    Q.    Mr. Vasquez, what is AFIS?

5    A.    AFIS is an acronym for Automated Fingerprint

6    Identification Systems.

7    Q.    And could you explain for the members of the jury what it

8    is?

9    A.    It's a computer that is used to search latent

10   fingerprints and try and identify and come up with a possible

11   match.

12   Q.    And you are familiar with utilizing the AFIS system as

13   part of your job responsibilities as a latent fingerprint

14   examiner?

15   A.    Yes, I am.

16   Q.    Is every print that is of value suitable for submission

17   to the AFIS system?

18   A.    No.

19   Q.    Could you explain why not, please.

20   A.    Sometimes there is just--  There is enough detail to

21   individualize, but not enough to search, to make it worth a

22   search of value through the AFIS system.

23          Other times there is landmark areas of the

24   fingerprint pattern or friction ridge skin that is absent that

25   makes it difficult to search, such as the core of a

M. Vasquez - Redirect

601

1  fingerprint pattern or the Delta area, which are very big

2  landmark features in the fingerprint pattern that really aid

3  an AFIS search.  That's lacking, that's not there.

4  Q.   So, you were asked on cross-examination about, I believe

5  it was card 7 out of 7 with respect to the Infinity that had a

6  print that was of value for comparison but did not match

7  Mirwais Mohamadi.

8  A.   Yes.

9  Q.   And you testified that did you not submit that to AFIS?

10 A.   Yes.

11 Q.   Why is that?

12 A.   Looking at the lift, there is really only seven, possibly

13 eight ridge characteristics.  I didn't think that was enough

14 to really do a quality search utilizing AFIS.

15 Q.   Okay.  And you were asked some questions about--  Well,

16 let me just skip that.

17        You testified on direct and you were asked on

18 cross-examination about the comparison that you did in this

19 case.

20        And in the diagram, you testified that you

21 identified 40 points of identification?

22 A.   Yes, 40 matching points of matching ridge characteristic

23 level two detail.

24 Q.   Do you think that that's a mistake on your part?

25        MR. COREY:  Objection, Your Honor.

602

```
 1              THE COURT:  Overruled.

 2    A.   No.

 3    BY MR. BEN'ARY: (Continuing)

 4    Q.   Do you think that was a mistake?

 5    A.   No.  There was, that particular--

 6              THE COURT:  You have answered his question.  All

 7    right.  May Mr. Vasquez be excused?

 8              MR. BEN'ARY:  Yes, Your Honor.

 9              THE COURT:  All right.  Thank you, Mr. Vasquez.

10    Please don't discuss your testimony with anyone until this

11    trial is over.

12              THE WITNESS:  Thank you, Your Honor.

13              NOTE:  The witness stood down.

14              THE COURT:  Call your next witness.

15              MR. WALUTES:  Your Honor, the Government would call

16    Mr. Haile.  If I might get him.

17              THE COURT:  All right.

18              NOTE:  The witness is sworn.

19              THE COURT:  Go ahead.

20              MR. WALUTES:  Thank you, Your Honor.

21              GEBRU HAILE, called by counsel for the United

22    States, first being duly sworn, testifies and states:

23        DIRECT EXAMINATION

24    BY MR. WALUTES:

25    Q.   Good afternoon, sir.  In a loud voice, and I would like
```

603

1   you to adjust your microphone so that everybody in the

2   courtroom has an opportunity to hear you, but could you tell

3   us your full name, sir.

4   A.   Gebru Haile.

5   Q.   And in what state do you live, sir?  Not the exact

6   location, but in what state do you live?

7   A.   Maryland.

8   Q.   And back in May of 2007, did you also live in Maryland?

9   A.   Yes.

10  Q.   Where were you born, sir?

11  A.   I am from Ethiopia.

12  Q.   I'm sorry?

13  A.   Ethiopia.

14  Q.   And how long have you been in the United States?

15  A.   More than seven years.

16  Q.   Are you employed?

17  A.   Yes.

18  Q.   Do you have more than one job?

19  A.   Yes, I got two jobs.

20  Q.   Is one of your jobs to operate a taxicab?

21  A.   Right.

22  Q.   How long have you operated a taxicab, Mr. Haile?

23  A.   Five years.

24  Q.   Did you work on Memorial Day weekend on Saturday, May 26

25  into the early morning hours of Sunday, May 27 of 2007?

604

1    A.   Yes, I did.

2    Q.   Do you recall about what time, approximately, you started

3    working that Saturday on that Memorial Day weekend, on May 26?

4    A.   Around 7 o'clock.

5    Q.   7 in the afternoon?

6    A.   In the afternoon, right.

7    Q.   Do you recall where you were around 2:30 in the morning

8    on Sunday, May 27 of 2007?

9    A.   I was on 1300 block of Connecticut Avenue, which is N

10   Street, north of N Street on Connecticut.

11   Q.   And at that time, is that close to any geographic

12   location in D.C.?

13   A.   It's south of DuPont Circle.

14   Q.   I'm sorry, south of--

15   A.   South part of DuPont Circle.

16   Q.   DuPont Circle?

17   A.   Right.

18   Q.   Are you familiar with that part of D.C.?

19   A.   Yes.

20   Q.   Are you familiar with some of the establishments in that

21   area?

22   A.   I do remember some of the bars around that place.

23   Q.   Okay.  Can you name some of the bars today?

24   A.   The Big Hunt, Cafe Citron and Heritage, those are some of

25   them.

G. Haile - Direct

605

1  Q.    Okay.  At some point around 2:30 that morning on May 27

2  of 2007, did you pick up a fare?

3  A.    Yes, I did.

4  Q.    And did you pick it up from that block of Connecticut and

5  N?

6  A.    Yes.

7  Q.    What is the lighting like in that area?

8  A.    It's bright.

9  Q.    Even at 2:30 in the morning?

10  A.    Yes, there are a lot of lights from the clubs and the

11  cars on the street.  So, it was bright.

12  Q.    And the fare you picked up, was that fare alone or with

13  someone else?

14  A.    He was alone.

15  Q.    And where did he ask you to take him?

16  A.    To Landmark Mall, Virginia.

17  Q.    To the actual mall, or just that area?

18  A.    To the mall area.

19  Q.    And did you agree to take that fare to the Landmark area

20  of Virginia?

21  A.    Yes, I did.

22  Q.    And did he get into your cab?

23  A.    Yes, he did.

24  Q.    And where did you then go?

25  A.    As soon as we start heading towards Virginia, on the way

G. Haile - Direct

606

1    he changed his mind and asked me to take him to Georgetown.

2    Q.   Were you willing to take him to Georgetown?

3    A.   Yes, I was.

4    Q.   And what, if anything, happened as--  Do you start to

5    head to Georgetown with him?

6    A.   Yes, we start heading to Georgetown.

7    Q.   What, if anything, happened at that point, Mr. Haile?

8    A.   The first thing is he ask me to borrow my cell phone.  I

9    gave it to him.  And after awhile--

10   Q.   So, you were actually willing to loan your cell phone to

11   this fare?

12   A.   I borrow him.  He say, may I use your cell phone.  He

13   asked me.

14   Q.   And you said what?

15   A.   I say okay.  And I give it to him.

16   Q.   So, you actually let your customer use your cell phone?

17   A.   Oh, once in awhile customers ask for cell phone, but it

18   is not usual.

19   Q.   Okay.  And did anything else happen as you were heading

20   towards Georgetown as he asked to use your cell phone?

21   A.   On the way there were people waving their hands to get

22   ride on the left side of 23rd Street between M and N Streets.

23   And then he asked me to stop the car and he get out of the car

24   and talk to them.

25   Q.   Okay.  Did you also get out of the car?

1   A.   He got out of the car.

2   Q.   I understand.  Did you, Mr. Haile, get out of the car?

3   A.   No, I remain seated in the car.

4   Q.   At some point did he get back in the car?

5   A.   Yes, he did.

6   Q.   Did those other people on the side of the street on 23rd

7   near M and N, did they get in the car too or did they stay on

8   the street?

9   A.   They stayed there.

10  Q.   Could you actually hear what was being said outside your

11  cab?

12  A.   No, I didn't hear that.

13  Q.   What was your number?  Do you remember your cell phone

14  number back then, Mr. Haile?

15  A.   It was 240-462-3221.

16  Q.   That's not your cell phone number anymore, is it?

17  A.   Yeah, I have changed it after awhile.

18  Q.   When he asked to borrow your cell phone, did he ask to

19  borrow anything else?

20  A.   He asked me to give him a paper and a pen to write on

21  while he is calling.

22  Q.   And were you willing, did you give him paper and pen?

23  A.   Yes, I give him both items.

24  Q.   Did you do anything else while he was making that call

25  with your paper and pen?

G. Haile - Direct

608

1    A.   He asked me to, I use a Blue Tooth, he asked me to remove

2    the Blue Tooth because he don't like it.

3    Q.   For those of us who don't have Blue Tooth, Mr. Haile, can

4    you explain to us what a Blue Tooth is?

5    A.   A Blue Tooth is a device that makes me hands free while I

6    am driving.  I put on my ears so that I don't have to worry, I

7    just touch when somebody calls and turn it on and off.  So, he

8    don't want to put on his ear, for some reason I don't know, he

9    just said, disconnect it with the main phone and he will take

10   the main phone.

11   Q.   Okay.  So, when he borrowed your phone, he asked you not

12   to listen into his call?

13   A.   I didn't listen to his call.

14   Q.   You took the Blue Tooth off your ear?

15   A.   Yes.

16   Q.   Did you do anything else in terms of the lighting of your

17   vehicle, your cab?

18   A.   Whenever he stretch for the front and he ask me to turn

19   the radio, I turned the light on sometimes for him.

20   Q.   Okay.  And I wonder if you can describe for the ladies

21   and gentlemen of this jury what kind of lights you have inside

22   your taxicab that you were using back on May 27 of 2007?

23   A.   My car is an old police car, it's Ford Crown Victoria

24   cab, and it has two lights, one interior light is a factory

25   built light, and the other one is a police light, light that

609

1    is very bright so the police do reports.

2           So, I used the factory built light, interior light,

3    which is not that much light, but has sufficient light to view

4    things around.

5           So, the radio buttons are darker.  So he can see it,

6    I turn on those lights.

7    Q.   When he would get out of your car like he did at 23rd

8    Street near those people on the way to Georgetown, which

9    lights come on inside your taxicab, the factory built ones or

10   also the police interior light?

11   A.   The factory built.

12   Q.   Okay.  At any point when he is in your cab, does the

13   police light ever come on?

14   A.   No.  That's the only time I turn that light on, is when I

15   finish the fare.

16   Q.   When you finish the fare, you turn it on?

17   A.   Yes.

18   Q.   Okay.  Was it ever on when the person was in your taxi?

19   A.   The last place where he robbed me, that's where I turned

20   that light on.

21   Q.   Mr. Haile, did you ever make it to Georgetown that day?

22   A.   No, we didn't go to Georgetown.

23   Q.   And why did you not get to Georgetown?

24   A.   After he come back from, when he met those three people

25   on the road and he come back in, as soon as we start driving

G. Haile - Direct

610

1    to Georgetown he say, I changed my mind, take me to Landmark

2    Mall, Virginia.

3    Q.   Okay.  And did you, were you agreeable to going to that

4    area?

5    A.   Yes, I did.

6    Q.   Okay.  And what did you do?  Take us on the journey--  Do

7    you go across a bridge?

8    A.   Yes.  We were on 23rd Street, so I proceed on 23rd Street

9    towards the Memorial Bridge and I go across the Memorial

10   Bridge.

11   Q.   So, you cross the Memorial Bridge?

12   A.   Yes.

13   Q.   Now you are in Virginia?

14   A.   Right, I am Virginia.

15   Q.   Then what happened?

16   A.   On the way while we were driving, as soon as we were on

17   the west side of the Pentagon, he said, sorry, just take me

18   back to D.C.  He asked me to take him back to D.C.

19   Q.   And were you willing to take him back to D.C.?

20   A.   Yes, I did.

21   Q.   Okay.  And what bridge did you take to get back into the

22   District of Columbia?

23   A.   I take the Columbia Pike exit, and then take back the

24   route to 395 north, which goes through the 14 Street Bridge.

25   Q.   So, you come Memorial Bridge into Virginia and then 14

1   Street back into the District of Columbia?

2   A.   Yes.

3   Q.   What happened next, Mr. Haile?

4   A.   As soon as we cross the 14th Street Bridge and we are by

5   the side of the Holocaust Museum, he said, sorry, now take me

6   back to Landmark Mall, he changed his mind.

7   Q.   At this point did you have some concerns?

8   A.   Yes, I do have concerns because he was driving me around.

9   It was a peak business time for me, so I am wasting my time.

10  So, I don't know why you drive me around, why don't you tell

11  me the exact place where you want to go, I asked him this

12  question.

13          And we were, you know, he was trying to convince me

14  that he is going to give me enough money for my service and

15  we're waiting for some time while the light turns green.

16  Q.   Okay.  And at some point does he show you money to

17  suggest to you that he could actually pay for this fare?

18  A.   Yes.  When I was, you know, not comfortable and he is

19  driving me around, he say, you are working, don't worry, I am

20  going to given you money, I have this much amount of money.

21  He showed me a handful of money, like hundred dollars, new

22  hundred dollars.  He shows me like this, and say, don't worry,

23  I will give you money, so just go where I ask you to drive.

24  Q.   And you saw it, you saw the money?

25  A.   Yes, I saw the money.

612

1    Q.   And that was somewhere near the Holocaust Museum in the

2    Washington, D.C.?

3    A.   Yes, it was on the C Street to try to turn left onto 14th

4    Street Bridge.

5    Q.   Over by the Mint?  Or you don't know where the Mint is?

6    A.   Over the Engraving, yeah.

7    Q.   Engraving?

8    A.   Engraving, yeah.

9    Q.   Other than the trip that you just described, did he do

10   anything else that struck you as unusual during this trip with

11   your fare that you picked up over by N Street on Connecticut?

12   A.   Yes.  He asked me repeatedly about my religion.

13   Q.   Okay.  What did he ask you about your religion?

14   A.   He asked me are you a Muslim.  And then I reply, I am not

15   a Muslim.

16   Q.   Other than asking you if you were a Muslim, did he ask

17   you any other questions that struck you as unusual?

18   A.   Yes.  Other questions include like if I know of somebody

19   who needs a gun or if I carry a gun.

20   Q.   He asked you if you carried a gun?

21   A.   Yes.

22   Q.   Okay.  And did you tell him whether or not you were

23   armed?

24   A.   I tell him I am not armed.

25   Q.   Okay.  Did he ask you whether you--  Okay.  Your Honor,

G. Haile - Direct

613

1    if I could ask some leading questions at this point.

2            THE COURT:  Ask and we will see how it goes.

3    Q.   Were you offered--  Did he ask you if you wanted to buy a

4    gun?

5    A.   Yes.  First he comes, when he start about the weapon, he

6    asked me, his father was from Afghan and he was driving the

7    cab and his father carries a gun.  And he said, how come you

8    don't a gun.  I told I don't like a gun and I don't have one.

9            Then he say, okay, do you know anybody who want to

10   buy a gun, anybody who likes to have a gun.  He asked me these

11   questions.

12   Q.   And if I could just focus on something you just said.

13   Did you say his father was from--  The fare told you that his

14   father was from Afghanistan?

15   A.   Yes.

16   Q.   Did he also ask you if you wanted a woman?

17   A.   Yes, he asked me if I want a woman.

18   Q.   Okay.  Could you explain what he told you about wanting a

19   woman or if you wanted a woman?

20   A.   He asked me, do you need a woman?  Like I say, no, I

21   don't want any woman.

22           And he tried to convince me that there are women,

23   beautiful women out there renting from the cheapest Spanish

24   $40 to $500.  So, he asked me those things.

25   Q.   Where do you actually take this fare?  Where does he

G. Haile - Direct

614

1    actually end up--  Do you go someplace--  As you are talking

2    on the Memorial, outside the Holocaust Museum and you are near

3    the C Street waiting for the light to turn green, when it

4    turns green, where do you actually take him to?

5    A.   When the light turns green, we just head towards Virginia

6    over the 14th Street Bridge.

7    Q.   So, you come back over the 14th Street Bridge now for a

8    second time, this time going south?

9    A.   Yes.

10   Q.   And where do you go, after the 14th Street Bridge, where

11   do you take him?

12   A.   I take him all the way on 395 south, and we take the Duke

13   Street exit, which is exit 3A.  And we headed towards the EOS

14   Apartments.

15   Q.   And I wonder if you can tell the jury, what happens once

16   you actually--  As you are going towards the apartments, does

17   he borrow your cell phone anymore?

18   A.   As we head towards the apartments, he head me towards

19   different buildings.

20   Q.   I am sorry, I didn't understand what you said, Mr. Haile.

21   If you could repeat it and just go a little bit slower.

22   A.   As we close into the apartment complex, close the Van

23   Dorn, South Van Dorn Street, we enter that apartment complex,

24   EOS Apartments.  And he did, he lead me to the first building

25   straight.  And then he state, no, this is not the one, just

G. Haile - Direct

615

1    take me to the next one.

2          Then we keep on changing about three buildings, and

3    he just drive me around towards the back of the buildings.

4    Q.   Okay.  And at some point did he tell you why he was going

5    to those apartments?  What was at the apartments that he

6    wanted to get to?

7    A.   He said he want to meet his girlfriend.

8    Q.   And did he do anything while he was in your vehicle to

9    suggest that he was getting ready to meet a girlfriend?

10         MR. NACHMANOFF:  Objection, calls for speculation

11   unless there is some specific information that the cab driver

12   can provide.

13         MR. WALUTES:  I am willing to use a leading

14   question, Your Honor.

15         MR. NACHMANOFF:  Your Honor, I would object to any

16   more leading questions at this point.

17         THE COURT:  Rephrase it, not leading, see if you

18   can--

19   BY MR. WALUTES: (Continuing)

20   Q.   Was anything else borrowed as you were coming up to the

21   apartments by your fare that day, Mr. Haile?

22   A.   He asked me if I want a cigarette.  And I say I don't

23   smoke because I don't like cigarettes.  And he asked me to

24   give him a gum so that his breath is good when he meets his

25   girlfriend.  He asked me for gum.

G. Haile - Direct

616

1    Q.    He asked you for some gum?

2    A.    Yes.

3    Q.    Because he wanted to have good breath?

4    A.    Yes, that's what he told me.

5    Q.    He explained that to you?

6    A.    Yes, he did.

7    Q.    And did you have gum?

8    A.    I don't have gum at that time.

9    Q.    Then, I am sorry, you said you got into the apartments,

10   you got into the apartments and--  I am sorry, I think at that

11   point I interrupted you.  You move around from different

12   places inside the apartment complex?

13   A.    Yes, I did.

14   Q.    And then what happened, sir?

15   A.    And then at some place at the back exit he asked me to

16   park the car, this is the place he say, he asked me to park

17   the car.

18          And then I turn on that light, the police light,

19   which they use for report, and then he asked me to turn

20   around.  And he asked me, look, look, I just turned like this.

21   And he showed me the gun and say, now, bring all the money you

22   have, otherwise I am going to kill you.

23   Q.    And can you describe the gun?

24   A.    The gun, it's black gun.

25   Q.    And do you know what type it was?

G. Haile - Direct

617

1   A.   I don't know exactly what it is.

2   Q.   And he shows you the gun.  And he tells you, give him

3   your money?

4   A.   Yes.

5   Q.   Okay.  Now, do you give him the money or does he take the

6   money?

7   A.   Okay.  What happened is I have some money in pocket here.

8   Q.   May the record reflect that Mr. Haile is putting his

9   right hand into his left pocket, although there is no pocket

10  on that shirt, is that correct?

11  A.   No pocket this time.  He takes what is in here, and I

12  give him what I have in the right side of my pocket.

13  Q.   Pants pocket?

14  A.   And then the one I have on the left side, he took it

15  himself stretching over my shoulder.

16  Q.   So, he put his hands into your left pants pocket?

17  A.   Yes.

18  Q.   Could you explain to the jury why as a taxicab driver you

19  were carrying money in three different spots while you are

20  taking fares around the District of Columbia at 2 or 3 in the

21  morning?

22  A.   Okay.  Well, we carry some money when we go out for work

23  for change, we have to give our customers change because most

24  of the time they give, come with $20 bills, which they take it

25  out from ATMs because most of the D.C. cabs, we don't have

G. Haile - Direct

618

1    credit card system.  So, they come with $20 bills.  So, we

2    have some change for to give them back.

3            So, we will have some change arranged in this

4    nearest pocket and this pocket on the right.  And most of the

5    $20 bills which we don't use it much of the time, I put on the

6    left side of my pocket.  And smaller dollar bills I keep in

7    this pocket.

8            And whenever we have, when I am in a rush whatever

9    customers give me, I just put it here.  And when I have time,

10   I rearrange it to wherever it has to go.  So, that's how we

11   carry money.

12   Q.   Mr. Haile, you did a great job answering my question, the

13   problem is the court reporter doesn't always know where you

14   say here.  I take it that the $20 bills you said, and you put

15   your hand into your--

16   A.   On the left side of my pocket.

17   Q.   In your left pants pocket?

18   A.   Yes.

19   Q.   And then you start out your day with your change, and the

20   change is primarily in your shirt pocket?

21   A.   Yes.

22   Q.   Okay.  And then sometimes you said when you are in a

23   rush, you just put the money into your--

24   A.   Here, on the right side.

25   Q.   Right side of your pants pocket?

G. Haile - Direct

619

1  A.  Yes, yes.

2  Q.  And I take it sometimes as you are taking fares around to

3  different locations, the money moves around to different

4  spots?

5  A.  Yes.

6  Q.  Okay.  You said that when you were robbed, the man took,

7  you gave the money out of your right pants pocket and your

8  shirt pocket, but the man actually leaned over the back seat

9  and took it from your left pocket, pants pocket.

10 A.  Yes.

11         THE DEFENDANT:  Your Honor, can I approach the

12 bench?

13         THE COURT:  I am sorry?

14         THE DEFENDANT:  Can I approach the bench, Your

15 Honor.  I am trying to figure out--

16         THE COURT:  Approach the bench.  Come on up.

17         NOTE:  A side-bar discussion is had between the

18 Court and counsel out of the hearing of the jury as follows:

19 AT SIDE BAR

20         THE DEFENDANT:  I apologize.  Can I please speak,

21 Your Honor?  Can I please speak, Your Honor?

22         THE COURT:  Have you talked to, have you talked to

23 counsel about this?

24         THE DEFENDANT:  Yes.  Your Honor, I faced this

25 individual three times in three different proceedings.  And

620

1    during each proceeding this individual has changed his story

2    repeatedly.  He has been coached repeatedly by police

3    officers.  Even in his interview he has been led, like

4    Detective Hickman told him, oh, was there any drugs.  And then

5    he changed his story, as a matter of fact there was drugs.

6    Anything you say to this person, he is going to follow

7    whatever leads you give him.

8             And now Mr. Walutes is completely, Your Honor,

9    leading in every single question.  We have allowed him to lead

10   him in the beginning, the Court aloud him.  It is just getting

11   to the point where it is becoming outrageous.

12            THE COURT:  Two points.  He is not going to be

13   leading him, he hasn't been leading him with the particulars

14   about the robbery.

15            And number two, his prior testimony was recorded and

16   your counsel has it and he can be impeached with that prior

17   testimony.  We are going to break before cross-examination

18   begins, you will have an opportunity to discuss whether his

19   testimony today is different than it was previously and to use

20   that in cross-examination.

21            THE DEFENDANT:  Your Honor, I just have a real

22   problem with the perjury that is being presented in front of

23   this Court.

24            THE COURT:  This is my first time seeing him.  I am

25   on notice to what you are talking about.

621

1          THE DEFENDANT:  It's just continuous.  There are so

2     many contradictions.  They are reading a script.  It is not

3     fair to me in any way possible.

4          THE COURT:  All right, you have alerted me to that.

5          MR. WALUTES:  If I can make my point.  One of the

6     things that is discussed as the trip is coming into Virginia

7     is whether the taxicab driver would like to purchase drugs

8     from this fare.  I assume from the Court's earlier statements,

9     which is why I asked to use some questions there, to try to

10    avoid that.  There actually has been no adverse ruling to the

11    Government, no motion made by the defense--

12         THE COURT:  Let's--

13         MR. NACHMANOFF:  We would make that motion now.

14         THE COURT:  Let's exclude it.

15         MR. WALUTES:  My point now, Your Honor, if there

16    should be a need for the appellate record, why the Government

17    started to go very carefully while we were going through this

18    rendition of events is just to say to the gun and the

19    identification testimony and to avoid the drugs.

20         THE COURT:  All right, it is noted.  Thank you.

21         THE DEFENDANT:  Thank you, Your Honor.

22         NOTE:  The side-bar discussion is concluded;

23    whereupon the case continues before the jury as follows:

24    BEFORE THE JURY

25         THE COURT:  How is the temperature, is it cold in

622

1    here again?  All right, I think so too.  We will try to do

2    better after lunch.

3              All right, Mr. Walutes.

4              MR. WALUTES:  Thank you, Your Honor.

5    BY MR. WALUTES: (Continuing)

6    Q.   I am sorry, Mr. Haile, I think we stopped when you were

7    saying what had happened.  I was asking you about the gun and

8    then the location of the money.

9              What else, if anything, happened when money was

10   being taken from you or given from you?

11   A.   Okay.  At this time he asked me to park the car, turn off

12   the engine, give him the keys, take the cell phone from me,

13   and tell me not to move from that place.  And he is going to

14   rob another Spanish guy who got $10,000, and when he come back

15   he is going to take me to the nearest 7-Eleven and he is going

16   to give me $1,000.  If in the meantime I move from that place,

17   he is going to come and kill me.

18             And then he come out of the car--  Before he come

19   out--  Well, after he collect all the money--

20             MR. NACHMANOFF:  Objection, Your Honor, this is

21   turning into a narrative.

