794

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :       Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
              Defendant.      :
                              :
------------------------------:
```

V O L U M E   4 of 5

TRIAL   TRANSCRIPT

March 10-11 & 15-18, 2010

Before:  Liam O'Grady, Judge

And a Jury

APPEARANCES:

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| BRIAN JOHNSON | | |
| | DIRECT | 824 |
| | CROSS | 826 |
| GEORGE BURNHAM | | |
| | DIRECT | 827 |
| | CROSS | 845 |
| | REDIRECT | 851 |
| AMANDA T. INGE | | |
| | DIRECT | 857 |
| | CROSS | 895 |
| | REDIRECT | 915 |
| VICTOR CASTRO | | |
| | DIRECT | 921 |
| | CROSS | 945 |
| RHETT C. BUER | | |
| | DIRECT | 983 |
| SOLOMON D. TEEKA | | |
| | DIRECT | 987 |
| | CROSS | 990 |
| NICHOLAS LION | | |
| | DIRECT | 991 |
| | CROSS | 994 |
| PASCUAL VELARDE | | |
| | DIRECT | 996 |
| | CROSS | 1005 |
| | REDIRECT | 1009 |

796

1              NOTE:  The March 16, 2010 portion of the case begins

2  in the absence of the jury as follows:

3  JURY OUT

4              THE COURT:  All right, good morning.

5              MR. WALUTES:  Good morning, Your Honor.

6              MR. NACHMANOFF:  Good morning, Your Honor.

7              THE COURT:  Good morning, Mr. Nachmanoff.

8              MR. NACHMANOFF:  Thank you for coming out before the

9  jury came in.  There are a couple of preliminaries.  There are

10 two brief evidentiary matters, just housekeeping objections

11 that I would like to address.  And then there are some more

12 substantial matters that Mr. Mohamadi would like to address to

13 the Court.

14             THE COURT:  Certainly, go ahead.

15             MR. NACHMANOFF:  Thank you.  If I could just have

16 Ms. Minter address the two evidentiary issues very briefly.

17             MS. MINTER:  Good morning, Your Honor.

18             THE COURT:  Good morning.

19             MS. MINTER:  The first, Your Honor, I think is

20 pretty short and sweet.  Yesterday during Officer Paige's

21 testimony regarding the gun we indicated that there was no

22 objection to the gun.  I think for record purposes and

23 appellate purposes, we should make clear that we maintain our

24 objection that the evidence regarding the gun should be

25 inadmissible.  We understand the Court's ruling, and that's

797

1   why we didn't affirmatively object yesterday.

2          But we maintain that that testimony and that

3   evidence is inadmissible.

4          THE COURT:  I think that's very reasonable.  And I

5   noted your exception to the admission of all the June 12

6   activity.  So, I think the record is clear.  Your exception is

7   noted.

8          MS. MINTER:  Thank you, Your Honor.  Your Honor, the

9   second objection is to upcoming evidence.  The Government

10  indicated yesterday that they intended to introduce the

11  upcoming recordings of phone calls from the jail allegedly

12  between Mr. Mohamadi and Dominik Brown.  There has been some

13  discussion of those tapes previously and specific portions,

14  but at this point we would object to them wholesale.

15         We would submit they--  Our assumption, Your Honor,

16  is that they are being admitted as a business record given

17  that they are coming in through Investigator Burnham and not

18  through any party to the conversation.

19         Based on that, Your Honor, we would submit that it

20  is not a proper business record.  It is kept by the jail, but

21  it is not kept by the jail for the purpose of running the

22  jail.

23         The inherent reliability of business records comes

24  from the fact that businesses are assumed to keep proper,

25  correct, authentic records because they the functioning of

798

1    their business would fail but for that.

2            That is not the purpose here.  The jail does not go

3    back and rely on these tapes or use them for some reason to

4    run the jail or manage the jail.

5            Additionally, they are not a proper business record

6    because they are not prepared by the business.  One of the

7    elements for a proper business record is that it has to have

8    been based on the personal knowledge of the entrant of the

9    information.

10           And in this case, the entrant of the information

11   that is at issue is really the two parties who are alleged to

12   have the conversation.  There is no information being inputted

13   by Investigator Burnham here.  In fact, my understanding is

14   that the collection part of the phone calls is completely

15   automated.

16           So, this is not a circumstance where they are

17   recording themselves the information that takes place.

18   Rather, it is Dominik, allegedly Dominik Brown and Mr.

19   Mohamadi that are creating the business record.  And they are

20   not employees of the jail and they are not people with

21   firsthand knowledge of the business.

22           So, we would submit it's not a good, proper business

23   record.

24           Beyond that, Your Honor, regardless, the comments by

25   Dominik Brown on his half of the conversations are hearsay and

799

1   are still being admitted for the truth of the matter asserted.

2   And without any proper exception to that hearsay, they are

3   inadmissible.

4          Lastly, Your Honor, Dominik Brown, as we understand

5   from the Government's witness list, is not here to be

6   questioned or cross-examined or confronted.  So, this is a

7   violation of the Supreme Court's ruling in Crawford in that it

8   allows testimonial evidence without the opportunity to

9   cross-examine and confront Mr. Mohamadi's accusers.

10          We would ask the Court to keep out the Government's

11   exhibits relating to those tapes.

12          THE COURT:  All right, thank you, Ms. Minter.

13          Mr. Walutes.

14          MR. WALUTES:  Your Honor, frankly, it is settled law

15   I believe in this circuit now that these recorded jail calls

16   do come in.  They are statements of the defendant against his

17   interest.

18          Mr. Brown's portion of the call is obviously not

19   offered for the truth of the matter, although they are

20   statements of a co-conspirator, which is also settled law in

21   the Fourth Circuit.  You don't have to charge the conspiracy,

22   whether you have statements in furtherance of the conspiracy.

23          And clearly there is, under the Government's charge,

24   an effort to tamper with a witness appearing before the

25   federal grand jury.

800

1          Even on the business records, Your Honor, I don't

2     believe you can just analyze it under that.  But even under

3     that, they are wrong.  Mr. Burnham is in charge of running

4     the, recording inmate calls for the Alexandria Adult Detention

5     Center.  He does that in order to secure that institution.

6     The institution does it to ensure that there aren't guards

7     fraternizing with prisoners, that there weren't illegal

8     activities occurring in the jail.  He will testify to all of

9     that today, Your Honor.

10          And he is personally responsible for monitoring the

11    system.  And he is the one who in fact monitors the calls.  He

12    is familiar with this defendant's voice.  He can authentic the

13    defendant's voice.  They are statements against the

14    defendant's interests.

15          And Mr. Brown's part of the conversation, Your

16    Honor, he is not on trial here.  As the Court knows from

17    having reviewed these transcripts, in fact issuing an order

18    prior to this trial allowing their use and admission in this

19    trial, there is nothing from Mr. Brown that adds to the

20    conversation.  Mr. Brown is simply doing what he is told.  He

21    is texting information that is--  In fact, the words in the

22    text is being given to him by the defendant.

23          And the Government has Ms. Inge who will testify

24    that those texts are in fact received by her.  Ms. Inge is on

25    a portion of two of the calls and she will testify that it was

801

 1    Mr. Brown who she knew to be a friend of the defendant's.  She

 2    will testify that it was her voice.

 3           And so, Your Honor, there is nothing being offered

 4    in these tapes that--  Frankly, it is all black letter

 5    admissible in the Government's view.

 6           I understand that Ms. Minter has informed me this

 7    morning for the first time that she wished to make the

 8    objection, Your Honor, but I didn't have time to pull up the

 9    cases, but I know that Judge Ellis has written on this.

10           I know I have admitted these tapes after many, many

11    long disputes with the attorneys in the capital case before

12    Judge Lee.  And I believe that at this point the Fourth

13    Circuit has written on this as well.

14           And so, it's my recollection that these tapes are

15    admissible.  It is the proper witness to lay the foundation,

16    he is the one in charge of doing it as a matter of security

17    for the Alexandra Adult Detention Center.

18           THE COURT:  All right.  Thank you.

19           Well, your exception is noted.  I am going to admit

20    the tapes.  I think that the law, Fourth Circuit law is clear

21    that these are admissible.  They are business records.  Mr.

22    Burnham in fact is in charge of keeping these tapes for

23    security reasons at the jail.  They are kept in the ordinary

24    course of the jail.  And understandably for security reasons

25    are an important part of the functioning of the jail itself.

802

1          So, they have been admitted previously over the

2     years as business records.  They are also clearly admissions

3     against interest by Mr. Mohamadi.

4          And Dominik Brown has been identified as a

5     co-conspirator in this series of events.  And clearly they are

6     also admissible as statements by a co-conspirator, although

7     not charged.

8          So, your exception is noted, Ms. Minter.

9          MS. MINTER:  Thank you, Your Honor.  If it could be

10    noted on a continuing basis.

11         THE COURT:  All right.  Mr. Mohamadi, do you want

12    to--

13         MR.  NACHMANOFF:  Your Honor, I mentioned to Mr.

14    Walutes that this issue might arise.  And I would ask the

15    Court to permit us to have the Government leave and do this ex

16    parte if this discussion begins to address issues of

17    representation or defense strategy.  I don't think there is

18    any need for the Government to be here, and it would be

19    inappropriate.

20         MR. WALUTES:  We have no objection to proceeding in

21    that fashion, Your Honor.

22         THE COURT:  All right.

23         MR. NACHMANOFF:  Thank you.

24         NOTE:  The Government attorneys leave the courtroom.

25         MR. NACHMANOFF:  Your Honor, I think in the

803

1   interests of justice, it would be appropriate to close the

2   courtroom as well.

3           THE COURT:  All right, let's have our visitors to

4   the courtroom exit at this time.  Thank you.

5           NOTE:  All spectators leave the courtroom.

6           THE COURT:  All right.  Good morning, sir.  Go

7   ahead.

8           THE DEFENDANT:  Good morning, Your Honor.

9           I just want to start off by first of all objecting

10  to the 911 call that was entered into evidence yesterday for

11  the simple fact that this was a call that I was deprived of in

12  state court, they didn't offer this into evidence and didn't

13  even give me a notification that it even existed.

14          Second, to the context of how they completely

15  transformed the call and then provided a transcript,

16  completely misstating what was said on that call.

17          The guy clearly says when he is asked, who is this

18  individual, the lady, the dispatcher asks, who is it?  And the

19  first time she asks he says, he has a gun, I don't know,

20  blas-a-blah.  And then he is asked again, is he white, black

21  or Hispanic?  And he repeats again, and this time he says, he

22  says, he say he have a gun, I don't.  Blas-a-blah, in that

23  context.

24          And then just the fact that he told Officer Lion it

25  was a black or Hispanic individual and just countless other

804

1    officers, just clearly points out that he does not say, he

2    said he's Afghan, because nowhere in his testimony did he say

3    that the person in the cab told him that he was Afghan.

4    Because if that was the case, that would have been something

5    that would have been told to the officers who initially

6    arrived.

7              And just the fact that this guy just completely

8    perjured himself.  I mean, I am very sympathetic if he was

9    robbed, and that's a whole different matter.  But just from my

10   experience, I have witnessed him lie in three different court

11   proceedings.  And it is just extremely frustrating.

12             And then on top of that, to have the Government

13   coach him into saying all this extra stuff that was never

14   revealed or never even discussed in the any of his other

15   testimonies.

16             And just the fact that now the jury was provided

17   with this 911 call, and then in addition a transcript of the

18   call, clearly misleading the jury into believing that he said

19   that it was an Afghan individual.  Basically combating all of

20   the other identifications that he made and all the other times

21   he has lied clearly in court where, you know, tons and tons of

22   situations where it is already on record.

23             And I just wanted to object to this--

24             THE COURT:  Well, the tape existed whether it was

25   played or not in prior hearings, it clearly existed.  And if

805

1   you were listening, I told the jury that the call itself was

2   the evidence and not the transcript.

3           And your counsel very effectively brought out the

4   inconsistencies in that testimony and that he had said on

5   multiple occasions, gave varying descriptions.

6           So, I don't know what else--  I know you object to

7   it--

8           THE DEFENDANT:  Are you referring to the badgering

9   he did to the witness?

10          THE COURT:  I am sorry?

11          THE DEFENDANT:  Are you referring to when he

12   badgered the witness while he was on the stand?

13          THE COURT:  I am referring to the fact the witness

14   had to admit to having made multiple descriptions of the

15   person who robbed him and, you know, undermining repeatedly

16   whether the individual who robbed him was white, black,

17   Hispanic, Chinese.  There was significant cross-examination,

18   and I thought it was very effective.

19          THE DEFENDANT:  But it's just the fact that he is

20   saying, he say he have gun.  And if you listen to that part,

21   the first part, the first time he said it sounds like he says

22   Afghani.  But he is saying, he says he have gun.  And you have

23   witnessed yourself the way he speaks.

24          THE COURT:  Well, then that is something counsel can

25   argue.  And they will have the tape back and they can listen

806

1  to it.

2          THE DEFENDANT:  Okay.  That was my first issue.

3  Thank you.

4          THE COURT:  Okay.

5          THE DEFENDANT:  My second issue is I am being denied

6  my Constitutional right.  And the Fourth Circuit has also

7  ruled on this where I have a right not only to prepare for a

8  defense, but a Constitutional right to have witnesses in my

9  favor to help assist in my defense.

10          From the get-go I gave Mr. Salvato a list of

11  witnesses, which I also gave Mr. Nachmanoff the same witness

12  list.

13          Just for the record, just so there isn't any

14  confusion because I know the Court has recognized my numerous

15  complaints regarding counsel, I am extremely appreciative of

16  Ms. Minter's spirited defense of me.  But Ms. Minter is not

17  the only counsel representing me, it is a three group, three

18  individuals involved.  And I just can't agree with some of the

19  decisions and some of the stuff that has been, you know,

20  decided upon in my defense regarding all the individuals

21  involved in my case.

22          One of the main issues is the witnesses.  I have

23  noted, I have described several witnesses that I would need in

24  my defense.  I m basically being accused of ten different

25  counts of felonies that hold lengthy sentences.  I am being

1  slandered with these prostitution allegations.  And then a

2  fictitious gun has been entered into the case where, you know,

3  an individual, all he had to do was just say, oh, this is

4  someone I knew.  He doesn't even know my name, he doesn't even

5  know me, but he is able to introduce a firearm into this case.

6          Now, with all these, all these factors being

7  considered, I just feel like it is very necessary that I

8  present some type of a defense outside of the defense that Mr.

9  Nachmanoff has proposed.  Which is to say that, okay, this is

10  what the police officers didn't do.

11          And I just don't--  I have told him from the

12  beginning, I am not going to just sit here and base my defense

13  on a bunch of inferences and, you know, base it on theories.

14  My whole intention was to provide facts and evidence to

15  support my defense.

16          And up until this point, I haven't received anything

17  substantial that will help the jury even consider innocence in

18  regards to my case.  I mean, there is no evidence or anything

19  being offered.

20          The Government has offered over 57 pieces of

21  evidence, numerous witnesses who have been coached and have

22  made numerous false accusations.  And now I am being told that

23  the only witnesses that are going to be offered in my defense

24  are a cab driver that Mr. Hickman forgot to follow through on

25  and maybe two other witnesses.  Which I don't feel like that's

808

1    going to be-- That's not a full defense. I am facing a life

2    sentence. And I feel like I am being deprived of my

3    Constitutional right to a full defense.

4           Given the time period of the amount of time that my

5    counsel had to receive my case, I understand all these

6    factors, but I can't just sit here and allow myself to be

7    fast-tracked just because, okay, you know, it's not their

8    fault, the Court assigned them to the case and the Court told

9    them they have to come to trial at a certain date.

10          I feel like the fact that, you know, the time limit,

11   the time restraint has hindered my defense in a sense, but at

12   the same token I have also been very adamant about certain

13   witnesses which the investigator that Mr. Nachmanoff has in

14   his office has spoke to some witnesses, but failed to give

15   them a subpoena to come to court.

16          And I explained to Mr. Nachmanoff, given-- His

17   concern is the fact that he doesn't want to put anyone on the

18   stand that he is not 100 percent sure of what they might say.

19   Human nature is unpredictable, you never know what a person

20   will say on the stand.

21          My whole assertion is that I wanted to place these

22   people on the stand and compel them to tell the truth. And if

23   they lied, that will be a matter that I will deal with

24   afterwards if that's the case. And that's why we are having

25   this conflict. And I think it is a very serious conflict

809

1    because, you know, I am being--  I was just told at the end of

2    the Government's presentation yesterday, I was just told,

3    notified that, okay, these other witnesses are not going to be

4    available, or they haven't been reached, they haven't been

5    contacted or they haven't been subpoenaed.  So, basically,

6    letting me know that I am going to be deprived of a very

7    essential part of the defense.

8            THE COURT:  Are these eyewitnesses?  Who are these--

9            THE DEFENDANT:  These are, one of them is an alibi

10   witness that I have phone records to support the situation on

11   May 26 and 27th.  That was one of the most important

12   witnesses.  And the investigator did go speak with these

13   individuals.  And being that it is two years after the fact, I

14   just received the phone records and I was just able to narrow

15   down, you know, kind of get an idea of where I was by the call

16   patterns.

17           They were able to kind of say, well, we think so, we

18   are not really sure.  But even to that extent, I would want

19   even that bit of evidence to be presented to the jury.  They

20   should be able to evaluate every, every and any possible

21   defense.

22           And other witnesses are--  You know, this case was

23   orchestrated while I was incarcerated, so there is tons of

24   government and state employees that witnessed certain events

25   that I wanted to compel to get on the stand and describe these

810

1    events in my defense.

2          For example, a very important factor where the

3    Government's informant gave the envelope with the money

4    receipt, requesting money to be removed off of my account to

5    the deputy.  And I have already spoke to the deputy while I

6    was in Alexandria, he recalls this exactly.  And I wanted this

7    factor to be introduced to the jury because in the long run

8    this is an issue I can pursue later on where--  And I have

9    already filed a motion saying they manufactured jurisdiction.

10   This individual himself gave this document that they are

11   asserting is their federal jurisdiction, that I sent this

12   money off of my account for a specific reason.  I think this

13   is a very important fact that I would like to present to the

14   jury, outside of just me saying it.

15         You know, like I have said before, I don't know what

16   the Court is going to rule in regards to my past and the

17   charges that I received in the past, so I don't know how that

18   is going to play out.  But given if, you know, given the way

19   things are going now, I don't plan on hoping for anything

20   helpful.

21         But with that in mind, I realize that I am probably

22   going to be impeached by my past records.

23         So, I think it is very, very important that I have

24   more than just my word when I get up and speak.

25         THE COURT:  All right.  I don't understand really

811

1    why you think jurisdiction rests on the payment.

2         THE DEFENDANT:  For federal murder for hire, my

3    understanding, what I believe, and I am not an attorney, for

4    it to become a federal case and not a state, there needs to be

5    use of interstate facilities in furtherance of--

6         THE COURT:  Interstate commerce.

7         THE DEFENDANT:  Yeah, interstate facilities and

8    interstate commerce, meaning the phone or the mail.  So,

9    that's what they are resting their case on.  And which Mr.

10   Walutes clearly established his jurisdiction by stating,

11   didn't you, you know, receive this in the mail and didn't you,

12   so on and so forth.

13        That's just two of the issues that without getting

14   into the--  I mean, it is a ten-count indictment.  There are

15   several issues.  I have requested several witnesses.

16        And the last issue, I don't know if the Court is

17   going to make a decision on this since I have already

18   presented this already once before, I now just received the

19   phone bill.  And I have, amongst many things, I have been able

20   to identify certain calls that are missing, and I have

21   pinpointed them.

22        I don't know how--  I know the Court has asked me to

23   provide this to the Government.  I just don't understand how

24   that is going to help me right now at this stage because even

25   if I was to provide them with the calls that I have identified

812

1    are missing, it is just a ton of calls.  I don't have access

2    to any type of a proper device to properly review the stuff.

3    I am still trying to review the transcripts with the

4    recordings and stuff.  I am trying to make sure these are

5    accurate.

6              And it's just, you know, I am overwhelmed, and I

7    just feel like I am being deprived of a fair trial.

8              THE COURT:  All right.  Well, the reason I wanted

9    you to identify the calls is because, obviously, I don't have

10   control of any of that information either.  And if you

11   highlight missing calls that you can prove were made through

12   other--

13             THE DEFENDANT:  I have those.

14             THE COURT:  -- sources, then I can order the

15   Government to go back to the jail and look further.  And that

16   was my motivation.

17             So, I don't know if you have got specific calls, we

18   will have--

19             THE DEFENDANT:  I do.

20             THE COURT:  We will continue to pursue that.

21             All right.  Is that it?

22             THE DEFENDANT:  Also, I had asked in my motion to

23   compel for the Government to return some of the property that

24   was taken while I was in Alexandria.  And it is the close of

25   their evidence, it is time for me to make a defense.

813

1              I am wondering when they are going to return the

2       letters from Ms. Inge and Mr. Bryan.  And they said they were

3       going to look into it, but I haven't had any response or any

4       notification whether that is going to be returned or not and

5       whether I should file a motion in regards--

6              THE COURT:  I thought they indicated that they had

7       returned what they had.  Wasn't there a reference to that,

8       that they weren't withholding any letters?

9              THE DEFENDANT:  I was under the impression that they

10      were going to find out.  I haven't heard anything else from

11      it.  I have proof that certain letters are missing because the

12      way they were shipped down, Warsaw had marked down the letters

13      that were separated and put in a different bag.  And upon

14      coming back to Warsaw, these letters were not included in that

15      stuff.

16             So, there is no way for, other than for Alexandria

17      to take it or lose or it or whatever the case may be.

18             THE COURT:  All right, I will inquire about the

19      letters.

20             THE DEFENDANT:  So, I am just wondering what's the

21      Court's ruling is on the fact that I am truly not happy with

22      the decision making of lead counsel in regards to witnesses

23      and all the other issues.

24             THE COURT:  Well, let me talk to Mr. Nachmanoff for

25      a minute.

814

1          THE DEFENDANT:  All right.  Thank you, Your Honor.

2          THE COURT:  Yes, sir.  Well, I don't have any notice

3     of an alibi, obviously.  And you've, I'm sure, discussed at

4     length any alibi defense to the, I guess to the robberies on

5     the 26th and 27th with Mr. Mohamadi?

6          MR. NACHMANOFF:  Yes, Your Honor, we have.

7          THE COURT:  All right.

8          MR. NACHMANOFF:  Obviously, this discussion is a

9     difficult one because we do not want to reveal defense

10    strategy.  We don't want to inappropriately reveal

11    attorney/client privilege information.

12         I can tell the Court that we have discussed all of

13    the issues that Mr. Mohamadi raises many, many times over the

14    past days, over the past weeks.  We have devoted many, many

15    hours to investigating and preparing his defense.  I have

16    devoted tremendous resources from the office.

17         We have had an investigator who has worked

18    continuously to track down leads, to review the Government's

19    evidence, to pursue our own defense theories, to pursue Mr.

20    Mohamadi's suggestions.

21         We have endeavored to fashion the most compelling

22    defense that we could based on the information that we

23    received, the information that we found.

24         There are numerous areas that we explored that as a

25    matter of strategy we decided not to pursue for a variety of

815

1    reasons.

2            We have consulted with the Virginia State Bar.  I

3    have consulted with my colleagues.  I have endeavored to make

4    sure that I am discharging and that we are discharging our

5    ethical obligations appropriately.  We want nothing more than

6    to give Mr. Mohamadi the most effective defense that we can.

7            We also appreciate that this is Mr. Mohamadi's trial

8    and that he has very definite views about what he wants to do,

9    and he has expressed those.  We have tried to engage with him

10   to explain the law as we understand it and why perhaps some of

11   the things that he wants to do we view as either improper in

12   the sense that they simply don't conform to the rules of

13   evidence, the Court would not permit it, or as strategically

14   detrimental to his defense.

15           We have differences of opinion over that, and we

16   have talked about that many, many times in person, on the

17   phone, even through letters.

18           We are at the point when the Government rests that

19   we must put on our defense case.  The ethics rules are clear

20   that counsel must make appropriate strategic decisions.  And

21   we have made decisions about who we are going to call.  There

22   are some witnesses, they will be brief.

23           They are not the witnesses that Mr. Mohamadi wishes

24   to call.  Some of those people we simply have not been able to

25   locate and, therefore, it was impossible to subpoena.

816

1          Others we were able to speak to, but decided that it

2     was not appropriate to subpoena them because we did not know

3     enough information or we felt that the information they

4     provided would not be helpful.

5          We are at the point where Mr. Mohamadi needs to

6     understand that we will be presenting the evidence that we

7     think is appropriate in the defense case.  Mr. Mohamadi has a

8     Constitutional right to decide whether to testify.  He does

9     not need to make that decision until the Court addresses him

10    during the defense case.

11         If he decides to testify, I am prepared to question

12    him.  He has provided me this morning with information that

13    would be of assistance in that regard, but it is voluminous

14    and I have not seen it before.

15         And so, I am going to have to find a way and a time

16    to review that in order to determine whether I can ask those

17    questions, whether they are appropriate.

18         I have advised him about his right to testify and

19    his right to remain silent.  I know the Court will do the

20    same.

21         I have also advised him with regard to the fact that

22    he will be subject to cross-examination.  He has previously

23    testified under oath.  And I have advised him that there may

24    be consequences depending upon his testimony here and whether

25    it is in conflict with his testimony in state court.

817

1           I am not at a point where I am seeking to withdraw

2    or have any reason to do so.  I do not want to stand in the

3    way of Mr. Mohamadi presenting his defense as he sees fit.

4           What I cannot do is allow Mr. Mohamadi to dictate

5    who asks questions or who gives an argument or what witness is

6    called.  I would be failing in my ethical duties if I were to

7    do that.

8           And so, that leaves Mr. Mohamadi with having his

9    lawyers do their best to defend him, or exercising his rights

10   if he should desire to do so if the Court will permit that at

11   this point.

12          He has not expressed that desire to me.  I have not

13   encouraged him to do that.  We continue to be prepared to do

14   our best to cross-examine the Government's witnesses, present

15   our own case and give closing argument.

16          THE COURT:  All right.  Thank you, Mr. Nachmanoff.

17          Yes, sir.

18          THE DEFENDANT:  Can I just make an example of how

19   Mr. Nachmanoff is stating that, you know, it's either improper

20   or unstrategic.  I just don't understand how--  I will just

21   use this example for the Court to understand where I am coming

22   from.

23          When Mr. Bryan was asked whether there was an

24   incident that occurred prior to the recording, whether there

25   would be any conflict or any type of a problem between me and

818

1    him, and Mr. Bryan clearly lied on the stand and said, no,

2    nothing occurred in the kitchen, so on and so forth.

3         But I have notified counsel that there is a kitchen

4    supervisor that can recall the incident where Mr. Bryan was

5    caught taking stuff out of the kitchen and he blamed me.  And

6    the kitchen supervisor called me into the back and told me, in

7    front of Mr. Bryan, look, Mr. Bryan just said that this is

8    your stuff that you asked him to take back to the unit.

9         So, I just don't understand how that is not a

10   relevant factor where you are dealing--  And there is another

11   example also where Mr. Bryan has gotten on the stand and he is

12   basically, you know, put on this whole spiel about him wanting

13   to join the military because of a last ditch effort and he

14   doesn't care about dying and so on and so forth.

15        And I had pointed out a witness to my counsel where

16   this individual grew up with Mr. Bryan and can identify how

17   Mr. Bryan is very capable of manipulating the government, the

18   state, foundations, charities, all type of other stuff where

19   he was given a vehicle as part of some type of charity or some

20   type of organization and he used this vehicle to go and rob

21   and burglarize.

22        And from what this person's testimony was to the

23   investigator, that he would go and harass transvestites and

24   this all other stuff and rob them.

25        To that extent, I just wanted to identify who really

819

1   is on the stand and what he really is capable of and not just

2   the act that he puts on in front of, you know, the jury under

3   the Government's advisement.

4           And for me not to do that, it is just completely,

5   completely unfair because, you know, the jury only has that

6   perception and that's it.  And for me not to present any

7   witnesses that impeach this individual's--

8           THE COURT:  Mr. Bryan was impeached.  Mr. Bryan has

9   got plenty of baggage, and it was all brought out to the

10  extent that it is admissible to impeach him.

11          The jury is either going to believe or disbelieve

12  the evidence against you with regard to Mr. Bryan's testimony

13  based on what you said in those recordings.  They are not

14  going to believe anything or likely are not going to consider

15  anything that isn't corroborated.

16          So, the problem isn't Mr. Bryan's background because

17  he was fully impeached, and as were the others.  I mean, one

18  of them has got 18 felonies.  This jury isn't going to believe

19  anything that somebody with 18 felonies says unless there is

20  corroboration in some other respect.

21          THE DEFENDANT:  It's the accumulation.

22          THE COURT:  No.  The jury, these are smart people

23  they can figure out what it is or isn't supported.  So, your

24  counsel have repeatedly done an excellent job in impeaching

25  the credibility of the witnesses as to what they say standing

820

1   alone.

2          The fact that the conversations are taped is a much

3   more significant issue.  And your counsel, as I have repeated

4   previously, have also kept out a significant amount of

5   collateral information from the case.

6          I have made the rulings that I have.  They have

7   taken exception to every one of them, and I have done what I

8   think I am required to do under the rules of evidence in

9   managing this chase.  And if I am wrong, and if you are

10  convicted, then the Fourth Circuit will tell me I am wrong and

11  we will be back here again.

12         And the record is clear that you have provided names

13  and information to counsel.  They have done an investigation

14  of the witnesses they could find on your behalf to run down

15  the theories of defense that you have, and that they have

16  expended tremendous resources in doing that.

17         So, you have made your record now.  Give me the 911

18  calls and I will continue to require the Government to try and

19  push.  And I will ask them when they come back in about the

20  letters, whether there is any other information about any

21  other records that you are missing from your travel between

22  Warsaw and Alexandria.  And we are going to move forward at

23  this time.

24         THE DEFENDANT:  Your Honor, do I have any say-so in

25  regards to my defense as in, you know, I have three attorneys,

821

1  if I want a certain attorney to cross-examine me or--  I mean,

2  do I have any say-so at all?

3          THE COURT:  You can discuss, as you have been for

4  the last several weeks, those matters with counsel and make

5  suggestions as to cross-examination as you have.  And counsel

6  I think have been--

7          THE DEFENDANT:  In regards, I have asked Mr.

8  Nachmanoff to allow Ms. Minter to do my closing and my

9  cross-examination of me if I take the stand.  He has refused

10 to even acknowledge that--

11         THE COURT:  Well, you have made the request.  They

12 will decide --

13         THE DEFENDANT:  It's just--

14         THE COURT:  -- as your trial team--

15         THE DEFENDANT:  It's with everything.  I mean, I

16 haven't had any--  I mean, I have had to force them to accept

17 my questions.  I have had--  It's just not right, it's not

18 right at all.

19         THE COURT:  All right.  Your exception is noted.

20         All right, let's bring the Government back in,

21 please.

22         NOTE:  The Government attorneys return to the

23 courtroom.

24         THE COURT:  All right, Mr. Walutes, a couple of

25 things.  One, Mr. Mohamadi has continued to look at telephone

822

1   records, and I think is, perhaps at the next break, he is

2   going to consult with his counsel and get you some other

3   information regarding calls that, third party information

4   reflects calls having been made, but the Alexandria Detention

5   Center doesn't have a record of those calls.

6          So, when you get that information, I want you to

7   follow up that.

8          MR. WALUTES:  Certainly, Your Honor.  I understood

9   that to be the Court's instruction last week.  I have been

10  unable to get it so far.

11         THE COURT:  Okay.  And the second is that Mr.

12  Mohamadi again indicates he is missing some letters and

13  correspondence from his property that was being transferred

14  from Warsaw to Alexandria and back and forth.

15         So, I want you to check and make sure that there are

16  no other letters or correspondence or notes from his, that are

17  being held by Alexandria or Warsaw that we haven't, that we

18  haven't checked.

19         I know you checked one time before, but if you would

20  recheck to make sure there is not missing information.

21         MR. WALUTES:  To be clear, Your Honor, I think last

22  time I had said that I was available to help, but I was

23  concerned about the Sixth Amendment issues.

24         I understand the Court now to be asking me to get

25  involved, so I will seek to do that.

823

1          MS. MINTER:  Your Honor, it sounds like Mr. Walutes

2    is reiterating the concern that I would reiterate, which is

3    simply that I think the jail should be instructed to provide

4    any materials directly to us.

5          I can see them getting them confused and sending

6    them to the U.S. Attorney's Office.

7          THE COURT:  Certainly.  I will ask them to send them

8    directly to defense counsel.

9          MR. WALUTES:  Will do, Your Honor.

10         THE COURT:  All right.  Is our jury here, Joe?

11         THE MARSHAL:  Yes, sir.

12         THE COURT:  All right, let's get our jury in.

13         NOTE:  At this point the jury returns to the

14    courtroom; whereupon the case continues as follows:

15    JURY IN

16         THE COURT:  All right.  Good morning, ladies and

17    gentlemen, and thank you for your patience.

18         Did you all heed my request that you not do any

19    independent investigation or research or talk to anybody about

20    the case?  A nod of heads.  Thank you very much.

21         All right, Mr. Walutes, next witness, sir.

22         MR. WALUTES:  Your Honor, the Government would call

23    Lieutenant Brian Johnson.

24         NOTE:  The witness is sworn.

25         BRIAN JOHNSON, called by counsel for the United

B. Johnson - Direct

824

1    States, first being duly sworn, testifies and states:

2        DIRECT EXAMINATION

3    BY MR. WALUTES:

4    Q.   Good morning, sir.

5    A.   Good morning, sir.

6    Q.   Could you please tell us your name.

7    A.   Lieutenant Brian Johnson.

8    Q.   And how are you how currently employed?

9    A.   I am employed as a lieutenant with the Fairfax County

10   Sheriff's Office.

11   Q.   How long have you been with the Fairfax County Sheriff's

12   Office?

13   A.   26 years.

14   Q.   And could you tell us what your responsibilities include

15   as a lieutenant in the Fairfax County Jail.

16   A.   Okay.  I am the commander of the emergency response

17   criminal intelligence unit.  My collateral duties for today

18   are going to be records collection.

19   Q.   Okay.  And does the Fairfax County Adult Detention Center

20   maintain records of financial accounts for each of its

21   inmates?

22   A.   Yes, sir, they do.

23   Q.   And in the normal course of business are those records

24   kept?

25   A.   Yes, sir.

B. Johnson - Direct

825

1    Q.   Did the Fairfax County Jail provide in this case a set of

2    records which are now marked as Government's Exhibit 56?  If

3    you could have a chance to look at them.  56--  I am sorry,

4    57B, 57B as in boy.

5              You can take it out of the plastic sleeve to make

6    sure it is what you believe it to be, Lieutenant.

7    A.   Yes, sir, these are financial records that are kept in

8    the daily course of business at the Sheriff's Office, our

9    financial section.

10   Q.   Okay.  And have you actually sent a couple sets of those

11   over to me in the course of the last year?

12   A.   Yes, sir, I have.

13   Q.   Okay.  And are those records, for what inmate are those

14   the records for?

15   A.   The inmate on trial here today.

16   Q.   And what is the name just so the record is clear?  Is it

17   Mr. Mirwais Mohamadi?

18   A.   Mirwais Mohamadi, yes, sir.

19             MR. WALUTES:  Your Honor, I would move the admission

20   of Government's 57B at this time.

21             THE COURT:  Any objection?

22             MR. NACHMANOFF:  No objection.

23             THE COURT:  It will be received.

24   BY MR. WALUTES: (Continuing)

25   Q.   Lieutenant Johnson, one other question, if I could.  Are

B. Johnson - Cross

826

1    inmates' calls recorded at the Fairfax County Adult Detention

2    Center?

3    A.   Yes, sir, they are.

4    Q.   Okay.  And are they monitored?

5    A.   They are.

6    Q.   Are inmates' calls to their attorneys monitored?

7    A.   No, sir, they are not.

8           MR. WALUTES:  No further questions, Your Honor.

9           THE COURT:  All right.  Any cross-examination?

10          MR. NACHMANOFF:  Just very briefly.

