```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
                     Alexandria Division




-----------------------------:
                             :
UNITED STATES OF AMERICA     :
                             :
                             :
    -vs-                     :      Case No. 1:09-cr-179
                             :
                             :
MIRWAIS MOHAMADI,            :
              Defendant.     :
                             :
-----------------------------:


                                    V O L U M E   5 of 5


                     TRIAL   TRANSCRIPT


                 March 10-11 & 15-18, 2010


              Before:  Liam O'Grady, Judge


                      And a Jury
```

APPEARANCES:

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

1058

INDEX

WITNESS                              EXAMINATION        PAGE


MIRWAIS MOHAMADI
                                     DIRECT             1071
                                     CROSS              1098
                                     REDIRECT           1147


ROBERT HICKMAN
                                     DIRECT             1150
                                     CROSS              1151


NADIA JALLAD
                                     DIRECT             1152
                                     CROSS              1155
                                     REDIRECT           1157

1059

1          NOTE:  The March 17, 2010 portion of the case begins

2    in the absence of the jury as follows:

3    JURY OUT

4          THE COURT:  All right, good morning to you all.  I

5    see all counsel present.

6          Good morning, Mr. Mohamadi.

7          You got my message last night about the 609 issue?

8          MR. NACHMANOFF:  Yes, Your Honor.  The message that

9    we got was not a final resolution, but a suggestion that the

10   Court perhaps was reconsidering whether or not anything more

11   than simply the fact of a prior felony conviction would be

12   appropriate.

13         THE COURT:  All right.  And I didn't want to

14   preclude the Government from making any argument that you

15   wanted to make, but that's my reading of the cases.

16         MR. WALUTES:  Your Honor, I appreciate the notice.

17   Frankly, the Government can conform to the Court's

18   instruction.

19         I would note, I mean, he is serving until he is 21.

20   He is 28 today.  So, he isn't actually released from the

21   charges until--  So, the ten years doesn't apply at all.

22         But I understand the Court's thinking, and I am fine

23   in conforming to it, Your Honor.

24         THE COURT:  All right.  I think under the United

25   States versus Sanders, Fourth Circuit case, although it is

1060

1    dated, it has been followed pretty closely.  And because of

2    the fact that he was convicted of armed robbery and then now

3    stands charged with two counts of armed robbery, that the

4    potential prejudice outweighs the probative value.

5          I do think that when you look at the balancing test,

6    that it would be unduly prejudicial.

7          On the other hand, of course, the conviction itself

8    goes to the credibility, and I think is clearly admissible for

9    that purpose.

10          So, absent something happening during examination

11    which somehow changed the equation, that's my ruling on that.

12          A couple of other housekeeping matters.  The jury

13    instructions, I am conforming them to the Hobbs Act as pled in

14    the indictment.  There was an attempt in one, but it was an

15    attempt and obtain.

16          And, of course, attempt is a lesser included offense

17    in the completed robbery.  I don't know that it is of any

18    great moment or what counsel is prepared to do with it, but I

19    think it's important to conform the instructions to the actual

20    indictment.

21          You had an eyewitness instruction in your group.  We

22    didn't talk about that yesterday.  You want that from Horn,

23    which is almost exactly that contained in the O'Malley

24    instructions.  Do you still want that eyewitness

25    identification instruction?

1      MR. NACHMANOFF:  Yes, Your Honor.

2      THE COURT:  All right.  I will give the eyewitness

3  identification instruction.

4      There were two others, intimidation and the, there

5  is also a second which accompanies it, which wasn't identified

6  by either party in the witness tampering.

7      The Government have any objection to giving the

8  intimidation instruction as part of the witness tampering

9  instructions?  It is 49.04 I think identified by defense

10 counsel.

11     I think if we give the intimidation, we ought to

12 give the delay, obstructs instruction that goes along with it.

13     MR. NACHMANOFF:  That's fine, there is no objection.

14     MR. WALUTES:  As long as they are grouped, I think

15 that's fair, Your Honor.

16     THE COURT:  I think we will give them both then.

17     All right.  I looked at the Harris and Perry cases

18 on the elements of the witness tampering.  I think that

19 clearly Harris looks at the Perry case and as far as the Court

20 went in Perry and then clarifies the burden on the Government.

21 And I think that the Government's instruction accurately

22 reflects the Harris finding.

23     So, I am going to give the Government's instruction

24 on the elements of the offense.  And your exception is noted.

25     MR. NACHMANOFF:  Thank you, Your Honor.

1062

1          THE COURT:  All right.  All right, then that's all I

2    have.

3          MR. NACHMANOFF:  Thank you, Your Honor.  And I just

4    have a couple of preliminary matters.

5          THE COURT:  Okay.

6          MR. NACHMANOFF:  First of all, we have spent a

7    considerable amount of time with Mr. Mohamadi since yesterday,

8    last night, and then this morning as well, and we thank the

9    Court for giving us extra this morning.

10          Mr. Mohamadi has reaffirmed that he does want to

11    take the stand.  And so, I think that would be the first order

12    of business when the jury comes in.

13          THE COURT:  Okay.

14          MR. NACHMANOFF:  One of the things that we did with

15    Mr. Mohamadi last night was to try and get at this issue that

16    the Court has engaged in collogues with Mr. Mohamadi directly

17    on regarding tapes and audio tapes and things that he has been

18    very intent on trying to find a way to introduce.

19          We endeavored and spent a considerable amount of

20    time, and I have to thank, acknowledge Mr. Corey, who devoted

21    many hours to this, to reviewing some of the specific audio

22    tapes that Mr. Mohamadi managed to narrow down.  It is not all

23    of them, but it was some of them.

24          We concluded after reviewing those tapes and

25    consulting with each other that we cannot as officers of the

1063

1    court in good faith take the position that any of these

2    conversations would be admissible.  But we wanted to make sure

3    given the way this case has played out, that the Court is able

4    to address this however it sees fit.

5          So, if the Court wants to let Mr. Mohamadi address

6    this issue, we want to be sure that he has that opportunity.

7    If the Court wants to make an independent in camera review of

8    these CDs, we certainly want Mr. Mohamadi to have that

9    opportunity.

10         In our capacity, we have concluded that there simply

11   is no way to get these admitted.

12         THE COURT:  All right.  Thank you.

13         Mr. Mohamadi.

14         THE DEFENDANT:  Good morning, Your Honor.

15         THE COURT:  Good morning.  First, we talked at

16   length last night about the decision to take the stand and to

17   testify.  And we went over the fact that you had consulted

18   with counsel and that you had understood and understand now

19   that the fact that you have a prior felony conviction will

20   come out, but not the nature of the charge.

21         THE DEFENDANT:  I appreciate that, Your Honor.

22         THE COURT:  And that also it opens you up to

23   cross-examination your many other issues that go to your

24   credibility.  And, of course, you have listened to the tapes

25   and read the transcripts of the tapes, the cross-examination.

1   Depending upon what you testify in direct examination, you

2   would be subject to impeachment on a number of issues,

3   including the prostitution issue and, of course, the charged

4   offenses and the firearm offense.

5           So, you understand that?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  All right.  And after consulting with

8   counsel and also thinking about what we talked about yesterday

9   and now this morning, you have decided to take the stand in

10  any event?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Okay.  All right.  Tell me about the

13  tapes.

14          THE DEFENDANT:  There aren't that many.  There are

15  just specific phone call conversations that clearly explain--

16  Because they played the tape of conversations I had with Mr.

17  Brown in regards to legal advice I provided Ms. Inge.  And

18  they made accusations to say that I was giving false

19  information.

20          I just wanted to follow up and provide phone calls

21  with Amanda Inge where she informs me while I am in Alexandria

22  during these conversations as to how she is being harassed by

23  police, how they are putting words in her mouth, how she is

24  being manipulated.

25          And another call in regards to just a lot of the

1065

1  manipulation and stuff that occurred which caused me to go to

2  that extent to, you know, provide her with legal advice and

3  give her advice on immunities and all the other stuff that you

4  heard over the calls.

5          Without these calls, it would be unfair for me

6  because it doesn't portray the whole story line of events.

7  You are just getting the end result of me being in 3AB in the

8  mental health unit ward where I am allowed out late at night,

9  I am blocked access to attorneys.

10          So, I just wanted to explain the whole situation in

11  regards to Amanda Inge.

12          THE COURT:  Well, I think you can testify--

13          THE DEFENDANT:  It would be hearsay because I would

14  be discussing what she said.

15          THE COURT:  So are the tapes, so are the tapes.

16  That's the problem, the tapes are hearsay as well, right?

17  That's what your counsel explained to you, that Amanda Inge

18  was here yesterday and testified, but she is not here.  So,

19  the tapes themselves are hearsay.

20          THE DEFENDANT:  Isn't that the grounds we objected

21  and the Court allowed the tapes in for the Government even

22  though we objected on that basis?

23          I just thought it would be only fair for me to

24  provide recordings, and especially in light of the fact that

25  they have spent six days prosecuting me and presenting all

1066

1    this evidence, I would just hope that the Court would allow me

2    to just present this small bit of evidence with testimony from

3    other individuals, not just what I am saying, to support, you

4    know--

5           THE COURT:  Do we have transcript of these, or is

6    this just the tapes themselves?

7           MR. NACHMANOFF:  No, Your Honor, this is amongst the

8    hundreds of calls.

9           THE DEFENDANT:  But they are phone calls.  And they

10   are clear, you can hear both sides speaking.  They are

11   recorded phone calls from the jail.  They are not audio wires

12   or undercover stuff with background noise.  They are very

13   audible.

14          THE COURT:  Well, they are not admissible for the

15   truth of what Ms. Inge stated.  I mean, you can be asked

16   questions by counsel that go to the substance of what you want

17   to get in, such as did you have a conversation with Ms. Inge

18   and as a result, you know, what did you do.

19          THE DEFENDANT:  As a--

20          THE COURT:  There are hearsay issues there as well,

21   but at least--

22          THE DEFENDANT:  Let me just understand.  I am not

23   going to be able to introduce evidence of facts that occurred?

24   The only evidence that I have at my disposal because I am

25   incarcerated.  So, I am being deprived of that one aspect of

1067

1  defense where the Government has been able to provide

2  recordings of my jail calls, been able to acquire and present

3  recordings that were obtained in violation of my Sixth

4  Amendment rights.

5          I just don't understand how I can't present recorded

6  calls--

7          THE COURT:  Well, I will wait to the see the

8  evidence come in and I will make a decision then.  But you

9  have talked to your counsel, you know why they have instructed

10  you as to their belief that under the Federal Rules it's not

11  admissible--

12          THE DEFENDANT:  Is that counsel's stance, that they

13  are not admissible or that they just chose strategically not

14  to allow them?  I am just curious.

15          MR. NACHMANOFF:  Both, Your Honor.  And again, I am

16  not sure it is appropriate to divulge, especially with the

17  Government here, our specific evaluation of each call.

18          But it is both issues of admissibility and strategy.

19          THE DEFENDANT:  That just goes to another factor of

20  why I am not happy with the representation.  That just

21  supports--

22          THE COURT:  Well, we have gone through that.  And I

23  couldn't disagree with you more.  I will make--

24          THE DEFENDANT:  Can I at least review, Your Honor,

25  can I at least in camera review?  I mean, this is it, there is

1068

1    nothing else the defense is offering.

2              I mean, could you at least review certain specific

3    calls in regards to Ms. Inge and Ms. Jessica Hull where the

4    Government asserted that I specifically asked her to move from

5    Michigan for the purpose of prostitution activity, when

6    actuality the calls show that she was experiencing a lot of

7    domestic disturbances with her children' father.  There is a

8    lot of violence going on.  And the whole purpose of her moving

9    was to get way from that violence, and I have phone calls

10   supporting that.

11             THE COURT:  That is such--  It is hearsay.  And then

12   it's also such a collateral issue, it doesn't--  It's so far

13   off and--

14             THE DEFENDANT:  These individuals came on the stand.

15             THE COURT:  That wasn't even worth trying to impeach

16   her on--

17             THE DEFENDANT:  It's just the assertions that are

18   being made.  I mean, shouldn't I at least have the opportunity

19   to defend myself that it is false?

20             THE COURT:  What I said to you is you give me the

21   specifics, and I will listen to certain of those materials

22   when we have a break.  And so, yes, I will do what you are

23   asking now.

24             THE DEFENDANT:  Thank you.

25             THE COURT:  I will actually look at or listen to the

1   tapes.  But you understand that it may not change my mind, but

2   I will look at it, I will listen to it.  All right.

3              THE DEFENDANT:  Thank you, Your Honor.

4              THE COURT:  So, give me the tapes.  Or do you have a

5   list of the tapes or--

6              THE DEFENDANT:  I can narrow them down to specifics

7   so I don't belabor the Court with too many calls.  I can--

8              THE COURT:  Mr. Corey.

9              MR. COREY:  Yes, Your Honor.  I think we can assist

10  in the review.  It's going to take some explanation of how the

11  computer program works in terms of opening the audio and how

12  you need to bring it up, but I think with the combination of

13  working together here we can facilitate that.

14             THE COURT:  Can I do that in chambers?  Or do I have

15  to do that in the courtroom?

16             MR. COREY:  I think it--

17             MR. NACHMANOFF:  It can be done in chambers.  We

18  have a laptop, we can provide it to the Court.

19             THE COURT:  Okay.  All right.  Then let's identify--

20  You know, don't give me hours of tape, but I will listen to

21  segments of a couple of different tapes, and that ought to

22  give me the information I need.

23             THE DEFENDANT:  Thank you, Your Honor, I appreciate

24  it.

25             THE COURT:  All right.  Yes, sir.

1070

```
 1              Anything else this morning?

 2              THE DEFENDANT:  My final request, Your Honor, is

 3    simply that in light of the history of the case and the

 4    Court's prior rulings, I would ask that counsel be given a

 5    little bit of latitude with regard to the examination of Mr.

 6    Mohamadi.

 7              THE COURT:  We will do the best we can.

 8              MR. NACHMANOFF:  Thank you.

 9              THE COURT:  All right.  Anything else for the

10    Government this morning?

11              MR. WALUTES:  Your Honor, obviously, the Government

12    is going to want the Court to revisit 403 rulings the Court

13    has made if appropriate during this examination.

14              THE COURT:  I understand that.

15              All right, let's bring our jury in.

16              NOTE:  At this point the jury returns to the

17    courtroom; whereupon the case continues as follows:

18    JURY IN

19              THE COURT:  All right, good morning to you all.

20    Thank you for getting in on time this morning.  Please have a

21    seat.  And I hope you had a good evening.

22              Did you all heed my request that you not do any

23    research or talk about the case with anyone and not do any

24    independent investigation?  A show of hands.  Thank you very

25    much.  It is important.
```

M. Mohamadi - Direct

1071

1          All right, Mr. Nachmanoff, call your next witness,

2    sir.

3          MR. NACHMANOFF:  Thank you.  Ms. Minter will be

4    taking this witness.

