1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division




------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :        Case No. 1:09-cr-179
                              :
                              :
MIRWAIS MOHAMADI,             :
              Defendant.      :
                              :
------------------------------:
```

SENTENCING HEARING

June 18, 2010

Before:  Liam O'Grady, Judge

<u>APPEARANCES:</u>

Ronald L. Walutes, Jr. and Michael P. Ben'Ary,
Counsel for the United States

Michael S. Nachmanoff, Whitney E.C. Minter and
Jeffrey C. Corey, Counsel for the Defendant

The Defendant, M. Mohamadi, in person

2

1          THE CLERK:  Criminal case number 1:09-cr-179, the

2   United States of America versus Mirwais Mohamadi.

3          MR. WALUTES:  Good morning, Your Honor.  Ronald

4   Walutes and Mike Ben'Ary for the United States.

5          THE COURT:  All right, good morning.

6          MR. NACHMANOFF:  Good morning, Your Honor.  Michael

7   Nachmanoff on behalf of Mr. Mohamadi, along with Ms. Minter

8   and Mr. Corey.

9          THE COURT:  All right.  Good morning to you.

10          Good morning, Mr. Mohamadi.

11          THE DEFENDANT:  Good morning, Your Honor.

12          THE COURT:  This comes on for sentencing.  Does the

13   Government have any amendments, changes that it desires to

14   make to the presentence report?

15          MR. WALUTES:  It does not, Your Honor.

16          THE COURT:  All right.  Mr. Nachmanoff, I have read

17   the multiple submissions and also reviewed the objections that

18   have been made to the presentence report, especially on the

19   obstruction of justice and the reference to some of the other

20   offenses.  I will hear anything in addition you would like to

21   say at this time.

22          MR. NACHMANOFF:  Thank you, Your Honor.

23          If I can start perhaps with some preliminary

24   matters.  And I know the Court wants to focus on the

25   presentence report and on sentencing, but we met with Mr.

3

1    Mohamadi this morning and I want] to be sure that I convey to

2    the Court his concerns.  And we have shared with him the

3    Court's rulings on the outstanding motions.  And he has not

4    had an opportunity to read those or review them in depth, but

5    I did want the Court to know that he very much wanted the

6    opportunity to address the Court on those motions, including

7    with respect to the recordings that we submitted.  And I

8    wanted to confirm that the Court had those and had been able

9    to listen to them before rendering its decision on the related

10   motions.

11          THE COURT:  All right.  We can handle that first.  I

12   have reviewed both of the recordings.  The first one is a

13   video of one of the cooperating individuals being wired up or

14   miked up before he went into the cell with Mr. Mohamadi.

15          And the second one is an audio tape of Ms. Inge

16   having a conversation with Mr. Mohamadi about her testimony

17   that she had given.

18          So, I have reviewed both of those.  And do you want

19   to be heard in argument on those, or do you want Mr. Mohamadi

20   to address those?

21          MR. NACHMANOFF:  No.  I know Mr. Mohamadi would like

22   that opportunity if the Court is willing to give it to him.

23          THE COURT:  Yes, sir.  Mr. Mohamadi, come forward

24   and tell me why you chose the tapes and what you think it

25   means to your case, sir.

4

1          THE DEFENDANT:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          THE DEFENDANT:  Basically in regards to the

4  recording where they wired the informant up, basically in the

5  first like two minutes the law enforcement agents are telling

6  him, oh, we got him in the unit with you.  We tried to get him

7  in the cell with you, but we couldn't.  We got him at least in

8  the unit with you.  And they are giving him directions on what

9  to elicit.  Basically one of the standards of a <u>Massiah</u>

10  violation is whether it was elicited or whether the informant

11  received instructions.

12          Then the second part, I broke it down into three

13  sections and kind of narrowed out the exact parts.  The second

14  part was while I'm on the phone he comes to me and he's like,

15  oh, I just got word that, you know, I'm not going to go to

16  D.C.  I want to you talk to you about--  You know, basically

17  initiating that whole situation where they made it seem like

18  it was already planned, but in actuality all that occurred

19  during that process.

20          I mean, the guy was just very manipulative and very

21  smart in how he put that together.

22          And then the last part is the section where he makes

23  direct questions in regards to the robbery case.  Where he

24  asks, oh, so you're into robberies?  Oh, so what happened with

25  that?

5

1           I mean, that's clearly a Sixth Amendment violation

2    because my right to counsel had been attached in regards to

3    those cases.

4           And then from that, from that initial, which they

5    didn't transcribe, from that initial questioning we go into

6    the whole scenario.  Even though I told him false situations,

7    it was still in regards to robberies and I felt were very

8    prejudicial in regards to that case.  And I felt like he

9    elicited those conversations through his questions.

10          And just throughout the recordings he basically

11   asked questions in regards to the case asking what my attorney

12   was doing.  He asked about Amanda, which is a witness in the

13   case.  I mean, that is clearly stuff from the case where--

14   Because I read your order where you said that, A, that the

15   informant didn't ask any questions and he was just supposed--

16   Which is not accurate.

17          And then the second thing you wrote in your order

18   was that you were under the impression that none of the

19   informants were informants prior to the situation.  But as the

20   trial showed, Mr. Pressley was an informant and had informed

21   on several cases.

22          And Mr. Stephens had also testified on other people.

23   And these are all professional informants that have been

24   employed by law enforcement prior to this case.

25          So, that was, I guess the--  I was hoping I could

6

1   get those parts transcribed for you because I know my Ebonics

2   isn't that easy to understand in those recordings.

3          But the second issue is in regards to compulsory

4   process.  I don't know if I am saying it right.  Under the

5   Sixth Amendment where I have the right to present evidence

6   that may change the determination or the decision of the jury.

7          In regards to, even if it may not have changed the

8   decision in regards to the Hobbs Act, I think it is very

9   relevant in regards to the witness tampering because Ms. Inge

10  came on the stand and stated that I--  She had told me from

11  the get-go that she had told the officers this and I had went

12  on this campaign to influence her or whatever.

13         But that's just one of the recordings that I have.

14  I have about eight recordings where throughout the procedure

15  she basically tells me that--  I had a counsel at the time.

16  And through that whole procedure she is the one that is savvy.

17  She is like, look, let's not talk over--  I am sure it's on

18  the recording.  She is like, let's not talk about it over the

19  phone, I will talk to your lawyer about it.

20         So, everything, all my communication with Ms. Inge

21  was through counsel.  There was no time that I spoke with her.

22  The only reason I spoke to her on the phone in March, which

23  the recording was played, was because I was denied access to

24  counsel as the e-mails from Mr. Walutes to Ms. Buker showed

25  where Mr. Walutes tries to tell the Captain, please allow me

7

1  to see attorneys during that period where I wasn't allowed.

2          That's why I made that call to Ms. Inge.  But prior

3  to that I had no communication with her in regards to my case.