22             THE COURT:  Hold on, stop.  Okay.  I am sorry?

23             MR. NACHMANOFF:  It is turning into a narrative,

24   Your Honor.

25             THE COURT:  Ask your next question.

623

1           MR. WALUTES:  I am sorry, Your Honor, I thought--

2           THE COURT:  Well, he has explained what he told him

3    to do.  Stay in the car, I am going to go rob somebody else

4    and I am coming back.  And then what happened after that?

5    BY MR. WALUTES: (Continuing)

6    Q.   Okay.  I wanted to stop and clarify something you just

7    said, Mr. Haile.  I'm sorry, I know I am slowing you down.

8    But what is it he said that he had to go rob?

9    A.   He want to go and rob another Spanish guy who got

10   $10,000.

11   Q.   Okay.  And then he asked you to wait for him?

12   A.   Yes.

13   Q.   After taking your money?

14   A.   Yes.

15   Q.   And then what do you see him do, if anything, after he

16   tells you to wait for him?

17   A.   Before he leave my car he just get all the money from me

18   and by himself and then check it and say, is this all the

19   money.  Unfortunately, that day I have a lot of $1 bills, $5,

20   smaller bills.  So, he was mad.  Is this all the money you

21   have?  He don't like it.

22           Then he say--  He take the key and he told me not to

23   move from that place.  He just throw the key into a bush and

24   then start to walk away around the building.

25           MR. NACHMANOFF:  Your Honor, I am just going to

624

1    object to the characterization of what he liked and didn't

2    like and ask that that be stricken.

3           MR. WALUTES:  Your Honor, I believe he said that he

4    was told that he didn't like it.

5           THE COURT:  All right.  To the extent he was

6    speculating, but I think he did say he said he didn't like it.

7    But your recollection will control.

8           All right.  Ask your next question.

9    BY MR. WALUTES: (Continuing)

10   Q.  Mr. Haile, I want to be clear on that point.  What were

11   you told when the man who had just taken your money from you

12   was looking at it?

13   A.  He looked at the money and it is not that big money, it

14   is not a big money, that's why he gave, you know--

15           THE COURT:  Well--

16   Q.  Not what he thought.  What, if anything, did he say?

17   When he was looking at your money, what does he say?

18   A.  He say, don't move from here.

19   Q.  Okay.  But does he comment on the money?

20   A.  He comment that the money is little money.

21   Q.  Okay.  And how much money was it that was taken from your

22   person, Mr. Haile?

23   A.  It was $400.

24   Q.  And is that money you had earned?

25   A.  Some of it.  Portion of it is what I have, I came from my

G. Haile - Direct

625

1    home for change.  And most of it is what I earn.

2    Q.    Doing taxi jobs?

3    A.    Yes, from taxicab.

4    Q.    What, if anything, do you see after he gets out of your

5    cab?

6    A.    I see him throwing the keys into a bush and then walk

7    around at the back of my car, go to the back, which is going

8    to be the front of the building, but he go up a hill.

9            So, as soon as he turn and he is no more, he can't

10   see me, I tried to, you know, think about the way out.

11   Q.    Okay.  You tried to think about a way out?

12   A.    Yes.

13   Q.    Once you can't see him anymore, what do you actually do?

14   A.    What I did is I open my door, come out of the car and go

15   on the floor and grab the key and run on to Reynolds Street,

16   South Reynolds Street.

17   Q.    Okay.  And I am sorry, where are the keys that you go to

18   grab?

19   A.    He throw it into a bush.  I saw when he throw it into a

20   bush.  So, I grab it from there.

21   Q.    Okay.  So, when you get out of your cab, the first place

22   you go is to--

23   A.    The bush.

24   Q.    The bush?

25   A.    Yes.

G. Haile - Direct

626

1    Q.   When you get to the bush, are you able to find the keys?

2    A.   Yes, I was.

3    Q.   And once you have your cab keys, what do you do next, Mr.

4    Haile?

5    A.   The next is I run for help.  I run onto the street for

6    help.

7    Q.   Okay.  You don't actually move your taxicab?

8    A.   No.

9    Q.   You just get the keys to your taxicab and then you run

10   for help?

11   A.   Yes.

12   Q.   At that point do you have a phone?

13   A.   No, I don't have phone, he took already.

14   Q.   Okay.  And were you able to find the phone?  The phone

15   wasn't with the keys?

16   A.   He took both the phone and the keys at the same time.

17   Q.   And when you get the keys back, is the phone also thrown

18   in the bush or is it gone?

19   A.   No, only, I know only the keys.

20   Q.   Okay.  You said you run to call for help.  Were you able

21   to call for help?

22   A.   Yes.

23   Q.   And how are you able to call for help?

24   A.   I try to stop a few cars driving on that street that time

25   of the night, the morning.  And some of them, they refused me.

G. Haile - Direct

627

1    But luckily I get one car, driver who is a taxi driver, and he

2    understands me and he stops for me.  And then I was able to

3    get into his car.  And then I ask him to borrow his cell

4    phone.

5    Q.   Okay.  So, you tried to flag some cars down.  Not all the

6    cars will stop?

7    A.   Yes, the rest of the cars, they don't stop.

8    Q.   Okay.  But one car does stop?

9    A.   That car is a taxicab.

10   Q.   Okay.  Did you know that taxicab driver before?

11   A.   I never know him, I don't know him.

12   Q.   Have you ever referred to him as a friend?

13         MR. NACHMANOFF:  Objection, Your Honor, leading.

14   A.   We passed--

15         THE COURT:  Sustained, sustained.  Go ahead, ask

16   your next question.

17   BY MR. WALUTES: (Continuing)

18   Q.   Were you able to make a 911 call with the help of that

19   person?

20   A.   Yes.

21   Q.   Was that 911 call recorded?

22   A.   Yes.

23   Q.   And have you had an opportunity to listen to it prior to

24   taking the stand today?

25   A.   Yes.

G. Haile - Direct

628

1   Q.   If I could ask you to look at Government's Exhibit No. 14

2   marked for purposes of identification.

3        Do you see that disk?

4   A.   Yes, I see this disk.

5   Q.   Okay.  And do you recognize it?

6   A.   Yes, I do recognize.

7   Q.   How do you recognize it?

8   A.   I make my initial on it.

9   Q.   And what is that?

10  A.   This is 911 call.

11  Q.   And is it the 911 call that you placed after being robbed

12  on May 27 of 2007?

13  A.   Yes.

14  Q.   Have you also been asked by, have you been asked to look

15  at a transcript of that 911 call?

16  A.   Yes, I did.

17  Q.   And with the Court's permission, if I could hand you now

18  what is marked, if I could hand you now what is an unmarked

19  transcript.

20       Do you recognize that transcript, Mr. Haile?

21  A.   Yes, I do recognize.

22  Q.   And have you had an opportunity to check that transcript

23  against your 911 call made after you were robbed on May 27 of

24  2007?

25  A.   Yes, I do.

G. Haile - Direct

629

1   Q.   Is that an accurate transcript of your call for help?

2   A.   Yes, it is.

3   Q.   And how do you know that's an accurate transcript?

4   A.   I read it while listening to the tape, and then I initial

5   it.

6   Q.   You initialed it?

7   A.   Yes.

8           MR. WALUTES:  Your Honor, at this time we would move

9   the admission of Government's Exhibit 14 and ask permission at

10  this time to play it with the aid of the transcript that Mr.

11  Haile has had an opportunity to review.

12          THE COURT:  All right.  Any objection?

13          MR. NACHMANOFF:  No objection to the call.  We do

14  object to the transcript.

15          MR. WALUTES:  We are not trying to enter the

16  transcript.  We are only asking for use.

17          THE COURT:  Yes, I will allow it to be used as an

18  aid.

19          Ladies and gentlemen, you understand that the

20  transcripts that you have been looking at over the last

21  several days are not the evidence, but it's the actual

22  recording.  And the transcripts are to assist you in

23  understanding what's being said in the recordings themselves.

24  And I will allow that for this call as well.

25          MR. WALUTES:  May we play it now, Your Honor?

630

1           THE COURT:  Yes, go ahead.

2           NOTE:  The recording is played.

3    BY MR. WALUTES: (Continuing)

4    Q.  Was that the call that you made, Mr. Haile, after you

5    were able to get your keys and run to the street?

6    A.  Yes.

7    Q.  Okay.  You described the man in that tape as having no

8    hair and wearing a white T-shirt.  Do you remember that?

9    A.  Yes.

10   Q.  So, you had picked the man up just south of DuPont Circle

11   who wore a white T-shirt and had no hair on his head?

12   A.  Yes.

13          MR. NACHMANOFF:  Objection, Your Honor.  This is

14   leading, repeating the testimony.

15          THE COURT:  Sustained.  Ask your next question.

16   BY MR. WALUTES: (Continuing)

17   Q.  Were you asked to come down to the Alexandria Police

18   Department on June 1 of 2007 to look at some photographs about

19   five days after you were robbed, Mr. Haile?

20   A.  Yes.

21   Q.  And did you go down there as they asked you to?

22   A.  Yes, I did.

23   Q.  Did you see the man who had robbed you?

24   A.  Yes.

25   Q.  If I could ask you what's marked as Government's Exhibit

G. Haile - Direct

631

1   No. 4C.  And ask you if you recognize that, sir?

2           Do you recognize that sheet of paper, Mr. Haile?

3   A.   Yes, I do recognize.

4   Q.   And did you sign that?

5   A.   Yes, I signed.

6   Q.   Okay.  Did you sign next to the photograph that was the

7   person who had robbed you?

8   A.   Yes.

9   Q.   And do you see it is dated as June 1, 2007?

10  A.   Yes.

11  Q.   Did you testify in state court proceedings, Mr. Haile?

12  A.   Yes.

13  Q.   How many times did you testify in the state?

14  A.   Two times.

15  Q.   On August 18 of 2008 did you come down to the city of

16  Alexandria Circuit Court and testify in a preliminary hearing?

17  A.   Yes, I did.

18  Q.   Did you see the man who had robbed you in that

19  preliminary hearing proceeding?

20  A.   Yes, I did.

21  Q.   Were you able to identify him the state courtroom?

22  A.   Yes.

23  Q.   Were you certain that that was the man who had robbed

24  you?

25  A.   Yes.

G. Haile - Direct

632

1   Q.   The night before you came down to the first court

2   proceeding on August 17 of 2008, did someone come to your

3   house?

4   A.   Yes.

5   Q.   Who came to your house, Mr. Haile?

6   A.   He said he is private investigator working for defense

7   attorney.

8   Q.   Did he give you his card?

9   A.   Yes, he did.

10  Q.   Did he write any, did you write anything on his business

11  card?

12  A.   Yes.

13  Q.   What did you write?

14  A.   I write his plate number because I was scared.  That is

15  so unusual for me.

16  Q.   Were you surprised that he was able to find out where you

17  lived?

18  A.   Yes.

19  Q.   If I could ask you to look at Government's Exhibit No.

20  20.  Ask you if you recognize this?

21          Do you see that, Mr. Haile?

22  A.   Yes.

23  Q.   What is it?

24  A.   This is that private investigator's business card.

25  Q.   The man who came to your home?

G. Haile - Direct

633

1    A.   Yes.

2    Q.   And does the back--  If you could actually open it up,

3    take it out, look at the back and see if there are any

4    markings that you might have made.

5         Do you see some markings on the back?

6    A.   Yes, this is what I write.

7    Q.   You wrote those on the back?

8    A.   Yes, I wrote these things.

9    Q.   What is it that you wrote on the back of the private

10   investigator's card who came to see you the night before you

11   went to the Court for the first time?

12   A.   This is his plate number, Virginia plate number, and his

13   working ID as a private investigator, his ID number.

14   Q.   And the address he came to see you at, what was the

15   address, what was your address at that time?

16        Not what it is today, Mr. Haile, but what was your

17   address when he came to see you on August 17 of 2008?

18   A.   7401.

19   Q.   7401, what was the street?

20   A.   New Hampshire Avenue.

21   Q.   New Hampshire Avenue?

22   A.   Yes.

23   Q.   And what apartment were you living at that time?  Not

24   today.

25   A.   419.

634

1   Q.    419.  Mr. Haile, do you have a birth mark on your

2   forehead?

3   A.    What?

4   Q.    Do you have a birth mark on your forehead?

5   A.    Yes, I have one.

6   Q.    And where is it just so everybody can be clear?

7   A.    I have here on the left side of my forehead.

8              MR. WALUTES:  Thank you, Mr. Haile.

9              Your Honor, I move the admission of Government's

10  Exhibit No. 20, the card that Mr. Haile has just completed

11  testifying about.

12             THE COURT:  Any objection.

13             MR. NACHMANOFF:  No objection, Your Honor.

14             THE COURT:  It will be received.

15  BY MR. WALUTES: (Continuing)

16  Q.   Mr. Haile, did you also come to testify a second time in

17  the state proceedings in December of 2008?

18  A.    Yes.

19  Q.    And did you see the man in the state courtroom that had

20  robbed you on December of 2008?

21  A.    Yes.

22  Q.    Were you able to identify him in the courtroom?

23  A.    Yes.

24  Q.    Were you certain that that was the man who had robbed you

25  on May 27 of 2007?

635

1    A.    Yes.

2    Q.    Do you see the man in the courtroom today, Mr. Haile, who

3    robbed you?

4    A.    Yes.

5    Q.    Could you identify him by an article of clothing and by

6    pointing to him?

7    A.    He is the person sitting in the middle of these three

8    people.

9           THE COURT:  I will note the identification of Mr.

10   Mohamadi.

11   Q.    Mr. Haile, if I could ask you to look at what is now

12   marked as Government's Exhibit 15A through 15R.

13          Actually, if I could direct your attention, I think

14   we can skip over, starting with 15E.  15E.

15          If you would look, Mr. Haile, when you get a chance.

16   A.    Okay.

17   Q.    If I could ask you to look at 15E, 15F, G and H, just the

18   first four photographs, E, F, G and H.

19          Do you recognize those, Mr. Haile?

20   A.    Yes.

21   Q.    And what are those?

22   A.    This is photograph taken from inside of my taxicab.

23   Q.    Okay.  Is that the way your taxi, the interior of your

24   taxicab appeared on the day you were robbed on May 27, 2007?

25   A.    Yes.

636

1    Q.   If I could ask you to skip to what's now marked as

2    Government's Exhibit No. 15K, 15L and 15M and 15N and 15O.  I

3    think the last five, I am sorry, 15P, Q.

4              Do you see the last paragraphs?

5    A.   Which ones?

6    Q.   I am sorry, starting at 15K.  Maybe we should do it one

7    at a time, Mr. Haile.  Do you recognize what 15K is?

8    A.   Yes.

9    Q.   What is that, sir?

10   A.   This is the back side of the back seat of my taxicab.

11   Q.   Is that how it appeared the day you were robbed?

12   A.   Yes.

13   Q.   And then the next picture, 15L.

14   A.   Yes.

15   Q.   Is this a picture--

16   A.   This is my taxicab, a photograph of my taxicab.

17   Q.   Okay.  I want to talk about that for a second.  What

18   color does it look in the photograph?

19   A.   Here it looks like blue, but light blue, but it is green.

20   Q.   In truth, you know what color your taxi is?

21   A.   Yes.

22   Q.   What color is your taxi?

23   A.   Is green.

24   Q.   So, even though in this photograph it appears to be blue,

25   that's just something with the photograph?

G. Haile - Direct

637

1    A.    Yes.

2    Q.    If I could go to 15M.  Do you recognize that, sir?

3    A.    Yes.

4    Q.    What is that?

5    A.    This is again the photograph of my taxicab.

6    Q.    Okay.  And 15N?

7    A.    Yes, this is photograph of my taxicab which shows my

8    plate number at the back.

9    Q.    You don't have to tell us what your plate is, but it is a

10   Washington, D.C. plate?

11   A.    Yes.

12   Q.    Your taxi was actually licensed in the District of

13   Columbia?

14   A.    Yes.

15   Q.    And that's where you were working when this started?

16   A.    Yes.

17   Q.    And then 15O?

18   A.    This is again a photograph of my taxicab.

19   Q.    Okay.  And 15P, do you see 15P?

20   A.    Yes, I see 15P.  This is where my taxicab was parked the

21   last time where I was robbed.  This is the place.

22   Q.    That's where you were robbed?

23   A.    Yes.

24   Q.    The cab was at that spot?

25   A.    Yes.

638

```
 1              MR. WALUTES:  Okay.  Your Honor, I would move

 2    admission of 15P at this time and ask permission to publish

 3    15P?

 4              THE COURT:  Any objection?

 5              MR. NACHMANOFF:  I think they are already in.

 6              THE COURT:  I think they are as well.  You can

 7    publish.

 8              MR. WALUTES:  Thank you, Your Honor.

 9    BY MR. WALUTES: (Continuing)

10    Q.   Okay.  Mr. Haile, do you see it in front of you?

11    A.   Yes.

12    Q.   There are on my screen.  I think you are hitting it with

13    the book.

14              Mr. Haile, do you see that photograph?

15    A.   Yes, I see.

16    Q.   Okay.  And do you see your cab in that?

17    A.   Yes, I see.

18    Q.   And which side of the photograph is your cab on?

19    A.   Side?

20    Q.   Where is it?  Is it on the right, the left, top, bottom?

21    A.   This is the left side.

22    Q.   Okay.  Could you put your finger right on top of your

23    cab, I think it will make a mark.

24    A.   Here.

25    Q.   Exactly.  Do you see, do you see in this photograph the
```

639

1    bush where your keys were put, or can you not see it in this

2    photograph?

3    A.   Yes, is up here.

4    Q.   Thank you, Mr. Haile.  If I could ask you to go back to

5    15Q.  Do you see 15Q, Mr. Haile?

6    A.   Yes.

7    Q.   Okay.  What is that a photograph of?

8    A.   This is again my car where it was parked.

9    Q.   And is that a fair and accurate picture?

10   A.   Yes, it is.

11            MR. WALUTES:  Okay.  If we could publish that as

12   well since it was previously admitted, Your Honor?

13            THE COURT:  Yes.

14   BY MR. WALUTES: (Continuing)

15   Q.   Could you again put--  It should be on the screen next to

16   you.

17            Mr. Haile, do you see your cab?

18   A.   Yes, I see.

19   Q.   And could you tap on it just so we can make sure we are

20   all looking at the same thing.

21   A.   Yes.  This is the left side of my taxicab.

22   Q.   Can you put your finger on top of your taxicab?

23   A.   Yes, this is the top of it.

24            MR. WALUTES:  Thank you.  Your Honor, at this time I

25   would ask permission to have Mr. Haile look at Government's

G. Haile - Direct

640

1    Exhibit 2A, which is the large diagram.

2            THE COURT:  All right.  Are you going to have a fair

3    amount of further testimony from Mr. Haile?

4            MR. WALUTES:  I don't, Your Honor.  I have about

5    four or five questions.

6            THE COURT:  All right, let's finish up the direct

7    then.  Thank you.

8            MR. WALUTES:  I am not sure the pen is.  Do I have

9    the pen or do you have the pen?

10           THE MARSHAL:  I have the pen.

11           MR. WALUTES:  Excellent.

12   BY MR. WALUTES: (Continuing)

13   Q.   Mr. Haile, if I could ask you if you could circle where

14   it is that you picked up this fare, with the Court's

15   permission, and then just put your initials next to that.

16   A.   I pick him up here.

17   Q.   Circle or an X.  General area where it was that you

18   picked up the fare.

19   A.   Okay.

20   Q.   Okay.  Can you circle you the mark you just made so

21   everybody can find that mark.

22           Okay.  Could you put your initials next to that so

23   people will later be able to remember who did that.

24   A.   Sorry.

25   Q.   Mr. Haile, can you tell the jury again, do you know that

G. Haile - Direct

641

1    block in the District of Columbia pretty well?

2    A.    Yes, I do.

3    Q.    Can you show us with your finger just what the different

4    clubs are or landmarks in that area?

5    A.    This is the Connecticut Avenue running this way.  And

6    this is N Street.  And these are the clubs up here.  There are

7    clubs down here too before N.  And there are clubs here along,

8    the Indian Heritage, Cafe Citron and The Big Hunt.  These are

9    the major.  And there is Otello and Magic, some Magic, Majal,

10   Taj Mahal, these the kind of names I see there.  But popular

11   ones are The Heritage, The Big Hunt and the Cafe Citron.

12   Q.    Is the lighting pretty good in that block?

13   A.    Yes, it is good enough, yes.

14   Q.    Can you show DuPont Circle on that just so we can orient

15   ourselves?

16   A.    Okay.  As we head north on this Connecticut Avenue, this

17   is the DuPont Circle over here.

18   Q.    Okay.  Thank you.  Thank you to the Court Security

19   Officer.

20         Did you come--  Did police detectives come and visit

21   you sometime last year or maybe a little earlier to discuss

22   concerns?

23   A.    Yes.

24   Q.    Okay.  And did they advise you of some--

25         MR. NACHMANOFF:  Objection, calls for hearsay.

G. Haile - Cross

642

1    Q.   As a result, not without-- Without telling us-- If I

2    might rephrase, Your Honor.

3            THE COURT:  Yes, please.

4    Q.   Without telling us what you were told, Mr. Haile, did you

5    have to actually move somewhere else, move to a different

6    place?

7    A.   Yes.

8            MR. WALUTES:  Those are all the questions I have,

9    Your Honor.

10           THE COURT:  All right.  We are going to break at

11   this time for an hour for lunch.  We will come back at 2

12   o'clock and begin cross-examination.

13           Mr. Haile, you are excused at this time as well, but

14   please don't discuss your testimony with anyone because you

15   are in the middle of your testimony.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  All right.  Then we are in recess until

18   2 o'clock.

19           NOTE:  At this point a lunch recess is taken; at the

20   conclusion of which the case continues as follows:

21           THE COURT:  Whenever you are ready, sir.

22           MR. NACHMANOFF:  Thank you, Your Honor.

23       CROSS EXAMINATION

24   BY MR. NACHMANOFF:

25   Q.   Mr. Haile, you testified on direct that you have been a

G. Haile - Cross

643

1    cab driver I think for more than five years, is that correct?

2    A.   Yes.

3    Q.   And you have been in this country for more than seven

4    years, is that right?

5    A.   Seven, yes.

6    Q.   And you are originally from Ethiopia?

7    A.   Right.

8    Q.   And other than as a cab driver, have you had other jobs

9    here in the United States?

10   A.   Yes, I have.

11   Q.   And what other jobs have you had?

12          MR. WALUTES:  Objection.  Not relevant to this case.

13          THE COURT:  I think on direct examination he said he

14   had two jobs.  I will allow the question.

15   BY MR. NACHMANOFF: (Continuing)

16   Q.   What other jobs have you had, Mr. Haile?

17   A.   I work as a document processing clerk.

18   Q.   I am sorry, as a what?

19   A.   I work as a document processing clerk for a contractor.

20   Q.   Is that a legal job?

21   A.   Not legal.

22   Q.   As a cab driver, do you work for yourself?

23   A.   Yes.

24   Q.   You are not an employee of a cab company, is that right?

25   A.   Yes.

644

1   Q.   Yes, you are an employee?  Or, no, you are not an

2   employee?

3   A.   I am not an employee.  I am self---

4   Q.   You are self-employed, correct?

5   A.   Self-employed, correct.

6   Q.   You don't work for Swift Cab Company, right?

7   A.   No, I don't work for the company.

8   Q.   But that was the name on your cab on May 27, 2007,

9   correct?

10  A.   Yes.

11  Q.   Do you own that cab?

12  A.   Yes.

13  Q.   And did you own it at the time?

14  A.   Yes.

15  Q.   But you don't receive a paycheck from Swift Cab Company,

16  correct?

17  A.   I don't receive one.

18  Q.   You don't control the finances of Swift Cab Company, do

19  you?

20  A.   I don't.

21  Q.   And approximately how much do you make in a day?

22  A.   It all depends on the season of the work.  So, it is

23  variable.

24  Q.   And in May of 2007, approximately how much would you earn

25  in a day?

G. Haile - Cross

645

1   A.   That's a busy time, I earn about 350.

2   Q.   $350 in a day?

3   A.   Yes.

4   Q.   That would be a typical amount?

5   A.   Yes, that is the maximum.

6   Q.   But you don't always earn the same amount every day?

7   A.   No.

8   Q.   It depends upon how much you work?

9   A.   Yes.

10  Q.   And you decide when you work, right?

11  A.   Yes.

12  Q.   You don't work eight hours a day necessarily?

13  A.   Not necessarily.

14  Q.   Some days you might work a lot more than that?

15  A.   Yes.

16  Q.   And some days you might work less?

17  A.   Yes.

18  Q.   Or some days you might choose not to work not at all?

19  A.   Yes.

20  Q.   It's up to you?

21  A.   Yes.

22  Q.   And the money that you earn, you place in the bank?

23  A.   Yes.

24  Q.   Sometimes you spend it, sometimes you save it?

25  A.   Yes, I do.

G. Haile - Cross

646

1    Q.    Okay.  But you have no office, correct?

2    A.    The office is the name of the Swift Cab Company, that's

3    the office.

4    Q.    Okay.  Do you pay rent to Swift Cab Company?

5    A.    I pay weekly insurance, and part of the insurance goes to

6    running the office.

7    Q.    But you don't have a secretary, do you?

8    A.    I don't recall that.

9    Q.    Well, do you have someone who works for you?

10   A.    We do have office, we do have cashier that collects the

11   money.

12   Q.    Okay.  My question is, do you have employees?

13   A.    Yeah, we do have some.

14   Q.    You are answering me we, and I am asking you

15   individually.  Do you pay any employee to work for you?

16   A.    No, I don't pay.  I am grouped under cab fleet company of

17   certain number of cabs, and that company at that time was

18   named Swift, and it has office and some employees there.