11       CROSS-EXAMINATION

12   BY MR. NACHMANOFF:

13   Q.   Good morning, Lieutenant.

14   A.   Good morning, sir.

15   Q.   With regard to these records, they show amounts of money

16   that are in the commissary account, is that correct?

17   A.   That's correct, sir.

18   Q.   You don't have any knowledge about where that money came

19   from, is that correct?

20   A.   No, sir, I do not.

21   Q.   Or how that money was earned?

22   A.   No, sir.

23   Q.   Or how it was deposited?

24   A.   No, sir.

25          MR. NACHMANOFF:  Thank you.  No further questions.

G. Burnham - Direct

827

1            THE COURT:  All right.  May Lieutenant Johnson be

2   excused?

3            MR. WALUTES:  Yes, Your Honor.

4            THE COURT:  All right, you are excused with our

5   thanks, Lieutenant.  Please don't discuss your testimony with

6   anyone until the case is over.

7            THE WITNESS:  Yes, sir.

8            THE COURT:  All right.  Have a good day.

9            NOTE:  The witness stood down.

10           THE COURT:  Next witness.

11           MR. WALUTES:  Your Honor, the Government would call

12  Deputy George Burnham.

13           NOTE:  The witness is sworn.

14           MR. WALUTES:  May I proceed, Your Honor?

15           THE COURT:  Yes, sir.

16           GEORGE BURNHAM, called by counsel for the United

17  States, first being duly sworn, testifies and states:

18       DIRECT EXAMINATION

19  BY MR. WALUTES:

20  Q.   Good morning, sir.  Could you please tell us your name.

21  A.   George Burnham.

22  Q.   And how are you currently employed?

23  A.   I am a deputy sheriff with the city of Alexandria

24  Sheriff's Office.

25  Q.   How long have you been a deputy sheriff with the

G. Burnham - Direct

828

1    Alexandria Sheriff's Office?

2    A.    Almost three years.

3    Q.    I am sorry?

4    A.    Almost three years.

5    Q.    Prior to joining the Alexandria Jail, how were you

6    employed, sir?

7    A.    I was employed with the Alexandria Police Department for

8    34 years.

9    Q.    34 years?

10   A.    Just about 34.

11   Q.    So, you have a total of 37 years of law enforcement?

12   A.    Just about, yes, sir.

13   Q.    Could you tell us what your responsibilities are at the

14   Alexandria Adult Detention Center?

15   A.    I am in charge, I am the special investigation unit for

16   the Sheriff's Office.

17   Q.    Are you responsible for monitoring inmate telephone

18   traffic at the Alexandria Adult Detention Center?

19   A.    Yes, I am.

20   Q.    Are those calls recorded?

21   A.    Yes, they are?

22   Q.    Are attorney's calls recorded?

23   A.    If the attorney calls on the attorney line, it is not

24   recorded.

25   Q.    And why are inmate calls recorded?

G. Burnham - Direct

829

1   A.    For several reasons.  For the integrity of the jail and

2   for the security of the jail.  Calls, ongoing crimes that are

3   committed in the jail, protective orders where inmates are not

4   allowed to make phone calls, domestic violence, cases like

5   that, court orders where they are not allowed to call.  All

6   phone numbers are recorded that are called.

7   Q.    Are three-way calls permitted from the Alexandria Jail?

8   A.    No, they are not.

9   Q.    And why not?

10  A.    For the same reasons.  You don't know where they are

11  going.  Billing purposes also.  But majority for the integrity

12  of the system and for the jail.

13  Q.    If I could ask you to look at what is now marked as

14  Government's Exhibit 32B, as in boy.

15  A.    Yes, sir.

16  Q.    I believe this exhibit has been previously admitted, but

17  do you recognize the bottom disk, the jail telephone call from

18  December 19 of 2008?

19  A.    Yes, sir.

20  Q.    And how do you recognize it?

21  A.    It's got my initials on it, and it has got the date that

22  I produced on 11/21/08.

23  Q.    Did you provide that disk to ATF to assist them in their

24  investigation?

25  A.    Yes, I did.

G. Burnham - Direct

830

1   Q.   Now, if I could ask you to turn your attention to

2   Government's Exhibit 41A, which I believe, 41A and 41B, which

3   I think is directly behind it.

4   A.   41A, yes, sir, that was produced on 9/29/09.

5   Q.   And--

6   A.   And the same for B was on 9/29/09, it has got my initials

7   and my writing on there.

8   Q.   Okay.  And is that the recording of a jail call made on

9   March 4 of 2009 at 7:52 p.m.?

10  A.   Yes, sir.

11  Q.   Okay.  And have you had an opportunity to compare the

12  transcript now marked as 41B of that telephone call to ensure

13  its accuracy from the recording made by your institution that

14  you are responsible for?

15  A.   Yes, sir, I did.

16  Q.   And is that an accurate transcript, 41B?

17  A.   Yes, sir.

18  Q.   And you recognize both of these items by your initials?

19  A.   Yes, I do.

20          MR. WALUTES:  Your Honor, at this time I move the

21  admission of 41A.  And I ask permission to use 41B, the

22  transcript, at the time of playing 41A.  I would ask

23  permission to publish it now.

24          THE COURT:  Any objection?

25          MS. MINTER:  Your Honor, understanding the Court's

G. Burnham - Direct

831

1   ruling previously, there is no objection at this time.  We

2   would just ask that the jury be reminded that the transcripts

3   are for assistance and not evidence.

4              THE COURT:  All right, certainly.

5              All right, you can pass out the transcripts at this

6   time.  41 will be received with exceptions noted.

7              And, ladies and gentlemen, again, the actual

8   recording is the evidence, and the transcripts are just to

9   assist you as you listen to the tape itself.

10             NOTE:  The recording is played.

11             MS. MINTER:  Your Honor, may we stop the tape for a

12   minute and approach the bench?

13             THE COURT:  Yes, stop the tape.

14             NOTE:  A side-bar discussion is had between the

15   Court and counsel out of the hearing of the jury as follows:

16   AT SIDE BAR

17             MS. MINTER:  Your Honor, at this point I have to

18   confess that all the various tapes and modifications and

19   redactions have my head spinning, but I do believe we are into

20   a section of the recording that the Court had ordered

21   excluded.

22             MR. WALUTES:  I don't believe that is accurate, Your

23   Honor.  I am sorry, they use the exhibits, Your Honor, instead

24   of the actual dates of the calls, which makes it incredibly

25   complicated.

1          Your Honor, none of this was in any of their

2    exhibits.

3          THE COURT:  I don't remember reading this, at

4    least--  That doesn't mean I didn't.

5          MR. NACHMANOFF:  If I can go back to the motion,

6    Your Honor.  What we had done was identify by page and line

7    number and then attach the corresponding pages.  And if we

8    flip to the end of that motion, which the Court granted in

9    part, with regard to Exhibit F, the Court excluded beginning

10   of the transcript at pages--

11         MR. WALUTES:  Your Honor, this is simple.  That is

12   March 5.  This call is March 4.

13         MR. NACHMANOFF:  Oh, I am sorry.

14         MR. WALUTES:  It is a short bench conference, Your

15   Honor.

16         THE COURT:  Okay.  All right, relax.  So, we have

17   got the day before.

18         MS. MINTER:  That's our mistake then, Your Honor.

19         THE COURT:  All right, good.

20         NOTE:  The side-bar discussion is concluded;

21   whereupon the case continues before the jury as follows:

22   BEFORE THE JURY

23         THE COURT:  All right, proceed.

24         MR. WALUTES:  Thank you, Your Honor.

25         NOTE:  The recording is continued to be played.

833

1   BY MR. WALUTES: (Continuing)

2   Q.   Is that the complete call, Detective Burnham, for that

3   date?

4   A.   Yes, it is.

5   Q.   Okay.  And do you recognize his voice, Mr. Mohamadi's

6   voice on that phone?

7   A.   Yes, I do.

8   Q.   Okay.  If I could now ask you to turn your attention to

9   March 5 of 2009, the first of two tapes from March 5, and ask

10  if you would look at what is now marked as Government's

11  Exhibit 42A and 42B.  42A is the disk and 42B would be the

12  transcript.

13  A.   Yes, sir.

14  Q.   Okay.  And how do you recognize those items?

15  A.   They have my date and initials on there.

16  Q.   Okay.  And have you had an opportunity to compare this

17  transcript to the contents of this telephone call?

18  A.   Yes, I did.

19  Q.   Is it fair and accurate?

20  A.   Yes, it is.

21         MR. WALUTES:  Your Honor, at this time the

22  Government would move the admission of 42A, which is the

23  recording of a telephone call on March 5 of 2009 at 12:43, a

24  little after midnight.  And ask permission to use the

25  transcript, which is marked as 42B, to assist the jury in just

G. Burnham - Direct

834

1    listening to the tape, but obviously not moved into evidence

2    itself.

3              THE COURT:  All right.  Any objection other than

4    already noted?

5              MS. MINTER:  Your Honor, our position with regard to

6    42A and 42B would be the same as to 41A and B.

7              THE COURT:  All right, thank you.  42A is admitted,

8    and you may use the transcripts.

9    BY MR. WALUTES: (Continuing)

10   Q.   Before we actually start the recording, Detective

11   Burnham, is it unusual to have an inmate be able to make a

12   call out of the jail after midnight?

13   A.   Depending upon when their break is.  The majority of them

14   the phones are off at 11 o'clock, but there are some phones in

15   the detention center that are on.

16             THE COURT:  Okay.

17             NOTE:  The recording is played.

18   BY MR. WALUTES: (Continuing)

19   Q.   Detective Burnham, if I could now ask you to turn to what

20   is marked as Government's Exhibit No. 43A and B.

21             43A, Your Honor, is the recording.  And 43B is the

22   transcript, and that will only be offered as an aid for the

23   jury.

24             THE COURT:  All right.

25   Q.   Do you see those, Deputy Burnham?

G. Burnham - Direct

835

1  A.   Yes, I do.

2  Q.   Are those a recorded jail call of Mr. Mohamadi placed

3  after the grand jury appearance on March 5 of 2009 at

4  7:35 p.m.?

5  A.   Yes, they are.

6  Q.   And is that an accurate recording of that call?

7  A.   Yes, it is.

8  Q.   And have you had an opportunity to compare the

9  transcript, 43B, against the call?

10  A.   Yes, I did.

11  Q.   And is the transcript accurate?

12  A.   Yes, it is.

13       MR. WALUTES:  Your Honor, at this time I would move

14  the admission of 43A.  And I would ask permission to publish

15  with the aid of 43B, which is the transcript.

16       THE COURT:  All right.  Any objection other than

17  noted previously?

18       MS. MINTER:  Our position is the same as regards 41

19  and 42.

20       THE COURT:  All right.  I will receive 43, and I

21  will allow transcripts to be made available to the jury.

22       NOTE:  The recording is played.

23       MR. WALUTES:  Your Honor, the Government is not

24  offering any more of this call.  If I can move to the next

25  exhibit.

G. Burnham - Direct

836

1              THE COURT:  All right.

2    BY MR. WALUTES: (Continuing)

3    Q.   And the fourth exhibit that is now marked as 44A and 44B,

4    Deputy Burnham, do you see that call?

5    A.   March 6, at 6:11?

6    Q.   Exactly.  6:11 in the evening the following day on

7    March 6.  And have you had an opportunity to download the

8    telephone call placed by Mr. Mohamadi on that day, now a day

9    after the grand jury, and compare a transcript for accuracy

10   against it?

11   A.   Yes, I did.

12   Q.   And is the transcript--  Is that the call placed from

13   your jail?

14   A.   Yes, sir.

15   Q.   And is that the transcript prepared in conjunction with

16   it?

17   A.   Yes, it is.

18   Q.   Is the transcript fair and accurate?

19   A.   Yes, it is.

20              MR. WALUTES:  Your Honor, I would move the admission

21   of both 44A and 44B.

22              THE COURT:  All right, the same ruling, the same

23   exceptions.

24              MS. MINTER:  The same position.

25              THE COURT:  All right, 44A will be received.  44B

G. Burnham - Direct

837

1  will be provided to the jury for reference.

2         Are you all okay to listen to one more tape before

3  we take our morning break?  All right.

4         NOTE:  The recording is played.

5         THE COURT:  All right, let's take our morning break

6  at this time.  We will take 15 minutes and then we will come

7  back and hear further testimony at that time.

8         All right.  We are in recess.

9         NOTE:  At this point a recess is taken; at the

10 conclusion of which the case continues in the absence of the

11 jury as follows:

12 JURY OUT

13        THE COURT:  All right, Mr. Nachmanoff, I understand

14 Mr. Mohamadi has a motion?

15        MR. NACHMANOFF:  He does, Your Honor.  He advised me

16 and asked to address the Court that he would like to represent

17 himself at this time.

18        THE COURT:  All right.  Mr. Mohamadi, come up.

19        THE DEFENDANT:  As I have said before, I would

20 rather have my own attorney, I would rather hire an attorney,

21 but that right has been taken away from me by this Court.

22        The issue now is I am frustrated because I am not

23 even getting an opportunity to present recordings that I have

24 in my possession that I spent countless, countless months

25 reviewing and documenting.  I am not able to introduce these

G. Burnham - Direct

838

1   recordings to rebut some of the assertions that the Government

2   is making by cutting and pasting and, you know, instilling

3   certain recordings to paint a certain picture where they are

4   not giving the whole picture.

5           And I have the recordings that I would like to

6   offer, but I have been notified by counsel that due to the

7   fact, you know, it hasn't been reviewed and all the other

8   circumstances, I am not able to offer these recordings.  And

9   that's extremely frustrating.

10          I mean, I don't see how I have any other options

11  other than to just stand by and get--

12          THE COURT:  Let's have the detective--  Why don't

13  you take, go back out of the courtroom if you would, sir.

14  Thank you.

15          NOTE:  The witness leaves the courtroom.

16          THE COURT:  I am not sure what recordings--  The

17  Government has turned over all the recordings.

18          THE DEFENDANT:  No, I have the recordings.  I just

19  have specific phone calls that I wanted to introduce against

20  previous witnesses, and I want to for the future witnesses,

21  the last two at least, I want to present these recordings, but

22  I am being told that I can't.  I have been told that I can't

23  due to the fact that counsel hasn't had the opportunity to

24  review these calls to see if they are worth putting them in or

25  whether it is a good idea to put them in.

G. Burnham - Direct

839

1              MR. NACHMANOFF:  Your Honor, let me be clear, it is

2    not appropriate to go into attorney/client privilege.  We are

3    not going to get into any kind of dispute over what's been

4    said or what hasn't been said, that wouldn't be appropriate.

5              I think if the Court wants to permit Mr. Mohamadi to

6    exercise his Faretta rights, the Court should do a colloquy.

7    If he answers the questions and wants to represent himself, we

8    would ask the Court he be permitted to do that.

9              THE COURT:  Well, it's not unfettered discretion to

10   represent yourself.  And Faretta as well as the other cases

11   clearly state that the time to do that has long since passed.

12   And that where there is, for some very good reasons, that the

13   motion should be denied if it's going to cause delay, if it's

14   going to result in confusion to the jury, if it is one that is

15   tactically chosen, then the Court is within its discretion to

16   deny the request.

17             And we are at the end of the Government's case at

18   this stage.  The trial has been going on for an extended

19   period of time.  We have had what I will call a negotiation

20   allowing you, Mr. Mohamadi, to be involved in every stage of

21   your proceeding.

22             You have admitted on significant--  Significantly,

23   you have admitted on many occasions that you were thankful for

24   the counsel that you presently had.  Your problem has been all

25   along that you don't think that you should have had to go to

G. Burnham - Direct

840

1    trial at this time and you wanted more time.  And we have had

2    that discussion and the record is pretty clear--

3              THE DEFENDANT:  It's not just time, it's

4    preparation.

5              THE COURT:  But you were--  There is also a need to

6    minimize disruptions and avoid inconvenience and delay and to

7    maintain continuity.

8              THE DEFENDANT:  I have spent more time with counsel

9    in trial than I have outside of trial in preparation.

10             THE COURT:  Well, that doesn't mean that your

11   counsel hasn't been working with you and while, not in your

12   presence, but has not been working on your behalf.

13             THE DEFENDANT:  Do I have any rights?  I am just

14   curious, do I have any rights at all?  Do I have any rights?

15   I mean--

16             THE COURT:  You have had significant--  You know

17   what rights you have had.  And we have gone through

18   appointment of four different sets of attorneys--

19             THE DEFENDANT:  I am sorry, I want to correct the

20   Court because the other attorney was in state court.  The

21   first attorney, Mr. Brown, was in the state proceeding.

22             THE COURT:  Okay.  So, we have gone through

23   Jenkins--

24             THE DEFENDANT:  Jenkins was a week.  He didn't even

25   have my file.  I was under restrictions where I couldn't speak

G. Burnham - Direct

841

1    to an attorney unless I retained them.  I don't understand how

2    that is fair where I couldn't even talk to an attorney until I

3    pay them.  I don't understand how that is fair.  I had to pay

4    this man for him to come see me.

5         THE COURT:  All right, Mr. Nachmanoff, do you

6    disagree with me about the fact that Faretta is not an

7    unlimited right, and that at this stage in the proceeding that

8    cases such as United States versus Lawrence and United States

9    versus Dunlop out of the Fourth Circuit are still good law?

10         MR. NACHMANOFF:  I do not disagree, Your Honor.  It

11   is clearly within the Court's discretion.  And the fact that

12   we are in trial certainly is a factor the Court can weigh.

13   The Court I think certainly can permit Mr. Mohamadi to

14   represent himself at this time.

15         Whether or not it would be reversible error to deny

16   him that ability, the cases certainly seem to give the Court

17   latitude.

18         I think the question really is how can Mr. Mohamadi

19   best be able to present the defense as well as he can that he

20   wants.  We have endeavored to work with him.  We will continue

21   to endeavor to work with him.  We will do what the Court

22   orders us to do.  We are prepared to continue to move forward,

23   but we also want to be cognizant of what Mr. Mohamadi wants to

24   do within the bounds of the rules of the Court.

25         And if he thinks that he can take over at this point

G. Burnham - Direct

842

1   and do a job in a way that is different and that achieves his

2   goals better than we can, we certainly don't want to stand in

3   his way.

4            On the other hand, this is a request that is coming

5   from him.  We have not encouraged him to do this.  And I have

6   placed on the record I think this morning and previously that

7   we have never encouraged him to represent himself, but at the

8   same time we don't want to stand in his way.

9            THE DEFENDANT:  If you refuse to cooperate with me

10  and work with me, what is that basically leaving me?  The only

11  option--

12           THE COURT:  All right.  Does the Government have a

13  position?  Mr. Walutes, do you have a position?

14           MR. WALUTES:  Your Honor, obviously we are anxious

15  to have this case concluded before the jury that the parties

16  selected.  That's our only position, Your Honor.

17           THE COURT:  All right.  You have made your motion to

18  represent yourself.  I am going to deny the motion at this

19  time for the reasons I have just stated.

20           I think, as I have told you many, many times, your

21  best chance to present the best argument to this jury is

22  through counsel.  And that although you have filed a series of

23  motions and you understand some parts of proceedings, you are

24  not an attorney.  And you have acknowledged that you don't

25  know all there is to know, and you have requested previously

843

1    help conforming questions you wanted to ask to different

2    witnesses into an admissible manner.  That has been done for

3    you.

4            Your counsel have assisted you time and time again

5    in getting additional questions before the witnesses that you

6    wanted.  I have listened to your arguments this morning and I

7    have responded accordingly.

8            And in conjunction with the fact that your present

9    agitation with the way the case is going in or isn't going in

10   is going to be as well clearly communicated through your

11   frustration in your questioning, and you are only going to

12   hurt yourself, not help yourself.

13           Your attorneys know the case.  They have worked on

14   the case for many weeks.  They have listened to you and the

15   options that you have provided for defending the case and have

16   deliberated carefully on that as we heard this morning, and

17   are in the best position to put that defense before the jury.

18           So, your exception is noted.  And so, have a seat

19   and let's continue.

20           THE DEFENDANT:  Can I at least ask for the Court to

21   ask counsel to please sit down with me and review the

22   testimony that I would like to present if I was to take the

23   stand and to at least view the recordings that I would like to

24   present while I take the stand?  Can I at least ask for that

25   much?

G. Burnham - Direct

844

1              THE COURT:  I have no question that your counsel

2    will continue to work with you during the remainder of this

3    case.  So, I don't need to make the request, I know the

4    answer.  I know counsel will do so.

5              All right.  Let's get our jury in.

6              THE DEFENDANT:  You got what you need.  Do whatever

7    you want.  It doesn't matter what I say.

8              NOTE:  At this point the jury returns to the

9    courtroom; whereupon the case continues as follows:

10   JURY IN

11             THE COURT:  Let's get our witness back.

12             NOTE:  The witness returns to the courtroom.

13             THE COURT:  Whenever you are ready, Mr. Walutes.

14             MR. WALUTES:  Thank you, Your Honor.

15   BY MR. WALUTES: (Continuing)

16   Q.   Deputy Burnham, are attorney calls recorded in the

17   Alexandria Detention facility?

18   A.   Calls from the coming from the attorney's office is not.

19   If an inmate calls out, it's possible that they are.

20   Q.   Okay.  If they actually use the attorney line, would it

21   be monitored?

22   A.   No, it would not.

23   Q.   And then if I could ask you to look at what is

24   Government's Exhibit 57A, and ask if you recognize that item,

25   sir?

845

1    A.    The account balance sheet.

2    Q.    Do you see the account balance sheet for an inmate?

3    A.    Yes.

4    Q.    Okay.  Are inmates' financial records kept in the normal

5    course of business at the Alexandria Adult Detention facility?

6    A.    Yes, they are.

7    Q.    And have you had an opportunity to verify that this is in

8    fact the account balance sheet for an inmate named Mirwais

9    Mohamadi?

10   A.    Yes.

11   Q.    Is that an accurate reflection of the records that the

12   Alexandria Adult Detention Center has for this inmate during a

13   certain period of time?

14   A.    For a certain period of time, yes, sir.

15              MR. WALUTES:  Your Honor, I would move the admission

16   of Government's Exhibit 57A at this time.

17              THE COURT:  Any objection?

18              MS. MINTER:  Your Honor, our position would be the

19   same as with respect to 41, 42, 43A and B.

20              THE COURT:  All right, it will be received with your

21   exception.

22              MR. WALUTES:  Thank you, Your Honor.  I have no

23   further questions for this witness.

24              THE COURT:  All right.

25         CROSS-EXAMINATION

846

1   BY MS. MINTER:

2   Q.   Mr. Burnham, you recovered these phone calls that we have

3   just heard from a computer, correct?

4   A.   Yes, ma'am.

5   Q.   Okay.  So, there is a system that records the phone

6   conversations digitally, correct?

7   A.   Yes.

8   Q.   Okay.  There is no tape or cassette tape like an

9   answering machine?

10  A.   Correct.

11  Q.   And then those are automatically recorded?

12  A.   It goes directly to a hard drive, my understanding.  We

13  have a newer system.  But the older system, it went to a hard

14  drive that was in the jail.

15  Q.   But as you understand it, there is a system by which you

16  go and recover them from the computer?

17  A.   Yes.

18  Q.   And that's what you did in this case, correct?

19  A.   Yes.

20  Q.   Okay.  You didn't listen to these phone calls as they

21  were happening, did you?

22  A.   No, I did not.

23  Q.   You didn't observe these phone calls happening, did you?

24  A.   No, I did not.

25  Q.   You don't know Dominik Brown, do you know?

G. Burnham - Cross

847

1   A.   No, I do not.

2   Q.   You don't know the sound of his voice?

3   A.   I'm sorry?

4   Q.   You don't know the sound of his voice?

5   A.   The defendant's voice?

6   Q.   Mr. Brown, Dominik Brown.

7   A.   Dominik Brown's voice?  No, I do not.

8   Q.   Now, in your initial testimony in response to the

9   Government's questions you indicated that there were a number

10  of reasons why inmates might be denied phone privileges, such

11  as protective orders, court orders, things like that, correct?

12  A.   Correct.

13  Q.   Okay.  None of those circumstances applied to Mr.

14  Mohamadi, correct?

15  A.   I don't know.

16  Q.   Okay.  But you are giving those as examples of reasons

17  why phone calls are monitored?

18  A.   Correct.

19  Q.   You're not saying that applies to Mr. Mohamadi

20  specifically?

21  A.   Correct.

22  Q.   Those are just general examples?

23  A.   Yes.

24  Q.   Mr. Burnham, how long have you worked in the jail?

25  A.   I'm sorry?

G. Burnham - Cross

848

1   Q.   How long have you worked in the jail?

2   A.   Actually I do not work in the jail.  I work on the

3   administrative side of the jail.  I have been there since

4   August of 2007, September 2007.

5   Q.   So, several years now?

6   A.   Yes.

7   Q.   Okay.  And you are familiar with the Alexandria Jail?

8   A.   Yes.

9   Q.   And how the system works there?

10  A.   Yes, ma'am.

11  Q.   Okay.  And Alexandria Jail has a procedure for inmates to

12  file requests?

13  A.   Yes, there is request forms.

14  Q.   I am sorry, you said a form?

15  A.   There are forms, there is procedures, there is

16  grievances, there are several kinds of--

17  Q.   And there is a form for each of those, correct?

18  A.   I believe so.

19  Q.   And Mr. Mohamadi filed a request to speak with you in

20  October of 2008, is that correct?

21  A.   I believe so.

22  Q.   Okay.  And he subsequently, in that request he wished to

23  speak to you about another inmate, correct?

24  A.   I don't know which one--  He asked to speak to me twice

25  in late 2008.

G. Burnham - Cross

849

1   Q.   During one-- Excuse me, go ahead.

2   A.   I am not sure exactly how that request was written, but

3   he made it known that he wanted to speak to me twice.

4   Q.   Okay.  And in the course of making it known to you twice,

5   at least one of those concerned speaking to you about another

6   inmate, correct?

7   A.   I'm not sure.

8   Q.   Okay.  Would it refresh your recollection to view the

9   request?

10  A.   Yes.

11  Q.   The Court's indulgence, please, Your Honor.

12          THE COURT:  Yes.

13  Q.   With the assistance of the Court Security Officer, I will

14  pass up to you this document.

15          If you could review the document in its entirety and

16  look up when you are done so I will know you are finished

17  reading.

18  A.   Okay.

19  Q.   Okay.  Does that refresh your recollection about the

20  subject matter of Mr. Mohamadi's request form?

21  A.   Yes.

22  Q.   And did he request to speak with you about another

23  inmate?

24  A.   Yes, he did.

25  Q.   Okay.  And subsequent to that in November of 2008 he

G. Burnham - Cross

850

1    filed a grievance form, correct?

2    A.    He filed many.

3    Q.    Specific to you.

4    A.    On me or to me?

5    Q.    Alleging a grievance against you, if you remember.

6    A.    I am sure he did.

7    Q.    Okay.  Do you recall specifically at this point?

8    A.    What the grievance was?  No, I do not.

9    Q.    Okay.  Would it refresh your recollection to review the

10   grievance form?

11   A.    Yes.

12   Q.    With the assistance of the Court Security Officer, I will

13   pass up this document.  If you would please review it in its

14   entirety and look up when you are done so I know you have

15   finished reading.

16   A.    I don't believe I have seen this one before.

17   Q.    Okay.  That does not refresh your recollection?

18   A.    I would not have been the one investigating this

19   grievance.  I don't believe I have seen this form before.

20   Q.    Well, let me ask you this.  After reviewing that

21   document, does that refresh your recollection about whether

22   Mr. Mohamadi filed a grievance alleging that you had failed to

23   follow up on his previous request?

24   A.    I don't believe I was informed of that complaint.

25   Q.    So, no, you do not recall?

G. Burnham - Redirect

851

1    A.   I don't recollect it, that's correct.

2            MS. MINTER:  Nothing further, Your Honor.

3            THE COURT:  All right.  Any redirect?

4        REDIRECT EXAMINATION

5    BY MR. WALUTES:

6    Q.   Detective Burnham, if I could have those two for a

7    moment.  If I could actually have them and put stickers on

8    them.

9            If I could now mark the first one as Government's 63

10   and the second one as Government's 64.

11           And then ask, Detective Burnham, on the first one,

12   which is now marked as Government's 63, do you recognize the

13   defendant's handwriting?

14   A.   Yes.

15   Q.   Okay.  And you were aware of that one?

16   A.   Yes, I went and spoke to him.

17           MR. WALUTES:  Okay.  Your Honor, if I could move in

18   Government's 63 at this time.

19           THE COURT:  Any objection?

20           MS. MINTER:  No objection, Your Honor.

21           THE COURT:  It will be received.

22   BY MR. WALUTES: (Continuing)

23   Q.   And Government's 64, although obviously you've just

24   testified you weren't aware of that one, do you recognize both

25   the form, the procedure, the inmate's name as well as the

852

1  handwriting?

2  A.   Yes.

3          MR. WALUTES:  Your Honor, I would move in

4  Government's 64 at this time.

5          THE COURT:  Any objection to 64?

6          MS. MINTER:  Your Honor, I would object based on the

7  grounds that he is unable to identify the document.

8          THE COURT:  Other than coming from Mr. Mohamadi.  I

9  will admit it over your objection.

10  BY MR. WALUTES: (Continuing)

11  Q.   Now, I wonder, Detective Burnham, if you might explain to

12  us the circumstances about 63.  You were shown that, but I

13  wonder if you could explain what happened.

14  A.   Yes.  He sent out this request form for me to go talk to

15  him, which I did.  I went up and he was brought into a room.

16  I asked him what he wanted to speak to me about.  And he

17  started cussing me out and told me that he did not want to

18  speak to me.

19          And I asked him again, you know, responding to this.

20  And he walked away, asked to go back to his cell.  Another

21  deputy took him back to his cell.

22  Q.   The other one, you weren't aware of so you can't comment

23  on it?

24  A.   Right.  This would have been handled by security, and I

25  don't remember anybody bringing this to my attention, I don't

853

1    recall that one.

2    Q.   Normally would you be the person to investigate

3    grievances within the Alexandria Adult Detention facility?

4    A.   No, I would not.

5    Q.   And obviously if it concerned you, you wouldn't

6    necessarily be investigating it?

7    A.   I wouldn't investigate a complaint on myself, no.

8    Q.   Obviously.  And I know that they asked you if you were

9    listening to the phone calls as they were being made.  You

10   don't live at the Alexandria Adult Detention facility, do you?

11   A.   No, I do not.

12   Q.   But did you have occasion to pay some close attention to

13   this particular inmate?

14   A.   Yes, I did.

15   Q.   And did that happen long before the murder for hire

16   investigation that was conducted in your facility by ATF?

17   A.   It started around June, July.

18   Q.   Of 2008?

19          MS. MINTER:  Your Honor, I object to the relevance

20   of this line of questioning.

21          THE COURT:  Yeah, what's the relevance?

22          MR. WALUTES:  Your Honor, I believe that the

23   cross-examination was trying to suggest that this man, somehow

24   mischief, that he has got a bias.

25          THE COURT:  You can answer that question.

G. Burnham - Redirect

854

1          MS. MINTER:  Your Honor, if we could approach?

2          THE COURT:  Excuse me?

3          MS. MINTER:  If we could approach, please.

4          THE COURT:  Yes.

5          NOTE:  A side-bar discussion is had between the

6    Court and counsel out of the hearing of the jury as follows:

7    AT SIDE BAR

8          THE COURT:  Yes, ma'am.

9          MS. MINTER:  Your Honor, two points.  One, I will

10   say initially that some of the difficulties that we are placed

11   in with our evidence and our evidentiary objections are due to

12   the nature of the hybrid representation of this trial.

13          But what I will say is the line of questioning was

14   very specific and to the point that Mr. Mohamadi had reported

15   an incident with another inmate and then expressed concern

16   when that report was not followed up on.  It was for that

17   purpose only.  And it's not to impeach Investigator Burnham or

18   imply any sort of past dealings.

19          And anything that the Government would get into

20   unrelated to these counts is evidence of other bad acts and it

21   proves nothing of the elements of this indictment.

22          MR. WALUTES:  I think that is actually quite

23   helpful.  It is exactly that link between those two documents

24   that the Government seeks to explore.

25          The testimony the Government anticipates from this

1    witness is that he started in June and July and became aware

2    that Mr. Mohamadi was conducting a prostitution ring within

3    his facility, and special restrictions started to be placed on

4    Mr. Mohamadi.

5            It is that that I would suggest that the first

6    document dated October 28 prior to the November 7 ATF meeting

7    with Mr. Bryan is referring to or at least suggested to the

8    fact finders in this case, which is the jury, that there are

9    other things going on that the defendant is trying to draw to

10   the attention of Mr. Burnham.

11           Obviously, at this point the Government doesn't know

12   whether or not the defendant will exercise his right to

13   testify.  We think we are entitled to put in the information

14   surrounding this defendant.  I don't believe the link between

15   the October 28 and then the defendant's statement on

16   November 27, which is a week before his state trial after

17   discovery has attached to this investigation, has been burned.

18           THE COURT:  What does 64 say?

19           MR. WALUTES:  Your Honor, 64, if I can summarize it,

20   obviously I have only seen it for the first time, but it says,

21   what kind of jail, kangaroo jail are you running here.  You

22   have, you are putting a person in on a wire, and his complaint

23   against Detective Burnham.

24           THE COURT:  Well, this is way collateral.  And I am

25   going to exclude 64.  You can ask him the last question you

856

1    just asked him about when he started to focus more, but we are

2    not going to get into the whole side show of the way he was

3    acting in the detention center.  I think that's really

4    collateral right now.

5            If Mr. Mohamadi testifies and you think something of

6    what he says is relevant, you can call Detective Burnham in

7    rebuttal.

8            MR. WALUTES:  To avoid a second approach, Your

9    Honor.  The other question I would ask him was if he had to

10   pay particular attention to Mr. Mohamadi's voice because the

11   defendant is using different methods to circumvent the

12   monitoring, such as other inmates' pins and that such of

13   thing.

14           THE COURT:  You have already established that

15   without any question through your other witnesses.

16           MR. WALUTES:  All right.  I will ask no more

17   questions, Your Honor.

18           THE COURT:  All right, thank you.

19           NOTE:  The side-bar discussion is concluded;

20   whereupon the case continues before the jury as follows:

21   BEFORE THE JURY

22           MR. WALUTES:  I have no further questions of the

23   deputy.  Thank you very much.

24           THE WITNESS:  Thank you.

25           THE COURT:  All right.  Do you want the deputy

857

1    excused, or do you want him subject to further recall?

2              MR. WALUTES:  He may be excused, Your Honor.

3              THE COURT:  You are excused at this time.  You are

4    not to discuss your testimony with anyone until the trial is

5    over.  And just in the off chance that you may be requested to

6    give further testimony, you are to remain outside of the

7    courtroom.  All right.

8              THE WITNESS:  Yes, sir.

9              MR. WALUTES:  Your Honor, I wonder if he might be

10   able to go back to the jail.

11             THE COURT:  Yes.

12             MR. WALUTES:  Thank you, Your Honor.

13             THE COURT:  Sure.  You can go back to your regular

14   duties, and we will let you know.

15             THE WITNESS:  Thank you.

16             NOTE:  The witness stood down.

17             THE COURT:  All right, next witness.

18             MR. WALUTES:  The Your Honor, the Government would

19   call Amanda Inge to the stand.

20             NOTE:  The witness is sworn.

21             MR. WALUTES:  May I proceed, Your Honor?

22             THE COURT:  Yes.

23             AMANDA T. INGE, called by counsel for the United

24   States, first being duly sworn, testifies and states:

25         DIRECT EXAMINATION

1    BY MR. WALUTES:

2    Q.    Good afternoon.

3    A.    Hi.

4    Q.    Can you give us your full name.

5    A.    Amanda Thomas Inge.

6    Q.    And, Ms. Inge, how are you currently employed?

7    A.    Ballers Rock and Roll Bar, Incorporated.

8    Q.    And what's your job?

9    A.    Bartending.

10   Q.    And how far did you go in school, Ms. Inge?

11   A.    Through high school up to an academy for esthetics.

12   Q.    And without giving us the exact address, what city, what

13   major city do you now live near?

14   A.    Miami.

15   Q.    In Florida?

16   A.    Miami, Florida.

17   Q.    And do you recall approximately when you moved to Miami,

18   Florida?

19   A.    December of 2008.

20   Q.    If I can ask you to look at what is now marked as

21   Government's Exhibit 52 and ask if you recognize that?

22   A.    Yes.

23   Q.    And what is that, Ms. Inge?

24   A.    It's an immunity letter.

25   Q.    And were you given that when you appeared before a

859

1    federal grand jury in this courthouse on March 5 of 2009?

2    A.   Yes.

3              MR. WALUTES:  Your Honor, I move the admission of

4    Government's 52 at this time.

5              THE COURT:  Any objection?

6              MS. MINTER:  No objection, Your Honor.

7              THE COURT:  It will be received.

8    BY MR. WALUTES: (Continuing)

9    Q.   Ms. Inge, what's your understanding of that letter?

10   A.   That this is protection, my protection for this case,

11   what happens in this case if I am honest.

12   Q.   If you tell the truth, will anything happen to you?

13   A.   No.

14   Q.   Is that your understanding?

15   A.   Yes.

16   Q.   Does it protect you if you lie?

17   A.   No.

18   Q.   If I can draw your attention back to Sunday, May 27 of

19   2007, Memorial Day weekend.

20             Do you remember the apartment that you used to live

21   at?

22   A.   Yes.  It's apartment, 175 Reynolds Street, apartment

23   K117.

24   Q.   117?

25   A.   Yes.

A.T. Inge - Direct

860

1   Q.   Is that a ground floor apartment?

2   A.   It is a ground floor.

3   Q.   Back in that time, Memorial Day May 2007, were you dating

4   anyone?

5   A.   Yes.

6   Q.   Who were you are dating?

7   A.   I was dating Mirwais.

8   Q.   And do you know his last name?

9   A.   Mohamadi.

10   Q.   And did you have a nickname or did he use a nickname?

11   A.   Omar.

12   Q.   Were you dating anyone else at that time?

13   A.   No.

14   Q.   At some point during that weekend did you become aware

15   that the police, the Alexandria City Police had made entry

16   into your apartment?

17   A.   Yes.

18   Q.   How did you become aware first?

19   A.   There was a card left under my door.

20   Q.   When you saw the card, what, if anything, did you do?

21   A.   I mentioned it to Omar, and then I called them back.

22   Q.   And what had you yourself been doing that Sunday night,

23   that Sunday evening on May 26 of 2007?

24   A.   I was working.

25   Q.   When you left for work, do you remember about when you

A.T. Inge - Direct

861

1  left for work on May 26, the Saturday?

2  A.    Probably around 5 or 5:30, probably 5.

3  Q.    When you left for work that day, was anyone in your

4  apartment?

5  A.    Yes.

6  Q.    Who?

7  A.    Mirwais, or Omar.

8  Q.    At that point, Memorial Day weekend of 2007, can you

9  recall approximately how long you were dating Omar, Mr.

10 Mohamadi?

11 A.    Probably a few months.  Like three months, two months.

12 Q.    And would he occasionally stay at your apartment?

13 A.    Yes.

14 Q.    Did you have a cell phone?

15 A.    Yes.

16 Q.    And do you remember your cell phone number today that you

17 had on May 27 of 2007?

18 A.    I remember the area code and the last four digits.

19 Q.    If I said the number, would you recognize it?

20 A.    Yes.

21 Q.    With the Court's permission.

22        THE COURT:  Yes.

23        MS. MINTER:  Your Honor, I would object to the

24 leading.

25        THE COURT:  Understand.  Overruled.