5          THE COURT:  All right.

6          MS. MINTER:  Your Honor, we will call Mirwais

7    Mohamadi.

8          THE COURT:  All right.

9          NOTE:  The defendant is sworn.

10         MIRWAIS MOHAMADI, the defendant herein, called in

11   his own behalf, first being duly sworn, testifies and states:

12       DIRECT EXAMINATION

13   BY MS. MINTER:

14   Q.   Stir, would you please state full name and spell your

15   first and last name for the court reporter.

16   A.   My name is Mirwais Mohamadi.  M-i-r-w-a-i-s

17   M-o-h-a-m-a-d-i.

18   Q.   How old are you, Mr. Mohamadi?

19   A.   I am 28 years old.

20   Q.   How far did you go in school?

21   A.   Two semesters in college.

22   Q.   What line of work are you in?

23   A.   Car salesman.

24   Q.   What did your father do for a living?

25   A.   My father was a taxicab driver.

M. Mohamadi - Direct

1072

1    Q.   Mr. Mohamadi, did you ever intend for Randy Pressley to

2    kill Gebru Haile?

3    A.   No, ma'am.

4    Q.   Did you ever intend for Stephen Grant to kill Gebru

5    Haile?

6    A.   No, ma'am.

7    Q.   Did you ever intend for Richard Bryan to kill Gebru

8    Haile?

9    A.   No, ma'am.

10   Q.   Did you ever intend for Amanda Inge to fabricate

11   testimony?

12   A.   No, I did not.

13   Q.   Mr. Mohamadi, I would like to direct your attention to

14   the fall of 2007.

15           Where were you at that time?

16   A.   I was housed at Fairfax Adult Detention Center.

17   Q.   And during that time, did you know an individual by the

18   name of Randy Pressley?

19   A.   Yes, ma'am, I am familiar with that name.

20   Q.   Describe how you know him and your relationship with him.

21   A.   There was no relationship.  He was an inmate that was

22   housed in a unit that I was also housed in.

23   Q.   And did you ever speak with him?

24   A.   Outside of just the basic dialog that occurs in jail.

25   Nothing too much.  Nothing specific.

M. Mohamadi - Direct

1073

1   Q.   Were you ever in a unit in the Fairfax Jail that is

2   specifically designated for Muslim inmates?

3   A.   Yes, ma'am.  They provide a unit for all the inmates that

4   are practicing Ramadan, they place them all in the same unit

5   because of the different periods where they eat, so it makes

6   it easy for the jail and also helps these inmates practice

7   their belief.

8   Q.   And could you describe the layout of that unit for the

9   members of the jury.

10  A.   It is a pretty small unit.  There are two tiers of cells

11  that wrap around.  There is stairs.  And in the middle of this

12  unit there is benches where inmates can sit and converse.  And

13  there is a TV in the corner.  And on the wall about in the

14  middle of the unit there is two phone calls right next to each

15  other placed right in the middle of the unit.

16  Q.   I am sorry, two phone calls?

17  A.   I am sorry, phone, like pay phones placed right there.

18  Q.   And are those pay phones in a booth like they might be on

19  the street?

20  A.   No, ma'am.  They are open and just attached to the wall

21  right next to each other.

22  Q.   Is there anything that separates the inmate on the phone

23  from the other inmates in the unit?

24  A.   No, ma'am.

25  Q.   Did there come a time that you moved out of that unit?

1074

1    A.   Yes.  In the middle of Ramadan I asked to be moved out of

2    the unit due to the fact that this was a very, let's just say

3    I had a lot of stuff that I was dealing with at that time in

4    regards to my faith.  And since '05 I had started, I had begun

5    having an interest in Christianity and I had a lot of people

6    ministering to me.

7              And while I was at the jail I tried to go back to

8    what I knew and what my mother and everyone else would advise

9    me to do.  And I tried to, you know, practice Islam, but it

10   just didn't feel right.  And I just finally realized that I

11   couldn't just go through the motions, that I needed to do what

12   I believed and what I felt was right.

13             So, I moved out of that unit.

14   Q.   Did you ever speak to Randy Pressley intending for him to

15   kill Gebru Haile?

16   A.   No, ma'am.

17   Q.   Mr. Mohamadi, do you know an individual named Stephen

18   Grant?

19   A.   Yes, ma'am, I am familiar with that name.

20   Q.   How do you know him?

21   A.   He was in one of the units that I was in in Fairfax, and

22   he was there for approximately two weeks.

23   Q.   Okay.  And is that the extent of your relationship with

24   him?

25   A.   Yes, ma'am.  I met him in the jail.

1075

1   Q.   Did you ever spend any time with him outside of the jail?

2   A.   No, ma'am.

3   Q.   Did there come a time where you received information that

4   caused you to stop talking to Mr. Grant?

5   A.   Yes.  After conversing with my attorney at that time, I

6   received some information from him that caused me to not

7   communicate with Mr. Grant.

8   Q.   Did you ever speak to Stephen Grant with the intent that

9   he do any harm to Gebru Haile?

10  A.   No, ma'am.  I never discussed any part of my case.  The

11  only discussions I had with Mr. Grant was in regards to the

12  fact that he was from the Springfield area, which I was also

13  from the West Springfield area, and we knew some of the same

14  individuals.

15  Q.   Now, you described one unit within the Fairfax Adult

16  Detention Center.  Is that description a good general

17  description for the rest of the units in the Adult Detention

18  Center?

19  A.   Yes, ma'am.

20  Q.   Okay.

21  A.   Yes, it is.

22  Q.   And the unit that you were in with Stephen Grant, did

23  that have phones as well?

24  A.   Yes, ma'am.  It was exactly the same way I described the

25  other unit.

M. Mohamadi - Direct

1076

1  Q.   Now, with respect to the units within the Fairfax Adult

2  Detention Center, you described a big open area.  Where are

3  the individual cells in relation to that open area?

4  A.   They are on the wall.  They are basically, like I said,

5  it wraps around the unit.  And there is a row of cells on the

6  first floor.  And then there is some steps that you have to go

7  up.  And there is a second tier of cells.

8  Q.   And how does the-- Let me ask you first.  Do those cells

9  have doors?

10  A.   Yes, ma'am, they are automated doors that only open from

11  the master control room.  And they are opened at specific

12  hours and closed at specific hours.

13  Q.   Do you as an inmate have any control over when the doors

14  open?

15  A.   No, ma'am.

16  Q.   Do you as an inmate have any control over when the doors

17  close?

18  A.   No, we don't.

19  Q.   Do you have any ability or authority to close the door if

20  it's open?

21  A.   No, ma'am.

22  Q.   Okay.

23  A.   There are specific times they open and close.

24  Q.   Is there any way to prevent other people from being in

25  your cell?

1077

1    A.    No, there isn't.  I mean, there is if you are in the

2    unit, you can prevent it.  But if you have a court date or

3    something that may cause you to be out of the unit during the

4    hours when the door is open, there is no way for you to know

5    if someone has went in your cell or what.

6    Q.    So, you personally could intervene if someone went in

7    your cell?

8    A.    While I am in the unit, of course.

9    Q.    But you don't have any locking mechanism to prevent that?

10   A.    I mean, the only thing I could possibly do is if there is

11   someone that I have any type of a relationship with, I could

12   ask them to watch my cell.  But then--

13   Q.    But no lock system, correct?

14   A.    No, ma'am.

15   Q.    Mr. Mohamadi, do you know a gentleman by the name of

16   Richard Bryan?

17   A.    Yes, ma'am.

18   Q.    How do you know him?

19   A.    I met Mr. Bryan while I was housed in Alexandria Jail?

20   After five months of being in Alexandria Jail I was moved into

21   the trustee unit where all the inmates in that unit work

22   either in the kitchen or they do maintenance work, cleaning

23   the floors and stuff.  And I met Mr. Bryan from both of us

24   working in the kitchen.

25   Q.    And did you work at the same time?

M. Mohamadi - Direct

1078

1    A.    No, ma'am.  His schedule was different from--  There is a

2    hierarchy of positions in the kitchen where you start out at a

3    certain level and then you gradually move up as people switch

4    jobs.

5              Mr. Bryan was the dietitian at the jail where he

6    would make all the trays for people that had specific medical

7    diets.

8              And my job at the time was a dishwasher.  So, I had

9    a specific time that I would come in, after meals, before

10   meals to wash and prepare trays.  And Mr. Bryan was there for

11   the majority of the day.

12   Q.   Did there come a time that Mr. Bryan was training you?

13   A.   Yes, ma'am.  He asked me if I wanted to possibly help him

14   with his duties, and that's during the period where I started

15   communicating with Mr. Bryan.

16   Q.   Mr. Mohamadi, you watched the videos that were played

17   earlier in this trial.  Why did you say the things that you

18   said on those videos?

19   A.   I never in my wildest nightmare imagined that my jail

20   conversations would be played for the public or in a federal

21   courthouse for that matter.

22             There is a life inside of jail and a manner of

23   speaking and a way of communicating that probably would

24   repulse the average person.

25             So, the stuff that was viewed on that recording is

M. Mohamadi - Direct

1079

1    just a bunch of garbage that was just discussed while I was in

2    jail.  And there is no explanation as to why I said the stuff,

3    it was just, it was just talk.

4    Q.   You indicated that, about the conditions in the jail.  Do

5    you behave the same way inside the jail that you would behave

6    outside the jail?

7    A.   No, ma'am, I don't.

8    Q.   How is it different?

9    A.   Well, in jail it's sort of a survival of the fit,

10   mentally and physically.  I mean, you can't, I can't go in

11   there and, you know, speak intelligently and try to give and

12   act a certain way because I would stand out.  Everyone has a

13   certain way of communicating and a way of how they act so they

14   don't stand out.

15          And I basically just tried to adapt to that

16   environment and portray this tough guy image just to keep

17   people from targeting me and, you know--

18   Q.   And along those same lines, do you talk the same way in

19   jail that you talk when you are outside of jail?

20   A.   No, ma'am, I don't.

21   Q.   Did there come a time that you offered money to Richard

22   Bryan?

23   A.   We had discussions in regards to the fact that he gave me

24   a story about how he lost all of his clothes and, you know, he

25   would have to start from scratch.  And in the midst of that

1080

1    conversation, you know, I offered to provide him with some

2    funds and for him.  And he promised that he would pay me back

3    later on.

4              And this isn't the first time I have done this.  I

5    have heard some pretty tough stories from individuals in jail.

6    Q.   That money that you offered to him, did he get that

7    money?

8    A.   From my knowledge, yes.  I mean--

9    Q.   How did that come about?

10   A.   What happened was after discussing this with Mr. Bryan,

11   what he did was he gave Deputy Gilmore a release form.

12   Because in the jail for you to send money off of your account,

13   you have to fill out a release form with an envelope and hand

14   it to a staff member.  And Mr. Bryan went and did that, he

15   handed the documents to a staff member at the jail.

16             And next I received, then later on I received a

17   deduction slip that stated that it was deducted from my

18   account.

19   Q.   If I could draw your attention to the end of October 2008

20   through the middle of November, approximately a two-week

21   period in the fall of 2008.

22             Where were you at that time?

23   A.   I was housed in the lock down unit.  I was at the trustee

24   unit, but I was moved out because I received some charges for

25   a female inmate writing me a letter, and I responded to that

M. Mohamadi - Direct

1081

1    letter.  And come to realize that the jail doesn't allow that.

2    And because of that incident, I was charged and placed in a

3    lock down unit during that period.

4    Q.   Was Richard Bryan in the lock down unit with you?

5    A.   No, ma'am, he wasn't.

6    Q.   Okay.  Where, if you know, was he?

7    A.   He was in a different unit in population.

8    Q.   Mr. Mohamadi, did there come a time that you spoke with

9    Richard Bryan on the phone?

10   A.   Yes, ma'am.  Upon his release he provided a friend of

11   mine with a phone number for me to call to just keep in

12   contact with him.

13   Q.   When you had those phone conversations, did you intend

14   any harm to Gebru Haile?

15   A.   No, ma'am.  As the phone call can verify, the content of

16   the call was just basically how he felt released and what he

17   planned on doing as in getting a job and just conversations of

18   that nature.  There was nothing in regards to anything like

19   that.

20   Q.   We heard testimony from Investigator Burnham and,

21   testimony from Investigator Burnham about reports or requests

22   that you had filed.

23        What was the basis of those requests?

24   A.   While I was in the trustee unit Mr. Bryan had made a

25   statement that really caused me some concern.  And in that

M. Mohamadi - Direct

1082

1    statement he basically offered to help me out in my case in

2    regards to speaking to witnesses because I portrayed a false

3    story as to why I was incarcerated.  That's what I normally do

4    when I asked about my case, I will make, I will exaggerate a

5    scene from a move or something to that extent.

6              And in the course of, you know, making those

7    comments, Mr. Bryan was very adamant about saying that, well,

8    you know, he could help out, he could discuss witnesses, talk

9    to witnesses and try to get them in my favor.

10             So, that kind of concerned me.  So, I wrote a

11   request form to Mr. Burnham letting him know that, you know,

12   an inmate had propositioned me just to make sure--

13   Q.   Did there come a time when you filed a second report with

14   respect to Mr. Bryan?

15   A.   Yes, after filing that request form I met Mr. Burnham and

16   I explained the situation.  And he just was very dismissive.

17   He basically accused me of lying, stating that I was just

18   making stuff up.  So, I was a little disturbed by his

19   reaction, I followed up with a grievance.

20   Q.   Did there come a time that you met with Richard Bryan at

21   the jail while you were incarcerated but he had been released?

22   A.   Yes.  While we were in the jail and during the

23   conversation we had over the phone, he asked me to place him

24   on my visit list, that he would come visit me and that he

25   would bring other female friends to introduce me to while I

was in jail for, during that time.

So, that was the gist of why he came to visit me.

Q. Okay. But he came to visit you?

A. Yes, ma'am, he did, twice.

Q. Did you ever display a hand sign or hand signal with four fingers?

A. After reviewing the Government's video, I noticed that at the end of the visit I gave a peace sign. And the video is free frame, it is not a continuous video where you can stop it on that exact moment. Even though the Government makes this assertions of me holding up four fingers to support their theories, if you would like at the video, it clearly shows me giving the peace sign to Mr. Bryan, two fingers, and that's it. Which is not uncommon when you want to say bye through the glass.

Q. Mr. Mohamadi, you have talked about the conditions in jail and the circumstances in jail. Describe, if you will, how you felt while you were incarcerated.

A. I don't even think words can describe what I was going through during that period. I was incarcerated in August for these false allegations of robbery.

And my daughter had just been born in June. So, it was just, it was just very, very difficult for me emotionally. And then just on top of it, just to be accused of robbing the cab driver when my dad was a cab driver, and he actually

1084

1    passed away inside of his cab, he had a heart attack, and it

2    was just very embarrassing.

3            And it was a very confusing period in my time.  And

4    I tried to substitute my pain and my anxiety and duress by

5    keeping myself busy, by talking to people, and just trying to

6    stay in contact with individuals over the phone, and just

7    trying to get my mind outside of what I had to deal with in

8    there.