4  All the communication was through counsel.  And I have

5  numerous recordings to highlight that.  And I feel like that's

6  very relevant at least in regards to the witness tampering.

7          THE COURT:  All right, thank you.  You may have a

8  seat.

9          Did you want to add anything?

10          MR. NACHMANOFF:  No, thank you, Your Honor.

11          THE COURT:  All right.  The Government want to

12  respond?

13          MR. WALUTES:  Your Honor, the sworn testimony at

14  trial is that they did not have any prior relationship with

15  law enforcement.  I didn't hear anything on that tape that

16  says something different.

17          Both tapes were available to the defendant and

18  provided to him at his original, at the arraignment,

19  immediately after the arraignment.  All of that material was

20  available to him.

21          The fact that he files the day before the sentencing

22  a staged call between him and Ms. Inge--  And in that call she

23  says she has an attorney when he is talking about her concerns

24  over perjury.  The attorney is Larry Brown, who is the same

25  attorney representing Mr. Mohamadi at that time.

1        Your Honor, the call clearly is staged.  She is

2   clearly uncomfortable with all of his probing questions.  It

3   is almost as if there was a script.  And we certainly know

4   that he favors scripts from his federal grand jury

5   orchestration of her testimony.

6        She testified that she had been approached by his

7   sister in June of 2008.  And so, a call in 2008 repeating what

8   the sister had told her is clearly consistent with her trial

9   testimony.

10        Your Honor, to have that believed, she would have--

11   And she says on the tape, I had a couple other bald

12   boyfriends.  To have it believed, one of those other bald

13   boyfriends had this defendant's fingerprints that he left on

14   Kim Riley's car.  It just doesn't go.  Drop the same gun that

15   Kim Riley saw put to her temple two weeks after.

16        And then Mr. Mohamadi is trying to kill the taxicab

17   driver.  Your Honor, the point, I think the take away point is

18   that he filing an orchestrated piece of evidence the day

19   before his sentencing.  He just doesn't stop.

20        THE COURT:  All right.  Well, I have listened

21   carefully to the tapes.  I did not hear any testimony that I

22   would think would implicate the Massiah line of cases.

23        Clearly the testimony was that there was never any

24   attempt to get you to incriminate yourself.  And the

25   conversations that you had about the robberies with the

1   cooperating individuals were prior to the Government becoming

2   involved in your case.

3        So, the first tape where the informant is being

4   wired up doesn't, I don't think, affect at all the testimony

5   during the trial, doesn't support your theory.

6        And the testimony of, the conversation with Ms.

7   Inge, she was thoroughly cross-examined and the jury had an

8   opportunity to consider her credibility.  She was impeached

9   during cross-examination I thought effectively with

10  inconsistencies in her testimony.  And the jury had an

11  opportunity to view her testimony.  And it fell as it did

12  because of reasons other than just her statements, but in fact

13  the corroboration, as Mr. Walutes said, the weapon, the

14  fingerprint, the other consistencies in the Government's case

15  that was presented and which the jury used to find you guilty

16  beyond a reasonable doubt.

17       So, I will consider the tapes a request for a new

18  trial in addition to the other reasons, and I will deny it at

19  this time.

20       All right, Mr. Nachmanoff.

21       MR. NACHMANOFF:  Thank you, Your Honor.

22       With regard to the presentence report, we've had the

23  opportunity to review it.  As the Court is aware, we submitted

24  extensive objections.  Those objections have been memorialized

25  in the addendum that the Probation officer included.

10

1          I would reiterate those objections now.  And they

2    fall into a couple of categories.  The first is, of course, we

3    maintain Mr. Mohamadi's innocence.  We disagree with the facts

4    as set forth in the presentence report regarding the offense

5    conduct.

6          And as we noted in our pleadings and I would

7    reiterate today, nothing that I argue regarding the facts is

8    in any way an acknowledgement that they are correct.  But

9    there are arguments that we have made, obviously, accepting

10   arguendo that the Court finds as the jury did the facts as

11   contained in the presentence report, and that we can then turn

12   to what an appropriate sentence is.

13         But those are the objections with regard to

14   paragraphs 21 through 51, the offense conduct.  There were

15   also very specific objections lodged to the descriptions of

16   the pretrial detention and the conduct in the Alexandria Jail

17   as well as to specific references in the criminal history.

18   The Probation officer responded to those.  None of those

19   objections ultimately affect the Guideline calculation, but it

20   is important to us, important to Mr. Mohamadi that they be

21   noted.

22         We would ask the Court to strike those portions of

23   the presentence report that we do object to.  Mr. Mohamadi

24   understands that that can have an impact in many different

25   ways on him as the presentence report follows him to the

11

1    Bureau of Prisons.

2            And so, we don't believe that many of the

3    allegations that have been untested and unverified, not

4    subject to any sort of process, should be used to later

5    penalize him.  And those relates to paragraphs 7 through 18.

6    And then specifically with regard to his criminal history,

7    paragraphs 60, 63, 83 through 87.

8            And so, I just wanted to make sure the record was

9    clear that we maintain our objections to those.

10           Likewise, as the Court has noted, we have objections

11   to the Guideline calculations.  The Guideline calculations are

12   very complicated in this case.  Obviously, we have made our

13   arguments with regard to the obstruction of justice

14   enhancement, but also specifically with regard to how the

15   Guidelines are calculated for Counts 9 and 10, which are the

16   witness tampering counts under 2J1.2.

17           Again, because of the grouping rules, ultimately the

18   Guideline calculations for those counts don't affect the

19   ultimate determination of the advisory Guideline range.  But,

20   of course, it is important as a procedural matter and a

21   substantive matter that they be calculated correctly.

22           And so, we would stand on our arguments as to why,

23   although 2J1.2 is proper, the substantial interference and the

24   extensiveness and scope is not appropriate for the conduct

25   here that really was quite straight forward and not nearly so

12

1   sophisticated as one can see in other types of cases that are

2   found under that Guideline.

3          The final Guideline issue that I would like to raise

4   is one that we note in our pleading regarding criminal

5   history.  The criminal history has been determined to be a

6   Criminal History V.  That is actually determined by the

7   inclusion of one point for recency.

8          In other words, not only for having two points for

9   having committed the offenses within two years of being

10  incarcerated--  I'm sorry, two points for being on supervision

11  at the time the offenses occurred, but the additional one

12  point for recency for having committed it within two years of

13  being incarcerated.

14         That has been abolished by the most recent set of

15  amendments.  The Sentencing Commission has actually concluded

16  the recency points really shouldn't be part of the criminal

17  history calculation, and in this Guideline cycle they have

18  recommended to Congress that they be permitted to eliminate

19  them from the Guideline book.

20         The Probation officer correctly calculated that

21  recency points apply as of this date, and technically Congress

22  has the power to keep those amendments from going forward.