19   Q.    So, you are an independent contractor?

20   A.    Yes.

21   Q.    Okay.  And you pay some money to get some benefits from

22   Swift Cab?

23   A.    Yes.

24   Q.    But the people at Swift Cab don't work for you?

25   A.    They process my insurance, they work for my insurance.

G. Haile - Cross

647

1   Q.   You give them pieces of paper to help you with your

2   insurance?

3   A.   I pay, I pay and they process.

4   Q.   But you don't have a payroll that you pay?

5   A.   No, I don't have payroll.

6   Q.   You don't pay taxes on their behalf, do you?

7   A.   No, I pay tax on my own.

8   Q.   You pay your own taxes?

9   A.   Yes.

10  Q.   You don't directly purchase office supplies, do you?

11  A.   No, it's not me, but the company.

12  Q.   As part of your business, you don't do that?

13  A.   I don't do that, yes.

14  Q.   On direct you testified that when you start the day, you

15  take some change with you so that you can make change for

16  customers, is that correct?

17  A.   Yes.

18  Q.   Had you done that on May 26?

19  A.   Yes, I did.

20  Q.   And that's because sometimes customers don't have the

21  exact amount to pay?

22  A.   Yes.

23  Q.   Correct?

24  A.   Yes.

25  Q.   And in a typical day, you might have as many as 50

G. Haile - Cross

648

1    customers, correct?

2    A.    Yes.

3    Q.    And you are based in Washington, D.C., correct?

4    A.    Yes.

5    Q.    Now, turning your attention to May 26 and May 27.  You

6    testified on direct that you started work at about 7 p.m.?

7    A.    Yes.

8    Q.    And that was in the District of Columbia, correct?

9    A.    Correct.

10   Q.    And between 7 p.m. and 2 or 2:30 a.m., you were driving

11   your cab, is that right?

12   A.    Yes, yes.

13   Q.    And you picked up fares?

14   A.    Yes.

15   Q.    Correct?  And people paid you money?

16   A.    Yes.

17   Q.    And you made change?

18   A.    Yes.

19   Q.    And you had a number of customers, is that right?

20   A.    Yes.

21   Q.    This was a Saturday night?

22   A.    Right, busy.

23   Q.    It was Memorial Day weekend?

24   A.    Yes.

25   Q.    And so, you were very busy?

649

1   A.   Yes.

2   Q.   So, by 2 or 2:30 in the morning, you had been working

3   almost seven or eight hours, is that right?

4   A.   Yes.

5   Q.   And you had not had many breaks?

6   A.   I don't have any breaks.

7   Q.   Not many breaks?

8   A.   Yeah, just get some drinks, that's all.

9   Q.   Fair to say you were probably tired at that point?

10  A.   I take some breaks like get coffee from 7-Eleven, just

11  buy 7-Eleven some stores--

12  Q.   Were you tired at 2:30 in the morning?

13  A.   I am good because I got tea, something before that.

14  Q.   You had some caffeine?

15  A.   Yes.

16  Q.   To help keep you awake?

17  A.   Yes.

18  Q.   And sometimes you work many hours all the way through the

19  night?

20  A.   Still, yeah, I work that.

21  Q.   In fact, on direct you said that this was one of your

22  peak times, is that right?

23  A.   Yes, yes.

24  Q.   So, you get a lot of customers at 2 or 3 in the morning?

25  A.   Yes.

G. Haile - Cross

650

1    Q.   And that's because it was a weekend?

2    A.   Yes.

3    Q.   And that's because in part you were working around the

4    DuPont Circle area which is very crowded?

5    A.   Yes.

6    Q.   And that night on December 26--  December, excuse me.

7    May 26 and May 27, it was a typical night in May, is that

8    correct?

9    A.   Yes, it was one of the--

10   Q.   And there were a lot of people out?

11   A.   Yes.

12   Q.   And you testified that you picked up a person who you've

13   testified eventually robbed you just south of DuPont Circle,

14   is that right?

15   A.   Yes.

16   Q.   And you picked that fare up around 2:30 a.m.?

17   A.   Yes.

18   Q.   And there were other people around at that time, correct?

19   A.   Yes.

20   Q.   And he got into the back of the cab, is that right?

21   A.   Right.

22   Q.   And there was nothing unusual about the way he got into

23   the cab, is that right?

24   A.   He just, my door was locked for security reasons because

25   drunk people go into the cab and disturb us a lot, they don't

G. Haile - Cross

651

1  know where to go.  And because my door is looked, so he tried

2  to open the door.  And I see him and I unlocked the door for

3  him, then he get in.

4  Q.    Trying to open the back of the cab is not unusual, is it?

5  A.    It is not unusual.

6  Q.    And when you saw that he was trying to get into the cab,

7  you opened it for him?

8  A.    Yes.

9  Q.    Because you wanted him to get in?

10  A.    Yes.

11  Q.    And you didn't get out of the cab to help him in?

12  A.    No.

13  Q.    And he didn't have any luggage?

14  A.    No.

15  Q.    So, you didn't have to put nothing in the trunk?

16  A.    No.

17  Q.    And you didn't notice that he was carrying a bag with

18  him, did you?

19  A.    He doesn't have a bag at that time.

20  Q.    He did not have a bag?

21  A.    No.

22  Q.    Not a knapsack?

23  A.    No.

24  Q.    Nothing?  Just he got in the cab?

25  A.    Yes.

G. Haile - Cross

652

1    Q.   And he asked you first to take him to the Landmark Mall

2    area in Alexandria, is that right?

3    A.   Right.

4    Q.   But then he changed his mind and said he wanted to go to

5    Georgetown?

6    A.   Yes.

7    Q.   Now, when you drive, on direct I think you testified that

8    you normally keep the lights in the cab off, correct?

9    A.   Yes.

10   Q.   And that's because it's safer?

11   A.   Yes.

12   Q.   And it's easier to see outside the cab if there is no

13   light shining inside the cab, correct?

14   A.   Correct.

15   Q.   And so, generally if the light is on, it would only be on

16   when you are stopped, is that right?

17   A.   Yeah, normally.  Or when my customer inside the cab needs

18   some service from me, I turn light on.

19   Q.   But you are a careful driver, right?

20   A.   Yes, I am.

21   Q.   And you drive for a living?

22   A.   Yes.

23   Q.   And it is important to have a clean record, right?

24   A.   Yes.

25   Q.   Right.  So, it is important not to get caught for

G. Haile - Cross

653

1    speeding or to have other traffic problems, right?

2    A.    Yes.

3    Q.    And so, you keep your eyes on the road?

4    A.    Yes.

5    Q.    So, that night you were driving carefully?

6    A.    Yes.

7    Q.    And your eyes were on the road?

8    A.    Yes.

9    Q.    And you explained on direct that you went essentially to

10   three places.  The first place was Georgetown?

11   A.    Okay.

12   Q.    And in Georgetown the person who was in the cab got out

13   briefly, correct?

14   A.    We didn't get to Georgetown.  On the way to Georgetown.

15   Q.    I'm sorry, let me correct myself.  I believe you

16   testified that on the way to Georgetown around 23rd Street he

17   asked to get out, is that correct?

18   A.    Yes.

19   Q.    And he did get out?

20   A.    Yes.

21   Q.    But it was very brief?

22   A.    Yes.

23   Q.    And he got out of the back seat, correct?

24   A.    Yes.

25   Q.    And you did not get out of the car?

G. Haile - Cross

654

1   A.   No.

2   Q.   And he spoke to someone, but you couldn't hear what was

3   said?

4   A.   Yes.

5   Q.   When you say yes, you mean you could not hear what he

6   said?

7   A.   It was on the other side of the street, I didn't hear

8   anything that they communicate.

9   Q.   And then he got back into the back of the cab.

10  A.   Yes.

11  Q.   So, whatever you observed, you observed from your seat in

12  the driver's seat as you waited for him?

13  A.   When he come in, when he was back seat, I see him.

14  Q.   When he got back in, he told you he wanted to go to

15  Virginia.  And so, you crossed Memorial Bridge?

16  A.   Yes.

17  Q.   And then you crossed back over the 14th Street Bridge?

18  A.   Right.

19  Q.   And very briefly you stopped near the Holocaust Museum

20  you testified?

21  A.   Yes.

22  Q.   Okay.  But he didn't get out of the cab at that time?

23  A.   No, he didn't.

24  Q.   And during this period of time he asked to borrow your

25  cell phone, is that right?

G. Haile - Cross

655

1   A.   Yes.

2   Q.   And you let him borrow your cell phone?

3   A.   Yes.

4   Q.   He also asked to borrow a pen, is that right?

5   A.   Yes, pen and paper.

6   Q.   And paper?

7   A.   Yes.

8   Q.   And you gave him both of those things?

9   A.   I gave him pen and receipt to write down.

10  Q.   And he didn't take those, he asked for them and you gave

11  them to him?

12  A.   Yes, I gave to him, yeah.

13  Q.   And you testified that you had a Blue Tooth device?

14  A.   Yes.

15  Q.   And that's because in D.C. you can't talk on a cell

16  phone, right?

17  A.   Right.

18  Q.   It's illegal?

19  A.   Yes.

20  Q.   So, you wouldn't do that?

21  A.   Yes.

22  Q.   But it is legal to talk if you have a handheld device, is

23  that right?  Hands free device.

24  A.   Hands free, yes.

25  Q.   Okay.  And so, that's why you used the Blue Tooth?

G. Haile - Cross

656

1   A.   Yes.

2   Q.   Okay.  Now, at any point during this period of time did

3   you ask him to get out of the cab?

4   A.   No, never.

5   Q.   And at one point you testified near the Holocaust Museum

6   you were worried because this was your peak time and you

7   thought maybe you could earn more money if you had other

8   fares, is that right?

9   A.   Yes.

10  Q.   And you wanted to be sure that he would pay you?

11  A.   Yes.

12  Q.   And he assured you that he would pay you?

13  A.   Yes.

14  Q.   But you weren't worried that he was going to do something

15  to you, correct?

16  A.   Yes.

17  Q.   Yes, you were worried?

18  A.   I was worried, yes.

19  Q.   You were--  I am sorry, you were not worried or you were

20  worried?

21  A.   I was worried.

22  Q.   You were worried?

23  A.   Yeah.  In a sense it is so unusual to change one

24  passenger's mind like this too much.  So, it is not all I was

25  worried about the money, but what going to be the end, how can

G. Haile - Cross

657

1  I get rid of this man and have my way to home or another job,

2  get another job.  So, because I was nervous, it's too much to

3  change like this for me.

4  Q.   So, you have driven a cab for a numbers of years in the

5  District of Columbia, correct?

6  A.   Yes.

7  Q.   And you are familiar with the streets of the District of

8  Columbia, correct?

9  A.   Yes.

10  Q.   And you know where various buildings are, for example?

11  A.   Yes.

12  Q.   For example, restaurants?

13  A.   Yes.

14  Q.   And hotels?

15  A.   Yes.

16  Q.   And you are familiar with where police stations, right?

17  A.   Some of them.

18  Q.   Okay.  And you never drove to a police station, did you,

19  when this man was in your cab?

20  A.   No, I didn't.

21  Q.   You never drove back to DuPont Circle, did you?

22  A.   No.

23  Q.   You never drove to an area where there were a lot of

24  people around?

25  A.   No.

G. Haile - Cross

658

1   Q.   There weren't a lot of people around the Holocaust Museum

2   at 3 o'clock in the morning on May 27, 2007, were there?

3   A.   No.

4   Q.   You wanted to get paid for your fare, right?

5   A.   Yes.

6   Q.   And so, you kept driving him, right?

7   A.   Yes.

8   Q.   Eventually you drove back over the river and got off near

9   Van Dorn Street, correct?

10  A.   Yes.

11  Q.   And you went into the EOS 21 Apartments?

12  A.   Yes.

13  Q.   And that's where eventually you parked the car?

14  A.   Yes.

15  Q.   And it was at that point that the person who was in the

16  cab showed you a gun, is that correct?

17  A.   Yes.

18  Q.   Now, he didn't point the gun at your head, did he?

19  A.   He showed me flat like this.

20  Q.   So, the gun was flat?

21  A.   Yes.

22  Q.   Not pointed.

23  A.   Flat, like this.

24  Q.   Okay.  And it was held down, not held up at your face?

25  A.   It is held like this.  I don't know how do you call that.

G. Haile - Cross

659

1   Q.   So, your hands are at the level of your shoulder?

2   A.   Yes.

3   Q.   And he was sitting in the back of the cab?

4   A.   He was sitting in the middle.

5   Q.   In the back of the cab?

6   A.   Yes.

7   Q.   In the middle seat?

8   A.   Yes.

9   Q.   Or in the middle of a bench?

10  A.   Yes, that place.

11  Q.   And it was at that point you said that you gave him some

12  money?

13  A.   Yes.

14  Q.   And that he also took some money?

15  A.   Right.

16  Q.   But he didn't take a wallet, did he?

17  A.   He didn't take a wallet.

18  Q.   And he didn't take a credit card?

19  A.   No.

20  Q.   He didn't take a debit card?

21  A.   No.

22  Q.   The only thing he took was cash?

23  A.   Yes.

24  Q.   Now, after the robbery, the police came after you called

25  911, correct?

G. Haile - Cross

660

1    A.    Yes.

2    Q.    And you remember the police arrived very quickly?

3    A.    Yes.

4    Q.    In fact, by the time that you were finished talking to

5    the 911 operator, the police had arrived, is that right?

6    A.    Yes, yes.

7    Q.    And there was more than one police officer who arrived?

8    A.    Yes.

9    Q.    And they spoke to you to try to get information, is that

10   right?

11   A.    Yes.

12   Q.    And they wanted a description of the person who had just

13   robbed you, is that right?

14   A.    Yes.

15   Q.    And after you gave those descriptions right there on the

16   scene on May 27, you met with the police again four days

17   later, is that right?

18   A.    Yes.

19   Q.    On May 31?

20   A.    Right.

21   Q.    That's when you met with Detective Hickman, is that

22   right?

23   A.    Yes.

24   Q.    And he was the police officer who ended up being in

25   charge of the investigation, is that right?

G. Haile - Cross

661

1    A.    Yes.

2    Q.    And he asked to you come back again the next day on

3    June 1, 2007?

4    A.    Yes.

5    Q.    To look at some photographs, is that right?

6    A.    Right.

7    Q.    And then almost a year later you testified in state

8    court?

9    A.    Yes.

10   Q.    Okay.  And then you testified once again in state court

11   at the state court trial, is that right?

12   A.    Yes.

13   Q.    Okay.  So, you've given at least six statements to the

14   police or testified in court trying to describe the person who

15   robbed you, is that right?

16   A.    Yes.

17   Q.    And it was very important to you every time you spoke to

18   the police that you tell the truth, is that right?

19   A.    Right.

20   Q.    Because you understood that the police would be

21   responsible for trying to find the person who robbed you?

22   A.    Yes.

23   Q.    And you understood that it was very important that they

24   get accurate information about what this person looked like?

25   A.    Yes.

G. Haile - Cross

662

1    Q.    Is that right?

2    A.    Right.

3    Q.    So, you did the best every time you spoke to the police?

4    A.    Yes, I try.

5    Q.    And that's true in court as well?

6    A.    Yes.

7    Q.    And in court you were under oath?

8    A.    Yes.

9    Q.    And you understood that that meant you had to tell the

10   truth or you could be prosecuted?

11   A.    Yes.

12   Q.    Now, you have also met with the Government prosecutors in

13   this case, is that right?

14   A.    Right.

15   Q.    And you have told them as much as you can about the case

16   as well?

17   A.    Yes.

18   Q.    And in fact, you met with them preparing to testify here

19   today, right?

20   A.    I meet them, they just informed that I am going to

21   testify here today.

22   Q.    I am sorry, the answer is yes, did you meet with them?

23   A.    I meet them, yes.

24   Q.    Okay.  And that was to help prepare you for testifying

25   here today?

G. Haile - Cross

663

1   A.   I don't see that's prepare, just they tell me I am going

2   to appear here.

3   Q.   And did they talk to you about what would happen when

4   they asked you questions?

5   A.   Who asked me questions?

6   Q.   The prosecutors.

7   A.   I didn't get this.

8   Q.   Okay.  The Government prosecutors here, do you see them

9   here in the courtroom?

10  A.   Yes.

11  Q.   Have you met them before?

12  A.   Yes, I meet them.

13  Q.   Did you meet them in their offices?

14  A.   Yes.

15  Q.   When you were together, did they talk to you about what

16  would happen here today?

17  A.   The Court decision will go through.

18  Q.   I am sorry, can you repeat that?

19  A.   I will testify today, they told me I am going to testify.

20  Q.   And they talked about what you would testify to, correct?

21  A.   About the case, that case, yes.

22  Q.   About the case?

23  A.   Yes.

24  Q.   With regard to this description that you gave, on the

25  scene on May 27 after the police arrived, you described the

G. Haile - Cross

664

1    person who had robbed you as a black male, isn't that right?

2    A.   I don't exactly recall what I told him, but what I am

3    hundred percent sure about the person is this is the person

4    that robbed me, that's here in the courtroom this time.  I do

5    remember him, I--

6    Q.   Let me stop you because my question was very simple and I

7    am sorry to interrupt.

8         But my question was, isn't that true that on the

9    scene on May 27, minutes after you had been robbed, you told a

10   police officer that the man who had robbed you was a black

11   male.

12   A.   I told him he either he could be black, Hispanic or

13   Middle Eastern.

14   Q.   Let me go over that with you one more time.

15   A.   Okay.

16   Q.   I understand that you are telling me that you told the

17   police officer that the person who robbed you could have been

18   black, correct?

19   A.   Could have been, yes.

20   Q.   And could have been Hispanic?

21   A.   Yeah.

22   Q.   Those are two things that you remember telling the police

23   officer?

24   A.   Could have been Middle Eastern.

25   Q.   Okay.  Well, let me ask that question specifically.  Do

G. Haile - Cross

665

1    you remember telling Officer Lion that the man who robbed you

2    could have been Middle Eastern?

3    A.    Exactly at that point I will remember the two, that he

4    could be Hispanic or black, but that one is in my mind.  I

5    don't recall exactly I tell him that time.

6    Q.    Let me be clear.

7    A.    Okay.

8    Q.    You remember telling Officer Lion, who was the first

9    officer on the scene, that the person who robbed you could

10   have been black or Hispanic, isn't that right?

11   A.    I think, yes.

12   Q.    Okay.  Now, four days later you met with Detective

13   Hickman, correct?

14   A.    Yes.

15   Q.    And you met with him at the Alexandria police station?

16   A.    Yes.

17   Q.    And he explained to you that he was now in charge of the

18   case?

19   A.    Yes.

20   Q.    And that he was going to investigate it, right?

21   A.    Yeah.

22   Q.    And you had had the opportunity to rest, it was four days

23   later, right?

24   A.    Yes.

25   Q.    So, you had had four days to recover and think about what

G. Haile - Cross

666

1    had happened, is that right?

2    A.   Right.

3    Q.   And when you came in, he asked you to tell him what

4    happened and you did that?

5    A.   Yes.

6    Q.   Isn't it true that at the police station on May 31 you

7    told Detective Hickman that the person who robbed you could

8    have been Hispanic, isn't that right?

9    A.   I told him.

10   Q.   Okay.  And for the first time after Detective Hickman

11   suggested it was a possibility, you told him that maybe he

12   could have been Middle Eastern?

13   A.   Is not suggestion, is what I remember from my

14   recollection.

15   Q.   My question is this.  Didn't Detective Hickman ask you

16   whether or not it was possible that the person who robbed you

17   could have been Middle Eastern?

18   A.   Yes, yes.

19   Q.   Now, the following day Detective Hickman asked you to

20   come back and he showed you several photographs, correct?

21   A.   Yes.

22   Q.   And he explained to you that the purpose of this photo

23   array was to try to identify the person who had robbed you, is

24   that right?

25   A.   Yes, right.

G. Haile - Cross

667

1    Q.   All right.  And he showed you six separate photographs?

2    A.   Right.

3    Q.   One at a time?

4    A.   Yes.

5    Q.   And the first one he showed you thought looked somewhat

6    close to the person who robbed you, isn't that right?

7    A.   I don't remember which one, but one, one of out of the

8    remaining five, I was not sure about that.

9    Q.   So, one of them looked somewhat close?

10   A.   Somewhat.

11   Q.   And then you looked at a couple more and you identified

12   another photograph and you thought that was the person, is

13   that right?

14   A.   Yes.

15   Q.   So, there were two photographs that you thought looked

16   like the person who robbed you, isn't that right?

17   A.   Yes.

18   Q.   Okay.  And later on when you testified about this at the

19   preliminary hearing in August of 2007, you testified that

20   those two photographs looked sort of like brothers to you?

21   A.   No.

22   Q.   You don't recall testifying in the preliminary hearing?

23   A.   What I remember saying, that those two photos at a glance

24   look similar, but when you take, took a look, serious look,

25   then they are different.

G. Haile - Cross

668

1    Q.    You testified on direct that you recall being in court on

2    August 18, 2007, is that correct?

3    A.    Yes.

4    Q.    Okay.  And you remember you were placed under oath?

5    A.    Yes.

6    Q.    And you understood that this was a very important

7    hearing, correct?

8    A.    Yes.

9    Q.    And that you had to tell the truth?

10   A.    Yes.

11   Q.    And that you answered all of the questions that were

12   asked of you by the lawyers, is that right?

13   A.    Yes, to the best of my ability.

14   Q.    Isn't it true that when you were asked this question--

15   Well, let me start by simply asking you the question and

16   asking if you recall this.

17          Isn't it true if you recall this question:  Do you

18   recall why you were, in regard to the picture that you said it

19   looked somewhat like the individual, do you recall why you

20   said that?

21          That's the question that was asked of you.  The

22   answer:  Some people look alike or have brothers, that's what

23   I mean by that time.

24          Do you remember giving that answer?

25   A.    One more time for the answer, please.

G. Haile - Cross

669

1  Q.   Sure.  The question was:  Do you recall why you were, in

2  regard to the picture that you said it looked somewhat like

3  the individual, do you recall why you said that?  Answer:

4  Some people look alike or have brothers, that's what I mean by

5  that time.

6            Isn't that your answer?

7  A.   I am not quite sure on the answer.  I don't recall

8  exactly what I said at that time.

9  Q.   You recall that several months after you testified in the

10  preliminary hearing you testified at a state trial?

11  A.   Yes.

12  Q.   Okay.  And that was in the Alexandria Circuit Court,

13  correct?

14  A.   Right.

15  Q.   And at that time you were also asked about the

16  description that you gave regarding the person who robbed you?

17  A.   Yes.

18  Q.   Isn't it true that at that time under oath you testified

19  that the person who robbed you could have been black, Hispanic

20  or Asian?

21  A.   I don't recall that I said Asian because he don't look

22  like Asian.

23  Q.   Do you remember testifying in the Alexandria Circuit

24  Court?

25  A.   Yes.

1    Q.    And do you remember being placed under oath?

2    A.    Yes.

3    Q.    And do you remember doing your best to tell the truth?

4    A.    Yes.

5    Q.    And do you remember being asked questions by the lawyers?

6    A.    Yes.

7    Q.    Do you remember giving this answer:  I just said that he

8    was not white, he is a light skinned person, black or Hispanic

9    or Asian.

10            Didn't you say that?

11   A.    Yes, I said this.  I mean, I want to explain this part.

12            THE COURT:  You just answer the questions and then

13   you will have another opportunity.

14   A.    Okay.

15   Q.    You also testified on direct that you identified Mr.

16   Mohamadi on those occasions in court, is that right?

17   A.    Yes.

18   Q.    Now, the Alexandria Circuit Court where you came in

19   August and in December of 2008 is somewhat like this court,

20   there are two tables, one for the Government lawyers and one

21   for the defense, is that right?

22   A.    Right.

23   Q.    And prior to testifying, you had also met with the

24   prosecutor in relation to the state case, correct?

25   A.    Yes.

G. Haile - Cross

671

1  Q.  To prepare your testimony, right?

2  A.  Yes.

3  Q.  And they had explained to you what would be asked of you,

4  right?

5  A.  I don't know.

6  Q.  They explained to you what would happen in court?

7  A.  Yes.

8  Q.  All right.  And you knew that Mr. Mohamadi would be

9  there, right?

10  A.  Yes, I know.

11  Q.  And you knew that Mr. Mohamadi had a lawyer, right?

12  A.  Yes.

13  Q.  And you knew that he would be sitting with his lawyer at

14  the defendant's table, didn't you?

15  A.  I know.

16  Q.  And when you identified him, you knew he was the person

17  that was not the lawyer, right?

18  A.  Yes.

19  Q.  In addition to the race of the person who robbed you, you

20  also gave information about every other aspect of the person

21  that you could think of, correct?

22  A.  Yes.

23  Q.  And immediately after you had been robbed on May 27, you

24  spoke to the police officers and tried to provide that

25  information too?

G. Haile - Cross

672

1   A.   Yes.

2   Q.   Right?

3   A.   Yes.

4   Q.   And on May 27 immediately after you had been robbed, you

5   could not identify the eye color of the person who robbed you,

6   right?

7   A.   Yeah.

8   Q.   And so, you could not say whether or not the person who

9   robbed you had blue eyes?

10  A.   I didn't.

11  Q.   Or brown eyes?

12  A.   I don't recall the eye at that time.

13  Q.   Or gray eyes?

14  A.   No.

15  Q.   You had no idea?

16  A.   I don't.

17  Q.   When you were first questioned by the police at the

18  scene, you also told them that the person had a light

19  complexion, isn't that right?

20  A.   Yes.

21  Q.   When you met with Detective Hickman four days later, you

22  told him that the person who robbed you had a dark complexion,

23  didn't you?

24  A.   That I told him his face is unshaved, that's way I mean,

25  that he is unshaved, the face looks darker.

G. Haile - Cross

673

1   Q.   You told Detective Hickman on May 31 that the person who

2   robbed you had a dark complexion, didn't you?

3   A.   The face looks darker, with the unshaved hair, that's

4   what I said.