862

BY MR. WALUTES: (Continuing)

Q.   703-862-4230?

A.   Yes.

Q.   Are you sure that's your number?

A.   Yes.

Q.   Focusing your attention on May 27 of 2007.  Did you
receive telephone calls from a strange number?

A.   Yes.

Q.   Do you remember approximately how many?

A.   Probably about seven.

Q.   If I could ask you to look at Government's Exhibit
No. 19, it has been previously admitted into evidence.  If we
could actually show the page with the telephone number.

        Ms. Inge, do you recognize your phone number on the
list of telephone numbers on that sheet?

A.   I don't see a list of phone numbers.

Q.   Perhaps we should take it out of the plastic sleeve and
open it up.  Maybe that would be--  Thank you.  I can see how
the problem.  If you could look to--

A.   Okay.

Q.   Do you see a list of phone numbers?

A.   Yes, I see a list of phone numbers.

Q.   And do you see your phone number appearing on that list
of phone numbers for May 27, 2007?

A.   Yes.

A.T. Inge - Direct

863

1    Q.   Okay.  I wonder if you can tell us how many times you see

2    your phone number?

3    A.   Eight, eight times.

4    Q.   And I wonder if you can tell us the times at which your

5    phone number is called?  Do you see where it has the time, I

6    think on the third column?

7            MS. MINTER:  Your Honor, I object to reading it into

8    evidence.  The document is in evidence and the jury can review

9    it.

10           THE COURT:  Understand.  Overruled.

11   BY MR. WALUTES: (Continuing)

12   Q.   If you can tell us the time for each of the calls that

13   you see that are your number.

14   A.   Okay.  There is one at 3:10 a.m. on 5/27 at 3:10 a.m.

15   And then 3:11 a.m.  3:14 a.m.  3:48 a.m.  4:05 a.m.  And

16   5:21 a.m.  And 6:01 a.m.  And then 12-- No, 10:28 a.m.

17   Q.   Okay.  Thank you.  Each of those calls, you didn't

18   actually have a conversation, they are just calls to your

19   phone?  Do you see the duration on the far right of the time

20   of the call?

21   A.   Yeah, it's like a minute.

22   Q.   Each is a minute or less?

23   A.   One of them is for two minutes.  Yeah, they are all for a

24   minute, except for one was two minutes.  Well, there is one

25   for three minutes.

864

1   Q.   Okay.  But you didn't actually have a conversation at

2   that time?

3   A.   Not what I can remember.  I did get voicemails.

4   Q.   And did you recognize the voice on the voicemails?

5   A.   Yes.

6   Q.   And who was the voice of?

7   A.   Omar.

8   Q.   And you said you had gone to work when you left him in

9   your apartment, 117, that Saturday, May 26, 2007.  How long

10  did you stay at work that day?

11  A.   I am sorry, can you repeat that?

12  Q.   How long were you at work that Saturday going into the

13  Sunday?

14  A.   Probably left around 2:20ish.

15  Q.   a.m.?

16  A.   We close at 2.

17  Q.   a.m.?

18  A.   Yeah, a.m.

19  Q.   And when you got off work that Saturday, where did you

20  go?

21  A.   I stopped at home briefly to let my dogs out, and then my

22  girlfriend came and picked me up and I stayed at her house.

23  Q.   And how long would you estimate it takes you to get from

24  your job at 2, 2:20, to your home?

25  A.   At that time, about 10 to 15 minutes.

A.T. Inge - Direct

865

1   Q.   Okay.  Not too much traffic at 2 in the morning?

2   A.   No.

3   Q.   And when you get home, is there anyone in your apartment

4   other than your dogs?

5   A.   No.

6   Q.   And what kind of dogs do you have?

7   A.   Yorkshire terriers.

8   Q.   And you said you went with your girlfriend at that point?

9   A.   Yes.

10  Q.   Okay.  Did you use your car or did you use your

11  girlfriend's car?

12  A.   No, she came and picked me up in her car.

13  Q.   Where did your car stay?

14  A.   In the parking lot.

15  Q.   Now, I take it you didn't see Omar in your apartment when

16  you arrived home from work?

17  A.   No.

18  Q.   At some point did you actually have an opportunity to

19  speak with your boyfriend, Mr. Mohamadi?

20  A.   Days later.

21  Q.   And what, if anything, was said?

22  A.   I was telling him about the card that I found.  And he

23  mentioned that he had done something stupid.

24  Q.   And did he later tell you what the stupid thing he had

25  done was?

866

1    A.    Yes.  That he had taken money, robbed a cab driver.  And

2    that he tried to get in my door, but I wasn't there.

3    Q.    Did he tell you whether he thought you were at home?

4    A.    Yes.

5    Q.    And what did he tell you?

6    A.    He said he had been banging on my door and that he didn't

7    understand because my car was there, and that am usually home

8    after work, and that the police were after him.

9    Q.    And did he tell you how he knew the police were after

10   him?

11   A.    There was a dog running after him.

12   Q.    I am sorry?

13   A.    A police dog running after him.

14   Q.    At some point after that conversation with your

15   boyfriend, Mr. Mohamadi, did you have occasion to be visited

16   by a detective or detectives from the Alexandria City Police

17   Department?

18   A.    Yes.

19   Q.    Did they come to your place of work?

20   A.    Yes, they did.

21   Q.    Do you remember if they came early in your shift or late

22   in your shift?

23   A.    Early in my shift.

24   Q.    And did you tell them anything?

25   A.    Yes.

A.T. Inge - Direct

867

1    Q.   Did they ask where your boyfriend was from?

2    A.   Yes.

3    Q.   And what did you tell them?

4    A.   Afghanistan.

5    Q.   Did they ask if your boyfriend had any--

6            MS. MINTER:  Your Honor, I object to the hearsay as

7    to the statements from the police officer.

8            MR. WALUTES:  I will try to rephrase, Your Honor.

9            THE COURT:  All right, please.

10   BY MR. WALUTES: (Continuing)

11   Q.   What were you asked, if you remember, Ms. Inge?

12   A.   I was shown some pictures and asked if I recognized him.

13   And it was a picture of Omar.  And I was asked about the phone

14   calls.

15   Q.   And did you tell them who had called you?  Did you tell

16   them that was your phone number?

17   A.   Yes, I did.

18   Q.   And did they ask you to describe anything about unique

19   appearances on his body?

20   A.   Yes, tattoos.

21   Q.   And did you tell them about the tattoos?

22   A.   Yes.

23   Q.   Did they come to your apartment and ask you to sign a

24   consent to search your apartment on June 1 of 2007?

25   A.   Yes.

A.T. Inge - Direct

868

1    Q.    Is that the next day after you talked to them?

2    A.    I am not exactly sure.  It was after.

3    Q.    It was after, but you don't remember whether a day or two

4    may have passed?

5    A.    It might have been a little more, it might have been

6    right after.

7    Q.    In any case, did you sign and let them search your

8    apartment?

9    A.    Yes, I did.

10   Q.    Had Omar's, were Omar's things still in your apartment at

11   that point?

12   A.    No.

13   Q.    What had happened to Omar's things?

14   A.    I packed them up and dropped them off.

15   Q.    And why did you pack up Omar's things before your

16   apartment was searched by the police?

17          MS. MINTER:  Objection, relevance.

18          THE COURT:  Overruled.

19   A.    Because he wanted me to get his things out, his clothes.

20   BY MR. WALUTES: (Continuing)

21   Q.    When you say he, just so we are clear, who is he?

22   A.    Omar.

23   Q.    So, sometime before the police came to search your

24   apartment, he asked you to remove his stuff?

25   A.    Yes.  And I also wanted it to go.

869

1    Q.   Did you know what the police were looking for inside your

2    apartment?

3    A.   Well, they said that they had entered--

4         MS. MINTER:  Objection, calls for speculation and

5    hearsay.

6         MR. WALUTES:  I could rephrase, Your Honor.

7         THE COURT:  Yes, please do.

8    BY MR. WALUTES: (Continuing)

9    Q.   Have you ever seen Mr. Mohamadi with a weapon?

10   A.   Yes.

11   Q.   Can you tell us when you saw him with a weapon?

12   A.   In my car.

13   Q.   And did you also see it in other places other than your

14   car?

15   A.   In my apartment.

16   Q.   And did you actually have an occasion to look at it?

17   A.   Yes, actually I almost sat on it once by accident.

18   Q.   And can you describe the weapon that you saw both in your

19   car and in your apartment to the ladies and gentlemen of this

20   jury?

21   A.   It was about the length of my hand.

22   Q.   Can you hold your hand up so we can see if you have big

23   hands or small hands.

24   A.   And flat and black.

25   Q.   Could you actually see the bullets or could you not see

A.T. Inge - Direct

870

1   the bullets when you were looking at it?

2   A.   No.

3   Q.   You could not see the bullets?

4   A.   No.  I mean, it was like smooth.

5   Q.   And without telling any details, you actually know that

6   gun worked?

7   A.   Yes.

8   Q.   Okay.  That's all I need to know.  And did you ever

9   discuss, did you ever see Mr. Mohamadi, your boyfriend, Omar,

10  carry that gun?

11  A.   Yes.

12  Q.   And when he carried it that you saw, where was he

13  carrying it?

14  A.   In his waist.

15  Q.   Did you ever ask him why he carried a gun?

16  A.   Yes.

17          MS. MINTER:  Objection.  May we approach, Your

18  Honor?

19          THE COURT:  Yes.

20          NOTE:  A side-bar discussion is had between the

21  Court and counsel out of the hearing of the jury as follows:

22  AT SIDE BAR

23          MS. MINTER:  Your Honor, I am in a fairly difficult

24  position because I thought that we knew everything that was to

25  know about the testimony about this gun, and we filed a motion

A.T. Inge - Direct

871

1    accordingly.  And I am now sitting at the edge of my chair

2    with no idea what testimony is coming because this is far

3    afield from what was discussed in our motion.

4              THE COURT:  What do you expect her to answer?

5              MR. WALUTES:  The answer is that he carried it for

6    protection.

7              THE COURT:  Protection?

8              MR. WALUTES:  For his protection.

9              THE COURT:  For his protection.

10             MR. WALUTES:  Yes, Your Honor.  This is squarely--

11   She is dating a man two or three months before an armed

12   robbery with a gun.  She has described the weapon consistent

13   with the description that has been admitted, the one that is

14   before this jury.  She is now tying him to it.

15             I understand we have a bench trial after this, but,

16   Your Honor, this is all dead heartland stuff for Counts 3 and

17   4 and another count that we will address later.

18             THE COURT:  Is that going to be the end of the gun?

19             MR. WALUTES:  It is, Your Honor.

20             THE COURT:  All right, I will permit the question.

21   Your exception is noted.

22             MS. MINTER:  I understand, Your Honor.

23             I would advise the Court that we do have objections

24   to a small handful of the Government's exhibits relating to

25   this witness.  I apologize, I had intended to raise it before

A.T. Inge - Direct

872

1    the witness took the stand.

2            I am simply tired at this point, I have no better

3    excuse, but I want to make the Court aware of that.

4            THE COURT:  Sure, go ahead.

5            MS. MINTER:  Your Honor, with respect to

6    Government's Exhibits 45 through 48, those are text messages

7    that purport to be messages from Dominik Brown to Amanda Inge.

8    And we would submit that those are inadmissible as hearsay

9    even if she could identify who they came from, and I don't

10   have any reason to believe that she can.

11           The other phone number, they are still hearsay

12   because they are still statements by Dominik Brown.

13           MR. WALUTES:  Your Honor, we would object, Your

14   Honor, to making these objections at the bench and not being

15   shown to her.

16           These are statements, the jury has already heard a

17   call of the defendant telling it to be issued.  They are being

18   received, she knows they are coming from the defendant.  They

19   are being tied to him.  O is having a heart attack.  O wants

20   to know what you said.  O's attorneys will get a copy of what

21   you said.

22           They are attributed by a co-conspirator to this

23   defendant who she will be able to identify.  And we believe

24   they are properly admitted.

25           MS. MINTER:  Your Honor, I do apologize, and I am

A.T. Inge - Direct

873

1   raising it now to simply avoid having another bench

2   conference, but I had intended to do it earlier.

3           If the Government wants to, I can identify the other

4   exhibits if the Government wishes to leave those aside and

5   perhaps when we break for lunch we can take them up, I am fine

6   with that is well.

7           THE COURT:  We have heard testimony through the tape

8   that Omar was sending this and that he is actually on the

9   telephone with Brown directing Brown to text the text

10  messages.  The one about he is having a heart attack, O, I

11  think she can testify that she received that text.  And it is

12  already admitted for the other purposes with your exception

13  already noted about the hearsay, but I found that it was a

14  statement of a co-conspirator.

15          So, what is your next one?

16          MS. MINTER:  The next, Your Honor, is with respect

17  to Exhibit 50, which is a letter from, that purports to be

18  from Mr. Mohamadi to Ms. Inge.

19          There is a fairly inflammatory, derogatory comment

20  about Agent Castro in there, and I would just ask that that

21  could be redacted.  It is fine I think to identify Agent

22  Castro, but I don't think the language that is included is

23  necessary.

24          MR. WALUTES:  I am not going to move it in on

25  direct, Your Honor.  I may do it on cross.

874

1          I will tell the Court that's the letter sending this

2    witness back a picture ripped up from the defendant.  But I

3    don't intend on direct to bring it up, I don't think it is

4    necessary.  I think it has got a lot of self-serving stuff in

5    there.

6          THE COURT:  Okay.

7          MS. MINTER:  The last thing, Your Honor, just with

8    respect to some of the mailings that purport to be from Mr.

9    Mohamadi to Ms. Inge.  I may have objections on the time.

10   Some of them are undated or the date is unclear from the

11   document.  Obviously, if Ms. Inge can specify when those were,

12   that's one thing, but I don't know at this point.

13         THE COURT:  All right.

14         MS. MINTER:  I just raise it for the Court.

15         THE COURT:  All right.  We will wait and hear what

16   we hear, and you can make your objection.

17         MS. MINTER:  Thank you.

18         THE COURT:  All right, thank you.

19         NOTE:  The side-bar discussion is concluded;

20   whereupon the case continues before the jury as follows:

21   BEFORE THE JURY

22         THE COURT:  Please proceed.

23         MR. WALUTES:  Thank you, Your Honor.

24   BY MR. WALUTES: (Continuing)

25   Q.  Ms. Inge, do you recall what, if anything, Mr. Mohamadi

A.T. Inge - Direct

875

1  told you on why he carried the gun?

2  A.   For protection.

3  Q.   Did you ever go out with Mr. Omar during the period that

4  you were dating him?  Did you ever go out to clubs?

5  A.   Yes.

6  Q.   Can you tell us what clubs?  Were there favorites?

7  A.   I think Ozio's and Camelot.  And there is one other that

8  I don't remember the name.  It was in D.C.

9  Q.   Did you ever, after having spoken with the Alexandria

10 detectives at your place of work and then having them search

11 your house, did you ever have occasion to speak again with Mr.

12 Mohamadi?

13 A.   Yes.

14 Q.   And did you tell him that you had talked to the

15 Alexandria police?

16 A.   Yes.

17 Q.   Did you tell him what you had told the police?

18 A.   Yes.

19 Q.   What was his reaction, if any?

20 A.   He was upset.

21         MS. MINTER:  Object to the characterization.

22         THE COURT:  I will allow it.

23 BY MR. WALUTES: (Continuing)

24 Q.   Why do you say he was upset?

25 A.   Because he pretty much was just like, why did you tell

A.T. Inge - Direct

876

1    them that.

2    Q.   At some point that summer--  Did there come a point when

3    you realized that he was in jail?

4    A.   Yes.

5    Q.   And did you visit him?

6    A.   Yes.

7    Q.   Did you visit him in a couple different jails?

8    A.   Yes.

9    Q.   And do you remember the two jails that you visited him

10   at?

11   A.   Fairfax and Alexandria.

12   Q.   Did you also speak to him by telephone?

13   A.   Yes.

14   Q.   Fairly frequently?

15   A.   Yes.

16   Q.   Did you break off your relationship with him after he

17   told you he had robbed this taxicab driver?

18   A.   No.

19   Q.   Why not?

20   A.   Honestly, I don't know.

21   Q.   Did you get served with a trial subpoena by the state,

22   the Commonwealth of Virginia for a trial on December 8 of

23   2007, 2008?  Excuse me, 2008.

24   A.   Yes, yes.

25   Q.   Did someone contact you to discuss your appearance at

A.T. Inge - Direct

877

1   trial?  Did you have a conversation with Mr. Mohamadi?

2   A.   Did I have a conversation with--

3   Q.   Yes, about someone needing to come talk to you?

4   A.   Yes.

5   Q.   Can you tell us who came?  Who did you meet with?

6   A.   A met with Mr. Brown.  And I believe I was visited again.

7   Q.   By who?

8   A.   By the detective.

9   Q.   But was there a member of, somebody speaking on behalf of

10  Mr. Mohamadi that met with you also?

11              MS. MINTER:  Objection, leading.

12              THE COURT:  Sustained.

13  BY MR. WALUTES: (Continuing)

14  Q.   At some point were you shown a photograph?

15  A.   Yes.

16  Q.   Okay.  Can you explain to us, were you shown the

17  photograph before or after the state trial?

18  A.   Before.

19  Q.   And who showed you the photograph?

20  A.   Omar's sister.

21  Q.   And do you know Omar's sister's name?

22  A.   Homaria.

23  Q.   Do you have any ability to spell that?

24  A.   H-o-m-a-r--  No.  H-o-m-a-r-i-a.

25  Q.   And who told you to meet with his sister?

A.T. Inge - Direct

878

1   A.   Omar.

2   Q.   And when he told you to meet with her, did you know

3   exactly what she was going to tell you?

4   A.   Not exactly.  Kind of had an idea.

5   Q.   And where did you meet her?

6   A.   Reynolds Street Bar.

7   Q.   Is that close to 175 South Reynolds, your address at that

8   time?

9   A.   Yes, it was on my street.

10  Q.   Do you remember how far in advance of the state trial on

11  December 8 of 2008 you had that meeting with Mr. Mohamadi's

12  sister?

13  A.   I don't remember exactly.

14  Q.   Can you tell the ladies and gentlemen of the jury what

15  you discussed with the sister?

16  A.   I was shown a picture and told his name.

17            MS. MINTER:  Objection, hearsay.

18            MR. WALUTES:  Your Honor, it is a--

19            THE COURT:  Overruled.  Go ahead.

20  BY MR. WALUTES: (Continuing)

21  Q.   I'm sorry, you were shown a picture and told his name?

22  A.   Yes.

23  Q.   And what was his name?  Do you remember it today?

24  A.   Ahmed.

25  Q.   Ahmed.  And what did the picture look like?

A.T. Inge - Direct

879

A.   He had kind of fair toned skin, shaved head, blue eyes, tattoos--  No, I don't think the tattoos were visible in the picture.

Q.   And were you told why you were being shown this picture?

A.   Yes.

Q.   And what were you told?

A.   Because he looked very similar to Omar.

Q.   And what were you supposed to do with that knowledge?

A.   Say that I was, I used to date him and that I had been dating him around that time.

Q.   Around what time?

A.   May 27.

Q.   Of 2007?

A.   2007.

Q.   In fact, before seeing that picture in the bar that night or that day with Mr. Mohamadi's sister, had you ever seen that man before?

A.   No.

Q.   And you said that there was some discussion of tattoos although not visible?

A.   Yes.

Q.   Can you tell us what the discussion was about the tattoos?

A.   I was told that he had supposedly a tattoo on his arm and on his back.

A.T. Inge - Direct

880

1    Q.   And do you know why you were being told about the

2    tattoos?

3              MS. MINTER:  Objection, speculation.

4              THE COURT:  Sustained.  Rephrase.

5    BY MR. WALUTES: (Continuing)

6    Q.   Were you told why you were being shown or given the

7    knowledge about the tattoos?

8    A.   Yes.

9    Q.   And what were you told?

10   A.   Because if I dated him, obviously I would know about the

11   tattoos.

12   Q.   Do you see his sister in the courtroom today?

13   A.   Yes.

14   Q.   Would you identify her by the location and article of

15   clothing?

16   A.   The second row, black jacket and top.

17   Q.   Thank you.  Did you in fact testify at the state trial,

18   Commonwealth versus Mohamadi on December 8 of 2008?

19   A.   Yes.

20   Q.   Before 12 jurors?

21   A.   Yes.

22   Q.   Did you admit to your telephone number?

23   A.   Yes.

24   Q.   Did you tell them the truth about who had called you that

25   night?

A.T. Inge - Direct

881

1    A.    No.

2    Q.    And what did you testify to?

3    A.    I said that I wasn't honest with the police, when I was.

4    Q.    And did you blame it on someone else?

5    A.    Yes.

6              MS. MINTER:  Objection, leading.

7              THE COURT:  Sustained.  Rephrase.

8    BY MR. WALUTES: (Continuing)

9    Q.    Did you repeat information that you had been provided

10   earlier by the defendant's sister?

11   A.    Yes.

12             MS. MINTER:  Objection, leading.

13             THE COURT:  I will allow it.  Go ahead.

14   BY MR. WALUTES: (Continuing)

15   Q.    Do you remember a defense attorney in the state trial

16   telling you that you were testifying under oath and subject to

17   perjury?

18             MS. MINTER:  Objection, hearsay.

19             THE COURT:  Overruled.

20   BY MR. WALUTES: (Continuing)

21   Q.    Do you remember being advised about the penalties of

22   perjury by Mr. Mohamadi's attorney when you were testifying in

23   his case?

24   A.    Yes.

25   Q.    Were you told ahead time that they were going to do that

A.T. Inge - Direct

882

1    to you in the courtroom?

2    A.    No.

3    Q.    How did that make you feel up on the witness stand?

4    A.    Nervous.

5    Q.    Why?

6    A.    Because I wasn't being honest.

7    Q.    How long after testifying for Mr. Mohamadi in this state

8    trial on December 8 of 2008 did you move to Miami, Florida?

9    A.    It was in a couple days, within a day or two.

10   Q.    Were you given money by Mr. Mohamadi while he was in

11   jail?

12   A.    Yes.

13   Q.    Both before and after you testified in the state trial?

14   A.    Yes.

15   Q.    And did he regularly call you both before and after the

16   state trial?

17   A.    Yes.

18   Q.    Did he write you letters both before and after the state

19   trial?

20   A.    Yes.

21   Q.    When do you consider your relationship with Mr. Mohamadi

22   to have ended?

23   A.    After my move to Florida.

24   Q.    In December after the trial, December of 2008?

25   A.    Yes.

A.T. Inge - Direct

883

1   Q.   At some time prior to March 5 of 2009 did Federal

2   Alcohol, Tobacco and Firearms agents come to your place in

3   Miami and serve you with a grand jury subpoena ordering you

4   before a federal grand jury?

5   A.   Yes.

6   Q.   Were travel arrangements made at the Government's expense

7   for you to travel from Miami to this courthouse to appear

8   before a federal grand jury?

9   A.   Yes.

10  Q.   Did you tell anyone that you were coming?

11  A.   Just my neighbor.

12  Q.   Did you tell anybody connected to the defendant that you

13  were coming up here to talk to a federal grand jury?

14  A.   Yes, through a text message.

15  Q.   Who did you tell?

16  A.   Homaria.

17  Q.   Is that the same lady that you identified in the

18  courtroom?

19  A.   Yes.

20  Q.   At some point after telling, did you get phone calls

21  prior to flying up to this courthouse?

22  A.   Yes.

23  Q.   And did you speak with Mr. Mohamadi directly, or did you

24  speak through someone else?

25  A.   It was through someone else.

A.T. Inge - Direct

884

1   Q.   And could you tell us who it was that you spoke to Mr.

2   Mohamadi through?

3   A.   I know him as Dogg.

4   Q.   And do you know his first name?

5   A.   I think it's Dwayne.

6   Q.   Can you tell us, how long have you known Dogg for?

7   A.   He was one of Omar's friends, so I would have met him

8   around the time when I started hanging out with Omar.

9   Q.   Back before, two or three months before May of 2007?

10  A.   Yes.

11  Q.   And when he spoke with you and communicated information

12  to you, did you know who was giving him the information to

13  communicate to you?

14  A.   Yes.

15  Q.   And how did you know?

16  A.   Because he told me.

17  Q.   And at some point in those conversations did you hang up?

18  A.   Yes.

19  Q.   Why did you hang up?

20  A.   Because I was trying to sleep.

21  Q.   Were you actually able to turn off your phone?

22  A.   No.

23  Q.   Can you explain to the jury why you couldn't turn your

24  phone off?

25  A.   That was my alarm clock, it was set to wake me up for my

885

1    flight.

2    Q.   Were you instructed to write things down?

3    A.   Yes.

4    Q.   Were you instructed to tell those things to the federal

5    grand jury?

6    A.   Yes.

7    Q.   Were those things that you were told to write down the

8    truth?

9    A.   No.

10   Q.   Did you in fact come to this courthouse and appear before

11   a federal grand jury on March 5 of 2009?

12   A.   Can you repeat that?

13   Q.   Did you come to this courthouse on March 5, did you fly

14   up from Miami?

15   A.   Yes.

16   Q.   And did you appear before the federal grand jury on March

17   5 of 2009?

18   A.   Yes.

19   Q.   Did you tell them what Omar had told you to write down?

20   Did you tell them that or did you tell them something

21   different?

22   A.   I told them what I had been told to write down.

23   Q.   And then did you tell them whether that was the truth or

24   not?  Did you testify truthfully before the federal grand

25   jury?

A.T. Inge - Direct

886

1    A.   Yes, I did.

2    Q.   And is that something different than what Omar had told

3    you the night before?

4    A.   Yes.

5    Q.   You didn't blame the robbery on some person named Ahmed?

6    A.   No.

7    Q.   A person you don't even know?

8    A.   Right.

9    Q.   When you appeared before the federal grand jury, you were

10   immunized, correct?

11   A.   Yes.

12   Q.   You were given immunity, the letter you have already

13   identified?

14   A.   Yes.

15   Q.   And you were also told that the state would join that

16   immunity, that the state also wouldn't prosecute you, correct?

17   A.   Yes.

18   Q.   After you left the federal grand jury, did people try to

19   contact you?

20   A.   Yes.

21   Q.   Who tried to contact you?

22   A.   Dogg and Omar.

23   Q.   And did you receive a series of text messages?

24   A.   Yes.

25   Q.   At some point did you allow federal agents to photograph

A.T. Inge - Direct

887

1    your phone?

2    A.    Yes.

3    Q.    Were they able to photograph the text messages?

4    A.    Yes.

5    Q.    And do you know who those text messages were coming from?

6    A.    Dogg.

7    Q.    Okay.  And do you know who was telling Dogg to send those

8    text messages to you?

9    A.    Omar.

10   Q.    If I could ask you to look at what is now marked as

11   Government's Exhibit 45, 46, 47 and 48.

12            Do you see the first one?  If you could look at all

13   four of them.

14   A.    Okay.

15   Q.    Have you gotten to the fourth one?

16   A.    Yes.

17   Q.    There are four of them.  Do you see four?

18   A.    Yes.

19   Q.    And do you recognize those as messages that you received

20   on your phone after you left the federal grand jury on March

21   5 of 2009?

22   A.    Yes.

23   Q.    Okay.  And are those the same--  All four of those were

24   photographed off of your phone?

25   A.    Yes.

888

1   Q.   And are they accurate?

2   A.   Yes.

3   Q.   And they are messages that are communicated to you by

4   Dogg from Mr. Mohamadi?

5   A.   Yes.

6            MR. WALUTES:  Your Honor, I move the admission of

7   Government's Exhibits 45, 46, 47 and 48 at this time.

8            THE COURT:  All right, I will receive them.  And

9   your exception is noted.

10           MS. MINTER:  Yes, Your Honor.

11           MR. WALUTES:  Your Honor, may I have permission to

12  publish at this time?

13           THE COURT:  Yes.

14  BY MR. WALUTES: (Continuing)

15  Q.   If you could look at the screen, Ms. Inge.

16           Do you see Government's Exhibit 45, the first of

17  them, it has both a grand jury exhibit sticker on the bottom

18  and then a Government's exhibit sticker above it, do you see

19  that?

20  A.   Yes.

21  Q.   And that is--  I'm sorry.  And do you see the time,

22  Thursday, March 5, 8:53 p.m.?  So, this is communicated to you

23  right after you have left the grand jury, sometime that

24  evening?

25  A.   Yes.

A.T. Inge - Direct

889

1    Q.    Okay.  And then the next one, again this would be the day

2    after the grand jury appearance, again in the evening,

3    7:24 p.m. on that Friday, and you have a communication on your

4    cell phone, correct?  This is a day after you have left the

5    federal grand jury?

6    A.    Yes.

7    Q.    And the third.  This one is the following day, Saturday

8    at 1:17 p.m. on March 7, and you have obviously gone to the

9    grand jury and left on Thursday?

10           MS. MINTER:  Your Honor, I would object to the

11   leading and the characterization.

12           THE COURT:  Sustained.

13   BY MR. WALUTES: (Continuing)

14   Q.    Ms. Inge, what day did you receive the third one?

15   A.    March 7, Saturday.

16   Q.    And what time did you receive the third one?

17   A.    1:17 p.m.

18   Q.    Thank you.  If you could go to the fourth one.  And what

19   time did you receive this message?

20   A.    1:27 p.m. on March 7, Saturday.

21   Q.    Did you understand why Dogg was trying to find out if you

22   still were working at the Paper Moon?

23   A.    So he could come talk to me.

24   Q.    Did that make you nervous?

25   A.    Yes.

A.T. Inge - Direct

890

1    Q.   Were you asked for whatever mail you still had from Mr.

2    Mohamadi by the federal grand jury?

3    A.   Yes.

4    Q.   And did you provide whatever letters you might still have

5    had?

6    A.   Yes.

7    Q.   If I could ask you to look at Government's Exhibit 51.

8         Do you see that?  You can actually take it out of

9    the sleeve if you want to.

10        You can look at the second page too.  I want to make

11   sure you have had an opportunity to see the whole thing.

12        Do you know who that's from?

13   A.   Omar.

14   Q.   And how do you know it's from Omar?

15   A.   Well, it says Mirwais.

16   Q.   Did you also recognize the handwriting?

17   A.   Yes.

18   Q.   Did this, I assume, came in an envelope?

19        MS. MINTER:  Objection, leading.

20        THE COURT:  Overruled.

21   BY MR. WALUTES: (Continuing)

22   Q.   And did yo have the envelope--  At the point you were

23   asked to give this letter to the federal grand jury, did you

24   still have the envelope that this letter came in?

25   A.   No, I usually throw those away.

A.T. Inge - Direct

891

1  Q.   Okay.  And what does this letter tell you?  Do you know

2  about when you received this letter from the content of the

3  letter?

4  A.   This is probably maybe shortly after I moved down there.

5  Q.   Okay.  Is there a discussion about you having moved to

6  Miami?

7  A.   Yes.

8          MR. WALUTES:  Your Honor, at this time I move the

9  admission of Government's Exhibit 51.

10          THE COURT:  Any objection?

11          MS. MINTER:  No objection, Your Honor.

12          THE COURT:  It is received.

13  BY MR. WALUTES: (Continuing)

14  Q.   And what is the, what does Mr. Mohamadi tell you in this

15  letter?

16  A.   That a plane ticket is only $250 and he can send his

17  cousin down there.

18  Q.   Does he say something, he can have someone spy on you?

19  A.   Spy on me, yeah.

20          MS. MINTER:  Objection, leading.

21          THE COURT:  Sustained.

22          MR. WALUTES:  I will move on, Your Honor.

23          THE COURT:  Thank you.

24  BY MR. WALUTES: (Continuing)

25  Q.   Do you see Mr. Mohamadi in the courtroom today, Ms. Inge?

892

1   A.   Yes.

2   Q.   Could you identify him by pointing to him and giving us

3   an article of clothing.

4   A.   White sweater.

5           MR. WALUTES:  Your Honor--

6           THE COURT:  I will note the identification of Mr.

7   Mohamadi.

8   BY MR. WALUTES: (Continuing)

9   Q.   Is this the same person who told you that he had robbed

10  the taxicab driver back in May of 2007?

11  A.   Yes.

12  Q.   Is this the same person who told you to lie in front of a

13  federal grand jury on March 5 of 2009?

14  A.   Yes.

15  Q.   Is this the same person who told you both directly and

16  through his family to lie before a state trial on December 8

17  of 2008?

18  A.   Yes.

19  Q.   What was the defendant's reaction, what was Mr.

20  Mohamadi's reaction after the state trial ended in a hung jury

21  without able to reach a verdict?

22          MS. MINTER:  Your Honor, I would object to the form

23  of the question.  I think she can testify to his statements,

24  not anything that calls for speculation.

25          THE COURT:  Not your impression of his reaction, but

893

1    what he said or what you physically observed if you saw him.

2    Don't speculate.

3            Go ahead.

4    A.   I don't remember exact words that he said.

5    BY MR. WALUTES: (Continuing)

6    Q.   But what was the import of what he said?

7    A.   I am sorry, what?

8    Q.   Do you remember the theme of what he was saying?  I know

9    you can't verbatim say word for word.

10   A.   That he was coming home.

11           MR. WALUTES:  Thank you.  No further questions, Your

12   Honor.

13           THE COURT:  All right.  Why don't we break at this

14   time.  We will take an hour for lunch at this time.  We will

15   come back at ten minutes to 2 and we will begin the

16   cross-examination.

17           All right, then we are in recess until ten minutes

18   until 2.

19           NOTE:  At this point a lunch recess is taken; at the

20   conclusion of which the case continues as follows:

21           THE COURT:  All right, cross-examination.

22           Let's get our witness.

23           MS. MINTER:  Your Honor, while the witness is being

24   brought in, pursuant to this Court's instructions, I would ask

25   that we could approach the bench briefly.

894

1              THE COURT:  Yes, ma'am.

2              NOTE:  A side-bar discussion is had between the

3       Court and counsel out of the hearing of the jury as follows:

4       AT SIDE BAR

5              THE COURT:  Yes.

6              MS. MINTER:  Your Honor, there is an arrest on Ms.

7       Inge's record that we intend to inquire into.  It is not a

8       conviction.  It was a dismissal.  It's not being introduced as

9       an impeachment by a prior conviction.  It is being introduced

10      for other reasons.  And I just wanted to bring that to the

11      Court's attention.

12             THE COURT:  How do you think it is admissible?

13             MS. MINTER:  Your Honor, we have reason to believe

14      that it goes to show her prior cooperation with law

15      enforcement and the benefits she received as a result of the

16      cooperation.

17             THE COURT:  So, you are going to ask, have you

18      cooperated with the Government previously and have they

19      assisted you--

20             MS. MINTER:  Precisely.

21             MR. WALUTES:  Your Honor, I am sorry, Ms. Minter

22      asked me further additional information.  I don't even

23      actually know what year this was.  Do you know what year?

24             MS. MINTER:  2004.  January of 2004.

25             MR. WALUTES:  It's years before she met the

A.T. Inge - Cross

895

1    defendant.  And so, we would object.  We don't believe that

2    pure arrest from 2004, which is years before she, three years

3    before she even met the defendant, how that even comes close.

4              THE COURT:  Well, the purpose of the admission is to

5    demonstrate that she knows she gets benefits from cooperation

6    with the Government because she has done it previously.  And

7    so, it goes to bias, truthfulness this time because she

8    understands that cooperating with the Government has benefits.

9              Do you know that the case was dismissed because--

10   Are you going to ask her, were your charges dismissed as part

11   of your cooperation?

12             MS. MINTER:  We don't know, Your Honor.  We have

13   tried to inquire from the Government, but they have indicated

14   they have no more information than we do.

15             THE COURT:  All right.  I will allow the questions.

16             NOTE:  The side-bar discussion is concluded;

17   whereupon the case continues before the jury as follows:

18   BEFORE THE JURY

19             THE COURT:  All right.

20        CROSS-EXAMINATION

21   BY MR. NACHMANOFF:

22   Q.   Ms. Inge, you testified on direction in response to the

23   prosecutor's questions about a trial that you testified in in

24   December of 2008, correct?

25   A.   Yes.

A.T. Inge - Cross

896

1   Q.   And you described taking the stand at that trial?

2   A.   Yes.

3   Q.   And you said that you were advised at that time that

4   lying under oath could be the crime of perjury, correct?

5   A.   Yes.

6   Q.   And you indicated that was the first time you had been

7   advised of that?

8   A.   On the stand, yes.

9   Q.   Okay.  Prior to taking the stand, you walked into a

10  courtroom, correct?

11  A.   Yes.

12  Q.   Similar to this one?

13  A.   Yes.

14  Q.   There was a judge?

15  A.   Yes.

16  Q.   There was a jury and there was a witness stand?  You will

17  have to answer out loud so the court reporter can write your

18  answers.

19  A.   Prior to that one you mean?

20  Q.   No.  When you went to court in December of 2008, you went

21  to a courtroom, correct?

22  A.   Yes.

23  Q.   And there was a judge?

24  A.   Yes.

25  Q.   There was a jury?

A.T. Inge - Cross

897

1    A.   Yes.

2    Q.   And you took the witness stand just like you did today,

3    correct?

4    A.   Yes.

5    Q.   Okay.  And just before you got up on the witness stand

6    and gave your testimony, you took an oath, correct?

7    A.   Yes.

8    Q.   And you swore to tell the truth?

9    A.   Yes.

10   Q.   And that was in the courtroom?

11   A.   Yes.

12   Q.   And before you gave your testimony, you did all of these

13   things?

14   A.   Yes.

15   Q.   And at some point you were advised that lying on the

16   witness stand was a crime?

17   A.   Yes.

18   Q.   Okay.  You did not change your testimony?

19   A.   No.

20   Q.   And you're telling this jury here today that you lied on

21   the stand under oath in a courtroom in December of 2008?

22   A.   Yes.

23   Q.   Now, in June of 2008 you met with an attorney by the name

24   of Larry Brown, correct?

25   A.   Yes.

A.T. Inge - Cross

898

1    Q.    And that was at his office?

2    A.    Yes.

3    Q.    Mr. Mohamadi was not there?

4    A.    No.

5    Q.    You had actually been to the office before?

6    A.    Yes.

7    Q.    And Mr. Brown had asked you to come back?

8    A.    Yes.

9    Q.    To meet with him?

10   A.    Right.

11   Q.    To discuss some issues that you had raised with him?

12   A.    With this situation with Omar?

13   Q.    That Mr. Brown asked you to come back and meet with him

14   on a different day to discuss some things that you had told

15   him about, correct?

16   A.    Yes.

17   Q.    And before you came back, he asked you to think about

18   your statements before you came back to meet with him,

19   correct?

20   A.    I am sure he did.

21   Q.    And it was several weeks later when you came back to meet

22   with him?

23   A.    Yeah, it had been awhile.

24   Q.    Now, when you met with him, he asked you if you were

25   there voluntarily?

A.T. Inge - Cross

899

1    A.    Yes.

2    Q.    And you said you were?

3    A.    Yes.

4    Q.    And he confirmed with you that you were not there based

5    on anyone telling you to come there?

6    A.    Right.

7    Q.    And he confirmed with you that you were not there based

8    on anyone else's will?

9    A.    Yes.

10   Q.    And you agreed with those statements?

11   A.    I agreed.

12   Q.    And Mr. Brown told you that he was going to relay the

13   information that you gave him to the Commonwealth's Attorney,

14   correct?

15   A.    Yes.

16   Q.    And you understood who the Commonwealth's Attorney was,

17   correct?

18   A.    Not really.

19   Q.    You understand that a Commonwealth's Attorney is a

20   prosecutor, correct?

21   A.    Okay.

22   Q.    And you understood that Mr. Brown would relay your

23   statements to the prosecutor?

24   A.    Okay, yes.

25   Q.    And you spoke with Mr. Brown after saying all of these

A.T. Inge - Cross

900

1    things?

2    A.   Yes.

3    Q.   Now, when you met with Mr. Brown, you informed him that

4    you had made statements to the police?

5    A.   Yes.

6    Q.   And you informed him that those statements were

7    inaccurate?

8    A.   Yes.

9    Q.   And he asked you if Mr. Mohamadi ever said anything to

10   you about committing a robbery, correct?  He asked you that

11   question?

12   A.   Yes.

13   Q.   And you said, no, he did not, correct?

14   A.   Yes.

15   Q.   And he asked you why you would have said he had made

16   statements if he hadn't, correct?  He asked you why you did

17   that?

18   A.   Yes.

19   Q.   And you told him that you felt that Mr. Mohamadi was

20   interested in other girls?

21   A.   Yes.

22   Q.   And you told him that you were upset that he had girls in

23   your house?

24   A.   Yes.

25   Q.   And you told Attorney Brown that you wanted to get back

A.T. Inge - Cross

901

1    at Mr. Mohamadi, correct?

2    A.   Yes, that's what I said.

3    Q.   Ms. Inge, you testified in response to the prosecutor's

4    questions about some bars in Washington, D.C., correct?

5    A.   Yes.

6    Q.   Okay.  One of those bars was called Camelot, correct?

7    A.   Yes.

8    Q.   And you in fact worked at Camelot, correct?

9    A.   No.

10   Q.   At some period of time?

11   A.   Like seven years ago for like a month.

12   Q.   So, you had worked at Camelot?

13   A.   Yes.

14   Q.   Ms. Inge, if we can go back for a moment and talk about

15   your conversation with Mr. Brown.  You have indicated that

16   when you met with him, that Mr. Mohamadi was not present,

17   correct?

18   A.   Right.  Yes.

19   Q.   And Mr. Brown was present?

20   A.   Yes.

21   Q.   And a secretary was present, is that correct?

22   A.   No.

23   Q.   Was anyone else present?

24   A.   No.

25   Q.   Okay.  Just you and Mr. Brown?

A.T. Inge - Cross

902