9            And it was just, it just got to a point after my

10   case was delayed for over two years and just constantly being

11   delayed, I wasn't getting an opportunity to go to trial to

12   defend myself because from what I found out now, the

13   Government was trying all these different ploys to try to

14   entrap me into their, into their little schemes.

15           I didn't know all that stuff was going on during

16   that time.  All I knew was my trial was continuously being

17   continued.  I wasn't getting my opportunity to go to trial.

18   And it was just causing me a lot of duress where it eventually

19   got to the point where it was frustrating to the point where I

20   even considered taking my life.  And during October 28 I

21   attempted to hang myself.

22   Q.   So, you were very upset?

23   A.   Yes.  It was a very traumatizing experience and still is

24   to this date.

25   Q.   Did you receive any mental health treatment after that

1085

1    incident?

2    A.   No, ma'am, I was immediately placed in lock down unit.

3    And maybe two weeks following this incident the Government was

4    able to obtain these recordings.

5    Q.   Was there ever a time when any of your property was

6    seized?

7    A.   Yes, ma'am.  As soon as I was indicted for this federal

8    case, on April 20 I was moved to Warsaw, Virginia.  Three

9    hours away from family, three hours away from attorneys, and I

10   was placed on 24-hour lock down.

11        And during that period I asked the Court if I would

12   get an opportunity to get closer to my attorney so I could

13   prepare for my trial.  And the Court graciously allowed me to

14   come back to Alexandria for a weekend.

15        And as soon as I was brought back, I was told that I

16   could only bring my legal materials and everything relating to

17   my case.  And when I came back, all of these documents were

18   seized from me.  And they were held over a day.  And when they

19   were finally returned to me, I was missing a ton of stuff,

20   especially letters and documents from Ms. Inge, one of the

21   witnesses that came and basically perjured herself again in

22   front of a jury.

23        I had documents that were very helpful to my case

24   that now to this day I have not been returned.

25   Q.   Mr. Mohamadi, if I can go back to something you said.

1086

1    You said that you were sent to a different jail.  Was that for

2    these charges or different charges?

3    A.    For these charges.

4    Q.    And these papers that you described and the difficulties

5    you described, did that contribute to your anxiety?

6    A.    Yes, ma'am.  I have lost over 40 pounds.

7    Q.    You made reference to the previous charge in the state

8    system.

9    A.    Yes, ma'am.

10   Q.    For the same conduct?

11   A.    Yes, ma'am.

12   Q.    Did you have an attorney in that case?

13   A.    Yes, I was represented by Mr. Larry Brown.

14   Q.    Was there an investigator assigned to that case?

15   A.    Yes, we did hire an investigator to help in my defense.

16   Q.    Okay.  And did he gather information, to your knowledge,

17   about your case?

18   A.    Yes, he did.  The investigator was very helpful.  During,

19   when I was notified finally after a year of being held,

20   detained, I was finally given a partial discovery describing

21   the allegations of a robbery against Mr. Haile.

22          And in the midst of my confusion, I was just trying

23   to figure out why would this individual accuse me of something

24   that I didn't do.  So, I retained Mr. Larry Brown to help me

25   defend against the case, and I also hired a private

M. Mohamadi - Direct

1087

1    investigator.

2              And in the course of his investigations, he was able

3    to conduct an interview with Mr. Haile.  And this interview

4    occurred in, I want to say September of '08.  And then, no,

5    July of '08.  And I went to my first court proceeding in

6    August.  And after the Court proceeding I came to realize that

7    because I had sent the investigator there to speak with him,

8    they had placed--

9    Q.   If I could interrupt you for one second.  You mentioned

10   the investigator.  Is that Mr. Velarde who testified yesterday

11   or was that a different individual?

12   A.   No, ma'am, it was a different individual.

13   Q.   And was information from his investigation shared with

14   you?

15   A.   Yes.

16   Q.   Was the information that the investigator obtained, was

17   that shared with you?

18   A.   Yes.  The investigator basically notified me of all of

19   his, all the stuff he was able to obtain.

20   Q.   Why was that?

21   A.   Because I was very active in my defense.  I was really

22   trying very hard to find out what was going on.  And I was

23   just shocked to find out that, you know, they had placed this

24   individual on the witness protection program just because I

25   sent an investigator to go speak with him.

M. Mohamadi - Direct

1088

1    MR. WALUTES:  Your Honor--

2    THE COURT:  Yes, sir.

3    MR. WALUTES:  The Government has--  Never mind.

4    THE COURT:  All right.

5    BY MS. MINTER: (Continuing)

6    Q.    Mr. Mohamadi, do you know an individual named Jessica

7    Hull?

8    A.    Yes, ma'am, I do.

9    Q.    How do you know her?

10   A.    I met Ms. Hull during my occupation as a car salesman.

11   You get to meet a lot of different, colorful different

12   individuals in my line of work.  And upon meeting her from

13   that, while I was incarcerated I was very lonely and very,

14   just under a lot of duress, as I explained before, I would try

15   to reach out to individuals and try to stay in communication

16   with people to kind of get my mind outside of the jail.

17   Q.    Did you ask her to move to Virginia?

18   A.    No, ma'am, I never asked her to move to Virginia.  She

19   was experiencing domestic problems with the individual that

20   she had children with.  And the person was, you know, unhappy

21   with her lifestyle because of the activities Ms. Hull was

22   involved in, the drugs and the prostitution and stuff.

23         And I basically gave Ms. Hull advice in the sense

24   that it would be helpful for her to move to a new location to

25   start all over because of all the stuff she was dealing with

M. Mohamadi - Direct

1089

1   in the previous place.

2   Q.   Did you ever ask Ms. Hull to engage in prostitution for

3   money?

4   A.   No, ma'am.  As the phone calls that I have can verify

5   that I only asked--  Well, I initially asked Ms. Hull to, you

6   know, obtain employment.  I even directed her to places where

7   she could fill out applications and obtain a job, but she

8   refused to go that route.  And she just wanted to do what she

9   wanted to do.

10          And there is no way I could control what she does.

11  All I could do was give her advice.

12  Q.   Do you know an individual by the name of Silvia

13  Escamilla?

14  A.   Yes, ma'am, I do.

15  Q.   How did you know her?

16  A.   I met Ms. Escamilla when I retained Mr. Brown.  And she

17  was a secretary there.  And from me calling up Mr. Brown, I

18  was able to communicate with her.  And she was very nice to me

19  and was able to provide me with phone calls when--  Because at

20  the jail, all the collect calls, your family and friends have

21  to set up an account.  So, when the money would run out, you

22  would have no way of letting them know that the money ran out.

23          So, you either had to depend on another inmate for

24  them to call your family to do it or send a letter out.  And

25  Ms. Escamilla was very helpful by making these calls for me.

1090

1    And during the course of these interactions we became somewhat

2    friends.

3    Q.    Did you ever ask her to deliver a firearm for you?

4    A.    No, ma'am, I have no knowledge of a firearm.  And I never

5    asked her to do anything of that nature.

6    Q.    Mr. Mohamadi, did you ever operate a prostitution ring?

7    A.    No, ma'am, I did not operate a prostitution business.

8    Q.    Do you know Amanda Inge?

9    A.    Yes, ma'am.

10   Q.    How do you know her?

11   A.    I had a, I casually dated her prior to me being

12   incarcerated.  And while I was incarcerated because of the

13   fact that she doesn't work during the day and that's the

14   period where I am out and able to use the phone, we were able

15   to talk a lot.  And in the course of all the communication we

16   had, we became very close during that period.

17   Q.    Did you ever intend for Ms. Inge to violate the law?

18   A.    No, ma'am.  I had no knowledge of Ms. Inge being involved

19   in my case for the first year that I was detained in Fairfax

20   because I had never received any documents regarding Ms.

21   Inge's involvement as to the investigation until I was moved

22   to Alexandria in May of 2008.

23        And upon my arrival at Alexandria I received a

24   partial discovery where Ms. Inge was identified as someone

25   that provided information to law enforcement stating that I

M. Mohamadi - Direct

1091

1   admitted something to her.

2           And as soon as I figured this out, as the timeline

3   of calls that are recorded show, I asked Ms. Inge about this.

4   And she immediately said that she didn't want to discuss it

5   over the phone.  And she said that she would talk to Mr. Brown

6   and go about it that way.

7   Q.   All right.

8   A.   And that's when I came to realize all of this stuff that

9   occurred with Ms. Inge.

10  Q.   Mr. Mohamadi, did you rob Kimberly Riley on May 27, 2007?

11  A.   No, ma'am, I did not rob Ms. Riley.

12  Q.   Did you display a firearm to rob Ms. Riley on May 27?

13  A.   No, ma'am, I did not do that.

14  Q.   Did you rob Gebru Haile on May 27?

15  A.   No, ma'am, I did not rob Mr. Haile.

16  Q.   Did you display a firearm to rob Mr. Haile?

17  A.   No, ma'am, I did not.

18          MS. MINTER:  The Court's indulgence please, Your

19  Honor.

20          THE COURT:  Yes.

21          MS. MINTER:  Your Honor, if we could approach ex

22  parte at this time.

23          THE COURT:  Yes.

24          NOTE:  A side-bar discussion is had between the

25  Court and defense counsel out of the hearing of the jury and

M. Mohamadi - Direct

1092

1    the Government counsel as follows:

2    AT SIDE BAR

3           MS. MINTER:  Your Honor, that is the extent of the

4    questions that I have for the defendant.  I had indicated to

5    Mr. Mohamadi that we would allow him to raise with you any

6    issues that he feels should have been raised.

7           THE COURT:  Anything else that you want?

8           THE DEFENDANT:  Can I look at my documents real

9    quick?

10          THE COURT:  Yes.

11          THE DEFENDANT:  I just basically wanted to lay a

12   foundation, basically ask Ms. Minter to ask questions in

13   regards to the stuff that occurred with Ms. Inge with the

14   police harassment.  How she was--  The stuff she went through.

15          Just asking me whether I was--  I don't know how to

16   legally do it, but I am sure there is a way that I can

17   introduce that without getting into hearsay.  And the phone

18   calls.  Because I am being accused of corruptly, intentionally

19   and corruptly getting her to lie, but how can I prove that?

20   While I am in jail all I have is knowledge of what I was told

21   by my attorney and by Ms. Inge.

22          So, for me to defend against the intent, I would

23   have to prove what I was told by Ms. Inge.  There is no other

24   way for me to prove that.  This is what I believed from the

25   information that I was given.

M. Mohamadi - Direct

1093

```
 1              THE COURT:  Ms. Inge was on the stand yesterday.  I
 2   have given you latitude to speak at every opportunity.  And
 3   when any witness has finished testifying, I have given breaks
 4   so that you could consult me with counsel about asking
 5   additional questions, and I didn't have any conversation with
 6   you yesterday about that at any stage.  So--
 7              THE DEFENDANT:  But I did notify counsel that I
 8   wanted her to introduce those calls yesterday also for
 9   impeachment of Ms. Inge.
10              MS. MINTER:  It was yesterday.  Your Honor, I can
11   probably ask a follow-up question or two that may address
12   that.
13              THE COURT:  All right.  Then let's see where it
14   goes.
15              MS. MINTER:  Thank you, Your Honor.
16              THE COURT:  Anything else?
17              THE DEFENDANT:  Thank you, Your Honor.  I appreciate
18   it.
19              NOTE:  The side-bar discussion is concluded;
20   whereupon the case continues before the jury as follows:
21   BEFORE THE JURY
22   BY MS. MINTER: (Continuing)
23   Q.   Mr. Mohamadi, you had testified to information or advice
24   that you had given Ms. Inge.  Why did you feel that she was in
25   the need of that advice?
```

M. Mohamadi - Direct

1094

1   A.   Because as soon as I found out that Ms. Inge was part of

2   the case I asked her as to how she became involved.  And she

3   explained to me that she was coerced, harassed by police.

4   They came and searched her house.  And because of Ms. Inge's

5   drug use they found items in her home and basically persuaded

6   heard to say that, you know, if she is not helpful, they would

7   charge her for this stuff.

8        And me knowing the type of person Ms. Inge is, I

9   know she is not deliberately intending to hurt me, but she

10  will do whatever she has to to protect herself.

11       So, me understanding that and realizing all this

12  stuff, I just became very defensive.  And in the course of my

13  interactions with Ms. Inge all I basically did was advise her

14  not to use drugs and to try to clean up her act so that way

15  she wasn't attacked again or charged with more stuff which

16  would cause her to influence her testimony even more.

17       And just in the course of me speaking to her, she

18  has made numerous comments over the phone and numerous

19  statements regarding the fact that she was coerced, she was

20  harassed.  She has made numerous statements which I can offer

21  as evidence that police have harassed her, manipulated here.

22  Even on 11/20 when she wouldn't go meet with the state

23  prosecutors, she was arrested under a false charge.

24       So, it is just experiencing all this stuff and

25  observing all of the actions that law enforcement has done.  I

M. Mohamadi - Direct

1095

1    was very alarmed and concerned by the situation in March.

2    That's why when she wrote me and told me that she received the

3    grand jury subpoena by the federal government and she asked me

4    for legal advice or whether my attorney could help her, I

5    basically--  At the time I was not allowed to speak with

6    attorneys, I wasn't allowed to have attorney visits, I wasn't

7    allowed had to call attorneys unless it was on a collect call

8    recorded phone.  It was a very frustrating period.  And I was

9    only allowed late at night, that's why the call was made 1 in

10   the morning.

11           And at that time she had moved to Miami and her

12   number wasn't--

13   Q.   Let me ask you this, Mr. Mohamadi.  You indicated that

14   you gave advice.  Are you a lawyer?

15   A.   No, ma'am.  What I did was I asked the deputy to allow me

16   to go to the law library.  And knowing the facts of this

17   situation with Ms. Inge where she informed me that she may

18   have made false statements to law enforcement initially and

19   then told the truth in trial, I knew the ploys that the

20   Government would use by saying, okay, well, you said this

21   first and then you said this later, we are going to charge you

22   with perjury, we are going to lock you up for five years, I

23   knew the ploys that they would use to get her to shape her

24   testimony to what they want.

25           So, what I did was I went to the law library and

1    looked up what would be helpful to Ms. Inge.  And I found the

2    section on immunities.

3             And me not being a lawyer, what I read was that it's

4    okay to persuade an individual to tell the truth.  And that is

5    the truth as I know it.  Because I am incarcerated, all the

6    information that I received, I wasn't there when she spoke to

7    law enforcement, I wasn't there during all this stuff, all I

8    know is what she told me and what she told my attorney.

9    Q.   So, you gave her the best advice you could?

10   A.   Exactly.  I just basically told her, I actually urged her

11   to go to the grand jury meeting.  Because when she wrote me,

12   she explained that she had just broke up the previous

13   boyfriend, I have the letter also.  And that the other

14   boyfriend had promised that she didn't have to dance anymore.

15   And during that period she didn't dance, she didn't make any

16   money, so she didn't have any money for a plane ticket.  And

17   she received the subpoena on March 1 for her to go on the 5th,

18   and she was just frustrated, she didn't know how she was going

19   to make it up there.