23         As a practical matter, that doesn't happen, it

24  happens almost never.  There is no reason to believe that it

25  will happen now.  And, obviously, the Commission concluded

13

1    that recency points should be eliminated because they don't

2    serve the purposes of sentencing, and increasing punishment

3    and increasing criminal history based on recency isn't

4    justified.

5            This is not technically a Guideline argument.  In

6    other words, I am not arguing that the Court should find that

7    he is in Criminal History IV.  I could argue, I believe I may

8    have argued or suggested a 4A1.3 horizontal departure, which

9    would be a way of taking this into account.  That is

10   prohibited because of the nature of the offenses for which he

11   is convicted.

12           But, of course, under 3553(a), to the extent the

13   Court wants to give weight to the advisory Guideline range,

14   and we have a whole series of arguments on that as well, what

15   I would say is that I think the Court should consider the

16   appropriate Guideline range based on what would be Criminal

17   History IV, which has a significant difference.

18           As the Court knows, the Guideline range right now

19   for those Guideline-related counts is 324 to 405 months.  If

20   the Court looks at the same Guideline range, a total Offense

21   Level 37, but at a Criminal History IV, it goes down to

22   292 months to 365.  So, it is a three-year difference.

23           So, ultimately what I am arguing to the Court is

24   that because the Sentencing Commission has made this, it's a

25   very specific and a very technical, but one that results in a

14

1    very real difference, the conclusion that one of those

2    criminal history points is not appropriate and should not be

3    considered and just the happenstance of this sentencing

4    occurring now in June rather than November, this individual

5    would be under the advisory Guidelines in a Criminal History

6    IV.  It's right on the edge between nine points and

7    ten points.

8            Therefore, we would ask the Court to take that into

9    consideration under 3553(a) and all of the cases that allow

10   this Court to reject a Guideline as unsound where here the

11   Commission itself has rejected this particular part of the

12   Guidelines.

13           And so, to the extent, again, and I know this is

14   significant because the Government has argued that the Court

15   should follow the Guidelines here, the Guidelines really

16   should be ratcheted down to the equivalent of Criminal History

17   IV.

18           THE COURT:  All right, Thank you.

19           MR. NACHMANOFF:  Thank you.

20           THE COURT:  Mr. Walutes, do you want to be heard on

21   the objections?

22           MR. WALUTES:  Your Honor, I actually think that the

23   Probation officer in this instance did a laudable job of

24   detailing the adjustment to confinement for this defendant.

25           I would note that Mr. Nachmanoff says that they are

15

1  while he is awaiting trial, but she actually carefully dates

2  the offenses.  They are all back for 1999, 2000, 2003.  I

3  mean, 85 infractions while he is confined, including

4  assaulting another inmate, I think it is an important thing

5  that needs to remain in this document so the Bureau of Prisons

6  appreciates who they are getting.

7        It is my personal belief that he belongs in Florence

8  because I think that his threat continues beyond the

9  sentencing to the Government's witnesses.  And I think he has

10 demonstrated to a degree further than any defendant I think I

11 have ever seen his willingness to kill the witnesses.

12       And so, we would is ask that BOP get this defendant

13 with open eyes and see how he has performed when he has been

14 incarcerated previously.

15       As to the others, Your Honor, obviously the

16 Guidelines are advisory.  We think the obstruction of justice

17 is properly awarded to this defendant.  We will submit on our

18 arguments in writing.

19       On the tampering of the witness, we believe that

20 this defendant actually did subvert justice in a criminal

21 trial.  So, I think that they don't advance the argument as to

22 Count 9.

23       As to 10, I don't think you can analysis 10 without

24 some recognition of what occurred in 9.  I think the case law

25 supports us.  I will submit on the pleadings as to those as

16

1    well, Your Honor.

2            As to the recency.  Again, at that point we believe

3    his criminal history is understated.  We believe, given that

4    the state was dealing with, just took three out of what

5    appeared to be seven robberies, he has received benefit and

6    leniency upon benefit and leniency.

7            So, we think that it is properly calculated.  There

8    is no reason for the Court to jump to someplace that the

9    Guidelines are not at today as this sentence is being imposed.

10           THE COURT:  All right, thank you.

11           Well, I will amend the criminal history based on the

12   argument of counsel on the recency point.  And it reduces the

13   Guideline range to 292 to 365 months.

14           The other amendments, request for amendments, are

15   denied.  I think the witness tampering points are accurately

16   calculated.

17           I think that the information in this report

18   regarding Mr. Mohamadi's actions during periods of

19   incarceration are very important for the Bureau of Prisons to

20   be able to review and to have access to in determining the

21   appropriate Bureau of Prisons facility that he is designated

22   to.

23           I find they are sufficiently reliable, that they

24   should be included.

25           Mr. Mohamadi's objections are noted and will also be

1     part of the report.

2            I find that the obstruction of justice points are

3     properly included.

4            And that the resulting offense-- So, I am not going

5     to make any other amendments to the report.  The adjusted

6     Offense Level is a 37, and a Criminal History Category IV.

7     It's a Guideline range of 292 to 365 months.

8            And also, we have minimum mandatory consecutive

9     sentences that are required for Count 3 and Count 4.

10           And so, I will make that one amendment and file the

11    report.

12           There are objections to the imposition of the armed

13    career criminal statute, the consecutive nature of the

14    firearms offenses, and let me hear from Mr. Nachmanoff first.

15           MR. NACHMANOFF:  Thank you, Your Honor.

16           And you are correct, we do object to the mandatory

17    minimum sentences in this case.  We have I think laid out in

18    some detail the many, many different arguments that we have as

19    well as the many different options that this Court could

20    pursue with regard to how it feels obliged to sentence in this

21    case.

22           And we are, of course, not asking the Court to

23    ignore the law, and we acknowledge that there is some law out

24    there that is not in our favor.

25           With regard to which mandatory minimums apply and

18

1    how they can be imposed, we believe that the Court has both a

2    statutory and a constitutional basis for imposing a concurrent

3    term for the seven-year mandatory minimum, which is one of the

4    two 924(c)s.  The except-for clause directly addresses this

5    issue.  The circuits are split on this.  Arguably, the Fourth

6    Circuit forecloses it.  I am not sure that's the case, and we

7    would urge the Court not to feel that it is foreclosed.

8            As the Court knows, there are two cases in the

9    Supreme Court right now addressing this issue, Abbott and

10   Gould.  And to the extent the Supreme Court concludes on

11   statutory grounds or Constitutional grounds that 924(c)

12   authorizes the Court the impose a single mandatory minimum,

13   which in this case would be the longer mandatory minimum of

14   25 years, we would, of course, urge the Court to impose the

15   25 years on that count and have the seven run concurrent to

16   that.

17           To the extent the Court feels that it cannot do so,

18   we are asking the Court to consider the minimum sentence that

19   it can impose given the mandatory minimums in this case.