5   Q.   Well, let me just make sure I am asking the right

6   question.

7   A.   Okay.

8   Q.   I'm asking about complexion.  And isn't it true that you

9   told Detective Hickman that his complexion was dark?

10  A.   No, light complexion.

11  Q.   Do you not recall telling him that, or are you telling me

12  that you did not tell him that?

13  A.   I recall that I said he light complexion with unshaved

14  hair on his face.

15  Q.   I'm sorry to keep asking the question, I just want to

16  make sure I am understanding you.  Are you saying you don't

17  remember what you said to Detective Hickman, or that you are

18  sure you did not say that he had a dark complexion?

19  A.   I don't exactly remember what I said to him.

20  Q.   Would it help you if I tried to refresh your

21  recollection?

22  A.   Okay.

23  Q.   I can give you his police department, would that help you

24  refresh your recollection, help you remember what you had told

25  him?

G. Haile - Cross

674

1    A.    Let me try.

2    Q.    Very good.  If I could, with the assistance of the Court

3    Security Officer, hand up this document.

4          I believe that's turned to the third page.  If I

5    could direct your attention to the bottom of the first

6    paragraph, the highlighted portion, I would ask you simply to

7    read it and then look up when you are finished.

8          Have you read it?

9    A.    Yes.

10   Q.    Does having read that refresh your recollection as to

11   what you told Detective Hickman?

12   A.    Yes.  What--

13   Q.    That was my only question, is whether or not you can now

14   remember what you told him?

15   A.    Yeah.

16   Q.    My question now is, didn't you tell him that the person

17   who robbed you had a dark complexion?

18   A.    My answer will be the face has hair on him, that's what I

19   mean by dark complexion that time.

20   Q.    I will ask the question one more time and we will talk

21   about the hair on the face afterwards.  My question now to you

22   is, having read Detective Hickman's report--

23         THE COURT:  I think he has answered your question

24   several times and you have tried to refresh his recollection.

25   He has given his answer.  Let's move on.

675

1          MR. NACHMANOFF:  Very good, Your Honor.

2     BY MR. NACHMANOFF: (Continuing)

3     Q.   When you first spoke to the police in the minutes after

4     the robbery on May 27, you told them that the person was bald

5     who had robbed you and had an unshaven face, is that correct?

6     A.   Right.

7     Q.   You did not at that time tell the police that he had a

8     beard, is that right?

9     A.   Unshaved, just not shaved.

10    Q.   You just said unshaved?

11    A.   Yeah.

12    Q.   When you testified at trial in December of 2008, you

13    testified that he had a beard or I believe you said barb at

14    the time?

15    A.   Everything, if it is unshaved, is some beard growing,

16    that's what it means.

17    Q.   Do you remember testifying in December of 2008?

18    A.   I do remember his face is unshaved altogether.

19    Q.   Do you remember saying under oath in December that he had

20    a barb.

21    A.   He--

22    Q.   Let me turn your attention--

23          THE COURT:  Do you understand what the word "barb"

24    means in this context?

25          THE WITNESS:  No.

G. Haile - Cross

676

1   BY MR. NACHMANOFF: (Continuing)

2   Q.   Let me read the question and see if you remember it and

3   the answer:  Could you please tell the good people of the jury

4   why you told Detective Hickman that the person who robbed had

5   a dark complexion?  Answer:  Because he had some kind of barb

6   on his face and it's not like the one I see right now here on

7   his face.

8           That's what you testified to.

9   A.   Yeah.

10          MR. WALUTES:  I'm sorry, Your Honor, was there a

11  question?  The least I heard some stuff was let into the

12  record, but I would object unless there is a question.

13          THE COURT:  Is there a question?

14  BY MR. NACHMANOFF: (Continuing)

15  Q.   The question is, that is what you testified to, I believe

16  the answer is yes.

17          THE COURT:  Isn't that a typo in the transcript?

18  Does anybody disagree that barb makes no sense at all and

19  that, I mean--

20          MR. NACHMANOFF:  Your Honor, I believe that barb

21  means beard.  I can ask that question directly, but I am not

22  sure whether it's a typo of if that is what was said--

23          THE COURT:  Please ask the question.

24          MR. NACHMANOFF:  Sure.

25  BY MR. NACHMANOFF: (Continuing)

G. Haile - Cross

677

1    Q.   Does the word that you used, "barb," refer to beard?

2    A.   Barb?  No, I don't know the word "barb."

3    Q.   Let me turn your attention--  Just to be clear and then

4    finish that point.  When you testified in state court that he

5    had some kind of barb on his face--

6            MR. WALUTES:  Your Honor, at this point it has been

7    asked too much.

8            THE COURT:  Let him finish the question.

9            MR. WALUTES:  Your Honor, if he is reading into the

10   record stuff that--  The witness has already said he doesn't

11   know what barb meant and he meant unshaven when he testified.

12           THE COURT:  Let's move on.  Let's move on.

13           MR. NACHMANOFF:  Yes, Your Honor.

14   BY MR. NACHMANOFF: (Continuing)

15   Q.   You testified that the gun that you saw on the night of

16   May 27 was black, is that correct?

17   A.   Yes.

18   Q.   But you can't give any other description of that gun, can

19   you?

20   A.   No.

21   Q.   With regard to your cab.  You testified on direct that

22   the person who robbed you had reached over and touched the

23   radio, is that correct?

24   A.   Right.

25   Q.   And you told the police everything in the cab that the

678

1    person who robbed you touched, isn't that right?

2    A.    Yes.

3    Q.    And they asked you about items in the cab that he may

4    have touched, is that right?

5    A.    Yes.

6    Q.    And you told the police officers that he had borrowed a

7    pen and paper, correct?

8    A.    Yes.

9    Q.    And that pen and paper were in the car?

10   A.    Yes.

11   Q.    At the time that you were robbed, correct?

12   A.    Yes.

13   Q.    And you pointed the pen and the paper out to the police,

14   right?

15   A.    Yes.

16   Q.    In fact, you identified photographs that showed the pen

17   and the paper in the cab, right?

18   A.    Some, he returned the pen, but the paper, that is not

19   one.  But he returned the pen, what I remember.  The paper he

20   took it.  And the one we saw, fell on the floor is part of

21   that paper.

22   Q.    After the robbery, the police let you take your cab,

23   isn't that right?

24   A.    Yes.

25   Q.    Okay.  And you took the cab home with you?

1    A.    Yes.

2    Q.    And you clean your cab regularly, don't you?

3    A.    Yes.

4    Q.    It's important to keep a clean cab?

5    A.    Yes.

6    Q.    So that customers will be comfortable in your cab?

7    A.    Right.

8    Q.    And you clean it on a regular basis?

9    A.    Yes.

10   Q.    And after the robbery, you cleaned your cab, didn't you?

11   A.    I take it to car wash.

12   Q.    And you cleaned the outside of it on the car wash?

13   A.    And they vacuumed the inside too.

14   Q.    And they vacuumed the inside as well?

15   A.    Yes.

16   Q.    Okay.  And that was done shortly after the robbery?

17   A.    Yes.

18   Q.    Now, you testified immediately after you were robbed

19   after the person ran away, you got out of the car and you

20   recovered the keys, is that right?

21   A.    Right.

22   Q.    And they were in a bush, is that right?

23   A.    Yes, yes.

24   Q.    And it was dark, wasn't it?

25   A.    There is some light out there, is not quite dark.

G. Haile - Cross

680

1   Q.   And it took you a little while to find the keys, right?

2   A.   Yes, a little bit.

3   Q.   So, after you had searched around in the bushes for the

4   keys, you then ran down to Reynolds Road, didn't you?

5   A.   Yes.

6   Q.   And you tried to find someone who could help, isn't that

7   right?

8   A.   Right.

9   Q.   And you found someone who lent you their cell phone, is

10  that right?

11  A.   Yes.

12  Q.   And that was a person that you had never met before,

13  right?

14  A.   Right.

15  Q.   And when you were interviewed by the police, you told

16  them as much as you could about the events that led to the

17  robbery, correct?

18  A.   Yes.

19  Q.   And one of the things you told the police is that you

20  told them that you called 911 from a friend's phone who lived

21  in the complex, isn't that right?

22  A.   Yes, I told them.

23  Q.   The Court's indulgence for a moment.

24          THE COURT:  Yes, sir.

25          MR. NACHMANOFF:  Just a couple more questions, Your

681

1    Honor.

2         THE COURT:  Yes, sir, go ahead.

3    BY MR. NACHMANOFF: (Continuing)

4    Q.   When you met with Detective Hickman on May 31, that was

5    the first time you met with Detective Hickman, correct?

6    A.   Yes.

7    Q.   And that was four days after the robbery?

8    A.   Right.

9    Q.   And you provided a description as best you could to

10   Detective Hickman, isn't that right?

11   A.   Yes.

12   Q.   And at that time you told Detective Hickman that the

13   person who robbed you had a Hispanic accent, isn't that right?

14   A.   He got some kind of accent.  I don't know exactly what

15   kind.

16   Q.   And you told Detective Hickman that it could have been a

17   Hispanic accent, didn't you?

18   A.   Yeah, I said that.

19        MR. NACHMANOFF:  No further questions.

20        THE COURT:  All right.  Redirect?

21        MR. WALUTES:  Yes, thank you, Your Honor.

22        REDIRECT EXAMINATION

23   BY MR. WALUTES:

24   Q.   Mr. Haile, Mr. Nachmanoff just asked you did you call 911

25   from a friend's phone who lived in the complex.  Do you

G. Haile - Redirect

682

1    remember him just asking you that question?

2    A.    Yes, I do remember.

3    Q.    Okay.  Could you explain that?

4    A.    Okay.  This is the thing.  We are on the same business,

5    he is a D.C. cab driver.  All we call each other friends.

6    Even if we rush, run for a fare, even we fight for a fare, I

7    tell you why we called friends.  Normally we ask for change if

8    passenger come out and we don't have change, we run somebody,

9    ask, please, friend.  So, right away we call each other

10   friend, that's the nature of the business.

11            That's how I said a friend.  And he told me he lives

12   there.

13   Q.    Okay.

14   A.    In that complex.

15   Q.    So, you described him as a friend, but prior to that day,

16   the day that you were robbed, had you met that man?

17   A.    I never met him.  I never met him.

18   Q.    Okay.  But when you are asked by the police afterwards,

19   you described him as a friend?

20   A.    A friend, yeah.

21   Q.    And that was because?

22   A.    Business, the same business.

23   Q.    You are in the same business?

24   A.    Yes.  And we use that language all the time in our

25   business.

G. Haile - Redirect

683

1   Q.   I am sorry.

2   A.   We use the friend, the word "friend," we refer to

3   whenever we ask for some kind of help.

4   Q.   So, in your experience, when you are speaking with other

5   people in the same business, taxicab driving in the District

6   of Columbia, it's your practice to refer to them as friends?

7   A.   Yes.

8   Q.   And when, if you are up short, even though you are

9   fighting for the same fares and you are all trying to make the

10  same money, when you run short on change you could turn to

11  another cab driver and seek change from him?

12  A.   Yes.

13          MR. NACHMANOFF:  Your Honor, this is asked and

14  answered.

15          THE COURT:  Yes, it is.  Let's move on to something

16  new.

17  BY MR. WALUTES: (Continuing)

18  Q.   Do you remember the questions Mr. Nachmanoff asked you to

19  begin with about your other job?

20  A.   Yes.

21  Q.   Are you nervous talking about your other job in this

22  courtroom?

23  A.   Yes.

24  Q.   Why are you nervous about talking about your other job?

25  A.   I want--

G. Haile - Redirect

684

1          MR. NACHMANOFF:  Objection.

2          THE COURT:  Sustained.

3   A.   I don't think--

4          MR. WALUTES:  Don't answer the question unless the

5   Court permits it.

6          THE COURT:  What's the relevance of this?

7          MR. WALUTES:  Your Honor, he spoke about--  The

8   question, as I recall, Mr. Nachmanoff asked a series of

9   questions about document processing and then legal, I think

10  leaves the impression that this man is somehow not legally

11  employed.

12         THE COURT:  You can ask that.  I didn't get that

13  impression--

14         MR. WALUTES:  My point, Your Honor, is perhaps why

15  this witness is perhaps not as clear as the witness could be--

16         THE COURT:  Well, you know where that's going.

17  What's the relevance of that?

18         MR. WALUTES:  I will try to take baby steps, if I

19  might, Your Honor.  I am sorry, Your Honor, with the Court's

20  permission.

21         THE COURT:  Go ahead.

22  BY MR. WALUTES: (Continuing)

23  Q.   Mr. Haile, are you present in the United States legally?

24  A.   Yes.

25  Q.   And do you have a Green Card?

G. Haile - Redirect

685

1   A.   Yes.

2   Q.   You said you had another job?

3   A.   Yes.

4   Q.   Okay.  Without telling us exactly who the employer is,

5   what other type of work do you do?

6   A.   I, that's a document processing, that's converting large

7   volume of documents into electronic format.  Like reference

8   books, it could be different kind of documents.

9            So, I don't want to state the type, but is big, per

10  like that we do the electronic processing, like scanning

11  documents and converting into electronic format.

12  Q.   And then you were asked a series of questions on

13  cross-examination about your job as a taxicab driver, do you

14  recall?

15  A.   Yes.

16  Q.   Okay.  When you hold yourself out in the community as a

17  taxicab driver, do you do a number of things?  Are you

18  licensed?

19  A.   Yes.

20  Q.   Do you maintain a clean cab?

21  A.   Yes.

22  Q.   Does it have to be a safe cab?

23  A.   Yes.

24  Q.   At that time back in 2007, was it inspected to make sure

25  it was a safe cab by the District of Columbia?

G. Haile - Redirect

686

1    A.   Inspection is done every six months, but I don't know

2    that time--  Always I drive inspected car.

3    Q.   You ensure that you have an inspected car?

4    A.   Yes.

5    Q.   Do you also keep supplies such as receipts I think you

6    mentioned in your cab?

7    A.   Yes.

8    Q.   And at least on this occasion you actually allowed your

9    cell phone to be utilized by a customer at their request?

10   A.   Yes.

11   Q.   You understood this to be a business?

12   A.   Yes.

13   Q.   It's how you earn your income or at least how you

14   supplement your income?

15   A.   Yes.

16   Q.   Then Mr. Nachmanoff asked you a series of questions about

17   people's race, do you remember that, Asian, Middle Eastern,

18   Hispanic and black?

19   A.   Okay.

20   Q.   You have to say yes or no?

21   A.   Yes, I am sorry.

22   Q.   Okay.  But the first person, before you came into a

23   courtroom and before you ever saw a police officer in front of

24   you, who is the first person who asked you to describe the

25   person who had just robbed you?

G. Haile - Redirect

687

1   A.   The 911.

2   Q.   Okay.  And do you recall when the 911 operator asked you

3   was the guy black, white or Hispanic, what was your answer, do

4   you remember?

5   A.   I said he was from Afghan.

6   Q.   From Afghan?

7   A.   Yes.

8   Q.   And then do you remember when you were immediately then

9   asked what was he wearing?

10  A.   Yes.

11  Q.   And do you remember what you told them the first time

12  that question was asked just after running to the street to

13  look for help?

14  A.   It's a white shirt.

15  Q.   A white shirt?

16  A.   A white shirt.

17  Q.   Okay.  And then do you recall her saying what color, and

18  then do you remember what you said?

19  A.   That moment I can't have words to explain what color it

20  is.

21  Q.   But I want to actually be clear on this, Mr. Haile, it is

22  important.  Do you still have the transcript of the 911 tape

23  in front of you?

24  A.   I don't have it right now.

25  Q.   If I could ask you to look at it and see page 3.

G. Haile - Redirect

688

1          Do you see page 3, line 26, where it says,

2     dispatcher is asking you what color the T-shirt is.

3     A.   What line is it?

4     Q.   Line 16.  Line 15 you say:  Just T-shirt.  And the

5     dispatcher then says:  What color?

6     A.   White color, yes.

7     Q.   What do you then say?

8     A.   I say I don't know the front.

9     Q.   Okay, I'm sorry.  Can you read the exact line.  The exact

10    words are important.

11          Do you see line 17, your answer?  And when she says,

12    what color, what do you say.

13    A.   I say white color.  And I don't remember the pattern.

14    Q.   What?

15    A.   The pattern, I couldn't--

16    Q.   The white T-shirt had a pattern?

17    A.   Yes, it has a pattern on it, but I don't remember at that

18    time.

19    Q.   And then do you give her any more description about the

20    person who had just robbed you?

21    A.   Yes, I told her he is bald.

22    Q.   Now, you didn't know what country he was from, you just

23    knew that he had told you what country?

24    A.   Yes.

25          MR. NACHMANOFF:  Objection, leading, Your Honor.

G. Haile - Redirect

689

1              THE COURT:  Sustained.

2    BY MR. WALUTES: (Continuing)

3    Q.   When you are shown pictures, did you get to put--  Do you

4    remember there were six photographs or you don't remember?

5    A.   I remember.

6    Q.   Okay.  Did they show them to you one at a time or at all

7    once?

8    A.   One at a time.

9    Q.   The first picture, do you remember what exactly you say

10   to the first picture?

11   A.   I just--

12   Q.   Did you sign a sheet when you were looking at the

13   photographs?

14   A.   Yes, I signed the sheet.

15   Q.   If I could ask you to look at that again, Mr. Haile, I

16   think that is marked as Government's Exhibit No. 4C.

17              Did you see that exhibit when you were testifying

18   before lunch?  Do you see that?

19   A.   Yes.

20   Q.   Okay.  Actually, Your Honor, if I could publish this at

21   this point so it is not a closed conversation between the

22   witness and the person asking the question.

23              THE COURT:  Any objection?

24              MR. NACHMANOFF:  No, Your Honor.

25              THE COURT:  All right.  4C is received and it will

G. Haile - Redirect

690

1    be published.

2    BY MR. WALUTES: (Continuing)

3    Q.   Okay.  You are seeing the pictures one at a time, Mr.

4    Haile?

5    A.   Yes.

6    Q.   Okay.  Picture 1, which I think on this is marked as A1,

7    do you see that?

8    A.   Yes.

9    Q.   Okay.  And what is checked for your response as to that

10   one?

11   A.   Yeah, it was, is not that one, I say no.

12   Q.   Do you say no or do you say not sure?

13   A.   No, the first one, no.

14   Q.   Are you looking at the same piece of paper that I am, Mr.

15   Haile?  Do you see the three where it says in the middle,

16   check one, and it says, yes, no, not sure?

17   A.   Yes.

18   Q.   Do you see the number 1, A1, sequence 1, first photo, do

19   you see what it says next to that?

20   A.   All say no except the third one, it says yes.

21   Q.   I see that.  But do all the other ones actually say no,

22   or does one of them say not sure?

23   A.   All say no.

24   Q.   If you could take your time, Mr. Haile, and look at each

25   of them.  No, just stick to that one page.  Are you looking

691

1    at-- I'm sorry, I think you've been given the wrong exhibit.

2    Are you looking at the one you signed?

3    A.   Okay, yeah, I looked some other page.

4    Q.   I understand that.  Can we turn to your exhibit, not

5    another person's exhibit.

6    A.   Okay.

7    Q.   Now, do you see the one where you signed that exhibit?

8    A.   Yes.

9    Q.   Okay.  Now that we are all looking at the same thing, do

10   you see the screen to the left of you, does that match what

11   you are looking at?

12   A.   Yes.

13   Q.   Okay.  Now, can you explain on the first photograph, what

14   do you say?

15   A.   I say I am not sure, I am not sure about this picture.

16   Q.   Okay.  And you hadn't seen the other five pictures yet?

17   A.   Not yet.

18   Q.   Okay.  The second picture, what do you say?

19   A.   Is not, that not the guy.

20   Q.   The third picture, what do you say?

21   A.   I say yes.

22   Q.   Did you actually sign that?  Is that your signature?

23   A.   Yes, that's my signature.

24            MR. NACHMANOFF:  Your Honor, I object to the leading

25   and the repetition of what was covered on direct.

G. Haile - Redirect

692

1          THE COURT:  Well, I will sustain the objection as to

2     leading.

3     BY MR. WALUTES: (Continuing)

4     Q.   And then they actually insist, or do they make you look

5     at the other three pictures?

6     A.   Yes.

7     Q.   Okay.  And do you respond to those?

8     A.   Yes.

9     Q.   What do you respond?

10    A.   The rest are no, not the one who robbed me.

11    Q.   And you have come into a courtroom now three times, is

12    that correct?

13    A.   Yes.

14    Q.   And have you been able to identify the person who robbed

15    you?

16    A.   Yes.

17    Q.   Has there been any doubt?

18    A.   No.

19    Q.   If you had come into the courtroom and the man was not

20    there, would you have identified him?

21          MR. NACHMANOFF:  Objection.

22    A.   No.

23          THE COURT:  Sustained.

24          MR. NACHMANOFF:  I ask that that be stricken, the

25    answer.

693

1                THE COURT:  That will be stricken.

2    BY MR. WALUTES:  (Continuing)

3    Q.   Do you remember how Mr. Nachmanoff asked you in the state

4    trial if you remembered saying, telling a detective that the

5    person was light skinned, black or Hispanic or Asian?

6    A.   Yes.

7    Q.   Okay.  What did you mean?

8    A.   Okay.  Here when I say Asian, I don't mean like he is

9    from Chinese, Japanese or Vietnam, it's not that.  All except

10   other countries.  No person, it doesn't look like people from

11   those countries.

12   Q.   Why have you kept coming back to court so many times, Mr.

13   Haile?

14                MR. NACHMANOFF:  Objection.

15                MR. WALUTES:  I have no further questions.

16                THE COURT:  Sustained, it's not relevant.

17                All right.  All right, may Mr. Haile be excused?

18                MR. WALUTES:  Yes, Your Honor.

19                THE COURT:  All right.  You are excused with our

20   thanks, sir.  Please don't discuss your testimony with anyone

21   until the trial is over.  You are free to go.

22                NOTE:  The witness stood down.

23                THE COURT:  Next witness.

24                MR. WALUTES:  Your Honor, the Government would like

25   to do two witnesses from June 12 of 2007.  This evidence is

694

1    being offered for a limited purpose, and I didn't know--  The

2    first, Your Honor is Andrew Schap, I believe is his name.

3              THE COURT:  Let's approach the bench.  I am not sure

4    what is going on here.

5              MR. WALUTES:  I am sorry, Your Honor, we had a

6    special proceeding about--

7              MS. MINTER:  If we could approach, please.

8              THE COURT:  Yes.

9              NOTE:  A side-bar discussion is had between the

10   Court and counsel out of the hearing of the jury as follows:

11   AT SIDE BAR

12             THE COURT:  I am sorry.

13             MR. WALUTES:  This is the gun, Your Honor.

14             THE COURT:  This is the gun.  Okay.

15             MR. WALUTES:  This would be on June 12, in the

16   District of Columbia.  And the first one is the civilian

17   witness.  I told him ahead of time not to say the gun was

18   pointed to him.

19             But I am going to ask for the Court's assistance if

20   they cross him and say, you don't remember him well.  Because

21   he says, you don't forget people who points a gun at you.  But

22   I know the Court has made some comments on that, I don't think

23   they are contesting it.  He knows the defendant quite well.

24             But he is going to come in and say that I saw the

25   defendant with a gun on June 12, I saw it dropped in front of

695

1    Camelot and I maintain security.

2              And Officer Paige will come in here and say, I

3    recovered that gun.  She has also been told not to talk about

4    the stripper, not to talk about the taxicabs, and to focus her

5    attention only on the recovery of the weapon.  That's all that

6    is being offered here.

7              THE COURT:  Okay.

8              THE DEFENDANT:  How is it being tied to me though?

9              THE COURT:  Excuse me?

10             THE DEFENDANT:  How is it going to be tied to me?

11             THE COURT:  He is going to identify you perhaps here

12   in the courtroom.

13             THE DEFENDANT:  Anybody can come in--

14             MS. MINTER:  At this point we would object to the

15   admission of the June 12 testimony, period.  There has been

16   nothing from either Ms. Riley or Mr. Haile that says that gun

17   that was recovered is the gun, looks like the gun, has any

18   relation to the gun.

19             I mean, in theory, probably over half the guns in

20   the world fit the description that they have given.

21             We would submit at this point it is irrelevant

22   because there is no connection, other than a vague general

23   description to Ms. Riley's testimony or, excuse me, Mr.

24   Haile's testimony or Ms. Riley's testimony.

25             THE COURT:  I think it's relevant.  And I think it's

A. Schap - Direct

696

1    probative.  And I think your objection goes to the weight.

2    And you certainly may argue that it's not the same gun.  But

3    to have testimony that Mr. Mohamadi is in possession of a gun

4    described very specifically by Ms. Riley as the weapon used I

5    think is, as I have ruled previously, sufficient.

6              MS. MINTER:  If the Court would note our objection,

7    please.

8              THE COURT:  Certainly.  All right.

9              NOTE:  The side-bar discussion is concluded;

10   whereupon the case continues before the jury as follows:

11   BEFORE THE JURY

12             NOTE:  The witness is sworn.

13             MR. WALUTES:  May I proceed, Your Honor.

14             THE COURT:  Yes, sir.

15             ANDREW SCHAP, called by counsel for the United

16   States, first being duly sworn, testifies and states:

17        DIRECT EXAMINATION

18   BY MR. WALUTES:

19   Q.   Good afternoon, sir.  Good afternoon, sir.  Can you give

20   us your full name.

21   A.   Andrew Schap.

22   Q.   And, Mr. Schap, did you have occasion to be working in

23   the District of Columbia back on June 12 of 2007?

24   A.   Yes, sir.

25   Q.   Okay.  Could you tell the ladies and gentlemen of this

1    trial jury how you were then employed?

2    A.    I was head of security at Ozio Nightclub.

3    Q.    Just for people who may not be familiar with the District

4    of Columbia, could you tell them where Ozio Nightclub is

5    located?