```
1    A.   Yes.

2    Q.   Okay.  And Mr. Brown had actually been your lawyer,

3    correct?

4    A.   Yes, for a DUI.

5    Q.   Okay.  And he actually represented you before you had

6    this conversation with him?

7    A.   Yes.

8    Q.   And after you had this conversation with him?

9    A.   I'm sorry, the question was did he represent me after?

10   Q.   Yes, ma'am.

11   A.   After represent me for--

12   Q.   After-- Let me clarify.  You indicated that you had this

13   conversation with Mr. Brown in June of 2008, correct?

14   A.   Yes.

15   Q.   Okay.  The conversation at his office.  Now, prior to

16   that, he had been your lawyer?

17   A.   Yes.

18   Q.   And after that conversation in his office in June of

19   2008, he was your lawyer again, correct?

20   A.   Yes.

21   Q.   Now, you testified in response to the prosecutor's

22   questions that you received a phone call the night before you

23   came up here to testify at this courthouse, correct?

24   A.   Yes.

25   Q.   And during the course of that phone call you believed
```

A.T. Inge - Cross

903

1    that you were receiving instructions from Mr. Mohamadi,

2    correct?

3    A.   Yes.  I had received several phone calls actually.

4    Q.   Okay.  This particular conversation that you testified

5    to.

6    A.   Okay.

7    Q.   And he indicated that he wanted you to tell the truth?

8    A.   Actually, yes, I think that was said.

9    Q.   Now, you, in response to the prosecutor's questions you

10   described a letter that you had been given by the prosecutor

11   before you went to the grand jury, correct?

12   A.   A subpoena do you mean?

13   Q.   No, ma'am, the letter that you testified about earlier

14   today.

15   A.   Oh, okay, yes.

16   Q.   And you described that as an immunity letter, I believe?

17   A.   Yes.

18   Q.   Okay.  And your understanding is that that gives you

19   immunity both from federal prosecution and state prosecution?

20   A.   Yes.

21   Q.   So, your understanding is that there will not be any

22   ramifications for anything you may have said in the state

23   trial in December 2008, correct?

24   A.   Yes.

25   Q.   And you understood that you wouldn't be prosecuted for

A.T. Inge - Cross

904

1   any other crimes, correct?

2   A.   No.  I understand that--  As long as I am honest, I

3   can't, involving this trial, not for any other crimes.

4   Q.   I am sorry, could you repeat that.

5   A.   I am guess I am getting confused.

6   Q.   You understand that that letter gives you immunity from

7   other crimes, not just perjury in the state court, correct?

8   A.   Okay, yes.

9   Q.   And you indicated just now that if you are honest, I

10  believe that was your word --

11  A.   Yes.

12  Q.   -- today, that this letter will protect you?

13  A.   Yes.

14  Q.   Okay.  And to your understanding, who decides if you are

15  honest?

16  A.   I guess the jury and the judge.

17  Q.   Now, before, if I could take you back to December 2008.

18  Before you testified at the state trial, had you spoken to

19  anyone who was a federal law enforcement officer?

20  A.   This is before--

21  Q.   Before the state trial, to your knowledge?

22  A.   I can't remember.

23  Q.   But you don't affirmatively recall meeting?

24  A.   I do remember--

25  Q.   Let me rephrase that.  You don't have a memory of meeting

A.T. Inge - Cross

905

1   with a federal law enforcement officer prior?

2   A.   A federal law enforcement officer?

3   Q.   Correct.

4   A.   I did meet with them, but I can't remember if it was

5   before.

6   Q.   Okay.  So, you have no recollection when you met with the

7   federal law enforcement officers.

8   A.   Not at this very moment.

9   Q.   Okay.  And just to make sure my question is clear,

10  obviously you understand that there are law enforcement

11  officers who work for the federal government?

12  A.   Yes.

13  Q.   And investigate federal cases?

14  A.   Yes.

15  Q.   And law enforcement officers who work for the state

16  government and investigate state cases?

17  A.   Yes.

18  Q.   And are you aware which individuals in this case worked

19  for the state government versus the federal government, or do

20  you not know?

21  A.   Yes.

22  Q.   Yes, you are aware?

23  A.   Yes.

24  Q.   Okay.  And thinking of those federal law enforcement

25  officers that you spoke with, I guess for simplicity let's say

906

1   before 2009 had you spoken with any federal law enforcement

2   officers, if you recall?

3            THE COURT:  Well, do you have any names that might

4   assist her?

5            MS. MINTER:  I can certainly go down that path, Your

6   Honor, if the Court prefers.

7            THE COURT:  Well, you have already asked the set of

8   questions once without any real response.  So, if you want

9   more specific responses, I think it would be helpful.

10            MS. MINTER:  Very well, Your Honor, thank you.

11   BY MS. MINTER: (Continuing)

12   Q.   Ms. Inge, you have spoken with Detective Castro in this

13   case, correct?

14   A.   Yes.

15   Q.   The individual seated at the table to the right?

16   A.   Yes.

17   Q.   And did you speak to him prior to 2009, if you recall?

18   A.   Yes.

19   Q.   Do you recall when?

20   A.   I think it was after the state trial.

21   Q.   Okay.  So, prior to 2009 but after the state trial?

22   A.   I think.  I mean, I am pretty sure.

23   Q.   And do you remember Detective Hickman?

24   A.   Yes.

25   Q.   And you had spoken to him prior to the state trial?

A.T. Inge - Cross

907

1    A.    Yes.

2    Q.    Okay.  A number of times?

3    A.    Yes.

4    Q.    And he is the primary individual that you had spoken with

5    before the state trial?

6    A.    Yes.

7    Q.    Do you recall speaking to anybody else from law

8    enforcement prior to the state trial?

9    A.    I think there might have been one other officer or

10   detective with Hickman, but I don't recall who it was.

11   Q.    And was that when they came to interview you at your

12   workplace?

13   A.    Yes.  And at my house.

14   Q.    Okay.  But those are the only times that you recall

15   anyone other than Detective Hickman prior to the state trial?

16   A.    Other than the search in my apartment, there was like a

17   number of people, but--

18   Q.    The Court's indulgence please, Your Honor.

19            Ms. Inge, you indicated that you spoke to Detective

20   Hickman on a number of occasions, correct?

21   A.    Yes.

22   Q.    And when you spoke to him, you answered all of his

23   questions?

24   A.    Yes.

25   Q.    You gave specific details if you could remember them?

A.T. Inge - Cross

908

1   A.   Yes.

2   Q.   You were careful about what you told him?

3   A.   Yes.

4   Q.   Okay.  Because you wanted him to get the information

5   correct?

6   A.   Yes.

7   Q.   Okay.  Ms. Inge, you previously dated a gentleman named

8   Aliakbar Babaei, correct?

9   A.   Yes.

10  Q.   You bought a car together?

11  A.   No, he just co-signed.

12  Q.   Okay.  But he was on the paperwork for your vehicle,

13  correct?

14  A.   Yes.

15  Q.   And that was in December of 2006?

16  A.   Yes.

17  Q.   And he had your cell phone numbers, correct?

18  A.   I think my number was different by then.  It had changed.

19  Q.   Does he have your new number?

20  A.   No, I haven't spoken with him in years.

21  Q.   You also dated a gentleman, if I am saying this

22  correctly, by the name Badr Fadli, is that correct?

23  A.   Yes.

24  Q.   And he had your cell phone number, correct?

25  A.   Yes.

909

1   Q.   Ms. Inge, you have previously testified that in March of

2   2009 you came here to testify?

3   A.   Yes.

4   Q.   Okay.  And that was when you testified in the grand jury?

5   A.   I think so, yes.

6   Q.   Okay.  Approximately, Spring of '09?

7   A.   Yes.

8   Q.   Correct?

9   A.   Yes.

10  Q.   And you were served a subpoena for that, correct?

11  A.   Yes.

12  Q.   Shortly before you had to come up here and testify,

13  correct?

14  A.   Yes.

15  Q.   Okay.  And the Government arranged for your travel,

16  correct?  Did you have to pay for your plane ticket?

17  A.   The Spring of last year?

18  Q.   Yes, ma'am.

19  A.   I'm sorry, I am getting confused.  Yes.

20  Q.   Well, let's back up.

21  A.   Yes.  Okay, yes.

22  Q.   You recall coming here to testify?

23  A.   Yes.

24  Q.   And you recall being served with a subpoena?  Okay.  And

25  you recall that the Government made your travel arrangements

910

1    for you?

2    A.    Yes.

3    Q.    And you decided to stay here a few extra days, correct?

4    A.    Yes.

5    Q.    Okay.  And that was to work?

6    A.    Yes.

7    Q.    Okay.  What kind of work was that?

8    A.    That was dancing.

9    Q.    Okay.  And was that at Camelot?

10   A.    No.

11   Q.    That was another club?

12   A.    Yes.

13   Q.    And you informed the agents of that, correct, that you

14   wished to stay here?

15   A.    Yes.

16   Q.    Ms. Inge, I would direct your attention to January 14 of

17   2004, or January of 2004, if you don't recall the specific

18   date.

19           You were arrested and charged with conspiracy to

20   distribute cocaine, correct?

21   A.    Actually, I wasn't charged with that.

22   Q.    You were arrested?

23   A.    Yeah.  Released within two hours.

24   Q.    Okay.  And that was after you spoke with law enforcement,

25   correct?

A.T. Inge - Cross

911

1    A.    Yes.

2    Q.    Okay.  And they interviewed you, correct, about what you

3    knew?

4    A.    Briefly.

5    Q.    And you gave them information about someone else related

6    to the drug conspiracy, is that correct?

7    A.    Actually, I just happened to be in the same house when

8    this happened.

9    Q.    Okay.  My question is, you gave information to the

10   officers who arrested you, correct?

11   A.    Yeah.

12   Q.    They asked you questions?

13   A.    Yes.

14   Q.    About the other people who had been arrested?

15   A.    Right.

16   Q.    And after you gave that information, your charges were

17   dropped, correct?

18   A.    Yes.

19   Q.    Ms. Inge, you have met, you have testified that you met

20   with the agents involved in this case, correct?

21   A.    Yes.

22   Q.    Okay.  And you have met with the prosecutors involved in

23   this case?

24   A.    Yes.

25   Q.    Okay.  And you discussed what would happen here today at

912

1   the trial?

2   A.   Yes.

3   Q.   And the things you would be asked about?

4   A.   A list of questions, yes.

5   Q.   How many times did you meet with them?

6   A.   Maybe two to three times total.

7   Q.   I am sorry, two to three?

8   A.   Yes, about three times total.

9   Q.   Ms. Inge, if we can go back to discussing your apartment

10  that you lived in in May of 2007.

11          You did not have Internet access in that apartment,

12  correct?

13  A.   No.

14  Q.   You did not have a computer in that apartment?

15  A.   No.

16  Q.   And you had been issued--

17  A.   I am sorry, I had a laptop right toward the end, the last

18  few months, but I had to leave to use it.

19  Q.   Okay.  So, you had to leave the apartment to use it?

20  A.   Yeah, they had a center where you could, they had

21  Internet access in the center in the complex, but--

22  Q.   So, you had to leave because you didn't have Internet

23  access in your own apartment?

24  A.   Right.

25  Q.   And you said that was toward the end.  So, you did not

913

1    have that laptop in May of 2007, correct?

2    A.    No.

3    Q.    Okay.  And you were issued multiple keys from the

4    apartment complex, is that correct?

5    A.    There is one building key and two keys for the actual

6    door to my apartment.

7    Q.    Okay.  And did one of those keys get lost?

8    A.    No.

9    Q.    Okay.  When you moved out, did you turn both of those

10   keys back.  Actually, let me rephrase that.

11         When you moved out, did you turn all three of those

12   keys back in.

13   A.    I actually returned the lead key, one key.  And the other

14   key I had misplaced, but I found it after I had moved.

15   Q.    Now, you indicated that, if we can go back to the early

16   morning hours of May 27, 2007.  That you came home, perhaps

17   not that early, but at some point during the morning you came

18   home and discovered that the police had been in your

19   apartment?

20   A.    Yes.

21   Q.    Okay.  And you subsequently spoke to the police on the

22   phone, correct?

23   A.    Yes.

24   Q.    Okay.  And in person when they came to your apartment?

25   A.    Yes.

A.T. Inge - Cross

914

1  Q.   And in person when you were interviewed?

2  A.   Yes.

3  Q.   By Detective Hickman?  And during those interviews, were

4  you advised about what the police officers thought had

5  happened that evening?

6  A.   Not until after they had interviewed me.

7  Q.   Okay.  But eventually you were advised?

8  A.   A little, yeah.

9  Q.   And you were advised that they believed that Mr. Mohamadi

10  had committed a robbery?

11  A.   Yes.

12  Q.   Okay.

13  A.   I think.

14  Q.   And they told you that he was accused of robbing a cab

15  driver?

16  A.   I really honestly don't remember if it was what I was

17  told through him or through--

18  Q.   Okay.

19  A.   I think it might have been, I remember they were giving

20  me some details.

21  Q.   Okay.  And you indicated just a moment ago that you

22  recall an interview with Detective Hickman when you were at

23  your job?

24  A.   Yes.

25  Q.   Okay.  And were you under the influence of alcohol at the

A.T. Inge - Redirect

915

1    time of that interview?

2    A.   No.  I had actually just gotten there and was still

3    putting my stuff down.

4    Q.   Okay.  And were you under the influence of any controlled

5    substances at that time?

6    A.   No.

7    Q.   But you are a drug user, correct?

8    A.   I used to be.

9    Q.   At the time this happened you were?

10   A.   Not at that moment.

11   Q.   Let me clarify.  In May of 2007 you were still using

12   controlled substances, correct?

13   A.   Yes.

14   Q.   And that included cocaine?

15   A.   Yes.

16   Q.   And Ecstasy?

17   A.   Occasionally.

18   Q.   And you've described that time period as somewhat fuzzy?

19   A.   Sometimes.

20          MS. MINTER:  Nothing further, Your Honor.

21          THE COURT:  Thank you.  Any redirect?

22          MR. WALUTES:  Thank you, Your Honor.

23      REDIRECT EXAMINATION

24   BY MR. WALUTES:

25   Q.   Did the defendant know about your drug use back in May of

A.T. Inge - Redirect

916

1   2007 when you were dating him?

2   A.   Yes.

3   Q.   And if I could go back through a couple things.  Ms.

4   Minter just asked you a series of questions about June of 2008

5   you went down to see your boyfriend's attorney, Larry Brown?

6   A.   Yes.

7   Q.   And she gave you things, she suggested to you things you

8   might have said to that attorney?

9   A.   Yes.

10  Q.   Did you actually remember them as you are sitting here

11  today, or did you just agree with her?

12          MS. MINTER:  Objection.  That is an improper line of

13  questioning.  She answered the questions and she is under

14  oath.

15          THE COURT:  Overruled.  Answer it if you can.

16  A.   I remembered some of them, yes.

17  BY MR. WALUTES: (Continuing)

18  Q.   Do you remember all of them?

19  A.   Not every single one.

20  Q.   And why did you tell that to Larry Brown, your

21  boyfriend's attorney?

22  A.   Because that's what I thought I was supposed to say.

23  Q.   Why did you think that was what you were supposed to say?

24  A.   Because that's what I was told.

25  Q.   Who told you that?

917

1    A.    Omar.

2    Q.    And that's your boyfriend?

3    A.    Yes.

4    Q.    Today as you sit here testifying for this trial jury, do

5    you know if Omar's attorney at that time, Larry Brown, the one

6    who represented him in that state trial, do you know if he

7    knew that that was a lie?

8              MS. MINTER:  Objection, calls for speculation.

9              THE COURT:  Yeah, lay a foundation.

10   BY MR. WALUTES: (Continuing)

11   Q.    You had a conversation with his, with Mr. Mohamadi's

12   state trial attorney, Larry Brown, prior to the trial in

13   December of 2008?

14   A.    Yes.

15   Q.    And in that conversation with him in June of 2008, do you

16   remember that date?  Does that sound about right to you?

17   A.    That sounds about right.

18   Q.    Did you see him again after that date, or was that the

19   only time you saw him before the courtroom?

20   A.    I think I saw him again after that.

21   Q.    And in the course of your conversations with him, could

22   you tell, could you tell--

23             MS. MINTER:  Objection, calls for speculation and

24   hearsay.

25             THE COURT:  Sustained.

A.T. Inge - Redirect

918

1   BY MR. WALUTES: (Continuing)

2   Q.   In any case, what you were telling Mr. Brown was

3   information that you were given from Mr. Mohamadi?

4   A.   Yes.

5   Q.   And they asked you about an arrest on January of 2004,

6   over three years before the robbery of the taxicab driver by

7   your boyfriend, Mr. Mohamadi?

8   A.   Yes.

9   Q.   Okay.  Does that have anything at all to do with this

10  case?

11  A.   No.

12  Q.   Do you see any connection between being arrested for two

13  hours--

14           MS. MINTER:  Objection, relevance.

15           THE COURT:  Overruled.

16  BY MR. WALUTES: (Continuing)

17  Q.   Being arrested for two hours back on January 14 of 2007

18  and coming to court today?

19  A.   No.

20  Q.   Were any of the police officers the same?

21  A.   No.

22  Q.   You hadn't even met Mr. Mohamadi at that point?

23  A.   No.

24  Q.   He had nothing to do with that?

25  A.   No.

A.T. Inge - Redirect

919

1    Q.   You answered Ms. Minter's question about the immunity

2    letter and your understanding of it, and you said that there

3    would be no charges outside of this trial.

4             Do you remember that?

5    A.   Yes, I remember.

6    Q.   Do you have any other charges that you are worried about?

7    A.   No.

8    Q.   What charges are you worried about sitting on that stand?

9    A.   Nothing.

10   Q.   Okay.  You said that--  Ms. Minter asked you if your

11   boyfriend had told you or your former boyfriend I guess by the

12   time of March of 2009 as you are trying to get some sleep

13   before coming to this courthouse for the federal grand jury,

14   that he told you to tell the truth, is that correct?

15            You said that he said that?

16   A.   Yeah, I think that was mentioned along with a list of

17   things, laws to follow that I could, I don't know, meander.

18   Q.   If you put aside the statement to tell the truth, the

19   things he told you to write down about blaming it on your

20   other boyfriend, was that the truth?

21            When he told you write this, do you remember writing

22   it down?

23   A.   Yes.

24   Q.   Do you remember him asking you to read it back?

25   A.   Yes.

A.T. Inge - Redirect

920

1   Q.   And do you remember him saying to you, just say that you

2   were drunk when the cops were talking to you?

3   A.   Okay, yes.

4   Q.   And was that the truth?

5   A.   No, that was not the truth.

6   Q.   And do you remember him to say to blame it on Ahmed?  Was

7   that the truth?

8   A.   No.

9   Q.   But he did at the same say, tell the truth, on the those

10  recordings that the jail captured?

11          Do you understand what I'm saying?

12  A.   Yes.  Yes, I understand.

13  Q.   That day when you came to the federal grand jury, did

14  anyone threaten you?

15  A.   No.

16  Q.   Did anyone force you to do anything?

17  A.   No.

18  Q.   Why did you decide to tell the truth to the federal grand

19  jury?

20  A.   I just wanted to move on with my life and come clean with

21  everything.

22  Q.   And today, has anyone forced to you testify today?

23  A.   No.

24  Q.   Has anyone told you what to say?

25  A.   No.

921

1          MR. WALUTES:  Thank you, Your Honor.  I have no

2     further questions.

3          THE COURT:  All right.  May Ms. Inge be excused?

4          MR. WALUTES:  Yes, Your Honor.

5          MS. MINTER:  Your Honor, I would actually ask to

6     recross briefly.  Mr. Walutes elicited testimony that the

7     answers I was given on cross-examination were not in fact--

8          THE COURT:  No, I think he was well within the

9     bounds of your cross-examination.  This witness will be

10    excused at this time.

11         You are excused at this time, ma'am.  Please don't

12    discuss your testimony that you have given here today with

13    anyone until the trial is over.

14         THE WITNESS:  Okay.  Yes, Your Honor.

15         THE COURT:  Have a good afternoon.

16         NOTE:  The witness stood down.

17         THE COURT:  Next witness.

18         MR. WALUTES:  Your Honor, the Government would call

19    Special Agent Victor Castro.

20         NOTE:  The witness is sworn.

21         THE COURT:  Go ahead, sir.

22         MR. WALUTES:  Thank you, Your Honor.

23         VICTOR CASTRO, called by counsel for the United

24    States, first being duly sworn, testifies and states:

25        DIRECT EXAMINATION

V. Castro - Direct

922

1    BY MR. WALUTES:

2    Q.   Good afternoon, sir.

3    A.   Good afternoon.

4    Q.   Would you please tell us your name.

5    A.   Victor Castro.  C-a-s-t-r-o.

6    Q.   How are you currently employed?

7    A.   I am a Special Agent with the Bureau of Alcohol, Tobacco,

8    Firearms and Explosives, ATF.

9    Q.   And prior to your employment with the ATF, can you tell

10   us what prior employment you had in the area of law

11   enforcement?

12   A.   Yes.  Prior to ATF I was a U.S. Secret Service agent for

13   over seven years.  And prior to that I was an Arlington

14   County, Virginia police officer for approximately three years.

15   Q.   All total, how much experience do you have in the field

16   of law enforcement from these three jobs?

17   A.   At the end of this month it will be approximately

18   22 years.

19   Q.   Did you participate into an investigation in a murder for

20   hire plot back in November of 2008?

21   A.   Yes, I did.

22   Q.   Do you recall the exact date you had your first

23   opportunity to speak with an individual who brought

24   information to your attention?

25   A.   Yes, it was November 7, 2008.

923

1  Q.   What was that person's name?

2  A.   Richard Bryan.

3  Q.   Had you ever worked with Richard Bryan prior to

4  November 7 of 2008?

5  A.   No, I had not.

6  Q.   To your knowledge, had any law enforcement ever worked

7  with Mr. Bryan prior to that date?

8          MR. NACHMANOFF:  Objection, Your Honor, unless he

9  has specific information that allows him to answer.

10          THE COURT:  All right, lay a foundation.  Sustained.

11  BY MR. WALUTES: (Continuing)

12  Q.   Have you had an opportunity to look at Mr. Bryan's

13  record?

14  A.   Yes, I did.

15  Q.   Have you had an opportunity to interview Mr. Bryan about

16  events that--  About his life?  About his life.

17  A.   Yes.

18  Q.   Okay.  Have you had an opportunity to actually travel to

19  his mother's home?

20  A.   Yes.

21  Q.   And have you had an opportunity to become familiar with

22  some of the members of his family?

23  A.   Yes, I have.

24  Q.   In that exposure, do you have any information personally

25  that would suggest to you or that tells you that he had ever

1    worked with law enforcement before?

2              MR. NACHMANOFF:  Your Honor, that calls for hearsay.

3              THE COURT:  I will overrule the objection.  You may

4    answer.

5    A.   To my knowledge, based on my interaction with him and the

6    history I know of, no, there is no history of his having

7    worked with law enforcement.

8    BY MR. WALUTES: (Continuing)

9    Q.   In fact, was he concerned when he first met with you

10   about his family?

11   A.   Then and now, very concerned.

12   Q.   Were you aware that he was being released from the

13   Alexandria Adult Detention Center sometime after you were

14   speaking with him on November 8, 2008?

15   A.   Yes, I was aware that he was going to be leaving,

16   finishing his term there in less than two weeks.

17   Q.   Did you give him any instructions or did you ask him to

18   do something to help you in your investigation?

19   A.   Yes, I did.

20   Q.   And what did you ask?

21   A.   I asked him to, if he was approached by Mirwais Mohamadi,

22   the gentleman sitting to my right, if Mr. Mohamadi approached

23   him again regarding a murder solicitation, I asked Richard

24   Bryan to tell Mohamadi that he would be interested in the

25   murder plot and that he would commit the murder on his behalf.

V. Castro - Direct

925

1    Q.    And why did you do that, Special Agent Castro?

2    A.    Two reasons.  The first reason was to keep the cab

3    driver, Mr. Haile alive.

4          The second was to assist me in an investigation into

5    the murder plot.  I didn't want other people solicited.  I had

6    no way of knowing if that was going to happen.  So, that was

7    my concern.

8    Q.    At some point thereafter did you ask Mr. Bryan to wear a

9    wire inside the Alexandria Adult Detention Center?

10   A.    Yes, I did.

11   Q.    And do you recall the dates at which you asked him to

12   wear a wire inside the Alexandria Jail?

13   A.    November 12 was the first time.  The November 17, 2008

14   was the second time, that was the day before his release.

15   Q.    Were you actually present when you placed the wire on Mr.

16   Bryan?

17   A.    Yes, I was.

18   Q.    Did Mr. Bryan have the ability to start and stop that

19   tape?

20   A.    No, I actually took the device and built it in myself

21   into a prison jumpsuit.  And the way it was built, I wouldn't

22   it was impossible, but I didn't complain how to turn it on or

23   off.  I never did so in Mr. Bryan's presence.  And the way it

24   was built in, the way I built it, it would be very difficult

25   to do so.

V. Castro - Direct

926

1   Q.   And have you had an opportunity to review the entire

2   tape?

3   A.   Several times.

4   Q.   Do you actually capture him going to the bathroom and

5   such if you watch the entire tape?

6   A.   Yes.

7   Q.   Did that tape also have a video?

8   A.   Yes, it did.

9   Q.   Did you tell Mr. Bryan that it had a video?

10  A.   I did not.

11  Q.   Why did you not tell him that?

12  A.   I did not tell him that basically because he had

13  volunteered to wear this device.  To me, he seemed extremely

14  nervous, and rightfully so concerning where he was going to

15  wear it.

16          I have worn it before working undercover.  It's

17  distracting to know that it's on you.

18          The audio recording device and the video device were

19  built in the same unit.  So, the fact that it had the ability

20  to capture video really didn't add any more bulk.  The threat

21  was already there.  I didn't want to distract him any more

22  than he was regarding what he was going to do and actually he

23  was going to wear it in the jail.

24  Q.   And when Mr. Bryan wore a wire inside the jail at your

25  request, where were you?

V. Castro - Direct

927

1    A.    When he was wearing the wire?

2    Q.    While he was wearing the wire.

3    A.    After he put on the outfit that contained the recording

4    device on November 12 of 2008, the first place I went to, I

5    was in the company of Deputy George Burnham and Alexandria

6    Detective Tom Buckley, we went to a video room, the best way I

7    can describe it, to actually see the video live time, real

8    time.

9              But we didn't stay there long.  Investigator Burnham

10   told me that we could actually be in a mezzanine level and

11   actually watch it as it was going on because there was going

12   to be a window that was a one-way window.  So, we went to that

13   location in the fourth level.

14   Q.    So, inside the Alexandria Adult Detention Center there is

15   the ability for the Sheriff's Office to monitor the inmates

16   inside the facility without anybody knowing that they are

17   right behind them?

18   A.    Yes.

19   Q.    Okay.  And did you position yourself there?

20   A.    I did.

21   Q.    At some point did you see Mr. Bryan approach the area

22   that you were standing at on the other side of a one-way

23   glass?

24   A.    Yes.  By coincidence, they had walked over to an area

25   where they had more privacy, and they sat down on the ground,

V. Castro - Direct

928

1    they were shoulder to shoulder.  Mr. Bryan was sitting to Mr.

2    Mohamadi's right.  They both had their back up against a

3    cinder block wall.

4           And about waist level there was a window, glass, it

5    was a thick glass which was one-way.  I was staining behind

6    that wall, I was standing behind both of them, probably two to

7    three over Mr. Mohamadi's shoulder.  I actually stood over his

8    shoulder, looked down, looked at his face so that I could

9    recognize him so that I could be assured that Mr. Bryan was

10   speaking to Mohamadi.

11          You know, in the video we saw the first day--

12          MR. NACHMANOFF:  Objection, Your Honor.  This no

13   longer responsive to the question.

14          THE COURT:  All right.  Wait for the next question.

15          THE WITNESS:  Yes, Your Honor.

16          MR. WALUTES:  Your Honor, at this point I would note

17   that the witness has identified Mr. Mohamadi in the courtroom.

18   I would just like the record to reflect that.

19          THE COURT:  So noted.

20          MR. WALUTES:  Thank you, Your Honor.

21   BY MR. WALUTES: (Continuing)

22   Q.   To be clear, Special Agent Castro, could you actually

23   hear what the conversation was?

24   A.   At that moment?  No.  I could hear mumbling, muffled

25   because of the wall.  I could not distinct any words that were

V. Castro - Direct

929

1   being said.  I could, you know, basically as you would hear

2   somebody talking in another room, but no distinct words, not

3   at all.

4   Q.   But you could see physically the two people that you were

5   monitoring visually, but not audibly?

6   A.   Yes, I could see them engaged in what appeared to be

7   conversation.  I could hear the noise of talking.

8   Q.   And I wonder if you could describe for the ladies and

9   gentlemen of this jury the interior of the Alexandria Adult

10  Detention Center as it--  What is in front of Mr. Mohamadi and

11  Mr. Bryan as they are seated down below you against the cinder

12  block wall I think you said?

13          What's is in front of them?

14  A.   Well, I stood behind both of them, so I could see the

15  vantage point.  The video that was on the device would have

16  captured what was in front of Richard Bryan.  And as I stood

17  behind him, I could see his vantage point.

18          They were basically on the top tier.  There is an

19  opening in the middle, but there is walkways on either side

20  and there is cells.

21          So, from Richard Bryan's vantage point, which the

22  video would have shown, was like an open door to a cellblock

23  that was open.  And maybe at times he could see other inmates

24  walking that general recollection.

25          But for the majority of the time, great majority of

V. Castro - Direct

930

1    the time, they had privacy in that section.

2    Q.   Did you provide to Mr. Bryan a mailing address to be used

3    in the course of your investigation into this murder for hire?

4    A.   Yes, I did.

5    Q.   And why did you give him an address?

6    A.   Because there was, in the investigation there was mention

7    and talk about money being sent to Richard Bryan when he was

8    released on November 18, which was going to be in a couple

9    days, less than a week or a week's time.

10           So, I provided him an address to give to Mohamadi.

11   That address was actually an ATF P.O. box number.  Or actually

12   similar, I believe it might have been UPS, but a similar type

13   of address.

14   Q.   If I could ask you, what is marked now as Government's

15   Exhibit No. 21, and ask if you recognize that?

16   A.   Yes, I recognize this.

17   Q.   Is this the mailing that Mr. Mohamadi made to your

18   address?

19   A.   Yes.  I actually picked this up from the mail box, this

20   letter.

21           MR. WALUTES:  Your Honor, I believe that is

22   previously admitted.  If it hasn't been, I would move its

23   admission now.

24           THE COURT:  Any objection?

25           MR. NACHMANOFF:  No objection.

931

1              THE COURT:  It is received.

2    BY MR. WALUTES: (Continuing)

3    Q.   If I could ask you now to look, Special Agent Castro, at

4    Government's Exhibits 22, 23 and 24.  I believe those three

5    have been previously admitted and published?

6              But do you see those three?

7    A.   Yes, I do.

8    Q.   Okay.  Would it be fair to describe those as pocket liter

9    or small scraps of paper with information on them?

10   A.   Yes.

11   Q.   Who did you get those from, if anyone?

12   A.   I received these directly from Richard Bryan.

13   Q.   Was a telephone used in this case?

14   A.   Yes.

15   Q.   And was that on--  You don't remember when that was?

16   A.   I provided Richard Bryan a cellular phone, a mobile phone

17   with a 202 number.  Once again, it was an ATF provided phone.

18   And I gave that to him the day he was released from the

19   Alexandria Jail.  So, that would have been November 18, 2008.

20   Q.   And then the following day, on November 19, 2008, was

21   there actually a telephone conversation between him and Mr.

22   Mohamadi using that?

23   A.   Yes.  I'm sorry.

24   Q.   Using that phone?

25   A.   Yes, there was.

V. Castro - Direct

932

1   Q.   And that was recorded?

2   A.   It was recorded twice.

3   Q.   On both ends, one on your ATF phone and also by the jail?

4   A.   Correct.

5   Q.   And I believe those have been previously admitted, Your

6   Honor.

7            THE COURT:  Yes.

8   Q.   Were there any jail visits by Mr. Bryan at your request

9   after he had been released on November 18 of 2008?

10  A.   At my request and Mr. Mohamadi's request.

11  Q.   And would those visits have occurred on November 22 of

12  2008 and November 29 of 2008?

13  A.   Yes, those are the dates.

14  Q.   Okay.  That's bracketing Thanksgiving?

15  A.   Correct.  I believe those days are probably both

16  Saturdays, if I recall.

17  Q.   Did you provide Mr. Bryan with anything prior to the

18  first visit?

19  A.   Yes, I did.

20  Q.   Okay.  And what was it?

21  A.   It was a newspaper article that I had written.  I had

22  written an article which described the murder, the shooting

23  death of Mr. Haile at his apartment parking lot by his

24  taxicab.  I had provided that article to an ATF technician who

25  had the ability to print that onto newspaper print.  And it

933

1    appeared--  I also had provided, I believe it is called the

2    Gazette Community News, which is local paper that served

3    Silver Spring, Maryland and Tacoma Park.  Mr. Haile had lived

4    in Tacoma Park.

5           So, this newspaper article was basically built into

6    the Gazette Community News.

7    Q.   And did you have occasion to actually watch the display

8    of that newspaper article to Mr. Mohamadi that day on

9    November 22 of 2008?

10   A.   Yes, I did.

11   Q.   Did you have a vantage point that allowed you to have a

12   visual line of sight on him?

13   A.   Yes, I did.

14   Q.   Again, could you hear conversation or is it just a visual

15   line of sight?

16   A.   I at that time just saw a visual line of sight.  I was

17   standing at a mezzanine level which looked down upon Mr.

18   Mohamadi's side of the visitation room and could see the

19   article being pressed against the separation glass.

20   Q.   Without telling us what you don't know, which is

21   obviously what Mr. Mohamadi was thinking, could you describe

22   for the ladies and gentlemen of the jury objective things that

23   you saw?

24          By that I mean, any motions or anything that was

25   observable from your point of--  Were you elevated above Mr.

V. Castro - Direct

934

1    Mohamadi?

2    A.   I was.  The room is approximately 15 feet high, by the

3    ceiling there is windows for a mezzanine level.  Once again,

4    it is one-way glass.  So, I was looking down upon the

5    interview room.  I could see Mr. Mohamadi on one side and

6    Richard Bryan on the other.

7            But I stood on the side of Mr. Mohamadi, and that's

8    my vantage point.

9    Q.   And what, if anything, did you see him do as the article

10   was being pressed up against the Plexiglas?

11   A.   I recognized the article, I had just given it to Richard

12   Bryan.  I saw it pressed against the separation, the Plexiglas

13   between Mr. Mohamadi and Richard Bryan, the visitor.  And I

14   could see Mr. Mohamadi moving left to right.  To me it

15   appeared to be the physical action of reading.

16           After that, his physical actions were different than

17   they were prior to the article being pressed against the

18   window.  He stood up, he sat down a lot.  At times when he

19   turned his head, I could see his face.  He was smiling.

20           The best way that I could describe his body actions,

21   although I couldn't read is mind, was that they were excited,

22   excited body actions.

23           I just thought--  I remember just taking note of how

24   he was acting considering what he had just read.

25   Q.   Okay.  Did you ever see him make any hand motions?

V. Castro - Direct

935

1    A.   Yes.

2    Q.   Could you describe what those hand motions were?

3    A.   Towards the end of the visit before he was escorted out,

4    he made what I would call a positive fist pump and then showed

5    two fingers.  I could demonstrate if you'd like.

6    Q.   If the Court would permit.

7             THE COURT:  Yes, go ahead.

8    A.   He faced Richard Bryan and made a motion like this, and

9    gave four fingers.

10            MR. WALUTES:  Your Honor, if the record could

11   reflect that the agent just held up four fingers with the

12   thumb pulled in, and that he pumped his fist across his chest.

13            THE COURT:  All right, it will so note.

14            MR. WALUTES:  Thank you, Your Honor.

15   BY MR. WALUTES: (Continuing)

16   Q.   What had been your original objective thereafter, Agent

17   Castro?  Did you know that the state trial was approaching?