20            She called for my family asking for them to help,

21   but my family refused to get involved.  And then she finally

22   called the Government to arrange a flight to come up to the

23   meeting because I informed her during the phone call that she

24   needs to get up there because they are going to arrest her if

25   she doesn't go to the grand jury hearing.

M. Mohamadi - Direct

1097

1       And I explained the different types of immunities
2  she could obtain.  And from listening to the recording, it
3  seems like I am telling her to plead the Fifth, don't say
4  anything, but what I read under the immunity clause in the
5  federal code section is I basically read out the process of
6  how to receive immunity.  Is that you have to, when you are
7  put in front of the grand jury, you have to go through a
8  process of refusing to answer until you are given immunity.
9  And then you can answer without any coercion.
10      And that's all I was trying to do, was to get her to
11  be able to speak freely without any type of coercion.  That
12  was my only intention.  I never asked her to lie, I never
13  asked her to withhold anything from Government agents.
14      And in regards to Count 9, they claim that I was
15  withholding, getting her to withhold information from federal
16  agents, but that's not the case.  Because her original
17  statement was already available for them to prosecute if
18  that's what they wanted to do.  But that's not--
19  Q.   So, you gave her advice?
20  A.   Just legal advice, as she asked me to do to help her
21  illegal because I knew the circumstances of her situation.
22      MS. MINTER:  I have no further questions for you.
23  The Government may have some questions to ask you.
24      THE DEFENDANT:  Yes, ma'am.  Thank you.
25      MR. WALUTES:  May I proceed, Your Honor?

M. Mohamadi - Cross

1098

1        THE COURT:  Yes, sir.

2        CROSS EXAMINATION

3    BY MR. WALUTES:

4    Q.   Mr. Mohamadi, you are convicted felon, isn't that true?

5    A.   Yes, I am.

6    Q.   And I thought I heard you say just a moment ago that your

7    case kept getting continued.  Did you say that?

8    A.   Yes, I did.

9    Q.   Isn't it the truth that since you have been in federal

10   custody your case has never been continued at the Government's

11   request?

12   A.   Yes.  But as soon as I was federally indicted, I was

13   moved to a location and denied access to attorneys, denied

14   access to family, denied access to my resources just because

15   you didn't want this bogus case to fall apart.

16   Q.   What was the answer in there, Mr. Mohamadi?

17   A.   You asked me, the comment that I made was in regard to

18   the state case and you asked me about the federal case that

19   occurred on April 20 of 2009.

20   Q.   Do you remember the question?

21   A.   Yes, you asked me did I say anything about it being

22   continued in state court.

23   Q.   No.  I asked you had your case ever been continued by the

24   Government since you have been in federal custody?

25   A.   No.  The Government had over a year to prepare and

1099

1    orchestrate this.

2              THE COURT:  Mr. Mohamadi, listen to the question and

3    answer the question and only the question.  And if there is

4    follow-up, then your counsel will take care of that.  All

5    right.

6              THE DEFENDANT:  Your Honor, the Government is asking

7    me whether they--

8              THE COURT:  No, we are going to follow the rules of

9    evidence.

10             THE DEFENDANT:  I understand.

11             THE COURT:  You have been given great leeway to tell

12   your--

13             THE DEFENDANT:  I am just explaining--

14             THE COURT:  No, no.  You listen.  Direct examination

15   you have been given tremendous leeway, and we are going to

16   follow of the rules of evidence.  The rules of evidence on

17   cross-examination are if the Government asks a yes or no

18   question that you can answer yes or no to, then you do so.

19             THE DEFENDANT:  Okay.

20             THE COURT:  If you say I can't answer it yes or no,

21   then say that.

22             THE DEFENDANT:  I understand.  I understand.  Thank

23   you.

24             THE COURT:  Okay, thank you.

25   BY MR. WALUTES: (Continuing)

M. Mohamadi - Cross

1100

1  Q.   The truth is, Mr. Mohamadi, you asked for continuances

2  since you have been in federal court, isn't it?

3  A.   Yes.

4  Q.   How many times have you asked for a continuance of your

5  federal trial?

6  A.   Twice.

7  Q.   Okay.  And how many times beyond that has it been

8  continued?  When was your first trial date, do you remember?

9  A.   I can't recall.

10 Q.   Was it the summer of 2009?

11 A.   I can't recall.

12 Q.   In your state trial Larry Brown was your attorney, is

13 that correct?

14 A.   Yes, he was.

15 Q.   And Silvia was his receptionist?

16 A.   Yes, she was.

17 Q.   You developed a relationship with Silvia?

18 A.   Yes, I did.

19 Q.   She made three-way calls for you?

20 A.   Yes, she did.

21 Q.   You understood that you weren't supposed to use that

22 phone for three-way calls?

23 A.   There was no rule stating that.

24 Q.   There was no rule in the Fairfax County Jail that you

25 could not use an attorney phone to three-way out onto the

1101

1  street?

2  A.    No, sir.

3  Q.    That's your position?

4  A.    That's my position.

5  Q.    Under oath that you had no--  You were allowed to use an

6  attorney line to three-way out and avoid all the monitoring

7  from the jail?

8  A.    I have never seen that in any rules.  And the calls are

9  monitored, they are just not recorded.

10  Q.   You understand that the Fairfax County inmate handbook is

11  in evidence in this case?

12  A.   Okay.  If you point it out, then--

13  Q.   I am not going to point it out to you, but I am making

14  the point that the jury will be able to read the rules for

15  that jail?

16  A.   Well, I--

17  Q.   So, is it your position now under oath that you cannot

18  use the attorney phone, that you can use an attorney phone to

19  three-way out into the street and not allow the jail to

20  monitor your call?

21         MS. MINTER:  Your Honor, that is a compound

22  question.

23         THE COURT:  Answer it if you can.

24  A.   My position is that I did not see that rule.  There is no

25  rule by the phone stating that.  So, I personally did not see

M. Mohamadi - Cross

1    that.

2    BY MR. WALUTES: (Continuing)

3    Q.    She was trying to be nice to you, Silvia?

4    A.    Yes, she was nice in the beginning.

5    Q.    You never actually met her?

6    A.    No, no, sir, I have never met her prior to her coming to

7    this court proceeding.

8    Q.    She was lonely?

9    A.    Who?

10   Q.    Silvia.

11   A.    No, she was actually involved in a relationship.

12   Q.    Why did she spend so much time with you?

13   A.    She is just a friendly person.

14          MS. MINTER:  Calls for speculation.

15          THE COURT:  If you know.

16   A.    I mean, I can't speak what's inside her head, Your Honor.

17   BY MR. WALUTES: (Continuing)

18   Q.    Well, she helped you with your prostitution business.

19   A.    I have never had a prostitution business.

20   Q.    She took a 9 millimeter and tried to get it to Steve,

21   correct?

22   A.    And what are you basing this off of?

23   Q.    I am sorry, did you hear that testimony from her?

24   A.    Okay.

25   Q.    Did you hear that testimony?

M. Mohamadi - Cross

1103

1   A.   Just because you coerce someone to say something doesn't

2   mean that it is actual fact.  Just because someone says

3   something doesn't make it fact.

4   Q.   Now, the Steve she was trying to bring that gun to, that

5   was Stephen Grant, correct?

6   A.   And what are you basing this from?

7   Q.   Well, did you hear Stephen Grant say that the

8   receptionist was trying to get him a gun, but the cops told

9   him not to go get it?

10  A.   I have heard this 18 felony convicted individual who has

11  been allowed to continue to come back to society and terrorize

12  society say a lot of stuff that I didn't agree with.

13  Q.   Well now, you know he was released in 2007, correct?

14  A.   Of course, thanks to the wonderful judicial system.

15  Q.   You are making fun of the judicial system now, are you,

16  Mr. Mohamadi?

17  A.   He has had 18 felony convictions.

18  Q.   So, you think that the judicial system didn't do a very

19  good job?

20  A.   I can't speak for the judicial system.  I can just speak

21  for the fact that this individual was out terrorizing society,

22  burglarizing.

23  Q.   You know that because you are in jail?

24  A.   I know that from discovery, from receiving discovery and

25  receiving these facts.

M. Mohamadi - Cross

1104

1   Q.   You had a BMW back in 2007, correct?

2   A.   Yes, I did.

3   Q.   And your family lived in Springfield on Voila Street like

4   Mr. Grant said when he was testifying in this courtroom, isn't

5   that correct?

6   A.   Yes, I did.

7   Q.   And he went to look at your BMW parked in your garage

8   while you were in jail, correct?

9   A.   I have no knowledge of that.

10  Q.   Well, your BMW was in your garage in your parent's house?

11  A.   Yes, it was.

12  Q.   And the garage has a window that you can see through?

13  A.   Yes, it was.

14  Q.   So, if Mr. Grant went to your house, he could have seen

15  your BMW?

16  A.   He couldn't have just casually seen it.  The windows are

17  pretty up high.  He would have had to step on something and

18  look inside the garage.  That's a lot of effort to make, but I

19  guess that's not uncommon for a burglar to do something like

20  that.

21  Q.   Do you remember when Mr. Bryan was testifying about how

22  you offered him a position in your prostitution business?

23  A.   Now, what are you basing this accusation of

24  prostitution--

25            THE COURT:  The question was do you remember the

M. Mohamadi - Cross

1105

1    testimony of Mr. Bryan when he testified regarding your

2    prostitution business?

3    A.    Yes, I remember that false assertion.

4    Q.    You saw the tapes?  You heard the tapes?

5    A.    What tapes?

6    Q.    The tapes of him talking to you.

7    A.    Of Mr. Bryan?

8    Q.    Yes.

9    A.    Of us discussing his future activities in prostitution of

10   what he would do?  Are you referring to those conversations?

11   Q.    No.  The conversations where you were asking him to kill

12   the man who had a scar on his head.  Do you remember that

13   conversation?

14   A.    I have had several repulsive conversations in jail with

15   individuals, so--

16   Q.    Did you hear the tape played last week of you telling him

17   who to kill?

18   A.    Yes, I did hear that tape.

19   Q.    It was your voice, wasn't it?

20   A.    Yes, it was.

21   Q.    And it was Mr. Bryan's voice?

22   A.    Yes, it was.

23   Q.    And do you remember when he was asked on

24   cross-examination if he had any reason to believe you really

25   had a prostitution business?

M. Mohamadi - Cross

1106

1    A.   Yes, I do remember that.

2    Q.   Do you remember standing up in the courtroom and saying,

3    open the door wide, bring it on?

4    A.   No.  I asked whether he could provide any evidence as to

5    what he was saying.  And the question was not open the door

6    wide.  You basically got up to threaten and say, well, that's

7    going to open up the door.

8              I was basically asking you to go ahead and provide

9    evidence as to me operating a business and not provide just a

10   bunch of garbage talk inside of a jail cell.

11   Q.   Do you remember my question?  Do you remember my

12   question?

13             MS. MINTER:  Your Honor, perhaps we could restate

14   the question.

15   Q.   Your Honor, I would like to see if he could remember the

16   question.  That's my next question.

17             Do you remember my question, Mr. Mohamadi?

18   A.   Could you please restate your question.

19   Q.   Do you recall standing up and saying, open it wide, bring

20   it on?

21   A.   I can't recall saying that.

22   Q.   You do recall standing up?  Do you recall standing up?

23   A.   I can't recall exactly at what point in time I stood up.

24   Q.   Well, the truth is you did--

25   A.   There has been a lot of stuff that has made me stand up

1107

1    during this prosecution.

2    Q.   The truth is you used your attorney, your state

3    attorney's secretary to run a, help you run a prostitution

4    business while you were in jail?

5    A.   I never ran a prostitution business.  I spoke with

6    individuals that were involved in activities.  Just because

7    you communicate with someone, just because I speak with Ms.

8    Minter doesn't make me a lawyer.  Just because I speak to the

9    honorable judge, doesn't make me a judge.  Just because I have

10   interaction with someone that is involved in certain

11   activities does not make me responsible for their activities.

12            THE COURT:  All right.  Listen for the next

13   question, please.  And answer the questions now.  All right.

14            THE DEFENDANT:  Yes, Your Honor.

15   BY MR. WALUTES: (Continuing)

16   Q.   The truth is you had a single mother prostitute herself

17   and bring her money from prostitution to your jail canteen

18   account, isn't that correct?

19   A.   False, that is false.

20   Q.   You are absolutely certain?

21   A.   That is false.  What you are stating is false.

22   Q.   You were moved to the Alexandria Jail in what, May of

23   2008, somewhere in May of 2008?

24   A.   Yes.

25   Q.   And at that point they start keeping a record of your

M. Mohamadi - Cross

1108

1   canteen?

2   A.   Yes, they do.

3           MR. WALUTES:  Your Honor, this has been previously

4   admitted as Government's Exhibit No. 57A.  And if I could ask

5   him, Mr. Mohamadi, to have the opportunity to look at this

6   exhibit.

7           Your Honor, I would ask permission to be able to

8   publish pages from this admitted exhibit?

9           THE COURT:  Yes, sir, you may.

10  BY MR. WALUTES: (Continuing)

11  Q.   Mr. Mohamadi, we will start with Alexandria, which I

12  believe is the first one.  Do you see how when you look inside

13  that, there is item numbers for each specific deposit and

14  withdrawal?

15  A.   Yes, I can see that.

16  Q.   Do you see item number 77?

17          Do you see item 77?

18  A.   Yes, I do.

19  Q.   Okay.  And do you see this as being on the top of the

20  page your account at the Alexandria Jail?

21  A.   Okay.

22  Q.   Yes or no?

23  A.   Yes.

24  Q.   And do you see the date, June 23 of 2008?

25  A.   Yes, I do see that date.

M. Mohamadi - Cross

1109

1    Q.   And do you see the name of who deposited money into your

2    account, Jessica H?

3    A.   I don't see that.

4    Q.   Under Pay To/From.  It is about the middle of this.

5    A.   Which document is that?

6    Q.   Item 77.  I am only talking about that one page, Mr.

7    Mohamadi.

8    A.   I am looking at item 77, and it says 6/23 receives

9    inmate's money--

10   Q.   I am sorry, I am looking at behind that where there

11   actually is a page for each entry.  It has handwritten item

12   numbers to the right of the page.

13   A.   I see a money order from Pleasant Broadnax, an attorney,

14   $1,000 of--

15   Q.   Mr. Mohamadi, does it have an item number to the right, a

16   handwritten item number?

17   A.   I can't see the item number.

18   Q.   Can you look at the screen--

19   A.   I see money deposited from an attorney, $1,000.

20   Q.   Mr. Mohamadi, can you look at the screen to your left in

21   the witness box, do you see a small screen there below the--

22   Do you see the item number to the right where it says 77?

23   A.   Okay.

24   Q.   Could you find that, please.

25   A.   Yes, I can.  I am at number 77.

M. Mohamadi - Cross

1110

1    Q.   Okay.  Do you see in the middle where it says Jessica H

2    has deposited, and down at the bottom, $500 into your inmate

3    fund account?

4    A.   Yes, I do see that.

5    Q.   So, Jessica Hull put $500 into your account on June 23 of

6    2008?