20           And the other issue is the ACCA, the armed career

21   criminal 15-year mandatory minimum.

22           And so, as we have described it, Your Honor, and I

23   am sorry for the math, there is the option of imposing

24   25 years on the 924(c), concurrently imposing the seven years,

25   and then giving whatever sentence the Court feels appropriate,

1    and we would ask for one day of time, for all of those other

2    nonmandatory minimum sentences.

3              25 years is a long time under any circumstance.  And

4    the Government has submitted a lot of paper in this case as

5    well, and they have made the argument that Mr. Mohamadi should

6    go to jail for what will undoubtedly be the rest of his life.

7    Whether this Court imposes a sentence of the mandatory

8    minimums plus the advisory Guidelines, whether it is some

9    combination, the sentence that I understand the Government to

10   be asking for whether it's couched in a term of years or not

11   is going to be so long that it will be impossible for Mr.

12   Mohamadi to be able to look forward to a life on the outside

13   of prison.

14             And the question before this Court today is whether

15   that is necessary, whether that is called for under the

16   circumstances of this case.

17             I think it is significant that at root this is a

18   case that did not involve anyone being killed.  It didn't

19   involve anyone being harmed, anyone being touched.

20             Now, this is not to suggest--  And again, we

21   reiterate our objection to the facts found in the presentence

22   report.  This is not to suggest that being robbed at gunpoint

23   is a pleasant experience, is not a traumatic experience, is

24   not an experience that affects people in a significant way.

25   But when this Court is trying to determine the appropriate

20

1    quantum of punishment, one of the things that I think is

2    important for the Court to consider is how others that come

3    before the Court will be punished.

4            And if Mr. Mohamadi receives a sentence that will

5    keep him incarcerated for the rest of his life, what does that

6    say about the punishment that this Court must impose when

7    somebody comes before the Court who has killed someone, who

8    has injured someone severely, who has committed a crime that

9    as a comparative matter is far more serious and causes far

10   more harm and damage both to people and to property than the

11   crime here.

12           This was two robberies, one of a prostitute and one

13   of a taxi driver.  The amount of money involved was $2,000 or

14   less.  In one case a gun was held.  The taxi driver testified

15   that it was not pointed at him, it was just displayed.

16           And the other, the testimony, although I would

17   submit perhaps less compelling on the part of the witness or

18   that the gun was pointed at her, but nonetheless these are

19   cases where the harm has to be calibrated to the punishment.

20           And a sentence of life imprisonment or a sentence of

21   80 years, or even a sentence of 47 years if the Court

22   concludes that those mandatory minimum must be or should be

23   imposed consecutively, the seven, the 25 and the 15, is the

24   equivalent of virtually a life sentence.  And this Court

25   should not conclude that any sentence greater than that is

21

1  necessary or fulfills the purposes of sentencing.

2          Now, the Government has demonized Mr. Mohamadi,

3  there is no other way to put it.  They describe in their

4  sentencing papers that he has lived a life of crime and

5  violence that has racheted up and escalated over time.

6          But I think the presentence report really reflects

7  something quite different.  What the presentence report

8  reflects is that Mr. Mohamadi at the age of 16 committed a

9  series of crimes over a period of two weeks between June 15

10  and June 29 of 1998 that led to his incarceration.  It led to

11  him being designated ACCA.  And it led to the Government's

12  conclusion that he is a violent repeat offender.

13          And under the statute as it's written, and I have

14  deep disagreements with the way that statute is written, he

15  qualifies.  And we don't believe he should, and we've

16  submitted our Constitutional arguments, which I want to

17  preserve and reiterate under both the Eighth Amendment and the

18  Sixth Amendment.

19          But this was a spree of robberies or attempted

20  robberies in which no one was hurt, very little money was

21  taken.  And quite arguably, it happened during a period of

22  time that I don't think it's fair for the Court to segregate

23  out as a series of repeated violent offenses over time by a

24  juvenile.

25          The Government argues that he was then treated

22

1    leniently.  I am afraid I can't agree with that.  He was

2    incarcerated until he was 21.  He was in--  He was prosecuted

3    as an adult.  He became a convicted felon.  And then at the

4    age of 19 he was convicted of misdemeanor assault.

5         That is the totality of Mr. Mohamadi's violent

6    record, a decade of increasingly escalating violence until we

7    get to 2007.  Which at the time when these events occurred,

8    Mr. Mohamadi was 25.

9         And so, what we have is a series of events over the

10   period of the ages of 16 to 25, which are certainly

11   disturbing, concerning, certainly appropriate for the Court to

12   take into account in determining a punishment, but are they

13   the history of a person that this Court should now conclude

14   should be locked up forever.  And I would say, no, Your Honor,

15   emphatically no.  I don't think that that would be

16   appropriate.

17        The Supreme Court has addressed over the past

18   several years the issue of the fact that we know that people

19   in their teen-age years and their early twenties continue to

20   development in the area of their brain and their impulse

21   control.  And that in the criminal justice system we should

22   take into account when juveniles and young people commit

23   crimes in determining the appropriate punishment.

24        In the Roper case it was determined that the death

25   penalty is inappropriate for people who commit otherwise

23

1    capital crimes under the age of 18.

2         In the Gall case, one of the factors the Court

3    considered in imposing a lower sentence, which the Supreme

4    Court upheld, was that at the time the drug crimes were

5    committed Mr. Gall was in his early twenties and his brain

6    hadn't fully formed, and there was good reason to believe

7    based on his activities afterwards that he had matured.

8         And this term in Graham the Supreme Court has just

9    held that under the Eighth Amendment it's inappropriate to

10   impose life imprisonment without parole for nonhomicide crimes

11   to juveniles.

12        All of these things reflect what we know in the

13   scientific and the medical community about young people who

14   commit crimes, stupid crimes, potentially dangerous crimes,

15   but ultimately in this case not crimes that resulted in anyone

16   being injured, setting aside the misdemeanor assault

17   conviction in prison, which I think has to be seen in the

18   context of what prison was like.

19        I think this really is a different picture than the

20   one the Government paints.  And I think the other side of this

21   equation is critical for the Court to consider as well.  Which

22   is, we know that based on recidivism studies when people reach

23   their fifties and their sixties, they are far less danger, far

24   less likely to recidivate and far less in need of

25   incapacitation by the time they get to that age regardless of

24

1    what their youth is like.

2           And for that reason, to impose a sentence that

3    forecloses the possibility that Mr. Mohamadi could have an

4    opportunity to re-enter society, to have the opportunity to

5    rehabilitate himself, to have some relationship with his

6    family, I think would be wrong in this case.

7           And for that reason, we have asked the Court in

8    whatever way it thinks it can to fashion a sentence of either

9    25 years, 32, 40 years if it uses the 25 plus the 15 of ACCA,

10   or in the absolute worse case scenario 47 years based on

11   imposing them consecutive.  Which, frankly, puts him at an age

12   that really does not give him much to hope for.