6    A.    It's at 18th and M Street, Northwest, D.C.

7    Q.    And is there an establishment a couple doors now that

8    ended up becoming relevant that night?

9    A.    I'm sorry?

10   Q.    Is there a nightclub a couple doors down from you that

11   became relevant later that night?

12   A.    Camelot's.

13   Q.    And Camelot's is another club in the District of

14   Columbia?

15   A.    Yes.

16   Q.    On that night, June 12 of 2007, did you have occasion to

17   see someone in the courtroom today that you saw that night?

18   A.    Yes.

19   Q.    Okay.  How long had you known that person?  At that point

20   how long had you interacted with them?

21   A.    I didn't know him personally, but I had been seeing him

22   come to the clubs for about the last year-and-a-half to two

23   years before that.

24   Q.    Did you know their name?

25   A.    He went by Omar.

A. Schap - Direct

698

1    Q.    I'm sorry?

2    A.    He went by Omar.

3    Q.    Okay.  And did you actually speak to him on occasion

4    during that year-and-a-half, two years?

5    A.    Yes, sir.

6    Q.    And how many times would you say, would you describe your

7    contact with him over those two years?

8    A.    No problems, actually seemed like a half-way nice guy.

9    Q.    I am actually look for the frequency.  Would it be

10   monthly, couple times a year, or more frequent than that?

11   A.    At least probably once a month or so.

12   Q.    And on that night did you have occasion to speak with the

13   person named Omar?

14   A.    Yes, sir.

15   Q.    And what, if anything, did--  Did he come to your

16   establishment?

17   A.    Yes.

18   Q.    Did there come a point when he was asked to leave your

19   establishment?

20   A.    Yes.

21   Q.    Did you have occasion to speak with him?

22   A.    Yes.

23   Q.    Do you see that individual in the courtroom today?

24   A.    Yes, I do.

25   Q.    Could you identify him by location and an article of

A. Schap - Direct

699

1    clothing so that we can be sure that we are speaking of the

2    same person?

3    A.    Sitting in the blue sweater right here.

4          THE COURT:  I will note the identification of Mr.

5    Mohamadi.

6    Q.    Thank you, sir.  At that time did you see him come back

7    to that area on June 12 of 2007?

8    A.    I am not sure of the actual date, but, yes, the same

9    night we actually had to tell him to leave our club.  And he

10   did come back later.

11   Q.    At that time did you see him in possession of something?

12   A.    Yes.

13   Q.    What did you see him in possession of?

14   A.    He had a firearm.

15   Q.    Okay.  At some point was that firearm dropped?

16   A.    Yes.

17   Q.    Okay.  And did you have occasion to do anything in

18   relationship with that firearm until the police got there?

19   A.    Just keep the people away from it until the police could

20   get to it.

21   Q.    Because you were the still security guard for the

22   nightclub?

23   A.    I am sorry?

24   Q.    You were at that point security for Ozio's up the street?

25   A.    We had just closed, and it all happened in front of our

A. Schap - Cross

700

1   place and the two doors down at Camelot's, and the incident

2   happened out in the street.  So, technically, I was still

3   working, yes.

4   Q.   Okay.  And at some point did the police come and take

5   that gun?

6   A.   Yes, sir.

7           MR. WALUTES:  Your Honor, I have no further

8   questions of this witness.

9           THE COURT:  All right.  Cross-examination.

10          MS. MINTER:  The Court's indulgence, please.

11      CROSS EXAMINATION

12  BY MS. MINTER:

13  Q.   Mr. Schap, is it?

14  A.   Yes, ma'am.

15  Q.   You said that you work at Ozio, correct?

16  A.   Yes, I did.

17  Q.   You did.  You no longer do?

18  A.   No.

19  Q.   But you did in June of 2007?

20  A.   Yes.

21  Q.   Okay.  And how long had you been working there at that

22  time?

23  A.   About seven-and-a-half years.

24  Q.   Okay.  So, you are familiar with the facility?

25  A.   Sure.

A. Schap - Cross

701

1   Q.   Okay.  And that particular bar has security cameras?

2   A.   Yes, it does.

3   Q.   And the individual that you described as Omar, you said

4   that you had seen that individual at your establishment?

5   A.   Couple times that night.

6   Q.   Okay.  But you wouldn't consider yourself friends with

7   him?

8   A.   No.  I just know him from the clubs.

9   Q.   You don't spend time with him outside of Ozio?

10  A.   No, ma'am.

11  Q.   Not related to him?

12  A.   No, ma'am.

13           MS. MINTER:  The Court's indulgence.

14           Nothing further, Your Honor.

15           THE COURT:  All right.  May Mr. Schap be excused?

16           MR. WALUTES:  He may, Your Honor.

17           THE COURT:  All right.  You are excused at this

18  time, Mr. Schap.  Please don't discuss your testimony that you

19  have given here with anyone until the trial is over.  All

20  right.  Have a good afternoon.

21           THE WITNESS:  Yes, sir.  Thank you.

22           NOTE:  The witness stood down.

23           THE COURT:  All right, next witness.

24           MR. WALUTES:  Your Honor, the Government would call

25  Officer Holly Paige from the Metropolitan Police Department.

H. Paige - Direct

702

1          NOTE:  The witness is sworn.

2          HOLLY PAIGE, called by counsel for the United

3    States, first being duly sworn, testifies and states:

4          DIRECT EXAMINATION

5    BY MR. WALUTES:

6    Q.   Good afternoon, Officer.

7    A.   Good afternoon.

8    Q.   Could you please tell us your name.

9    A.   My name is Holly Paige.  P-a-i-g-e.

10   Q.   And how are you currently employed?

11   A.   I am employed with the Metropolitan Police Department,

12   Fifth District, Washington, D.C.

13   Q.   And for people who may not be familiar with the way the

14   District of Columbia is broken into districts, what part would

15   the Fifth District cover?

16   A.   Northeast D.C.

17   Q.   And how long have you been a member of the Metropolitan

18   Police Department?

19   A.   I have been employed since March 26 of 2001.

20   Q.   If I could direct your attention back to June 12 of 2007,

21   and ask what your duty assignment was at that time?

22   A.   I was on the midnight patrol, and I was assigned to the

23   Crime Scene Examination section.

24   Q.   And what does the Crime Scene Examination section do?

25   A.   We respond to different types of crime scenes,

703

1   photograph, prints, collect evidence, preserve evidence,

2   submit evidence.

3   Q.   And then if I can direct your attention to Tuesday,

4   June 12 of 2007 in front of an establishment called Camelot's

5   at 1827 M Street, Northwest.

6        Did you have an occasion to go there to recover a

7   piece of evidence?

8   A.   Yes, I did.

9   Q.   Prior to recovering it, did you have occasion to

10  photograph it?

11  A.   Yes, I did.

12       MS. MINTER:  I would object to the leading at this

13  point, Your Honor.  I think the preliminary questions have

14  been asked.

15       THE COURT:  Sustained.  Let's ask nonleading

16  questions.

17  BY MR. WALUTES: (Continuing)

18  Q.   If you could look at what is now marked as Government's

19  Exhibit's 33A through E, Officer Paige, and ask you if you

20  recognize those.  It is kind of bulky.

21       33A, though I think you are on the wrong page.  It

22  is not going to be a disk.  It should be an eight by 11.  33A.

23  A.   Yes, I took this photograph.

24  Q.   Could you actually look at all of them.  If we could, I

25  would like to--  Are they fair and accurate?

704

1    A.   Yes.

2    Q.   And you took them on June 12 of 2007 when you showed up

3    on the scene?

4    A.   Correct.

5         MR. WALUTES:  Your Honor, I would move the admission

6    of Government's Exhibit 33A through E at this time.

7         THE COURT:  Any objection?

8         MS. MINTER:  No objection, Your Honor.

9         THE COURT:  They will be received.

10        MR. WALUTES:  And if I could ask to publish them at

11   this time, Your Honor.

12        THE COURT:  Okay.

13   BY MR. WALUTES: (Continuing)

14   Q.   If we do it one at time.  Officer Paige, what is

15   Government's Exhibit 33A a photograph of?

16   A.   That's the photograph of the Camelot Club.

17   Q.   Okay.  And 33B?

18   A.   That's the location of a shattered window.

19   Q.   Okay.  But do you actually see a weapon in this picture?

20   A.   Oh, yes, sir.

21   Q.   Okay.  And can you, with your finger--  As the technology

22   works, there is a little screen to the left of you.  If you

23   are careful, can you actually touch it with your finger and

24   see if you can emphasize for us where the firearm is.

25        Okay, thank you.

H. Paige - Direct

705

1           And if you could now look at 33C and D.

2   A.    That's a close-up of the weapon.

3   Q.    And D?

4   A.    That's also a close-up of the weapon.

5   Q.    And then if you could look at the last one, 33E, and the

6   tell us what that is.

7   A.    That's a photograph of the weapon, the magazine and the

8   ammunition.

9   Q.    What type of weapon is that?

10  A.    That's a Bryco Firearms .380 auto.

11  Q.    It's a .380?

12  A.    Yes.

13  Q.    And what color is it?

14  A.    It is black.

15  Q.    If I could ask you now to look at what is now marked as

16  Government's Exhibit 58.

17  A.    This is the weapon I recovered that evening.

18  Q.    Okay.  And just to be clear, the weapon has now been

19  disabled, it has a plastic handcuff through it so it can no

20  longer work?

21  A.    Yes.

22  Q.    Okay.  But when you picked it up in the District of

23  Columbia on June 12 of 2007, I assume it didn't have the

24  plastic handcuff?

25  A.    No, it did not.

H. Paige - Direct

706

1   Q.   It has just been made safe now for the courtroom?

2   A.   Yes.

3   Q.   Other than the plastic handcuff though, that is the

4   weapon that was recovered from the District of Columbia on

5   June 12, 2007?

6   A.   Yes.

7   Q.   And how do you recognize it?

8   A.   I recognize it by my name that is printed on the receipt,

9   as well as the address, the date, and the Crime Scene

10  Examination section numbers.

11  Q.   Okay.  And did you process that weapon?  You can put it

12  down now.

13  A.   Yes, I did.

14  Q.   And can you tell the ladies and gentlemen of this trial

15  jury what, if anything, you did with that weapon?

16  A.   After I recovered that weapon, I took it back to the

17  office to process it for the presence of latent prints.

18  Q.   Why do you that in the your office as opposed to on the

19  street at whatever time it was?

20  A.   I took it back to the office because it is a more

21  controlled environment than outside say maybe on the back of a

22  car or something like that.  It is more controlled.

23  Q.   And were you able to pull up any prints?

24  A.   Yes, I did, I recovered one print.

25  Q.   Was that print usable?

H. Paige - Cross

707

1    A.   No, sir.

2    Q.   Were you able to pull up any other prints?

3    A.   No.

4    Q.   Did that surprise you?

5    A.   No.

6    Q.   Why not?

7    A.   It's very difficult to recover fingerprints from a

8    weapon.

9    Q.   And in your time, how many weapons would you estimate

10   that you have recovered from the streets?

11   A.   I have recovered hundreds of weapons from the streets of

12   the District of Columbia.

13   Q.   And do you frequently get fingerprints off firearms in

14   your personal experience?

15   A.   No.

16        MR. WALUTES:  Those are all the questions I have,

17   Your Honor.  Thank you.

18        Thank you, Officer Paige.

19        THE COURT:  Cross-examination.

20   CROSS EXAMINATION

21   BY MS. MINTER:

22   Q.   Ms. Paige, you testified that you took those pictures

23   outside Camelot, correct?

24   A.   Correct.

25   Q.   All of the pictures?

H. Paige - Cross

708

1    A.    Yes.

2    Q.    Okay.  And the picture that depicts a firearm laying on

3    the ground sort of to the back end of a car, that would be

4    Government's 33B, that depicts how you found the firearm?

5    A.    Correct.

6    Q.    Okay.  And that's exactly what you saw when you arrived,

7    I assume?

8    A.    Yes.

9    Q.    So, you never saw anyone touch the gun?

10   A.    No.

11   Q.    Never saw anyone hold the gun?

12   A.    No.

13   Q.    Okay.  And you have testified that you processed the gun

14   back at your lab or office?

15   A.    Correct.

16   Q.    Okay.  And I assume you did so carefully?

17   A.    Correct.

18   Q.    Okay.  Because you were looking to see if there were any

19   fingerprints?

20   A.    Correct.

21   Q.    Okay.  And after looking carefully, you found just the

22   one?

23   A.    Correct.

24   Q.    And that one was not usable to identify to anyone?

25   A.    Correct.

H. Paige - Cross

709

1  Q.   You testified that you have recovered hundreds of

2  firearms?

3  A.   Yes.

4  Q.   In the District of Columbia?

5  A.   Yes.

6  Q.   All sorts of firearms, or just handguns?

7  A.   All sorts of firearms, ma'am.

8  Q.   But handguns as well?

9  A.   Yes.

10  Q.   Many, I assume?

11  A.   Yes.

12  Q.   Probably hundreds of handguns?

13  A.   Correct.

14  Q.   Not just handguns?

15  A.   Yes.

16  Q.   So, you are familiar with all types of handguns?

17  A.   Correct.

18  Q.   Okay.  And there are handguns that are larger than the

19  handgun you recovered on June 12, correct?

20  A.   Yes.

21  Q.   That's a fairly small handgun?

22  A.   Yes.

23         MS. MINTER:  The Court's indulgence, Your Honor.

24         THE COURT:  Yes, ma'am.

25         MS. MINTER:  Nothing further, Your Honor.

710

1          THE COURT:  Thank you.  May the officer be excused?

2          MR. WALUTES:  Yes, Your Honor.

3          THE COURT:  All right, Officer Paige, you are

4    excused with our thanks.  Please don't discuss your testimony

5    until our trial is over.

6          NOTE:  The witness stood down.

7          THE COURT:  Ladies and gentlemen, you have heard

8    evidence about this weapon having been recovered on June 12.

9    I want you to understand that Mr. Mohamadi is not charged with

10   the offense of possession of a weapon on that date and you

11   must not consider it as such.  It is just offered for the

12   relevance that it may have as you will determine as to the

13   events that he is charged with.  It is not a separate offense

14   and you must not consider it in that fashion.

15         Thank you.

16         All right, next witness.

17         MR. BEN'ARY:  Your Honor, Silvia Escamilla.

18         NOTE:  The witness is sworn.

19         MR. BEN'ARY:  May I proceed, Your Honor?

20         THE COURT:  Go ahead.

21         Silvia ESCAMILLA, called by counsel for the United

22   States, first being duly sworn, testifies and states:

23      DIRECT EXAMINATION

24   BY MR. BEN'ARY:

25   Q.   Good afternoon, ma'am.

711

1    A.    Good afternoon.

2    Q.    Would you tell the members of the jury, please, your name

3    and what you do for work?

4    A.    My name is Silvia Escamilla.  And I am a business

5    director.

6    Q.    Okay.  And in the past have you worked in a legal office?

7    A.    That is correct.

8    Q.    Where did you work, would you tell the members of the

9    jury, please?

10   A.    I worked for the Love law firm.  And within there, Mr.

11   Brown's office.

12   Q.    And where is that located?

13   A.    In Alexandria, Virginia.

14   Q.    And can you tell the members of the jury what you did for

15   that law office?

16   A.    I was basically a legal secretary, minimal office work,

17   and office manager.

18   Q.    Okay.  Did you have as part of your job with that law

19   office telephone conversations with an individual that you

20   knew as Omar?

21   A.    Yes.

22   Q.    Did you ever meet Omar in person?

23   A.    No, I did not.

24   Q.    Do you know through your experiences there with the law

25   firm what Omar's full name was?

712

1    A.    Mirwais Mohamadi.

2    Q.    And how did you begin to have conversations over the

3    telephone with Mr. Mohamadi?

4    A.    Mr. Mohamadi was a client of the office.  And he would

5    call, obviously, to speak with his lawyer.  As well as one

6    time he called trying to get in touch with his mother who was

7    supposed to drop off payment to his lawyer.

8    Q.    And where was Mr. Mohamadi while these phone calls were

9    happening?

10   A.    In the Fairfax County Adult Detention Center.

11   Q.    And did he ask at some point for your assistance in

12   connecting calls to his mother?

13   A.    Yes, he did.  He had been trying to reach her a couple of

14   times, and I kind of felt bad, so I went ahead and did a call

15   for him to be able to call his mother.

16   Q.    Okay.  And was that the only time that you helped Mr.

17   Mohamadi connect calls through Mr. Brown's office with other

18   individuals?

19   A.    No, it was not.

20   Q.    How did that come to pass that you were connecting other

21   calls?

22   A.    Initially it was--

23              MS. MINTER:  Your Honor, may we approach?

24              THE COURT:  Yes.

25              NOTE:  A side-bar discussion is had between the

713

1    Court and counsel out of the hearing of the jury as follows:

2    AT SIDE BAR

3         MS. MINTER:  Your Honor, as the Court knows, we are

4    dealing with a number of things simultaneously, but in

5    listening to the Government's testimony, the testimony the

6    Government has elicited, I haven't heard anything that

7    indicates that she has ever met this person in person or that

8    she can identify his voice.

9         THE COURT:  Well, your objection is speculation,

10   that there is more than one?  She identified him by Omar and

11   by Mr. Mohamadi.

12        MS. MINTER:  It is lack of foundation.  She hasn't

13   given any testimony to indicate that she can identify the

14   voice on the phone.

15        THE COURT:  All right.  Then just make the

16   foundation objection.  And you are going to--  The testimony

17   has come in that Mr. Brown represented Mr. Mohamadi previously

18   right, or am I wrong about that?  I don't know when I heard

19   that.

20        THE DEFENDANT:  This is the first time.

21        THE COURT:  Do you want to ask her what she knows?

22   Go ahead, Mr. Ben'Ary.

23        MR. BEN'ARY:  Your Honor, she has seen the

24   defendant's mug shot associated with his file at Mr. Brown's

25   office.  I was trying to stay away from the mug shot.  She

1    hasn't met him.

2         THE COURT:  The objection is as to foundation.  So,

3    ask questions that establish that he is a client of the firm

4    and that's why she is having this contact with him.

5         MR. BEN'ARY:  Okay.

6         THE COURT:  If that's what you want.  I am going to

7    find that that is sufficient.  I mean, how many Mirwais

8    Mohamadis are represented at this period of time?

9         MS. MINTER:  Your Honor, the entire purpose of

10   laying the foundation that she knows this person and knows his

11   voice is to avoid the situation where someone calls up and

12   says, I'm insert name here, and it is taken as gospel that it

13   is that person.

14        Your Honor, I sincerely doubt the Government would

15   agree to admit evidence if we introduced someone who called up

16   and said, my name is Bob Smith and I am the real robber.  She

17   has to be able to testify--

18        THE COURT:  What is this woman going to testify to?

19        MR. BEN'ARY:  She is going to testify that she was

20   in constant telephone contact with the defendant.  She was

21   actually posting ads for his prostitutes onto the Internet.

22   She helped drive around one of his prostitutes.  She deposited

23   money into Mirwais Mohamadi's commissary account, $1,100 on

24   one occasion.  And further, this defendant directed her to

25   take possession of a black 9 millimeter firearm and drop it

S. Escamilla - Direct

715

1    off to an individual named Steve.

2              MS. MINTER:  All of which is a voice on the phone at

3    this point.

4              THE COURT:  All right, your exception is noted.

5              NOTE:  The side-bar discussion is concluded;

6    whereupon the case continues before the jury as follows:

7    BEFORE THE JURY

8              THE COURT:  You may proceed.

9              MR. BEN'ARY:  Thank you, Your Honor.

10   BY MR. BEN'ARY: (Continuing)

11   Q.   How did it come about that you were connecting other

12   phone calls besides the one that you told us about with Mr.

13   Mohamadi's mother?

14   A.   Well, initially it started with the phone calls to his

15   mother and family members, and then it went on to his

16   girlfriends and friends and other people he knew.

17   Q.   And--

18             THE COURT:  Well, go about back and ask a few more

19   foundational questions, if you would, Mr. Ben'Ary.

20   Q.   Okay.  The individual that we have been talking about who

21   we have referred to as both Omar and Mirwais Mohamadi, was he

22   a client of the law office where you worked?

23   A.   That is correct.

24   Q.   And was Mr. Brown his lawyer?

25   A.   Yes.

S. Escamilla - Direct

716

1   Q.   And was Mr. Brown representing him in a Virginia state

2   court case involving a robbery?

3   A.   Correct.  It was for the county of Fairfax and the city

4   of Alexandria.

5   Q.   Okay.

6            THE COURT:  All right, go ahead.

7   Q.   Once your calling progressed from his family to include

8   friends and girlfriends and other individuals, how often would

9   you say you were connecting calls from the defendant to other

10  people?

11  A.   It was quite regularly throughout the workday, any time

12  between 9 to 5.

13  Q.   Would you say that it happened at least once a day?

14  A.   Yes, more than once.

15  Q.   And was there a point where--  Well, how would you

16  characterize your relationship with Mr. Mohamadi?

17  A.   Well, in the beginning it was more of just like a client

18  and receptionist role, but after a time it kind of progressed

19  to more of a friendship, I would call it.

20  Q.   Okay.  And as this friendship developed, did the

21  defendant help ask you to help do things to conduct some kind

22  of a business while he was incarcerated?

23  A.   Yes.

24  Q.   And could you tell the members of the jury about that?

25  What type of business was it?

S. Escamilla - Direct

717

1   A.   It was pretty much a prostitution business.  He had

2   Jessica Hull, who had, who came from Michigan, and pretty much

3   she would prostitute in order to--

4           MS. MINTER:  Objection, speculation and hearsay.

5   Lack of foundation.

6           THE COURT:  Thank you.

7           MR. BEN'ARY:  I can--

8           THE COURT:  Establish the foundation of whether she

9   is speculating or not.

10          MR. BEN'ARY:  I will.

11          THE COURT:  Go ahead.

12  BY MR. BEN'ARY: (Continuing)

13  Q.   Well, let me take a step back first.  What were you doing

14  to help Mr. Mohamadi to conduct this prostitution business

15  while he was incarcerated?

16  A.   Initially it was just, obviously, putting the three-way

17  calls with him and Jessica or anyone else.  Once Jessica moved

18  down here from Michigan, I would let her borrow my car to do

19  whatever she needed to be able to establish herself here in

20  Michigan, I mean here in Virginia from Michigan.

21  Q.   And so, you met Jessica in person?

22  A.   Correct.

23  Q.   And did you also have occasion to listen to telephone

24  calls that you had connected between Mr. Mohamadi and Jessica

25  Hull?

718

1   A.   Correct.

2   Q.   And what do you base--  You described them as, her as his

3   girlfriend.  What do you base that on?

4   A.   Well, I guess that's what he called her on the phone.

5   And so, during his conversations he would say that once he got

6   out, they would be together.  And everything that she was

7   doing was based on the fact that she was helping him in order

8   to be able to get out of jail.

9   Q.   Okay.  And did you have occasion to make postings on the

10  Internet related to this business?

11  A.   Yes.

12  Q.   Where would you do that from?

13  A.   From the computer at the office, and it was done through

14  craigslist.

15  Q.   Okay.  Were these ads for prostitution services?

16  A.   Well, they said not listed specifically, but yes.

17  Q.   Okay.  Now, you mentioned that Jessica had borrowed your

18  vehicle at some point?

19  A.   Right.

20  Q.   Did you also have occasion to drive Jessica around to

21  places?

22  A.   Yes.

23  Q.   And was that related to her business as a prostitute?

24  A.   Yes.

25  Q.   And was that over the course of one weekend?

S. Escamilla - Direct

719

1   A.   Right.

2   Q.   And what did you observe Jessica do during that weekend

3   when you were driving her around?

4   A.   Well, pretty much we, she was able to get a hotel room,

5   and the clients or whatever you want to call them would come

6   see her, and then they would leave and--

7            MS. MINTER:  I would object to the speculation

8   unless she was present.

9            THE COURT:  Just what you observed.

10  A.   Okay.  So, the only thing that I observed was, obviously,

11  the people coming in and out.

12  BY MR. BEN'ARY: (Continuing)

13  Q.   Other than Jessica?

14  A.   Right.

15  Q.   And did you have occasion to collect money from Jessica?

16  A.   Well, she would give it to Phil.  And then there was a

17  time that it was given to me to deposit into Omar's commissary

18  account.

19  Q.   And you actually had occasion yourself to deposit money

20  into Omar's commissary account?

21  A.   Yes.

22  Q.   Was that at Fairfax or Alexandria or some other place?

23  A.   It was in Alexandria.

24  Q.   And the name on the account that you deposited these

25  funds into was Mirwais Mohamadi?

S. Escamilla - Direct

720

1   A.   Correct.

2   Q.   And how much was the money that you deposited?

3   A.   I don't recall exactly, but I believe it was about $800,

4   if not more.

5   Q.   Okay.

6   A.   I think there was two separate money orders.  One was of

7   800 and one was of 300.  I am not too sure on the amounts.

8   Q.   And did Jessica also make deposits into Mr. Mohamadi's

9   commissary account?

10  A.   Yes, per his instructions.

11          MS. MINTER:  Objection, speculation, unless she

12  observed it.

13          THE COURT:  Yes.  Lay a foundation before you ask

14  those questions, please.  Sustained.

15  BY MR. BEN'ARY: (Continuing)

16  Q.   Do you know what Jessica did with the money that she

17  earned as a prostitute?

18  A.   Well, it was always instructed that she would purchase

19  money orders--

20          MS. MINTER:  Objection, hearsay.

21  BY MR. BEN'ARY: (Continuing)

22  Q.   Who are these instructions coming from?

23  A.   From Omar.

24  Q.   Go ahead.  What were the instructions?

25  A.   For her to buy the money order and to deposit it into his

S. Escamilla - Direct

721

1   account when she went to go visit him on weekends.

2   Q.   And did the defendant instruct her to deposit all of the

3   money that she earned into his commissary account?