18   A.   Yes, I did.  I knew the date.

19   Q.   And what was the date?

20   A.   December 8, 2008.

21   Q.   And did you ask Mr. Bryan to come back in to visit, to

22   come back into the jail a second time on November 29 of 2008?

23   A.   Yes, I did.

24   Q.   And what was the purpose why you asked Mr. Bryan to make

25   the second visit?

V. Castro - Direct

936

1    A.   Well, it was my opinion working the investigation that it

2    was believed that the murder had taken place.  And it just

3    seemed appropriate--

4            MR. NACHMANOFF:  Objection to what seemed

5    appropriate and what his opinion was.

6            THE COURT:  Sustained.  Just ask him his reason for

7    sending Mr. Bryan back in.

8    BY MR. WALUTES: (Continuing)

9    Q.   Why did you send Mr. Bryan back in a second time, Agent

10   Castro?

11   A.   For Mr. Bryan to ask the status of the payment for the

12   murder.

13   Q.   Were you ultimately--  And what did you understand the

14   payment to be for?

15   A.   $4,000 and a position in a prostitution enterprise.

16   Q.   And were you ultimately able to acquire $4,000?

17   A.   No.

18   Q.   At some point were you aware that the Commonwealth

19   forwarded discovery obligations and had to give up

20   information?

21           MR. NACHMANOFF:  Objection, calls for hearsay.

22           THE COURT:  Overruled.

23   A.   Yes.  Sometime in early December, approximately

24   December 3 or 4th I was made aware that the Commonwealth

25   Attorney in Alexandria had told Mohamadi's attorney at the

1    time, Larry Brown, that Richard Bryan was going to be a

2    witness in the December 8, 2008 robbery trial.

3    BY MR. WALUTES: (Continuing)

4    Q.   You didn't expose him to Mr. Mohamadi thereafter, I take

5    it?

6    A.   That's correct, I did not.

7    Q.   Were some photographs taken from your vantage point while

8    you were observing the two visits that occurred on November 22

9    and November 29?

10   A.   Yes.  I actually took those digital images from a digital

11   camera I had.

12   Q.   And if I could ask you to look at what is now marked as

13   Government's Exhibit 36A through 36J.

14   A.   Yes, I recognize 36A, 36B, 36C, 36D, 36E, 36F, G, H, 36I,

15   and 36J.

16   Q.   Are those fair and accurate photographs that you took at

17   that time?

18   A.   Yes, these are the images I took, yes.

19           MR. WALUTES:  Your Honor, I would move the admission

20   of Government's Exhibit 36A through J.

21           THE COURT:  Any objection?

22           MR. NACHMANOFF:  No objection.

23           THE COURT:  They will be testified.

24           MR. WALUTES:  I would ask permission to publish,

25   Your Honor.

V. Castro - Direct

938

1                THE COURT:  Yes, sir.

2    BY MR. WALUTES: (Continuing)

3    Q.   Who is the person pictured in 36A?

4    A.   Mirwais Mohamadi.

5    Q.   Is that the same individual that you have identified in

6    the courtroom?

7    A.   Yes.

8    Q.   If we could just sequence through the rest of them.

9              Actually, is that Mr. Bryan on 36D?

10   A.   That's Richard Bryan.

11   Q.   So, he is wearing a white baseball cap at the time of the

12   first visit on November 22?

13   A.   Yes, that's right when he entered the visitation area.

14   Q.   Was Mr. Mohamadi writing at one point in those

15   photographs?

16   A.   Yes.

17   Q.   Could you, were you able to recover that napkin?

18   A.   I was not.

19   Q.   Is there a video camera inside the visitation area that

20   the prisoner can see?

21   A.   Yes, there is.

22   Q.   The phone inside that visiting area is not wired, I take

23   it, it is not recorded?

24             The intercom that they use to speak to one another

25   during the visit on November 22.

V. Castro - Direct

939

1    A.    On November 22?

2    Q.    Yes.

3    A.    On November 22, yes.

4    Q.    It was wired or wasn't wired?

5    A.    It was.

6    Q.    Okay.  Were you have able to pull the tape of that?

7    A.    Yes.

8    Q.    And were there any problems hearing the conversation on

9    that date?

10   A.    Not on that day, but on the following day.

11   Q.    If I could ask you to look at what's marked, on the

12   second visit, November 29, 2008, if you would look at 36, I am

13   sorry, 38A and 38I.

14   A.    Yes, I recognize Exhibit 38A through 38I.

15   Q.    Are those fair and accurate depictions of the second

16   visit with Mr. Bryan?

17   A.    Yes.

18   Q.    On November 29?

19   A.    Yes, they are.

20         MR. WALUTES:  Your Honor, I would move the admission

21   of 38A through I at this time.

22         THE COURT:  Any objection?

23         MR. NACHMANOFF:  No objection, Your Honor.

24         THE COURT:  All right, they will be received.

25   BY MR. WALUTES: (Continuing)

V. Castro - Direct

940

1  Q.   Then if I could ask you to look at what is marked as

2  Government's Exhibit 34A and B, and ask you if you recognize

3  those two items?

4  A.   Yes, I recognize these.

5  Q.   And could you tell us what these are?

6  A.   These are images or video capturing the November 22, 2008

7  visitation by Richard Bryan to Mohamadi.

8  Q.   Does it also have the audio of that visitation?

9  A.   Yes.

10 Q.   Your Honor, I would move--  And those are accurate, both

11 the audio recording of that visit between the two as well as

12 video and images of the visit between the two that had

13 occurred on November 22 of 2009?

14 A.   Yes.

15 Q.   2008?

16 A.   2008, correct.

17         MR. WALUTES:  Your Honor, I move the admission of

18 34A and 34B.

19         THE COURT:  Any objection?

20         MR. NACHMANOFF:  Your Honor, we would raise the same

21 objection that has been preserved regarding other phone calls.

22         THE COURT:  All right, that exception is noted.  I

23 will receive them.

24 BY MR. WALUTES: (Continuing)

25 Q.   And then if I could ask you to look at 37A and 37C.  And

941

1    I guess 37D as well.  And ask if you recognize those four

2    disks that are related to the second visit on November 29,

3    2008?

4    A.   Yes, I recognize these.

5    Q.   Are they, understanding that 37D is the, I think I was

6    calling it enhanced, but I think Mr. Greene calls it

7    processed, but 37D is processed, the first three video and

8    audio recordings from the second meeting on November 29, are

9    these the accurate recordings both whether they are visual

10   from video tape or audio when they are coming from recording

11   devices?

12   A.   Yes, they are.

13        MR. WALUTES:  Your Honor, I move the admission of

14   37A through D at this time.

15        THE COURT:  All right, the same objection?

16        MR. NACHMANOFF:  Yes, Your Honor.

17        THE COURT:  All right, your exception is noted.  I

18   will receive them.

19   BY MR. WALUTES: (Continuing)

20   Q.   Special Agent Castro, is the defendant's alleged

21   possession of a firearm being moved between, in the allegation

22   between Virginia and the District of Columbia, is that a

23   federal offense?

24   A.   Yes.

25   Q.   So, even back on May 27 of 2007, despite the fact that

V. Castro - Direct

942

1   both the city of Alexandria and the District of Columbia

2   investigated the case, it's also a federal offense?

3   A.   Yes, it is.

4   Q.   And were you interested in that federal offense?

5   A.   Yes, I am.

6   Q.   Did you have an occasion to actually go to the city of

7   Alexandria' courthouse to monitor what was occurring in that

8   that courtroom for Mr. Mohamadi in December of 2008?

9   A.   Yes, I did.

10  Q.   Have you previously prosecuted armed robbery cases that

11  crossed state lines as Hobbs Act violations?

12          MR. NACHMANOFF:  Objection, Your Honor, it's not a

13  proper question.

14          THE COURT:  Sustained.

15  BY MR. WALUTES: (Continuing)

16  Q.   In the course of your investigation, Special Agent

17  Castro, did you come to learn about a Stephen Grant?

18  A.   Yes, I did.

19  Q.   Did you have an occasion to go speak with him?

20  A.   I did.

21  Q.   While speaking with him, did you become aware of some

22  evidence that he might possess?

23          MR. NACHMANOFF:  Objection, Your Honor.  It calls

24  for hearsay, even though indirectly.  It is an improper

25  question.

V. Castro - Direct

943

1          THE COURT:  I don't think it's offered for the

2   truth.  He wants to know what he did.

3          As a result of learning certain information, did you

4   go back to Stephen Grant?

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  All right.  Ask your next question.

7   BY MR. WALUTES: (Continuing)

8   Q.   Did you take something from Mr. Grant?

9   A.   Yes, I did.

10  Q.   What did you take from Mr. Grant?

11  A.   It was a Fairfax County Adult Detention Center inmate

12  handbook.

13  Q.   Now, that has been previously admitted and published, I

14  just wanted to complete the link.

15         THE COURT:  All right.

16  Q.   You took it immediately when you were with him?

17  A.   I was interviewing him.  He mentioned it.  I asked him if

18  he had it.  He did.  I asked him to go inside his house and

19  get it and bring it to me, which he did.

20  Q.   Did you have occasion to speak with a Ms. Inge after her

21  grand jury appearance on March 5 of 2009?

22  A.   Yes, I did.

23  Q.   Did you become aware of text messages that she had

24  received on her phone?

25  A.   Yes.

V. Castro - Direct

944

1   Q.   And did you have occasion to photograph those?

2   A.   I took the digital images of the text messages on her

3   phone.

4   Q.   Did you pay ATF funds to Mr. Bryan in the course of your

5   investigation?

6   A.   Yes.

7   Q.   Why did you do that?

8   A.   He was released from the Alexandria Jail on November 18

9   after serving, of 2008 after serving ten months.  I wanted him

10  to stay in the area to assist with the investigation.  He was

11  unemployed having just been released from the jail.  So, in

12  the course of the next 16 months I paid him a total of $720

13  over 16 months for subsistence, for food, for rent, clothing,

14  subsistence, to include trips when he would come here to prep

15  for the case.

16  Q.   Okay.  Did you have occasion to go to his house in

17  another state?

18  A.   Yes.

19  Q.   Was that related to this case?

20  A.   Yes, it was.

21  Q.   When you went to his house, did you seize drugs?

22  A.   Yes, I did.

23  Q.   And what did you do when you seized those drugs?

24  A.   I seized a very small amount of marijuana from him.  I

25  reported it in an investigative report and I verbally reported

1    it to his Probation officer, as well as providing that

2    Probation officer with report that I had written.

3    Q.   And did he go back to jail?

4    A.   Yes, he did.

5    Q.   Have you had an opportunity--  But for this case, would

6    you have gone up to the other state to visit him?

7    A.   That was the only reason I went up there.

8    Q.   Did you have an opportunity to examine the .380 that was

9    admitted into evidence yesterday?

10   A.   Yes, I have.

11   Q.   And where is that weapon manufactured?

12   A.   Here in the United States, state of California.

13   Q.   Does it work?

14   A.   It does function.  I conducted a test fire of the weapon.

15          MR. WALUTES:  Thank you, Your Honor.  I have no

16   further questions of this witness.

17          THE COURT:  All right, thank you.

18   Cross-examination.

19          MR. NACHMANOFF:  Thank you, Your Honor.

20      CROSS-EXAMINATION

21   BY MR. NACHMANOFF:

22   Q.   Agent Castro, you just testified about going to

23   Pennsylvania to find Richard Bryan, is that right?

24   A.   That's correct.

25   Q.   And part of the reason you went up to Pennsylvania to

946

1    find him is because he had dropped out of touch with you and

2    other law enforcement, isn't that right?

3    A.    That's correct.

4    Q.    And you wanted to know where he was, correct?

5    A.    That's correct.

6    Q.    Because you needed him in connection with this case,

7    right?

8    A.    Absolutely, yes.

9    Q.    But he had not followed the rules?

10   A.    He did not keep in contact with me.  Those were--

11   Q.    And he didn't keep in contact with his Probation officer?

12   A.    That's correct.

13   Q.    And when you got up there, you discovered he had

14   committed new criminal offenses, correct?

15   A.    He was in possession of marijuana.

16   Q.    And those are criminal offenses?

17   A.    Yes, they are.

18   Q.    In Pennsylvania?

19   A.    Correct.

20   Q.    And you found those drugs?

21   A.    I found marijuana, that's what I collected.

22   Q.    And then the other officers who were with you found the

23   residue of cocaine, is that right?

24   A.    It was untested.  There was some plastic floating in a

25   toilet bowl, but nobody reached in there to obtain it.  I

947

1    didn't.  And I didn't see anybody else do it either.

2    Q.   Was that the conclusion you reached though, that he had

3    flushed cocaine down the toilet?

4    A.   I don't know if it was flushed.  It was just plastic was

5    floating on top of the toilet.  So, my guess, it would have

6    gone the toilet if it was flushed.

7    Q.   But when you spoke to him, he admitted he had both

8    marijuana and cocaine?

9    A.   That's what he told me, yes.

10   Q.   And the tried to get rid of it?

11   A.   That's what he told me, yes.

12   Q.   Because he didn't want to be caught with it?

13   A.   Yes.

14   Q.   And you say you reported that to his Probation officer,

15   is that right?

16   A.   Verbally and written form.

17   Q.   So far as you know, he was never prosecuted in

18   Pennsylvania for possession of those narcotics, was he?

19   A.   For the misdemeanor charge in Pennsylvania?  Not to my

20   knowledge.

21   Q.   For any charges in Pennsylvania related to those drugs?

22   A.   No, just as it related to the probation violation here in

23   Virginia.

24   Q.   And after that experience, which was in May of 2009,

25   correct?

V. Castro - Cross

948

1  A.    Yes.

2  Q.    You still wanted to work with him?

3  A.    He was a witness in this case.

4  Q.    And you still wanted to work with him, right?

5  A.    I wanted him to be a witness in this case.  So, if that's

6  what you're asking, yes.

7  Q.    Now, with regard to Mr. Bryan, you testified that you

8  were responsible for helping put the wire on his clothes on

9  November 12, is that right?

10 A.    Well, I built the device into his clothing.  He wasn't

11 wearing it at the time.

12 Q.    So, you actually placed the device in his clothing and

13 then he put the clothing on?

14 A.    Yes.  It was a prison jumpsuit.

15 Q.    And then you explained to him what was going on?

16 A.    What I explained to him, which he knew prior, was that he

17 would be in the presence of Mohamadi and a device that would

18 be in his clothing would pick up the audio recording of this

19 conversation.

20 Q.    Right.

21 A.    But I didn't explain the device or the functions.

22 Q.    My question is simple, you told him that there was a

23 device in the clothing?

24 A.    Yes, he knew that.

25 Q.    He didn't know that there was video?

1    A.    Correct.

2    Q.    He knew there was audio?

3    A.    Correct.

4    Q.    And I believe you testified on direct that it is

5    difficult but not impossible to turn that on and off, is that

6    right?

7    A.    Correct.

8    Q.    You also testified with regard to Richard Bryan, that you

9    provided him with the address that is referenced in

10   Exhibit 21, is that right?

11   A.    That's correct.

12   Q.    That was not an address that Mr. Mohamadi provided to

13   Richard Bryan?

14   A.    No.

15   Q.    And that's not an address that Mr. Bryan came up with

16   himself?

17   A.    No.

18   Q.    That was something that you gave to Mr. Bryan, is that

19   correct?

20   A.    That's correct.

21   Q.    And then he provided that information to Mr. Mohamadi?

22   A.    As his address, yes.

23   Q.    That's your understanding?

24   A.    Yes.

25   Q.    Okay.  And you testified subsequently you recovered that

V. Castro - Cross

950

1   piece of mail, is that right?

2   A.   That's true.

3   Q.   You have no idea how that piece of mail got into the mail

4   system, do you?

5   A.   I do, but I believe that would be hearsay.

6   Q.   Well, I am asking you if you have any personal knowledge

7   as to how it got in there?

8          In other words, did you see it placed in the mail?

9   A.   I did not.

10  Q.   Now, there were times when you were observing Mr.

11  Mohamadi, is that right?

12  A.   Police investigation or in the jail, yes.

13  Q.   In the jail?

14  A.   Yes.

15  Q.   You testified about being in the mezzanine level?

16  A.   Correct.

17  Q.   Being present when Mr. Bryan was wearing the wire?

18  A.   Correct.

19  Q.   During those times that you were observing him, you

20  didn't see that envelope, did you?

21  A.   I did not see that envelope.

22  Q.   So, you never saw Mr. Mohamadi handle that envelope?

23  A.   No.

24  Q.   And you don't know how that envelope got into the mail

25  system, correct?

1    A.   Well, I later showed him the envelope, and he admitted to

2    me that he had sent it.

3    Q.   Okay.  Well, my question is what you saw.  And the answer

4    is--

5    A.   No, it's just what I heard.  No, I didn't see him do it.

6    Q.   Thank you.

7    A.   Just what I heard.

8    Q.   Likewise with regard to the telephone that was used,

9    that's a telephone that you gave to Mr. Bryan, is that right?

10   A.   That's correct.

11   Q.   And the purpose for giving him telephone was so that Mr.

12   Mohamadi could speak to him after he was released, correct?

13   A.   That's correct.

14   Q.   And but for you giving him that telephone, Mr. Bryan

15   didn't have a telephone number that he could provide to Mr.

16   Mohamadi, did he?

17   A.   That's correct.

18   Q.   You also testified on direct that you were aware from Mr.

19   Bryan that he was due to be released on November 17 or

20   November 18, is that correct?

21   A.   November 18 of 2008.

22   Q.   And you also testified that you checked Mr. Bryan's

23   records, is that right?

24   A.   That's correct.

25   Q.   And I assume you confirmed that he was due to be released

V. Castro - Cross

952

1  on his probation violation on November 18?

2  A.   That's correct.

3  Q.   Did you also confirm that he had a detainer in his file

4  from the District of Columbia for which he was wanted to spend

5  30 days in jail?

6  A.   Yes, I did some research on that with the District of

7  Columbia prior to his release.

8  Q.   And you confirmed that there was in fact a detainer

9  there?

10  A.   Detainer, but they would not extradite from Virginia,

11  that's what I confirmed.

12  Q.   And when he was released on November 18, that detainer

13  was still out there?

14  A.   For the DWI charge, yes.

15  Q.   And you were sitting here when Mr. Bryan testified, so

16  you heard Mr. Bryan say that it is his understanding that it

17  still remains outstanding?

18  A.   I did hear that, yes.

19  Q.   And to your knowledge, he has never that time, correct?

20  A.   To my knowledge, I am not aware of him travelling to D.C.

21  where he would be arrested for it.  Outside of D.C., they

22  won't extradite.

23  Q.   And you have not taken him to D.C. to turn himself in,

24  have you?

25  A.   I did not, especially during the murder for hire

V. Castro - Cross

953

1    investigation, to answer that DWI charge, no.

2    Q.   So, you wanted him out until this matter was resolved?

3    A.   I felt that the murder for hire outweighed a warrant that

4    would not be extradited for Virginia regarding a DWI or

5    misdemeanor, misdemeanor marijuana charge, yes.

6    Q.   Now, you testified that during some of the visits, I

7    believe on November 22 and 29th, you were able to observe Mr.

8    Bryan and Mr. Mohamadi as they communicated, correct?

9    A.   That's correct.

10   Q.   And you were at a mezzanine level, so you were up above,

11   I think you testified it was about 15 feet above the floor

12   that they were on?

13   A.   Approximately, yes.

14   Q.   Is that right?  And you testified that you were on Mr.

15   Mohamadi's side, is that right?

16   A.   Yes, I knew I testified that I was on his side.  I would

17   say, to correct that, probably 98 percent of the time I was on

18   Mr. Mohamadi's side.  It was a quick one from one side to the

19   other.

20   Q.   And the photographs that you took were from your vantage

21   point as you were observing these conversations, correct?

22   A.   That's correct.

23   Q.   And so, those photographs for the most part show the back

24   of Mr. Mohamadi's head, correct?

25   A.   Correct.  I was above him and for the most part over his

V. Castro - Cross

954

1    head.

2    Q.   So, primarily the photographs reflect the view that you

3    had?

4    A.   Those photographs do not represent the entire view and my

5    vantage point.  I am not a photographer.  The room was dark,

6    it was I guess treated so it would be one way.  When I put the

7    camera down, what I could see was more explicit and more

8    detail than what this image captured as any picture in my

9    opinion.

10            But I did see him walk in, have a seat.  Those are

11   still shots that I took when he was seated speaking to Mr.

12   Bryan.

13   Q.   Well, let me ask you this question.  You were looking at

14   him through a glass window, is that correct?

15   A.   That's correct.

16   Q.   And it was a one-way glass window, is that right?

17   A.   Yes.

18   Q.   So, it was tinted on the side facing the inmates, is that

19   right?

20   A.   Yes.

21   Q.   And it was clear or clearer on your side?

22   A.   It was clearer.  It wasn't crystal clear.  It wasn't as

23   clear as something that wasn't treated or tinted.  I am not

24   sure exactly what it was treated with.

25   Q.   And you took the photographs through that glass, correct?

955

1    A.    At a downward angle, yes.

2    Q.    And so, they are quite fuzzy, aren't they?

3    A.    Yes.

4    Q.    You testified that Mr. Bryan provided you with what have

5    now been marked, I believe, as Exhibits 22, 23, 24, and you

6    referred to those or the Government referred to them as pocket

7    scraps, is that right?

8    A.    That's correct.

9    Q.    And those are pieces of paper that Mr. Bryan provided to

10   you, right?

11   A.    Yes.

12   Q.    Mr. Mohamadi did not provide them to you, correct?

13   A.    No, Richard Bryan showed them to me, then I asked to keep

14   them permanently.

15   Q.    And you were not present when those scraps were written,

16   were you?

17   A.    That's correct.

18   Q.    So, you did not see them being written?

19   A.    That's correct.

20   Q.    You testified that you were present at the December 2008

21   trial, correct?

22   A.    For one day, I believe it was December 8, the day it

23   started.

24   Q.    And that was the day that Richard Bryan testified?

25   A.    The day Richard Bryan and Amanda Inge were there, yes.

V. Castro - Cross

956

1    Q.   And you accompanied them there, is that right?

2    A.   I accompanied Richard Bryan there.

3    Q.   He wasn't in custody at that time?

4    A.   He was not in custody.

5    Q.   And he hadn't turned himself into D.C.?

6    A.   No, he had not.

7    Q.   And you had become involved in this matter because of

8    your interaction with Mr. Bryan which started on November 7,

9    is that correct?

10   A.   Regarding the murder for hire investigation, yes.

11   Q.   Correct.

12   A.   Yes.

13   Q.   Prior to November 7, 2008, had you had any involvement in

14   Mr. Mohamadi's case?

15   A.   I did, but wasn't aware of it until I read the Alexandria

16   police reports.

17   Q.   And that relates to a request to do a gun trace in June

18   of 2007, is that right?

19   A.   It wasn't a gun trace.  I can explain what it is, but it

20   wasn't a gun trace.

21   Q.   But information had been requested from you in connection

22   with Mr. Mohamadi's case, is that right?

23   A.   That's correct.

24   Q.   Okay.  But you hadn't been involved in the investigation

25   of the robberies, is that correct?

V. Castro - Cross

957

1   A.   Not at that point, no.  I was just answering a simple

2   administrative question from a detective.

3   Q.   Now, at some point after the state trial there was a

4   decision that this case would be prosecuted federally,

5   correct?

6   A.   The murder for hire or the robberies?

7   Q.   Well, all of it eventually, correct?

8   A.   Yes, after that.

9   Q.   And you are the case agent for the entire case, right?

10  A.   Yes.

11  Q.   And that's why you have been here at counsel table the

12  entire time?

13  A.   That's correct.

14  Q.   So, you are not here just as the case agent for the

15  murder for hire?

16  A.   That's correct.

17  Q.   It's for the entire set of charges?

18  A.   I mean, I am working with many investigators, but as far

19  as the lead case agent, yes, that title would fall upon me.

20  Q.   And you are the only federal agent that has had

21  significant responsibility in this matter, right?

22  A.   That's not true.  Well--

23  Q.   Well, you are the lead case agent?

24  A.   I carry--

25          THE COURT:  Whoa, whoa, wait for a question.  Repeat

958

1    that question.  Do you have another question?  He is the lead

2    case agent for the federal government.

3    Q.   So, in connection with that, you are responsible for the

4    Hobbs Act robberies, correct?

5    A.   Yes.

6    Q.   Now, have you sought to collect any information regarding

7    the craigslist postings that Kimberly Riley testified about?

8    A.   The craigslist postings that she has?  That she has--

9    Q.   Testified about.

10   A.   Yes.

11   Q.   Did you find any postings?

12   A.   Of Kim Riley's?

13   Q.   Yes.

14   A.   I was looking for her.  In the course of my investigation

15   I, myself, would look up her postings or have other people

16   look up her postings for me so I could help locate her.

17   Q.   And did you find her postings for May 26, 2007?

18   A.   I did not.  But--  I am sorry, the answer is no.

19          MR. NACHMANOFF:  The Court's indulgence for a

20   moment.

21          THE COURT:  Yes, sir.

22          THE MARSHAL:  Sir, there is a question of a juror.

23          A JUROR:  Judge, can I step out for a moment?

24          THE COURT:  Yes.  What kind of break do you need?

25   We all need to break--  Hold on.

1              We all go in and out together because, of course,

2       they want you to hear--

3              A JUROR:  A few minutes.

4              THE COURT:  Ten minutes do you need, would that be

5       all right?  All right.

6              MR. NACHMANOFF:  Your Honor, we are finished with

7       our questions.

8              THE COURT:  Okay, then we will that take a

9       ten-minute recess and we will come back and see if there is

10      any redirect.

11             You are excused, I am going to stay here.

12             NOTE:  At this point the jury leaves the courtroom;

13      whereupon the case continues as follows:

14      JURY OUT

15             THE COURT:  Mr. Hussain just had some blood cigar

16      issues, he needs to get a little bite to eat.

17             All right, you just have redirect and then you are

18      going--  Is that your last witness in your case in chief?

19             MR. WALUTES:  Yes, Your Honor.

20             THE COURT:  And then you have got some motions that

21      you want to bring?

22             MR. NACHMANOFF:  Yes, Your Honor.  And I don't think

23      they will be lengthy.  Mr. Corey will address them.

24             I don't know if the Court would like to, just for

25      administrative purposes, perhaps move forward with what the

960

1   jury can hear and then let them go and we could address those

2   issues and jury instructions and the other administrative

3   matters.  I don't know if that will work best for the Court,

4   but it may be a way of not having them wait around and then

5   come back for a short amount of time.

6          THE COURT:  Well, I don't expect the Rule 29 motions

7   to be a, you know, multihour affair.  So, I want to complete

8   the testimony, I want to continue on with the testimony this

9   afternoon.

10         So, we will take ten minutes now and we will come

11  back, we will hear the rest of the evidence, we will excuse

12  the jury again and see how far we get this afternoon.

13         MR. NACHMANOFF:  Yes, Your Honor.

14         THE COURT:  All right.  Then we are in recess.

15         NOTE:  At this point a recess is taken; at the

16  conclusion of which the case continues in the presence of the

17  jury as follows:

18  JURY IN

19         THE COURT:  All right, Mr. Walutes.

20         MR. WALUTES:  Your Honor, the Government has no

21  redirect.

22         THE COURT:  All right.  Agent Castro, you may return

23  and take your seat, sir.

24         NOTE:  The witness stood down.

25         THE COURT:  All right.  Subject to checking exhibits

961

1    to make sure they have been tendered and recorded properly,

2    does the Government have any other evidence or witnesses at

3    this time?

4            MR. WALUTES:  It does not, Your Honor.  At this

5    point the Government would rest.

6            THE COURT:  All right, thank you.

7            All right, ladies and gentlemen, we are going to

8    deal with some legal matters.  I am sorry to bring you back

9    out, there was some confusion as to whether we would have

10   further testimony or not.  I think the confusion was on my

11   part, frankly.  So, I apologize.

12           But I am going to excuse you now for approximately a

13   half an hour and then we will bring you back in.

14           All right.  You are excused at this time.  Thank

15   you.

16           NOTE:  At this point the jury leaves the courtroom;

17   whereupon the case continues as follows:

18   JURY OUT

19           THE COURT:  Mr. Corey, are you up on Rule 29

20   motions, sir?

21           MR. COREY:  Yes, Your Honor.

22           THE COURT:  Okay.

23           MR. COREY:  In addition to the Rule 29 motion, first

24   I would like to renew all previously filed motions, both our

25   motions and Mr. Mohamadi's pro se motions.

962

          1              THE COURT:  All right, they will be preserved.

          2              MR. COREY:  As for the Rule 29 motion, Your Honor,

          3    we are of course aware of the high standard here, and we

          4    believe that even under that standard if you view the evidence

          5    in the light most favorable to the Government, the Government

          6    has failed to produce evidence from which you could find the

          7    defendant guilty.

          8              I would like to address several very specific issues

          9    though.  First of all, with respect to Count 1, the allegation

         10    here, Your Honor, is that of an attempt crime.  The indictment

         11    states that Mr. Mohamadi did unlawfully attempt to take and

         12    obtain personal property consisting of United States currency

         13    belonging to Kimberly Riley.

         14              The Government, Your Honor, has failed to make a

         15    sufficient showing with respect to Count 1.  The Government

         16    put on evidence of a completed crime.  And the elements, of

         17    course, for an attempt crime and a completed crime are

         18    different in the sense that an attempt crime is a crime that

         19    has not been completed.

         20              So, with respect to Count 1, Your Honor, we believe

         21    that's a basis for dismissing Count 1.

         22              Also, with respect to Count 1--  One moment, Your

         23    Honor.

         24              We would like to reraise the issue of venue, which I

         25    know has been briefed and argued before.  Your Honor, the

963

1    evidence even when viewed in the light most favorable to the

2    Government shows that venue is lacking with respect to Count

3    1.

4          The robbery itself, of course, this is the Kimberly

5    Riley robbery, occurred in D.C.  There is no evidence of any

6    plan originating in Virginia to rob Ms. Riley.  The evidence

7    showed that at most the purpose of the trip was to go to D.C.

8    to visit some clubs.

9          Ms. Riley in fact stated that she did not fear or

10    have any concern at the time they left Virginia to go to D.C.

11    with respect to being in anyone's presence.  In fact, she

12    stated that she did not have any fear until pulling into the

13    alley and thinking at that point in time the robbery was

14    occurring.

15          So, the robbery itself is a very defined act limited

16    to a few minutes and moments in the District of Columbia.

17    And, therefore, as a result of the evidence that the

18    Government has put on, we believe that the crime itself is

19    wholly contained within the District of Columbia and that

20    there is no jurisdiction here in the Eastern District of

21    Virginia.

22          THE COURT:  What about the evidence that the gun was

23    taken from the apartment by Mr. Mohamadi and brought into the

24    District of Columbia and then used in the robbery?

25          MR. COREY:  Well, Your Honor, there is nothing to

964

1    establish that the gun was taken across state lines for the

2    purpose of committing a robbery.  I think that goes to the

3    issue of whether there was an intent to commit a robbery at

4    the time they left Virginia.  And in fact, there has been no

5    evidence of that intent.

6            A lot of people carry guns, Your Honor.  That

7    doesn't mean that they are going to rob someone.  In fact, the

8    robbery here was, as I said, limited to a very defined space

9    and time in the District of Columbia.

10           THE COURT:  All right.

11           MR. COREY:  A couple other points.  Now, with

12   respect to both Counts 1 and 2, the Government has put forth

13   insufficient evidence to show that these robberies obstructed,

14   delayed and affected interstate commerce.  Of course, this is

15   the Hobbs Act jurisdictional issue that I know Your Honor is

16   well familiar with.

17           I think it is important though to keep an eye on the

18   standard that is applicable to a substantive Hobbs Act robbery

19   as opposed to a conspiracy or an extortion attempt under the

20   Hobbs Act.  And the case law is very clear, Your Honor, that

21   under a substantive robbery, there must be an actual impact on

22   interstate commerce.  This is not a case where it could be a

23   conspiracy where Your Honor might consider whether there might

24   have been an impact on interstate commerce.

25           So, we are not talking hypotheticals here.  We are

965

1    talking whether there was an actual impact on interstate

2    commerce.  And with respect to that issue, we know the

3    Government has relied heavily on the Williams case.  I think

4    it's important to keep in mind the distinction between that

5    case and this case.  And that case, of course, involved a drug

6    dealer.  Drug dealers, Your Honor, are individuals involved in

7    interstate commerce by the nature of their connection to other

8    drug dealers.

9           In this case, on the other hand, we have two

10   independent contractors.  They are not working with other

11   prostitutes.  They are not working with other cab drivers.

12   They are simply their own independent contractors.

13          In fact, the evidence showed that a small portion of

14   their personal income was taken.  This is not a case where

15   they are employees of corporations.  It's also not a case

16   where they themselves are incorporated.  I think there was

17   testimony to that effect.  And they don't have suppliers.

18   They are not supplying others.

19          So, typical channels of interstate commerce are not

20   at all present here.  In fact, the Government has not proved

21   any of those channels are present here.

22          There is also nothing such as restraint on trade.

23          And the impact on their business, Your Honor, was

24   frankly not shown.  We know that each individual lost a

25   relatively small amount of money, and yet we also know that

966

1    they continued operating their business.  And so that I think

2    it's questionable whether there was even an impact on their

3    own business let alone any impact on interstate commerce.

4            So, with respect to this issue, Your Honor, we

5    believe that the evidence warrants dismissing Counts 1 and 2.

6            Moving on to a couple other issues.  Counts 6 and 7

7    allege that Mr. Mohamadi violated 18 U.S.C. 373 by soliciting

8    others to engage in murder.  We believe the Government has not

9    presented sufficient evidence on a very specific issue related

10   to this offense.

11           Counts 6 and 7 allege basically that Mr. Mohamadi

12   intended for another inmate to commit the offense set forth in

13   18 U.S.C. 1958.  That is, of course, the underlying offense.

14   And that underlying offense, Your Honor, has an interstate

15   travel requirement.  Specifically, that underlying offense

16   makes it a crime to "travel or cause another to travel in

17   interstate commerce with the intent that a murder be

18   committed."

19           Here, Your Honor, the Government has failed to show

20   that Mr. Mohamadi had the intent to solicit anyone to travel

21   outside the state of Virginia.  And this is a very important

22   evidentiary issue.  The Government failed to present evidence

23   showing that Mr. Mohamadi knew where Mr. Haile lived at the

24   time of the alleged solicitation attempt.

25           So, at the time he is talking to inmates 1 and 2, he

967

1   has no knowledge with respect to where Mr. Haile lives and,

2   therefore, he cannot possibly be soliciting them to travel in

3   interstate commerce.  Therefore, he is not violating the

4   underlying offense.  And, therefore, the 373 offense has not

5   been established.

6           And actually, another point with regard to that

7   issue, Your Honor.  The evidence was that Mr. Brown's, Larry

8   Brown's private investigator did not go to Mr. Haile's house

9   until August of 2008.

10          And, of course, Mr. Mohamadi's conversation with

11  Pressley and Grant occurred in September and November of 2007,