7    A.   Yes, I see that she deposited $500.

8    Q.   Okay.  Now, if you could go to 78.

9         Do you see on the same day a second entry, June 23,

10   Jessica H, inmate funds, an additional 50?

11        So, she deposited a total of 550 that day, correct?

12   A.   Yes.

13   Q.   Now, if we could go to 85.  Do you see 85?  I don't want

14   to get ahead of you.

15        Are you at 85, Mr. Mohamadi?

16   A.   Yes, I am at 85.

17   Q.   Do you see on June 6 of 2008 Jessica Hull has now

18   deposited another $500 into your account?

19   A.   Wow.

20   Q.   I'm sorry?

21   A.   Yes, I do see that.

22   Q.   Did you say wow?

23   A.   Yes.

24   Q.   Okay.  So, the fact that you are having a mother with

25   four children deposit all the money she is earning from

1111

1  prostitution gets a wow?

2  A.   Where are you getting from that this money is coming from

3  prostitution?

4           MS. MINTER:  Argument at this point.

5           THE COURT:  Overruled.

6  A.   You are just making statements without any proof.  Do you

7  have footage, do you have proof of her activities?  And of me

8  telling her to conduct these activities?

9           THE COURT:  You listen to the question and answer

10  the question.

11           THE DEFENDANT:  I understand, but he is--

12           THE COURT:  I told you your lawyer on redirect

13  will--

14           THE DEFENDANT:  He is manipulating it, he is

15  misleading stuff.

16           THE COURT:  No, no.  Listen.

17  BY MR. WALUTES: (Continuing)

18  Q.   I am manipulating you right now?

19  A.   No.  You are a manipulator.

20  Q.   I am the manipulator?

21  A.   Yes, you are.  You manipulated all the witnesses that

22  have stood up and lied on the stand.

23           THE COURT:  Mr. Mohamadi--

24           THE DEFENDANT:  You coached them--

25           THE COURT:  Mr. Mohamadi, you listen to the question

M. Mohamadi - Cross

1112

1   and you get the answer.  And you know the consequences of

2   violating the rules --

3            THE DEFENDANT:  I apologize.

4            THE COURT:  -- in the courtroom.

5            THE DEFENDANT:  I apologize, Your Honor.  I don't

6   mean to disrespect the Court.  I apologize.

7            THE COURT:  I realize.  Let's keep it within the

8   rules of evidence.

9            Ask your next question.

10  BY MR. WALUTES: (Continuing)

11  Q.   Your Honor, if I could ask Mr. Mohamadi to look at now

12  what is item 88 from his canteen.

13            Do you see this, Mr. Mohamadi?  Are you at 88?

14            I don't want to get ahead of you.

15  A.   Yes, I am.

16  Q.   And do you see on May 30 of 2008, Jessica Hill, they

17  misspelled her name, it actually should be Hull, shouldn't it,

18  with a u?

19  A.   I do see that.

20  Q.   Do you see that she deposited $200 to your account on

21  May 30 of 2008?

22  A.   That is what it shows.

23  Q.   Okay.  Now if I could ask you to look at item number 90.

24            Do you see this item 90, Mr. Mohamadi?

25  A.   Yes, I do.

M. Mohamadi - Cross

1113

1  Q.   Do you see that again they have misspelled her name,

2  Jessica Hill, on May 23 of 2008 has deposited $500 into your

3  account?

4  A.   Yes, I do see that document.

5  Q.   And so, in just one month between May 23 of 2008 and June

6  of 2008, June 23 of 2008, Ms. Hull had deposited $1,750 into

7  your account?

8  A.   Okay.

9  Q.   And you used that money to give it to Amanda to make sure

10  she would stick by your side?

11  A.   That's false.

12  Q.   But you gave her money?

13  A.   That's false.  She was with me before I even had any

14  intersection with Ms. Hull.  So, I don't understand how that--

15  Q.   When you were in jail in Alexandria, summer of 2008

16  before your trial in December of 2008--  And I think your

17  attorney was asking Ms. Inge yesterday that she went to see

18  your attorney, Mr. Brown, do you remember that testimony?

19  A.   Yes, I do.

20  Q.   That was in the summer of 2008?

21  A.   Yes, it was.

22  Q.   And after she went to your attorney and gave, and talked

23  to him, you started giving her money, correct?

24  A.   Is that what you're saying?

25  Q.   I'm asking you.

1114

1    A.    No.   That is not what occurred.

2    Q.    You gave her money?

3    A.    I have provided her with funds, yes, I have.

4    Q.    And you gave her money during the summer of 2008?

5    A.    I can't recall doing that during the summer of 2008.

6    Q.    Well, you know it was after she talked your attorney like

7    you asked her to, right?

8    A.    Could you show me a document stating that so it would

9    refresh my memory?

10   Q.    Certainly.

11   A.    Thank you.   I am sure that, it probably was, I would just

12   like to see a document.

13   Q.    I understand.   If you could look at item number 72.   Do

14   you see item number 72, Mr. Mohamadi?

15   A.    Yes, I do.

16   Q.    Okay.   Now, this is going the other way.   You are

17   actually disbursing funds now, correct?   Do you see check

18   withdrawal?

19   A.    Yes, I do, release 1,500.

20   Q.    And so, on August 1 of 2008 you have disbursed $1,500 to

21   an Amanda Inge, correct?

22   A.    Yes, I did release that money so she could visit her

23   father who was on his death bed for cancer.   And I gave her

24   that money so she could make that plane ticket.

25   Q.    I am sure you have--  Mr. Mohamadi, that wasn't the

M. Mohamadi - Cross

1115

1    question.

2    A.   And soon after--

3          THE COURT:  You can't get a transcript when both

4    people are talking at the same time.  You listen to--

5          THE DEFENDANT:  Can I just say one thing, Your

6    Honor, please?

7          THE COURT:  No.  We can't--

8          THE DEFENDANT:  Just let me get some clarification.

9          THE COURT:  No, no, no.  You listen to the question

10   and answer the question if you can.  And if you have follow-up

11   testimony you would like to give, you let your attorney know

12   and that attorney will ask the question on redirect.  All

13   right.

14         THE DEFENDANT:  Yes, I will.

15         THE COURT:  Okay.  And when both people are talking,

16   the court reporter has an impossible job and the record won't

17   be accurate.  All right.

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  All right.  Will you follow my

20   direction?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  All right.  Ask your next question.

23   BY MR. WALUTES: (Continuing)

24   Q.   If I could ask you, Mr. Mohamadi, to look at item 67.

25         And this item on August 14 of 2008, you have given a

M. Mohamadi - Cross

1116

1   check to your sister, and now we actually have the spelling, I

2   don't want to mispronounce your sister's name, can you say

3   your sister's name.

4   A.   Homaira.

5   Q.   Okay.  Homara?

6   A.   Homaira.

7   Q.   I'm sorry?

8   A.   Homaira.

9   Q.   Homaira.

10  A.   Homaira.  The H is silent.  Homaira.

11  Q.   Homaira?

12  A.   Yes, yes, sir.

13  Q.   I apologize.  I actually don't mean to mispronounce her

14  name.  At this point you have given her a $400 check, correct?

15  A.   I released $400 to her, yes, I did.

16  Q.   Now, she didn't money to help you try to beat your state

17  case, did she?

18  A.   She does not need money at all.

19  Q.   Okay.  So, this money is actually for Amanda, correct?

20  A.   No.  This money is actually to buy Jessica Hull some

21  items for her children because she wouldn't do it.

22  Q.   Okay.

23  A.   She was too busy running around, she wouldn't even take

24  care of her own kids.

25          THE COURT:  All right, wait for the next question.

M. Mohamadi - Cross

1117

1   Q.   If you could look at item 36.

2        Do you see 36, Mr. Mohamadi?

3   A.   Yes, I do.

4   Q.   Okay.  Now, on this date, November 24 of 2008, just to

5   orientate you, what is that, two weeks before your state

6   trial?

7   A.   Okay.

8   Q.   Is it two weeks before your state trial?  Don't say okay,

9   Mr. Mohamadi.  Do you recall today when you went to trial?

10  A.   Yes, I went to trial December 8.

11  Q.   Okay.  So, how far would you say this is before your

12  state trial?

13  A.   What you said, two weeks.

14  Q.   Okay.  And on that day you have given another check to

15  Amanda Inge for $130, is that correct?

16  A.   That is correct.

17  Q.   Okay.  If you can now look at item 22.

18       Do you see this item, sir?  Do you see this item?

19  A.   22?

20  Q.   Yes.

21  A.   Yes, I do.

22  Q.   And so, after your trial, now on February 4 of 2008, this

23  is when she has actually gone to Miami, correct?

24  A.   Yes, sir.

25  Q.   Okay.  On this date you have given her a check for

M. Mohamadi - Cross

1118

1   another $100 after she has testified as a witness in your

2   trial?

3   A.   Yes, her birthday was on the 8th.

4   Q.   I understand.  And then when you talked to her at

5   midnight or a little after midnight, 12:43 on March 5 of 2009,

6   now she is coming to the federal grand jury, you heard that

7   the tape played when Deputy Burnham was admitting all the jail

8   tapes?

9        I am sorry, did you hear the question, Mr. Mohamadi?

10  A.   I am sorry, I didn't hear the question.  I apologize.

11  Q.   Did you hear the tape played yesterday by Deputy Burnham

12  of you speaking to Ms. Inge through Dominik Brown at midnight

13  as you explained the late hour right before she is testifying

14  before the federal grand jury?

15  A.   Yes, I did hear that.

16  Q.   Okay.  And on page 19 of that transcript did you say--

17  A.   Can I please look at the transcript so I can--

18  Q.   You sure can, Mr. Mohamadi.  I actually have an extra

19  copy for you.  I clipped them together.  The Court Security

20  Officer--

21       If I could ask you to look at page 18 of the

22  transcript of your conversation with Ms. Inge on March 5 of

23  2009 at 12:43 a.m. through Mr. Brown.

24       Do you see on line 20 on page 18, I am going to read

25  a couple lines, Mr. Mohamadi.  At the end I am going to ask

M. Mohamadi - Cross

1119

1    you if I have accurately read it, so please make sure I do.

2    A.   Okay.

3    Q.   Mr. Mohamadi:  And tell her I got her, man.  Tell her I

4    can do--  Mr. Brown:  He got you.

5         Mr. Mohamadi:  I can do like 500 for her, to help

6    her with her rent.  Mr. Brown:  Said he can do 500 to help you

7    with your rent.

8         Mr. Mohamadi:  She's got to come look at my ugly

9    face.  Mr. Brown:  He said you got to come look at his ugly

10   face.

11        Mr. Mohamadi:  Saturday, 2 o'clock.  Mr. Brown:

12   Saturday, 2 o'clock.

13        MS. MINTER:  Your Honor, I would object to just

14   reading the entire transcript back in evidence.  I think he

15   can direct him to the portions and ask him questions, but I

16   don't think it is appropriate to reiterate the evidence.

17        THE COURT:  Overruled.  Go ahead.

18   BY MR. WALUTES: (Continuing)

19   Q.   And then Mr. Mohamadi:  And he'll release the joint.  Mr.

20   Brown:  And he'll release the joint.

21        Mr. Mohamadi:  That's a deal?

22        Is that accurately read, Mr. Mohamadi?

23   A.   Yeah.

24   Q.   Okay.  So, what you were saying to Ms. Inge hours before

25   she appeared before the federal grand jury is, you would give

M. Mohamadi - Cross

1120

1    her money, but she had to come see you after she testified in

2    the grand jury before you would give it to her, correct?

3    A.    That's not correct.

4    Q.    I'm sorry, what was the deal that you thought you were

5    just arranging with her?

6    A.    There was no deal that I was arranging.  Can I explain?

7    Q.    Please.

8    A.    Okay.  If you notice right before that line 20, on line

9    18 Mr. Brown informs Ms. Inge that I just received her letter.

10   And in that letter she basically explained the situation where

11   her boyfriend had, or some guy she met at the club had

12   promised her, oh, you know, you don't have to work at this

13   club no more, I will take care of you.

14          So, she stopped working for that month and ran off

15   with guy.  And then this guy after a certain period of time

16   stopped talking to her, and now she was left high and dry.

17          And in this letter she discusses this event.  So,

18   that's why I basically told her that I could help her out with

19   that if she came to visit me.  There was nothing in regards to

20   the case.  There is no deal in regard to testimony.  It was

21   just saying, look, I can help her out, I understand her

22   situation.

23   Q.    So, you are calling her a few hours before her federal

24   grand jury appearance because you are just a friend that wants

25   to be there for her?

M. Mohamadi - Cross

1121

1    A.   You notice in February I sent her $100 for her birthday.

2    I mean, she had been very supportive during the first two

3    years.  If you could see the volumes upon volumes of phone

4    calls--

5    Q.   I am sorry, Mr. Mohamadi, what's the question?

6    A.   You basically insinuated--

7         THE COURT:  Listen to the question and answer the

8    question.  Next question.

9    Q.   Thank you, Your Honor.

10        Mr. Mohamadi, you testified in your state trial in

11   December of 2008, correct?

12   A.   Yes, I did.

13   Q.   You were under oath in that proceeding, weren't you?

14   A.   Yes, I was.

15   Q.   And you were the only one on trial, correct?

16   A.   Yes, I was.

17   Q.   So, you weren't helping anybody else when you testified,

18   you were trying to make sure the jury knew what you wanted

19   them to hear?

20   A.   I was trying to provide the jury with facts as I believed

21   it at that time.

22   Q.   And was that the truth?

23   A.   Excuse me?

24   Q.   When you testified--

25   A.   I just said I was trying to provide the jury with the

M. Mohamadi - Cross

1122

1   facts that I believed.

2   Q.   And the question now is, when you testified in December

3   of 2008, did you testify truthfully to the jury?

4   A.   Yes, I did.

5   Q.   Okay, let's spend some time with your testimony.  Do you

6   have a copy of your--  Let's see.

7          Mr. Mohamadi, would you like a copy of your trial

8   testimony?

9   A.   Sure, that would be helpful.

10  Q.   Thank you.  If I could draw your attention--  Do you see

11  that as your testimony, Mr. Mohamadi?

12  A.   Yes, it is.

13  Q.   Okay.  If I could ask you to look at page 108, line 12.

14  Do you see where your attorney, Mr. Brown, was asking you

15  questions, correct?

16  A.   Yes.

17  Q.   And Mr. Brown asks you:  How long have you known Ms.

18  Inge?  And you say:  Almost four years.

19  A.   Yes.

20  Q.   That's dramatically different than what Ms. Inge

21  testified to that she had known you for two or three months

22  before the robbery?

23  A.    Ms. Inge's testimony has changed many times.

24  Q.   So, your testimony now is that you have known Ms. Inge--

25  This is given in 2008.  So, you say now that you have known

M. Mohamadi - Cross

1   her for four years, since 2004?