13          Let me add that, and I have discussed this with Mr.

14   Mohamadi, his family, some of whom are here today, support him

15   and love him.  And this is a tragedy for them.  As the Court

16   knows, he lost his father while he was incarcerated.  He has

17   had trauma in his life.

18          He has explicitly asked me not to make those

19   arguments, not to make arguments based on sympathy.  And his

20   family prepared very compelling, very moving letters, which I

21   wanted to submit.  And Mr. Mohamadi asked me not to submit

22   them because he did not want his family to be put through the

23   difficulty of sharing that information about how his loss has

24   affected them, the positive impact he has had on his sisters

25   and his cousins and, of course, his love for his daughter and

25

1     the fact that he is separated from her.

2          I think those things are all relevant to this

3     Court's consideration because Mr. Mohamadi is a human being.

4     And despite whatever the Government may say, whatever negative

5     information is in the presentence report, that is a fact that

6     this Court should not deny and the Court should consider.

7          The Court has a difficult job to do, and we

8     appreciate that, but for all of the reasons that I have

9     articulated, we would ask the Court to fashion a sentence that

10    allows Mr. Mohamadi to have something to look forward to and

11    allows him to re-enter society and imposes a sentence that is

12    proportionate to the harm that was caused in this case and

13    that is not greater than necessary as 3553(a) requires to

14    achieve all of the purposes of sentencing, not just the desire

15    for sending a message or the desire for deterrence or for

16    incapacitation.

17         All of the sentences that we have suggested will

18    serve those purposes and will incapacitate him, and he knows

19    that.  The question is, how much is too much?  And we would

20    ask the Court to impose a fair sentence in this case.

21         Thank you.

22         THE COURT:  All right, thank you.

23         Does the Government want to be heard on sentencing?

24         MR. WALUTES:  Briefly, Your Honor.  We will submit

25    on our papers.  I believe the Court is familiar with the case.

1            We believe that Studifin and some of the other

2    Fourth Circuit opinions are binding.  We believe the arguments

3    have been rejected all the way up.  We, obviously, don't know

4    what the Supreme Court will do.

5            Second, the defendant's father died in 1999.  He

6    committed these crimes substantially after that.  The fact

7    that his father died while he was incarcerated, it is because

8    he was incarcerated because of robberies he committed back

9    when he was 16.

10           I would note first that he didn't start at 16.

11   There are multiple offenses reported in there from previous

12   years.  He comes to the armed robbery.  And then the ones he

13   committed in this case are at age 25 and he is now 28.

14           I think the point here to be made--  Or perhaps 24.

15   The point to be made today is that this defendant is an adult.

16   He is well past those formative, gentle teen years.  And the

17   difference between an armed robbery and a felony murder is

18   razor thin.

19           What is striking in this case, having handled myself

20   many, if not dozens of felony murders, is typically many times

21   there is the remorse of the person who has killed the person

22   they were just seeking to rob because they are using a loaded

23   armed weapon and things happen.  And that's why I believe the

24   community makes the penalties so harsh for a robbery.

25           In this case though, the reason the defendant we

1  believe deserves such a large sentence, and we recognize that

2  it is obviously large, we don't dispute that he is a human

3  being, is because of what he did after committing those armed

4  robberies.

5        And in this case you have the murder, the murder for

6  hire, multiple counts, where he is going into a community of

7  inmates who obviously have felony convictions and recruiting

8  people and then articulating, captured for this Court on tape,

9  and that is awfully rare for a judge to see, but the rich mens

10  rea, the deliberate, the reflective intent to take a human

11  life is present in this case.

12        He did nothing to save Mr. Haile's life.  Mr.

13  Haile's life was saved because of other inmates whose thought

14  lines had been crossed and came forward and put themselves

15  through this process.  And, Your Honor, I think that means

16  that those sentences are entirely appropriate.

17        But the second reason, Your Honor, is that when--

18  The Government is often before Your Honor and other judges in

19  this courthouse asking for permission to redact, asking to put

20  things outside the scope of discovery or perhaps to leave it

21  until moments before the trial, and it is because of our

22  concern of a defendant like Mr. Mohamadi.  And in this case it

23  is realized.

24        Mr. Mohamadi has challenged the system.  And there

25  will be other people accused of crimes who will not enjoy

28

1    early discovery because of Mr. Mohamadi.  It is, when you see

2    a defendant like this who has challenged the system and has

3    effectively subverted justice in a criminal trial for which

4    citizens were called and then tries to repeat the entire

5    process in federal court, Your Honor, I think that requires

6    the harshest of sentences.

7            It has to be understood, this is a man who is

8    bragging on a telephone call that if he is convicted, as he is

9    committing the crime, he could do the 15 years, 10 to 15 years

10   at Club Fed, Club Med and there is a recession going on, he

11   welcomes the opportunity.  So, he is boasting to his friends

12   that this is worth it.  That challenging the system and

13   beating the system is worth the risk.

14           Your Honor, it is a miracle that our victims were

15   not killed in this case.  And we were lucky, the Government

16   was lucky in this prostitution that we had the courage and the

17   caliber of witnesses that we did.

18           We would ask for the maximum sentence.

19           THE COURT:  All right, thank you.

20           Mr. Mohamadi, please come to the lectern, sir.

21           You went to trial.  You were found guilty.  You have

22   a right to appeal the sentence that I impose and the guilty

23   verdicts.  And anything that you say here today could be used

24   against you in future appellate arguments.  So, I want you to

25   know that up front.  And you must appeal within ten days,

1    notice your appeal within ten days.

2         I will hear anything you would like to say then.

3         THE DEFENDANT:  I am a little nervous, especially

4    after that dramatic and compelling argument.

5         Words cannot describe the pain and disappointment I

6    feel standing here accused and convicted of these notoriously

7    distasteful crimes.  I would have loved to apologize, I would

8    have loved to have been able to avoid the embarrassment of

9    trial and take responsibility for my actions and take a plea

10   bargain for a much lesser amount of time, but I could not and

11   cannot apologize and take blame for something I did not do.

12        But I am compelled to apologize to my family for

13   dragging their distinguished name through the dirt, especially

14   when they are such outstanding, good, decent people and they

15   truly do not deserve to be put through all that they have

16   gracefully endured.  I am truly sorry.

17        Though I am innocent of the crimes I have been

18   convicted of, there are some decisions I regret making that

19   have caused certain individuals to go to great lengths to

20   cause me harm.

21        So, I am sorry that I was not wiser and I am sorry

22   that I didn't use caution when associating with certain

23   people.  I should have took heed to my father's warning which

24   he would tell me using an all Pashtun saying, (foreign

25   language spoken by the defendant).  Which basically means that

1    when you hang out with dogs, you can expect to get fleas.