4   A.   Almost all of it.  The only thing that she would keep is

5   money for the rent.

6   Q.   Did you have some discussions with Mr. Mohamadi revolving

7   around an individual named Steve?

8   A.   We did at one point.

9   Q.   And could you describe those conversations for the

10  members of the jury, please.

11  A.   Well, he would call him on three-way.

12  Q.   Who is he?

13  A.   Stephen.

14  Q.   And who would call?

15          MS. MINTER:  Your Honor, I would object to the lack

16  of foundation on the same grounds articulated.

17          THE COURT:  Let's approach the bench for a moment.

18          NOTE:  A side-bar discussion is had between the

19  Court and counsel out of the hearing of the jury as follows:

20  AT SIDE BAR

21          THE COURT:  Who is Stephen and what does he have to

22  do with anything?

23          MR. BEN'ARY:  Your Honor, the jury heard testimony

24  from Stephen Grant about him making arrangements to pick up a

25  gun.  Now, Mr. Grant testified it never happened.

722

1          Ms. Escamilla is going to testify that she took

2     instructions from the defendant to take possession of 9

3     millimeter firearm to deliver to Mr. Grant.  She will also

4     testify that the exchange never occurred.

5          THE COURT:  So, did Steve ever identify himself

6     further to her, just some person named Steve?

7          MR. BEN'ARY:  She only knows him as a person named

8     Steve.

9          THE COURT:  She is going to testify that the

10    defendant asked her to pick up a gun and deliver it to a

11    person named Steve, is that right?

12         MR. BEN'ARY:  Yes.

13         THE COURT:  What's the objection?

14         MS. MINTER:  I just want to be clear whether that's

15    the anticipated testimony from Ms. Hull or Ms. Escamilla.

16         MR. BEN'ARY:  That's this witness' anticipated

17    testimony.

18         MS. MINTER:  Your Honor, again, I would submit that

19    it is being offered to prove that she was speaking to someone

20    named Steve.  She can't authenticate based on his voice who

21    the person is to whom she is speaking.

22         MR. BEN'ARY:  Just to be clear.  It is not Steve's

23    part of the conversation that I am seeking to admit, it is the

24    defendant's.

25         THE COURT:  I am going to admit it over your

723

1   objection.  Your exception is noted.

2            MS. MINTER:  Your Honor, if I can raise one other

3   issue while we are here.  I presume the Court's instruction

4   from I believe Thursday of last week is still standing in that

5   we are to incorporate Mr. Mohamadi's proposed questions into

6   our examination.  I am not going to be able to do that on the

7   fly.

8            I would ask if perhaps after this witness finishes

9   testifying we could have our break at that point.

10           THE COURT:  Certainly.

11           MS. MINTER:  Thank you.

12           THE COURT:  All right.

13           NOTE:  The side-bar discussion is concluded;

14  whereupon the case continues before the jury as follows:

15  BEFORE THE JURY

16           THE COURT:  All right, proceed.

17           MR. BEN'ARY:  Thank you, Your Honor.

18  BY MR. BEN'ARY: (Continuing)

19  Q.   We were talking about conversations that you had with Mr.

20  Mohamadi that involved an individual named Steve?

21  A.   Yes.

22  Q.   Can you tell the members of the jury what Mr. Mohamadi

23  told you related to this individual Steve?

24  A.   I am not too sure on any of the background information,

25  but--

S. Escamilla - Direct

724

1    Q.   Just what the defendant told you.

2    A.   He instructed me to take a gun that was in Jessica's

3    possession and give it to Stephen.

4    Q.   Did you actually take possession of a firearm?

5    A.   It was given to me in a plastic bag with clothes and

6    other items, and that was the time that I had possession of

7    it.

8    Q.   Do you know anything about guns?

9    A.   A little bit.

10   Q.   Do you know what kind of gun this was?

11   A.   It was like a black 9 millimeter gun.

12   Q.   Okay.  And did you ever give that gun to Steve?

13   A.   No, I did not.

14   Q.   Ms. Escamilla, if I could ask, with the help of the Court

15   Security Officer, for you to take a look at what is marked for

16   identification as Exhibit 56, please.

17        Do you recognize that exhibit?

18   A.   Yes.

19   Q.   Is that what's called an immunity letter that has been

20   given to you by the Government?

21   A.   That's correct.

22   Q.   And what's the date on that?

23   A.   It's dated January 12, 2010.

24        MR. BEN'ARY:  Offer Exhibit 56 into evidence.

25        THE COURT:  Any objection?

1          MS. MINTER:  No objection, Your Honor.

2          THE COURT:  It will be received.

3    BY MR. BEN'ARY: (Continuing)

4    Q.   Ms. Escamilla, what does that agreement mean to you in

5    your words?

6    A.   It basically means that I am here to testify and say the

7    whole truth regarding this case.

8    Q.   Okay.  And does that letter include consequences if it

9    turned out that you weren't telling the truth?

10   A.   Yes.

11         MR. BEN'ARY:  Your Honor, those are my questions.

12   Thank you.

13         THE COURT:  All right.  Let's take our afternoon

14   break before we begin cross-examination.  So, we are going to

15   take approximately 20 minutes, and we will hear

16   cross-examination at that time.

17         All right.  We are in recess.

18         NOTE:  At this point a recess is taken; at the

19   conclusion of which the case continues as follows:

20         THE COURT:  All right, cross-examination whenever

21   you are ready, counsel.

22      CROSS-EXAMINATION

23   BY MS. MINTER:

24   Q.   Ms. Escamilla, you indicated that you had conversations

25   on the phone with somebody that you believed to be named

S. Escamilla - Cross

726

1   Mirwais Mohamadi, correct?

2   A.   Correct.

3   Q.   And you never met that individual in person?

4   A.   Correct.

5   Q.   You only heard their voice on the phone?

6   A.   Correct.

7   Q.   You didn't know them prior to speaking to them on the

8   phone?

9   A.   No.

10  Q.   You didn't know of them any other way?

11  A.   No.

12  Q.   Except through attorney Larry Brown?

13  A.   Correct.

14  Q.   Who you worked for?

15  A.   Correct.

16  Q.   You were the receptionist, I believe, is that correct?

17  A.   Yes.

18  Q.   Did you have any other responsibilities in the office?

19  A.   General office manager duties.

20  Q.   All right.  So, you were familiar with how the office

21  worked?

22  A.   Correct.

23  Q.   And the cases that came in the office?

24  A.   Yes.

25  Q.   And, of course, you know that Mr. Mohamadi was never

727

1  charged with robbery in Fairfax?

2  A.   I am not sure what specifically he was charged with.   I

3  just know what counties they were in.

4  Q.   So, you don't have any idea what his charges were?

5  A.   Correct.

6  Q.   And you indicated that you spoke to a person that you

7  believed was Mr. Mohamadi?

8  A.   Correct.

9  Q.   And you advised that person that you spoke with that your

10 office records phone calls?

11 A.   Actually, the prompts from the jail state that.

12 Q.   Okay.  So, the conversations are recorded?

13 A.   Correct.

14 Q.   Now, there were other clients, obviously, that called the

15 office?

16 A.   Correct.

17 Q.   And you spoke with those other clients?

18 A.   Not in the same manner as with Mr. Mohamadi.

19 Q.   But you spoke with other clients?

20 A.   Correct.

21 Q.   Correct?  They would call the office?

22 A.   Correct.

23 Q.   Ask for Mr. Brown?

24 A.   Correct.

25 Q.   Ask questions about their case?

S. Escamilla - Cross

728

1    A.    Right.

2    Q.    Okay.  And you spoke with those individuals?

3    A.    Yes.

4    Q.    And you also arranged three-way phone calls for other

5    individuals?

6    A.    No, ma'am.

7    Q.    You never arranged three-way phone calls for Donald

8    Casson?

9    A.    No, ma'am.

10   Q.    You never arranged three-way phone calls for Joshua

11   Puryear?

12   A.    Actually, Mr. Puryear was a client of Mr. Brown's as

13   well.

14   Q.    And you arranged three-way phone calls for him?

15   A.    Yes.

16   Q.    So, you did arrange three-way phone calls for other

17   people?

18   A.    Well, Mr. Puryear was actually a friend of Mohamadi's as

19   well.

20   Q.    You did arrange three-way phone calls for other people?

21   A.    Right, but it was in that connection.

22   Q.    That is my question.

23   A.    Okay.

24   Q.    Now, you testified in response to the prosecutor's

25   questions that you had listened to phone conversations between

729

1  Jessica Hull and the person that you believed to be Mr.

2  Mohamadi, correct?

3  A.   Correct.

4  Q.   And you heard Mr. Mohamadi ask Ms. Hull to put money in

5  his commissary so he could post bond?

6  A.   Correct.

7  Q.   And the person that you believed to be Mr. Mohamadi made

8  arrangements for Ms. Hull to have a babysitter for her

9  children, correct?

10 A.   Specifically when?

11 Q.   Well, did you ever hear --

12 A.   Right.

13 Q.   -- that person make arrangement?  You did?

14 A.   Yes.

15 Q.   I am sorry.  Okay.  And in fact, you babysat for her

16 children, correct?

17 A.   I do believe so.

18 Q.   Now, you indicated that you were familiar with Ms. Hull's

19 activities as a prostitute, correct?

20 A.   Correct.

21 Q.   You never actually saw her have sex with clients?

22 A.   No, I did not.

23 Q.   And you never actually saw anyone place money in her

24 hands?

25 A.   No.

S. Escamilla - Cross

730

1   Q.   The individual that you spoke with on the phone that you

2   believed to be Mr. Mohamadi, he gave you advice on all sorts

3   of matters, correct?

4   A.   For the most part.

5   Q.   You said you were friends?

6   A.   Right.

7   Q.   And prior to coming to court today, you spoke with

8   Government agents or police officers?

9   A.   Correct.

10   Q.   And you spoke with the prosecutors for this case?

11   A.   Yes.

12   Q.   And you discussed what would happen here today?

13   A.   Yes.

14   Q.   And you discussed what your testimony would be?

15   A.   Yes, I guess, what I knew.

16   Q.   Okay.  And in response to the prosecutor's questions, you

17   identified a letter, correct?

18   A.   Correct.

19   Q.   And you said that you thought that that letter meant that

20   you had to testify truthfully?

21   A.   Correct.

22   Q.   But you also understood that letter to mean that you were

23   being given immunity, correct?

24   A.   Correct.

25   Q.   Okay.  And by immunity, that means that the prosecution

731

1   has agreed not to use any of this information against you,

2   correct?

3   A.   Correct.

4   Q.   And you understand that you won't be prosecuted for any

5   of this, any of the things that you have talked about?

6   A.   Yes.

7            MR. MINTER:  The Court's indulgence, Your Honor.

8            THE COURT:  Very well.

9            MS. MINTER:  Nothing further, Your Honor.

10           THE COURT:  All right.  Any redirect?

11           MR. BEN'ARY:  No thank you, Your Honor.

12           THE COURT:  May Ms. Escamilla be excused?

13           MR. BEN'ARY:  Yes, Your Honor.

14           THE COURT:  All right.  You are excused at this

15   time, Ms. Escamilla.  Please don't discuss your testimony that

16   you have given her with anyone until the trial is over.  All

17   right?

18           THE WITNESS:  Understood.

19           THE COURT:  All right.  Have a good afternoon.

20           NOTE:  The witness stood down.

21           THE COURT:  Next witness.

22           MR. BEN'ARY:  Jessica Hull, please.

23           NOTE:  The witness is sworn.

24           JESSICA HULL, called by counsel for the United

25   States, first being duly sworn, testifies and states:

1      DIRECT EXAMINATION

2    BY MR. BEN'ARY:

3    Q.    Good afternoon.

4    A.    How are you doing?

5    Q.    Could you tell the members of the jury your name, please.

6    A.    Jessica Hull.

7    Q.    And, Ms. Hull, do you know an individual named Mirwais

8    Mohamadi?

9    A.    Yes, sir.

10   Q.    Do you know him by another name?

11   A.    Omar.

12   Q.    The individual that you know as Mirwais Mohamadi or Omar,

13   do you see him in the room?

14   A.    Yes, sir.

15   Q.    Could you tell us where he is sitting and identify him by

16   an article of clothing, please.

17   A.    A blue shirt to my right.

18           THE COURT:  I will note the identification of Mr.

19   Mohamadi.

20           Speak a little closer to the microphone, please, Ms.

21   Hull.

22   Q.    At some point were you involved in a boyfriend/girlfriend

23   relationship with the defendant?

24   A.    Yes, sir.

25   Q.    And did you move to the Northern Virginia area to

J. Hull - Direct

733

1    continue that relationship?

2    A.   Yes, sir.

3    Q.   When you moved back to the area, where was the defendant

4    living at that point?

5    A.   He was incarcerated.

6    Q.   And did you have discussions with the defendant over the

7    telephone while he was incarcerated?

8    A.   Yes, sir.

9    Q.   Do you know an individual named Silvia Escamilla?

10   A.   Yes, sir.

11   Q.   Who is Silvia Escamilla?

12   A.   She was a mutual friend of his I met.

13   Q.   And did Silvia on occasion connect telephone calls from

14   the defendant to you?

15   A.   Yes, sir.

16   Q.   And did you have conversations with the defendant while

17   he was incarcerated regarding the issue of--

18            MS. MINTER:  Your Honor, I would object to the

19   leading at this point.  We are past the introductory

20   questions.

21            THE COURT:  Sustained.

22   BY MR. BEN'ARY: (Continuing)

23   Q.   What, if any, conversations did you have with the

24   defendant related to raising money for his bail?

25            MS. MINTER:  Objection, leading.

J. Hull - Direct

734

1          THE COURT:  I will allow the question.  Go ahead.

2    BY MR. BEN'ARY: (Continuing)

3    Q.   What conversations, if any, did you have from the

4    defendant regarding raising money for his bail?

5    A.   Prostitution.

6    Q.   When you say that, could you explain your answer a little

7    bit more.

8    A.   He asked me if I would go to work.

9    Q.   The defendant asked you if you would work as a prostitute

10   to raise money for his bail?

11   A.   Yes, sir.

12   Q.   And did you agree to do that?

13   A.   Yes, sir.

14   Q.   And was Ms. Escamilla involved in this prostitution

15   business?

16   A.   Yes, sir.

17   Q.   Now, what did you do with the money that you earned as a

18   prostitute?

19   A.   It was given to him on his account.

20   Q.   And did you actually make deposits into his account?

21   A.   I had made money orders, but there was other individuals

22   that put the money onto the account.

23   Q.   All right.  Were there any times that you actually

24   physically went to the adult detention center and deposited

25   money into the defendant's commissary account?

735

1    A.   No, sir, it was other individuals that took it.

2         MS. MINTER:  Object to the speculation and hearsay

3    then.

4         THE COURT:  Well, there is no question on the table.

5    I overruled the last objection.  Ask your next question.

6    BY MR. BEN'ARY: (Continuing)

7    Q.   Were you present when other individuals deposited money

8    into the defendant's commissary account?

9    A.   Yes, sir.

10   Q.   You saw them deposit the money?

11   A.   Yes, sir.

12   Q.   Was it money you had given to these other individuals?

13   A.   Yes, sir.

14   Q.   And at what facility was this?

15   A.   Fairfax County and Alexandria.

16   Q.   Both Fairfax County Adult Detention Center and City of

17   Alexandria Adult Detention Center?

18   A.   Yes.

19   Q.   And how much money did you personally observe being

20   deposited into the defendant's commissary accounts?

21   A.   Altogether it was a little over 10,000, about 10,000.

22   Q.   And over what time period?

23   A.   About three months.

24   Q.   And did you get to keep any of the money that you earned

25   as a prostitute?

J. Hull - Direct

736

1    A.    Very little.

2    Q.    What did you use the little money that you did keep for?

3    A.    For food, pay my rent.  I had children.

4    Q.    Let me have you take a look, with the assistance of our

5    Court Security Officer, what is marked for identification

6    purposes as Exhibit 53, please.

7    A.    Yes, sir, I have a copy of this.

8    Q.    Do you recognize it?

9    A.    Yes, sir.

10   Q.    Is that a letter to you from the Government?

11   A.    Yes, sir.

12         MR. BEN'ARY:  I would offer Exhibit 53 into

13   evidence.

14         THE COURT:  Any objection?

15         MS. MINTER:  No objection.

16         THE COURT:  It is received.

17   BY MR. BEN'ARY: (Continuing)

18   Q.    What does that letter mean, if you would tell the members

19   of the jury?

20   A.    It's immunity where I know I am not getting, offering

21   nothing, I am not getting nothing from the state.  I am just

22   testifying on my relationship with Mirwais, and that

23   everything that I have said is the truth on what I had gave.

24         MR. BEN'ARY:  Your Honor, thank you, those are my

25   questions.

J. Hull - Cross

737

1          THE COURT:  All right.  Cross-examination.

2      CROSS-EXAMINATION

3  BY MS. MINTER:

4  Q.   Ms. Hull, you were just referencing a letter from the

5  Government?

6  A.   Yes.

7  Q.   Okay.  And you were provided a copy of that letter by the

8  prosecutors?

9  A.   Yes, ma'am.

10  Q.   And what this letter actually says is that the statements

11  you make will not be used to prosecute you, correct?

12  A.   Correct.

13  Q.   Okay.  So, you know that regardless of what you say here

14  today, you are not being charged with a crime?

15  A.   Correct.

16  Q.   Now, you indicated that you had been working as a

17  prostitute, correct?

18  A.   For that time period, yes.

19  Q.   Okay.  And that was, I believe your testimony was that

20  all but a little bit of the money went into the commissary?

21  A.   Pretty much.

22  Q.   Is that correct?

23  A.   Yes.

24  Q.   And so, over the course of three months, that was

25  $10,000, correct?

J. Hull - Cross

738

1   A.   On his account, yes.

2   Q.   Okay.  How much did you keep then?

3   A.   Besides paying for hotels and having a rental and food

4   and stuff like that--

5   Q.   What did you spend on those things?  How much money did

6   you spend on those things?

7   A.   I don't recall.  Rental was $200 a week.  Food, cost of

8   living, providing for me and my children.  So, I mean--

9   Q.   Okay.  So, your testimony is over the course of three

10  months you didn't make much more than $10,000?

11  A.   Correct.

12  Q.   How much were you making a week?

13  A.   I don't recall.

14  Q.   You don't recall.

15  A.   I mean, I was putting $500 at a time on his account.

16  Q.   Okay.  So, you remember very clearly the money you put

17  into the account, correct?

18  A.   Correct.

19  Q.   Do you remember--  Well, but you don't remember how much

20  you made a week, that's your testimony?

21  A.   I mean, I don't recall.  It was like sometimes I make a

22  thousand, sometimes I make a little bit more than, less than

23  that.  I mean, it just depends.

24  Q.   Okay.  How did you determine what to charge your clients?

25  A.   Through him.

J. Hull - Cross

739

1   Q.   Okay.  And so, what did you tell people?  When you met an

2   individual, what did you tell them the price would be or how

3   you would determine the price?

4   A.   I never discussed anything over the phone.

5   Q.   You never discussed anything?

6   A.   Not very--  My information was very limited.

7   Q.   Okay.

8   A.   It was posted on the Internet.  So, all the prices, my

9   phone number and everything was on the Internet.  It was in

10  the postings.  So, they already knew the price and the

11  postings and the phone number before they would even call.

12  Q.   So, the prices were on the Internet?

13  A.   Correct.

14  Q.   For the specific acts?

15  A.   I mean, it varied.  It wasn't the same price all the

16  time, it was different.

17  Q.   Okay.  But my question was, the specific acts that you

18  would perform, each had a price associated with them on the

19  Internet?

20  A.   Depends upon what it was.  Not everything was always

21  sexual, not everything.  Everything was different.

22  Q.   Okay.  But the acts that you would perform for money were

23  listed on the Internet, correct, that's what you just said?

24  A.   Correct.

25  Q.   And the prices associated with them were listed on there

J. Hull - Cross

740

1   as well?

2   A.   Correct.

3   Q.   Okay.  So, it was very clear what the acts were that you

4   would perform, correct?

5   A.   No.  The acts was not listed on the Internet.

6   Q.   I am sorry, I thought you just said they were?

7   A.   The prices were.  My phone number was and a brief

8   description of myself or whatever the posting was, what it

9   was.

10  Q.   So, there were just prices on the Internet with no--

11  A.   Correct.

12  Q.   But nothing about what they said, it just said $100, $5?

13  A.   No.

14  Q.   Nothing about what would happen?

15  A.   No.  It would be describing like a female, like how I am

16  sure you are aware of craigslist and how the postings are.  It

17  described what the females looked like, what type of gentleman

18  that they are looking for.  It never lists anything sexual or

19  anything like that.  Nothing was discussed until the people or

20  whenever I meant the clients.

21  Q.   So, I am sorry, you are saying that nothing was discussed

22  about the rates until you met the client?

23  A.   No, ma'am.  What I am saying is on the Internet with my

24  craigslist postings, my prices was already on the Internet.

25  So, when a gentleman or whoever called already knew what the

J. Hull - Cross

741

1    prices was.  It was for an hour, 30 minutes, whatever it was,

2    the price was already on the Internet.

3    Q.   Okay.

4    A.   So, when they called, they knew what the price was.

5    Q.   So, it was an hourly rate is what you're saying?

6    A.   Pretty much by the hour, half hour, 30 minutes.

7    Q.   So, once they arrived--

8    A.   They never arrived.  I would go to them.

9    Q.   Okay.  After you went to them, how did you know what was

10   going to happen?

11   A.   I didn't know what was going to happen.  I would go in

12   there and talk to the individuals.  It depends on what they

13   wanted.  Sometimes some of them wanted to go out, some of them

14   wanted to go to dinner.  I mean, everything was different.

15   Like I said, not everything was always sexual.

16           So, therefore, I mean--

17   Q.   And what were the rates per hour or half hour?

18   A.   It depends.  200, 250, 500, $1,000.

19   Q.   Okay.  And what did those numbers correspond to?  $1,000,

20   what would that correspond to, how many hours?

21   A.   Probably like six hours.

22   Q.   Okay.  And how many clients did you have in an evening on

23   average?

24   A.   I feel that's irrelevant.  It was enough to make his

25   money for bond.

J. Hull - Cross

742

1   Q.   This Court will determine what is relevant and what is

2   not relevant.  My question to you is, how many individuals did

3   you meet with?

4   A.   It depends.  Sometimes one, it was more than one.

5   Q.   Okay.  So, sometimes one.  What is the greatest number of

6   people that you met with --

7   A.   I don't recall.

8   Q.   -- in a day?

9   A.   It has been such awhile ago.

10   Q.   You don't recall?  But you remember all these other

11   things that you have testified to, correct?

12   A.   Right.

13   Q.   Now, this time period that you have described, this three

14   months, Mr. Mohamadi was incarcerated during that time,

15   correct?

16   A.   Yes, ma'am.

17   Q.   So, he wasn't living with you?

18   A.   No, ma'am.

19   Q.   You didn't see him in person outside of--

20   A.   Not outside the jail, no.  I would go to visit him.

21   Q.   Now, you are a drug user, correct?

22   A.   No, ma'am.

23   Q.   You have never used drugs?

24   A.   Yes, I have, ma'am, but I don't do that.

25   Q.   Okay.  So, you had--

J. Hull - Cross

743

1    A.    In my past.  Everybody makes mistakes.  And I have made

2    mistakes, I learned from them.

3    Q.    So, you have used drugs?

4    A.    Yes, ma'am.

5    Q.    The Court's indulgence please, Your Honor.

6          THE COURT:  Yes, ma'am.

7    Q.    Now, to be clear, Ms. Hull, you described your conduct

8    over a period of approximately three months?

9    A.    Yes.

10   Q.    Is that correct?

11   A.    It was from January, or it was February, probably up

12   until, March, April, May, up to probably May.

13   Q.    February to May.  And prior to this time period you had

14   performed sexual acts for money before?

15         MR. BEN'ARY:  Objection, relevance.

16         THE COURT:  I will allow the question.

17   A.    Yes, I have.

18   BY MS. MINTER: (Continuing)

19   Q.    And that was prior to meeting Mr. Mohamadi, correct?

20   A.    That was when I met him, yes.

21   Q.    So, you were engaging in sexual activity for money before

22   you met Mr. Mohamadi?

23   A.    Correct.

24   Q.    And Mr. Mohamadi in fact encouraged you to find

25   employment outside of the area of prostitution, correct?

J. Hull - Redirect

744

1   A.   When I came to Virginia or when we met?

2   Q.   At any time?

3   A.   Because when we first met, when I first met him, during

4   Tysons Corner, I had strictly informed him that I needed some

5   help.  I told him I was in a situation--

6   Q.   My question is actually what he told you.  He advised you

7   to look for a job that did not involve prostitution, correct,

8   at some point?

9   A.   I mean, yeah, I have tried to look for a job before,

10  before that.

11  Q.   Mr. Mohamadi advised you to look for a job unrelated to

12  prostitution?

13  A.   He told me to go try.

14  Q.   So, the answer is yes?

15  A.   Yes.

16  Q.   And he advised you against using illegal narcotics as

17  well?

18  A.   He advised me not to?  That would be false.  No, he

19  didn't.

20          MS. MINTER:  The Court's indulgence, Your Honor.

21          Nothing further, Your Honor.

22          THE COURT:  All right, thank you.  Redirect.

23          MR. BEN'ARY:  Thank you.

24      REDIRECT EXAMINATION

25  BY MR. BEN'ARY:

J. Hull - Redirect

745

```
 1    Q.    How did you meet the defendant?

 2    A.    I met him in Tysons Corner when I came with a couple

 3    friends in Virginia.

 4    Q.    And did you discuss what you were doing for work at the

 5    time?  Did you discuss the fact that you were a prostitute

 6    with him?

 7    A.    Actually, he was a client, him and his friend.

 8    Q.    Okay.  And I take it that you moved out of the area after

 9    that, is that right?

10    A.    I was just visiting for the weekend, yes.

11    Q.    Okay.  And did you have discussions related to jobs with

12    the defendant that caused you to move back to the area or to

13    move to the area?

14    A.    When I was out of state, when I went back, when I had

15    phone conversations with him, he said that he would help me

16    get a job, he was very resourceful.  Him and Silvia both said

17    that it would be easy to get a job since Virginia is big.

18          So, I assumed that when I came down here it would be

19    easy for me to look for a job.  I did look for employment.  I

20    couldn't find employment.  So--

21    Q.    Did the defendant--

22    A.    Go ahead.

23    Q.    Did the defendant help you to find a job other than

24    prostitution once you moved down here?

25    A.    No, sir.
```

746

1    Q.   Did he encourage you to do anything except engage in the

2    prostitution activities that you have testified about?