12  which is an important time distinction that came out during

13  the Government's case.

14          Also, with respect to Count 9, Your Honor, there is

15  an important legal issue here that we think the evidence is

16  lacking on as well.  Count 9 alleges that Mr. Mohamadi

17  instructed the witness to testify falsely at a state trial "in

18  an effort to shield himself from federal prosecution."

19          How the Government has charged this is important

20  here, Your Honor.  They are alleging that in 2008, long before

21  Mr. Mohamadi knew or had any knowledge that he was the target

22  of a federal investigation, that he basically told Ms. Inge to

23  lie in an effort to avoid that nonexistent federal

24  investigation.

25          Again, the legal standard set forth in Harris is

968

1    such that there has to be a likelihood or possibility of

2    federal prosecution.

3           And also with respect to how Count 9 has been

4    charged, the allegation is that he intended to avoid that

5    federal prosecution.  And there is just no evidence of this,

6    Your Honor.  And, therefore, we also submit that Count 9

7    should be dismissed.

8           THE COURT:  All right, thank you.

9           MR. COREY:  One moment, Your Honor.

10          THE COURT:  Yes.

11          MR. COREY:  And one clarifying point.  If Counts 1

12   and 2 are dismissed, Your Honor, we also submit that Counts 3

13   and 4 would be dismissed because they are, of course,

14   dependent on Counts 1 and 2.

15          THE COURT:  Are they?  Oh, 3 and 4, the use of the

16   firearm.

17          MR. COREY:  Yes.

18          THE COURT:  Okay.  All right.  Does the Government

19   want to respond?  Mr. Ben'Ary.

20          MR. BEN'ARY:  Thank you, Your Honor.  Briefly.

21          THE COURT:  Sure.  Take as much time as you want.

22          MR. BEN'ARY:  I will try to go in the same order,

23   Your Honor, so that it makes sense.

24          As to the issue dealing with attempt appearing in

25   Count 1 of the indictment.  Of course, as the Court knows, an

969

1  indictment is a notice document to the defendant so that he is

2  aware of what he is being charged with.

3       If you look at Count 1, it includes language that

4  would suggest that the act was in fact completed, but does

5  include the term "attempt" there, probably about just more

6  than have way down.

7       THE COURT:  I see it.

8       MR. BEN'ARY:  I would submit, Your Honor, that the

9  evidence in this case would cover both, and a reasonable fact

10  finder could conclude based on the evidence that the defendant

11  did actually complete the robbery.  They could also conclude

12  that the defendant did attempt to take money, property, et

13  cetera by means of actual and threatened force, violence, et

14  cetera.

15       So, I would submit that there is no problem with the

16  word "attempt" appearing at some point in Count 1.

17       Now, as to the venue issue with Count 1, I would

18  submit that the evidence has shown that this is a crime that

19  started in Virginia.  It caused Ms. Riley to travel from

20  Maryland into Virginia.  It caused Ms. Riley to then travel

21  with the defendant from the Commonwealth of Virginia into D.C.

22  where the robbery occurred.

23       I think Your Honor's question about the firearm was

24  a good one.  I think that I would submit that a reasonable

25  fact finder based on this evidence could very well conclude

970

1    that the gun was taken by this defendant from the apartment

2    where Ms. Inge testified she had left him and traveled across

3    state lines with it to the District of Columbia where the

4    robbery was committed.

5           So, I would submit that there is sufficient evidence

6    on venue for Count 1.

7           As to Counts 1 and 2 and the issue of interstate

8    commerce.  I would submit that there is no prohibition against

9    including independent contractors and their work in the

10   definition of interstate commerce.  And in fact, the evidence

11   in this case is even if Mr. Haile and Ms. Riley were working

12   as self-employed or independent contractors, their services

13   for the defendant that evening caused them to travel in

14   interstate commerce.  And that his actions necessarily

15   affected interstate commerce.

16          If you look at the jury instructions that deal with

17   interstate commerce, and I understand we haven't settled the

18   issue of jury instructions yet, there is some language to

19   indicate that if the money or property taken was to be used to

20   purchase goods in interstate commerce, that that is sufficient

21   to meet the definition of interstate commerce under the Hobbs

22   Act.

23          I understand we haven't settled the issue of the law

24   of the case yet, but I would submit based on the evidence and

25   the fact that both Mr. Haile and Ms. Riley traveled in

971

1    interstate commerce as part of performing services for the

2    defendant, a jury certainly could find that element to have

3    been established in this case.

4              As to Counts 6 and 7, on the solicitation counts,

5    the issue is whether the defendant knowingly solicited Mr., I

6    am sorry, Stephen Grant and Randy Pressley to travel in

7    interstate commerce.  I would submit that the defendant's

8    knowledge of Mr. Haile's residence at the time that he

9    committed the offense is not dispositive.

10             The fact, is the jury now has evidence that Mr.

11   Haile, who was a District of Columbia cab driver and picked up

12   the defendant in the District of Columbia and lived in

13   Maryland, the commission of the acts requested and solicited

14   by this defendant would have necessarily required Mr. Pressley

15   and Mr. Grant to travel in interstate commerce to complete the

16   act.

17             Certainly there was nothing about the defendant's

18   interactions with Mr. Haile on the evening that he got into

19   his cab that would suggest that Mr. Haile lived or worked in

20   the Commonwealth of Virginia.  He was a D.C. cab driver,

21   picked up in D.C. in a D.C. cab with D.C. license plates.

22             So, I would submit that regardless of his actual

23   knowledge of Mr. Haile's residence in Maryland, there is

24   enough for the jury to convict on Counts 6 and 7.

25             And as to the issue raised as Count 9, Your Honor,

972

1   and whether there was the possibility of a federal charge

2   being involved, I would cite the Court to the case of the

3   United States v. Perry, P-e-r-r-y, which is a 2003 Fourth

4   Circuit case.  It involved the Montgomery County Police

5   Department investigating a felon in possession case.  The

6   defendant in that case was arrested on a traffic stop.  There

7   were weapons found.  He gave a false name.

8        After the Montgomery police completed their

9   investigation and learned his true identity, they then

10  referred the case to the U.S. Attorney's Office and it became

11  federal.

12       The Fourth Circuit upheld a federal prosecution

13  under the same statute.  And they held, among other things,

14  that the--  I am sorry, I am trying to find the quote that I

15  am looking for.  As long as the defendant engaged in conduct,

16  misleading conduct with an intent to hinder or delay or

17  prevent communication on something that could have,

18  essentially could have been a federal statute, that that is

19  all that the Government needs to show in that case.

20       There doesn't need to be any federal investigation

21  initiated at that point.  The defendant doesn't have to

22  directly intend that his actions would influence a federal

23  investigation.  It's just that there could have been a federal

24  offense based on those actions and the defendant gave

25  misleading information to law enforcement.

973

1                And the Fourth Circuit cites other circuits.  And I

2     would be happy to discuss those further if the Court would

3     like.

4                THE COURT:  No.

5                THE DEFENDANT:  Your Honor--

6                THE COURT:  Yes, sir, Mr. Mohamadi.

7                THE DEFENDANT:  I understand that the defense's

8     argument--

9                THE COURT:  Do you want to add anything to what Mr.

10    Corey said?

11               THE DEFENDANT:  If the Court would allow me, I would

12    really appreciate that.

13               THE COURT:  Go ahead.

14               THE DEFENDANT:  All right.  First of all, I would

15    like to discuss the effect on interstate commerce, basing it

16    on travel.

17               I have done a lot of research on my own dealing with

18    the Hobbs Act.  And from my understanding and from what I

19    believe is for a crime to fall under the Hobbs Act, a

20    completed offense of robbery to fall under the Hobbs Act, it

21    has to fit three prongs.  Either A, under the depletion of

22    asset theory, which is the theory that a lot of prosecutors

23    have used in regards to stores that operate intrastate but buy

24    supplies from out of state, and that's--

25               THE COURT:  That's the 7-Eleven.

974

1           THE DEFENDANT:  Exactly.  And that's how they were

2   able to use that to prosecute small amounts of money under

3   that theory.

4           Then the second is a large amount from an individual

5   that is involved, a substantial amount of money from a person

6   that is involved in interstate commerce.

7           And the third is a substantial amount from a

8   business.

9           Now, the Government has not made a showing of either

10   three.  Now, for the depletion of asset theory, they have to

11   prove that it's an interstate activity, that is buying goods

12   from out of state and then selling them interstate, for the

13   robbery to affect that.

14           Now, they haven't showed how the robbery has--

15           THE COURT:  Their theory is that the money taken

16   from both these persons was money that would be used in

17   interstate commerce.  It would be used in different ways,

18   purchasing items, rent, rental car.

19           THE DEFENDANT:  They made no showing.

20           THE COURT:  Hotel room.

21           THE DEFENDANT:  There was no showing of that.

22           THE COURT:  Well, of course, you have got witnesses

23   who have said, I was staying at a hotel in Maryland, I rented

24   a car, I came to Virginia.

25           THE DEFENDANT:  But that's exactly what the Fourth

975

1   Circuit prohibited in Buffey, saying that you can't just make

2   a whole bunch of attenuated inferences as to what could

3   possibly affect interstate commerce.  There needs to be an

4   actual effect of interstate commerce.  And in Buffey the Court

5   clearly stated --

6             THE COURT:  I understand your argument.

7             THE DEFENDANT:  -- that you can't take a person's

8   personal funds and try to make that as an effect on

9   interstate--

10            THE COURT:  This is their business, this is their

11  business funds, right?  That's the difference.

12            THE DEFENDANT:  I don't understand how it is a

13  business fund.  This is purely profit.

14            THE COURT:  Next argument.

15            THE DEFENDANT:  The next argument is in regards to

16  Count 6 and 7 where in my motion I cited U.S. versus Korab.

17  And in that case it made it very clear that to prosecute under

18  a federal solicitation, there needs to be a solicitation of a

19  federal offense intended.  Not resulting, but intended.

20            And even the statute clearly defines that there

21  needs to be an intent of a federal offense for it to become a

22  federal offense.  Otherwise it would just open up the door to

23  a lot of other things.

24            And Mr. Ben'Ary made the statement that eventually

25  it would have resulted or eventually now we found out that it

976

1    was a federal offense.

2              THE COURT:  That was to Count 9.  His theory--

3    Well, he may have said that as to 6 and 7 as well, but I think

4    he mostly relies on the fact that you have a D.C. cab driver

5    in a D.C. cab travelling from D.C.--

6              THE DEFENDANT:  My father drove a cab in Arlington

7    and lived in Springfield.  I mean, that has nothing to do with

8    the intent factor where a defendant has to have that intent

9    forward.  And I think Korab is a strong case, it hasn't been

10   overruled.  And the argument in that is not just a district

11   argument, it is a statutory argument.

12             THE COURT:  I will look at that again.  All right.

13             THE DEFENDANT:  And the last issue is in regards to

14   Perry.  Perry avoided an investigation by him not telling the

15   police officer the true facts of the situation.  He hindered a

16   federal investigation that would have occurred in the normal

17   course of a felon who possesses a firearm.  Which he, it's

18   clearly established that that was something that was going

19   occur.

20             Where in my case I had a state case pending that had

21   been pending for over two, almost two years and I was going to

22   trial and I went to trial.  If anything, it should have been a

23   charge for perjury or aiding and abetting perjury.  There is

24   no way they can put that, I am sure they can here, but I just

25   don't see any legal way they can make it a federal case.

977

1          And especially since they stated that--  And Mr.

2   Castro got on the stand and lied and said that he observed Ms.

3   Inge making some type of false statement when, in actuality,

4   Mr. Bryan, Ms. Inge testified before Mr. Bryan, and Mr. Castro

5   didn't make his appearance into the court until he came in

6   escorting Mr. Bryan.  So, I don't understand how he observed

7   that.

8          And even in his interview with me, he tried to claim

9   that he has no involvement in the robbery case and that he had

10  no knowledge of it until I pointed out that he was asked by

11  Mr. Hickman to run a gun check.

12         So, if he is going to take responsibility for the

13  federal offense, then he should take responsibility for the

14  speedy trial.

15         The problem that I am having right now is that

16  everything that was done wrong in the state against me is

17  being washed under the rug, but everything that I did wrong in

18  the state is now being brought federal.  I just don't

19  understand see how that is just and fair.

20         That's the end of my argument.  Thank you, Your

21  Honor.

22         THE COURT:  All right.  Well, I will look at Perry

23  again.  The way I interpret Perry is could have been is the

24  standard.  But we will look at it again.

25         I think that as to counts, Count 1 in particular, a

978

1   completed Hobbs Act is, an attempt is a lesser included

2   offense of the charge of the substantive completed offense.

3   And it's charged under Title 18, Section 1951, and there is no

4   18.2 attempt added in Count 1.

5           And certainly the jury has enough evidence to prove,

6   the Government has demonstrated at this stage that they have

7   shown at least an attempt if not a completed act.

8           And the venue, as I indicated, I think the taking,

9   the evidence of the gun being brought from Virginia into the

10  District of Columbia before the robbery occurred, the jury

11  could find that Mr. Mohamadi took the gun intending to rob the

12  victim after spending some additional time with her.

13          And I have looked at the obstructed, delayed and

14  affected, and we have talked about that.  I think there is

15  evidence sufficient to go to the jury.

16          I understand your argument about the moneys being

17  personal moneys to the victims of the robbery.  They in fact

18  each testified at length regarding the businesses that they

19  had.  That they were in furtherance of those businesses when

20  they were robbed.  The amounts of money that were taken are

21  insignificant to some, but the case law is--

22          THE DEFENDANT:  What's the difference between a

23  regular robbery and a Hobbs Act robbery?  Just the defendant

24  is Mohamadi?

25          THE COURT:  The case law is clear that the amount of

979

1    money does not have to be significant in order for the

2    statutory elements to be met.

3           And as to 6 and 7, I am going to look at that a

4    little more closely.  I think that the Government is correct

5    that they don't have, clearly the first two persons solicited,

6    there is no evidence that they had the information as to where

7    Mr. Haile lived at the time they were solicited and on those

8    dates of August or September and November, but they had the

9    information about the D.C. cab driver and the D.C. cab.  And I

10   will continue to look at that.

11          And as I indicated, I will look again at the Perry

12   case and the Harris case that have been cited.

13          So, I will take those under consideration at this

14   time.

15          I would like to continue with the evidence.  And you

16   have got how many witnesses other than possibly Mr. Mohamadi?

17          MR. NACHMANOFF:  We have four, Your Honor.

18          THE COURT:  Four witnesses?

19          MR. NACHMANOFF:  Yes.

20          THE COURT:  All right.  Then let's try, I don't know

21   how lengthy those witnesses are, perhaps we can get through

22   those witnesses, and we will give you the evening to decide

23   whether Mr. Mohamadi would take the stand or not, and we can

24   deal with some jury instruction issues.

25          MR.  NACHMANOFF:  Very good, Your Honor.

980

1          THE COURT:  Does that work?

2          MR. NACHMANOFF:  We would appreciate that.

3          THE COURT:  Yes, sir.

4          THE DEFENDANT:  Your Honor, in the previous motions

5   Mr. Nachmanoff wasn't present during the Sixth Amendment

6   argument rights in regards to the Massiah claim.

7          I thought from my recollection that you stated that

8   if during trial it was proven that a government agency was

9   attached prior to the recording, that you would declare a

10   mistrial.  And I just wanted to reiterate that it has been

11   clear from the Government's showing that Government's agency

12   was attached on the 7th.  The recordings were obtained on the

13   12th.  So--

14          THE COURT:  But remember that the offense, that the

15   violation is specific to the offense.  And the evidence was

16   that Mr. Bryan wasn't solicited to get evidence about the

17   robbery offense.  Instead, he was solicited and acting as a

18   Government agent only in the investigation of the murder for

19   hire.

20          So, that's why it's not--

21          THE DEFENDANT:  I understand that, Your Honor.  I

22   understand that they can use those recordings toward the

23   murder for hire offense.  And the issue that I have read in

24   several courts and from the Supreme Court was the fact that

25   once you are indicted, you can't use new obtained information

981

1    that was in violation of the Sixth Amendment because it

2    doesn't only just violate this Sixth Amendment, it violates

3    the Fifth Amendment where --

4              THE COURT:  But there weren't any--

5              THE DEFENDANT:  -- compelling testimony, you are

6    compelling testimony against me that incriminates me in

7    violation of my Fifth Amendment rights.

8              THE COURT:  There weren't any, there hadn't been any

9    federal charges, you hadn't been indicted on any federal

10   offenses when that investigation took place, correct?

11             THE DEFENDANT:  But I was still under the Sixth

12   Amendment right for the robberies.  And the Fourth Circuit

13   ruled in a case where a defendant, his state case was

14   dismissed and there was a period where there was no charge

15   hanging over his head, and then the federal case was picked

16   up.  And during that period there was the investigation that

17   occurred.  And he claimed there was a Sixth Amendment

18   violation.

19             And the Fourth Circuit claimed that as long as there

20   is, that attachment is there, then it still carries on in the

21   federal court as long as the same conduct that is prohibited.

22             So, I don't see how the fact that the robbery was

23   picked up in the federal case changes the fact that I was

24   under the Sixth Amendment.

25             THE COURT:  All right.  I have explained my

982

1    reasoning, and your exception is noted.

2            THE DEFENDANT:  All right.  Thank you, Your Honor.

3            THE COURT:  All right.  Are we ready for our jury?

4            MR. NACHMANOFF:  Your Honor, just if I may before

5    they come back in.

6            THE COURT:  Okay.

7            MR. NACHMANOFF:  I think we will be able to go

8    through these witnesses quite quickly.  If the Court then

9    excuses the jury and we can do jury instructions, I think that

10   would be very helpful unless it is too late.

11           I would ask the Court to consider, and I know we

12   don't want to inconvenience the jury too much, that perhaps we

13   resume at 10 o'clock tomorrow rather than 9 so that we can

14   maximize our opportunity to spend time with Mr. Mohamadi

15   before this very important decision.

16           THE COURT:  All right, certainly.

17           MR. NACHMANOFF:  Thank you.

18           THE COURT:  All right, Joe, let's get our jury in,

19   please.

20           NOTE:  At this point the jury returns to the

21   courtroom; whereupon the case continues as follows:

22   JURY IN

23           THE COURT:  As you heard earlier, the Government has

24   rested its case in chief, and we will now hear from the

25   defense.

R.C. Buer - Direct

983

1              Mr. Nachmanoff, call your first witness, sir.

2              MR. NACHMANOFF:  Thank you, Your Honor.  We call

3    Rhett Buer.

4              NOTE:  The witness is sworn.

5              THE COURT:  Go ahead.

6              MR. NACHMANOFF:  Thank you, Your Honor.

7              RHETT C. BUER, called by counsel for the defendant,

8    first being duly sworn, testifies and states:

9         DIRECT EXAMINATION

10   BY MR. NACHMANOFF:

11   Q.   Good afternoon.  Could you please state your full name

12   and spell it for the jury.

13   A.   Yes.  My name is Rhett Charles Buer.  R-h-e-t-t

14   C-h-a-r-l-e-s B-u-e-r.

15   Q.   And where are you employed?

16   A.   I am the president at Alexandria Yellow Cab.

17   Q.   And how long have you been at Yellow Cab?

18   A.   Nearly four years.

19   Q.   Okay.  And in that capacity, do you have responsibility

20   for maintaining the records that are kept in connection with

21   the business of Yellow Cab?

22   A.   Yes, I do.

23   Q.   Okay.  And did Yellow Cab receive a subpoena in

24   connection with this case that brings you here today?

25   A.   Yes.

984

1    Q.   Okay.  With the assistance of the Court Security Officer,

2    I would hand up what has been previously marked as Defendant's

3    Exhibit 6.  And I would ask you to take a look at that

4    document.

5           Do you recognize it?

6    A.   I do.

7    Q.   And is it a record that is kept in the ordinary and

8    regular course of business at Yellow Cab?

9    A.   It is.

10   Q.   And is it a record that you as the custodian have

11   maintained and produced pursuant to the subpoena?

12   A.   Yes, I have.

13   Q.   Okay.  And can you tell us what that is?

14   A.   Every dispatched call that we send through to the drivers

15   produces a fare number.  And this fare number is then sent to

16   a driver.  He is given the address where to pick up the

17   individual.

18          And so, this document that I brought here today is

19   that fare number and the information on it.

20   Q.   And does that reflect the telephone from which the fare

21   called?

22   A.   It's reflected what the call center employee puts into

23   the computer.  So--

24   Q.   And that would include the telephone number that they

25   receive?

R.C. Buer - Direct

985

1    A.    Yes.

2    Q.    And what about the address to which the cab would be

3    sent?

4    A.    Yeah.  Anything that is verbalized over the phone to the

5    employee would be put in the computer.

6    Q.    And what is the address that is marked on that document?

7    A.    175 South Reynolds Street.

8    Q.    In Alexandria?

9    A.    Correct.

10   Q.    And what is the date of this pickup?

11   A.    The date is May 27, 2007.

12   Q.    Okay.  And does this information also include the cab

13   number so that a person could then identify which cab driver

14   went to make that pickup?

15   A.    Yes, it does.

16   Q.    And does it show where the person then took the fare from

17   the pickup?

18   A.    No, not on this report, no.

19   Q.    Is there another report that contains that information?

20   A.    There is.  But our records, we have so much data that is

21   being captured, that it writes over itself after several

22   months.

23          And so, this information we maintain through the

24   years, but any type of GPS data because of the quantity and

25   number of cabs that we have is rewritten.

R.C. Buer - Direct

986

1            So, that information would have been erased sometime

2      in June or July of 2007.

3      Q.   And does the cab driver keep a report of where he both

4      picks up a fare and where he drops off a fare?

5      A.   Yes.  City ordinance requires that he keeps a daily

6      manifest for one year.

7      Q.   And so, there is a time limit as to how long he is

8      required to keep that manifest?

9      A.   Yes, according to code.

10     Q.   Okay.  And in this case, can you tell us who the cab

11     driver was that picked up the fare on May 27 at 175 South

12     Reynolds Street?

13     A.   His name is Mr. Teeka Solomon, he drives cab number 39

14     for Alexandria Yellow Cab.

15     Q.   And what time is reflected for this pickup?

16     A.   The meter was turned on at 4:03.

17     Q.   a.m. or p.m.?

18     A.   a.m.

19            MR. NACHMANOFF:  I would move Defendant's Exhibit 6

20     into evidence at this time.

21            THE COURT:  Any objection?

22            MR. WALUTES:  No, Your Honor.

23            THE COURT:  It is received.

24            MR.  NACHMANOFF:  I have no further questions.

25     Thank you.

987

1           THE COURT:  Any cross?

2           MR. WALUTES:  I have no cross, Your Honor.  Thank

3  you, sir.

4           THE COURT:  All right.  May we excuse Mr. Buer?  May

5  Mr. Buer be excused?

6           MR. WALUTES:  Yes.

7           THE COURT:  May Mr. Buer be excused?

8           MR. NACHMANOFF:  He may.

9           THE COURT:  All right.  You are excused with our

10  thanks, sir.  Please don't discuss your testimony that you

11  have given here until the trial is over.  All right.

12           NOTE:  The witness stood down.

13           THE COURT:  Next witness.

14           MR. NACHMANOFF:  Your Honor, we call Solomon Teeka.

15  Teeka Solomon.

16           NOTE:  The witness is sworn.

17           THE COURT:  Go ahead.

18           SOLOMON D. TEEKA, called by counsel for the

19  defendant, first being duly sworn, testifies and states:

20      DIRECT EXAMINATION

21  BY MR. NACHMANOFF:

22  Q.   Good afternoon.

23  A.   Good afternoon.  How are you?

24  Q.   Can you please state your name for the jury and the

25  Court.

S.D. Teeka - Direct

988

1   A.    Solomon D. Teeka.

2   Q.    Mr. Teeka, can you tell me how you are employed?

3   A.    A taxi driver.

4   Q.    And how long have you been driving a taxi?

5   A.    Almost four years.

6   Q.    And who are you employed by?

7   A.    Alexandria Yellow Cab.

8   Q.    Alexandria Yellow Cab?

9   A.    Yes.

10  Q.    Were you employed by Alexandria Yellow Cab on May 27,

11  2007?

12  A.    Yes.

13  Q.    Okay.  Do you have any recollection of what you were

14  doing on May 27, 2007?

15  A.    No.

16  Q.    Can you remember anybody that you picked up if you were

17  work working on that day?

18  A.    I don't remember.

19  Q.    Do you keep records, a manifest of who you pick up and

20  where you take them to?

21  A.    Yes, but that's destroyed.

22  Q.    Okay.  So, you keep those records for a certain period of

23  time and then you throw them away?

24  A.    Yes.

25  Q.    Okay.  And how long do you keep them for before they are

989

1    thrown away?

2    A.    Almost for one year.

3    Q.    For one year?

4    A.    Yes.

5    Q.    Okay.  So, is it fair to say that any records for May 27,

6    2007, would be something that you threw away?

7    A.    Yes.

8    Q.    Because that's a couple of years ago?

9    A.    Yes.

10   Q.    Okay.  An investigator from our office came and showed

11   you some pictures, do you remember that?

12   A.    I don't remember.

13   Q.    Okay.  If I give you a photograph to show you--  I am

14   handing up what is marked as Defendant's Exhibit 7.  I would

15   like you to look at this photograph.

16          Do you recall being shown that photograph?

17   A.    No.

18   Q.    Okay.  Does that person look familiar to you at all?

19   A.    No.

20   Q.    If you look around the courtroom today, do you see anyone

21   that you can recall ever having in your cab?

22   A.    No.

23   Q.    No?

24   A.    Yeah.

25          MR. NACHMANOFF:  No further questions.  Thank you.

990

1          THE COURT:  Thank you.

2      CROSS-EXAMINATION

3  BY MR. WALUTES:

4  Q.   Good afternoon, sir.  Before you came into court, they

5  showed you this photograph?

6  A.   Yes.

7  Q.   They wanted to make sure you wouldn't recognize it?

8  A.   No, I don't.

9  Q.   And you don't recognize it?

10  A.   Yes.

11  Q.   And then they asked you to come in?

12  A.   What's that?

13  Q.   After they made sure you didn't recognize this person,

14  they asked you to come in here?

15  A.   I don't know.

16          MR. WALUTES:  I have no further questions.  Thank

17  you, sir.

18          THE COURT:  May Mr. Teeka be excused?

19          MR. WALUTES:  Yes, Your Honor.

20          MR. NACHMANOFF:  Yes, Your Honor.

21          THE COURT:  All right.  Mr. Teeka, your appearance

22  was brief, sir.  Thank you.  You are excused at this time.

23  Please don't discuss your testimony until this trial is over.

24  All right.

25          THE WITNESS:  All right.

991

1          THE COURT:  All right.  Have a good afternoon.

2          THE WITNESS:  Thank you.

3          NOTE:  The witness stood down.

4          THE COURT:  Next witness.

5          MS. MINTER:  Your Honor, we would called Detective

6    Nicholas Lion.

7          THE COURT:  Detective Lion.  All right.

8          NOTE:  The witness is sworn.

9          NICHOLAS LION, called by counsel for the defendant,

10   first being duly sworn, testifies and states:

11        DIRECT EXAMINATION

12   BY MS. MINTER:

13   Q.   Detective, would you please state your full name and

14   spell your last name for the court reporter.

15   A.   Nicholas Lion, L-i-o-n.

16   Q.   And what is your occupation?

17   A.   I am a detective with the Alexandria Police Department.

18   Q.   How long have you been a detective?

19   A.   I have been a detective for almost one year.

20   Q.   And prior to that, were you employed with the Alexandria

21   Police Department?

22   A.   I was.

23   Q.   What was your job then?

24   A.   I was a patrol officer.

25   Q.   And was that your job in May of 2007?

1    A.    It was.

2    Q.    Okay.  If I could direct your attention to the early

3    morning hours of May 27, 2007.

4             Were you on patrol?

5    A.    I was.

6    Q.    Okay.  In your capacity as a police officer?

7    A.    Yes, ma'am.

8    Q.    Okay.  And did you receive a call that caused you to

9    respond to the EOS Apartments?

10   A.    Yes, ma'am.

11   Q.    Okay.  And during the course of your duties at EOS

12   Apartments, were you approached by an individual by the name

13   of Kimberly Riley?

14   A.    Yes.

15   Q.    And did she advise you of an alleged incident that had

16   happened to her?

17   A.    She did.

18   Q.    Okay.  And did you interview her about that incident?

19   A.    Yes, I did.

20   Q.    Okay.  And did she give you information about that

21   incident?

22   A.    Yes, she did.

23   Q.    And as part of your interview--  Well, let me ask you

24   this.  Did she advise you that some money had been taken from

25   her?

993

1    A.    She did.

2    Q.    And as part of your interview, did you ask her how much

3    money was taken?

4    A.    I did.

5    Q.    Okay.  What did she advise you?

6    A.    From my recollection, I believe it was $700.

7    Q.    The Court's indulgence.

8         THE COURT:  Yes.

9    Q.    Detective Lion, did you also have occasion to interview

10   another individual with respect to an incident that had

11   happened that night?

12   A.    I did.

13   Q.    Okay.  And was that individual a Mr. Gebru Haile?

14   A.    Yes, it was.

15   Q.    And did he report an incident that had allegedly happened

16   to him?

17   A.    Yes, he did.

18   Q.    Okay.  Did you interview him with respect to that

19   incident?

20   A.    I did.

21   Q.    And did you ask him questions about what had happened?

22   A.    Yes, ma'am.

23   Q.    And as part of your interview, did you ask for a

24   description of the person that had committed this offense?

25   A.    I did.

N. Lion - Cross

994

1    Q.   Okay.  And what did Mr. Haile tell you with respect to

2    the description of that individual?

3    A.   May I reference my report?

4    Q.   Certainly.

5    A.   Mr. Haile stated it was a light-skinned black or Hispanic

6    male, between 20 and 30 years of age, with a bald head,

7    wearing a white T-shirt and unknown pants.

8    Q.   And when you indicated the report that you prepared, you

9    prepare a report for everything or almost everything that

10   happens while you are on patrol?

11   A.   Reportable offenses, yes, ma'am.

12   Q.   Okay.  And are you careful when you prepare that report?

13   A.   Yes, ma'am.

14   Q.   Detailed?

15   A.   Yes, ma'am.

16   Q.   And you include all the information that is relayed to

17   you?

18   A.   Yes.

19        MS. MINTER:  Okay.  I have no further questions at

20   this time.

21        THE COURT:  All right.  Any cross-examination?

22        MR. WALUTES:  Briefly, Your Honor.

23   CROSS EXAMINATION

24   BY MR. WALUTES:

25   Q.   Good afternoon, sir.

995

1    A.    How are you?

2    Q.    Good, thank you.  Just so I can be clear, would Mr. Haile

3    have spoken with you first or made the 911 call first?

4    A.    I was sent a call, so he would have had to call 911

5    first.

6    Q.    So, when he spoke to you, he would have already been

7    recorded on the 911?

8    A.    Yes.

9          MR. WALUTES:  Thank you.  I have no further

10   questions.  Thank you, sir.

11         THE COURT:  May Detective Lion--  Any redirect?

12         MS. MINTER:  No redirect, Your Honor.  He can be

13   excused.

14         THE COURT:  All right.  Detective, you are excused

15   with our thanks.  Please don't discuss your testimony until

16   the case is over.  All right.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Have a good afternoon.

19         NOTE:  The witness stood down.

20         THE COURT:  Next witness.

21         MS. MINTER:  Your Honor, we would call Mr. Pascual

22   Velarde.

23         NOTE:  The witness is sworn.

24         PASCUAL VELARDE, called by counsel for the

25   defendant, first being duly sworn, testifies and states:

P. Velarde - Direct

996

1          DIRECT EXAMINATION

2    BY MS. MINTER:

3    Q.   Mr. Velarde, would you please state your full name for

4    the record, and spell your first and last name for the court

5    reporter, please.

6    A.   Pascual Velarde.  P-a-s-c-u-a-l V-e-l-a-r-d-e.

7    Q.   Thank you.  Mr. Velarde, what is your occupation?

8    A.   Staff investigator.

9    Q.   Okay.  For where?

10   A.   For the Federal Public Defender.

11   Q.   Okay.  Do you work for Mr. Nachmanoff?

12   A.   Yes, I do.

13   Q.   What does that job entail?

14   A.   Interviewing witnesses.  Getting records.  Doing

15   background check on witnesses.  Drawing sketches of crime

16   scenes.  Take photographs.

17          THE COURT:  Mr. Velarde, please speak up a little

18   bit, sir, so we make sure we hear you.

19          THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

20          THE COURT:  Thank you.

21          MS. MINTER:  I believe you can move the microphone a

22   little bit closer to you if that helps.

23   BY MS. MINTER: (Continuing)

24   Q.   And prior to your current employment, where did you work?

25   A.   I was an investigator with the Public Defender Service in

1   D.C.

2   Q.   And prior to that?

3   A.   I was a Probation officer in D.C.

4   Q.   And are you the lead investigator on this case?

5   A.   Yes, ma'am.

6   Q.   Okay.  And approximately when did you first begin

7   investigating this case?

8   A.   February.

9   Q.   Of this year?

10  A.   Yes, ma'am.

11  Q.   Were you involved in any manner in the investigation for

12  the state level prosecution?

13  A.   No, ma'am.

14  Q.   Mr. Velarde, did you have occasion to visit an area in

15  Washington, D.C. called DuPont Circle?

16  A.   Yes, ma'am.

17  Q.   Specifically what area near DuPont Circle did you visit?

18  A.   1300 block of Connecticut Avenue, Northwest.

19  Q.   Mr. Velarde, with the assistance of the Court Security

20  Officer, I would like to show you Government's Exhibit 2A.

21         And do you recognize what that image depicts?

22  A.   Yes, ma'am.

23  Q.   And what does that depict?

24  A.   Well, this is DuPont Circle, N Street, and that's the

25  Northwest area of Washington, D.C.

P. Velarde - Direct

998

1    Q.   Okay.  Unfortunately, when you turn to the map, you are

2    moving away from the microphone a little.  So, if you could

3    just make sure the jury can still hear you.  Thank you.

4    A.   Sure.

5    Q.   And you indicated that you had occasion to go to the 1300

6    block of Connecticut Avenue?

7    A.   Yes, ma'am.

8    Q.   Can you indicate for the members of the jury where on

9    that map it is depicted if it is depicted?

10   A.   It is from here to here.

11   Q.   Okay.  And I believe you indicated that the horizontal

12   street just below is N Street, is that correct?

13   A.   Yes, ma'am.

14   Q.   Okay.  And did you have occasion--  Nothing further with

15   Exhibit 2A.  Thank you.

16          Did you have occasion to photograph that area that

17   you have testified to?