2   A.   Yes, I have.

3   Q.   Okay.

4   A.   She was a dancer at Crystal City during that period.

5   Q.   The only question I want to know, make sure we are

6   sticking with that.  And then do you see where line 18, on the

7   same page:  Were you at any point romantically involved with

8   Ms. Inge?

9        Do you remember that?

10  A.   Yes, I do.

11  Q.   Okay.  And what was your answer?

12  A.   In the beginning I was romantically involved.

13  Q.   Okay.  So, at the time you were giving this testimony,

14  the time when you were on trial, what did you tell the jury?

15  A.   In regards to what?

16  Q.   Whether you had a romantic relationship with the witness

17  who was also testifying before them at that trial?

18  A.   I told them that we had a romantic relationship in the

19  beginning.

20  Q.   Which meant four years earlier?

21  A.   About.

22  Q.   Okay.  And that's a lie, right?

23  A.   Why would that be a lie?

24  Q.   I'm asking you, is that a lie?

25  A.   No, it's not.

M. Mohamadi - Cross

1124

1   Q.   If I could ask you to look at Exhibit 51, previously

2   admitted into evidence when Ms. Inge testified.

3            Do you see it?

4   A.   Yes, I do.

5   Q.   This is a letter you wrote to her after your state trial,

6   right?

7   A.   I don't see the date.

8   Q.   Okay.  Well, you're talking about how you can have

9   someone spy on her in Miami, right?

10  A.   Regarding her drug use in Miami, not anything else.

11  Q.   Mr. Mohamadi, save that for your attorneys.  My question

12  is to you, she moved to Miami, Florida for the first time in

13  December of 2008, correct?

14  A.   Can I read the whole letter?

15  Q.   Please do.  But we are going to read it out loud in the

16  courtroom.  So, if you want, go ahead and read it first, make

17  sure it's you?

18  A.   If you are going to read it, go ahead.

19  Q.   Okay.

20  A.   There is no point.

21  Q.   Okay.  Do you recognize your handwriting?

22  A.   Yes, I do.

23  Q.   And do you see on the second page where you sign it?

24  A.   Yes, I did sign it.

25  Q.   Okay.  Do you see where you say:  Dear Amanda, hello my

M. Mohamadi - Cross

1125

1    love?

2    A.    Yes, I did.

3    Q.    And do you see where you say:  Don't think I can't spy on

4    you in Miami?

5    A.    You skipped a big part.

6    Q.    I'm sorry, you can read the whole letter out loud if you

7    would like.  I was just going to try--

8    A.    I would like if you read it and I can answer any

9    questions as you read the whole letter.

10          THE COURT:  Take moment and review the letter and

11   then counsel will ask you the questions he wants.  And the

12   parts, and then as I indicated, if you want to complete

13   something, your counsel will help you.

14          THE DEFENDANT:  Okay, Your Honor.

15          THE COURT:  All right.

16          THE DEFENDANT:  Okay.

17   BY MR. WALUTES: (Continuing)

18   Q.    And so, in this letter you tell her:  Don't think I can't

19   spy on you in Miami; is that an accurate statement?

20   A.    That is one of the sentences in this letter.

21   Q.    Okay.  You also tell her, I'm sorry, down on the

22   paragraph below that:  But every day away from you, but every

23   day away from you is a day of misery and suffering.  I can't

24   wait to get back out there and be the, be with the one person

25   I love and adore!

M. Mohamadi - Cross

1126

1    Do you see that?

2    A.   Yes, I do see that.

3    Q.   If you could go to the second page.  Obviously, the jury

4    will be able to read the whole thing.  I just want to go to

5    just your finish:  Baby, I love you so much.  We will make it

6    through this!  Love, signed you.

7    A.   Yes.

8    Q.   Okay.  So, when you told the jury a month earlier that

9    you weren't romantically involved, you lied to that jury,

10   didn't you, Mr. Mohamadi?

11   A.   And what are you basing off of this letter to say that I

12   am romantically involved?  I told Mr. Brown I loved him in the

13   phone conversation, so--

14   Q.   You lied to them?

15   A.   Does that make me romantically involved with Mr. Brown

16   also because I told him I loved him at the end of the

17   conversation?

18   Q.   I am sorry, are we talking about Mr. Brown?

19   A.   I am just--

20   Q.   Who are we talking about, Mr. Mohamadi?

21   A.   I am just in regard to your insinuations, that's all.

22           THE COURT:  Just listen to the questions.

23   A.   We're talking about Amanda--

24           THE COURT:  Stop, stop.  Listen to the question and

25   answer the question.  All right.

M. Mohamadi - Cross

1127

1       THE DEFENDANT:  Okay, Your Honor.

2       THE COURT:  Thank you.

3       THE DEFENDANT:  I am trying my best.

4       THE COURT:  Next question.

5   BY MR. WALUTES: (Continuing)

6   Q.   You also testified to the jury that Mr. Bryan was

7   testifying against you because you had switched faiths?

8   A.   That's one of many reasons why Mr. Bryan did that.

9   Q.   I am sorry, I asked you a question.  Do you remember what

10  the question was?

11  A.   What was the question again?

12      THE COURT:  Ask your next question.  He has answered

13  that question.

14      MR. WALUTES:  Your Honor, I intend to go through his

15  testimony on that question.

16      THE COURT:  That's fine.

17      MR. WALUTES:  Thank you, Your Honor.

18  BY MR. WALUTES: (Continuing)

19  Q.   When you were testifying in the state court before a

20  jury, you said that you were no longer Muslim and that's why

21  Richmond Bryan was testifying against you, correct?

22  A.   Can you point out the section you are referring to?

23  Q.   I sure can.  If I could ask you to look at page 115--  Do

24  you still have the transcript in front of you?

25  A.   Yes, I do.

M. Mohamadi - Cross

1128

1    Q.   115.   Your Honor, I am sorry, I have an extra copy if the

2    Court would like me to pass one up.

3         THE COURT:   No, I am fine for now, thank you.

4    Q.   Do you see it, Mr. Bryan?   I am sorry, Mr. Mohamadi.

5    A.   What page is it again?

6    Q.   Page 115, line 19.

7    A.   Okay.

8    Q.   Do you see on line 19 where it says:   By mid-October I

9    actually converted, I accepted Christ.   Mr. Brown asked you:

10   Well, before you talk about mid-October, did there ever come a

11   period of time in which you lost touch with Mr. Bryan?

12   Answer, this is you talking:   Because of that?

13         Question:   When was that?   Answer:   When I made that

14   announcement.   Because there was a little group of us that

15   usually hung out or, you know, we prayed and stuff like that,

16   but when I made the announcement that I converted, I accepted

17   Christ, that's when I noticed a negative reaction there.   He

18   was a little argumentative at first, but eventually we just

19   stopped talking.

20   A.   Okay.

21   Q.   That's your sworn state testimony, correct?

22   A.   Yes, that is.

23   Q.   That is you talking?

24   A.   That is.

25   Q.   But the jury didn't get to hear the tape recordings that

M. Mohamadi - Cross

1129

1    you and Mr. Bryan had, did they?

2            You saw the whole trial, nothing happened outside

3    your presence?

4    A.    Yeah.

5    Q.    When Mr. Bryan testified, was he allowed to answer any

6    questions about the murder for hire?

7    A.    They didn't come in the state trial.

8    Q.    Was he allowed to play any of the tapes?

9    A.    No, no tapes were played during the state trial even

10   though we requested them.

11   Q.    Okay.  Again, save that for your attorney, Mr. Mohamadi.

12   If we can just focus on my--

13            MS. MINTER:  Your Honor, I don't think the

14   Government gets to dictates which ones he answers--

15            THE COURT:  I will make the rulings, but Mr.

16   Mohamadi has been cautioned at least five times now to answer

17   the question that is asked.

18            THE DEFENDANT:  Yeah, I am under a microscope, but

19   the Government's witnesses were able to --

20            THE COURT:  No, no.  You're--

21            THE DEFENDANT:  -- insinuate and say all types of

22   other stuff, but I am supposed to just play into his--

23            THE COURT:  No, stop.  It's time for a break.

24            THE DEFENDANT:  It's not fair at all.

25            THE COURT:  We will take 15 minutes now and we will

M. Mohamadi - Cross

1130

1   come back for further testimony.  And you are excused.  Thank

2   you.

3        NOTE:  At this point the jury leaves the courtroom;

4   whereupon the case continues as follows:

5   JURY OUT

6        THE DEFENDANT:  That is amazing, to dictate what a

7   person says.

8        THE COURT:  Have a seat.  All right.

9        I am going to give you 15 minutes to calm down.

10       THE DEFENDANT:  I am calm, Your Honor.  I am not

11  upset.

12       THE COURT:  No, you're not, you're not answering the

13  questions.  This is how, you have been through trial before

14  and you were on cross-examination before in state court.  I

15  don't know what happened in your robbery trials, whether you

16  pled guilty or you went to trial in those, but you know the

17  rules.

18       And let me remind you, you had great leeway that the

19  prosecutor didn't object to any leading questions.  You were

20  asked leading questions.  You were permitted to get the full

21  explanation out as to why Ms. Inge said what she said on the

22  stand.  You were allowed to talk about the tapes that

23  contradict certain evidence.  There were no objections made.

24  You now have been able to get that into evidence.

25       And you are going to respond to the questions that

M. Mohamadi - Cross

1131

1  you are asked or there are going to be sanctions.  I will give

2  you an opportunity to speak.

3          THE DEFENDANT:  Can I just say--

4          THE COURT:  You need to calm down.  There hasn't

5  been one question that was asked by the prosecutor which was

6  improper.  There were a couple comments when you went back and

7  forth, but you can eliminate that by answering the questions.

8          And here are the rules.  When he asks a question

9  which asks only for a yes or no answer, if you can answer it

10  yes or no, you do so.

11          If you say, I can't answer that yes or no, that's

12  all you have to say.  And if you say, may I explain, and he

13  says, go ahead, you may then answer that and explain.

14          Otherwise, you wait for redirect where your counsel

15  will have the opportunity to ask you questions.  And we will

16  take a break after cross-examination so you can consult with

17  your counsel.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  And bring up the areas that you want to

20  amplify on.  Do we understand each other?

21          THE DEFENDANT:  Yes, I do, Your Honor.  Can I say

22  something?

23          THE COURT:  Yes, sir.

24          THE DEFENDANT:  Can I explain where my confusion is?

25  The problem is, he is not just asking me a question.  He will

M. Mohamadi - Cross

1132

1    make an insinuation--

2              THE COURT:  If he--

3              THE DEFENDANT:  Can I just explain where my

4    confusion is so I can--

5              THE COURT:  Go ahead.

6              THE DEFENDANT:  So, what he will do is say, for

7    example, he will say--  Instead of just saying, did you walk

8    to the store, he will say, didn't you walk to the store with

9    the intention to kick the ball?

10             And what I will say, I will explain to him, I am--

11   He is basically telling me to say yes or no.  So, if I say

12   yes, than am I saying yes to walking to the store, or am I

13   also saying yes to walking to the store and kicking the ball?

14             But if I say no to kicking the ball and say no to

15   that, then he is going to come back and say, well, it says

16   right here that you walked to the store.

17             THE COURT:  If he asks--

18             THE DEFENDANT:  So they are trying to make me a

19   liar.

20             THE COURT:  If he asks a compound question, then you

21   can say, that's two questions.  Or you can say, I can't answer

22   that question and he will break it down.

23             THE DEFENDANT:  I don't want, I don't want to seem

24   like I am withholding anything or trying to be deceitful to

25   the jury.  I want to basically answer the questions --

1133

1          THE COURT:  If you think--

2          THE DEFENDANT:  -- and address the insinuations that

3  he is making.

4          THE COURT:  If you think the way you have been

5  answering some of these questions is helping your case, you

6  are wrong.  You ought to consult with counsel about that.

7          THE DEFENDANT:  I know it is not helping.

8          THE COURT:  But the Government's job is to ask

9  questions where a yes or no answer--  Where an answer can be

10  responded to yes or no.  If they have compound questions, it's

11  a compound question, you know, which question do you want me

12  to answer.

13          THE DEFENDANT:  Okay.

14          THE COURT:  And you are listening carefully to

15  questions, I can see that.  So, work with that.

16          THE DEFENDANT:  Okay.  Thank you for that guidance.

17  I will do that from this point forward.

18          MS. MINTER:  Your Honor, if I may address one issue.

19  I do object to the form of some of the questions.  There is a

20  process for introducing prior testimony, and that process is

21  if the individual says they don't recall, then their

22  recollection can be refreshed by allowing them to review it.

23          Or, if they deny it, a prior statement, then the

24  statement can be read into evidence.

25          I don't think it is appropriate to lead off by

M. Mohamadi - Cross

1134

1  reading something from the state trial into evidence and

2  saying, is this what happened?  The question has to be phrased

3  first.  And if the individual denies it, then impeachment with

4  the prior transcript is appropriate.

5          THE COURT:  All right.  And that is the rules.  And

6  we varied from them based on answers that Mr. Mohamadi was

7  giving and the constant requests for the opportunity to read

8  anything before he answered.

9          So, but let's go back to the way that we started.

10          MS. MINTER:  Yes, Your Honor.

11          THE COURT:  All right.  Then we will come back at

12 noon and continue on with our cross-examination.

13          NOTE:  At this point a recess is taken; at the

14 conclusion of which the case continues in the presence of the

15 jury as follows:

16 JURY IN

17          THE COURT:  All right, let's proceed.

18          MR. WALUTES:  Thank you, Your Honor.

19 BY MR. WALUTES: (Continuing)

20 Q.   Mr. Mohamadi, do you remember where we were before our

21 break?

22 A.   No, sir, I can't recall exactly.

23 Q.   Do you remember just reviewing some of the transcript

24 where you said that you had stopped speaking with Mr. Bryan in

25 mid-October when you testified in the state trial?

M. Mohamadi - Cross

1135

1    A.   Yes, I did.

2    Q.   Okay.  So, you told the jury that you had no more

3    conversations with Mr. Bryan after mid-October?

4    A.   What page was it again?

5    Q.   I'm sorry, over the break I was going to the next

6    question.  I will find it, Mr. Mohamadi.  I think it is

7    page 115 or 116, perhaps, line 14.  116--

8    A.   Page 115 or 116?

9    Q.   Yes.

10   A.   Which one, 115 or 116?

11   Q.   116 I believe is where we were, sir.

12   A.   Okay.

13   Q.   Do you see, he was a little argumentative, on line 13?

14   A.   Okay.

15   Q.   Okay.  Do you see where you said you just stopped

16   talking?

17   A.   I see where I said that.

18   Q.   Okay.  And earlier when your attorney was asking you the

19   questions, he said to you about when was it, and you said

20   mid-October.  I think that's the page before on line 20.

21   A.   Okay.

22   Q.   So, the fact that you are recorded talking to Mr. Bryan

23   in November of 2008 shows that you didn't stop talking to him,

24   did you, Mr. Mohamadi?

25   A.   Can I clarify that I didn't say I stopped talking to him.

1136

1    If you look at line 1 and 2, did there come a period of time

2    in which you lost touch with Mr. Bryan.  There was a small

3    window, a period that we didn't speak.  I am not saying that I

4    didn't speak from that point forward.