2         But some things one must experience to learn.

3    Unfortunately, I am the hard-headed type that has to learn

4    everything through experience.  Some experiences have brought

5    me joy, some have brought me pain.  Pain is a great teacher,

6    yet the greatest teacher imparts little wisdom if the student

7    does not open his eyes to see or ears to hear.

8         I learn that one must open their eyes and listen

9    carefully so that they may benefit from suffering and

10   eventually triumph over the pain and in the process become a

11   better, stronger, warmer, more compassionate, deeper and a

12   more happier human being because I realize that the ultimate

13   value of pain reduction is not comfort but growth.

14        Since a very, very young age I became crippled by

15   pain.  This pain caused me sadness, anxiety, anger, pessimism,

16   withdrawing from people, and emotional numbing and distrust.

17   But as a survivor and a fighter, I tried to cope and overcome

18   on my own and tried to keep smiling, all the while internally

19   I suffered great emotional upheaval.

20        In school I scored high grades and was placed in

21   honor classes and I excelled in sports.  But being small and

22   different caused me to become a target for bullying and

23   conflicts.  But unlike most kids, I refused to be victimized

24   and fought back.

25        When I did something wrong, I was hit.  So, I

31

1    ignorantly took that to mean I could respond with violence

2    when others violated me.  And in the blink of an eye one

3    moment of violence removed me from public school and put me in

4    an alternative school where I was exposed to everything my

5    parents tried to protect me from.

6          My parents would buy me a violin for strings

7    program.  They always supported every sport I wanted to

8    participate in.  They enrolled me in martial arts to instill

9    discipline.

10          My mother is the type of parent who put her children

11   before herself.  She would buy fabric and make her own clothes

12   while we wore designer clothes.  My parents are the best

13   parents anyone can be fortunate to have.  They did their best

14   to instill values and morals--  They did their best to instill

15   values and morals into their children.  They were very strict

16   and extremely protective.  But all of that was defeated by the

17   introduction of drugs at the alternative school that housed

18   the worst of the worst.  The mixture of drugs and my internal

19   turmoil opened up the door to the delinquent behavior

20   showcased in the arrest and imprisonment as a juvenile.

21          While being incarcerated, I realized that the

22   juvenile system was a failure.  The system had an opportunity

23   to influence these impressionable teens who were at a

24   crossroad in their life, but instead of rehabilitation,

25   received institutionalization.  Instead of being taught life

32

1    skills and vocational training or college courses, we were

2    taught survival of the fittest.  We were warehoused and

3    treated like cattle in a modern day cattle ranch where the

4    only value was the amount the facility was paid per head each

5    year.  Violence was the norm.

6            I responded to this chaos by acting up to get a

7    write-up just to be placed in isolation so I could have some

8    peace, explaining the 87 write-ups Mr. Walutes referred to.

9            I witnessed deaths of kids by abusive staff.

10   Numerous riots, assaults and deprivations.  During the

11   struggle I suddenly lost my father to a heart attack, but I

12   believe that it was because I broke his heart with

13   disappointment.

14           During this confusing period I basically turned a

15   four-year sentence into a seven-year sentence because of my

16   inability to adapt to incarceration.

17           Then I was released in 2004 and I came out with my

18   head full of dreams, heart full of hope and I put another

19   traumatic experience away deep inside and looked forward to

20   the future.  With courage and optimism and determination I

21   pursued my goals even though I encountered several barriers

22   and obstacles.

23           I can't understand why Ms. Lauder could not obtain

24   records of my college transcripts or employment when I was

25   under intensive probation and always provided pay stubs and

33

1   school transcripts to my parole officer.

2          Even with the limitations and barriers my felony

3   conviction caused, I had no problem gaining employment and

4   earning an income, but my record did stop me from serving my

5   country in the armed forces.

6          Unlike the Government's informant who all of a

7   sudden claimed he wanted to enlist in the military as a ploy

8   to take the attention off his drug dealing and drug use while

9   being employed by the ATF, my desire to serve was a sincere

10  attempt to serve and protect the great country that has given

11  so much to my family and me.  So, I wanted to stop taking and

12  I wanted to give back.

13         And my record also made me a target for false

14  arrests and false accusations, as my PSR record shows the

15  dismissal of three cases prior to this one.

16         I admit, I am no match or pose no real challenge in

17  defending myself against the attacks by the AUSA.  But, Mr.

18  Walutes, you are not just against me, you are also up against

19  Jesus because I am aware, I am one of the Lord's servants.

20  You may have won against me, but you will not win against the

21  Lord.  If you don't realize now, I hope eventually you see the

22  truth and realize and own the fact that you have prosecuted

23  and caused an innocent man to be convicted and sent to prison

24  for an extremely long time.

25         In the past you may have caused me anger, but

34

through Christ I am able to forgive you and I have no
animosity toward you and have even prayed for you.  I realize
that it is easy to love those that love you, and that the real
test is to love those that may attack or persecute you.  For
me to be able to do that, for me to be able to do that now
really is a testament to the Lord.

I assume you will stand by your word and cite the
story line of events you believe to be true and present it in
the way that you believe makes sense, but no probability
however seductive can protect us from error.

Even if all parts of a problem seem to fit together
lying pieces of jig-saw puzzle, one has to remember that the
probable need not necessarily be the truth and the truth not
always probable.

And, Mr. Walutes, despite your unfair
characterization of me, I do believe you are a decent person
and a good attorney, but winning a case does always equate to
justice and truth.  So, it's not right to be satisfied with
just exercising your ingenuity, unconcerned how far removed
that conclusion may be from the truth.

The truth is, I did not rob Haile or Riley.  The
truth is, I did not receive a fair trial.  The truth is that I
was denied my Constitutional rights.

The people that were supposed to defend me failed in
their duty.  Frank Salvato took my family's and my money and

1    did not return the unearned amount as he promised he would,

2    depriving me of the ability to retain counsel and hire experts

3    after I fired him due to his negligence and lack of

4    preparation.

5           Then the Federal Defender's Office, who were

6    crippled by Salvato's lack of preparation and continuances

7    where the Court refused to properly continue the case any

8    longer, giving them less than a month to prepare for trial,

9    where they gave me what I call a drive-thru defense where I am

10   rushed into trial with no strategy, no witnesses, no evidence,

11   no reasonable amount of cooperation with me.

12          The same as when a person rushes and gets a fast

13   food meal through a drive-thru and are able to get full in a

14   rush, but the food had no nutritional value, in this case the

15   defense represented the illusion of a defense, but in reality

16   it was a defense without any value.  They basically walked me

17   into a verbal firing squad.

18          And I am not saying the Federal Defenders are not

19   good attorneys because I believe they are very talented and

20   dedicated attorneys that perform a thankless duty to society,

21   but what I am saying is I did not receive proper

22   representation.