3    A.   No.  If I prostituted myself, it would make the money

4    faster rather than working for regular employment, it would

5    take longer.

6    Q.   And you testified that these activities happened February

7    through, did you say May?

8    A.   I believe, yes, correct.

9    Q.   What year?

10   A.   2008.

11   Q.   And do you still have Exhibit 53, is that sitting right

12   there?

13   A.   Yes, sir.

14   Q.   Ms. Minter asked you if it was your understanding that

15   that letter meant that regardless of what you say, that you

16   wouldn't be prosecuted, do you remember her asking you that?

17   A.   Yes, sir.

18   Q.   I want to you look again at the letter and see if it says

19   anything about what would happen if you didn't tell the truth.

20   A.   That I might be prosecuted for perjury, obstruction of

21   justice and making false statements.

22           MR. BEN'ARY:  Those are my questions, Judge.

23           THE COURT:  All right.  May Ms. Hull be excused at

24   this time?

25           MR. BEN'ARY:  Yes, sir.

747

1          THE COURT:  Ms. Hull, you are excused at this time.

2   Please don't discuss the testimony you have given here with

3   anyone until the trial is over.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Have a good afternoon.

6          NOTE:  The witness stood down.

7          THE COURT:  Next witness.

8          MR. WALUTES:  Your Honor, the Government would call

9   Detective Brian Wise.

10         THE COURT:  All right.

11         NOTE:  The witness is sworn.

12         MR. WALUTES:  May I proceed, Your Honor.

13         THE COURT:  Yes, please.

14         BRIAN WISE, called by counsel for the United States,

15  first being duly sworn, testifies and states:

16     DIRECT EXAMINATION

17  BY MR. WALUTES:

18  Q.   Good afternoon, sir.

19  A.   Good afternoon.

20  Q.   Would you please tell us your name.

21  A.   My name is Brian Wise.  Last name is spelled W-i-s-e.

22  Q.   How are you currently employed?

23  A.   I am employed with the Metropolitan Police Department in

24  Washington, D.C.

25  Q.   How long have you been a member of the D.C.'s Police

B. Wise- Direct

748

1    Department?

2    A.   Since 2000.

3    Q.   Almost ten years?

4    A.   Yes, sir.

5    Q.   Prior to your current duty assignment, were you a

6    detective in the District of Columbia?

7    A.   I was.

8    Q.   You are currently a detective, but in a different

9    subsection?

10   A.   Yes, sir.

11   Q.   Did you have occasion to participate in the investigation

12   into a robbery, an armed robbery of Kimberly Riley in the area

13   of DuPont Circle on May 27 of 2007?

14   A.   I did.

15   Q.   Did you have an opportunity to interview Ms. Riley?

16   A.   Yes.

17   Q.   And did you have occasion in the course of your

18   investigation to ask Ms. Riley to look at some photographs

19   that you had?

20   A.   Yes, sir.

21   Q.   If I can ask you to look at what is now marked as

22   Government's Exhibit 7A through, 7A1 through 7A8.

23          Do you see those items, Detective?

24   A.   I do.

25   Q.   And what is that?

B. Wise- Direct

749

1    A.    7A is a photo array.  And 7B is a Metropolitan Police

2    Department photo viewing sheet.

3    Q.    And are those the photographs that you showed to Ms.

4    Riley?

5    A.    Yes, sir, it is.

6              MR. WALUTES:  Your Honor, I would move the admission

7    at this time of 7A1 through 7A8.

8              THE COURT:  Any objection?

9              MS. MINTER:  No objection.

10              THE COURT:  It will be received.

11              MR. WALUTES:  I am being told there is 9, Your

12    Honor.

13    BY MR. WALUTES: (Continuing)

14    Q.    7A9.  Is that why you are giving me a strange look,

15    Detective Wise?

16    A.    Correct.

17    Q.    So, there are nine photographs total?

18    A.    Yes, 7A1 through 7A9 is the photo array.

19    Q.    That you showed to Ms. Riley?

20    A.    That's correct.

21    Q.    And then 7B, is that the photo array sheet that was

22    prepared at the time that you showed these photographs to Ms.

23    Riley?

24    A.    Yes, sir.

25    Q.    And was that on June 14 of 2007?

750

1   A.   Yes, sir.

2   Q.   A little over two weeks after the robbery on May 27?

3   A.   That is correct.

4   Q.   And does that record her response or statements that she

5   made at the time of seeing the spread?

6   A.   Yes, sir.

7   Q.   Okay.  And did you sign it as well as to what she said?

8   A.   Yes, sir.

9        MR. WALUTES:  Your Honor, I move the admission of

10  Government's Exhibit 7B at this time.

11       THE COURT:  Any objection?

12       MS. MINTER:  Your Honor, I would object on the

13  grounds that it contains inadmissible hearsay.  In evidence

14  already is the photograph that Ms. Riley indicated.  There is

15  no need to introduce inadmissible evidence for any reason, let

16  alone not when evidence is in.

17       MR. WALUTES:  Your Honor, it is specifically

18  admissible by rule, 801(d)(1)(C), it is prior identification

19  testimony.  And the statement as to identification is

20  explicitly made by the witness.

21       THE COURT:  It will be received over your objection.

22  BY MR. WALUTES: (Continuing)

23  Q.   What, if any, statement did Ms. Riley--  Or was she able

24  to pick a photograph from your spread, Detective Wise?

25  A.   Yes, sir.

1   Q.   And what photograph did she pick?

2   A.   She picked photograph number 8.

3   Q.   And do you recognize the individual-- Who was the

4   photograph number 8 of?

5   A.   Defendant Mohamadi.

6          MR. WALUTES:  Your Honor, if I could at this time,

7   if we could publish 8 at this time, Your Honor.

8          THE COURT:  Yes, go ahead.

9   BY MR. WALUTES: (Continuing)

10  Q.   Did you actually have her sign the photograph, Detective

11  Wise?

12  A.   Yes, sir, I did.

13  Q.   Okay.  Is that the picture of Mr. Mohamadi that you used

14  in this photo spread?

15  A.   Yes, sir, it is.

16  Q.   And what, if any, statement did you record her as making

17  on your photo viewing sheet now admitted as 7B?

18  A.   That's Omar, he is the one that robbed me.

19  Q.   And is your entire interview of Ms. Riley videotaped?

20  A.   Yes, sir.

21         THE COURT:  Detective, did you also go over the

22  bullet points on the top of the photo viewing sheet, 7B, with

23  Ms. Riley?

24         THE WITNESS:  Yes, Your Honor.  Prior to presenting

25  Ms. Riley with the photo array, she was read verbatim the

B. Wise- Direct

752

1    bullets on the photo viewing sheet.

2         THE COURT:  All right, thank you.  Go ahead.

3    BY MR. WALUTES: (Continuing)

4    Q.  And the videotape, if I could ask you to look at

5    Government's Exhibit No. 8, if you have that in front of you.

6         Do you a see a disk in No. 8, Detective Wise?

7    A.  I do.

8    Q.  And that is not the entire videotaped interview, is that

9    correct?

10   A.  That's correct.

11   Q.  What is this portion of the videotape of?

12   A.  It is a clipped portion of the interview that I conducted

13   with Ms. Riley that captures only the photo identification

14   procedure.

15   Q.  And so, the actual display of these nine photographs that

16   you have already testified to?

17   A.  Yes, sir.

18   Q.  And the verbatim reading of what is now marked as 7B?

19   A.  Yes, sir.

20   Q.  Your Honor, I move the admission--

21        And nothing else?

22   A.  Correct.

23        MR. WALUTES:  I would move the admission of

24   Government's 8 at this time.

25        THE COURT:  Any objection?

753

1              MS. MINTER:  The Court's indulgence, Your Honor,

2      please.

3              There is no objection.

4              THE COURT:  All right, it will be received.

5              MR. WALUTES:  Those are all the questions I have for

6      this witness, Your Honor.

7              THE COURT:  All right.  Ms. Minter.

8         CROSS-EXAMINATION

9      BY MS. MINTER:

10     Q.   Detective Wise, you have an established procedure for a

11     lineup, correct, a photo lineup?

12     A.   For a photo array?

13     Q.   Array.

14     A.   Yes, ma'am.

15     Q.   Okay.  And certain rules that you follow?

16     A.   Yes, ma'am.

17     Q.   Okay.  Regarding, for example, the number of pictures

18     that you use?

19     A.   Yes, ma'am.

20     Q.   You would always use more than say two pictures?

21     A.   It depends on how well the victim knew the suspect.

22     Q.   If it involved what--  Let me back up.

23              You had some background information about this

24     alleged robbery before you did the photo array, correct?

25     A.   Yes, ma'am.

B. Wise- Cross

754

1    Q.   Okay.  And that's important because you have to have

2    certain information to decide how to do the photo array,

3    correct?

4    A.   Yes, ma'am.

5    Q.   And that information includes, I would assume based on

6    what you just said, whether or not the individuals knew one

7    another, correct?

8    A.   Yes, ma'am.

9    Q.   Okay.  And if the individuals did not know one another,

10   you would use more than one or two pictures, correct.

11   A.   Yes, ma'am.

12   Q.   Okay.  And that's to make sure that the person selecting

13   the photo doesn't just select the photo that is in front of

14   them, correct?

15   A.   Well, if I could make a correction.  It's not on the

16   basis if they know each other.  How often did you interact

17   with that person or see that person in passing over a certain

18   period.

19   Q.   So, their opportunity to observe that person?

20   A.   Yes, ma'am.

21   Q.   Okay.  So, if somebody had only observed a person for a

22   couple of hours, you would want to make sure that you had

23   enough photographs, correct?

24   A.   I would do a photo array.

25   Q.   Okay.  And when you say do a photo array, how many

B. Wise- Cross

755

1    pictures does that entail?

2    A.    Nine.

3    Q.    Nine, okay.  And obviously you follow other rules

4    regarding the individuals that you select for the photo array,

5    correct, or procedures I should say?

6    A.    Yes, ma'am.

7    Q.    Okay.  So, you want individuals that you think look like

8    the person that has been described to you, correct?

9    A.    Well, not look like per se.  You want to develop an array

10   to where the suspect in the array doesn't jump out to the

11   victim.  A likeness, but not, definitely not, it is not a

12   requirement that they look alike.

13   Q.    Well, certainly you probably can't find nine identical

14   looking individuals?

15   A.    Absolutely not.

16   Q.    But you said I think that you want to make sure that the

17   individual that you suspect doesn't jump out?

18   A.    Yes.

19   Q.    Okay.  And part of how you do that is by making them one

20   of a number of photos, correct?

21   A.    Correct.

22   Q.    Okay.  So, you wouldn't show based on the circumstances

23   that you've just testified to, you wouldn't show a single

24   photo to someone, correct?

25   A.    With what circumstances?

B. Wise- Cross

756

1    Q.   The circumstances that we just discussed, an individual

2    who had known someone only for a couple hours.  You wouldn't

3    show that person a single photo?

4    A.   I wouldn't, no.

5    Q.   All right.  Now, you were familiar with the facts of this

6    case and the ongoing investigation, correct?

7    A.   I was aware that an offense had occurred in Alexandria.

8    The extent of the offense was that a robbery had occurred.

9    But that at that point was only my knowledge of what happened

10   in Virginia.

11   Q.   And you had spoken to Detective Hickman about the case --

12   A.   Yes, ma'am.

13   Q.   -- at that point?

14   A.   Yes, ma'am.

15   Q.   Okay.  So, you were aware that a photo array had been

16   done in Virginia as well?

17   A.   I don't recall that.

18   Q.   Okay.  You don't recall if one was done or you don't

19   recall if you were aware of that?

20   A.   I don't recall if one was done.  I don't recall if we had

21   that conversation.

22   Q.   And you are the lead investigator on this incident that

23   happened in Washington, D.C. involving Ms. Riley?

24   A.   Yes, ma'am, I'm the only one.

25   Q.   And you've been to the area where this robbery was

B. Wise- Cross

757

1    alleged to have occurred?

2    A.    Yes, ma'am.

3              MS. MINTER:  The Court's indulgence, Your Honor.

4              Nothing further, Your Honor.  We would ask that he

5    be subject to recall.

6              THE COURT:  Subject to recall?

7              MS. MINTER:  Please, Your Honor.  Not necessarily in

8    the building, but available by phone if necessary.

9              THE COURT:  All right, certainly.  Redirect?

10             MR. WALUTES:  Your Honor, I have no redirect, but I

11   would ask that he be allowed to return to the District of

12   Columbia to continue--  I can certainly get him very rapidly,

13   but so that he might continue to be able to work.

14             MS. MINTER:  That's fine, Your Honor.  We would just

15   ask that he be subject to the rule and available for testimony

16   if necessary.

17             THE COURT:  All right.  Detective Wise, you have

18   heard the discussion.  You are excused for this afternoon.  It

19   may be necessary for you to come back and give further

20   testimony.  So, please don't discuss your testimony you have

21   given so far with anyone.  All right.  And we will let you

22   know one way or the other as soon as we have more information

23   about returning.

24             THE WITNESS:  Yes, sir, Your Honor.

25             THE COURT:  Have a good afternoon.

R. Hickman - Direct

758

```
 1              NOTE:  The witness stood down.

 2              THE COURT:  Next witness.

 3              MR. WALUTES:  Your Honor, the Government would call

 4    Detective Hickman from the city of Alexandria police force.

 5              NOTE:  The witness is sworn.

 6              THE COURT:  Please go ahead.

 7              MR. WALUTES:  Thank you, Your Honor.

 8              ROBERT HICKMAN, called by counsel for the United

 9    States, first being duly sworn, testifies and states:

10         DIRECT EXAMINATION

11    BY MR. WALUTES:

12    Q.    Good afternoon, sir.

13    A.    Good afternoon.

14    Q.    Can you please tell us your name.

15    A.    Robert Hickman.

16    Q.    And how are you currently employed?

17    A.    I am a detective with the Alexandria Police Department.

18    Q.    How long have you been a detective with the Alexandria

19    city police force?

20    A.    16 years.

21    Q.    How long have you been with the police force?

22    A.    22 years.

23    Q.    Did you have occasion to participate in the investigation

24    into the robbery of a taxicab driver that occurred in the city

25    of Alexandria on May 27 of 2007?
```

759

1    A.    I did.

2    Q.    What was your role in that investigation?

3    A.    I was the lead investigator in the case.

4    Q.    Did you have an opportunity to interview the victim?

5    A.    I did.

6    Q.    Do you recall the date when you had an opportunity to

7    interview the victim?

8    A.    I believe it was May 31, 2007.

9    Q.    Did you have occasion to ask--  Do you recall his name

10   today?

11   A.    I do, it is Gebru Haile.

12   Q.    And did you have an occasion to ask Mr. Haile to come

13   back to look at some photographs?

14   A.    I did.

15   Q.    And was that on June 1 of 2007?

16   A.    It was.

17   Q.    Five days after he was robbed?

18   A.    That's correct.

19   Q.    Are you sure?  Can you do the math?

20   A.    Five days, correct.

21   Q.    If I can ask you to look at what is now marked as

22   Government's Exhibit 4A for purposes of identification, and

23   ask if you recognize that?

24   A.    This is the photo spread that I showed Mr. Haile.

25   Q.    On June 1?

760

1    A.   That's correct.

2              MR. WALUTES:  Your Honor, I would move the admission

3    of 4A at this time.

4              THE COURT:  Any objection?

5              MS. MINTER:  There is no objection.

6              THE COURT:  It is received.

7              MR. WALUTES:  I would ask permission to publish it

8    at this time, sir.

9              THE COURT:  Yes, sir.

10   BY MR. WALUTES: (Continuing)

11   Q.   Detective Hickman, perhaps we could go through the six

12   photographs that comprise your--  If we could do it photo by

13   photo, apparently that's the way it is in the system.  I can't

14   do the collage effect.

15             But perhaps if you could verify the photographs as

16   they come up on the screen as being one of the six photographs

17   that composed your spread.

18             On the screen to your left, the first photograph,

19   4A1, but if we could go back actually to the photographs and

20   not do the numbers anymore.

21   A.   Yes, that's first photograph of the photo spread.

22   Q.   Okay.  And then if we could go to the second one now.

23   A.   That's the second photograph of the photo spread.

24   Q.   The third.

25   A.   That's the third.

R. Hickman - Direct

761

1          THE COURT:  Was that identified as A3, sir?

2          THE WITNESS:  That photograph is A3, Your Honor.

3          THE COURT:  All right.

4    BY MR. WALUTES:  (Continuing)

5    Q.   And that's always the order in which this spread is shown

6    by you, you have the system and that's the system?

7    A.   Yes.  And on the back of the photographs I have them

8    listed as A1 through A6.

9    Q.   And then if I could go to 4.

10   A.   That's the fourth photograph.

11   Q.   Fifth.

12   A.   That's A5.

13   Q.   And the last photograph.

14   A.   And that's the final photograph.

15   Q.   These are the photographs that you showed to Mr. Haile on

16   June 1 of 2007?

17   A.   Yes.

18   Q.   Okay.  Could you tell the jury exactly, was your photo

19   spread to Mr. Haile videotaped?

20   A.   It was not.

21   Q.   Could you tell the members of this jury the manner in

22   which you showed these six photographs to Mr. Haile and what

23   it is, if anything, you said to Mr. Haile before showing him

24   the photographs?

25   A.   I explained to him that I was going to show him six

R. Hickman - Direct

762

1    photographs one at a time, and after each photograph he should

2    answer yes, no, or he was not sure whether it was the person

3    who robbed him.  I told him not to pay too much attention to

4    facial hair, hair on the head, how light or dark a person

5    looked, anything that could change from photograph to

6    photograph.

7         I advised him that just because I was showing him

8    photographs, didn't mean that the person who robbed him was

9    necessarily one of those pictured, so he should not feel

10   compelled to identify anyone.

11   Q.   And do you show all six photographs--  Does the witness

12   have an opportunity, or did Mr. Haile have an opportunity that

13   day to look all six, or did he see only one and then have to

14   give you a response?

15   A.   I showed him one at a time and he has to give a response

16   after each photograph.

17   Q.   Is that recorded on the sheet that you use?

18   A.   It is.

19   Q.   If I could ask you to look at what is marked now

20   Exhibit 4C as in cat.  I think it might be in the book in

21   front of you.

22   A.   That's actually another one of the sheets.

23   Q.   4C, not 4B, I am sorry.

24   A.   Okay, I have it in front of me.

25   Q.   Is that the sheet that you prepared with Mr. Haile?

R. Hickman - Direct

763

1   A.   It is.

2   Q.   And does it record--  Did you actually sign that sheet?

3   A.   I did, my signature is at the bottom with the date, June

4   1, and the time, 1910, which is 7:10 p.m.

5   Q.   When you showed him the first photograph--  If we could

6   have that back on the screen--  I am not sorry, the photograph

7   of A1, whatever that is, 4A1.

8           When you showed him this photograph, what, if any,

9   response did Mr. Haile say?

10   A.   He said, close, somewhat.

11   Q.   Okay.  And then you showed him number 2.  What response

12   did he say to number 2?

13   A.   He said no.

14   Q.   And number 3, what response did he say, if any?

15   A.   He said, yes, yes.

16   Q.   And then that's number 3 on the screen now?

17   A.   Yes.

18   Q.   And did you continue the spread or did you just stop at

19   number 3?

20   A.   No, I continued.  I have to show all six photographs no

21   matter what the response is.

22   Q.   And then when you showed him number 4, what is his

23   response?

24   A.   His response to 4 was no.

25   Q.   Number 5?

R. Hickman - Direct

764

1   A.   No.

2   Q.   Number 6?

3   A.   No.

4   Q.   Were you able to speak with another victim, Detective

5   Hickman, in the course of your investigation?

6   A.   I was.

7   Q.   And did you use, did you have an opportunity to show her

8   photographs?

9   A.   I did.

10  Q.   Was that before or after Mr. Haile?

11  A.   It was after Mr. Haile.

12  Q.   On June 5 of 2007 did you have an opportunity to show

13  him, to show her the photographs?

14  A.   I did.

15  Q.   And at that time did you prepare a sheet similar to the

16  one that you prepared with Mr. Haile?

17  A.   I did.

18  Q.   And if I could ask you now to look at what is marked as

19  Government's Exhibit 4B.

20  A.   Okay.

21  Q.   And is that the sheet that you used at the time on June 5

22  of 2007?

23  A.   It is.  Again, my signature is at the bottom along with

24  the date, June 5, 2007, along with the time, 12:23.

25  Q.   What, if any, answers did Ms. Riley give to the same six

1    photographs, if you would?

2    A.   Well, she answered no to numbers 1 and 2.  She answered

3    yes to number 3.  And then she answered no to numbers 4, 5 and

4    6.

5    Q.   And did you have her sign that sheet?

6    A.   I did.

7         MR. WALUTES:  Your Honor, I would move, if I haven't

8    already, 4B into evidence at this time.

9         THE COURT:  All right.

10         MS. MINTER:  No objection.

11         THE COURT:  It is in.

12   BY MR. WALUTES: (Continuing)

13   Q.   In addition, was Ms. Riley able to describe to you any

14   markings or unique characteristics to the person who had

15   robbed her?

16   A.   She did.

17   Q.   And could you tell us what, if you recall, her comments

18   as to unique markings?

19   A.   She said that he had tattoos on the back of each shoulder

20   and a large tattoo on the upper back, kind of the back of the

21   neck area.

22   Q.   In the course of interviewing or when you were showing a

23   photo spread to Ms. Riley four days later on June 5 of 2007,

24   was that videotaped?

25   A.   It was.

R. Hickman - Direct

766

1    Q.   And in the course of showing that photo spread to Ms.

2    Riley, did something inadvertent, something unplanned by you

3    occur?

4    A.   It did.

5    Q.   Could you tell us what, if anything, occurred.

6    A.   Certainly.  I had a, what we call a case file, which is

7    brown file that has several flaps inside, and that's where we

8    would put different elements of our investigation, such as the

9    police report and supplements, photographs, the photo spread

10   would be on one of the flaps.

11        Because Ms. Riley's report actually occurred or

12   offense occurred in the District of Columbia, we in Alexandria

13   took what is called a police information report since we

14   couldn't report the actual criminal offense that happened

15   outside the boundaries of the city of Alexandria.

16        So, I had that report in the back.  Next to that

17   particular flap was Mr. Mohamadi's personal information which

18   on top had a photograph of Mr. Mohamadi.

19        When I opened up my case file to get her police

20   information case number, which is documented on the worksheet,

21   she was obviously sitting there, saw the photograph of Mr.

22   Mohamadi and said, yep, that's him.

23   Q.   Okay.  Was that the same photograph that you used in the

24   spread that we just looked at?

25   A.   It was not.

R. Hickman - Direct

767

1    Q.   Different photograph?

2    A.   Different photograph.

3    Q.   And all of that was videotaped?

4    A.   It was.

5    Q.   If I could ask you to now look at what is marked as

6    Government's Exhibit No. 5.  And ask if that is the clip of

7    the inadvertent display--  Have you had an opportunity to look

8    at the portion of the videotape that includes only the

9    inadvertent display and then the display of the photo spread a

10   moments, a few minutes later?

11   A.   I did.

12   Q.   Okay.  And is that the videotape that is now marked as 5?

13   A.   Yes, my initials are on it.

14        MR. WALUTES:  Your Honor, I would move in the photo

15   identification procedure, but also the additional earlier

16   inadvertent display of the photo into evidence at this time.

17        THE COURT:  Any objection?

18        MS. MINTER:  The Court's indulgence, Your Honor.

19        There is no objection, Your Honor.

20        THE COURT:  All right, it will be received.

21        MR. WALUTES:  Your Honor, I will ask permission to

22   just publish it at this time.

23        THE COURT:  Go ahead.

24        NOTE:  The video is played.

25   BY MR. WALUTES: (Continuing)

768

1   Q.   Detective Hickman, unfortunately, it appears to be two

2   clips, it makes it look like you walked out and walked back in

3   the room.

4          But is there a break of time between the inadvertent

5   display of a photograph inside your case jacket that is

6   sitting on that file and then you coming back in the room to

7   show the spread?

8   A.   Yes.

9   Q.   And can you give the jury some estimate of the amount of

10  time that you were outside the room?

11  A.   Oh, I think it was three or four minutes.

12  Q.   And just to be clear, the entire interview is videotaped,

13  but this is the portion that is dealing with the inadvertent

14  display and then the display of the photographs?

15  A.   That's correct.

16  Q.   And if you could now look at what is marked as

17  Government's Exhibit No. 6.

18          And I ask you if you recognize that, Detective

19  Hickman?

20  A.   That is the photograph that she inadvertently saw.  She

21  being Ms. Riley.

22          MR. WALUTES:  Your Honor, I would move the admission

23  of Government's 6 at this time.

24          THE COURT:  Any objection?

25          MS. MINTER:  No objection.

769

1              THE COURT:  It will be received.

2              MR. WALUTES:  And if we could publish it at this

3    time, Your Honor.

4              THE COURT:  All right.

5    BY MR. WALUTES: (Continuing)

6    Q.   Is this the approximate size that it was sitting in your

7    jacket, or is that a little bit different in size?

8    A.   Are you asking me the one on the screen, sir, or the one

9    right here in my hand?