18   A.   Yes.  Yes, ma'am.

19   Q.   Okay.  And if I could show you what's been marked for

20   identification as Defendant's Exhibit 1.

21          Before showing it to the jury, could you tell us

22   what that depicts?

23   A.   This is, I tried to get the whole block, 1300 block of

24   Connecticut Avenue.

25   Q.   Okay.  And does that image fairly and accurately depict

999

1   what you saw in the 1300 block of Connecticut Avenue?

2   A.   Yes, ma'am.

3          MS. MINTER:  Your Honor, I would move Defendant's 1

4   into evidence and ask to publish it to the jury.

5          THE COURT:  Any objection?

6          MR. BEN'ARY:  No, Your Honor.

7          THE COURT:  All right.  But let's be clear though,

8   this is 2009 photograph or 2010 photograph or 2007.

9          MS. MINTER:  I can clarify that, Your Honor.

10         THE COURT:  All right.

11  BY MS. MINTER: (Continuing)

12  Q.   Mr. Velarde, you said you said occasion to visit this

13  block?

14  A.   Yes, ma'am.

15  Q.   When was that?

16  A.   It was yesterday.

17  Q.   And that's when you took these pictures?

18  A.   Yes, ma'am.

19  Q.   If you could turn that around and show the image to the

20  jury.  And if you can explain where is Connecticut Avenue

21  depicted in that picture?

22  A.   Connecticut Avenue is right here.  This is DuPont Circle.

23  And N Street is on this end.

24  Q.   Okay.  Okay.  So, your testimony is that DuPont Circle

25  would be to the far left of Defendant's Exhibit 1?

1000

1    A.    Yes, ma'am.

2    Q.    And N Street would be the far right of Exhibit 1?

3    A.    Yes, ma'am.

4    Q.    And is that image one large picture, or is it made up of

5    multiple pictures?

6    A.    It is made up of multiple pictures.

7    Q.    Okay.  Does it fairly fair and accurately depict the

8    block?

9    A.    Yes, ma'am.

10   Q.    Okay.  Is there any missing that you observed on that

11   block that does not appear in those pictures?

12   A.    No.

13         MS. MINTER:  Okay.  Your Honor, I believe the Court

14   had accepted Defendant's Exhibit 1?

15         THE COURT:  Yes, there is no objection, it's in.

16         MS. MINTER:  Thank you, Your Honor.

17   BY MS. MINTER: (Continuing)

18   Q.    If I could show you, with the assistance of the Court

19   Security Officer, Exhibit 2.  And without showing it to the

20   jury just yet, if you could tell us what that depicts?

21   A.    This is also the 1300 block of Connecticut Avenue.

22   Q.    And how does it differ, if at all, from Exhibit 1?

23   A.    This one was taken from the middle of the street.  The

24   first one was from the corner from DuPont Circle.

25   Q.    Does it fairly and accurately depict the 1300 block of

P. Velarde - Direct

1001

1    Connecticut Avenue?

2    A.    Yes, ma'am.

3    Q.    As you observed it from that point?

4    A.    Yes.

5         MS. MINTER:  Your Honor, I would move Exhibit 2 into

6    evidence and ask to publish it to the jury.

7         THE COURT:  Any objection?

8         MR. BEN'ARY:  No, Your Honor.

9         THE COURT:  All right, it is received.  Go ahead.

10   BY MS. MINTER: (Continuing)

11   Q.    If you could turn that around and show it to the jury,

12   and just explain again where DuPont Circle and N Street are in

13   that image.

14   A.    DuPont Circle is on this side.  N Street is on the other

15   side.

16   Q.    Okay.  And to be clear, DuPont Circle is to the left of

17   Exhibit 2, N Street is to the right side of Exhibit 2?

18   A.    Yes, ma'am.

19   Q.    And again, is that image made up of one picture or

20   multiple pictures?

21   A.    Multiple pictures.

22   Q.    Does it fairly and accurately depict the block of 1300

23   Connecticut as you viewed it from that vantage point?

24   A.    Yes, ma'am.

25   Q.    Is there anything missing from the picture as displayed?

P. Velarde - Direct

1002

1    A.   No.

2    Q.   Then with the assistance of the Court Security Officer, I

3    will show you what has been marked as Exhibit 3.

4              Without showing it to the jury at this time, could

5    you tell us what that depicts.

6    A.   This is the intersection between Connecticut Avenue and N

7    Street.

8    Q.   Okay.  And does that fairly and accurately depict what

9    you viewed from that intersection?

10   A.   Yes, ma'am.

11             MS. MINTER:  Okay.  And, Your Honor, at this time I

12   would move Exhibit 3 into evidence.

13             THE COURT:  Any objection?

14             MR. BEN'ARY:  No, sir.

15             THE COURT:  It is received.

16             MS. MINTER:  Permission to publish to the jury, Your

17   Honor?

18             THE COURT:  Yes.

19   BY MS. MINTER: (Continuing)

20   Q.   If you could just explain for the members of the jury

21   briefly what streets are pictured in that image.

22   A.   This is Connecticut Avenue.  And going across will be N

23   Street.

24   Q.   Okay.  So, the bulk of what is depicted in that picture

25   in terms of road would be Connecticut Avenue, correct?

P. Velarde - Direct

1003

1    A.   Yes, ma'am.

2    Q.   And lastly, if I can show you what's been marked for

3    identification as Exhibit 4.

4         Without showing it to the jury at this time, can you

5    tell me if you recognize that picture?

6    A.   Yes, ma'am.

7    Q.   And what does that picture depict?

8    A.   It shows a few restaurants.

9    Q.   Okay.  And is--

10   A.   It's in the middle of the street, sorry.

11   Q.   And by street, you mean Connecticut Avenue within the

12   1300 block?

13   A.   Yes, ma'am.

14   Q.   Okay.  And does that fairly and accurately depict what

15   you saw?

16   A.   Yes, ma'am.

17        MS. MINTER:  Your Honor, at this time I would ask to

18   move into evidence and publish to the jury Exhibit 4.

19        THE COURT:  Any objection?

20        MR. BEN'ARY:  No, Your Honor.

21        THE COURT:  It is admitted.  And you may publish it.

22        MS. MINTER:  Thank you, Your Honor.

23   BY MS. MINTER: (Continuing)

24   Q.   If you could turn that around.  And if you could just

25   approximate for the jury where within that block that is.  If

P. Velarde - Direct

1004

1  it is closer to DuPont Circle, closer to N Street?

2  A.   I would say it's in the middle in between DuPont Circle

3  and N Street.

4  Q.   Okay.  Thank you.  Thank you, you can put the exhibit

5  down.

6        Mr. Velarde, in the course of your inspection of the

7  1300 block of North Connecticut, did you observe any alleys?

8  A.   No, ma'am.

9  Q.   Is there any space to drive a car between any of the

10  buildings in that block?

11  A.   No.

12        MS. MINTER:  Nothing further at this time, Your

13  Honor.

14        THE COURT:  All right.  Any questions on

15  cross-examination?

16        MR. BEN'ARY:  Your Honor, I do.  I was wondering if

17  I could just have the Court's indulgence for 30 seconds to

18  look at the defense exhibits before I begin my

19  cross-examination.

20        THE COURT:  Certainly.

21        MR. BEN'ARY:  Thank you very much, Your Honor.  I

22  appreciate that.

23        THE COURT:  Yes.

24        MR. BEN'ARY:  May I proceed, Your Honor?

25        THE COURT:  Yes, sir.

P. Velarde - Cross

1005

1      MR. BEN'ARY:  Thank you.

2      CROSS-EXAMINATION

3  BY MR. BEN'ARY:

4  Q.    Good afternoon, Mr. Velarde.

5  A.    Good afternoon, sir.

6  Q.    So, you traveled yesterday into the District of Columbia

7  and took the photographs that are marked and admitted into

8  evidence as Defendant's 1 through 4, is that right?

9  A.    Yes, sir.

10 Q.    And as you were observing that block and taking those

11 pictures, could you tell the members of the jury, isn't it

12 true that there are no Bank of Americas on that block of

13 Connecticut Avenue, is that correct?

14 A.    I wasn't looking for any specific bank or any specific

15 business.  I just walked through the whole block looking for

16 any opening, any alleys.  I didn't see any.

17 Q.    Okay.  Do you want a minute to review your photographs to

18 see if you can see any Bank of America banks?

19 A.    I don't see any Bank of America.

20 Q.    Okay.  So, it is fair to say, isn't it, that if I were on

21 that block and I needed to get to a Bank of America, I would

22 need to go to a different block, is that fair to say?

23 A.    I guess if you don't find any Bank of America in that

24 block, yeah, you will have to go around and look for another

25 one.

P. Velarde - Cross

1006

1    Q.    Okay.  And did you on your travels into the District of

2    Columbia, did you travel on any other street besides

3    Connecticut?

4    A.    I parked my car on N Street, and then I walk up on

5    Connecticut Avenue.

6    Q.    Okay.  Can I ask, with the help of Ms. Dickinson, to pull

7    up Government's 2A on the electronic evidence system.  And

8    there is a computer screen right on your left elbow, Mr.

9    Velarde.

10   A.    Yes, sir.

11   Q.    And I was wondering if we could enlarge a section that

12   encompasses the 1300 block of Connecticut but also N.  We need

13   to go little bit to the right there.  Okay, that was fine.

14           Now, take a minute and see if you can orient

15   yourself there, Mr. Velarde.  Do you see N Street crossing

16   sort of in the middle of the screen there?

17   A.    Yes, sir.

18   Q.    And if you look over, 19th Street goes sort of right

19   north and south down the middle of the screen, do you see

20   that?

21   A.    Yes, sir.

22   Q.    And then there is a diagonal street.  And at the top you

23   can see part of the words "DuPont C-i-r," do you see that?

24   A.    Yes, sir.

25   Q.    And that is Connecticut Avenue, correct, that diagonal

1   street?

2   A.   Yes, sir, it is.

3   Q.   Where did you park your car on N?

4   A.   Between 19th and Connecticut.  Facing east.

5   Q.   Okay.  So, somewhere, I am going to make a mark, if I

6   could, somewhere on that section of N Street?

7   A.   Yes, sir.

8   Q.   Did you pass any alleyways walking from your car to take

9   the pictures on Connecticut?

10   A.   No, sir.

11   Q.   Do you see this opening right here between the buildings?

12   A.   Yes, sir.

13   Q.   Is that an alleyway?

14   A.   I didn't pass that alley.

15   Q.   Okay.  But that is an alleyway, correct?

16   A.   I am not sure, I didn't pass that area.

17   Q.   Okay.  And do you see this break between the buildings

18   here?  Do you see where I just made that mark?

19   A.   Yes, sir.

20   Q.   Did you pass that?

21   A.   I did pass that area.

22   Q.   Is that an alleyway?

23   A.   I didn't notice it.  I didn't see it.  I wasn't paying

24   attention to that street.

25   Q.   Okay.  Is it fair to say that you were only focused on

1008

1   the 1300 block of Connecticut?

2   A.   Pretty much.

3   Q.   And that there are alleyways all throughout that

4   neighborhood on the side streets, is that fair to say?

5   A.   I am sorry, can you say that again, please.

6   Q.   It is fair to say, isn't it, that there are alleys all

7   around the area surrounding the 1300 block of Connecticut

8   Avenue?

9   A.   I guess.  I am not sure.

10  Q.   Well, we have marked two.  Do you see that where I just

11  made that mark?

12  A.   Yes, sir.

13  Q.   Is that an alley?

14  A.   I wasn't there.  I don't know.

15  Q.   Okay.  It's fair to say there are a number of alleys in

16  that area, sir, isn't it?

17          MS. MINTER:  Your Honor, I guess I would ask to

18  rephrase the question.  If the question relates to what Mr.

19  Velarde himself observed, that is one thing.  If the question

20  relates to what he or the Government thinks they see on the

21  overhead map, that's different.

22          THE COURT:  Well, he has answered he didn't notice

23  the alley.  And the members of the jury can view the exhibit

24  and determine that for themselves.

25          MR. BEN'ARY:  Okay.  I don't have any other

P. Velarde - Redirect

1009

1    questions.  Thank you.

2              THE COURT:  All right.  Any redirect?

3              MS. MINTER:  Just briefly, Your Honor.

4         REDIRECT EXAMINATION

5    BY MS. MINTER:

6    Q.   Mr. Velarde, were you asked to investigate any other area

7    besides the 1300 block of Connecticut?

8    A.   No, ma'am.

9              MS. MINTER:  Okay.  Nothing further, Your Honor.

10             THE COURT:  All right.  May Mr. Velarde be excused?

11             MS. MINTER:  He may, Your Honor.

12             MR. BEN'ARY:  Yes, sir.

13             THE COURT:  All right.  Mr. Velarde, you are

14   excused, sir.  Please don't discuss your testimony with anyone

15   until the trial is over.  All right.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  All right, have a good afternoon.

18             THE WITNESS:  Thank you.

19             NOTE:  The witness stood down.

20             THE COURT:  All right, ladies and gentlemen, we are

21   going to let you go at this time.  And that doesn't mean the

22   testimony is over with, but we are done for today.  And we

23   will resume at 10 o'clock tomorrow morning.

24             I promise you we will be busy for a period of time

25   beyond that, but we don't want you to be inconvenienced.  So,

1 if we can resume at 10 o'clock, does that work for everybody?

2          All right, then the defense will continue tomorrow

3 at 10 a.m. if they choose to put on any further witnesses.

4          And you are excused at this time, again with my

5 request that you not do any research, that you not read

6 anything about the case, and you not discuss it with anyone.

7          All right, we will see you at 10 o'clock tomorrow

8 morning.  Thank you.

9          NOTE:  At this point the jury leaves the courtroom;

10 whereupon the case continues as follows:

11 JURY OUT

12          THE COURT:  All right, have a seat.  Where are you?

13 Do you need a couple minutes to talk about jury instructions,

14 or are you ready now?

15          MR. NACHMANOFF:  We have not had the chance to speak

16 with each other.  We had exchanged some messages.  I think if

17 the Court wanted to give us 10 or 15 minutes, it might speed

18 things along when we discuss what is still in dispute.

19          THE COURT:  I am happy to do that.  All right, we

20 are in recess for 15 minutes.

21          NOTE:  At this point a recess is taken; at the

22 conclusion of which the case continues in the absence of the

23 jury as follows:

24 JURY OUT

25          THE COURT:  All right, Mr. Nachmanoff.

1          MR. NACHMANOFF:  Your Honor, thank you for giving us

2    a few minutes and giving us the opportunity to do this this

3    afternoon.  We have tried to find some common ground.

4          So, I can sort of go through the things that we have

5    agreed upon first, if the Court would like that, and then talk

6    about what's left for the Court to resolve.

7          THE COURT:  I think that's an excellent way to go.

8          MR. NACHMANOFF:  There are a whole series of the

9    standard O'Malley instructions that I think are not in dispute

10   that the Court is aware of.

11         The first sort of technical things that we have sort

12   of agreed on, just to clarify, are the Government has combined

13   the elements of the offense for the Hobbs Act robberies, the

14   924(c)s and the solicitations.

15         We think just for clarity sake it's important to

16   have separate instructions for each of those counts.  We would

17   not want the jury to be confused that somehow they were linked

18   or that they would have to find someone guilty of more than

19   one count since every count has to be considered separately.

20         So, the Government does not have an objection to

21   that.  And with regard to Counts 1 and 2--  And again, if I

22   ever misspeak, I expect Mr. Walutes would interrupt.  I

23   believe the Government is willing to withdraw their page 36,

24   which is their Hobbs Act armed robbery essential elements, in

25   favor of our proposed jury instructions 26 and 28.

1012

1          So, defendant's number 26 and 28 is agreeable to

2   both parties.  The Government is withdrawing page 36.  And

3   that just allows the Court to follow the standard O'Malley on

4   the essential elements of the Hobbs Act robbery.

5          THE COURT:  All right.

6          MR. NACHMANOFF:  Page numbers for us are 37 and 39.

7   They are numbered proposed instructions 26 and 28.

8          THE COURT:  All right.

9          MR. NACHMANOFF:  Is this a clear way of doing it for

10  you.  I don't want to do it to make it more confusing.

11         THE COURT:  No, that's fine.  There is a lot of

12  instructions.  They are going to go back.

13         My practice is that I make three or four copies,

14  they go back with the jury to be used.  I am not going to

15  repeat every element of every offense for the separate Hobbs

16  Act robberies, just so that you are not surprised by that.

17         I am going to say, on two separate dates there have

18  been robberies and use of firearms charged.  I am going to

19  identify the dates.  I am going to identify the different

20  victims, they need to be considered independently, but I am

21  not going to repeat each of these.

22         MR. NACHMANOFF:  That's fine, Your Honor.  Our

23  concern is simply that the instructions don't lump them

24  together.  And to the extent the Court is making clear there

25  are two separate counts, they involve two separate victims,

1013

1    they have to be considered separately from each other.  The

2    fact that the elements are identical as to each is not in

3    controversy.

4               THE COURT:  Okay.

5               MR. NACHMANOFF:  And there are only three elements

6    to these, so they are not particularly long.  But if the Court

7    wants to take our two instructions, that's fine.  If the Court

8    wants to fashion something in between--

9               THE COURT:  No, I am going to take your

10   instructions.  I may just abridge them a little bit.

11              MR. NACHMANOFF:  Likewise with regard to Counts 3

12   and 4, which are the 924(c)s, the Government has agreed to

13   withdraw its proposed instruction which has them together and

14   is on page 44.

15              Our proposed instructions are jury instruction 32

16   and 33.

17              THE COURT:  So, the Government's are 42, 43 and 44,

18   the page numbers?

19              MR. WALUTES:  Your Honor, I think the only thing the

20   Government is agreeing to is that we would take out page 43,

21   which is the elements for use of a firearm.  And then I

22   thought we were agreeing to defense--

23              MR. NACHMANOFF:  Yes.

24              MR. WALUTES:  I think it printed differently.

25              MR. NACHMANOFF:  That's possible too.

1    MR. WALUTES:  Your Honor, I don't know which the

2  Court has.  It would be titled--

3    THE COURT:  The nature of the offense charged, use

4  of a firearm?

5    MR. WALUTES:  The essential elements of the offense

6  charged, use and carrying of a firearm would be the title on

7  the Government's proposed instruction.  We would be

8  withdrawing that.  On mine it is page 43, although apparently

9  Mr. Nachmanoff's 43, which I think are the--

10    MR. NACHMANOFF:  It's 44.  So, I don't know if there

11  is a difference in page numbering.  Our proposed instructions

12  are 32 and 33.

13    THE COURT:  The version of the Government's that I

14  have in my book has that instruction on page 41.  So, I am

15  glad we are all on one base.

16    All right.  Now, which instructions are being

17  substituted for the instruction which is entitled The Nature

18  of the Offense Charged, Use and Carry--

19    MR. NACHMANOFF:  No, Your Honor, it's not that

20  instruction.  If you go one or two more pages, the

21  Government's instruction is entitled Use and Carry a Firearm

22  in Crime of Violence, the Essential Elements of the Offense

23  Charged.

24    THE COURT:  Okay, I have got it.  Page 44, you are

25  right.

1          MR. NACHMANOFF:  Okay.  Then that is consistent with

2     my copy.

3          THE COURT:  Thank goodness.

4          MR. NACHMANOFF:  If the Court can withdraw that, the

5     Government is agreeable to our proposed instructions, which

6     are proposed defense instructions 32 and 33.

7          And that follows O'Malley, Grenig & Lee.  Although,

8     and this is a minor point, I have conferred with the

9     Government, there is a newer version of O'Malley that adds a

10    third element.  I am not sure it's necessary.  It is defining

11    use and carrying, but it is really simply repeating the

12    statutory language saying that use or carrying was during and

13    in relation to, which is in the prior elements.

14         So, I leave it to the Court's discretion whether to

15    add that.

16         THE COURT:  No, I think I will leave it the way it

17    is.

18         MR. NACHMANOFF:  With regard to Counts 6 and 7, we

19    have the same issue.

20         THE COURT:  Okay.

21         MR. NACHMANOFF:  The Government's instruction, which

22    they have agreed to withdraw, is at page 58.  And that is

23    solicitation to commit murder for hire, the essential elements

24    of the offense charged.

25         And so, in order to break them out and to add a

1016

1   little bit of language, they are willing to go with our

2   instruction with one modification.  And our instructions are

3   proposed defense instruction 39 and 40.  And this is for the

4   essential elements of Counts 6 and 7.

5           THE COURT:  All right.

6           MR. NACHMANOFF:  The only change is that our

7   instruction, which comes from Sand Siffert, that's where we

8   got it, O'Malley does not have a standard instruction, in

9   element two it states that Mr. Mohamadi's actions strongly

10  indicated that he intended the other person.  The strongly

11  corroborated is from the statute.

12          The Government would prefer, and we have no

13  objection, to changing the word "indicated" to "corroborated."

14  That follows the statute more closely.

15          THE COURT:  All right.

16          MR. NACHMANOFF:  If I am being clear.

17          THE COURT:  Yes, I see that.

18          MR. NACHMANOFF:  Okay.  So, the Government has

19  agreed on that.

20          The Government has agreed, and I don't think there

21  is any controversy at all, to remove all of the references to

22  Count 5 which are being considered by the Court and,

23  therefore, the jury should not be instructed on them.

24          I don't think the Government submitted instructions

25  relating to that.  We had.  And so, we would ask to withdraw

1017

1      those.  Those are defense instructions 34, 35, 36 and 37.

2                  THE COURT:  All right.  Okay.

3                  MR. NACHMANOFF:  On a related note, maybe we can do

4      this as housekeeping later, I think we need to renumber the

5      counts so that there are a total of nine.  Otherwise the jury

6      will obviously know by inference that there was a Count 5 that

7      has been taken out.

8                  I realize that is a little confusing, but I think it

9      is necessary in order to remove the possibility that the jury

10     is wondering about a tenth count that is not before them.

11                 THE COURT:  All right.

12                 MR. NACHMANOFF:  Count 8 is one in which we are

13     willing to withdraw our jury instruction, which is proposed

14     instruction 42, in favor of the Government's definition of the

15     essential elements of the murder for hire, which is at their

16     page 62.  And those are very similar instructions.

17                 THE COURT:  Yes.

18                 MR. NACHMANOFF:  So, we have no objection to that.

19                 That's the good news.  The bad news is I think that

20     is everything that we have agreed upon, and there are a series

21     of issues that we need to resolve.  I think most of them will

22     be familiar to the Court because they relate to some of the

23     fundamental issues that have been litigated in pretrial

24     motions and even referred to in the Rule 29.  But we want to

25     be sure that we have endeavored to get the most accurate

1018

1    instructions that we can.

2          The first is defendant's proposed jury instruction

3    30.  And this is the definition of interstate commerce under

4    the Hobbs Act.  The Government's instruction is at Government

5    page 37.

6          Let me add in one additional wrinkle, which is that

7    we have proposed an instruction that we think is consistent

8    with the case law.  We have cited the cases at the bottom.  It

9    is a simple instruction, but I think it accurately states the

10   law.

11         In speaking with Mr. Mohamadi, and as the Court

12   knows, this is an issue that he has spent a lot of time

13   thinking about and looking at, and we are very supportive of

14   that, we have looked at that issue and think it is an

15   important one too.  He has, essentially, a third instruction

16   that he would like the Court to consider, and we would too.  I

17   think it is also appropriate.  It is similar to our

18   instruction, but changes some of the language.  And I would

19   ask to hand it up now just for the Court to consider.

20         And I will point out the differences for the Court

21   to consider so that the record is clear regardless of what the

22   Court chooses to do.

23         THE COURT:  Yes, sir.

24         MR. NACHMANOFF:  And Mr. Corey I think articulated

25   why the differences are important here.  The Government's

1019

1    instruction is much longer.  It does follow O'Malley in part,

2    but I think it's important for the Court to be focused on the

3    fact that O'Malley's instruction addresses Hobbs Act

4    extortion.  And Hobbs Act extortion, along with conspiracy,

5    really affect the way courts have defined the interstate

6    commerce requirement.

7         In both extortion and conspiracy because of their

8    nature, their inchoate nature, their ongoing nature, unlike a

9    substantive offense which has a definite beginning or ending,

10   have allowed instructions to deal with more hypothetical

11   situations, more attenuated relationship to interstate

12   commerce.

13        And our position throughout here has been that the

14   Government must prove an essential element here to make this

15   from a regular state robbery, which we would have no argument

16   about if this was in state court, to coming into federal

17   court.  And, therefore, making it clear to the jury that there

18   was a minimal effect.

19        Now, we can't argue as much as we would like to with

20   the degree that has to be shown, but it has to be something

21   more than something totally in the air, something totally

22   hypothetical and abstract.  And that's why we have suggested

23   the language that we have.  Which I think is consistent with

24   the law in the Fourth Circuit and Hobbs Act law in general.

25        Mr. Mohamadi's version is similar, but you can see

1020

1    that it is reduced to saying that the Government must prove

2    beyond a reasonable doubt that Mr. Mohamadi's act of robbery

3    had a minimal effect on interstate commerce.

4              So, it takes out the additional language and it

5    makes clear that the impact, the effect has to be related to

6    the robbery.  Not simply that something happened, that someone

7    crossed a state line, but that the crime itself had an impact

8    on interstate commerce.

9              THE COURT:  Okay.

10             MR. NACHMANOFF:  So, that's an issue to be resolved.

11   I don't know if the Court wants to resolve these as we go or

12   simply have identified the sources of conflict.

13             THE COURT:  No, let's--  Mr. Walutes, do you want to

14   be heard or Mr. Ben'Ary on the commerce?

15             MR. WALUTES:  Your Honor, I generally appreciate

16   brevity, but I don't think that is entirely helpful to the

17   jury.  I think instructions are to guide the jury.

18             We think our instruction, frankly, is just a longer

19   version of the defendant's instruction.  We think it

20   appropriate.  We would ask it be given.

21             I have a problem, I actually don't have a copy of

22   the defense instruction with me, but I think when you bring it

23   down to a sentence, it is not helpful nor necessarily

24   accurate.

25             Your Honor, particularly the last paragraph of the

1021

1   Government's.  That's it.  I now have his, Your Honor.

2          All right.  Your Honor, I still go with my original

3   comments.

4          I do think the last paragraph of ours is necessary.

5   That is, that we must prove that commerce is being impacted.

6   It is not necessarily meant to impact commerce, but that we

7   have proved that it was impacted.

8          MR. NACHMANOFF:  Your Honor, just to be clear, the

9   first one, two, three paragraphs I think of the Government's

10  instruction are directly from O'Malley.

11         The fourth paragraph, the final paragraph is really

12  the one, frankly, that is most objectionable that I think

13  comes from another source that begins to sort of define in a

14  hypothetical way how interstate commerce could be affected.

15         So, again, we are seeking that the Court use our

16  instruction.  But certainly if the Court is going to rely on

17  the Government's instruction, we would ask that that final

18  paragraph be taken out because it's not consistent with

19  O'Malley.

20         And again, it gets into this issue of what might be

21  arguably appropriate in an extortion case or in a conspiracy

22  case, but is not in a substantive robbery case.

23         THE COURT:  Maybe I am--

24         MR. NACHMANOFF:  I am talking about Government's

25  page 37, the final paragraph.

1022

1    THE COURT:  Right, it is not necessary for the

2  Government to prove they actually intended to obstruct, delay

3  or affect commerce?

4    MR. NACHMANOFF:  Correct.

5    THE COURT:  Isn't that part of the O'Malley

6  instruction?

7    MR. NACHMANOFF:  I don't have the O'Malley

8  instruction here, but I have it on good authority, which is

9  Mr. Corey having compared all of these instructions to the

10  books, that that it is additional language.

11    I am not suggesting the Government did anything

12  wrong, I am sure it is the standard instruction that they use,

13  I just think in terms of the verbatim language the first

14  paragraphs are consistent with O'Malley.  I think that is an

15  additional paragraph.  If I am wrong, I certainly apologize.

16    THE COURT:  Well, I know this is the instruction

17  that I used in a trial I had last week.  So--

18    MR. WALUTES:  Your Honor, I have the O'Malley book

19  here.  It is actually--

20    MR. NACHMANOFF:  Does it have that final paragraph?

21    MR. WALUTES:  So, I am not sure what the good source

22  is, but the book suggests--  I sure hope I didn't miscite it,

23  Your Honor.  I know Ms. Hammerstrom did some of this.  But I

24  can't blame her.

25    THE COURT:  She is a labor lawyer now.

1023

1      MR. NACHMANOFF:  Well, it may be that we are simply

2  dealing with different editions, just like with the 924(c).

3  And I don't know if this is the same edition, if it is sooner

4  or later.

5      But I think the Court understands what the

6  difference here is.  And, you know, ultimately O'Malley is not

7  dispositive.  It may be something that the Court traditionally

8  looks at, but it is not necessarily the absolute correct

9  interpretation of the law.

10      THE COURT:  Well, you know where I am coming from.

11  I don't want to craft instructions that sway way or the other,

12  but instead instruct the jury on the case law.  And O'Malley's

13  instructions have been tried and tested and approved by the

14  Fourth Circuit.

15      And Mr. Mohamadi, as all counsel are aware, these

16  are instructions from which facts are argued.  And they are a

17  launching point, they aren't the end of the story.  And they

18  permit counsel from both sides to argue the facts of the case

19  from within the instructions.

20      THE DEFENDANT:  Your Honor, I object to those

21  instructions, it is misleading.  I am giving clear case law

22  with direct instruction to the jury.

23      THE COURT:  I understand.  Your counsel is arguing

24  for you.

25      THE DEFENDANT:  How much more are the cards going to

1024

1     be stacked against me?  Can I get something fair?

2               THE COURT:  Okay, have a seat.

3               THE DEFENDANT:  Man, this is crazy, man.

4               THE COURT:  All right.  I will look at the

5     interstate commerce again with --

6               THE DEFENDANT:  What's the point of this trial?

7               THE COURT:  -- the cases you've cited.

8               MR. NACHMANOFF:  Your Honor, moving forward on a

9     related point.  The Government has a proposed jury instruction

10    at their page 39, it is the definition of commerce.  We don't

11    have a similar instruction.  However, we would object to the

12    definition that they have proposed.  Not so much the language

13    regarding commerce that comes straight from the statute--

14    Although if it's complete, we don't have an objection.  If

15    it's partial, I think we do.

16              It is the final couple of sentences that I think are

17    objectionable and are not necessary.  For the Court to

18    instruct that the business need not be lawful and that somehow

19    prostitution is like drug dealing.  First of all we would, of

20    course, object vociferously to the injection of the analogy to

21    drug dealing.

22              We have worked heard to keep any reference to other

23    crimes that are not charged out of the case.  And, of course,

24    I understand the Williams case and the Government's reliance

25    on the fact that drug dealing has been recognized as involving

1025

1 interstate commerce.  But we, as you know, have a view that

2 prostitution is different, number one.

3         And number two, that an analogy or illustration for

4 the jury would be inappropriate.

5         So, what we would ask is that the Court include the

6 definition of commerce from the statute in its full and

7 accurate form, and delete the final two sentences, and that

8 would resolve our objections.

9         THE COURT:  Mr. Walutes.

10         MR. WALUTES:  Your Honor, actually I didn't

11 appreciate the defense objection, but I believe that the

12 second-to-last sentence by itself is fine.  I don't see

13 anything wrong with that.

14         I actually, Your Honor, given that we have purged

15 the word "drug dealing" from this trial as it relates to the

16 defendant, I would suggest to the Court, the last sentence

17 just be, drug dealing as an example can be commerce.  And

18 don't use, don't have this Court--  Maybe the Court as already

19 decided.

20         But I agree the prostitution should come out.  My

21 only suggestion is that the Court--  I mean, the Fourth

22 Circuit in <u>Williams</u> has clearly said that drug dealing can

23 constitute commerce.  And so--

24         THE DEFENDANT:  It's up to the jury.

25         MR. WALUTES:  Your Honor, that would be my

1026

1    suggestion, is that prostitution be stricken, and that drug

2    dealing, for example, could be commerce.

3            THE COURT:  All right.  I am going to strike the

4    last sentence in its entirety.  But I think the second-to-last

5    sentence, that the law does not require that commerce be

6    lawful, is a correct statement of Fourth Circuit precedent.

7    And I don't recall that you have raised the issue as to

8    whether prostitution could be, could constitute commerce.

9            Have you?  I mean, maybe in the beginning of the

10   case you argued it and I just have forgotten it, but I didn't

11   think that was an argument that you had made previously.

12           MR. NACHMANOFF:  Well, I mean, certainly I think the

13   activity that Ms. Riley was engaged in we think is relevant to

14   arguments regarding the essential element of interstate

15   commerce.

16           You know, whether or not someone who is engaged in

17   prostitution is engaged in a business is I guess a different

18   issue.  But we can note our objection and certainly understand

19   the Court's viewpoint.

20           THE COURT:  Okay.  All right.  Your exception is

21   noted.  All right.

22           MR. NACHMANOFF:  Page 48 of the Government's

23   proposed instructions refers to a definition of the crime of

24   violence.  This is not a standard instruction and this relates

25   to 924(c).

1027

1      We would certainly object, if the Court is going to

2  include a definition of the crime of violence at all to the

3  final paragraph, the bottom paragraph, which essentially

4  directs the jury to make a finding of fact.

5      If the Court is going to define what a crime of

6  violence is, I think it is necessary for the jury to conclude

7  that the alleged robberies are crimes of violence.

8      THE COURT:  All right.  Mr. Walutes.

9      MR. WALUTES:  Your Honor, I defer to the Court on

10  that.  I don't have a problem if the Court wants to delete the

11  last sentence.

12      THE COURT:  All right, I am going to delete the last

13  sentence.

14      MR. NACHMANOFF:  Likewise, I apologize, Your Honor,

15  going back one page, the Government's use and carry a firearm

16  defined, that is page 47 of the Government's instructions, the

17  first two paragraphs I think are O'Malley, although I am

18  hesitant now to assert what's in O'Malley and what isn't.

19      The final paragraph is what we object to here.

20  Again, it essentially is a way of illustrating or defining for

21  the jury what using or displaying the firearm means.

22      I think that goes beyond what the jury needs to hear

23  from the Court, especially given the fact that in 924(c), use,

24  carrying, brandishing are terms that, you know, are not

25  difficult for the jury to understand.

1028

1        So, what we would ask the Court to do, if it is

2   going to include this at all, and I am not sure it is

3   necessary, is to delete the final paragraph.

4        THE COURT:  Mr. Walutes, do you want to be heard?

5        MR. WALUTES:  Your Honor, that paragraph actually

6   comes out of the statute.  And Judge Luttig approved it for

7   use in a trial.

8        I, frankly, given, obviously, the use here is not an

9   indirect use, the Government's argument in this case is that

10  it is being displayed and used actively.

11        So, I do agree with Mr. Nachmanoff to the extent