5    Q.   You testified that your personal decision, I am not

6    questioning any of that, but your personal decision to switch

7    faiths occurred during Ramadan, correct?

8    A.   Yes.

9    Q.   For those people who aren't--

10   A.   I'm sorry.  I'm sorry.  The decision to switch faiths

11   didn't occur--  I accepted Christ as my savior during that

12   period.  I mean, I was already interested in discussing and I

13   was getting ministered prior to that back in 2005.  But I

14   accepted, that's the big difference of a person that is truly

15   Christian or something else, is when you finally accept Christ

16   as your savior, not just read a Bible or--

17   Q.   And so, you had accepted Christ long before you had those

18   recorded conversations with Mr. Bryan in November of 2008,

19   correct?

20   A.   Yes, I did accept Christ before that.

21   Q.   And it occurred during Ramadan?

22   A.   Yes, it did.

23   Q.   And just for people who aren't familiar with Ramadan,

24   could you tell us in 2007 about the dates of Ramadan?  How

25   long is the celebration of Ramadan?

1137

1    A.    It's a period of 30 days where you fast.

2    Q.    Okay.  And when does it start?

3    A.    It varies every year, but it is around that period.

4    Q.    End of September, October sometime?

5    A.    Yes, sir.

6    Q.    And I believe today you went even further, you said that

7    you had the same conversion during Ramadan back in 2007 when

8    you were interacting with Mr. Randy Puryear?

9    A.    No, there was no conversion at that time.  I just said

10   that prior to that and during that whole period I was having

11   an inner struggle in regards to a stance.  It wasn't in

12   regards to conversion.  I just basically spoke that at that

13   time I tried to go back and practice what I grew up doing, but

14   I just couldn't after obtaining the information that I had and

15   just, you know, my heart was, you know, believed something

16   else.  And I finally--  And at that point I just couldn't go

17   through the motions anymore.

18   Q.    So, what you are asking the jury to believe today is that

19   these people who are Muslim, you agree that Mr. Bryan and Mr.

20   Puryear are Muslims?

21   A.    Mr. who?

22   Q.    Pressley, I'm sorry.  I am so sorry, Mr. Pressley.  Thank

23   you, Mr. Mohamadi.  Randy Pressley and Mr. Bryan are both

24   Muslims, correct?  Do you know that?

25   A.    Yes.

M. Mohamadi - Cross

1138

1    Q.    You know that from interacting with them during Ramadan

2    while you were incarcerated with them?

3    A.    Yes, sir.

4    Q.    And saw them both come into the courtroom and actually

5    affirm the oath rather than swear on a Bible, correct?

6    A.    I didn't observe that.

7    Q.    Okay.  But you would ask the jury, your suggestion is

8    that they are testifying against you because they were in a

9    different faith?

10   A.    No, that's not what I'm saying.

11   Q.    Isn't it true--

12   A.    I can't speak for what they believe or in their mind.

13   Q.    If I could focus your attention, did I understand your

14   testimony on direct to be that Amanda Inge was helping law

15   enforcement because they found drugs in her apartment on

16   June 1 of 2007?

17   A.    That's what I was led to believe.

18   Q.    I'm sorry, I thought you were testifying from personal

19   knowledge.  Do you know that to be true?

20   A.    I know that she has a drug problem and always has drugs,

21   I know that for a fact.  But I don't know, I wasn't there when

22   law enforcement went into her apartment and did that search.

23   Q.    But you testified that they found drugs in her apartment.

24   A.    I don't think you heard me correctly.  I said that I was

25   led to believe from Ms. Inge from her own statements to me,

1139

1    but I didn't say that I knew firsthand.

2    Q.   And when you testified in the state trial, do you recall

3    your attorney asking you if you were employed at the time of

4    the robbery of the taxicab driver?

5    A.   Excuse me, rephrase that.

6    Q.   Do you recall Larry Brown--  He was your attorney,

7    correct?

8    A.   Yes.

9    Q.   Do you recall him asking you while you were under oath in

10   front of the jury whether you were employed at the time the

11   taxicab driver, Mr. Haile, was robbed?

12   A.   Yes, he did ask me whether I was employed.

13   Q.   So, did he focus your attention that at the end of May

14   were you employed, do you recall that?

15   A.   Can you direct me to the section, please?

16   Q.   Page 102, line 14.

17            MS. MINTER:  Your Honor, may we approach?

18            THE COURT:  Yes.

19            MR. WALUTES:  Your Honor, this is an interruption of

20   the Government's cross-

21            THE COURT:  I want to find out what the objection

22   is, so please approach.

23            NOTE:  A side-bar discussion is had between the

24   Court and counsel out of the hearing of the jury as follows:

25   AT SIDE BAR

M. Mohamadi - Cross

1140

1          MS. MINTER:  Your Honor, this is the same issue.  I

2     don't know where this line of questioning is going, but he

3     hasn't testified to anything today about where he was working

4     on--

5          THE COURT:  He said he was a car salesman.

6          MS. MINTER:  He said that was his line of work, Your

7     Honor, but he hasn't testified to where he was employed on the

8     date of the offense.  I don't know where this questioning is

9     going, but it seems to be some modified impeachment whereby

10    his prior statements are to be brought in, but that's not

11    appropriate at this point.

12         THE COURT:  I am going to allow this question.  We

13    will see where we are going.  You make an objection and I will

14    rule on it, but let's not have side bars every time.  I

15    encourage them, but not on something like this.  I don't know

16    whether it is proper impeachment or not, but we will listen to

17    the question.

18         We are here.  Where are you going with this?

19         MR. WALUTES:  Your Honor, he has testified under

20    oath that he is a car salesman in the state trial.  He said

21    that he was a car salesman at the time, that he made thousands

22    of dollars that week, that he was working at the time of the

23    robberies, he wasn't the man.

24         He was fired two months earlier.  I have the records

25    custodian from the employer outside the courtroom right now.

1141

1    I intend to do this.  I would ask that I be permitted.  It is

2    proper impeachment.

3              THE COURT:  It will be permitted.

4              MS. MINTER:  Your Honor--

5              THE COURT:  Your exception is noted.

6              MS. MINTER:  Your Honor, that is proper impeachment

7    in a state trial level--

8              THE COURT:  It goes to his credibility.  It's a

9    prior statement under oath, which was a lie.  Why isn't that

10   admissible?

11             MS. MINTER:  If I may, for the record, Your Honor, I

12   asked him his line of work.  He said he is a car salesman--

13             THE COURT:  He has put his credibility at issue by

14   testifying the way he has.  If I am misunderstanding the

15   rules, you tell me.  But he has put his credibility at issue.

16   He has testified previously under oath.  If it was a lie, it

17   goes to his credibility.

18             MS. MINTER:  Your Honor, any witness obviously puts

19   their credibility at issue by testifying, but he has not--

20   The Government is attempting to impeach a statement that he

21   made in a prior--

22             THE COURT:  I think they have to ask--

23             MR. NACHMANOFF:  Your Honor, if I may.  I apologize

24   for jumping in.  I think the issue here is if Mr. Walutes

25   wants to ask specific questions about May 27 or what he was

M. Mohamadi - Cross

1142

1    doing, perhaps the Court will find that that is proper since

2    he made a general denial of having committed the robbery.

3              There was no question on direct concerning what

4    money he was earning in particular to be impeached on right

5    now.

6              And so, rather than have him be impeached based on

7    his state trial testimony under oath, he needs to be asked

8    directly those questions.  If then a witness is sought on

9    rebuttal, it would be for the testimony that is given here

10   today.

11             MR. WALUTES:  He testified on direct that everything

12   he said in the state trial was true and he didn't want to

13   change any of it.  He has already adopted the entire

14   testimony.

15             THE COURT:  Well, he did answer that question.  But

16   ask the preliminary questions to set it up.

17             MR. WALUTES:  Very well.

18             NOTE:  The side-bar discussion is concluded;

19   whereupon the case continues before the jury as follows:

20   BEFORE THE JURY

21             MR. WALUTES:  May I proceed, Your Honor.

22             THE COURT:  Yes.

23   BY MR. WALUTES: (Continuing)

24   Q.   Mr. Mohamadi, you testified in the state trial in

25   December of 2008, correct?

1143

1   A.   Yes, sir.

2   Q.   And you have already said before we took our break that

3   everything you told that jury was true, correct?

4   A.   Yes, sir.

5   Q.   And you told that jury that you were employed as a car

6   salesman making an awful lot of money at the time that this

7   taxicab robbery occurred on May 27 of 2007, correct?

8   A.   What's the question?

9   Q.   You told the jury that you were employed at Eastern

10  Automotive, that you were making a lot of money, and that you

11  had no reason to want to rob a taxicab driver on May 27 of

12  2006, correct?

13  A.   What you're saying is not correct exactly.

14  Q.   I understand it's not verbatim because nobody wants me to

15  read the transcript, but--

16  A.   But you are saying a whole bunch of stuff, sir.

17  Q.   Okay.  Let me break it down.  Did you testify before a

18  jury that you were working on May 26 of 2007 at Eastern

19  Automotive?

20  A.   Yes, I did.

21  Q.   And was that the truth?

22  A.   Yes, it was.

23  Q.   And you told the jury that you were making thousands of

24  dollars, it was a very lucrative job, did you say that?

25  A.   I said I was very successful at my job, yes.

1144

1    Q.    Okay.  And did you say that you were making lots of money

2    the month before, April of 2007?

3    A.    I said the month before I made $9,000.

4    Q.    So, in April of 2007 you said you made $9,000 at Eastern

5    Automotive?

6    A.    I don't recall giving the specific date.  I recall saying

7    that the month before I made a certain amount of money.

8    Page 103, line 6.

9    Q.    Yes.  Do you see that?

10   A.    Yes, I do.

11   Q.    Thank you.

12   A.    Can you clarify?  It says the previous month I made--

13   Q.    If you're willing, I am--  Is this still a true

14   statement, that answer you gave on line 6?

15   A.    Yes, I did --

16   Q.    Okay.  So, the previous--

17   A.    -- make up to 10,000 during a month.

18   Q.    I just want to make sure I set the context to this.  When

19   you say a previous month, you mean of April of 2007, correct?

20   A.    I meant the previous month of the period that I was

21   referring to at that point in time.

22   Q.    Which is May--

23   A.    What I believe--  No, at the time what I believed from my

24   memory because I was trying to recall back a year in the past.

25   So, I basically, the decision to take the stand was a last

M. Mohamadi - Cross

1145

1    minute effort, and at that point in time when I was asked to

2    recall a year in the past, I recall the month after when I

3    earned that much month.

4    Q.    You testified to the jury that you were employed at the

5    time of the robberies, of the bank robbery, correct?

6    A.    Yes, I did testify that I was at Eastern Motors during

7    the day.

8    Q.    That you were making a lot of money in that position?

9    A.    That I was successful at my job, yes.

10   Q.    And that a month before the robbery of the taxicab

11   driver--  The taxicab driver you accept is robbed on May 27 of

12   2007?

13   A.    I did say I made 10,000 the month before.

14   Q.    So, in April of 2007 you told the jury you made $10,000

15   and that you are a pretty good salesman, car salesman,

16   correct?

17   A.    Again, I didn't say a specific month.  I just said a

18   month before.

19   Q.    That's actually a lie though, correct?

20   A.    How is that?  I made 10,000 a month during--

21   Q.    Because the truth of the matter, Mr. Mohamadi, is that

22   you were fired from Eastern Automotive in March of 2007?

23   A.    That's false.  I can pull out the documents if you like

24   to prove that it was false.

25             THE COURT:  Just ask the next question.  You said

M. Mohamadi - Cross

1146

1    that's incorrect.

2    A.    That's incorrect.

3    Q.    So, if outside this courtroom I have the records

4    custodian from Eastern Automotive with your employment file

5    and they will say you were terminated in March of 2007, that

6    person is lying?

7    A.    There are several documents.  There is other conflicting

8    documents also.  That may be one of the documents you have.

9    Am I--  Okay.

10   Q.    You said that you behaved differently outside of jail, is

11   that correct.

12   A.    Yes, sir.

13   Q.    You behave differently outside of jail because outside of

14   jail you carry a gun?

15   A.    No, sir, that's incorrect.

16   Q.    That was your .380 that we saw earlier in this trial,

17   wasn't it?

18   A.    That's false.

19   Q.    In fact, you used that gun to take money with force from

20   other people?

21   A.    That's false.  I have a job.

22   Q.    From business people?

23   A.    That's false.

24   Q.    And had you been outside of jail, you could have killed

25   Mr. Haile yourself, couldn't you?

1147

1  A.   If I recall exactly, the incident occurred in June.  I

2  was out until August.

3  Q.   But you hadn't seen him yet testify against you, had you?

4  A.   But if what you're saying is correct, then if I allegedly

5  robbed this individual, I would know who I robbed, correct?

6  Q.   You didn't know if he was coming forward, did you?

7  A.   No, because I did not rob this individual.

8  Q.   Once you were in jail, you saw the problem, didn't you,

9  Mr. Mohamadi?

10  A.   Excuse me?

11  Q.   Once you were in jail, you saw the problem, didn't you?

12  A.   The problem was I was falsely accused.

13          MR. WALUTES:  No further questions, Your Honor.

14          THE COURT:  All right.  Redirect.

15          MS. MINTER:  Briefly, Your Honor.

16      REDIRECT EXAMINATION

17  BY MS. MINTER:

18  Q.   Mr. Mohamadi, with the assistance of the Court Security

19  Officer, I would like to show you Government's Exhibit 51.

20          Do you recognize that?

21  A.   Yes, ma'am, I do.

22  Q.   From your testimony a few moments ago?

23  A.   Yes, I do recognize it.

24  Q.   And the attorney for the Government asked you a question

25  about one of the lines in that letter, correct?

1148

1    A.    Yes, ma'am.

2    Q.    Do you remember that question?

3    A.    Yes, ma'am.

4    Q.    And that question was about the line that says, don't

5    think I can't spy on you in Miami?

6    A.    Yes, ma'am.

7    Q.    Okay.  If you could read three lines below that.

8    A.    What's the first word?

9    Q.    It's a line that starts with the letter J?

10   A.    Okay.  Just playing, I trust you.

11   Q.    Okay.  And what does that mean?  When you say--  What

12   does just playing mean?

13   A.    It's in regards to the whole situation with Ms. Inge and

14   her drug problems.  I was basically after the incident in I

15   think August of--

16   Q.    Let me--

17   A.    It was an incident that occurred.

18   Q.    Perhaps my question was unclear.  My question is what

19   does just playing mean?

20   A.    Just playing meaning that, you know, I did trust her and

21   that I wasn't, you know, really not--  That I didn't distrust

22   her in what she was saying.  Because she made the assertion

23   that she was not going to use drugs while she worked and all

24   that other stuff, but--

25   Q.    So, it is like saying just kidding?

1149

1   A.   Yeah.  Because I had been kind of like responsible--

2           THE COURT:  Okay, listen to the next question.

3           THE DEFENDANT:  Okay.

4           THE COURT:  Thank you.

5           THE DEFENDANT:  Yes, Your Honor.

6   BY MS. MINTER: (Continuing)

7   Q.   Mr. Mohamadi, you have talked a fair amount about Ms.

8   Inge and your relationship over the course of time?

9   A.   Yes, ma'am.

10  Q.   While you were in jail, was your relationship cut and

11  dry?  Was it one exact think or did it change?