23          Truth be sold, I was denied a fair trial due to

24   decisions made by this honorable Court, the AUSA, law

25   enforcement, defense counsel, and me.  I am not without fault.

36

1  I have indirectly contributed to that problem.  I may have

2  panicked and made some poor decisions regarding my defense,

3  but keep in mind that I have been held in jail for an

4  extraordinarily long time under extremely oppressive

5  conditions while law enforcement placed me under duress,

6  played mind games and employed opportunist inmates to coerce

7  and creat inculpatory evidence to use against me in a case

8  that lacked sufficient evidence.

9       I cannot emphasis enough that things are not what

10 they seem and that this trial was unfair, unconstitutional and

11 that a grave injustice occurred in this courtroom.  But that

12 is a subject for appeal, and this is my final statement and I

13 will now attempt to move on from this chapter and begin a new,

14 most likely challenging chapter in my tumultuous life.

15      Thankfully my faith is unshaken despite what I have

16 endured.  I am sure and truly belief that God does not ignore

17 injustice, but will bring it to an end at his appointed time.

18 Although I have face and may continue to face many problems

19 that seem to contradict God's plan, these problems are not

20 barriers to believing in him, but opportunities to discover

21 that without God, life's problems have no lasting solution.

22      And I realize that I must not build my life on

23 perishable pursuits, but on the solid foundation of God.

24 Because when everything is taken away, I still have God, who

25 is all I really need anyway.

37

1          With that thought in mind, I should bring this to a

2   close.  Your Honor, I appreciate this opportunity to speak and

3   I wish all of you the best, and God bless.

4          THE COURT:  Well, I think you ought to embrace God

5   and hope that he gets you through this next stage in your

6   life, and I hope you will.

7          You are an extraordinarily dangerous man.  The jury

8   heard chilling testimony about the robberies and the witness

9   tampering and the use of the firearm.  And most compelling,

10  the murder for hire where they heard you telling the supposed

11  assassin that it didn't matter if the taxi driver came to the

12  door with his kids--

13         THE DEFENDANT:  Your Honor, I am familiar with the

14  details.  I mean--

15         THE COURT:  You just shoot him, shoot him, shoot

16  him, shoot him until he stops wiggling.

17         THE DEFENDANT:  That has been repeated numerous

18  times by the prosecution, I am familiar with that.

19         THE COURT:  I understand, I understand that.

20         THE DEFENDANT:  That's the whole basis of this whole

21  case.

22         THE COURT:  Okay.  And it's a chilling recitation--

23         THE DEFENDANT:  It would be chilling if you recorded

24  every defendant's testimony while they were in jail and used

25  it at trial against them in every single case.  That would be

1    chilling also.

2         THE COURT:  All right.  Well, it just shows how

3    dangerous you are.  And your statement today just shows that

4    you really have got no conscience.  You care only about your

5    own self-gratification and you will do anything necessary to

6    achieve it.

7         You committed those robberies when you were 16, and

8    I don't know whether it was six or seven, you were convicted

9    of several them.  The Criminal History category doesn't even

10   taken into account two of the robberies.

11        And I agree with Mr. Nachmanoff that you committed

12   those crimes as a juvenile, and I need to consider that.  But

13   you also look afterwards, you were given every opportunity to

14   rehabilitate yourself.  And instead, when released, you

15   violated the terms of your probation repeatedly--

16        THE DEFENDANT:  I never violated probation.

17        THE COURT:  Repeatedly you were sent back--

18        THE DEFENDANT:  Never once violated probation

19   until--

20        THE COURT:  You were repeatedly sent back because of

21   your actions when you got back into the community.  And it

22   demonstrates--

23        THE DEFENDANT:  I never violated probation, that's

24   false.

25        THE COURT:  Deterrence doesn't work.  You have your

39

1    own set of rules, your own beliefs.  You turn everything that

2    occurs into somebody trying to get back at you, and unfair,

3    and everything is unconstitutional.  Deterrence just doesn't

4    work for you because you don't operate in society the way that

5    the laws require you to operate.  You truly just operate on

6    your own set of rules.  And they make you, and you have no

7    conscience, and they make you just extraordinarily dangerous.

8            So, protection, when looking at the factors in 3553,

9    protection of our community is paramount.

10           I mean, the seriousness of the offense, they are

11   very serious offenses.

12           Deterrence, I have just indicated, I don't think

13   deterrence works.

14           The protection of our community is paramount.  A

15   sentence which allows you back into society is not going to

16   deter you from future violent crimes.  The likelihood of your

17   committing future serious crimes is 100 percent if you are

18   allowed back into this community.

19           So, the only option is to imprison you until you are

20   too old to commit further crimes.  And it's the only

21   alternative that I believe will protect the community.

22           So, you have been found guilty of Counts 1 through 4

23   and 7 through 10 by the jury.  And I have already--  And Count

24   5 by me.  And I have already entered those verdicts.  And as

25   to Counts 1, 2, 5, 9 and 10, the robberies, the armed career

40

1    criminal and the witness tampering, I am going to sentence to

2    you 180 months on each count to run concurrently with each

3    other and concurrent to Count 7.

4              Count 7, I will impose a term of 60 months to run

5    concurrent with the other counts I have just mentioned.

6              As to Count 8, I am going to impose, the murder for

7    hire, I am going to impose a sentence of 120 months to run

8    consecutive to all other counts.

9              Count 3, the first firearm offense, a sentence of

10   84 months to run consecutive to all other counts.

11             And Count 4, the second possession, use of the

12   firearm, 300 months to run consecutive to all other counts.

13             Adds up to a sentence in excess of, it's I think

14   approximately 57 years.

15             And I will impose a period of supervised release of

16   three years as to Counts 1, 2, 7, 8, 9 and 10 to run

17   concurrently.

18             And Counts 3, 4 and 5, a five-year period of

19   supervised release to run concurrently with each other and

20   concurrently with the other offenses.

21             And as a special condition of supervised release, if

22   there is any, then I will order that you receive mental health

23   treatment.

24             You're a bright guy and you're still young, and you

25   had an opportunity and you just, you blew it.  And why you

41

1    would go to commit these offenses that you did and go through

2    this process, I don't know.

3            I only can look at you and say what a shame because

4    you had an opportunity to do something good for yourself, and

5    you had an upbringing where you had a foundation to do

6    something for yourself, and you chose to go down a different

7    path.  And you have gone so far down that path now, I can't

8    trust you back in the community.  And I hope that you will

9    live in peace.

10           THE DEFENDANT:  Thank you, Your Honor.

11           THE COURT:  All right.  Anything else?

12           MR. NACHMANOFF:  Your Honor, two matters.  One, Mr.

13   Mohamadi asked me to make two requests.  One, it would be

14   unusual, but given the nature of this case, he would ask to be

15   able to have a contact visit with his daughter, supervised.