10   Q.   You know, how about the one that's in your hand that is

11   marked as Government's Exhibit's 6?

12   A.   I believe that is the size, if not-- Well, I don't

13   believe that's the actual photograph or sheet because it

14   doesn't have the holes at the top.  But that would be about

15   the size of the one that I had because that's how big I

16   usually print them out.  It is basically the same size as the

17   ones used in the photo spread.

18   Q.   So, the one that we have actually admitted into evidence

19   is an accurate size about of what you had in your jacket that

20   day inadvertently shown?

21   A.   Yes.

22   Q.   And then if you could do a comparison to that photograph

23   to the one on the screen.  Does the one on the screen appear

24   different in size?  You seem to distinguish between the two

25   and I wanted to--

770

1   A.   Well, at least on my screen it seemed just, you know, a

2   little bit smaller, but I think that's just as a result of the

3   size of the screen.

4   Q.   Got you.  Okay.  But the one that's in the exhibit book

5   that is marked now as Government's Exhibit 6 appears to you to

6   be about the same size as the one that was displayed

7   inadvertently when you spoke with Ms. Riley on June 5 of 2007?

8   A.   Yes.

9   Q.   Thank you.  Detective Hickman, in the course of your

10  investigation were you able to determine where Mr. Mohamadi

11  was born?

12  A.   I was.  He was born in Afghanistan.

13           MS. MINTER:  Objection, hearsay.

14           THE COURT:  Lay a foundation.  Sustained.

15  BY MR. WALUTES: (Continuing)

16  Q.   Did you have occasion to conduct an investigation into

17  Mr. Mohamadi's--  To communicate with other law enforcement?

18  A.   I did.

19  Q.   And do law enforcement records--

20           MS. MINTER:  Objection, hearsay.

21           THE COURT:  Sustained.

22  BY MR. WALUTES: (Continuing)

23  Q.   Did you interview Mr. Mohamadi's girlfriend?

24  A.   I did.

25  Q.   I will leave it there, Your Honor, I am not going to ask

771

1    the next question.  I will come back there later.

2            Turning your attention to Mr. Haile's stolen cell

3    phone, Detective.  Were you able to determine who was called

4    on that phone during the time when someone was in Mr. Haile's

5    cab and also after he had left the scene of the robbery?

6    A.   Yes.

7    Q.   And did you go to T-Mobile for that information?

8    A.   Electronically.

9    Q.   And did you have occasion to interview the person for

10   whom--  Did you see a number that repeatedly occurred during

11   the course of this robbery and afterwards?

12   A.   Yes.  A number, a particular number was called seven

13   times.  And investigation revealed that phone number returned

14   to Amanda Inge.

15           MS. MINTER:  Objection, hearsay.

16           THE COURT:  Sustained.

17   BY MR. WALUTES: (Continuing)

18   Q.   You did an investigation on who that phone number

19   belonged to?

20   A.   I did.

21   Q.   Did you also have occasion to find out who the apartment

22   at 117 in building 175 South Reynolds belonged to?

23   A.   I did.

24   Q.   Without telling us who that apartment belonged to, is it

25   the same individual that was identified by the phone?

R. Hickman - Direct

772

1   A.   Yes.

2   Q.   Did you have an opportunity, not to tell us what she

3   said, but did you have an opportunity to interview Ms. Inge in

4   the course of your investigation?

5   A.   I did.

6   Q.   And was she cooperative?

7   A.   She was.

8   Q.   Was she able to confirm information with you?  Without

9   telling us what the information was, was she able to confirm

10  information?

11  A.   Yes, she was.

12  Q.   Detective Hickman, do you see Mr. Mohamadi in the

13  courtroom today?

14  A.   I do.

15  Q.   Could you identify him by location and article of

16  clothing.

17  A.   The gentleman sitting at the defense table with the

18  purple sweater on.

19       THE COURT:  I will note the identification of Mr.

20  Mohamadi.

21       MR. WALUTES:  Your Honor, those are all the

22  questions the Government has.  Thank you.

23       THE COURT:  All right.  Cross-examination.

24       MS. MINTER:  Your Honor, based on the Court's

25  instructions at the beginning of this trial, I think we have

R. Hickman - Cross

773

1    to ask to approach at this time.

2              THE COURT:  All right.

3              NOTE:  A side-bar discussion is had between the

4    Court and counsel out of the hearing of the jury as follows:

5    AT SIDE BAR

6              MS. MINTER:  Your Honor, our intention through

7    Detective Hickman is to get into statements that were made to

8    him by Ms. Riley as impeachment of her statement earlier

9    regarding the amount of money that was stolen.

10             It's proper impeachment under the case law, but I

11   just want to raise it now so the Court is aware.

12             MR. WALUTES:  I don't think I have any objection,

13   Your Honor.

14             THE COURT:  Okay, that's fair game.  All right,

15   thank you.

16             NOTE:  The side-bar discussion is concluded;

17   whereupon the case continues before the jury as follows:

18   BEFORE THE JURY

19             THE COURT:  Whenever you are ready.

20             MS. MINTER:  Thank you, Your Honor.

21        CROSS EXAMINATION

22   BY MS. MINTER:

23   Q.   Detective Hickman, you spoke with Kimberly Riley on more

24   than one occasion, correct?

25   A.   I did.

R. Hickman - Cross

774

1   Q.   You spoke with her on the 31st of May of 2007?

2   A.   That's correct.

3   Q.   And that was a phone call?

4   A.   That's correct.

5   Q.   She was not in town at the time?

6   A.   That's right.

7   Q.   She was unavailable to meet with you, so you spoke by

8   phone?

9   A.   That's correct.

10  Q.   But you still discussed the case, correct?

11  A.   I did.

12  Q.   And you asked her some questions about what had happened?

13  A.   I did.

14  Q.   And she answered those questions?

15  A.   She did.

16  Q.   Okay.  One of those questions was--  The Court's

17  indulgence please, Your Honor.

18           THE COURT:  Yes.

19  Q.   Thank you, Your Honor.

20           Of the things that you discussed was the description

21  of the individual that she had seen that night, correct.

22  A.   Yes.

23  Q.   Okay.  And she told you on the phone that day that that

24  person was Persian and Chinese, correct?

25  A.   Correct.

R. Hickman - Cross

775

1   Q.   And that he had told her that he was Persian and Chinese?

2   A.   Yes.

3   Q.   Now, you obviously videotaped the interview that you had

4   with Ms. Riley, correct?

5   A.   I did.

6   Q.   And you don't normally videotape those interviews,

7   correct?

8   A.   Victim interviews?

9   Q.   Correct.

10  A.   I do sometimes.  Other times I don't.  It depends.

11  Q.   Okay.  But it is not your normal practice, you don't do

12  it in every case?

13  A.   Not in every case.

14  Q.   And you did it in this circumstance to protect against

15  false accusations, correct?

16  A.   That's correct.

17  Q.   Okay.  From Ms. Riley?

18  A.   Yes.

19  Q.   So, that was for your protection?

20  A.   That's correct.

21  Q.   Now, we've just seen that you brought Ms. Riley in to

22  view a photo array, correct?

23  A.   Yes.  And I interviewed her prior to the photo array.

24  Q.   Now, but one of the reasons for bringing her in was to

25  view a photo array?

R. Hickman - Cross

776

1    A.    That's correct.

2    Q.    And you showed individual pictures, correct?

3    A.    That's right.

4    Q.    One at a time?

5    A.    Yes.

6    Q.    Okay.  And similar to the way that the jury has observed

7    them today, one picture would go up at a time, correct?

8    A.    Well, I am not sure I understand the question.  That was

9    my showing--  So, it's not really similar.  That was it.

10   Q.    Okay.

11   A.    That was the actual video of me show Ms. Riley the

12   photos.

13   Q.    But I mean the way the jury actually observed them on the

14   screen, one picture would go up, she would have an opportunity

15   to view it?  It was the same set of pictures, correct, that

16   they have seen?

17   A.    Yes, yes.

18   Q.    Okay.  So, basically they have seen what Ms. Riley saw

19   that day?

20   A.    If I understand your question, I used one photo spread in

21   an A series for the entire case, no matter what the case is.

22   For each individual victim or witness, they would have their

23   own sheet, the photo lineup sheet.  And that way, other than

24   the A1 through A6 on the photographs, there is no markings on

25   the photographs.  One photo spread, multiple sheets.

R. Hickman - Cross

777

1            If say a case where there is tow or three suspects,

2    the second one would be the B series, the third one C series,

3    et cetera.

4    Q.   Understood.  And so, as you showed--  Well, you showed

5    these pictures at one at time and requested an answer one at a

6    time, correct?

7    A.   Yes.

8    Q.   Why did you do that?

9    A.   Because that is how we are supposed to do it.

10   Q.   Okay.  That's part of your training?

11   A.   Well, yes, we actually have a policy on showing photo

12   spreads, and that's how we are supposed to do it.

13   Q.   And you were the one who selected the pictures that were

14   to be used in that photo array, correct?

15   A.   I did.

16   Q.   And you have a system, I believe, is what the prosecutor

17   called it for putting together that array, correct?

18   A.   Well, yes.

19   Q.   Okay.  And part of that system is to put together six

20   photographs that look perhaps not identical, but similar

21   enough that one person doesn't stand out, correct?

22   A.   Well, the system doesn't do that.  I put in, you know, an

23   age, race and, you know, you can even put in hair if you want.

24   And it gives you a bunch of paragraphs, and then I simply page

25   through the photographs, picking out ones that I ultimately

1    will put in the photo spread.

2    Q.   Okay.  And I think my use of the word "system" may have

3    overly complicated things.  My question is simply, you

4    purposely as the designer of this photo array select

5    individuals who look similar enough that one person doesn't

6    stand out, correct?

7    A.   Yes.

8    Q.   And that's because you don't want to draw attention to

9    any one particular individual, don't want to highlight them?

10   A.   That's correct.

11   Q.   Now, prior, we have seen that prior to showing this six

12   person or six photograph photo array to Ms. Riley, she saw an

13   individual photograph?

14   A.   She did.

15   Q.   Of Mr. Mohamadi?

16   A.   Yes.

17   Q.   That wasn't a photograph from your database?  That was

18   specifically a photograph of Mr. Mohamadi?

19   A.   Yes, ma'am.

20   Q.   In the file?

21   A.   Yes.

22   Q.   And that picture that was in the file that you have

23   identified, that actually depicts Mr. Mohamadi in a jail

24   issued jumpsuit, correct?

25   A.   It does.

R. Hickman - Cross

779

1  Q.   And that was the only picture on the front of your file,

2  correct?

3  A.   Well--

4  Q.   When you opened it?

5  A.   Right.  That picture stood alone.

6  Q.   Okay.  And that picture was in a file for investigation

7  for one of these two robberies, correct?

8  A.   Well, that was my working case file for Mr. Haile's

9  robbery.

10  Q.   And, obviously, you took that file to the interview with

11  Ms. Riley even though Mr. Haile wasn't present for that

12  interview?

13  A.   That's correct.

14  Q.   Okay.  Now, you also have testified that you met with Mr.

15  Haile, correct?

16  A.   I did.

17  Q.   And, excuse me, that was the end of May, beginning of

18  June of '07, within a couple days after?

19  A.   I met with him for an interview on the 31st of May, and

20  then again on the 1st of June to show the photo spread.

21  Q.   Okay.  And when you met with him for the interview, you

22  discussed the circumstances of the event?

23  A.   Yes.

24  Q.   And you discussed the fact that a gun was alleged to have

25  been involved?

R. Hickman - Cross

780

1   A.    Yes.

2   Q.    And you asked Mr. Haile to describe the gun?

3   A.    I believe so, yes.

4   Q.    Okay.  And at that time he couldn't tell you the

5   difference between a revolver and an automatic, is that

6   correct?

7   A.    That's right.

8   Q.    Okay.  Even after being shown pictures?

9   A.    I believe that's accurate.

10  Q.    Okay.  And you also had a conversation with him about the

11  physical description of the person involved in the incident?

12  A.    I did.

13  Q.    Okay.  And he described that person to you?

14  A.    He did.

15  Q.    Okay.  And you asked him affirmatively if the person

16  could have been Middle Eastern, correct?  You offered that to

17  him as a possibility?

18  A.    No.  He told me that the person was either Middle Eastern

19  or Spanish.  And he said that his father, the victim is

20  telling me that the suspect told him his father was from

21  Afghanistan.

22  Q.    Okay.  So, your testimony today is you didn't

23  affirmatively ask if the person could be Middle Eastern?  That

24  was something he offered on his own?

25  A.    My recollection is that just in me taking the description

R. Hickman - Cross

781

1    and just asking what the person looked like, that was part of

2    his description.

3              I would have to check my supplemental report for the

4    exact verge I used in my report, but that's my recollection.

5    Q.   Would it refresh your recollection to review your report?

6    A.   It would.

7    Q.   Your Honor, with the assistance of the Court Security

8    Officer, I would pass up the document to Detective Hickman.

9              THE COURT:  All right.

10   A.   Thank you.

11             Okay.  Would you like me to read, ma'am, what it

12   says in my supplement report?

13   Q.   Well, if you would just tell me if that refreshes your

14   recollection about the conversation you had?

15   A.   It does.  I mean, it confirms what I said earlier.  I

16   asked him to describe the suspect.  And he said he was

17   Hispanic or Middle Eastern male.

18   Q.   Okay.  So, your testimony is that you did not

19   affirmatively ask him if he was, if the suspect was Middle

20   Eastern?

21   A.   My recollection is that I asked him to describe the

22   suspect, and that was his description, and that's what I

23   documented in my supplement.

24   Q.   Now, you--  Excuse me.  Mr. Haile indicated to you that

25   that person had an accent, correct?

782

1   A.   The suspect had an accent?

2   Q.   Yes.

3   A.   I don't recall if he did or not, ma'am.

4   Q.   The Court's indulgence.

5        THE COURT:  Yes, ma'am.

6   Q.   Detective, would it refresh your recollection to review a

7   transcript of your interview with Mr. Haile?

8   A.   I am sorry, I was reading and my mind was wondering.

9   Please ask the question again.

10  Q.   My question was, you indicated that you couldn't recall

11  if you had affirmatively, if he had offered the information

12  about having an accent?

13  A.   Yes.

14  Q.   Would it refresh your recollection to review?

15  A.   If you have the transcript, certainly.

16  Q.   I am going to pass up to you, with the assistance of the

17  Court Security Officer, and I am going to direct you--  There

18  are a number of tabs in that book.

19  A.   Okay.

20  Q.   And I am going to direct you to tab section under the

21  name Gebru Haile.

22  A.   Okay.

23  Q.   And then I would further direct your attention to page 20

24  under that tab.

25  A.   All right.

R. Hickman - Cross

783

1   Q.   What I am going to ask you to do is to read lines 1

2   through 9, and when you are done, just look up so I know you

3   are finished.

4   A.   Okay.  You want me to, obviously, give the individual who

5   is speaking for clarification?  Mr. Haile says --

6   Q.   I am sorry?

7   A.   -- he was bald.

8   Q.   My question is first whether that refreshes your

9   recollection about whether the two of you discussed?

10  A.   Yes.

11  Q.   Okay.  And if it refreshes your recollection, did you

12  discuss whether or not the individual had an accent?

13  A.   We did.

14  Q.   Okay.  And did Mr. Haile indicate that the individual who

15  had been in his cab that night had an accent?

16  A.   Yes, he did.

17  Q.   If you recall?

18  A.   He did.

19  Q.   Now, Detective, you testified on direct examination that

20  you obtained records relating to a cell phone, is that

21  correct?

22  A.   I did.

23  Q.   Okay.  And you said that you have been a detective for

24  how many years, I am sorry?

25  A.   16.

784

1   Q.   16.  And is robbery your specialty, if you will?  Is that

2   the primary type of case you work?

3   A.   For the last seven years, yes.

4   Q.   So, you have had occasion to pull records from what we

5   might call cell sites, correct?

6   A.   Well, that is one of the things that I request.  I don't

7   know the technology to map cell cites.  Another unit within

8   the police department does that.

9   Q.   Okay.  But you have requested those type of records,

10  correct?

11  A.   I have.

12  Q.   And the purpose of that would be to identify where a

13  particular cell phone was when it made or received a phone

14  call, correct?

15  A.   That's my understanding, yes.

16  Q.   Not to the square foot, but within a certain area?

17  A.   Within a, you know, a circular area.

18  Q.   Okay.  And that's something that you can use to identify

19  where someone with a particular cell phone might have been at

20  a particular time?

21  A.   Within that circular area, yes, ma'am.

22  Q.   And you've, you have used that for other cases you said?

23  A.   I have.

24  Q.   Now, if we could go back for just a moment to the

25  conversation that you had with Mr. Haile on the 1st of June

785

1   regarding the photographs.

2   A.   Okay.

3   Q.   You testified that initially in response to the first

4   picture, he indicated that person was close or somewhat?

5   A.   I believe those were his exact words, close, somewhat.

6   Q.   And he eventually asked to see that picture compared with

7   the picture that he ultimately identified, correct?

8   A.   That's right.

9   Q.   If we can go back then to the subject of phone records.

10  As part of this investigation you requested phone records for

11  Mr. Haile's cell phone, correct?

12  A.   I did.

13  Q.   Okay.  And that's because you believed that the person

14  who had committed the robbery had taken the cell phone with

15  them, correct?

16  A.   Well, Mr. Haile had told me that the individual that he

17  gave the ride to who ultimately robbed him used his cell

18  phone.

19  Q.   Okay.  So, you thought that obtaining those records might

20  give some indication who that person was, correct?

21  A.   That's correct.

22  Q.   Okay.  And you received the records that you requested,

23  correct?

24  A.   I did.

25  Q.   In June of 2007, approximately?

R. Hickman - Cross

786

1    A.    Approximately.

2    Q.    Okay.  And you reviewed those calls that were made on the

3    26th and 27th of May, perhaps just the 27th?

4    A.    The 27th, yes, ma'am.

5    Q.    And you discovered that a phone call had been made to

6    Yellow Cab of Alexandria, correct?

7    A.    Yes.

8    Q.    And that was because a phone call was made at 4:01 in the

9    morning on May 27 to Yellow Cab, correct?

10   A.    Yes.

11   Q.    And when you contacted Yellow Cab, they were able to give

12   you some information, correct?

13   A.    That's right.

14   Q.    That a person had been picked up at 175 South Reynolds

15   Street?

16   A.    Yes.

17   Q.    But they weren't able to tell you where that person was

18   delivered to, that passenger?

19   A.    That's correct.

20   Q.    And they never got back to you with that information,

21   correct?

22   A.    They did not.

23   Q.    Okay.  And you did not follow up on that information?

24   A.    I believe I did several months later, and just wasn't

25   able to get any information.

R. Hickman - Cross

787

1    Q.    Okay.  Is that documented in your report?

2    A.    I don't believe so because I don't think I actually spoke

3    with the gentleman I had spoken to that day.  I forget his

4    name, it may be documented, but he is one of the managers and

5    he wasn't around.  So, at that point, you know, I just let it

6    go.

7    Q.    Okay.  And that you indicated is not documented in your

8    report?

9    A.    The second phone call?  The first phone call when I

10   called Yellow Cab is documented.

11   Q.    Certainly.  And the second phone call when they were

12   unable to help you, you did not document that?

13   A.    No.  It was several months later.

14   Q.    The Court's indulgence.

15          THE COURT:  Yes, ma'am.

16   Q.    Detective Hickman, going back to the cab from Yellow Top

17   Cab, the conversation we were just having?

18   A.    Yellow Cab.

19   Q.    Correct.  I just want to make sure that we're clear since

20   there are a number of cabs at issue.  The cab that arrived to

21   pick up the individual at 175 South Reynolds Street, you never

22   spoke to the driver of that cab?

23   A.    I did not.

24          MS. MINTER:  Nothing further, Your Honor.

25          THE COURT:  All right?  Any redirect?

788

1          MR. WALUTES:  Just briefly, Your Honor.

2       REDIRECT EXAMINATION

3   BY MR. WALUTES:

4   Q.   Detective Hickman, if you could keep that for one second.

5   Do you remember being asked a question about whether you

6   suggested or Mr. Haile told you that it was a Middle Eastern

7   or a Hispanic male who robbed him?

8   A.   I do.

9   Q.   And do you remember her asking you to look at page 20 and

10  specifically focusing you on accent?

11  A.   Yes.

12  Q.   If I could ask you to look at the page before page,

13  page 19, and look at line 15.

14  A.   Okay.

15  Q.   And do you see his answer to that?

16  A.   Yes.

17  Q.   So, when you are talking to Mr. Haile, although you may

18  have said was he, was the accent Middle Eastern or Spanish,

19  what was the question immediately before that question that

20  you asked Mr. Haile?

21  A.   So, you are referring to the question I asked on line 15

22  of page 19?

23  Q.   Yes, I am.

24  A.   Do you want me to read it to you, sir?

25  Q.   Please, if that would make it the most accurate.

789

1   A.   Okay.  Now, do you think he was white, do you think he

2   was black, do you think he was Hispanic, Middle Eastern, what

3   would, what would you think he was?

4   Q.   And Mr. Haile's answer to you?

5   A.   Maybe Hispanic or Middle Eastern, he's not quite white.

6   He's got some accent, facially say more close to white.

7   Q.   And so, you give a range and Mr. Haile picks Middle

8   Eastern or Hispanic?

9   A.   Right.

10         MR. WALUTES:  Those are all the questions I have,

11   Your Honor.

12         THE COURT:  All right.  May the detective be

13   excused?

14         MR. WALUTES:  Yes, Your Honor.

15         THE COURT:  All right, Detective Hickman, you are

16   excused at this time.  Please don't discuss your testimony

17   until the trial is over.  All right, sir?

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  Have a good afternoon.

20         NOTE:  The witness stood down.

21         THE COURT:  Do you have a short witness you want to

22   put on?

23         MR. WALUTES:  We don't, Your Honor.  I hope you are

24   going to let me go until tomorrow.  The next witness is kind

25   of big with some audios and such.

790

1          THE COURT:  Okay.  Well, I think we've moved along
2   very well today.

3          All right.  We are going to break at this time.
4   Does 9 o'clock work tomorrow morning for everyone?

5          All right, then we will continue with the evidence.
6   Is the witness list that I have still approximately the number
7   of witnesses?  I see approximately four.

8          MR. WALUTES:  That's exactly dead on, Your Honor.
9   That's what we expect left, and we would think that --

10          THE COURT:  All right.  So, just for, I am sure you
11   are curious, we have got four more Government witnesses, and
12   then we will go from there.

13          So, we will see you at 9 o'clock.  Again, please
14   don't do any research, discuss the evidence that you have
15   heard with anyone, don't go visit any scenes.  Just have a
16   nice evening.  Hopefully the traffic will be a little bit
17   better tomorrow morning, and we will see you at 9 o'clock.

18          All right, you are excused at this time then.

19          NOTE:  At this point the jury leaves the courtroom;
20   whereupon the case continues as follows:
21   JURY OUT

22          THE COURT:  All right, have a seat.  So, you have
23   got the four witnesses.  And then I guess Ms. Inge would be
24   the longest of those witnesses probably?

25          MR. WALUTES:  Ironically, Your Honor, I think the

791

1    first one will be.  I might switch Lieutenant Johnson with

2    Investigator Burnham, but Investigator Burnham is going to put

3    in the four telephone calls and that is going to take some

4    time.

5            I believe you are right, there is more content

6    perhaps to Ms. Inge, but she will I think, because I am doing

7    the calls through a different witness, will not be as long.

8            THE COURT:  All right.  So, you will finish tomorrow

9    your case in chief?

10           MR. WALUTES:  I think before lunch, Your Honor.

11           THE COURT:  All right.  So, then let's be ready for,

12   if you are going to put on any witnesses, be ready tomorrow

13   afternoon to do so.  All right?

14           MS. MINTER:  Certainly, Your Honor.

15           THE COURT:  All right.  Anything else?

16           MR. WALUTES:  No, not from the Government, Your

17   Honor.

18           THE COURT:  All right.  Then we are in recess until

19   9:00 a.m.

20           I am sorry, have you discussed the jury

21   instructions?

22           MR. WALUTES:  We have, Your Honor.  Also, I believe

23   I moved in Government's 58, which is the gun, Your Honor.  I

24   know it was published to the jury.  I just because it actually

25   affects who takes custody of the weapon at night--

792

1          THE COURT:  I think it's in and we have made

2     arrangements to lock it up.

3          MR. WALUTES:  Great, thank you, Your Honor.  I am

4     sorry for the interruption.  Mr. Nachmanoff, and I think I did

5     see some, we exchanged e-mails in a constructive manner to try

6     to focus our areas.

7          I don't know if Mr. Nachmanoff has concluded his

8     review of both sets of competing jury instructions, but I know

9     that we have had discussions, and I think we have at least

10    focused some of the areas that we think we probably won't be

11    able to resolve between the parties.

12         THE COURT:  Okay.

13         MR. NACHMANOFF:  Yes, Your Honor.  We exchanged

14    messages over the weekend.  And I think what we need to do is

15    sit down and have a final conversation about what we have

16    agreed upon, what's left to address with the Court, and we

17    will be able to do that hopefully sometime tomorrow perhaps--

18         THE COURT:  Perhaps lunch time.

19         MR. NACHMANOFF:  Lunchtime or in the afternoon.

20         THE COURT:  All right.  If I need to give you a

21    little time to do that, let me know.  But the jury shouldn't

22    be unduly delayed because of work we need to do on jury

23    instructions.

24         All right, then we are in recess until 9 o'clock

25    tomorrow morning.

793

1          NOTE:  The March 15, 2010 portion of the case is

2     concluded.

3          --------------------------------------------------

4

5

6

7

8

9

10

11

12

13

14

15

16

17          I certify that the foregoing is a true and

18     accurate transcription of my stenographic notes.

19

20

21                    /s/  Norman B. Linnell
                  _____
22                Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25