12  that it is probably not needed here.  So, if the Court is not

13  inclined to give the last paragraph, Your Honor, that's fine.

14        THE COURT:  I will delete the last paragraph.

15        MR. NACHMANOFF:  Thank you, Your Honor.  Page 59 of

16  the Government's instructions deals with the intent element

17  for solicitation to commit murder for hire.

18        We've in some ways partially resolved this because

19  the Government agreed to include the strongly corroborates

20  language in the essential elements of the offense.

21        But to the extent the Government still wants to keep

22  this in, we would strongly object.  This, again, is another

23  instruction that is not a standard instruction.  And it refers

24  to a Senate report for authority, citing a case that is citing

25  the Senate report.  And it really, again, is trying to define

1   for the jury an illustration of what strongly corroborative of

2   intent might mean, and giving a specific example that a

3   promised payment or some other benefit would meet that

4   requirement.

5          And we would object strongly to that in that the

6   Court is not going to give an exhaustive list, there are no

7   other examples it is giving.  I think it would give undue

8   influence to those particular alleged acts.

9          THE COURT:  Mr. Walutes.

10         MR. WALUTES:  Your Honor--

11         THE COURT:  I mean, this is just pure argument,

12  isn't it?

13         MR. WALUTES:  I don't have any problem.  The thing,

14  Your Honor, there is actually a list in that case about the

15  length of time the matter is discussed and such.  Some Courts

16  prefer to give examples, some don't.  I understand the Court's

17  thinking on this issue.

18         THE COURT:  I will let you argue it.

19         MR. NACHMANOFF:  Thank you, Your Honor.  Page 64 of

20  the Government's proposed instructions.  Again, it sort of

21  falls in the same category.

22         And in addition, the second paragraph really I think

23  refers to something that the Government is not arguing here.

24  Here the allegation is that the pecuniary value is in fact

25  either money or an interest in the prostitution business.

1030

 1          This is not an extortion case where-- I'm sorry, I

 2   am mixing up my instructions.

 3          My objection is to the second paragraph, but not for

 4   that reason.  It is the same objection, which is giving a

 5   specific example about what pecuniary value is.  It is not

 6   appropriate, is not necessary.  Certainly the Government is

 7   going to argue that the interest in the prostitution business

 8   and the cash meet the definition of pecuniary value.  I think

 9   addressing it specifically is essentially, you know,

10   potentially taking that away from the jury.

11          MR. WALUTES:  I understand the Court's ruling on

12   that.

13          THE COURT:  Yeah, I will delete the second paragraph

14   for the reasons I have already stated.

15          MR. NACHMANOFF:  Thank you.  I am getting somewhat

16   confused here.

17          Defendant's proposed instruction 44, this is the

18   essential elements of Count 9.  And this relates back to the

19   witness tampering with regard to the state court that was

20   argued in the Rule 29.

21          The Government's proposed instruction is at page 67,

22   and those are substantially different instructions.  And I

23   think, I would ask the Court to look at both of them and

24   consider the arguments.

25          I would point out to the Court that there are some

1   commonalities that come from I think the same elements that

2   are not in dispute.  The final paragraph that we add we think

3   is the most consistent statement of the Fourth Circuit law, it

4   follows <u>Perry</u> and it follows <u>Harris</u>.

5          The Government has relied on a Third Circuit model

6   jury instruction and a Third Circuit case and a Fourth Circuit

7   case.  They also cite <u>Perry</u>.

8          The real question here is what the Government needs

9   to show with regard to information getting to a federal law

10  enforcement officer.  And we think that we state it accurately

11  and more appropriately.

12          I think what we don't want is for the jury to be

13  able to conclude that regardless of what Ms. Inge did and

14  regardless of what Mr. Mohamadi might have intended under the

15  Government's theory, that in some hypothetical world this

16  could create federal jurisdiction.

17          This is very different from Count 10 where the

18  argument is he interfered with testimony before the federal

19  grand jury.  And while certainly the fact that it was a state

20  court proceeding does not automatically make it ineligible for

21  federal prosecution, there is a limitation here.  And it is

22  important I think that the jury be instructed on that

23  completely.

24          So, again, I am not sure that's one the Court wants

25  to think about rather than resolve at this instant.

1032

1    THE COURT:  I will.  But, Mr. Walutes, is there

2  anything you wanted to add to the commentary earlier this

3  afternoon?

4    MR. WALUTES:  Your Honor, I think Perry definitively

5  answers this.  I actually think Perry is quite powerful and

6  directly on point.  I mean, it is Montgomery County police

7  officers that they are talking to.  There is no federal police

8  officer, no federal agent.  Perry doesn't see that as posing

9  any problem whatsoever in the enforcement of the statute.

10    I would note that we caught a typo on our proposed

11  instruction.  It should be on element two relating to the

12  commission or possible commission of a federal offense.  I

13  don't know why I missed that earlier, Your Honor, but I just

14  had a typo there.  I don't want to make my typos bleed into

15  the Court's typos.

16    THE COURT:  All right, I will continue to look at

17  that one.

18    MR. NACHMANOFF:  We really are, Your Honor, almost

19  at the end here of the issues.  And I appreciate the Court's

20  patience.

21    THE COURT:  That's all right.

22    MR. NACHMANOFF:  Page 68 of the Government's

23  instructions is their definition of corruptly persuade.  And

24  this is an instruction that they have crafted.  It's not a

25  standard instruction.

1033

1      This is--  Again, I think this falls under the

2  category of giving more information than is appropriate with

3  regard to these words from the statute.  It suggests that

4  improper purpose is sufficient.  And I am not sure that it is

5  appropriate for the Court to be giving that level of

6  information to the jury when the statute is quite specific on

7  what's required.

8      So, we would object to that definition of corruptly

9  persuade.

10      THE COURT:  Mr. Walutes.

11      MR. WALUTES:  Your Honor, I am going to the defer to

12  the Court on this one.  Again, if the Court thinks there is

13  enough information and the definition is not necessary, I will

14  defer to the Court.

15      THE COURT:  I think so.  I will delete that.

16      MR. NACHMANOFF:  The final--  Well, I don't want to

17  say it before I am sure, but the final one I have here is

18  Government's page 74, definition of official proceeding.

19      And I could be wrong, but I think there are three

20  definitions of official proceeding included by the Government,

21  one on the surrounding pages.

22      The only one we object to is this one on page 74.

23  And the reason for that is, and maybe it a misreading on our

24  part, with regard to Count 9, there is no issue with regard to

25  a federal official proceeding.

1034

1    In other words, official proceeding with regard to

2  the federal--  Saying that the federal grand jury is an

3  official proceeding is not in controversy, of course.  We

4  acknowledge that with regard to Count 10.

5    So, I guess the question is does page 74 in some way

6  create some confusion that the state court proceeding, of

7  course, is not an official proceeding for purposes of being a

8  federal official proceeding.

9    Maybe I've misunderstood this, but my suggestion

10  would be in order to eliminate confusion, the other

11  definitions of official proceeding are probably more than

12  sufficient.  I suggest we take this one out.

13    THE COURT:  I see 73.  Where is the other one?

14    MR. NACHMANOFF:  74 is the one we are objecting to.

15  I think it is 73, 74 and 75 potentially.

16    THE COURT:  And 75.

17    MR. NACHMANOFF:  And so, 73 and 74 we have no

18  problem with.

19    THE COURT:  Okay.  So, 75 includes the official

20  proceeding means a proceeding before a judge or court in the

21  United States, including a federal grand jury?

22    MR. NACHMANOFF:  Right.

23    THE COURT:  Okay.

24    MR. NACHMANOFF:  And I don't know, it may be that

25  that was just extra information.

1035

1        THE COURT:  Okay.  Well, Mr. O'Malley--  Mr.

2   O'Malley, yeah.  Mr. Walutes, do you object to removing 74?

3        MR. WALUTES:  Your Honor, I think that comes from

4   O'Malley.

5        THE COURT:  Yeah, but does it fit?  I mean, the

6   official proceeding just goes to Count 10, right?  Or do you

7   want to use this--  What are you proposing that this

8   instruction goes to?

9        MR. WALUTES:  I am sorry, Your Honor, perhaps the

10  hour has dulled my brain.

11        Your Honor, official proceeding is in count--  The

12  Court's indulgence for one second, Your Honor.

13        That's fine, Your Honor, I am with the Court.

14        MR. NACHMANOFF:  I think that's the end of the

15  disputes.  The only thing I have left is I want to make sure

16  that there are a number of defense instructions that we have

17  offered that the Government I don't think has objected to, and

18  I want to make sure that the Court will include those if the

19  Court thinks it is appropriate, or give us a chance to discuss

20  it if necessary.

21        What I could do is give the proposed instruction

22  number simply as a list if the Court wants to check those

23  against what the Court will eventually be including as it puts

24  together the final instructions.  Most of them have to do with

25  witness issues.

1036

1          In other words, immunized witnesses or bias and

2   hostility, things that are appropriate to the defense, but the

3   Government would generally not submit their own instructions,

4   nor would they I think have an objection.

5          THE COURT:  Okay, that's fine, go ahead that way.

6          MR. NACHMANOFF:  Those include defense proposed

7   instructions 10.  11.  12, although I think that is statutory

8   immunity of a Government witness.  And I think that everything

9   that has been offered has been informal immunity consistent

10  with the statute, but not actual statutory immunity.  So, that

11  may not be appropriate.

12          13.  14, which deals with informal immunity.  15.

13  16.  19, but that is going to be relevant only after the

14  defendant decides whether to testify and whether or not the

15  Court permits impeachment by prior conviction, which is

16  another housekeeping issue I would like to address perhaps

17  before we go today.

18          404(b) is proposed defendant's instruction number

19  23.  Number 45.  Number 48.  Number 51.

20          THE COURT:  Hold on, hold on, hold on.

21          MR. NACHMANOFF:  Sorry.

22          THE COURT:  So, when you go from 16 to 23, it is

23  because the Government has offered, or at least 18 through 22,

24  is that right?  Or do you want--

25          MR. NACHMANOFF:  Correct.  These are all

1    instructions that are, for which there is no analog.

2              THE COURT:  Right.  Okay.  All right.  So, 23.  And

3    then tell me the next one.

4              MR. NACHMANOFF:  45.  48.

5              THE COURT:  Law enforcement officer defined.  Okay.

6    I have never given, I have never seen that one, but all right.

7              MR. NACHMANOFF:  Again, that is specific to Count 9.

8    48.  51.

9              THE COURT:  Don't we already have evidence of prior

10   conviction, impeachment by a prior conviction from--

11             MR. NACHMANOFF:  If we do, if it is duplicative, I

12   apologize, Your Honor.

13             THE COURT:  No, that's all right.  Impeachment by--

14   Okay, we don't have the general one perhaps.

15             All right.  Go ahead.

16             MR. NACHMANOFF:  I know there is one more in here,

17   27.  I am sorry to go out of order.

18             THE COURT:  Venue?

19             MR. NACHMANOFF:  Yes, Your Honor.  And the final two

20   are 52 and 53.

21             MR. WALUTES:  Your Honor, I strongly object to 52,

22   it is simply an inaccurate statement of the law.  And the

23   Court has already ruled.

24             THE COURT:  These concern the early conversations

25   between Mr. Bryan and Mr. Mohamadi that weren't Government

1038

1    sponsored and Mr. Bryan was not acting as an agent of the

2    Government at the time concerning the robbery?

3              MR. NACHMANOFF:  That's right, Your Honor.  And it

4    relates to the larger issue.  And Mr. Mohamadi raised this

5    earlier when he was arguing about the Sixth Amendment issues.

6    And I was not here for that argument, though I certainly

7    participated in the briefing and the legal issues.

8              This relates to the Moulton case and the idea that

9    we have proposed and this Court rejected earlier in the

10   pretrial motion that although it may be appropriate if the

11   Court finds there is no Sixth Amendment violation with regard

12   to collecting new information about an uncharged crime, for

13   example a murder for hire, that it is inappropriate to

14   introduce that evidence and make an argument as to

15   consciousness of guilt as to the underlying conduct for which

16   the person was represented.

17             So, in other words, it is not simply the Sixth

18   Amendment violation that the Government intentionally tried to

19   collect information about the underlying charge knowing that

20   the person was represented by counsel.  It is the separate but

21   related issue that even if you are collecting information

22   about a separate crime, that arguing that that evidence--  In

23   other words, because he tried to have Mr. Haile killed, you

24   can conclude that that is consciousness of guilt, he must be

25   guilty of the robbery.  That's what we believe is improper.

1039

1     If the Court is not going to give that instruction,

2  we simply want that objection preserved.

3     THE COURT:  Okay.

4     MR. NACHMANOFF:  Thank you.

5     THE COURT:  All right.  What objections do you have

6  of these that have been offered?

7     MR. WALUTES:  Your Honor, I don't think, frankly,

8  the Court needs to give five instructions on immunity.  I

9  think the Court can find one, use immunity.

10     I see here, seriously, it's asked for six different

11  ways.  I think one is sufficient.  I do think one is

12  necessary, but I think one is sufficient, Your Honor.

13     I do object as to 52, I think that's just plain

14  wrong.  I mean, Harvey and the Fourth Circuit practice is that

15  if the defendant does things trying to eliminate a witness,

16  trying to escape, that those are things that the jury should

17  take into account because innocent people don't do these

18  things.

19     The Government hasn't violated the Sixth Amendment.

20  Moulton and Lentz are completely different cases where there

21  is a person who had prior law enforcement.  Your Honor, if

22  anything has been proven in this trial, it is that these three

23  inmates had nothing prior.

24     As to the definition of a law enforcement officer,

25  Your Honor, I have concede that I haven't look at it recently.

1040

1  So, I will just defer to the Court's discretion on whether

2  that's appropriate.

3          I think the point here is <u>Perry</u> says it doesn't have

4  to be a federal law enforcement officer.  The important focus

5  is not on who you are talking to, but whether the charge could

6  be a federal charge.

7          Your Honor, I think those are the ones--  And venue,

8  Your Honor, I guess I also have problem with that as well.

9          Your Honor, I also want to bring one other matter up

10 to the Court's attention, and this is a housekeeping matter.

11 And maybe the Court wants me to sit down and wait for the time

12 for that.

13         THE COURT:  No.  What's your objection to the venue?

14 I am looking for it now.  What number is venue?

15         MR. NACHMANOFF:  I think it was 27, Your Honor,

16 proposed 27.

17         THE COURT:  27.

18         MR. NACHMANOFF:  That's one, Your Honor, we think is

19 important.  It clearly is a jury issue.  I think the case law

20 is clear that the jury must make a finding as to venue.  It is

21 a simple statement of the law.  We would strongly urge the

22 Court to give that instruction.

23         THE COURT:  Okay.

24         MR. WALUTES:  Your Honor, I guess my problem is we

25 don't define what preponderance of the evidence is.  We don't

1   give them any guidance on this.

2          Your Honor, we will defer to however the Court

3   wishes to handle this.  We are not, obviously, running from

4   it.  We believe that there were critical elements occurring in

5   this Eastern District of Virginia, and we have no problem

6   arguing that to this jury.

7          But I am worried that if we start giving them

8   different levels of burdens of proof, they are asking for the

9   preponderance, but the Court is also telling them that the

10  defendant must be convicted beyond a reasonable doubt.

11         I defer to the Court as to how to blend the two.

12         THE COURT:  Well, particularly because each of these

13  counts requires demonstration that it occurred in the Eastern

14  District of Virginia.  And the jury is going to be told that

15  they have to prove each and every one of these elements of the

16  offense beyond a reasonable doubt.

17         So, I will look at it, but I am not persuaded that

18  it is a necessary instruction and may in fact be confusing.

19         All right.  What else do you have?

20         MR. WALUTES:  Your Honor, the point I was going to

21  raise is that because of the 403 and sort of the evolving

22  nature of the 403 objections as this case was tried as far as

23  the Government's case in chief, many of the exhibits that are

24  actually entered into evidence contain more information than

25  what was published and I think what the Court meant to have

1042

1   available to the jury.

2          There are two ways to handle that.  One is I can try

3   to trim these exhibits in the next 24 hours.

4          The alternative is that the Court during the

5   publishing of exhibits or if the jury should want to see one,

6   would then allow the jury to come back into the courtroom and

7   see it in that manner.  Obviously, they couldn't have the

8   transcripts back in the jury room because they are not

9   admitted evidence.

10          And I think they are likely to ask for the

11   transcripts should they want to, although I don't know.

12          But my only point, Your Honor, is I want to make

13   clear that in the Government's exhibit books we have in often

14   instances the entire tape.  And I am not sure that the Court

15   needs to have that entered into evidence in every instance.

16          I know some they are not objected to, but in a

17   couple of them, for instance, the entire number of hours that

18   the body wire is worn by Mr. Bryan, although I think the

19   entire thing should be in, I am not sure the Court agrees with

20   that analysis.

21          I do think as a compromise, Your Honor, that the

22   entire video could be allowed in because there is no audio to

23   it.

24          And my real problem there, Your Honor, I don't know,

25   because people were being asked to consume or absorb the

1   transcript at the same time they were hearing the thing

2   published, but if you actually had an opportunity to watch the

3   clips, at least on the one on November 17, there is no visual

4   at all, for whatever reason it is just black screen.

5              THE COURT:  Neither of the videos were--

6              MR. WALUTES:  Particularly useful, Your Honor.

7              THE COURT:  Right.

8              MR. WALUTES:  But if you saw the entire video, you

9   would actually see the person moving.

10             So, my suggestion, Your Honor, would be that at

11  least the Court be allow the video portion of the wire to be

12  admitted in its entirety, but only the audible portion for the

13  portions, if the Court is inclined not to allow the entire

14  audio because of its earlier 403 objections and concerns--

15             THE COURT:  I thought you had carved out the

16  portions of the transcript, of the conversations that you

17  played.  I thought they were carved out on a separate disk and

18  played in their entirety.  I guess I didn't realize that.

19             MR. WALUTES:  I thought I had as well, Your Honor,

20  but apparently there was some page clippings that even

21  narrowed that further than what I had.  And my hope, if that's

22  the preference of the Court, I will try to make our thinking

23  consistent--

24             THE COURT:  I really think we have to avoid the

25  prejudice that I have found for those other portions, they are

1044

1    highly inflammatory.  And I think you need to make it

2    consistent with what I have done.

3              MR. WALUTES:  And the only other point, currently it

4    affects the way that the evidence is absorbed, is they could

5    be made into a format that a computer, a laptop could play in

6    a jury room, for instance.  And then we could control the

7    clips so that it is only what is reflected in the Court that

8    was played.

9              But apparently that impacts the quality of the

10   audio.

11             THE COURT:  Of the audio?

12             MR. WALUTES:  That's what I am told.  I honestly,

13   Your Honor, haven't had the time to sit down with each of

14   these clips personally, I can't as an officer of the court

15   tell the Court, but I am being told that that impacts it.

16             I am told, however, that we could make the clips

17   down to just down what was being played in the courtroom.  And

18   then, obviously, if the courtroom system is used, it will be

19   of the same exact nature that was heard and published during

20   the trial.

21             Your Honor, I don't ask the Court to resolve it.  I

22   just want to make sure the Court sees the problem because I am

23   not having anybody touch those evidence books unless we are

24   all in entire agreement.

25             THE COURT:  You need to redact it down to what was

1  published to the jury and make sure that there isn't the other

2  excluded testimony on there that they are going to--

3          MR. WALUTES:  Understood, Your Honor.

4          THE COURT:  I don't know whether they are going to

5  sit and listen to those tapes or not or whether having the

6  headphones on gave them a sufficient opportunity to hear the

7  tapes, or that they are not.  You don't know what they are

8  going to do.  But I certainly don't want excluded testimony

9  sent back to them.

10         MR. WALUTES:  Understood, Your Honor.

11         THE COURT:  All right, thank you.

12         MR. NACHMANOFF:  Thank you, Your Honor.

13         And just sort of along those lines on housekeeping

14  matters maybe to address them now so we get it done.

15         We would certainly object to anything more than what

16  was published to the jury as the Court has just ruled.

17         We would also, and I think the Court would expect

18  this, make an objection to the transcripts going back.  The

19  transcripts we understood as demonstrative.

20         THE COURT:  They are not going back immediately.

21  And we will consider that if and when we need to consider it.

22  But they are not going to be sent back.

23         MR. NACHMANOFF:  Very good.  Let me make a final

24  objection.  The Government made an effort and had introduced

25  the enhanced tapes.

1046

1    Our view is under the best evidence rule what should

2    go back is the best evidence, is the original evidence, which

3    is the tapes, the recordings themselves.

4    And so, especially since it will draw undue

5    attention, I think, just as the transcripts would in the jury

6    room, having them, using them as a demonstrative aid is one

7    strategic choice the Government could make.  Having them go

8    back as evidence along with the original CDs we object to on

9    those grounds.

10    MR. WALUTES:  Your Honor, they have actually been

11    admitted.  So, I don't see how the Government after resting

12    could have some evidence unadmitted.

13    Second, I would notice the witnesses said they were

14    of equal quality, some had strengths, some had weaknesses.

15    The Government elected to only publish on one version.  That

16    didn't mean the Government didn't believe the others had equal

17    value.

18    THE COURT:  I am not troubled by the enhanced tapes

19    because what the witness testified to was that there had been,

20    the background noise had been removed, but that the voices had

21    not.  And so, I don't have a problem with those.  Your

22    exception is noted.

23    MR. NACHMANOFF:  Thank you, Your Honor.

24    Two other matters to deal with briefly.  One is, and

25    again this can be dealt with later, but it is of a similar

1047

1    nature.  We would object to a copy of the indictment going

2    back to the jury.  We always do.  And feel that, of course,

3    the indictment is not evidence.  And that by sending it back

4    there, it gives the jury an impression that because these

5    charges have been returned by the grand jury and written down,

6    they have some greater significance than the Court's

7    instructions.

8            If the Court disagrees and sends it back, we would,

9    of course, want the indictment redacted so that we dealt with

10   the numbering issue.

11           THE COURT:  All right.  I am not going to send the

12   indictment back in this case.  We are condensing it.

13           The overt acts section is a little bit inconsistent

14   with the evidence that went in, but not--  It doesn't track it

15   completely.

16           And also, we have got all the counts individually

17   identified.  And we will turn 6 through 10 into 5 through 9

18   for purposes of the jury's consideration.

19           MR. NACHMANOFF:  And I presume the verdict form as

20   well will have to reflect that.

21           THE COURT:  Yes.

22           MR. NACHMANOFF:  Two other issues.  One, Mr.

23   Mohamadi asked me to raise, which is just revisiting very

24   quickly Government's proposed 37, which is the Hobbs Act

25   affects commerce definition.  And he wants to ensure that his

1048

1    objection, vociferous objection to the Government's version is

2    preserved.

3             But he would note, and I agree entirely, that Count

4    1 as was noted in the Rule 29 is charged as an attempt.  And

5    although the Government addressed the fact that the

6    substantive offense was addressed higher up in the indictment,

7    I would ask the Court to look at that.

8             If the Court concludes it's charged as an attempt,

9    as we think it is, the instruction needs to conform to that so

10   that everything is consistent.  That is a charging decision

11   the Government made.  Why they made it, I don't know.  Clearly

12   this is a case where they have proved from their view a

13   completed robbery, but that word was inserted.  And I think

14   they have to live with what the grand jury was put on notice

15   of.

16            The final issue which I think is important for Mr.

17   Mohamadi to know is what the Court intends to rule with regard

18   to the Government's ability to impeach him with his prior

19   convictions should he take the stand.

20            The Court may be aware that he has prior felony

21   convictions.  All five of those felony convictions fall

22   outside of the ten-year time period of 609(b).

23            THE COURT:  In what respect?  The charges, the

24   convictions, or the time that he spent incarcerated.

25            MR. NACHMANOFF:  Let me separate them out.  They

1   were all, they were consolidated and all resolved in November

2   of 1998, please interrupt me--  Sentenced in November, right,

3   of 1998.  Which falls outside the ten-year period.

4           With regard to four of them, all of the time was

5   suspended.  And so, none of the ten-year time period for being

6   incarcerated falls within that ten-year period.

7           For one of them he was sentenced--  He was 16 at the

8   time these offenses occurred.  It was certified and he was

9   sentenced as an adult.  But the sentence imposed was a

10  juvenile sentence, commitment up to the age of 21.

11          So, for that felony that was imposed in 1998, he

12  remained incarcerated through 2002, which would fall within

13  the ten-year period.  That offense is an armed robbery.  And

14  we would argue that it is so prejudicial because of its

15  similarity to these offenses that the Court should exclude it.

16  And there is some case law to support that, including the

17  Wallace case.

18          With regard to the other four, we think they should

19  be excluded.  In other words, we think they should all be

20  excluded based on the fact that its highly prejudicial that

21  such a similar offense was committed.

22          With regard to other four, they fall outside the ten

23  years.  Although there were some probation violations, those

24  probation violations didn't bear any connection to the

25  underlying offense.  In other words, they weren't new robbery

1050

1   convictions.

2           And there is case law from the Ninth Circuit that

3   has been adopted in the Fourth Circuit that suggests not that

4   if there is a revocation, it doesn't toll the time, the Court

5   has recognized that, but that it is not that any revocation

6   tolls the time, it has to be a revocation that relates

7   essentially to the underlying conduct.

8           And so, here that's not the case.

9           So, we think there is a good reason to exclude all

10  five and not permit the Government to impeach Mr. Mohamadi

11  should he take the stand based on his prior convictions.

12          If the Court disagrees, we would, of course, want to

13  make an argument as to how that impeachment could take place.

14  But the first hurdle is whether or not the Court will allow it

15  at all.

16          THE COURT:  All right.  Mr. Walutes.

17          MR. WALUTES:  Your Honor, it is the Government's

18  belief the defendant is still serving, if I remember

19  correctly, he is arguing whether he has had full credit for

20  what he has served, but he has been, he is serving a sentence

21  related to that charge.  And he may still be--

22          THE COURT:  For a violation of probation?

23          MR. WALUTES:  Yes, Your Honor.  And to be clear, the

24  Government doesn't seek the Court's permission to use five

25  felony convictions.  The Government seeks the Court's

1051

1  permission to use one robbery conviction.  And we find that to

2  be entirely appropriate as to the man's veracity for

3  truthfulness.

4          Your Honor, he has been convicted, as Mr. Nachmanoff

5  just noted, as an adult.  Regardless of the nature of the

6  sentence, he was convicted as an adult of robbery.  And we

7  think it appropriate impeachment, particularly since he is

8  still or at least very recently been serving a sentence for

9  that, although albeit on a revocation.

10         But we don't seek all five, Your Honor.  Frankly, I

11 see some merit to that.  I think one is all the Government

12 needs to make the point we seek to make, which is that he

13 doesn't come before this jury without a prior serious adult

14 conviction.

15         THE COURT:  All right.

16         MR. NACHMANOFF:  Your Honor, just to be clear, that

17 revocation for which he was serving was not related to new

18 conduct involving robbery or anything close to it.  It was for

19 technical violations, it was for other minor convictions.

20         So, there is an argument that legally it's too

21 attenuated, they shouldn't come in.

22         We would object to them all coming in.  If the Court

23 does conclude that impeachment is appropriate, we would

24 certainly want the Court to limit it to the single question of

25 are you convicted of a felony.

1052

1    As soon as that felony is characterized, we run into

2  a significant problem of unfair prejudice based on the

3  similarity of the offense.  And so, we would want that out.

4    THE COURT:  What do you intend to ask him?  Whether

5  he has been convicted of a felony offense or whether he has

6  been convicted--  You believe you are entitled to ask him

7  whether--

8    MR. WALUTES:  He was convicted of robbery, Your

9  Honor.  I certainly believe that we are entitled to ask him

10 lying, cheating and stealing as I understand the impeachment

11 authority.

12   THE COURT:  I think it's on all fours with the law

13 that Mr. Mohamadi would be cross-examined on not only the

14 felony conviction, but also the nature of the felony given

15 that it is an armed robbery.  I will do some more research

16 tonight on it and look at it, but I think that's absolutely

17 central, Rule 609 impeachment by conviction of the crime.  But

18 I will continue to look at it.

19   Anything else?

20   MR. NACHMANOFF:  I don't think so, Your Honor.

21 Thank you for your patience.

22   THE COURT:  All right.  Mr. Mohamadi, you understand

23 that you have a right not to testify.  And that if you don't

24 testify, for instance, this evidence of a prior conviction for

25 armed robbery doesn't come in, the jury doesn't consider it.

1053

1    The jury will be instructed that the burden, and as

2  I already have instructed them, the burden never changes.  The

3  burden is always on the Government to prove its case beyond a

4  reasonable doubt, and that your failure to testify can't be

5  used against you in consideration of your guilt for this

6  series of crimes.

7    And that if you waive your right to remain silent

8  and take the stand and testify, that you then can be impeached

9  not only by the prior conviction, but by other evidence of,

10 character evidence under Rule 608.

11   If you make statements denying that you are involved

12 in a prostitution ring or that you have instructed others to

13 be involved in prostitution, then you subject yourself to

14 cross-examination and the use perhaps of some of the evidence

15 I have excluded.  I am not--  You know, depending upon what

16 you.  But that's a possibility.

17   So, it could also, testifying could also have

18 ramifications as to whether the Government is allowed to get

19 into certain matters that I have--

20   THE DEFENDANT:  So, I am being extorted?

21   THE COURT:  I am sorry?

22   THE DEFENDANT:  So, I am being extorted.

23   THE COURT:  No, no.

24   THE DEFENDANT:  I am being threatened, saying if I

25 get on the stand I am being to be bombarded with ever more

1054

1   prejudicial stuff.

2          THE COURT:  I am trying to tell you how the law

3   operates.

4          THE DEFENDANT:  This Court hasn't followed the law.

5          THE COURT:  And you need to be advised of that, and

6   I am required to advise you.

7          THE DEFENDANT:  I am being prosecuted by him and

8   you.  I mean, how is this fair?  This isn't following the law.

9          THE COURT:  I am not going to change your mind about

10  that.

11         THE DEFENDANT:  I mean, I have got to testify.

12         THE COURT:  I don't agree with you.

13         THE DEFENDANT:  I have no choice.

14         THE COURT:  But I am not going to change your mind.

15  What I want you to do is to discuss this matter fully with

16  your counsel, who will--  Have you already discussed whether

17  you are going to testify or not and what the legal

18  ramifications of them are?

19         THE DEFENDANT:  No, sir.

20         THE COURT:  All right.  Well, you are going to

21  discuss that--

22         THE DEFENDANT:  I mean, yes, sir, he did.  I am

23  sorry, I apologize, he did explain the ramifications, he wrote

24  me a letter.  I am sorry.

25         THE COURT:  Okay.  All right.  Well, consider it

1    until--  Decision time will be 10 o'clock tomorrow morning.  I

2    will ask whether you are going to testify or not.  But I want

3    you to understand the parameters of the cross-examination and

4    what might be admitted that wouldn't be admitted otherwise.

5    All right.

6              THE DEFENDANT:  Your Honor, I was really looking

7    forward to at least finding out if my motion for 609(b) was

8    going to get granted before I make that decision.  It would be

9    very helpful for me tonight to really make that decision.

10             THE COURT:  Well, I think you can count on me

11   allowing, because I think the law allows--  So, if I change my

12   mind, I will let you know, but I think you can count on --

13             THE DEFENDANT:  Don't hold my breath.

14             THE COURT:  -- being asked whether you have been

15   convicted of armed robbery.

16             THE DEFENDANT:  All right, I won't hold my breath.

17   Thank you, Your Honor.

18             THE COURT:  All right.  Anything else tonight then?

19             MR. NACHMANOFF:  No, thank you, Your Honor.

20             THE COURT:  All right.  Thank you, counsel.

21             Then we will put together a jury charge.  And the

22   substance of the agreements that you have reached will be

23   included.  I may pare down some of the instructions and may

24   use O'Malley versus Sand for some of the ones that you have

25   identified in the defendant's materials.

1056

1          We will get that to you tomorrow morning.  And how

2     long--  Well, all right, we will wait until tomorrow for that.

3          All right.  Have a good evening.

4          MR. NACHMANOFF:  Thank you.

5          NOTE:  The March 16, 2010 portion of the case is

6     concluded.

7     -------------------------------------------------
                       HEARING CONCLUDED

8

9

10

11

12

13

14

15

16

17          I certify that the foregoing is a true and

18     accurate transcription of my stenographic notes.

19

20

21                    /s/  Norman B. Linnell

22          Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25