12  A.   No, ma'am, it was very eventful.

13          MS. MINTER:  Nothing further, Your Honor.

14          THE COURT:  All right.  Mr. Mohamadi, you may resume

15  your seat.

16          THE DEFENDANT:  All right.  Thank you, Your Honor.

17  I apologize for just a little bit of confusion.

18          THE COURT:  All right.

19          NOTE:  The defendant stood down.

20          THE COURT:  Any other witnesses?

21          MR. NACHMANOFF:  The defense rests, Your Honor.

22          THE COURT:  All right.  Any rebuttal?

23          MR. WALUTES:  Yes, Your Honor, I have two brief

24  witnesses.

25          THE COURT:  All right.

R. Hickman - Direct

1150

1      MR. WALUTES:  Your Honor, the Government would

2  recall Detective Robert Hickman.

3      THE COURT:  All right.

4      Good afternoon, Detective Hickman.  You are still

5  under oath, sir.

6      THE WITNESS:  Thank you, Your Honor.

7      THE COURT:  Go ahead.

8      ROBERT HICKMAN, a witness recalled by counsel for

9  the United States, having been previously sworn, testifies and

10 states:

11     DIRECT EXAMINATION

12 BY MR. WALUTES:

13 Q.   For the record, could you tell us your name again,

14 please.

15 A.   Robert Hickman.

16 Q.   Detective Hickman, did you testify earlier in this trial

17 that you conducted a consensual search on Amanda Inge's

18 apartment at 175 South Reynolds Street, apartment 117, on June

19 1 of 2007?

20 A.   I believe I did.

21 Q.   And did she actually sign a consent at that time allowing

22 you to do that?

23 A.   She did.

24 Q.   Were any drugs found inside Ms. Amanda Inge's apartment?

25 A.   No.

R. Hickman - Cross

1151

1    Q.    Had you as a--  Is that apartment inside the city of

2    Alexandria?

3    A.    It is.

4    Q.    Had you found drugs inside Amanda Inge's apartment, what

5    would you have done?

6    A.    Well, we would have, depending upon the type of drug, we

7    would have got a field test kit out to field test them to

8    verify they were actually in fact drugs.  And if so, we would

9    have taken appropriate action, which would include seizing the

10   narcotics, packaging them and making an arrest if that, you

11   know, if the facts of the search was appropriate for that.

12   Q.    In any case, that did not occur on June 1 when you

13   searched her apartment?

14   A.    No.

15              MR. WALUTES:  No further questions, Your Honor.

16              THE COURT:  All right.  Any cross-examination?

17        CROSS EXAMINATION

18   BY MS. MINTER:

19   Q.    Detective Hickman, you indicated that this search took

20   place on the first of June?

21   A.    Yes.

22   Q.    Had you executed any search of that apartment prior to

23   the first of June?

24   A.    No.

25   Q.    Had Ms. Inge, excuse me, been contacted prior to 1st of

N. Jallad - Direct

1152

1    June?

2    A.   I spoke with her on the 31st of May at her workplace.

3    Q.   Did you advise her at that time that you might return to

4    meet with her at the apartment?

5    A.   I don't remember if I did or not, ma'am.

6             MS. MINTER:  No further questions.

7             THE COURT:  All right.  May the detective be

8    excused?

9             MR. WALUTES:  Yes, Your Honor.

10            THE COURT:  All right, you are excused at this time.

11            THE WITNESS:  Thank you, Your Honor.

12            THE COURT:  Thank you, sir.

13            NOTE:  The witness stood down.

14            MR. WALUTES:  Your Honor, I would call, if I might,

15   the records custodian, I apologize, I can't remember her name,

16   from Eastern Automotive.  I have her seated right behind me.

17            THE COURT:  All right, the Eastern Automotive

18   records custodian.

19            NOTE:  The witness is sworn.

20            MR. WALUTES:  May I proceed, Your Honor?

21            THE COURT:  Yes.

22            NADIA JALLAD, called by counsel for the United

23   States, first being duly sworn, testifies and states:

24        DIRECT EXAMINATION

25   BY MR. WALUTES:

N. Jallad - Direct

1153

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    Could you please tell us your name.

4    A.    Nadia Jallad.

5    Q.    And could you spell us your name.

6    A.    N-a-d-i-a, last name is J-a-l-l-a-d.

7    Q.    And are you currently employed?

8    A.    Yes, I am.

9    Q.    How are you currently employed?

10   A.    HR director at Eastern Automotive Group.

11   Q.    Okay, a little slower for us.

12   A.    HR director at Eastern Automotive Group.

13   Q.    Could you tell us what HR stands for?

14   A.    Human Resources.

15   Q.    Are you in charge of the employment files for that group?

16   A.    Yes, I am.

17   Q.    And for people who don't know the corporate name, what

18   would people more commonly recognize your employer as?  Would

19   it be called Eastern Automotive?

20   A.    Yes, it is.

21   Q.    Are you employed, in charge of the employment records for

22   Eastern Automotive?

23   A.    Yes, I am.

24   Q.    Are they kept in the normal course of business?

25   A.    Yes, they are.

N. Jallad - Direct

1154

1   Q.   Do you actually keep them under key to maintain the

2   privacy of each employee?

3   A.   I do.

4   Q.   And are they kept in the normal course of business for

5   Eastern Automotive?

6   A.   They are.

7   Q.   If I could ask you to look at what is now marked as

8   Government's Exhibit 65.

9        Do you recognize that document?

10  A.   I do.

11  Q.   What is that document?

12  A.   These are the documents that are required when we employ

13  someone.

14  Q.   And is that-  Can you tell us the name of the employee

15  for that file?

16  A.   Mirwais Mohamadi.

17  Q.   And does that reflect when his relationship or employment

18  with Eastern Automotive was terminated?

19  A.   It does.

20  Q.   Could you tell us when he was terminated as an employee

21  of Eastern Automotive?

22  A.   3/28/2007.

23  Q.   For those of us not in the military, would that be

24  March 20 of 2007?  Would that be--  3/20/07, is that March 20

25  of 2007?

N. Jallad - Cross

1155

1    A.    3/28.

2    Q.    Oh, I am sorry, March 28 of 2007.

3    A.    March 28, yes.

4            MR. WALUTES:  I'm sorry.  Your Honor, at this time I

5    would move the admission of Government's Exhibit 65.

6            THE COURT:  Any objection?

7            MR. NACHMANOFF:  No objection, Your Honor.

8            THE COURT:  All right, it will be received.

9            MR. WALUTES:  Thank you.  I appreciate you coming to

10   court.

11           CROSS EXAMINATION

12   BY MS. NACHMANOFF:

13   Q.    Good morning, Ms. Jallad.

14   A.    Hello.

15   Q.    You testified you work at Eastern Motors, you are

16   responsible for HR?

17   A.    That's correct.

18   Q.    And you are familiar with Mr. Mohamadi's file, is that

19   right?

20   A.    Somewhat, yes.

21   Q.    And you have got it in front of you?

22   A.    Uh-hum.

23   Q.    And it reflects that he left on March 28, is that right,

24   the very end of March?

25   A.    That's what it reflects, yes.

N. Jallad - Cross

1156

1    Q.    And do you see the document that says that he left on his

2    own?

3    A.    Yes.

4    Q.    In other words, he wasn't fired for any misconduct?

5    A.    No.  It just says he left on his own and never showed up.

6    Q.    Okay.  And it's not uncommon for people who do sales at

7    Eastern Motors to sort of come and go, is it?

8    A.    No, it is a revolving door.

9    Q.    Okay.  And in fact, it wouldn't surprise you if there was

10   some ongoing activity with Mr. Mohamadi that followed into

11   April, would it?

12   A.    I am not sure I understand what you mean.

13   Q.    Well, maybe I can hand up this document, see if you

14   recognize it.

15         MR. WALUTES:  May I see it first, Your Honor?

16   Q.    Sure.  Could you take a look at that document for a

17   moment and tell me if you recognize it.

18   A.    Yes, sorry.

19   Q.    Is that a copy of a document that would have been

20   generated by you, a printout of an e-mail?

21   A.    Yes.

22   Q.    And that document is dated April 7, is that right?

23   A.    Yes, it is, 2009.

24   Q.    And it refers to some outstanding business with Mr.

25   Mohamadi, is that right?

N. Jallad - Redirect

1157

1   A.    Business?  It just refers to scheduling.

2   Q.    Right.  And that's dated April 7 of 2008?

3   A.    Yes.

4   Q.    Of 2007, excuse me?

5   A.    2009.  This was sent Tuesday, April 7, 2009.

6   Q.    Okay.  So, there was some business ongoing with Mr.

7   Mohamadi even after March of 2007?

8   A.    I am not following the question.  The type of business as

9   in--

10  Q.    That had to do with his having worked at Eastern Motors

11  before, correct?

12  A.    It says--  I have no idea what his schedule is.  I am not

13  sure what--  I still don't follow you.

14  Q.    That's all right, I will move on.

15  A.    Okay.

16  Q.    Can a salesman come to Eastern Motors and conduct deals

17  in which they have another salesman actually do the

18  transaction for them?

19  A.    If they are not employed with us, no.

20  Q.    Okay.  And if they do have a relationship with Eastern

21  Motors, they can?

22  A.    They could do split deals, yes.

23        MR. NACHMANOFF:  Okay.  Thank you, I have no further

24  questions.

25        REDIRECT EXAMINATION

1158

1    BY MR. WALUTES:

2    Q.   But they can only do a split deal if they are employed

3    with you?

4    A.   That's correct.

5    Q.   And when did his employment stop?

6    A.   According to the records, 3/28/2007.  March 28, 2007.

7         MR. WALUTES:  Thank you.  I have no further

8    questions, Your Honor.

9         THE COURT:  All right.  Ms. Jallad, you are excused

10   at this time.  Thank you.

11        THE WITNESS:  Thank you.

12        NOTE:  The witness stood down.

13        THE COURT:  Any other witnesses?

14        MR. WALUTES:  No, Your Honor.  The Government rests.

15        THE COURT:  All right.  Ladies and gentlemen, that

16   concludes the evidence in the case.  And I am going to have

17   you take your lunch break at this time.  When we come back, we

18   will hear closing arguments and instructions.

19        All right.  Then you are excused at this time.  I am

20   sorry, let's come back at quarter to 2.  All right.  So, it

21   will take a little bit more than, we have got a little

22   business to attend to, so we are not going to break quite yet,

23   but we will come back at quarter to 2 and we will hear

24   argument at that time.

25        All right, thank you, you are excused.

1159

1           NOTE:  At this point the jury leaves the courtroom;

2   whereupon the case continues as follows:

3   JURY OUT

4           THE COURT:  All right, have a seat.  We have got the

5   packet of instructions that I think are going to be ready

6   shortly for you to look at.

7           Mr. Nachmanoff, any follow-up motions you want to

8   make?

9           MR. NACHMANOFF:  No, Your Honor, other than to

10  clarify whether the Court wants to follow up with the CDs,

11  that's the only outstanding issue.

12          And then I think we do have one additional

13  instruction we meant to include, which is the standard

14  instruction on a drug user.

15          THE COURT:  All right.

16          MR. NACHMANOFF:  We can get a copy for the Court if

17  it is not readily available.

18          THE COURT:  Okay.  Well, if you give me the number,

19  I will be happy to--  I am just going to put in the O'Malley

20  drug user instruction.

21          The Government object to that?

22          MR. WALUTES:  We do not, Your Honor.

23          THE COURT:  All right.  We will put that in.

24          I am not going to review the tapes given the direct

25  examination and the cross-examination.  Mr. Mohamadi was

1160

1    allowed to testify, as I discussed earlier, to the matters

2    that he was concerned he would not be able to get in regarding

3    Ms. Inge's drug use, motivation for cooperating with the

4    Government.  And that came in, there was no impeachment of

5    that testimony.  And so, it stands unchallenged.

6            So, I am not going to allow--  I am not going to go

7    through the tapes to determine whether they were admissible at

8    this stage because they would have only been available for

9    rehabilitation of his testimony after cross-examination in any

10   event, if at all.

11           So, I am going to close the evidence at this time

12   without further review of tapes.

13           Mr. Mohamadi.

14           THE DEFENDANT:  Your Honor, can I just ask to

15   address the misleading stuff that the Government just did with

16   Ms. Jallad?

17           She has no knowledge of what occurs at the

18   dealership.  I have recordings of me conducting sales even

19   while I was in jail.

20           So, the fact that he is trying to say, oh, just

21   because I was off the clock that, you know, I'm lying, that

22   doesn't take away from the fact I was still, would go at the

23   dealership and conduct curb deals and all types of other

24   transactions, which I can support with phone calls.

25           I mean, I think this is very misleading.  The jury

1161

1   has been misled by that whole--

2         THE COURT:  Well, the records are the records.

3         THE DEFENDANT:  Yeah, but--

4         THE COURT:  And that's what they establish, sir.

5   All right.  You have made, you have noted your objection to

6   the admissibility.  We have received the evidence of the

7   employment records.

8         How much time do you want to argue the case?

9         MR. BEN'ARY:  Your Honor, I am going to do the

10  opening closing.  Mr. Walutes is going to do the rebuttal.

11  Rebuttal is tough to predict, but I would say for the first

12  part of opening it will be less than 20 minutes.  45 minutes

13  total.

14        THE COURT:  All right.  45 minutes is not

15  unreasonable, there is ten charges.  And I think anything,

16  total time anything underneath an hour is--  I mean, I think

17  Judge Ellis is dead on when he says that there is a real good

18  reason why TV shows last a half an hour, and that's the

19  capacity of people today.

20        Is that within your range?

21        MR. NACHMANOFF:  That's fine, Your Honor.  And just

22  as a housekeeping matter, we would, of course, renew all of

23  our prior motions under Rule 29 and all of the pretrial

24  motions that we reasserted at the close of the Government's

25  case.

1162

1          THE COURT:  All right.

2          MR. NACHMANOFF:  Pro se and those filed by counsel.

3          THE COURT:  All right.  That is noted in the record.

4    And for the reasons I stated previously, I will deny the

5    motions at this time.

6          All right.  Then take a look at the--  I don't know

7    whether the instructions are ready now or we need a few

8    minutes or--  Where are we?

9          THE LAW CLERK:  We have just need to photocopy them.

10          THE COURT:  Okay.  We just need to photocopy them.

11    So, if you want to have somebody, we will get them out to you

12    as soon as we can.

13          All right, then we are in recess until quarter to 2.

14          NOTE:  The taking of testimony in the case is

15    concluded.

16          -------------------------------------------------

17

18

19

20

21          I certify that the foregoing is a true and

22       accurate transcription of my stenographic notes.

23

24
                        /s/  Norman B. Linnell
25                 Norman B. Linnell, RPR, CM, VCE, FCRR