16   Northern Neck apparently can accommodate that.  I have not

17   been able to independently verify that, but I am happy to

18   check.

19           I will say that he has been able to speak with his

20   sister every two weeks for the last month or so under

21   supervision, which we appreciate the Government cooperating

22   with us to arrange that, and that seems to be going fine.  I

23   haven't heard anything negative about that.

24           So, if the Court is willing to entertain that

25   possibility, I can certainly follow up with the Marshals and

42

1    Northern Neck to see if that is possible under obviously

2    monitored conditions.

3              THE COURT:  I will be happy to receive a contact

4    from you about that when you get a response from the Northern

5    Neck officials.

6              I did not--  I omitted to state that I would

7    recommend that Mr. Mohamadi be housed at a facility close to

8    the Northern Virginia area so that he can visit with family

9    and also prepare his appeal.

10             MR. NACHMANOFF:  Thank you, Your Honor.

11             THE COURT:  All right.

12             MR. NACHMANOFF:  That was noted.  The other thing

13   that he asked me to make a request for is that he is concerned

14   about the transportation of his documents with him when he

15   goes to the Bureau of Prisons.  It does happen that, you know,

16   legal documents end up being separated from people making that

17   transition from the Marshals to the Bureau of Prisons.  In

18   this case there is an unusual amount of it and it is

19   particularly important for him to not be separated from those

20   materials.

21             To the extent the Court can enter an order or assist

22   in making sure that he has accommodation in that regard, I

23   know he would appreciate it.

24             THE COURT:  Can we have them transferred into your,

25   to your offices and then you forward them to wherever he is?

43

1   Does that work or not?

2              MR. NACHMANOFF:  Well, that would be difficult for

3   us.  We, of course, have our own extremely large file which we

4   are in the process of organizing.  And we can certainly help

5   facilitate that.

6              The other possibility is to try and get those

7   materials back to his family and then have his family get them

8   back to him when he ends up at his eventual designation.  We

9   were in the process of addressing that some weeks ago, but I

10  can follow up on that.

11             I realize that it is somewhat mysterious how and

12  when the Marshals move people to BOP and who is responsible

13  for moving what.  I certainly don't know the answer to all

14  those questions.

15             THE COURT:  Well, I can--

16             MR. WALUTES:  Your Honor, we would object to having

17  any of those materials go to his family.  I don't have a

18  problem if he wants to tape it up and then sign his name

19  across the tape to show that it hasn't been altered and then

20  he gives to the Public Defender to ship it to him.

21             I just wouldn't want--  We gave very broad discovery

22  which identifies with particulars our witnesses.  I wouldn't

23  want that to go to his family.

24             THE COURT:  All right.  I will put in a sentence

25  that says, please be mindful of the defendant's written

44

1    records and be careful to transport them with him

2    contemporaneously.  Obviously, the safest of the options is

3    that he get them to you and that you then forward them to him.

4            So, I will put it in that any records that he does

5    possess should travel with him when he is designated.

6            THE DEFENDANT:  Thank you, Your Honor.

7            MR. NACHMANOFF:  Thank you, Your Honor.  I have just

8    been handed a document.

9            We would just ask for permission to file this

10   document later.  We can do it certainly after court.  It's a

11   detention motion to clarify detention, defendant's motion to

12   clarify detention.

13           THE COURT:  All right.  I omitted to say that there

14   was $900 of special assessments in total.

15           And also that I won't impose a fine or costs of

16   incarceration because Mr. Mohamadi cannot afford to pay them.

17   All right.

18           All right.

19           MR. NACHMANOFF:  The Court's indulgence, Your Honor.

20           THE COURT:  Yes, sir.

21           MR. NACHMANOFF:  Okay.  The final issue, Your Honor,

22   and I have had many discussions with Mr. Mohamadi about this,

23   is appellate counsel and whether or not it is appropriate for

24   the Court to relieve the Office of the Federal Public Defender

25   at this time and appoint new counsel for the appeal to give

45

1   Mr. Mohamadi the opportunity to have a fresh set of eyes and a

2   fresh relationship to assist him.

3          Or if the Court wants to relieve the Office of the

4   Federal Public Defender and defer to the Fourth Circuit who

5   maintains an appellate list of CJA counsel, it can be done

6   that way too.

7          Mr. Mohamadi has been endeavoring to contact

8   attorneys about retaining counsel.  That is difficult.  It

9   involves the family and having sufficient funds, and that may

10  or may not happen.  I am not suggesting that it won't happen,

11  but it certainly is not going to happen now.  And he needs

12  someone--  We certainly can note the appeal regardless of

13  whether we remain in the case, that's our duty, and we would

14  be happy to do that.

15         In terms of who files the docketing statement, who

16  orders the transcripts, who engages in dealing with the

17  briefing schedule, you know, that needs to be known now.  And

18  then if retained counsel comes in later, that certainly could

19  be the case.

20         THE COURT:  All right.  Is that your wish, Mr.

21  Mohamadi, that new counsel be appointed?

22         THE DEFENDANT:  Yes, sir.  I have a request.  Am I

23  able to make a request for a couple of CJA attorneys, or is

24  that not possible to do?

25         THE COURT:  I think we will let the Fourth Circuit

1    designate the new--  I will relieve counsel--

2            THE DEFENDANT:  So, during that period how do I

3    communicate?  Because I am not able to do things.  Right now I

4    am communicating through counsel.

5            So, during that period how do I communicate with--

6            MR. NACHMANOFF:  We are happy to facilitate that

7    communication.  And we can certainly make sure the Fourth

8    Circuit is aware that counsel needs to be appointed.  And

9    then, of course, we will promptly communicate with new

10   counsel, provide them with everything they need, and also make

11   sure that there is communication between new counsel and Mr.

12   Mohamadi whether he is in Marshal's custody or in BOP custody

13   at that point.

14           THE COURT:  All right.  Then that answers that

15   question.  And you will file a notice of appeal.

16           MR. NACHMANOFF:  We will, Your Honor.

17           THE DEFENDANT:  Also, Your Honor, I just wanted to

18   apologize for a couple of incidents where I unintentionally

19   tried the Court's patience during this whole procedure.

20           THE COURT:  No, that's not necessary.  I understand

21   what's at stake.

22           All right, we are going to take a brief recess, and

23   we will come back with our civil docket.

24   ------------------------------------------------
                        HEARING CONCLUDED

25

1

2

3            C E R T I F I C A T E   of   C O U R T   R E P O R T E R

4

5

6          I hereby certify that the foregoing is a true and

7    accurate transcript that was prepared by me from my

8    stenographic notes.

9

10

11

12

13                              /s/ Norman B. Linnell

14                          Norman B. Linnell

15                          Court Reporter - USDC/EDVA

16                          RPR, CM, VCE, FCRR

17

18

19

20

21

22

23

24

25